1                    UNITED STATES DISTRICT COURT

2                       DISTRICT OF MASSACHUSETTS

3    _____

4    UNITED STATES OF AMERICA,

5                    Plaintiff,          Criminal Action
                                         No. 16-CR-10343-ADB
6    v.
                                         January 17, 2019
7    MICHAEL J. GURRY, RICHARD M.        Pages 1 to 48
     SIMON, SUNRISE LEE, JOSEPH A.
8    ROWAN, and JOHN KAPOOR,

9                    Defendants.

10   _____

11

12

                     TRANSCRIPT OF JURY TRIAL - DAY 1
13            BEFORE THE HONORABLE ALLISON D. BURROUGHS
                     UNITED STATES DISTRICT COURT
14               JOHN J. MOAKLEY U.S. COURTHOUSE
                        ONE COURTHOUSE WAY
15                    BOSTON, MA  02210

16

17

18

19

20

21

22
                      JOAN M. DALY, RMR, CRR
23                   Official Court Reporter
                 John J. Moakley U.S. Courthouse
24              One Courthouse Way, Room 5507
                      Boston, MA  02210
25                   joanmdaly62@gmail.com

```
 1    APPEARANCES:

 2
      FOR THE GOVERNMENT:
 3
              FRED WYSHAK
 4            K. NATHANIEL YEAGER
              DAVID G. LAZARUS
 5            Assistant U.S. Attorneys
              United States Attorney's Office
 6            John Joseph Moakley Federal Courthouse
              1 Courthouse Way
 7            Suite 9200
              Boston, Massachusetts 02210
 8            617.748.3100
              fred.wyshak@usdoj.gov
 9            nathaniel.yeager@usdoj.gov
              david.lazarus2@usdoj.gov
10

11    FOR THE DEFENDANT MICHAEL J. GURRY:

12            TRACY A. MINER
              MEGAN A. SIDDALL
13            Demeo LLP
              200 State Street
14            Boston, Massachusetts 02109
              617.263.2600
15            tminer@demeollp.com
              msiddall@demeollp.com
16

17    FOR THE DEFENDANT RICHARD M. SIMON:

18            STEVEN TYRRELL
              Weil, Gotshal & Manges LLP
19            100 Federal Street
              Boston, Massachusetts 02110
20            617.772.8365
              steven.tyrrell.com
21

22

23

24

25
```

APPEARANCES (continued):


FOR THE DEFENDANT SUNRISE LEE:

        PETER C. HORSTMANN
        Law Offices of Peter Charles Horstmann
        450 Lexington Street
        Suite 101
        Newton, Massachusetts 02466
        617.723.1980
        pete@horstmannlaw.com


FOR THE DEFENDANT JOSEPH A. ROWAN:

        MICHAEL KENDALL
        ALEXANDRA I. GLIGA
        White & Case, LLP
        75 State Street
        Boston, Massachusetts 02109
        617.939.9310
        michael.kendall@whitecase.com
        alexandra.gliga@whitecase.com


FOR THE DEFENDANT JOHN KAPOOR:

        BETH WILKINSON
        KOSTA S. STOJILKOVIC
        Wilkinson Walsh Eskovitz
        2001 M Street NW
        Washington, D.C. 20036
        202.847.4000
        bwilkinson@wilkinsonwalsh.com
        kstojilkovic@wilkinsonwalsh.com

        AARON M. KATZ
        BRIEN T. O'CONNOR
        Ropes & Gray
        Prudential Tower
        800 Boylston Street
        Boston, Massachusetts 02199
        617.951.7385
        aaron.katz@ropesgray.com
        boconnor@ropesgray.com

```
1                        P R O C E E D I N G S
2                 (The following proceedings were held in the Jury
3      Lounge before the Honorable Allison D. Burroughs, United
4      States District Judge, United States District Court, District
5      of Massachusetts, at the John J. Moakley United States
6      Courthouse, One Courthouse Way, Boston, Massachusetts, on
7      January 17, 2018.)
8                 THE CLERK:  All rise.  Court is now in session.
9      Please be seated.  This is criminal matter 16-10343, United
10     States versus Michael Gurry, et al.  Will counsel identify
11     yourselves for the record.
12                MR. WYSHAK:  Fred Wyshak for the United States.
13                MR. YEAGER:  Good morning.  Nat Yeager for the
14     United States.
15                MR. LAZARUS:  Good morning.  David Lazarus for the
16     United States.
17                MS. WILKINSON:  Good morning.  Beth Wilkinson for
18     Dr. John Kapoor.
19                MR. STOJILKOVIC:  Good morning.  Kosta Stojilkovic
20     also for Dr. Kapoor.
21                MR. KATZ:  Good morning.  Aaron Katz for
22     Dr. Kapoor.
23                MR. TYRRELL:  Good morning.  Steven Tyrrell for
24     Richard Simon.
25                MS. MINER:  Good morning.  Tracy Miner for the
```

1    defendant Michael Gurry.

2         MS. SIDDALL:  Good morning.  Megan Siddall also

3    representing Mike Gurry.

4         MR. KENDALL:  Good morning.  Mike Kendall and

5    Alexandra Gliga for Mr. Rowan.

6         MR. HORSTMANN:  Good morning.  Pete Horstmann for

7    Sunrise Lee.

8         THE COURT:  Good morning, ladies and gentlemen.  We

9    have a full house here this morning.  My name is Allison

10   Burroughs.  I am the judge assigned to preside over this

11   session for the United States District Court for the District

12   of Massachusetts, it is my pleasure to welcome you here on

13   behalf of the court as potential members of our jury.

14        I understand that you have seen a video this

15   morning that explains something of the process that we're

16   going to go through this week.  I'm going to add a few words

17   of explanation of my own.  I apologize if I repeat some

18   things that you have already seen on the video or that you

19   may already know.

20        Let me start off by telling you what kind of case

21   this is because I'm sure many of you are probably curious

22   about that.  This is a criminal case.  There are five

23   defendants, each of whose counsel is here today.  The

24   defendants, Michael Gurry, Richard Simon, Sunrise Lee, Joseph

25   Rowan and John Kapoor all held management positions at a

1    pharmaceutical company called Insys Therapeutics,

2    Incorporated, which developed and sells a fentanyl spray

3    called Subsys that has been approved by the FDA for certain

4    medical issues.

5          They are charged in engaging in a racketeering

6    conspiracy through bribes, fraud, and the illicit

7    distribution of Subsys.  Those of you who are chosen as

8    jurors will be told later what the precise charge is and what

9    the government will have to prove beyond a reasonable doubt

10    in order for you to convict any of the defendants.  But I

11    want to emphasize that the charges in this case are only

12    accusations.  They are not evidence of guilt.

13          The defendants have all pleaded not guilty and are

14    presumed innocent unless and until the government proves

15    their guilt beyond a reasonable doubt as determined by a

16    unanimous jury.  These two concepts, the presumption of

17    innocence and the requirement of much proof beyond a

18    reasonable doubt, are bedrock principles of our system of

19    justice and are fundamental rights not just of the defendants

20    in this case but of all people in it country.

21          Now, many of you are probably nervous or interested

22    about the possible commitment of time that may be required of

23    you if you are selected.  So let me talk about that next.

24    The lawyers expect that this case will take about 14 weeks to

25    try.  We will generally sit from 10:00 in the morning until

1    4:00 in the afternoon with a lunch break and a short

2    afternoon break.  On some days, and I would guess at least

3    one time each week, we will sit from 9 in the morning to 1 in

4    the afternoon with a short morning break.  You probably heard

5    about the importance of jury service from the video, but I

6    want to add a few thoughts of my own.

7            Our jury system goes back at least 800 years to

8    England and the time of middle ages.  Although much has

9    changed since then, the idea is essentially the same.  No

10   person can be convicted of a serious crime except upon the

11   unanimous vote of a jury made up of ordinary persons.  The

12   founders of our nation believe the right to a jury was so

13   important that they put it in the Constitution and the Bill

14   of Rights.

15           Juries have always been composed of ordinary

16   citizens taken from all walks of life each of whom brings

17   their own individual perspective and life experience to the

18   table.  You don't have to have any particular education or

19   experience.  What is truly important is that you take your

20   responsibilities seriously and that you you exercise your

21   authority to the best of your ability.

22           The quality of justice in the United States depends

23   on the good judgment and common sense of ordinary citizens.

24   Trial by jury is not necessarily the most efficient way to

25   decide whether someone should be convicted of a crime.  In

1    some ways it's old-fashioned, but there are things more

2    important than efficiency.  And the protection of our rights

3    is one of them.  We enjoy a great many rights and freedoms in

4    this country, and probably all of us take some of them from

5    granted from time to time.  Sometimes we have to be reminded

6    what those rights are and why they're important.

7         The jury is one of the most basic protectors of our

8    freedom.  It is fundamental to our system of justice.  It is

9    both an obligation of citizenship but also an honor and

10   privilege to serve.  If you're selected to serve, I hope that

11   you will exercise your duties responsibly, solemnly and in

12   accordance with the law.

13        You should not, however, assume that your service

14   will be burdensome.  I speak to all jurors at the end of all

15   cases, and many jurors tell me that it turns out to be one of

16   the most interesting and rewarding experiences of their

17   lives.

18        Now I want to tell you how we're going to select a

19   jury.  The parties have a right to a jury in this case that

20   can sit and decide this matter fairly and impartially.  That

21   is, both sides are entitled to a jury that does not have its

22   mind made up one way or another about any of the issues in

23   this case before they hear the evidence and have been

24   instructed by me to begin deliberations.

25        We are looking for jurors who will hear the

1    evidence in this case and decide its outcome without bias in

2    favor of or prejudice against either side, any witness, or

3    any material matter and who will base any verdict in this

4    case on the evidence presented during the course of the trial

5    and the law as I give it to you and not on anything you may

6    have heard or read or experienced outside the courtroom.

7         As I mentioned, this case involves an alleged

8    racketeering conspiracy involving a prescription fentanyl

9    spray called Subsys.  Fentanyl is an opioid.  The issue here

10   is not whether you like or dislike or have any particular

11   views about opioids.  The issue is whether you can fairly and

12   impartially determine whether the government has proved that

13   any of these defendants have violated the criminal RICO

14   racketeering statute as alleged in the indictment.

15        Your job, if you're selected for jury service in

16   this case, will be to decide the case based on the evidence

17   admitted in this case and the law as I give it to you.  The

18   purpose of this jury selection is to find a jury that can do

19   that.  It is a fundamental principle of our justice system

20   that the defendants are presumed to be innocent, and our

21   purpose today is to select a jury that comes to this trial

22   without any bias as to each side and who will decide this

23   case fairly based solely on the evidence during the course of

24   the trial and the law as I explain it to you.

25        To obtain a fair jury, we have a selection process

1    that we will soon begin.  Today you will fill out a written

2    questionnaire.  This process is not meant to be intrusive.

3    Its important purpose is to ensure that the parties have a

4    fair and impartial jury to hear this case.  Your answers to

5    both the written questionnaire and my follow up questions

6    next week must be under oath.  In other words, you must swear

7    that your answers are truthful.

8           It's very important that you give truthful

9    responses.  So I'm going to ask Karen to swear the jury pool

10   and we'll begin the selection process.

11          THE CLERK:  Can you please stand and raise your

12   right hand.

13          (Jury Panel duly sworn by the Deputy Clerk.)

14          THE CLERK:  Thank you.  You may be seated.

15          THE COURT:  All right.  What I'm going to do first

16   is I'm going to ask each of the lawyers to identify him or

17   herself, the firm that they work for and tell you again whom

18   they represent.  Once they have done that, I am going to ask

19   if any of you know any of these lawyers or have been

20   represented by any of them or their law firms.  So let's

21   start.  Want to start over here?

22          MR. WYSHAK:  Good morning.  My name is Fred Wyshak,

23   and I represent and the United States.

24          THE COURT:  Here.  Come back over here so they can

25   hear you better.

1          MR. WYSHAK:  Good morning.  My name is Fred Wyshak,
2     and I represent the United States.
3          MR. YEAGER:  Good morning.  My name is Nat Yeager,
4     and I also represent the United States.
5          MR. LAZARUS:  Good morning, ladies and gentlemen.
6     My name is David Lazarus, and I too represent the United
7     States.
8          THE COURT:  All right.  Let's switch sides.
9          MS. WILKINSON:  Good morning.  My name is Beth
10    Wilkinson, and I'm with the firm Wilkinson Walsh and
11    Eskovitz, and I represent John Kapoor.
12         MR. STOJILKOVIC:  Good morning, folks.  My name is
13    Kosta Stojilkovic with the same firm of Wilkinson, Walsh and
14    Eskovitz, and I also represent Kapoor.
15         MR. KATZ:  Good morning.  My name is Aaron Katz.
16    I'm with the law firm of Ropes & Gray, and I also represent
17    Dr. John Kapoor.
18         MR. TYRRELL:  Good morning again, ladies and
19    gentlemen.  My name is Steven Tyrrell.  I'm with the firm of
20    Weilm Gotshal & Manges.  I represent Richard Simon, and I'll
21    be joined at the trial by my colleague Patrick O'Toole.
22         MS. MINER:  Good morning, ladies and gentlemen.  My
23    name is Tracy Miner of the law firm of Demeo LLP in Boston,
24    and I have the privilege of representing Mike Gurry.
25         MS. SIDDALL:  Good morning, ladies and gentlemen.

1    My name is Megan Siddal.  I'm also from Demeo LLP on behalf

2    of Mike Gurry.

3             MR. KENDALL:  Good morning, everyone.  My name is

4    Mike Kendall.  I'm going to be trying the case along with my

5    colleague Alexandra Gliga and an intern named Larissa Brito

6    de Senna, and we work for the law firm of White & Case.

7    Thank you.

8             MR. HORSTMANN:  Good morning again, ladies and

9    gentlemen.  My name is Peter Horstmann.  I represent Sunrise

10   Lee.  I may be joined from time to time by an associate

11   counsel by the name of Anthony Manieri.  Thank you.

12            THE COURT:  Okay.  Now, any of you please raise

13   your hands if you think you know any of these lawyers or have

14   been represented by them or by their law firm.  Hold on.

15   One, two, three, four of you.  In a minute I'm going to have

16   the four of you come up here and talk to me privately.  I

17   want you to remember if you've raised your hand.  Okay?  All

18   right.  All right.

19            Next we are going to have you fill out

20   questionnaires.  It looks like you already have the

21   questionnaires in front.

22            MR. McALEAR:  Not yet.

23            THE COURT:  No.  Jim is going to pass out the

24   questionnaires.  The first two pages are instructions about

25   how to fill out the questionnaire.  So you'll read those.

1   But basically you need to fill out the form -- this is what

2   the instructions say.  You will need to fill out the form

3   without consulting anyone.  If you don't know the answer to a

4   question, don't understand it or for some reason are

5   uncomfortable answering it, you should note that on the form.

6          You need to write legibly and only on the front

7   side of pages.  You'll see there's a blank page at the end in

8   case you need to go over the space that's allocated on the

9   page.  If you use that blank page, please make sure to

10  include the number of the question that you're writing about

11  on the blank page so we can figure out what answer it is.

12         Once you answer all of the questions, you'll go to

13  the last page of the form which will require you to sign and

14  date the form, certifying you've answered the questions

15  honestly and to the best of your ability.  Some of the

16  questions have to do with your ability to serve on a jury for

17  a case this long and whether it would be a hardship.  We

18  understand that being a juror can be an inconvenience, but a

19  hardship is something well beyond an inconvenience.

20         Once you have finished the form you will give it

21  back to the jury people here, Jim and his folks.  They have

22  or will give you instructions about when to call in to see

23  when you need to come back to the courthouse.  They're here

24  to help you.  If you have any questions, I'm sure they'll be

25  able to help you out.  We will see most of you again.  In the

1    meantime, thank you for coming.  I'm going to speak to the

2    four jurors that raised their hands, and then we're going to

3    leave you to fill out the questionnaires, and we'll see you

4    back next week.

5              Those of you that are selected for this jury will

6    soon figure out that every time I address you as a group, I

7    have to give the lawyers a chance to tell me if I missed

8    anything or misstated anything or need to add anything to my

9    explanation.  Before we talk to the four people that raised

10   their hand, is there anyone that thinks -- anybody?

11             MR. WYSHAK:  No, Your Honor.

12             THE COURT:  Okay.  So Jim is going to pass out the

13   questionnaires.  Except the four of you have that raised your

14   hand, can you come on up.

15             You raised your hand that you know one of these

16   lawyers.

17             THE JUROR:  I work for Ropes & Gray.  I didn't know

18   if that counted.  I'm an accountant.  I'm not a lawyer.  I'm

19   an accountant.  So I sit on the second floor away from

20   everyone.

21             THE COURT:  Do you have a juror number?

22             THE JUROR: It's 101854068.

23             THE COURT:  You can take your seat.

24             MR. KENDALL:  That's no problem, Fred.

25             THE COURT:  Do you want to let her go?

```
1                MR. WYSHAK:  Yes.

2                THE COURT:  She's excused.  I wrote down the

3       number.  She doesn't need to fill out the form.  Okay.

4                Hi.  You raised your hand about knowing one of

5       these lawyers.

6                THE JUROR:  I don't know him personally, but I've

7       worked for the law firm, Ropes & Gray.

8                THE COURT:  Do you work for them now?

9                THE JUROR:  I don't.

10               THE COURT:  What did you do?

11               THE JUROR:  I worked in practice acquisition,

12      employment law, and we had retained them as representing our

13      firm.

14               THE COURT:  Where do you work.

15               THE JUROR:  New Hampshire Massachusetts Dental

16      Practice and they represent --

17               THE COURT:  You're a dentist?

18               THE JUROR:  Correct.

19               THE COURT:  They have represented you?

20               THE JUROR:  Employment law and our practice

21      acquisitions.

22               THE COURT:  Do they still represent you?

23               THE JUROR:  No.

24               THE COURT:  How long ago did they represent you?

25               THE JUROR:  Two years ago.
```

```
 1              THE COURT:  Why don't you give me your juror number
 2      as well if you have it.
 3              What's your view?
 4              MR. WYSHAK:  Probably should let him go.  Has a
 5      business relationship.
 6              THE COURT:  Former relationship.  What is your
 7      position?
 8              MR. KATZ:  It's a totally separate practice.
 9      Obviously it's up to Your Honor.
10              THE COURT:  He might sort of interview Ropes & Gray
11      for credibility.
12              Not the summons.  Do you have another piece of
13      paper?
14              MS. MINER:  It might be the 101 number in front.
15              THE COURT:  Thank you.  101836373.  I'm going to
16      let him go.  He can go, too, Karen.  Next.
17              THE JUROR:  Good morning.
18              THE COURT:  How are you?
19              THE JUROR:  I'm good.
20              THE COURT:  You raised your hand that you know one
21      of these lawyers.
22              THE JUROR:  Actually Demeo Associates I heard.
23      Joseph Demeo is a very close personal friend.  I didn't know
24      if that had any sort of --
25              MS. MINER:  He's the named partner in our firm.
```

```
 1              THE COURT:  Do you have your juror number with you?

 2              THE JUROR:  Yes, I do.  I wrote it down.  I don't

 3     have the sheet.  101843232.

 4              THE COURT:  Okay.  Thanks very much.

 5              THE JUROR:  Thank you.

 6              THE COURT:  He's gone, too.

 7         How are you?

 8              THE JUROR:  Good, thank you.

 9              THE COURT:  Do you know one of these lawyers?

10              THE JUROR:  I don't know any of the lawyers.  But I

11     was represented, involved with Ropes & Gray a number of years

12     ago.  I was a graduate student at Brandeis.  And one of the

13     professors had been accused of inappropriate behavior with an

14     undergraduate, and he had been inappropriate with me.  But I

15     went later, and I was 30, and I said get away from me, among

16     other things.

17              THE COURT:  Good for for you.

18              THE JUROR:  I didn't have a problem, but he then

19     was -- he wasn't fired, but he was put on leave.  And I don't

20     know what happened to him eventually.  But I had to be

21     interviewed.  I brought actually a friend of mine who is a

22     lawyer with me to the interview.  That's my contact with

23     Ropes & Gray.

24              THE COURT:  Which one of those people was from

25     Ropes & Gray?  The person that went with you or the person
```

1   that interviewed you?

2           THE JUROR:  The person that interviewed me.  Ropes

3   & Gray was representing Brandeis.  So I was part of that.

4           THE COURT:  How long ago was that?

5           THE JUROR:  Probably 1980.

6           THE COURT:  Is there anything about that experience

7   that you think would affect your ability to listen to all the

8   lawyers fairly in this case?

9           THE JUROR:  No, I don't think there is.  But I did

10  have contact, so I figured I'd better say something.

11          THE COURT:  Okay.  Can I have your juror number,

12  that 101 number.  101839416.  You can take your seat.  Thank

13  you.

14          MR. WYSHAK:  She's fine.

15          THE COURT:  She's fine.  Next one, Karen.

16          Hi.  You raised your hand about knowing one of

17  these lawyers or being represented by their firm?

18          THE JUROR:  The firm of Ropes & Gray has served as

19  bond counsel for a former employer of mine.

20          THE COURT:  Did you have direct interaction

21  yourself with the lawyers of Ropes & Gray?

22          THE JUROR: Yes.  With the attorneys.

23          THE COURT:  What kind of job were you in?

24          THE JUROR:  Municipal finance.

25          THE COURT:  Are you a lawyer or not a lawyer?

1            THE JUROR:  No.

2            THE COURT:  You're no longer in that job?

3            THE JUROR:  Not with that employer.  In the same

4    line of work.

5            THE COURT:  How long ago did you leave that

6    employer?

7            THE JUROR:  13 years ago.

8            THE COURT:  How much contact did you have with

9    Ropes & Gray during the time that you were there?

10           THE JUROR:  Well, multiple times a year.  Probably

11   not monthly, but maybe once a quarter.

12           THE COURT:  It was a long time ago and they're a

13   former employer.  Was there anything about your interaction

14   with Ropes & Gray attorneys that you think you would view

15   what they say with more or less credibility than any other

16   lawyer here?

17           THE JUROR:  No.  Not necessarily.  They did a good

18   job.

19           THE COURT:  All of these lawyers are going to do a

20   good job.

21           THE JUROR:  I understand that.

22           THE COURT:  Do you start off with any

23   predisposition in favor of the Ropes & Gray attorney versus

24   any other attorney?  You could listen to all the evidence

25   fairly regardless of who is asking the question?

1           THE JUROR:  Yes.

2           THE COURT:  Thanks very much.  You can take your

3    seat.  I'm sorry.  I need your juror number.

4           THE JUROR:  101831839.

5           THE COURT:  She's okay, right?

6           MR. WYSHAK:  Yes.

7           THE COURT:  She's fine.  The last two are fine.

8    The first three are gone, and the last two are fine.  Why is

9    this line getting longer?

10          MS. MINER:  It keep growing.

11          THE JUROR:  Hi.  Good morning.

12          THE COURT:  You know one of these lawyers or been

13   represented by their firm?

14          THE JUROR:  I don't know any of these lawyers

15   personally, but I work for Microsoft.  And Ropes & Gray is a

16   customer of ours, and I work very closely with our customers

17   here in the Boston area on a regular basis.

18          THE COURT:  When you say you "work closely".

19          THE JUROR:  Our account teams that represent the

20   accounts of which Ropes & Gray is one.

21          THE COURT:  Do you have interaction with Ropes &

22   Gray attorneys yourself?

23          THE JUROR:  Not directly, no.

24          THE COURT:  Who are your contacts with?  Not by

25   name but by position.

```
 1              THE JUROR:  I work for Microsoft Corporation.  We
 2     have an account team that represents the work that we do
 3     together with Ropes & Gray.  I have specialize in artificial
 4     intelligence.  There's a lot of AI going on in professional
 5     services and legal space.  So I'm a little concerned about
 6     the conflict of interest given that they are a customer.
 7              THE COURT:  Okay.  Why don't you -- first let me
 8     have your juror number.  Come over here so Joan gets it.
 9              THE JUROR:  101839301.
10              THE COURT:  Just step back for a second.
11              MR. WYSHAK:  I think if there's a current business
12     relationship.
13              MS. WILKINSON:  I think she should go.  She said it
14     herself.
15              THE COURT:  Yes.
16              You know one of these lawyers or their law firm?
17              THE JUROR:  Not very well, but I believe I went to
18     college with Mr. Lazarus and we may have some mutual friends.
19              THE COURT:  Did he go to college?
20              MS. WILKINSON:  Typically.  He knows who you are.
21              THE COURT:  Do you know her?
22              MR. LAZARUS:  It's been a long time, but she looks
23     familiar.
24              THE COURT:  I hate to ask you, but when did you
25     graduate from college?
```

1          THE JUROR:  1999.

2          THE COURT:  What college did you go to?

3          THE JUROR:  Colgate.

4          THE COURT:  My niece just graduated from Colgate.

5    The important part of this is that you be able to listen to

6    what all the lawyers say with the same kind of fairness.  Do

7    you think that if it's coming out of Mr. Lazarus' mouth that

8    you would give it credibility beyond what you would give to

9    what comes out of the mouth of any of these other lawyers?

10         THE JUROR:  I still think I could probably be fair.

11         THE COURT:  You think you could probably be fair.

12   I need to push you a little harder on that.  It doesn't sound

13   like you guys really know each other.

14         THE JUROR:  Not real well, no.

15         THE COURT:  When you say you have mutual friends,

16   are these people that you see a lot?

17         THE JUROR:  Couple times a year.

18         THE COURT:  Do you think if you're chosen for this

19   jury in this case you could -- you wouldn't need to avoid

20   seeing those people, but you would need to avoid talking

21   about the case.

22         THE JUROR:  Okay.

23         THE COURT:  Have you had any interaction with him

24   since you graduated?

25         THE JUROR:  No.

```
 1              THE COURT:  Why don't you go ahead and step back.
 2     I need her jury number.
 3              THE JUROR:  101841488.
 4              MR. TYRRELL:  Can we ask Mr. Lazarus how he behaved
 5     in college?
 6              THE COURT:  He has no idea who she is.
 7              MR. LAZARUS:  We can excuse her.
 8              MR. KENDALL:  Your Honor, it's a small school.
 9     It's an intimate, friendly school.
10              THE COURT:  He has no idea who she is.
11              MR. HORSTMANN:  Don't answer any of these
12     questions.
13              MR. TYRRELL:  I think he does.
14              MS. WILKINSON:  He wishes he didn't.
15              THE COURT:  She can be excused.  We'll excuse her
16     because she knows some of these other people well.  Why did
17     four people raise their hand?
18              THE JUROR:  Good morning.
19              THE COURT:  Do you know one of these lawyers or
20     their law firm?
21              THE JUROR:  I don't know these lawyers personally,
22     but my brother-in-law works as an Assistant U.S. Attorney,
23     and I believe it's in this division.
24              THE COURT:  What's his name?
25              THE JUROR:  Bill Brady, William Brady.
```

```
1            MR. YEAGER:  I'm his boss.
2            THE COURT:  He's the boss man.  Boss man and boss
3    baby.  She is 101857225.  Thanks very much.
4            THE JUROR:  Thank you.
5            THE COURT:  She's gone.
6            Good morning.  Let's get her number first since she
7    just handed it to me.  It's 101859670.  Here you go.  And you
8    know one of these lawyers or their law firm?
9            THE JUROR:  My sister-in-law works in this building
10   as a federal prosecutor.  She does wiretapping and vice and
11   drugs.
12           THE COURT:  Who is she?
13           THE JUROR:  Ann Taylor.
14           THE COURT:  I knew you were going to say that.
15           THE JUROR:  I wasn't sure.  It seemed like it might
16   be relevant.
17           THE COURT:  She's gone.
18           THE JUROR:  Hi.
19           THE COURT:  Give me your number.  101847856.
20           THE JUROR:  You had mentioned if I've ever een
21   represented by any of the law firms but I recognize them.
22   Ropes & Gray, I know a number of people that work there.  I
23   don't know if that means anything.  But Demeo, is it Demeo
24   and Associates?
25           THE COURT:  Yes.
```

1          THE JUROR:  I managed the building they reside in.

2          MS. MINER:  At 200 State?

3          THE JUROR:  No.  Lewis Wharf.

4          MS. MINER:  The prior location.

5          THE COURT:  Are you a lawyer?

6          THE JUROR:  No.

7          THE COURT:  When you say you know people at Ropes &

8    Gray.

9          THE JUROR:  I know people who work there just from

10   clients.

11         THE COURT:  And you managed their former office

12   space?

13         THE JUROR:  Yeah.

14         THE COURT:  The question is, these relationships

15   with people that work at Ropes & Gray are all in your

16   professional capacity.

17         THE JUROR:  Right.

18         THE COURT:  It's not personal?  You don't

19   socialize?

20         THE JUROR:  No.

21         THE COURT:  The question is, I guess depending on

22   whether they're good tenants or bad tenants, but the question

23   is Ropes & Gray is obviously going to do some of the talking

24   here, but there's a lot of other lawyers that are going to do

25   talking from both sides of the fence.  The question is

1    whether you would give any additional credibility to

2    something just because it came out of the mouth of a Ropes &

3    Gray lawyer.

4            THE JUROR:  I don't think so.  I'm more wanted to

5    just disclose that, I guess.  I'll write it on my form.

6            THE COURT:  You did the right thing to come up.

7    You can take your seat.  Why does this line keep growing?

8    He's fine, right?

9            MR. WYSHAK:  Yes.

10           THE JUROR:  Hello.

11           THE COURT:  As long as you have that in your hand,

12   let's get your number.  He is 101863048.  How come we start

13   off with four, and you're number 11?

14           THE JUROR:  Sorry.  Clarifying question.

15           THE COURT:  Lucky number 11.

16           THE JUROR:  This is a clarifying question.  When

17   you say know the lawyers, is it awareness of them in a high

18   profile case, having known that they represented a defendant

19   in a high profile case as far as knowing them?

20           THE COURT:  Flesh that out for me.

21           THE JUROR:  I'm just aware that one of the lawyers

22   represented a high profile person.

23           THE COURT:  Which lawyer?

24           THE JUROR:  Ms. Miner.

25           THE COURT:  Represented who?

1          THE JUROR:  John Connolly.

2          THE COURT:  The question is there's going to be a

3    lot of lawyers speaking in this case, a lot of voices.

4    You're supposed to start off with a neutral slate.  You're

5    not supposed to accept something as it comes out of Ms.

6    Miner's mouth or reject it just because it comes out of

7    Mr. Kendall's mouth.  Obviously if she was related to you,

8    you might take what she says as more credible than what comes

9    out of a stranger's mouth.

10          So because you have read her name in the newspaper

11    and know that she's represented someone, at least one high

12    profile client, would you evaluate what she says any

13    differently than you would evaluate what any of the other

14    lawyers say.

15          THE JUROR:  No.

16          THE COURT:  Okay.  Thanks very much.

17          MR. WYSHAK:  Can I ask a question.  Does he know

18    Connolly?  Is he from South Boston?

19          THE COURT:  I don't think he knows Connolly, but

20    the geography we'll sort out on his questionnaire.

21          Come back forward.  The Connolly case, were you

22    following it for any particular reason or are you just a

23    newspaper reader?

24          THE JUROR:  Newspaper reader.

25          THE COURT:  Do you know John Connolly?

1          THE JUROR:  I don't know him personally.

2          THE COURT:  Did you know anybody associated with

3    that case?

4          THE JUROR:  No, I did not.

5          MR. WYSHAK:  Okay.  That's fine.

6          THE COURT:  That's what your peremptories are for.

7          MR. KENDALL:  He didn't know you, Fred.

8          THE COURT:  We're done.  We're going to leave, Jim.

9          MR. McALEAR:  Thank you, Your Honor.

10          (End of session.)

11          ***********************

12          THE CLERK:  All rise.  Court is now in session.

13    This is criminal matter 16-10343, United States versus

14    Michael Gurry.  Will counsel identify yourselves for the

15    record.

16          MR. WYSHAK:  Fred Wyshak for the United States.

17          THE CLERK:  You can be seated.  Sorry.

18          MR. LAZARUS:  Good afternoon, everybody.  I'm David

19    Lazarus also on behalf of the United States.

20          MR. YEAGER:  Good afternoon.  Nat Yeager also for

21    the United States.

22          MS. WILKINSON:  Hello.  I'm Beth Wilkinson on

23    behalf of John Kapoor.

24          MR. STOJILKOVIC:  Good afternoon.  Kosta

25    Stojilkovic also on behalf of John Kapoor.

1          MR. KATZ:  Good afternoon.  Aaron Katz on behalf of

2   John Kapoor.

3          MR. TYRRELL:  Good afternoon.  I'm Steven Tyrrell,

4   and I represent Richard Simon.

5          MS. MINER:  Good afternoon.  Tracey Miner on behalf

6   of Michael Gurry.

7          MS. GLIGA:  Good afternoon.  I am Alexandra Gliga

8   and together with Mike Kendall we represent Joseph Rowan.

9          MR. HORSTMANN:  Pete Horstmann on behalf of Sunrise

10  Lee.

11         THE COURT:  Good afternoon, ladies and gentlemen.

12  My name is Allison Burroughs.  I'm the judge assigned to

13  preside over this session of the United States District Court

14  for the District for the District of Massachusetts.  It's my

15  pleasure to welcome you on behalf of the Court as potential

16  members of our jury.

17         You were supposed to have seen a videotape before

18  you sat down this morning.  In the interest of time, you have

19  not seen a videotape.  You may see it later on in these

20  proceedings.  This video will indicate what your

21  responsibilities as a juror were.  So normally I say, I know

22  you've seen the video, and I apologize if I'm going to repeat

23  some of what you already saw.

24         Now, for the first time ever, I'm not at risk of

25  repeating myself.  So I'm going to begin by telling you what

kind of case this is because I'm sure that many of you are curious about that.

It is a criminal case. There are five defendants each of whose counsel is here today. The defendants, Michael Gurry, Richard Simon, Sunrise Lee, Joseph Rowan and John Kapoor all held management positions at a pharmaceutical company called Insys Therapeutics, Incorporated, which developed and sells a fentanyl spray called Subsys that has been approved by the FDA for certain medical uses.

They are charged with engaging in a racketeering conspiracy through bribes, fraud, and the illicit distribution of Subsys. Those of you who are chosen as jurors in this case will be told later what the precise charge is and what the government has to prove beyond a reasonable doubt in order for you to convict the defendants.

But I want to emphasize that the charges in this case are only accusations. They are not evidence of guilt. The defendants have all pleaded not guilty and are presumed innocent unless and until the government proves their guilt beyond a reasonable doubt as determined by a unanimous jury. These two concepts, the presumption of innocence and the requirement of proof beyond a reasonable doubt, are bedrock principles of our system of justice and are fundamental rights, not just of the defendants in this case, but of all people in this country.

1          Many of you are probably nervous or at least

2   curious about the possible commitment of time that may be

3   required of you if you're selected.  Let me talk about that

4   next.  The lawyers expect this case will take about 14 weeks

5   to try.  We will generally sit from 10 in the morning until 4

6   in the afternoon with a lunch break and a short afternoon

7   break.

8          On some days, and my guess is that would be at

9   least one time per week, we'll sit from 9 in the morning

10  until 1 in the afternoon with a short morning break.  Had you

11  seen the video you would have already heard about the

12  importance of jury service.  Since you haven't seen the

13  video, I'm going to expand on that.  Even if you had seen the

14  video, I would still have expanded on it.

15         The jury system goes back at least 800 years to

16  England and the time of the middle ages.  Although much has

17  changed since then, the idea is essentially the same.  No

18  person can be convicted of a serious crime except upon

19  unanimous vote of a jury made up of ordinary citizens.  The

20  founders of our nation believed the right to a jury was so

21  important they put it in the Constitution and the Bill of

22  Rights.

23         Juries have always been composed of ordinary

24  citizens taken from all walks of life each of whom brings

25  their own individual perspective and life experience to the

table.  You don't have to have any particular education.  You
don't have to have any particular experience.  What is truly
important is that you take your responsibilities seriously,
and that you exercise your authority to the best of your
ability.

The quality of justice in the United States depends
and has always depended on the good judgment and common sense
of ordinary citizens.  Trial by jury is not necessarily the
most efficient way to decide whether someone should be
convicted of a crime.  In some ways it's old-fashioned.  But
there are things more important than efficiency, and
protections of our rights is one of them.  We enjoy a great
many rights and freedoms in this country, and probably some
of us take them for granted from time to time.  Sometimes we
have to be reminded what those rights are and why they're
important.

The jury is one of our most basic protectors of our
freedom.  It is fundamental to our system of justice.  It is
both an obligation of citizenship and an honor and privilege
to serve.  If you're selected to serve, I hope you will
exercise your duties responsibly, solemnly and in accordance
with the law.  You should not, however, assume that your
service will be burdensome.  I speak to all jurors at the end
of every case, and I am told more times than you can imagine
how many jurors find out that this turns out to be one of the

1    most interesting and rewarding experiences of their lives.

2            I now want to tell you how we're going to go about

3    selecting a jury.  The parties have a right to a jury in this

4    case that can sit and decide this matter fairly and

5    impartially.  That is, both parties are entitled to a jury

6    that does not have its mind made up one way or another about

7    any issues in this case before they hear the evidence and

8    have been instructed by me to begin deliberations.

9            We're looking for jurors who will hear the evidence

10   in this case and decide its outcome without bias in favor of

11   or prejudice against either side, any witness, or any

12   material matter, and who will base any verdict in this case

13   on the evidence presented during the course of the trial and

14   the law as I give it to you and not on anything you may have

15   heard or read or experienced outside the courtroom.

16           As I mentioned, this case involves an alleged

17   racketeering conspiracy involving a prescription fentanyl

18   spray called Subsys.  Fentanyl is an opioid.  The issue here

19   is not whether you like or dislike or have any particular

20   views about opioids.  The issue is whether you can fairly and

21   impartially determine whether the government has proved that

22   any of these defendants have violated the criminal

23   racketeering or RICO statute as alleged in the indictment.

24           Your job, if you're selected for jury service in

25   this case, will be to decide the case based on the evidence

1    admitted in the case and the law as I give it to you.  The

2    purpose of this jury selection is to find a jury that can do

3    that.  It is a fundamental principle of our justice system

4    that the defendants are presumed to be innocent, and our

5    purpose today is to select a jury that comes to this trial

6    without any bias as to either side and who will decide this

7    case fairly based solely on the evidence presented during the

8    course of the trial and the law as I explain it to you.

9         To try and attain this fair jury we have a

10   selection process that we're going to begin today.  Today you

11   will fill out a written questionnaire that will be passed out

12   to you as soon as I finish up here.  There will then likely

13   be followup questions in person next week.  This process is

14   not meant to be intrusive.  Its important purpose is to

15   ensure that the parties have a fair and impartial jury to

16   hear this case.

17        Your answers to both the written questionnaire

18   today and my followup questions next week must be under oath.

19   In other words, you have to swear that the answers that you

20   give today or in person are truthful.  It's very important

21   that you give truthful responses.  So I'm going to ask Karen

22   to please swear you in, and we'll begin the jury selection

23   process.

24        THE CLERK:  Can you all please stand and raise your

25   right hand.

```
1              (JURY PANEL duly sworn by the Deputy Clerk.)

2         THE CLERK:  Thank you.  You may be seated.

3         THE COURT:  What I'm going to do first is I'm going

4    to ask each of the lawyers to identify him or herself, the

5    firm that they work for, and to tell you who they represent.

6    Once they have done that, I'm going to ask if any of you know

7    any of the lawyers or have been represented by them or by

8    their law firms.

9              All right.  Do you want to start?  We had another

10   group this morning.  They complained they couldn't hear in

11   the back of the room unless they were speaking in the

12   microphone.  That's why they're coming up here.

13        MR. WYSHAK:  Good afternoon.  My name is Fred

14   Wyshak.  I'm an Assistant U.S. Attorney representing the

15   government in this case.

16        MR. LAZARUS:  Good afternoon again.  My name is

17   David Lazarus.  I'm also an Assistant United States Attorney

18   representing the United States in this case.

19        MR. YEAGER:  Good afternoon.  My name is Nat

20   Yeager.  I'm an Assistant United States Attorney.

21        THE COURT:  All these microphones.  I feel like I'm

22   in the White House.

23        MS. WILKINSON:  I'm glad you're not.  Good

24   afternoon.  I'm Beth Wilkinson, and I represent Dr. Kapoor.

25   And I'm at my own firm called Wilkinson Walsh and Eskovitz.
```

1          MR. STOJILKOVIC:  Good afternoon.  My name again is

2    Kosta Stojilkovic, and I'm at the same firm of Wilkinson

3    Walsh Eskovitz representing Dr. Kapoor.

4          MR. KATZ:  Good afternoon.  I'm Aaron Katz also

5    representing Dr. Kapoor.  I'm with the law firm of Ropes &

6    Gray.

7          MR. TYRRELL:  Good afternoon again.  My name is

8    Steven Tyrrell.  I'm a partner at the law firm of Weil,

9    Gotshal & Manges.  And I'll be joined in representing

10   Mr. Simon by my partner at the law firm Patrick O'Toole.

11         MS. MINER:  Good afternoon.  My name is Tracy

12   Miner.  I work at the law firm of Demeo LLP.  And my

13   associate Megan Siddall may be here from time to time during

14   the trial as well.

15         MS. GLIGA:  Good afternoon.  My name is Alexandra

16   Gliga and together with Michael Kendall from White & Case

17   case we represent Joseph Rowan.

18         MR. HORSTMANN:  Good afternoon.  My name is Pete

19   Horstmann.  I represent Sunrise Lee.  And I may be joined

20   from time to time by Anthony Manieri who is also an attorney.

21         THE COURT:  Okay.  Now, could you please raise your

22   hand if you think that you know any of these lawyers, anyone

23   from the U.S. Attorney's Office, or you've worked with the

24   U.S. Attorney's Office or anyone been represented or know

25   anyone at their law firms.  Okay.  One, two, three, four.

1      Okay.  The four of you, I want you to remember that you
2      raised your hands.  When this is over as the others start
3      filling out the questionnaires, I'll talk to you up here in a
4      minute.
5              Is your hand still raised?  Different question or
6      same question?
7              THE JUROR:  Same question.
8              THE COURT:  I should say put your hands down.  Just
9      remember that you raised them.  Once we've all talked to
10     those four parties that raised their hands, you will fill
11     out -- we're going to leave you, and you will fill out
12     questionnaires.  A few words about the questionnaires.  The
13     first two pages are instructions about how to fill out the
14     questionnaire.  Please read the instructions.
15             Here's a summary of the instructions for you.  You
16     need to fill out the form without consulting anyone.  If you
17     don't know the answer to a question, don't understand it or
18     are for some reason uncomfortable answering the question, you
19     should note that on the form.  You need to write legibly and
20     only on the front page -- only on the front side of each
21     page.
22             There's a blank page at the end in case you don't
23     have enough room for one of the questions on the form.  If
24     you go over to that back page, that blank back page, make
25     sure you put the question number you're responding to so we

1  can see which question it is that you followed on that extra

2  page.  Once you've answered all the questions, you'll see

3  there's a place for you to sign and date the form.  That's a

4  certification that you answered the questions honestly and to

5  the best of your ability.

6         Some of the questions have to do with your ability

7  to serve on a jury for a case this long and whether it would

8  be a hardship.  We understand that jury service can be an

9  inconvenience.  A hardship is something well beyond an

10  inconvenience.

11         Once you finish the form, you'll give it back to

12  Jim or one of his people.  They have or will give you

13  instructions about whether to call in to see when you need to

14  come back to the courthouse.  They're here to help you.  So

15  if you have any questions when you're filling out the form,

16  just ask them.  I'm sure they'll be able to help you out.  We

17  will see most of you next week.

18         Those of you who are selected for this jury, will

19  soon figure out that every time I speak to you, the parties

20  get a chance to tell me what I have said wrong or misspoken

21  or otherwise screwed up.  So anything?

22         MR. LAZARUS:  No, Your Honor.

23         THE COURT:  Okay.  Those four that raised their

24  hand, come on up.  The rest of you, the questionnaires are

25  going to be passed out.  I want to thank you all for coming,

1    and we'll see you again next week.

2              MR. LAZARUS:  Your Honor, I did notice that the

3    individual we discussed before did not stand or take the

4    oath.

5              THE COURT:  I noticed the exact same thing.

6              MR. LAZARUS:  Because of that, we would move for

7    cause.

8              THE COURT:  Will you figure out his number and let

9    him go?

10             THE CLERK:  Yes.

11             THE COURT:  Come on up.  Do you have your juror

12   number handy, that piece of paper.  Let's see.  This is

13   101840803.  Okay.  You raised your hand because you know

14   someone or have been represented.

15             THE JUROR:  My girlfriend four years ago I think

16   worked at Ropes & Gray.

17             THE COURT:  Your girlfriend works for Ropes & Gray,

18   four years ago worked for Ropes & Gray or your girlfriend of

19   four years ago?

20             THE JUROR:  No.  Currently my girlfriend.  I think

21   she worked at Ropes & Gray.  I can't remember exactly.  She

22   worked at two law firms in Boston.

23             THE COURT:  Does she still work for Ropes & Gray?

24             THE JUROR:  No.

25             THE COURT:  Does she still work at a law firm?

1          THE JUROR:  No.

2          THE COURT:  What does she do now?

3          THE JUROR:  She works at a private school in New

4    Hampshire.

5          THE COURT:  What is she doing?

6          THE JUROR:  Admissions.

7          THE COURT:  Based on your conversations with her,

8    do you have any strong feelings about Ropes & Gray one way or

9    the other?

10         THE JUROR:  No.

11         THE COURT:  If you're selected as a juror in this

12   case, could you refrain from talking to her about Ropes &

13   Gray?

14         THE JUROR:  Yes.

15         THE COURT:  You can step back.  He's fine.

16         Can I copy down your number?  101833346.  You

17   raised your hand because you know any these lawyers or their

18   law firms?

19         THE JUROR:  Well, "know" is probably too strong a

20   word, but I'm familiar with two of the attorneys.  I don't

21   even know if we've ever met.  Attorney Miner and also

22   Attorney Kendall.  And so I don't even know if we've ever met

23   in person, but I know that I have emailed with both of them

24   in my professional capacity.

25         THE COURT:  What is your profession?

1          THE JUROR:  I am a law professor at Boston College.

2          THE COURT:  What do you teach out of curiosity?

3          THE JUROR:  In the criminal law field.

4          THE COURT:  As long as I have you standing here,

5     let me just ask you, is there anything about -- you're

6     obviously familiar with parts of this process.

7          THE JUROR:  Yes.

8          THE COURT:  Do you have any reservations about

9     sitting as a fair and impartial juror in this case?

10          THE JUROR:  No.

11          THE COURT:  Is there anything about your dealings

12    with Ms. Miner and Mr. Kendall that leaves you predisposed to

13    accept their credibility without analysis or reject their

14    credibility without analysis?

15          THE JUROR:  No.

16          THE COURT:  Thanks very much.  You can step back as

17    well.  She's okay.  Next.

18          Can I copy down your juror number?  So this is

19    101832206.  And you raised your hand as knowing one of these

20    lawyers or their law firms.

21          THE JUROR:  A friend from elementary school is a

22    partner at Ropes & Gray.

23          THE COURT:  That means they were your friend in

24    elementary school or still are your friend?

25          THE JUROR:  Still is.

```
 1              THE COURT:  An old friend of yours is --
 2              THE JUROR:  We don't like to characterize ourselves
 3   as old.
 4              THE COURT:  A longstanding friend.
 5              THE JUROR:  Longstanding friend, right.
 6              THE COURT:  That is why everybody likes to talk to
 7   me after I talk.  I have all these corrections that need to
 8   be made by my inartfully phrasing things.  How close a
 9   friend?  I know longstanding but how close?
10              THE JUROR:  I don't know.  Maybe, our families, we
11   grew up together.  We've played together.
12              THE COURT:  How often do you see each other now?
13              THE JUROR:  Now not that often.  Only if something
14   is a major family event like if somebody in the family is
15   being honored.
16              THE COURT:  And how often do you speak?
17              THE JUROR:  Rarely.
18              THE COURT:  What's the partner's name?
19              THE JUROR:  Larry Rowe.
20              THE COURT:  Is there anything about your
21   relationship with him that would make you give more
22   credibility to something that came out of the mouth of a
23   Ropes & Gray lawyer than it would out of any other defense
24   lawyer or government lawyer?
25              THE JUROR:  I don't think so, no.
```

1           THE COURT:  Okay.  You can step back.

2           MR. WYSHAK:  Fine.

3           MR. KATZ:  Fine.

4           THE COURT:  Here's this.

5           This morning four people raised their hand and they

6    turned into 11.  Four people raised their hand here and

7    stopped right at four.

8           THE JUROR:  That's pretty good.

9           THE COURT:  104846957.  And you raised your hand

10   because you know one of these people or their law firms?

11          THE JUROR:  I do not.  I know the firms.  I work at

12   an investment fund.  We do hire these firms to represent us

13   as creditors.  I've also dealt with them also on the other

14   side as debtors but nothing in the criminal capacity.

15          THE COURT:  Is there anything about your

16   relationship with any of the law firms here that would make

17   you give more credence to something that came out of one of

18   these people's mouths or that would make you more skeptical

19   about something because of your interactions with the firms?

20          THE JUROR:  No, it would not.

21          THE COURT:  Do you want to know which firms he's

22   referring to?

23          MR. TYRRELL:  Yes.

24          THE JUROR:  Ropes & Gray, we have a retainer to

25   review credit agreements and bond indenture.  And White &

1    Case, I spoke to them yesterday about a potential

2    representation in a creditor matter is really what that

3    relates to.

4              THE COURT:  When you had these conversations with

5    these law firms, are you the one that has the conversations?

6              THE JUROR:  Yes.

7              THE COURT:  Are you retaining White & Case for that

8    matter?

9              THE JUROR:  No.  We're leaning towards another one.

10   Anyway.

11             THE COURT:  Is Ropes & Gray currently representing

12   you on something?

13             THE JUROR:  Personally in my particular area of

14   coverage, no.  But at Eaton Vance where I work, they are

15   constantly involved in various matters.  We have them on

16   retainer for deals that they come to review from a legal

17   standpoint, having outside counsel review deals.

18             THE COURT:  You can step back.

19             MR. WYSHAK:  I think we have to challenge him.

20             THE COURT:  I think that's fair.  He's gone.

21             So you'll get his number.

22             THE CLERK:  Yes.

23             THE COURT:  While we're still here on the record,

24   who is taking responsibility for the witness list?

25             MR. YEAGER:  Do you want to combine those?  I'm

1    happy to do that.

2              THE COURT:  It would be nice to have a combined

3    one.  We'll make people give them back after we talk to them.

4    We don't need 300 of them.  If you can put together a list

5    we'd be happy to copy it.  But it would be great if somebody

6    else would put together the list.

7              MR. YEAGER:  We're happy to put it together.

8              THE COURT:  What about the voir dire questions?

9              MS. WILKINSON:  Maybe we should review and meet and

10   confer.

11             THE COURT:  Do you want to come up to the courtroom

12   this afternoon?  Is that the most efficient way to do it?

13             MS. MINER:  We haven't had a chance to review it.

14             THE COURT:  Do you want to come back at 4?  Do you

15   want to do it by email?

16             MS. WILKINSON:  I think email if we could.

17             MR. WYSHAK:  That's fine.  They looked good to me.

18   They're pretty rote.

19             MS. WILKINSON:  If Mr. Wyshak asserts that, I can't

20   see how we could have any objections.

21             THE COURT:  To be fair to Mr. Wyshak, many of them

22   come from Facteau and Fabian.  So they have been vetted by

23   both sides of the world.  And you are going to give Karen 50

24   names for Tuesday by 2:00 tomorrow?

25             Just include them if there's a dispute as well.

1    Don't feel like you need to pick 50 clean names.  Just pick

2    the first 50 that you haven't agreed can be struck, and then

3    we'll sort it out as we go.

4              MR. WYSHAK:  You want the names that we've agreed

5    should go for cause or have made the cut?

6              THE COURT:  How about both?  At some point I want

7    the ones for cause because I want to check them against my

8    list and see if I agree with you.  I assume I will because

9    this is both sides of the coin.  If you guys can agree they

10   should be struck, they probably should be.  At some point

11   I'll go over that list.  If I disagree with you I will bring

12   that person in the next day.  What's really important for me

13   right now is she get 50 names by mid day tomorrow to bring in

14   Tuesday.

15             MR. LAZARUS:  That's the first 50 names, Your

16   Honor, that we don't all agree should be struck going down

17   the list?

18             THE COURT:  Yes.  Anything else for today?

19             MS. WILKINSON:  No.

20             THE COURT:  I'll be around all afternoon.  So if

21   anything comes up.

22             MS. WILKINSON:  We'll go straight back and look.

23   Should we just email Karen if we think we need to come over?

24             THE COURT:  I'm hoping to work from home tomorrow,

25   but I can come in.  I'm around at least in the morning.  The

1    afternoon is a little more challenging for me.

2              MS. WILKINSON:  I don't think we will have anything

3    that we can't work out.

4              THE COURT:  Tuesday morning we're going to get a

5    second courtroom, but we'll all meet in my courtroom like

6    around 9 or 9:15.

7              MS. WILKINSON:  Your Honor, Mr. Kendall is not

8    here, but he did want to talk about time limits.

9              THE COURT:  He's concerned about time limits with

10   this criminal case?

11             MS. WILKINSON:  I don't know exactly why.

12             MS. MINER:  I think it's the opposite.  I think he

13   wants time limits.

14             MS. WILKINSON:  Yes.  He wants time limits.

15             THE COURT:  He wants time limits.  That could come

16   back and bite him.  I'm not inclined to impose time limits

17   unless I feel it's out of hand.  This is a criminal case.

18   They have the burden.  You have significant rights at issue.

19   So I am inclined to give everybody as much time as they need

20   unless we have an issue.

21             MS. WILKINSON:  Thank you, Your Honor.

22             THE COURT:  I'm always happy to talk.

23             (Court recessed at 1:58 p.m.)

24

25

1                    - - - - - - - - - - -

2                         CERTIFICATION

3

4          I certify that the foregoing is a correct

5     transcript of the record of proceedings in the above-entitled

6     matter to the best of my skill and ability.

7

8

9

10    /s/ Joan M. Daly                    January 20, 2019

11

12    _____        _____

13    Joan M. Daly, RMR, CRR              Date
      Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25