1              UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS

3    _____

4    UNITED STATES OF AMERICA,

5                   Plaintiff,        Criminal Action
                                      No. 16-CR-10343-ADB
6    v.
                                      January 22, 2019
7    MICHAEL J. GURRY, RICHARD M.     Pages 1 to 229
     SIMON, SUNRISE LEE, JOSEPH A.
8    ROWAN, and JOHN KAPOOR,

9                   Defendants.

10   _____

11

12

13          TRANSCRIPT OF JURY TRIAL - DAY 2
        BEFORE THE HONORABLE ALLISON D. BURROUGHS
14             UNITED STATES DISTRICT COURT
           JOHN J. MOAKLEY U.S. COURTHOUSE
15               ONE COURTHOUSE WAY
                 BOSTON, MA  02210

16

17

18

19

20

21            KELLY MORTELLITE, RMR, CRR
               JOAN M. DALY, RMR, CRR
22             Official Court Reporters
           John J. Moakley U.S. Courthouse
23          One Courthouse Way, Room 5507
                 Boston, MA  02210
24             joanmdaly62@gmail.com

25

```
1    APPEARANCES:

2

3    FOR THE GOVERNMENT:

             FRED WYSHAK
4            K. NATHANIEL YEAGER
             Assistant U.S. Attorneys
5            United States Attorney's Office
             John Joseph Moakley Federal Courthouse
6            1 Courthouse Way
             Suite 9200
7            Boston, Massachusetts 02210
             617.748.3100
8            fred.wyshak@usdoj.gov
             nathaniel.yeager@usdoj.gov
9            david.lazarus2@usdoj.gov

10

     FOR THE DEFENDANT MICHAEL J. GURRY:
11
             TRACY A. MINER
12           MEGAN A. SIDDALL
             Demeo LLP
13           200 State Street
             Boston, Massachusetts 02109
14           617.263.2600
             tminer@demeollp.com
15           msiddall@demeollp.com

16

     FOR THE DEFENDANT RICHARD M. SIMON:
17
             STEVEN TYRRELL
18           PATRICK J. O'TOOLE, JR.
             Weil, Gotshal & Manges LLP
19           100 Federal Street
             Boston, Massachusetts 02110
20           617.772.8365
             steven.tyrrell@weil.com
21           patrick.otoole@weil.com

22

23

24

25
```

 1   APPEARANCES (continued):

 2

 3   FOR THE DEFENDANT SUNRISE LEE:

 4           PETER C. HORSTMANN
             Law Offices of Peter Charles Horstmann
             450 Lexington Street
 5           Suite 101
             Newton, Massachusetts 02466
 6           617.723.1980
             pete@horstmannlaw.com
 7

 8   FOR THE DEFENDANT JOSEPH A. ROWAN:

 9           MICHAEL KENDALL
             ALEXANDRA I. GLIGA
10           White & Case, LLP
             75 State Street
11           Boston, Massachusetts 02109
             617.939.9310
12           michael.kendall@whitecase.com
             alexandra.gliga@whitecase.com
13

14   FOR THE DEFENDANT JOHN KAPOOR:

15           BETH WILKINSON
             KOSTA S. STOJILKOVIC
16           Wilkinson Walsh Eskovitz
             2001 M Street NW
17           Washington, D.C. 20036
             202.847.4000
18           bwilkinson@wilkinsonwalsh.com
             kstojilkovic@wilkinsonwalsh.com
19
             AARON M. KATZ
20           BRIEN T. O'CONNOR
             Ropes & Gray
21           Prudential Tower
             800 Boylston Street
22           Boston, Massachusetts 02199
             617.951.7385
23           aaron.katz@ropesgray.com
             boconnor@ropesgray.com
24

25

```
1                        P R O C E E D I N G S
2                    (The following proceedings were held in open
3     court before the Honorable Allison D. Burroughs, United
4     States District Judge, United States District Court, District
5     of Massachusetts, at the John J. Moakley United States
6     Courthouse, One Courthouse Way, Boston, Massachusetts, on
7     January 22, 2019.)
8                    THE COURT:  Let's do this first, okay?  All right.
9     Karen call the case, please.
10                   THE CLERK:  This is criminal matter 16-10343,
11    United States v. Michael Gurry, et al.  Will counsel identify
12    themselves for the record.
13                   MR. WYSHAK:  Good morning, Your Honor.  Fred Wyshak
14    and Nate Yeager for the United States.
15                   MS. WILKINSON:  Good morning, Your Honor.  Beth
16    Wilkinson and Kosta Stojilkovic for Dr. Kapoor, and Dr.
17    Kapoor is present in the courtroom.
18                   MS. MINER:  Good morning, Your Honor.  Tracy Miner
19    for Mike Gurry who is present in the courtroom.
20                   MR. TYRRELL:  Good morning, Your Honor.  Richard
21    Tyrrell for Richard Simon who is present in the courtroom.
22                   MR. HORSTMANN:  Good morning, Your Honor.  Peter
23    Horstmann on behalf of Sunrise Lee who is present courtroom.
24                   MR. KENDALL:  And finally, Your Honor, Mike Kendall
25    for Joe Rowan who is also present in the courtroom.
```

1      THE COURT:  Okay.  Mr. Wyshak, the only objection I
2  got from the government was on the immunity question.
3      MR. WYSHAK:  Yes, Judge.
4      THE COURT:  And I did not think that what you
5  submitted -- although it may have been legally accurate, I
6  don't think that it's going to adequately identify jurors who
7  have an issue with immunity.  I just think it's too --
8      MR. WYSHAK:  Well, when I prep a witness to respond
9  to questions the defense may ask them and even I may ask them
10 on direct about an immunity order, I prep them to say, "I
11 understand nothing I say here can be used against me."  I
12 don't prep them to say, "I can never be prosecuted for this
13 crime," because that's just a misstatement of the law.
14     THE COURT:  Well, it depends on what the immunity
15 agreement says, right?
16     MR. WYSHAK:  So --
17     THE COURT:  Hold on.  Let me read what I have
18 written and you tell me if you have any other objections.  I
19 took your point, but I just made some edits to it, some of
20 which were requested by the defense and some of which I
21 just -- "You may hear testimony during the course of the
22 trial from witnesses who have been given immunity by the
23 government.  Once a witness has been immunized, any
24 statements he or she makes or any evidence derived from those
25 statements cannot be used against them in a criminal

1    prosecution.  You're free to assess the immunized witness's

2    credibility and motivation as you would of any other witness,

3    including taking into account the effect of any of this

4    arrangement.  Does anyone have any beliefs or views about the

5    government's use of such witness that will prevent you from

6    evaluating fairly and impartially judging the evidence

7    presented in this case?"

8              MR. WYSHAK:  That's fine.

9              THE COURT:  Okay?

10             MS. WILKINSON:  That's fine, Your Honor.

11             THE COURT:  All right.  Now the defense requests.

12   The first one I made, more or less, so that now says, "Those

13   of you who are selected to serve on the jury will of course

14   hear much more about the case over the course of this trial."

15   Okay?

16             MS. WILKINSON:  Thank you, Your Honor.

17             THE COURT:  That neutral versus fair versus

18   impartial thing that the defendants rejected, that's where I

19   typically give a little thing about how we know they're all

20   fair and impartial people, but this case may not be a good

21   fit.  It's just a cue for me to give that.  And of course

22   you'll have the opportunity to object to anything I say.

23             The prior jury service question, so because we are

24   going to do individual voir dire, I'm happy to make the first

25   question -- I'm happy to have the first question be, "Have

1    you previously served as a juror," and then if they answer

2    yes, we can follow up with that during the individual voir

3    dire.  I'm not going to ask them if they were the foreperson.

4    I view that to be something that may or may not be part of

5    what goes on in the privacy of the jury room, and I'm not

6    going to ask them to fess up to that.  And at the voir dire

7    we can ask them if there's anything about that that would

8    affect their ability to serve fairly in this case.

9            Let me change this question.  Is that all right

10   with the government?

11           MR. WYSHAK:  Yes, Your Honor.  I don't object to

12   any of their proposed changes.  It's all wordsmithing.

13           THE COURT:  But I do.  I do.  Then we'll do the

14   follow-up question.  All right.

15           On their question about testifying, so they have

16   said "does not have any obligation to testify or to produce

17   evidence."  I have worded that question -- and I'm willing to

18   hear you on it -- "The defendant in any criminal case has the

19   right to testify or not to testify," and then the question

20   is, "If they choose not to testify, would you hold it against

21   them?  If they chose to testify, would you be inclined to

22   either believe or disbelieve them solely because they've been

23   charged with a crime?"

24           MS. WILKINSON:  That's fine with us, Your Honor.

25           THE COURT:  Both sides?

```
1            MR. YEAGER:  Yes.

2            MR. WYSHAK:  Yes.

3            THE COURT:  I just did the immunity question.  In

4    terms of law enforcement, "You may hear testimony during the

5    course of this trial from witnesses who work or have worked

6    in law enforcement or for a federal agency.  Would anyone be

7    inclined to either believe or disbelieve testimony solely

8    because it was coming from a law enforcement witness?"

9            MS. WILKINSON:  No objection from the defense, Your

10   Honor.

11           MR. WYSHAK:  Okay.

12           THE COURT:  So then the next question is, "Do you

13   have any feelings about or experience with law enforcement

14   personnel that may affect your ability to be a fair and

15   impartial juror in this case?"  I could take that out in lieu

16   of the question just before it, or do you still want it?

17           MS. WILKINSON:  It's fine to take it out, Your

18   Honor.

19           MR. WYSHAK:  I would ask that we keep it in, Your

20   Honor.

21           THE COURT:  All right.  So they have said, "Do you

22   have any feelings about or experience with law enforcement

23   personnel."  They want me to add "positive or negative."

24           MR. WYSHAK:  That's fine.

25           THE COURT:  I added "sales representatives" to the
```

```
1   next question.  I am disinclined to ask the question about
2   pharmaceutical companies' marketing drugs to doctors.
3           MS. WILKINSON:  Your Honor, it's just our
4   experience that people do have very strong views about that.
5   And obviously, that is one of the main issues in the case.
6   So that's why we asked you to put it there, to see if they --
7   I believe there will be jurors who have strong reactions to
8   that.
9           THE COURT:  Well, I would ask them if they have
10  such strong feelings that it would affect them to be fair and
11  impartial, but everybody is going to have -- it's like
12  immigration, right?
13          MS. WILKINSON:  True.
14          THE COURT:  So I'm willing to change that to ask if
15  they have such strong feelings.
16          MS. WILKINSON:  Sure.  Thank you.
17          THE COURT:  Okay.  I'm going to add that.  I
18  deleted "policing" on the next question.  I added "or
19  opinions" on the question after that.  So I will change the
20  question about marketing drugs to doctors.  And then I'll get
21  some copies printed off.  If you guys have -- I know
22  Mr. Kendall said you wanted to distribute something, so
23  you'll have a few minutes to do that.
24          MR. KENDALL:  We've all gotten it, Your Honor.
25          THE COURT:  All right.  What about the witness
```

1     list?

2          MR. YEAGER:  We gave a copy to Ms. Folan last week.

3     I emailed a copy.

4          THE COURT:  Have those been copied off for the

5     jurors?

6          THE CLERK:  I don't think so.  Let me look and see.

7     I'll print them.

8          THE COURT:  Okay.  All right.  Anything else before

9     we -- I'm going to leave in like ten minutes so then we can

10    start.

11         MR. HORSTMANN:  I have an additional witness, just

12    out of precaution, Stacey Gabriel of Phoenix, Arizona, Your

13    Honor.  I didn't realize you were hitting print.  Sorry.

14         THE CLERK:  I'll add it on after.  Can I just write

15    it?

16         THE COURT:  Do you mind if that one name is

17    handwritten in?  Why don't you just type it again, Karen.

18         THE CLERK:  All right.

19         THE COURT:  Is this a PDF?  We can't add a witness.

20    It's going to have to be added by hand.  She can't add to a

21    PDF.

22         MR. YEAGER:  It's a PDF.

23         THE COURT:  Want to write that last witness in by

24    hand?

25         MR. HORSTMANN:  I'm happy to, Your Honor.

```
 1              THE COURT:  Do you want to run upstairs and get a
 2    typed copy?
 3              MR. YEAGER:  I'm happy to go upstairs and find a
 4    Word version.  I think I have a Word version.
 5              THE COURT:  Well, you're going -- I'm really --
 6    this is -- the only thing that makes me cranky is when we
 7    have a bunch of jurors sitting around and we're not ready to
 8    go.
 9              MR. WYSHAK:  We can just write it down.  Let's just
10    write it down.
11              THE COURT:  Okay.  Write it in, please, Karen or
12    get them to do it.
13              THE CLERK:  He's writing it.
14              THE COURT:  Do you guys want copies of the voir
15    dire?
16              MS. WILKINSON:  If you don't mind, Your Honor.
17              THE COURT:  They're all sitting in there.  Want to
18    just walk over?
19              (Recess taken, 9:45 a.m.)
20              THE CLERK:  This is criminal matter 16-10343,
21    United States versus Michael Gurry, et al.
22              Will counsel identify yourselves for the record.
23              MR. WYSHAK:  Good morning, Your Honor.  Fred Wyshak
24    and Nat Yeager for the United States.  This is Camille Stine,
25    a paralegal who will be assisting us during the course of
```

1  this trial.

2       MS. WILKINSON:  Good morning, Your Honor.  Beth

3  Wilkinson and Kosta Stojilkovic for Dr. John Kapoor, and this

4  is Dr. John Kapoor.

5       MR. HORSTMANN:  Good morning, Your Honor.  Pete

6  Horstmann on behalf of Sunrise Lee, who is also present in

7  court.

8       MR. KENDALL:  Good morning, Your Honor.  Mike

9  Kendall for Joe Rowan, who is right next to me.

10      MS. MINER:  Good morning, Your Honor.  Tracy Miner

11  for Michael Gurry, who was just right next to me.

12      MR. TYRRELL:  Good morning, Your Honor.  Steve

13  Tyrrell for Richard Simon, who is next to me.

14      THE COURT:  Good morning, everybody.  Thank you for

15  getting here.  I know the weather was probably not optimal

16  this morning, So I appreciate the fact that everybody got

17  here on time.  This is not my regular courtroom.  We're using

18  two courtrooms for jury selection.  My regular courtroom is

19  actually next door, and it's smaller than this one so we

20  would be sitting closer to each other.  I'm going to stand up

21  just because we feel so far away.

22      We are going to continue our voir dire for this

23  case.  You see that counsel and their clients are all seated

24  at these tables.  They're facing me.  They have the awkward

25  decision of deciding whether to face me or face you.

1    Whichever they decide, they're not being rude.  They're just
2    trying to do their jobs as best they can.
3            I'll say for the rest of this jury selection, make
4    yourselves comfortable.  The jury box is empty, if you think
5    that would be a more comfortable place to do this.  Please
6    nobody be insulted by the fact that anybody has their backs
7    to you.  They're trying to manage the tables and the paper
8    and the chairs and the pens and everything else.  They'll
9    probably be back and forth.
10            Just to recap some of the things that we talked
11   about last week.  The case on which you've been called to sit
12   as jurors is a criminal case.  The case has been brought by
13   the United States Government.  I will sometimes refer to the
14   government as the prosecution.
15            The defendants in this case, as you just herd, are
16   Michael Gurry, Richard Simon, Sunrise Lee, Joseph Rowan, and
17   John Kapoor, all of whom are in the courtroom here today with
18   their counsel.
19            Each of the defendants worked for a company called
20   Insys, which developed and sells a fentanyl spray called
21   Subsys that has been approved by the FDA, the Food and Drug
22   Administration, for certain medical uses.  They are charged
23   with engaging in a racketeering conspiracy through bribes,
24   fraud, and the illicit distribution of Subsys.
25            Those of you who are chosen as jurors will be told

1    later what the precise charge is and what the government has

2    to prove beyond a reasonable doubt in order for you to

3    convict any of the defendants.

4         The defendants deny committing any crimes.  The

5    charge against Mr. Gurry, Mr. Simon, Ms. Lee, Mr. Rowan, and

6    Mr. Kapoor is contained in a document called an indictment.

7         An indictment is an accusation only.  It is not

8    evidence that any of the defendants are guilty of the crime

9    charged.  Each defendant has pleaded not guilty to the charge

10   against them and are presumed innocent of that charge.  It

11   will be up to you, the jury, our eventual jury, to determine

12   if the government has proven the charge beyond a reasonable

13   doubt.

14        Those of you who are selected to serve on the jury

15   will of course hear much more about this case over the course

16   of the trial.

17        We're going to continue our jury selection process.

18   Each of you I think has received a list of potential

19   witnesses in this case.  Is that right?  Does everybody have

20   that?  You should please review that list.  And when you're

21   called to speak with us individually, you should let us know

22   if you know anyone on that list or you think you know anyone

23   on that list or you might know anyone on that list, and we'll

24   figure it out.

25        Right now, I'm going to ask everyone on the panel a

1    series of other questions.  If your answer is yes to any

2    question or you think your answer should possibly be yes,

3    please raise your hand and keep it raised until Ms. Folan,

4    who is our courtroom clerk today, and I have a chance too

5    take down your juror number and record your answer.

6           After I finish asking all the questions, we've kept

7    track of all the yes answers, each of you will meet briefly

8    with me and the parties back in my courtroom where we will

9    ask if you know any of the potential witnesses and follow up

10   on question or questions to which you answered yes.  Maybe

11   there will be some additional questions.

12          We're going to move through this process as

13   efficiently as possible, but you're going to have to be a

14   little bit patient with us.  As I ask the questions here this

15   morning, please don't hesitate to raise your hand if you're

16   not sure what to do.  Don't be shy.  If you think an answer

17   is yes or you're not sure for some reason, then please raise

18   your hand so we can address any question you may have when we

19   move over to my courtroom.

20          The time to ask questions or raise questions is

21   now, not part way through the trial.  No one is going to be

22   upset if you raise your hand because you aren't sure of what

23   to do.

24          Just a note from me.  The idea here is we're trying

25   to get as neutral and fair and impartial a jury as we can

1    here today.  We all assume that you are all fair and neutral

2    and impartial people.  But the question is whether you are a

3    good juror for this particular case.  Even fair people

4    sometimes have certain issues that they feel so strongly

5    about that they can't put their own views aside to be fair in

6    a particular case.  It just might be the case is not a good

7    fit.  That's the purpose of all these questions to sort of

8    try and sort out if this case is a good fit for you.

9         Raise your hand if the answer to the question is

10   yes or you think it's yes or you're not sure it's yes and

11   we'll sort it out during the individual questioning.

12        We're going to begin now with the questions.  Final

13   reminder, if your answer is yes or you think it possibly

14   should be yes, raise your hand.

15        Just to make sure we're very clear on the record,

16   I'm going to ask everybody to rise and we're going to reswear

17   the jurors because your questions need to be given under

18   oath.

19        THE CLERK:  Will you please raise your right hand.

20        (Jury Panel duly sworn by the Deputy Clerk.)

21        THE CLERK:  Thank you.  You may be seated.

22        THE COURT:  All right.  We're going to get going.

23   Have you previously served as a juror in a criminal or civil

24   case in state or federal court or served as a member of grand

25   jury in federal or State Court?

1              Let's start over here and shout out your names for

2    me.  Your numbers, not your names.

3              THE JUROR:  32.

4              THE JUROR:  6.

5              THE JUROR:  37.

6              THE COURT:  Anybody else?

7              THE JUROR:  How recently?

8              THE COURT:  Ever.

9              THE JUROR:  74.

10             THE COURT:  Hold on a second.

11             THE JUROR:  Can you repeat the question one more

12   time?

13             THE COURT:  Yes.  Have you previously served as a

14   juror in a criminal or civil case in state or federal court

15   or served as a member of grand jury in federal or state

16   court?  Prior jury experience of any kind.  Number?

17             THE JUROR:  11.

18             THE JUROR:  1.

19             THE JUROR:  57.

20             THE JUROR:  33.

21             THE JUROR:  8.

22             THE JUROR:  73.

23             THE JUROR:  9.

24             THE JUROR:  10.

25             THE JUROR:  36.

```
1              THE COURT:  Is that everybody?  Okay.  Have you,
2     any member of your family, or any close friends -- and when I
3     say that, it's just sort of a recognition that in the world
4     in which we live sometimes people's close friends are closer
5     to them than family.  When I say you, any member of your
6     family, or any close friends, I mean that inner circle of
7     people with whom you closely interact.
8              Have you, any member of your family, or any close
9     friends been the subject of a criminal investigation or been
10    arrested, charged, or convicted for any crime, felony, or
11    misdemeanor other than a minor traffic violation.
12             Okay.  Start with you.  Shout them out.
13             THE JUROR:  64.
14             THE JUROR:  60.
15             THE JUROR:  72.
16             THE JUROR:  50.
17             THE JUROR:  19.
18             THE COURT:  Sorry.  19.
19             THE JUROR:  25.
20             THE JUROR:  5.
21             THE JUROR:  41.
22             THE JUROR:  28.
23             THE JUROR:  4.
24             THE JUROR:  3.
25             THE JUROR:  11.
```

```
1                THE JUROR:  75.

2                THE COURT:  And then I missed --

3                THE JUROR:  74.

4                THE JUROR:  67.

5                THE JUROR:  18.

6                THE JUROR:  55.

7                THE COURT:  Anybody else?  Have you or any member

8    of your family or any of your close friends ever been a

9    witness in a criminal case or a victim of a crime?

10               Let's do this by section.  How about this group

11   over here.  Anybody?  Let's go to the middle.  Is that a hand

12   up right there?

13               THE JUROR:  19.

14               THE JUROR:  64.

15               THE COURT:  Now how about over here?  Is that

16   everybody?

17               THE JUROR:  I'm not sure.

18               THE COURT:  Why don't you tell me your number.

19               THE JUROR:  78.

20               THE COURT:  Have you, a family member, or anyone

21   close to you ever been a party in a lawsuit?  Start with this

22   section.  Number.

23               THE JUROR:  46.

24               THE JUROR:  72.

25               THE JUROR:  27.
```

1          THE JUROR:  5.

2          THE JUROR:  4.

3          THE JUROR:  36.

4          THE JUROR:  I'm not sure.  55.

5          THE COURT:  55.  Anyone else.

6          THE JUROR:  I'm not sure.  75.

7          THE COURT:  Anybody else?  All right.  As I said

8    before, this is a criminal case.  The fact that a defendant

9    has been charged with a crime is not evidence that he or she

10   is guilty of that crime.  The defendants here are presumed to

11   be not guilty.  They are presumed innocent and the government

12   has the burden of proving guilt beyond a reasonable doubt.

13          Are there any of you who do not accept this basic

14   principle regarding the presumption of innocence and the

15   burden of proof?  Anyone?

16          Does anyone have any feelings about the United

17   States Government that might affect your ability to be a fair

18   and impartial juror in this case?

19          You must decide this case solely on the evidence

20   presented in this courtroom.  Is there anyone who does not

21   accept that principle and might decide the case based on

22   something other than the evidence?

23          You must also follow the law as I will provide it

24   to you in deciding this case.  You must put aside any notions

25   about what you thought the law requires or what you think the

1   law should require and follow only my instructions to you

2   about the law.  Is there anyone who is not willing and able

3   to apply the law as I give it to you?

4           Does anyone have strong feelings about the criminal

5   justice system or lawsuits or lawyers that might interfere

6   with or affect your ability to serve as an impartial juror in

7   this case?

8           The fact that an indictment has been filed does not

9   give rise to any presumptions or inferences whatsoever with

10  respect to a defendant's guilt or innocence, and an

11  indictment is not evidence.  The jury must determine whether

12  or not the government has proven a defendant guilty beyond a

13  reasonable doubt based on the evidence presented at trial.

14          Is there anyone here who might be so influenced by

15  the fact that Mr. Gurry, Mr. Simon, Ms. Lee, Mr. Rowan, or

16  Mr. Kapoor were charged with a crime in an indictment that it

17  might affect your ability to sit as a fair and impartial

18  juror in this case?

19          Hold on.  Let's start over here.  Anyone in this

20  section?  Number, please.

21          THE JUROR:  12.

22          THE JUROR:  Can you repeat the question?

23          THE COURT:  Yes.  The question is basically an

24  indictment is not proof or evidence of anything.  The

25  defendants are presumed innocent.  So the question is whether

1    anyone is so influenced by the fact that someone has been

2    charged with a crime that it might affect their ability to

3    fairly evaluate the evidence.  Okay.  Is that fair?

4            Do you want it again?  I saw a blank look over

5    there.  I might just be too far away to be able to see what

6    your look is.

7            I got 12.  Who else over here?

8            THE JUROR:  46.

9            THE JUROR:  64.

10           THE JUROR:  60.

11           THE JUROR:  50.

12           THE JUROR:  66.

13           THE JUROR:  18.

14           THE JUROR:  78.

15           THE JUROR:  45.

16           THE JUROR:  11.

17           THE JUROR:  63.

18           THE JUROR:  8.

19           THE JUROR:  73.

20           THE COURT:  Anybody else?  A defendant in any

21   criminal case has the right to testify or not to testify on

22   his or her own behalf.  If a defendant chooses not to

23   testify, would you hold that against him or her?

24           If a defendant does choose to testify, would you be

25   inclined to either believe or disbelieve his or her testimony

1    solely because he or she has been charged with a crime?

2              THE JUROR:  Again, please.

3              THE COURT:  The two questions are the two sides of

4    the same coin.  So a defendant in a criminal case has a right

5    to testify.  They also have the right not to testify.

6              The first question was, if a defendant chooses not

7    to testify, would you hold that against them?

8              The second question is, if a defendant does choose

9    to testify, would you be inclined to either believe or

10   disbelieve that person's testimony solely because he or she

11   has been charged with a crime?

12             Anyone?  Okay.  One at a time, please.

13             THE JUROR:  18.

14             THE JUROR:  11.

15             THE COURT:  Anybody else?  You may hear testimony

16   during the course of the trial from witnesses who have been

17   given immunity by the government.  Once a witness has been

18   immunized, any statements that he or she makes or any

19   evidence derived from those statements cannot be used against

20   them in a criminal prosecution.  You are free to assess the

21   immunized witness' credibility or motivations as you would

22   with any witness, including taking into account the effect,

23   if any, of this arrangement.

24             Does anyone have any beliefs or views about the

25   government's use of immunized witnesses that could prevent

1    you from evaluating and fairly and impartially judging and

2    evaluating the evidence presented in this case?

3              Anyone over here?  Anyone in the middle?  Anyone

4    over here?

5              THE JUROR:  I'm not sure.  66.

6              THE COURT:  66.  You may hear testimony during the

7    course of the trial from witnesses who have signed a plea

8    agreement and are now cooperating with the government.  Again

9    you may assess such a witness' credibility and motivations as

10   you would with any witness, including taking into account the

11   effect, if any, of this arrangement.

12             Does anyone have any beliefs or views about the

13   government's use of cooperating witnesses that could prevent

14   you from evaluating and fairly and impartially judging the

15   evidence presented in this case?  Anyone?

16             You may hear testimony during the course of this

17   trial from witnesses who work or have worked in law

18   enforcement or for a federal agency.  Would anyone be

19   inclined to either believe or disbelieve testimony solely

20   because it was coming from a law enforcement witness?

21   Numbers.

22             THE JUROR:  64.

23             THE JUROR:  66.

24             THE JUROR:  42.

25             THE JUROR:  18.

1          THE JUROR:  63.

2          THE JUROR:  8.

3          THE JUROR:  12.

4          THE COURT:  Anybody else?  Do you have any feelings

5     about or experience with law enforcement personnel, positive

6     or negative, that might affect your ability to be a fair and

7     impartial juror in this case?

8          THE JUROR:  64.

9          THE JUROR:  Would you repeat it, please?

10         THE COURT:  Do you have any feelings about or

11    experience with law enforcement personnel, positive or

12    negative, that might affect your ability to be a fair and

13    impartial juror in this case?  Anyone over here?  Middle.

14         THE JUROR:  42.

15         THE JUROR:  45.

16         THE JUROR:  44.

17         THE JUROR:  63.

18         THE COURT:  Anybody else?

19         THE JUROR:  4.

20         THE COURT:  Anyone else?

21         Does anyone have any positive or negative opinions

22    regarding the pharmaceutical industry or people that work for

23    pharmaceutical companies, including sales representatives,

24    that might affect your ability to be a fair and impartial

25    juror in this case?  All right.  Let's start over here,

1      please.

2                  THE JUROR:  12.

3                  THE JUROR:  20.

4                  THE JUROR:  4.

5                  THE JUROR:  10.

6                  THE JUROR:  39.

7                  THE JUROR:  46.

8                  THE JUROR:  64.

9                  THE JUROR:  50.

10                 THE JUROR:  25.

11                 THE JUROR:  66.

12                 THE JUROR:  18.

13                 THE JUROR:  78.

14                 THE JUROR:  45.

15                 THE JUROR:  11.

16                 THE JUROR:  8.

17                 THE JUROR:  73.

18                 THE JUROR:  33.

19                 THE COURT:  Is that it?

20                 Do you have any opinions or feelings, positive or

21     negative, about pharmaceutical companies marketing drugs to

22     doctors that could affect your ability to be a fair and

23     impartial juror in this case?

24                 Start over here.

25                 THE JUROR:  12.

1          THE JUROR:  Can you repeat the question, please?

2          THE COURT:  Do you have any opinions or feelings,

3    positive or negative, about pharmaceutical companies

4    marketing drugs to doctors that could affect your ability to

5    be a fair and impartial juror in this case?

6          THE JUROR:  20.

7          THE JUROR:  39.

8          THE JUROR:  36.  Not sure.

9          THE COURT:  36.  Okay.

10         THE JUROR:  64.

11         THE JUROR:  3.

12         THE JUROR:  50.

13         THE JUROR:  5.

14         THE JUROR:  25.

15         THE JUROR:  66.

16         THE JUROR:  18.

17         THE JUROR:  78.

18         THE JUROR:  1.

19         THE JUROR:  11.

20         THE JUROR:  8.

21         THE JUROR:  73.

22         THE COURT:  Anybody else?

23         The Food and Drug Administration or the FDA is the

24    federal agency responsible for approving, clearing, and to

25    some extent regulating the distribution of medicines.  Do you

```
1    have any feelings or opinions, positive or negative, about
2    the FDA that could affect your ability to be a fair and
3    impartial juror in this case?
4                 THE JUROR:  12.
5                 THE JUROR:  20.
6                 THE JUROR:  39.
7                 THE JUROR:  64.
8                 THE JUROR:  50.
9                 THE JUROR:  18.
10                THE JUROR:  78.  I'm not sure, Your Honor.
11                THE COURT:  Okay.  Anybody else?
12                When the FDA approves a drug, it generally approves
13   it for certain medical uses.  A doctor may prescribe a drug
14   for uses that have not been approved or cleared by the Food
15   and Drug Administration or the FDA, sometimes referred to as
16   off-label uses.
17                Do you have any feelings or opinions about the
18   off-label use of medications that might affect your ability
19   to be a fair and impartial juror in this case?
20                THE JUROR:  25.
21                THE JUROR:  36.
22                THE JUROR:  10.
23                THE JUROR:  39.
24                THE JUROR:  46.
25                THE JUROR:  50.
```

```
1                THE JUROR:  3.

2                THE JUROR:  66.

3                THE JUROR:  42.

4                THE COURT:  42.

5                THE JUROR:  Yes.

6                THE JUROR:  18.

7                THE JUROR:  78.

8                THE JUROR:  8.

9                THE JUROR:  45.

10               THE JUROR:  64.

11               THE COURT:  Anybody else?

12               THE JUROR:  20.

13               THE COURT:  Is that everybody?

14               Have you or family member or close friend ever

15    worked in the pharmaceutical or healthcare field, and if so,

16    is there anything about you or their experience in these

17    fields that might affect your ability to be a fair and

18    impartial juror in this case?

19               Start over here.

20               THE JUROR:  10.

21               THE JUROR:  39.

22               THE JUROR:  46.

23               THE JUROR:  13.

24               THE JUROR:  27.  I'm not sure.

25               THE COURT:  That's okay.  Who is after 13?
```

```
1              THE JUROR:  36.
2              THE JUROR:  4.
3              THE JUROR:  50.
4              THE JUROR:  43, but I'm not sure.
5              THE COURT:  That's okay.
6              THE JUROR:  52.
7              THE JUROR:  25.
8              THE JUROR:  42.
9              THE JUROR:  66.
10             THE JUROR:  55.
11             THE JUROR:  18.
12             THE JUROR:  78.
13             THE JUROR:  45.
14             THE JUROR:  1.
15             THE JUROR:  44.
16             THE JUROR:  11.
17             THE JUROR:  63.
18             THE JUROR:  75.
19             THE JUROR:  8.
20             THE JUROR:  73.
21             THE JUROR:  33.
22             THE COURT:  Anybody else?
23             Have you or any member of your family or any close
24      friend had any experience with Medicare or insurers and their
25      agents involved in the healthcare industry that could affect
```

```
1    your ability to be a fair and impartial juror in this case.
2              THE JUROR:  4.
3              THE JUROR:  39.
4              THE JUROR:  46.
5              THE JUROR:  20.
6              THE JUROR:  32.
7              THE JUROR:  27.  I'm not sure.
8              THE COURT:  That's okay.
9              THE JUROR:  78.
10             THE JUROR:  8.
11             THE JUROR:  73.
12             THE COURT:  Anybody else?  Is there anything else
13   beyond the topics that we've already discussed that might
14   prevent you from serving as a neutral juror on this case?
15             THE JUROR:  One more time, please.
16             THE COURT:  Is there anything else beyond the
17   issues that we've already discussed that might prevent you
18   from serving as a neutral juror in this case?
19             THE JUROR:  27.  I'm not sure.
20             THE COURT:  Okay.  That's fine.
21             THE JUROR:  50.
22             THE JUROR:  25.
23             THE JUROR:  66.
24             THE JUROR:  3.
25             THE JUROR:  60.
```

```
 1              THE JUROR:  64.

 2              THE JUROR:  39.

 3              THE COURT:  I keep remembering you as 39 and I keep

 4     hearing you as 31.  I want to make sure I have it right.

 5              THE JUROR:  18.

 6              THE JUROR:  78.  I'm not sure.

 7              THE JUROR:  44.

 8              THE JUROR:  1.

 9              THE JUROR:  11.

10              THE JUROR:  33.

11              THE JUROR:  8.

12              THE JUROR:  16.

13              THE JUROR:  63.

14              THE JUROR:  72.  Not sure.

15              THE COURT:  Okay.  Anybody else?  All right.

16              Is there anything you'd like to tell the Court

17     and/or the lawyers about your ability to serve fairly on this

18     jury that hasn't yet been addressed?

19              Is it 18?

20              THE JUROR:  18.

21              THE JUROR:  45.

22              THE COURT:  Anybody else?  All right.  Do any of

23     the parties want to see me at sidebar before we move back to

24     the other courtroom?

25              MR. WYSHAK:  No, Your Honor.
```

1        MS. WILKINSON:  No, Your Honor.

2        THE COURT:  All right.  This is what we're going to

3    do.  We're going to move back over to my courtroom, which is

4    one that way.  We're going to talk to each one of you

5    individually.  It will be fairly brief because I want to get

6    through all of you today.  So that's five or so minutes for

7    each one of you.

8        If you're not in there actually talking to us, you

9    can hang out in here or you can hang in the hallway.  You can

10   run down to the cafeteria for a cup of coffee.

11       We're going to be taking people in numerical order.

12   Sort of look at the people around you.  If we're anywhere

13   near where you're sitting, stick close or hang out close to

14   this room.

15       They're not in order.  I forgot.  I should have

16   known that.  Let me do it this way then.  We're going to talk

17   to you in numerical order.  We're going to take about five or

18   ten minutes with each one of you.  So do the math.  If you're

19   Number 70, you can go get a cup of coffee.  If you're like 1

20   through 10, you can hang close.  You can hang out in this

21   courtroom, the hallway.  Just make sure when it's your turn

22   we can find you.  All right?  So let's move over and we'll

23   get started.                         (Resumed, 10:42 a.m.)

24       THE COURT:  These are excused:  2, 7, 15, 21, 22, 23,

25   24, 26, 30, 31, 35, 38, 40, 47, 49, 51, 53, 56, 58, 59, 61,

1     62, 65.

2                MR. WYSHAK:  I can't write that fast, Your Honor.

3                THE COURT:  61, 62, 65, 68, 69, 70, 71, 77.  I can

4     keep going if you want, but that's today's bunch.

5                MR. TYRRELL:  I think that's fine.

6                THE COURT:  You guys can share those with your

7     people.  We literally have five or ten minutes per witness.

8     So we're not going to all ask questions just to ask

9     questions.  Got it?

10               Karen says seven and a half minutes.

11               THE CLERK:  Not even.

12               MR. TYRRELL:  That takes us to what time?  4:00?

13               THE COURT:  Takes us the full day.

14               MS. WILKINSON:  Did you already dismiss someone?

15               THE COURT:  I read with one party for each side.

16               MS. WILKINSON:  I'm not --

17               THE COURT:  I read the names of the first -- we

18     have 1 through 78 here today.  And I read all the names of

19     the people between 1 and 17 that have already been excused.

20     Okay?  So he's got it for the defense and he's got it for the

21     government.

22               MS. WILKINSON:  Got it.

23               THE COURT:  We're not all going to ask questions

24     just to ask questions.  We're going to ask questions.  If

25     there's a legitimate follow-up to something I ask, if anyone

1  I find is abusing it or trying to use the questions to

2  disqualify people will filter their questions through me

3  thereafter, all right?

4          Is everybody here that we need here?  All right.

5  Let's get Juror Number 1, please.

6          MR. HORSTMANN:  My client is not back from the

7  ladies room, but I expect her shortly.

8          THE COURT:  Do you want us to wait?

9          MR. HORSTMANN:  Not really.

10          THE COURT:  Have a seat.  You are Mr. Ignacio?

11          THE JUROR:  Yes.

12          THE COURT:  How are you?

13          THE JUROR:  Good.

14          THE COURT:  Did you have a chance to look over the

15  witness list?

16          THE JUROR:  I did.

17          THE COURT:  Do you know anybody on there?

18          THE JUROR:  No.

19          THE COURT:  That's a good start.  You raised your

20  hands -- you raised your hand to a few questions, and we're

21  just going to go over those.  You said you served on a prior

22  jury?

23          THE JUROR:  Yes.

24          THE COURT:  Tell us about that.  State, federal,

25  criminal, civil?

1              THE JUROR:  It was up in Lowell.  Lowell District

2     Court.

3              THE COURT:  I'm going to put this here for you.

4     Lowell District Court.  And when was that?

5              THE JUROR:  Last March.

6              THE COURT:  Last March.  And was there anything

7     about that jury service that you think could affect your

8     ability to sit fairly in this case?

9              THE JUROR:  I didn't think it was fair that the

10    judge told me I didn't have to go back for three years, and

11    here I am, not even a year later.  Something wrong with the

12    system.

13             THE COURT:  How many days did you sit?

14             THE JUROR:  It was four or five.

15             THE CLERK:  It's state and federal.

16             THE COURT:  So, yeah.  That means you won't be

17    called back to state court for three years, but this is

18    Federal Court.

19             THE JUROR:  I didn't know that until I got my

20    summons this time around.

21             THE COURT:  Well, is there anything aside from the

22    fact that you wish you didn't have to do it again?

23             THE JUROR:  It was a hung jury.

24             THE COURT:  Let me -- you don't need to tell us

25    what the results of the jury were, but just tell me, was

1  there anything about that experience that you think would

2  affect your ability to be a fair juror in this case?

3  Sometimes people have some kind of experience that pollutes

4  them.

5          THE JUROR:  No.

6          THE COURT:  Okay.  And then you also answered "yes"

7  that you had feelings about the pharmaceutical -- about

8  pharmaceutical companies marketing drugs to doctors that you

9  thought could affect your ability to be fair.  Can you tell

10  us about that?

11          THE JUROR:  I worked for a medical company for 30

12  years, and the company got sued for $60 million because of a

13  malfunction in the product.

14          THE COURT:  And you think that would affect your

15  ability to be a fair juror in this case?

16          THE JUROR:  I don't believe in drugs, so . . .

17          THE COURT:  You don't believe in drugs?

18          THE JUROR:  No.  I don't smoke, drink or do drugs.

19          THE COURT:  You're probably going to live to be

20  about 150.

21          THE JUROR:  Probably.  But I've got a bad heart, so

22  that's another problem with me.

23          THE COURT:  Let me ask you:  What company did you

24  work for?

25          THE JUROR:  C.R. Bard.

```
 1                THE COURT:  And when did you stop working for them?
 2                THE JUROR:  I had to retire a couple of years back.
 3   Five years back maybe.
 4                THE COURT:  And you retired on disability, right?
 5                THE JUROR:  Yes.
 6                THE COURT:  Is there anything about your disability
 7   that would make it difficult for you to sit on a jury?
 8                THE JUROR:  No, but I just have a hard time going
 9   out in the cold weather.
10                THE COURT:  Me too.
11                THE JUROR:  I have seven stents and a double-bypass
12   and 15 holes with a laser, and I've already been to the heart
13   transport doctor.
14                THE COURT:  All right.  I mean, is there -- I'm
15   getting the idea that you don't want to be here, but is there
16   anything about your heart situation that would keep you from
17   serving as a juror?
18                THE JUROR:  The stress.
19                THE COURT:  The stress.  Tell me about that.
20                THE JUROR:  I get chest pains under stress.
21                THE COURT:  And you think being a juror would be a
22   stressful situation?
23                THE JUROR:  It was stressful the last time I went
24   through being a juror, and that was only three days, four
25   days.
```

1          THE COURT:  Did you have chest pains when you

2     served as a prior juror?

3          THE JUROR:  I did.

4          THE COURT:  All right.  Back to this question about

5     pharmaceutical companies marketing drugs to doctors.  What

6     about that do you think would affect your ability to be fair?

7          THE JUROR:  I worked for a company for 30 years

8     that made medical products, and I don't believe that people

9     should take drugs, especially Fentanyl.  I have a nephew that

10    they had to revive with that Narcan.

11         THE COURT:  So obviously you're free to take drugs

12    or not take drugs as you see fit, and other people are free

13    to make that same decision, but if you heard testimony from

14    someone that took a drug, would you be inclined to believe or

15    disbelieve their testimony just because they had a different

16    belief about drugs than you did?

17         THE JUROR:  Can you repeat that?

18         THE COURT:  Would you be able to fairly evaluate

19    the testimony of someone who had beliefs about drugs that

20    were different than your own?

21         THE JUROR:  I think I'd have a hard time.

22         THE COURT:  Okay.  Why don't you step out.  Thank

23    you.

24         Juror Number 3, please.

25         MS. WILKINSON:  Your Honor, before we bring in

1    Number 3, we did public searches.

2              MR. TYRRELL:  Hold on one second.

3              MS. WILKINSON:  He posted on Facebook some pretty

4    horrible things about jury service and believing the

5    defendant guilty and put a picture of the word "guilty" up.

6    I'll pass it to the Government.

7              THE COURT:  This is Juror Number 3?

8              MS. WILKINSON:  Yes.  He answered a few questions.

9    Here you go.  I'll giver you two copies, Your Honor.  Excuse

10   me.

11             If you look at the back, that's the picture he

12   posted with the word "guilty" across it.  And then on the

13   front he starts talking about jury duty in Boston and says,

14   "I'm the prosecutor's dream," violating the rules about not

15   talking about the case that you announced when we were with

16   the jurors last week, never mind that it shows this bias.

17             THE COURT:  Is he coming in?

18             THE CLERK:  Yes, he was waiting.

19             THE COURT:  You are Mr. Rose?

20             THE JUROR:  I am, Your Honor.  How are you?

21             THE COURT:  I'm good, thank you.  You raised your

22   hand "yes" to a couple of questions.

23             First of all, did you have a chance to look over

24   the witness list?

25             THE JUROR:  I did.  I didn't see anybody on there.

1          THE COURT:  You didn't know anybody.

2          You raised your hand to question number two, which

3    is:  Have you or any member of your family or close friends

4    been the subject of a criminal investigation, arrested,

5    charged or convicted with anything other than a minor traffic

6    violation.

7          Can you tell us about that.

8          THE JUROR:  Yeah, so I'm a retired correctional

9    officer.  And a correctional officer I worked with was

10   arrested with an ex-inmate that he worked with, and they had

11   drugs in the car.  And he lost his job, went to jail.  Got

12   clean, he runs sober houses now.  That's one of the cases.

13         THE COURT:  So is there anything about that that

14   you think would affect your ability to sit as a fair juror in

15   this case?

16         THE JUROR:  I think it's more that being a

17   correctional officer that worked a drug unit, and also I've

18   seen part of this case in a clip on the news or somewhere.

19   And I have family members that have been hooked on heroin and

20   Fentanyl, and I might not be a good juror for that reason.

21         THE COURT:  Well, when you say -- can you expand on

22   that for me.  The case is not about whether or not you like

23   opioids or whether you take opioids.

24         THE JUROR:  No.

25         THE COURT:  The question is whether you can fairly

1  judge these people of committing the crime they --

2  THE JUROR:  I don't think I can fairly judge them

3  because of what I've already seen about the case.

4  THE COURT:  What have you seen about the case?

5  THE JUROR:  I've seen that this drug was supposed

6  to be originally just for cancer patients and it was pushed

7  outside of that onto maybe some soldiers that had injuries,

8  and seeing that there's been deaths over prescribed

9  medication and also somebody from inside the company kind of

10  rolled on them and was talking about they were making phone

11  calls, making believe they were calling from the doctor's

12  office.  So it's going to be very difficult to --

13  THE COURT:  Why don't you step outside for -- just

14  step outside.

15  Is there need to go any further with him?

16  MR. YEAGER:  No.

17  MS. WILKINSON:  No, Your Honor.

18  We are going through everybody's questions, but it

19  seems we're short on time.  I'll jump through them.

20  MS. WILKINSON:  Would you ask them whether they

21  have --

22  THE COURT:  Whether they have what?

23  MS. WILKINSON:  -- read anything about the case.

24  I'm afraid, because over the weekend, some people want to get

25  out of --

```
1              THE COURT:  Okay.
2              MS. WILKINSON:  Thank you.
3              THE COURT:  Juror Number 4, please.
4              Is she getting number 4?
5              THE CLERK:  Yes.
6              THE COURT:  Number 4, yes.  How are you?
7              THE JUROR:  Good.  How are you?
8              THE COURT:  Liberman or Liberman?
9              THE JUROR:  Liberman.
10             THE COURT:  How are you?
11             THE JUROR:  I'm good.
12             THE COURT:  We're just going to follow on some
13   questions you answered "yes" to.
14             You have that witness list in front of you.  Do you
15   know anybody anyone on the list?
16             THE JUROR:  I think the biggest thing to note is
17   one of my companies that will testify is Deloitte, which is
18   my employer, and they provide advisory services.
19             THE COURT:  You didn't raise your hand about that
20   last week.
21             THE JUROR:  No, because I thought on the form the
22   question said if I had any direct dealings with those
23   involved with the case, and I personally do not.
24             THE COURT:  Okay.  What do you do at Deloitte?
25             THE JUROR:  I'm in their consulting service.
```

1          THE COURT:  Have you had any interactions with

2    Insys?

3          THE JUROR:  No, but I've worked on -- I've had

4    pharmaceutical and health care clients.

5          THE COURT:  Is Insys a current client?

6          THE JUROR:  I'm sorry?

7          THE COURT:  Is Insys a current client of Deloitte?

8          THE JUROR:  I believe they are.  I'm not sure.

9          THE COURT:  All right.  Let's push on a little

10   further here.

11         You raised your hand -- I'm going to -- you raised

12   your hand about whether you or a close friend or family

13   member had worked in the pharmaceutical or health care field

14   and whether there was anything about their experience that

15   could affect your ability to be fair.

16         Could you tell us about that?

17         THE JUROR:  Just that I've had pharmaceutical and

18   health care clients.

19         THE COURT:  And how would that affect your ability

20   to be fair in this case?

21         THE JUROR:  It wouldn't, but I do know a lot about

22   the industry, specifically worked on -- with claims

23   processing, so I know a lot about insurance claims, but it

24   wouldn't make me partial.

25         THE COURT:  It would not?

1          THE JUROR:  No.

2          THE COURT:  Then you answered "yes" to if you or

3    any member of your family or close friends had experiences

4    with Medicare or insurers or agents in the health care

5    industry that could affect your ability to be fair.

6          THE JUROR:  That was, again, alluding to what I

7    just said.  I wasn't sure how to respond.

8          THE COURT:  That's fine.

9          THE JUROR:  It wouldn't make me partial.  I just --

10   I just have experience.

11         THE COURT:  Okay.  You raised your hand about

12   positive or negative opinions regarding the pharmaceutical

13   industry or people that worked for pharma companies,

14   including sales reps, that could a affect your ability to be

15   fair.

16         THE JUROR:  Again, I've had a pharmaceutical

17   client.

18         THE COURT:  And you answered all these questions

19   "yes."  I just want to make sure that -- it's fine that

20   you've had clients that you know something about the

21   industry.  Jurors come here with whatever their prior

22   experiences are.  The issue is whether or not those prior

23   experiences affect their ability to just listen to the

24   questions in this case and listen to the law as I give it to

25   you based on what you hear in the courtroom and the law as I

1    give it to you.

2              Do you have any reservations about that?

3              THE JUROR:  I do not.

4              THE COURT:  You raised your hand to the law

5    enforcement question about whether or not you had experience

6    with law enforcement personnel that could affect your ability

7    to be fair.

8              THE JUROR:  It wouldn't affect my ability to be

9    fair.

10             THE COURT:  What was the incident over which you

11   raised your hand?

12             THE JUROR:  Just that my -- two of my friends once

13   were incorrectly detained -- not detained but just held.  And

14   they were -- the incident wasn't involving them.

15             THE COURT:  How long ago was that?

16             THE JUROR:  Maybe three years ago.

17             THE COURT:  And I think you've already answered,

18   but is there anything about that that you think would affect

19   your ability to be fair in this case?

20             THE JUROR:  No.  It was -- it wasn't a big deal.

21   It wouldn't affect my judgment.

22             THE COURT:  And you said you or family member or

23   someone close to you had been a party to a lawsuit.

24             THE JUROR:  Yes, my father's involved in lawsuits.

25             THE COURT:  What kind of lawsuits?  Sorry.  I

1    didn't mean to be intrusive.

2              THE JUROR:  Civil.

3              THE COURT:  And is there -- is he the plaintiff or

4    the defendant?

5              THE JUROR:  Defendant.

6              THE COURT:  Or both.  Both?

7              THE JUROR:  Probably both, but with the one that I

8    recall, he was the defendant.

9              THE COURT:  And how long ago was that lawsuit?

10             THE JUROR:  Probably around three years ago as

11   well, four years ago.

12             THE COURT:  What kind of lawsuit was it?

13             THE JUROR:  It was regarding property rights.

14             THE COURT:  And is there anything about his

15   experience with the courts system or being party to a lawsuit

16   that you think would affect your ability to be fair and

17   impartial in this case?

18             THE JUROR:  No.

19             THE COURT:  Okay.  I'm going to ask you to step out

20   for just a second.  You may be back in.

21             MR. WYSHAK:  Can I ask one question?

22             THE COURT:  Yeah, go ahead.

23             MR. WYSHAK:  When you said you are a consultant for

24   the pharmaceutical and health care industry, what does that

25   mean?  What do you actually do?

1          THE JUROR:  I provide strategy technology services

2     to them.

3          THE COURT:  We may have you back in.  Just hang

4     close to the door for a minute.  Okay?

5          THE JUROR:  Okay.

6          THE COURT:  I mean, Deloitte.  Just wasn't sure I

7     should go on with him.  He works for Deloitte, and since this

8     is a client, do you have any views on that?

9          MR. YEAGER:  Keeper of records.  We haven't talked

10    about stipulations, but it would only be in the context of

11    searching particular documents.

12          He looks like a good juror.  Very responsive to the

13    questions.

14          MR. TYRRELL:  Your Honor, I thought he also

15    answered number 2 with a "yes," maybe the case involving his

16    friends.

17          THE COURT:  I thought I covered that, but if I

18    haven't, I can bring him back.

19          MR. WYSHAK:  Your Honor, I think we need to

20    challenge him for cause.  I just think he should have gone

21    out at the original --

22          THE COURT:  But why?

23          MR. WYSHAK:  He works for a company that has the

24    defendant's company for a client.

25          THE COURT:  But are any of these defendants still

1    at the company?

2            MR. WYSHAK:  I think Mr. Kapoor still owns stock in

3    the company.  I believe some of the other defendants may.

4    I'm not sure.

5            MR. KENDALL:  Deloitte has 100,000 employees.  He

6    has no contact with the company at all.  He's very diligent

7    in his responses, and he's very thorough being responsive to

8    the court's concerns.  If he had a bias, he would have said

9    it.

10           THE COURT:  Because I think he did not wish to be

11   here, so if he could figure out a way to get himself out, he

12   actually would have.

13           MS. WILKINSON:  Your Honor, Dr. Kapoor's shares are

14   in trust.  He has no connection to the company.

15           MR. WYSHAK:  But THE JUROR doesn't know that.

16           THE COURT:  Let's bring him back in.  I'll follow

17   up on number two, and I'll follow up on the Deloitte thing.

18           MR. YEAGER:  He, for the record, he owns 64 percent

19   of the company.  It's in trust, but he --

20           THE COURT:  There's one question I forgot to ask

21   you about, and one I want to follow up on a little bit more.

22           THE JUROR:  Sure.

23           THE COURT:  You also answered "yes" to question

24   two:  Anyone been the subject of a criminal investigation,

25   arrested, charged or convicted for any crime, felony,

1  misdemeanor, other than a traffic case.

2          Was that different than the incident you told us

3  about before?

4          THE JUROR:  Yes.

5          THE COURT:  Tell us about that.  Sorry.  I just

6  missed it.

7          THE JUROR:  I was just charged -- not "just."  This

8  didn't happen recently.  I was once charged with a

9  misdemeanor that was later dismissed.

10         THE COURT:  How old were you?

11         THE JUROR:  I was 20 years old.

12         THE COURT:  And how old are you now?

13         THE JUROR:  23.

14         THE COURT:  23.  Tell us -- can you flesh that out

15  for us a little bit.

16         THE JUROR:  Sure.  I was just -- I was charged with

17  a civil infraction that I then paid the fee for, and the case

18  was closed.

19         THE COURT:  Can you elaborate on "civil

20  infraction"?

21         THE JUROR:  That's -- the infraction was against

22  the city.  It was -- the charge was blocking the sidewalk.  I

23  don't --

24         MR. WYSHAK:  Can you tell us what you did that

25  resulted in the arrest?

1          THE JUROR:  I was just -- was in possession -- I

2   was a minor in possession of alcohol.

3          THE COURT:  Okay.

4          THE JUROR:  Sorry.

5          THE COURT:  And the other thing I want to circle

6   back on, let me ask you, is there anything about that

7   experience, your interaction with law enforcement, that you

8   think would affect your ability to be fair in this case?

9          THE JUROR:  I don't think it would affect my

10  ability, but I don't know.  It was --

11         THE COURT:  You're hesitating over that.  I'm

12  sure -- I'm sure it wasn't your best day.

13         THE JUROR:  It was just a silly mistake.

14         THE COURT:  But was there anything about your

15  interactions with law enforcement that you would hold against

16  law enforcement in this case if anyone from law enforcement

17  testified?  Would you view their testimony any differently

18  than any other witness because of your experience?

19         THE JUROR:  No.

20         THE COURT:  Okay.  The other thing I want to circle

21  back on is Deloitte.  They don't figure prominently in this

22  case.  They are -- it would be sort of a keeper of records

23  type of testimony.  They have documents that are relevant to

24  the case that would be produced by somebody.

25         THE JUROR:  Okay.

1          THE COURT:  That being said -- and Insys is not on

2     trial here.  It's these individuals.  You work for a company

3     that has a relationship with Insys, but I want you to think

4     really hard about whether you think that caused you to bring

5     any particular bias to the table or whether you could be fair

6     and impartial as to these defendants?

7          THE JUROR:  Well -- well, I -- whatever their

8     relationship is with Insys, whether they were or are

9     currently a client, I'm not exactly sure.  But with any

10    client, as an employee of Deloitte I have an interest and

11    responsibility to the welfare of both my employer and the

12    clients that we serve.

13         So I don't believe that supersedes my judgment in

14    the law, but it is just, just a conflict of interest that I

15    feel uncomfortable with.

16         THE COURT:  Okay.  All right.  Thank you.  You can

17    step out.

18         MR. WYSHAK:  Renew our challenge.

19         THE COURT:  I think once he identifies it as a

20    conflict of interest, it's hard to keep him.

21         MS. WILKINSON:  He did say, Your Honor, that it

22    didn't supersede his judgment.  He's a thoughtful,

23    sophisticated person.  I think he was trying to say we

24    basically all should know it, but I thought it was pretty

25    clear he knows he has that, but when he comes into the

1   courtroom --

2          THE COURT:  But he finished off by saying it was a

3   conflict of interest that made him uncomfortable.

4          MR. KENDALL:  Your Honor, I think a couple of

5   things.  I thought he was an incredibly respectful, a

6   well-intentioned juror, when he answered questions, and he

7   was clearly a thoughtful, respectful person.  Some people are

8   more analytical and think out loud through analysis.  He

9   raises an issue I thought a thoughtful person would.

10         I would suggest before we strike him, can we ask

11  him point blank:  Would this experience mean you couldn't be

12  fair, as opposed to, well, there's an issue.  I'm supposed to

13  be respectful to my clients and employer, but I also respect

14  the law.  I mean, he's somebody who talks like a decision

15  tree as he goes through each point.  I don't think he's

16  giving a statement of prejudice.

17         We're going to have a hard time getting jurors,

18  Your Honor.  He's a very responsible, thoughtful person.

19         MR. WYSHAK:  I think his answers were evasive.  He

20  didn't answer any question directly.  I mean, he didn't want

21  to even tell us he had been arrested for possession of

22  alcohol until he was pressed.  So I totally disagree with

23  Mr. Kendall's assessment, and clearly he has a conflict of

24  interest.  He's laboring under it.  He says he has a loyalty

25  to his employer as well as to his employer's clients.  I

1   don't know why we would want to --

2           THE COURT:  I think he's a close call.  I take your

3   point about this is going to be hard.  I'm going to get rid

4   of him.  I'm uncomfortable with him.

5           Number 5 please.

6           How are you?

7           THE JUROR:  I'm well, thank you.

8           THE COURT:  All right.  I'm going to give this a

9   try.  Ms. Banchongmaie?

10          THE JUROR:  Yes.

11          THE COURT:  Or are you just humoring me?  I really

12  got it right?  Excellent.  Thank you.  Some days I have good

13  days and bad days on that.

14          We're just going to follow up on some of the

15  questions that we talked about to you.

16          Did you have a chance to look at the witness list?

17        THE JUROR:  I did.

18          THE COURT:  Did you know anybody on that list?

19          THE JUROR:  I don't think so.  I don't think so.

20          THE COURT:  So let's see.  You answered "yes" to

21  the question about have you, any member of your family or

22  anyone close to you been the subject of a criminal

23  investigation, arrested, charged, convicted of anything other

24  than a minor traffic violation.

25          THE JUROR:  Well, let's see.  I need to clarify on

1    that because I was a little unsure.

2              THE COURT:  That's totally fine.

3              THE JUROR:  But my father has been sued several

4    times because he was formerly a physician.  So he's been

5    through a lot of court cases for what I -- medical

6    malpractice practice.

7              THE COURT:  All right.  So I'll move on to that,

8    but first, anyone with a criminal conviction or arrest,

9    investigation that you can think of?

10             THE JUROR:  No.

11             THE COURT:  Okay.  In terms of your father's

12   interaction, the fact that he's a doctor and he's been sued

13   for malpractice, is there anything about those experiences or

14   your relationship with your dad that you think would be make

15   difficult for you to be a fair juror in this case?

16             THE JUROR:  I mean, they are a little emotional,

17   but they were quite a long time ago.

18             THE COURT:  How long ago?

19             THE JUROR:  Over 20 years.

20             THE COURT:  And you know that there's no doctors

21   that have been charged in this case, medical doctors.

22             THE JUROR:  I understand.

23             THE COURT:  So when you think about your dad being

24   a doctor and having been sued for malpractice, do you think

25   that there's anything about those cases that would make it

1   difficult for you to be fair in this case?  By which I mean

2   listen to the testimony, make a decision based just on the

3   testimony and the law?

4            THE JUROR:  I do not.

5            THE COURT:  Okay.  And then the question about has

6   anyone, you or anyone in your family been a party to a

7   lawsuit.

8            THE JUROR:  That's the same --

9            THE COURT:  Okay.

10           THE JUROR:  -- reference.

11           THE COURT:  And then you answered "yes" about

12   opinions or feelings, positive or negative, about

13   pharmaceutical companies marketing drugs to doctors.

14           THE JUROR:  My dad had a fair amount of very

15   unusual experiences with pharmaceutical reps that came

16   through his office in his time.  So there was --

17           THE COURT:  So you know it happens.  You know that

18   sales reps market to doctors.  Is this the same thing 20

19   years ago, same timeframe?

20           THE JUROR:  Same window of time in my life.

21           THE COURT:  And the rules of the game have sort of

22   changed in the last 20 years.  So could you put aside your

23   experiences, stories that your dad told you and make a

24   decision in this case based on the facts and the law as I

25   give it to you?

1          THE JUROR:  I think so.

2          THE COURT:  When you say you "think so," is that a

3    manner of speech, or do you have reservations about it?

4          THE JUROR:  I can do it.

5          THE COURT:  Okay.  My last question for the moment

6    is you know we're in the middle of a Government shutdown and

7    jurors typically get paid and jurors in this case will be

8    paid, but there's apt to be a delay in the payment for as

9    long as the Government shutdown goes on.

10          Can you manage that?

11          THE JUROR:  (Nods.)

12          THE COURT:  Any follow-up?

13          MS. WILKINSON:  Nothing from us, Your Honor.

14          MR. WYSHAK:  Nothing.

15          THE COURT:  Okay.  You can go.  Thank you.

16          MR. KENDALL:  Your Honor, I believe she worked --

17          THE COURT:  Now we just let her go.  Raise these

18    things before.  Ask me to hold her.  This is the second time

19    you've done it.

20          MR. KENDALL:  I don't think it's a probable.  She's

21    probably worked with my daughter.  She's not made the

22    connection of the Kendall to Kendall, and I don't think she

23    ever will.  But she said she worked at Gentle Giant Moving.

24    My daughter is a mover for Gentle Giant.

25          THE COURT:  Do you want her back in?

```
 1              MR. WYSHAK:  No.  She's fine with the Government.

 2              THE COURT:  Great.

 3              MR. KENDALL:  I didn't want to say it in front of

 4    her.

 5              THE COURT:  Just ask me to hold them.  Once they go

 6    out back, they're gone.  Once we hold them out there, they're

 7    still present.

 8              Juror No. 6, please.  How are you?

 9              THE JUROR:  I'm okay.

10              THE COURT:  Mr. Stonge; is that right?

11              THE JUROR:  Yes.

12              THE COURT:  How are you?

13              THE JUROR:  I'm okay.  How are you?

14              THE COURT:  I'm good.  Do you have -- did you have

15    a chance to look at that witness list?

16              THE JUROR:  Briefly.

17              THE COURT:  Long enough to know whether you know

18    anybody on it?

19              THE JUROR:  I didn't recognize any names.

20              THE COURT:  Are you looking at it now for the first

21    time?  Do you want another minute to look at it?

22              THE JUROR:  No.  I mean, I just --

23              THE COURT:  You're just flipping back through.

24              THE JUROR:  Yeah.  I just --

25              THE COURT:  So I'm following up on your
```

1    questionnaire and on your answers to the questions that we

2    just went through in court.  I think you answered "yes" to

3    having been previously served as a juror or grand juror.

4             Can you tell us about that?

5             THE JUROR:  I was last -- it was last February in

6    New Bedford.  It was two days.  I guess it would be a

7    criminal, assault case.

8             THE COURT:  Is there anything about your experience

9    with that case that you think would affect your ability to be

10    a fair juror in this case?

11             THE JUROR:  No.

12             THE COURT:  Okay.  On your questionnaire, you have

13    a court date coming up, I guess in a divorce.

14             THE JUROR:  Yes, that's -- I'm not sure exactly,

15    like I said.  The lawyer said most likely it would be in

16    February.

17             THE COURT:  Okay.  So if you are selected as a

18    juror, and we will give you time off for your court date or

19    make arrangements, okay, we sit -- we'll sit a half day at

20    least one day a week, and we'll try and work that out with

21    your schedule if you're selected.  Okay?  Does that work?

22             THE JUROR:  I guess so.  I mean, there's other

23    things that are going on, too, you know.  I'm sure everybody

24    has stuff going on, too.  I'm going through probate with my

25    father's passing, you know, and stuff like that.

1          THE COURT:  Sorry to hear about your dad.

2          THE JUROR:  Yeah.

3          THE COURT:  I mean, you're right that everybody

4    does have stuff.

5          THE JUROR:  It's -- the only thing is if this is

6    Monday through Friday and lawyers only work Monday through

7    Friday pretty much and take care of business Monday through

8    Friday, you know, I got to get this divorce done.  I got to

9    get this probate done.  I got to get this stuff done, you

10   know.

11         THE COURT:  Well, do you have a date for probate?

12         THE JUROR:  We're in -- it's in the process.  You

13   know, as far as, if you're familiar with -- it's the lawyer

14   my sister used, so he's handling it.  He's always e-mailing

15   us and calling us about the house and all that stuff, you

16   know.

17         THE COURT:  Well, there will be breaks.  We'll let

18   you have your phone in there to take care of personal

19   business.  We're done every day by 4:00 and we don't start

20   until 10:00.  There's a lunch break.  You'll have time to

21   take care of that personal business.  If you end up with THE

22   COURT date -- it is my experience -- except in my court of

23   course -- they're never as quick as people think they're

24   going to be.  So we really don't excuse people for the fact

25   that they might have a court date coming up.  But if you did

1    have a court date and it was an important date and not easily

2    movable, we would make a provision for you to be at your

3    court proceeding on that day.

4              THE JUROR:  Okay.  Like that divorce thing, I

5    wouldn't be able to be here.

6              THE COURT:  No, I understand.

7              THE JUROR:  It's the whole day.

8              THE COURT:  Right, I understand.  But it's a long

9    trial, and if there's a day here and there, we can work with

10   that.  And just as I say, it just never happens as quick as

11   people think it's going to happen.

12             So we would not have you skip your court date if

13   you were selected to the jury.  But we will accommodate that.

14   Okay?

15             Anything for him?

16             MS. WILKINSON:  Yes, Your Honor.

17             You noted on your questionnaire that you had a

18   12-hour day/night schedule and you drive from far away.  Is

19   that going to make it difficult for you to stay awake in the

20   jury box?

21             THE JUROR:  I don't know how it would work because

22   it's a rotating.  Where it's like I'm on day shift now, then

23   I have some days off, then I go on to the night shift.  I

24   work every other weekend.  You know, I'm pretty much --

25   wouldn't be working if, you know, if I was here Monday

1  through Friday.  You know, maybe one day on the weekend or

2  something or maybe both days if it was my weekend to work.  I

3  don't know how they would address it, you know.

4          THE COURT:  Does your company pay for jury service?

5          THE JUROR:  I believe so, you know.  So but, yeah,

6  it is -- it's difficult.  It's not easy to begin with.  The

7  12-hour days one week, nights the next week, you know, but

8  it's a power plant, so it's got to stay running, you know.

9  Got to have a certain amount of people there at all times.

10         THE COURT:  Anybody else?  All right.  Why don't

11  you step out for a second.  That way or you can have them --

12         THE CLERK:  Excuse me, sir.  I'm just going to hold

13  you out here.

14         MR. WYSHAK:  Fine for the Government.

15         MS. WILKINSON:  My concern is his two legal issues,

16  Your Honor, could make more than a day.

17         THE COURT:  Or they could take no days at all.

18         MS. WILKINSON:  True.  But they could take more

19  than one day.  I mean, I don't have any idea what the details

20  are of his divorce, but he's clearly anxious about it.  He's

21  driving from far away and he has a horrible schedule.  You

22  can just tell --

23         THE COURT:  Well, he's not going to be working; his

24  company is going to be paying him.  He's going to be better

25  situated than a lot of people are going to be, and he's --

1    you know, I don't think he was thrilled to be here either,

2    but I don't think there was anything that would cause him to

3    be struck for cause.  That's what your peremptories are for.

4    He was fine.

5            MS. MINER:  On that, could you confirm with him

6    that he won't be working nights if he's on jury service.

7            THE COURT:  He just told me his company paid him

8    for jury duty and he would work one day a weekend.  He said

9    he pretty much wouldn't be working, which is true.

10           THE CLERK:  I'll get number 8.

11           THE COURT:  How are you?

12           THE JUROR:  Okay.  Nervous.

13           THE COURT:  Don't be nervous.

14           THE JUROR:  Okay.

15           THE COURT:  Everybody here is pretty friendly.

16   Ms. Buckout?

17           THE JUROR:  Buckout.

18           THE COURT:  The ones I think I'm going to butcher I

19   do fine with, and this one looks relatively simple and, of

20   course, I get it wrong.  My apologies for that.

21           We're following up on some of the questions that

22   you answered "yes" to.

23           THE JUROR:  Sure.

24           THE COURT:  And I'm -- the first one is you -- we

25   talked about the fact that an indictment doesn't give rise to

1    any presumptions or inferences as to a defendant's guilt.

2    And you raised your hand about you might be so influenced by

3    the fact that they've been charged with a crime, that it

4    could affect your ability to sit fairly.

5         Can you flesh that out for me?

6         THE JUROR:  Specifically -- relating -- which

7    question was it?

8         THE COURT:  I call it five, but the question was

9    the fact that an indictment has been filed does not give rise

10   to any presumptions or inferences whatsoever with respect to

11   a defendant's guilt or innocence, and an indictment is not

12   evidence.  The jury must determine whether or not the

13   Government has proven a defendant guilty beyond a reasonable

14   doubt based on the evidence presented at trial.

15        Is there anyone here who might be so influenced by

16   the fact that each of the defendants were charged with a

17   crime in an indictment that it might affect your ability to

18   sit as a fair and impartial juror?

19        THE JUROR:  Because of the nature, what you said

20   the case was about and what I do for my work, I have really

21   strong feelings about pharmaceutical companies.

22        THE COURT:  What are the feelings?

23        THE JUROR:  You want specifics?  Distasteful

24   tactics coming into our office and working with our

25   physicians.

1      THE COURT:  And so I'm sure there are some --

2      THE JUROR:  Specifics?

3      THE COURT:  There are some sales reps and companies

4  that are distasteful.  Some are distasteful, some are not.

5          Could you listen to the evidence in this case

6  fairly without assuming that what they were doing was

7  distasteful, or do you start off with a bias one way or

8  another?

9      THE JUROR:  I start off with a bias.

10      THE COURT:  All right.  Thanks very much.  Go out

11  the back.

12          How are you?

13      THE JUROR:  Good morning.

14      THE COURT:  Mr. Freitas?

15      THE JUROR:  Freitas.

16      THE COURT:  Not doing very well on my

17  pronunciations this morning.

18          We're just following up on the written

19  questionnaires and some of the answers to oral questions I

20  asked this morning.  You raised your hand about jury service.

21      THE JUROR:  Yeah.  Probably about 15 to 20 years

22  ago I was on a civil trial.  It was a car accident, two-day,

23  state.

24      THE COURT:  Anything about that experience that you

25  think would affect your ability to be a fair and impartial in

1    this case?

2                   THE JUROR:  No.

3                   THE COURT:  Did you have a chance to look at the

4    witness list before you came in here?

5                   THE JUROR:  Yes, ma'am.

6                   THE COURT:  Did you know anyone on there?

7                   THE JUROR:  No.

8                   THE COURT:  Can I ask you a question?  When do I go

9    from being a "miss" to a "ma'am"?  Just curious.

10                   THE JUROR:  I went to Mass. Maritime Academy.

11   Everybody was ma'am.

12                   THE COURT:  But I look like a "miss," right?

13                   THE JUROR:  Right.

14                   THE COURT:  Thank you.  The only thing I want to

15   ask you about, you know we're in the middle of a Government

16   shutdown, and jurors get paid but, because of the shutdown,

17   there may be some delay in the payment.  Can you manage that?

18                   THE JUROR:  I believe my company would pay me

19   anyway.

20                   MR. YEAGER:  Can we have him step out for a moment?

21   Sorry.  Wrong juror.

22                   THE COURT:  Thanks very much.  You can go.

23                   THE CLERK:  Juror 10.

24                   THE COURT:  How are you?

25                   THE JUROR:  Good.  How are you?

```
1              THE COURT:  Ms. Sullivan, right?
2              THE JUROR:  Yes.
3              THE COURT:  How you are you today?
4              THE JUROR:  Good.  How are you?
5              THE COURT:  Fine, thank you.
6              We're following up on some of the questionnaires
7    and oral questions we asked this morning.  You said you
8    previously served as a juror.
9              THE JUROR:  So I wasn't sure about that question.
10   I was called as a juror, but I was never selected.
11             THE COURT:  Okay.  How long ago were you called?
12             THE JUROR:  2013.
13             THE COURT:  And did you actually go to the
14   courthouse?
15             THE JUROR:  I did, yes, in Dedham.
16             THE COURT:  So state court.  Was there anything
17   about your experience in Dedham that would affect your
18   ability to be fair in this case?
19             THE JUROR:  No.
20             THE COURT:  Okay.  And the question was, did you
21   have any feelings, positive or negative, about the
22   pharmaceutical industry or people that worked for pharma
23   companies, including sales reps, that could affect your
24   ability to be fair?
25             THE JUROR:  My stepsister is a sales reps for a
```

1    pharmaceutical company.

2            THE COURT:  Which company?

3            THE JUROR:  I do not know the name of that exactly.

4            THE COURT:  Do you know what drug or device she

5    markets?

6            THE JUROR:  I don't know that either.

7            THE COURT:  How often do you interact with her?

8            THE JUROR:  I only see her about two or three times

9    a year.  Usually around the holidays.

10           THE COURT:  And is there anything about what you do

11   know about what she does for a job that you think would

12   affect your ability to be a fair juror in this case?

13           THE JUROR:  No.

14           THE COURT:  And then there's a question about

15   basically off-label uses, when the FDA approves a drug it

16   approves it for certain uses but doctors are allowed to

17   prescribe it for other uses.  That's off-label use.  And I

18   think you had feelings or opinions about off-label use that

19   could affect your ability to be fair?

20           THE JUROR:  So I wasn't sure about that one.  That,

21   for example, if they don't list side effects --

22           THE COURT:  It's not about side effects, but if the

23   FDA approves a drug for a certain use, then it's a legitimate

24   drug to sell and market.  There's rules about how the

25   pharmaceutical companies can market those drugs, which you

```
 1     would hear more about, but the doctors can, once a drug is
 2     approved by the FDA, a doctor can prescribe it for whatever
 3     use he deems appropriate.
 4               THE JUROR:  No.
 5               THE COURT:  Okay.  And then the last one was you
 6     said you had a family or member of or close friend in the
 7     pharmaceutical or health care industry.  Was that your --
 8               THE JUROR:  No.  My cousin is a pharmacist.
 9               THE COURT:  And how often do you see him or her?
10               THE JUROR:  A lot.  Like, I would say two or three
11     times a month.
12               THE COURT:  And so if you were selected as a juror
13     for this case, do you think you could keep from talking to
14     your cousin about the case for the duration?
15               THE JUROR:  Yes.
16               THE COURT:  And is there anything about the fact
17     that what you know about his -- or is it him or her?
18               THE JUROR:  Him.
19               THE COURT:  Anything you know about his job that
20     you think would affect your ability to be a fair juror in
21     this case?
22               THE JUROR:  No.
23               THE COURT:  Okay.  Did you have a chance to look at
24     the witness list before you came in here?
25               THE JUROR:  I did, yes.
```

1            THE COURT:  Did you know anybody on there?

2            THE JUROR:  No.

3            THE COURT:  Okay.  We're in the middle of a

4    Government shutdown, as I'm sure you all know by now.  So the

5    jurors in our cases get paid, but because of the shutdown

6    there might be some delay in the payment.  Can you manage

7    that?

8            THE JUROR:  Yes.

9            THE COURT:  Okay.  Follow-up for her?

10           MR. WYSHAK:  Yes, Your Honor.

11           Just checking.  Did you have a DUI arrest?

12           THE JUROR:  I did, yes.

13           MR. WYSHAK:  Okay.  Was that dismissed?

14           THE JUROR:  Yes.

15           MR. WYSHAK:  Anything about that experience that

16   resulted in negative feelings about THE COURT system or with

17   the police or --

18           THE JUROR:  No.

19           THE COURT:  Anyone else?

20           Thanks very much.  You can go.

21           THE CLERK:  Juror Number 11.

22           THE COURT:  Hold on a second on 11, please.  So

23   Juror Number 11, aside from her myriad of other issues and

24   she is a teacher -- and I generally excuse teachers anyway.

25   I think it's a long time to ask a classroom to be without

1   their teacher.  Do you want me to bring her in or is

2   everyone --

3           MS. WILKINSON:  We had her on our excusal list

4   because of your telling us, Your Honor.

5           MS. MINER:  She answered "yes" to so many

6   questions, Your Honor.

7           THE COURT:  I think she may be a challenge anyway,

8   but I do normally excuse teachers.  I'll bring her in if you

9   want.

10          MR. WYSHAK:  No, that's all right.  You can excuse

11  her.

12          THE COURT:  Okay.

13          All right.  Number 12.

14          THE COURT:  Mr. O'Dwyer, correct?

15          THE JUROR:  Yes.  Good morning.

16          THE COURT:  Did you have a chance to look at the

17  witness list?

18          THE JUROR:  I did, yes.

19          THE COURT:  Did you know anyone on it?

20          THE JUROR:  I did not recognize anyone.

21          THE COURT:  I'm just going to run through your

22  questionnaire and the oral questions today.

23          THE JUROR:  Sure.

24          THE COURT:  You raised your hand on the question

25  about the fact that I told you that the fact that an

1    indictment has been filed doesn't give rise to any

2    presumptions or inferences with regards to a defendant's

3    guilt.  And I think you raised your hand to the question that

4    you might be so influenced by the fact that these defendants

5    were charged with a crime in an indictment that could affect

6    your ability to sit fairly.

7              Can you flesh that out for me?

8              THE JUROR:  I think it was more the nature of the

9    indictment and the fact that from my limited understanding

10   seems to be a case where you have multiple defendants being

11   charged for the same crime.  And given the industry that

12   they're in, I feel like it would be a bias for me.

13             THE COURT:  Why that industry?

14             THE JUROR:  This is not a crime that is -- that is

15   being charged that has to do with violence.  It's a crime

16   that I see at my mind is a crime of greed.  Typically, I

17   think, with the health care industry, pharmaceutical

18   industry, that the corporations there should not be out to

19   make money.  They're in an industry that's supposed to be

20   there to help people out.  I see at the executive level a lot

21   of greed and in a lot of stories I've been reading for the

22   last 15 years.  And this goes back to when I was a kid when I

23   was less educated.

24             So I think there's a lot of good people and a lot

25   of good things that come out of the industry.  Unfortunately

1    I think it's corrupted by greed at the higher levels.

2         THE COURT:  So you're certainly entitled to your

3    kind of view of the industry.

4         Do you think that you could put aside those views

5    and focus on this company and these people and make a fair

6    decision based on the evidence and the law as I gave it to

7    you about whether or not they've committed a crime or not?

8         THE JUROR:  I think I could try.  I'm not sure, you

9    know, if I can be unbiased.  I'm not sure if I can.  I've

10   never been presented with a question of individually trying

11   to assess somebody's guilt in a case like this or even in

12   public, you know, debate.

13        THE COURT:  I'm trying to figure out if that's --

14   if you're concerned about -- I mean, it is a hard thing to

15   make a decision about somebody's guilt or innocence.  It's

16   supposed to be a hard thing, right?  It's supposed to be

17   something you think about seriously.

18        So the question that you think it might be a hard

19   thing does not make you a bad juror.  It might make you a

20   very good juror.  The question is, do you start off with a

21   bias because of the nature of the charges?

22        THE JUROR:  And that's what I meant.  It's

23   difficult for me to take my emotions out of it.  I think in

24   order to be a good juror and unbiased you have to be less

25   emotional towards the fact and not emotional towards the

1    situation, and that's where I find myself.  I'm not sure if I

2    have the ability to set aside those emotions.

3              THE COURT:  All right.  I'm going to push on a bit

4    here.

5              THE JUROR:  Okay.

6              THE COURT:  There may be law enforcement witnesses.

7    And you raised your hand about whether you'd be inclined to

8    believe or disbelieve testimony just because it was coming

9    from a law enforcement witness.

10             THE JUROR:  Yes.  I'm more inclined to believe

11    testimony from a law enforcement individual.

12             THE COURT:  You don't think you could listen to the

13    testimony and -- I mean, obviously, some law enforcement

14    witnesses tell the truth and maybe some don't.  Some other

15    witnesses tell the truth, some don't.  The job of a juror is

16    to evaluate the testimony without, again, starting off with

17    any bias.

18             Do you have reservations about your ability to do

19    that?

20             THE JUROR:  I'm sure I'm more apt to listen to that

21    testimony from a law enforcement individual unbiasly, but I

22    was just trying to answer the question truthfully.

23             THE COURT:  I appreciate that.  I'm just -- you're

24    obviously a thoughtful guy.  I'm just trying to get at

25    whether you're a thoughtful person giving thoughtful answers

1    or whether you really have reservations about your ability to

2    be fair.

3              THE JUROR:  With regard to law enforcement

4    testimony, I think I should be able to do that unbiasly, yes.

5              THE COURT:  And you answered the question about

6    positive or negative feelings about the pharma industry.  Is

7    there anything more than what we've already talked about?

8              THE JUROR:  No.  I think I've expressed myself

9    there.

10             THE COURT:  I think you also raised your hand on

11   the FDA.

12             THE JUROR:  So I see them as part of the problem

13   with the industry in general.  I think the FDA is a woefully

14   underfunded organization a the federal Government that cannot

15   keep up with the sheer number of requests that come through

16   it.  Unfortunately, I have read a lot about the FDA over the

17   years.  My wife has read a lot.  It's a hot-button topic in

18   our house, unfortunately.

19             THE COURT:  What does your wife do?

20             THE JUROR:  Right now she's a massage therapist by

21   trade, but she stays home with our children now.

22             But I think, unfortunately, the FDA has to rely on

23   a lot of outside information that is not always unbiased

24   information from scientists that have questionable practices,

25   and, unfortunately, especially in the medical and

1   pharmaceutical industry, I feel like the science in those

2   industries is not up to the standard that I think they should

3   be in terms of the practices and experimentation and how

4   experiments are analyzed and judged and how they're even

5   performed.  There's a lot of shoddy science in my opinion.

6              THE COURT:  So, again, obviously, you're entitled

7   to your opinions on the FDA.  But if someone from the FDA

8   testified, do you think you could fairly evaluate that

9   testimony?

10             THE JUROR:  Yes, I think I could.

11             THE COURT:  All right.  Now I need to circle back

12  to the pharma industry.  Because, obviously, the

13  pharmaceutical company is not on trial here but these

14  individuals have careers in the pharma industry.

15             THE JUROR:  Understood.

16             THE COURT:  And they're entitled to a fair jury.

17  It's super important, obviously, that they get a fair jury.

18             Do you think you start off with a presumption one

19  way or another about their guilt or innocence just based on

20  the fact that they worked for a pharmaceutical company?

21             THE JUROR:  Yes, I think I do.

22             THE COURT:  All right.  Thanks very much.  You can

23  go.

24             THE CLERK:  13.

25             THE COURT:  I tried.  We didn't even get to the

1   opioids, but I gave it the old college try.

2           MR. KENDALL:  I didn't hear you say it, Your Honor,

3   but I assume he's excused?

4           THE COURT:  Yes.

5           THE CLERK:  13.

6           THE COURT:  You are Ms. Burke?

7           THE JUROR:  Yes.

8           THE COURT:  How are you?

9           THE JUROR:  Good.  How are you doing?

10          THE COURT:  We have the same first name, except you

11  only have one L and I have two Ls.

12          I'm just following up on the written questionnaire

13  and the oral questions we asked this morning.  Did you have a

14  chance to look at the witness list?

15          THE JUROR:  Yes.

16          THE COURT:  Did you know anybody on it?

17          THE JUROR:  No.

18          THE COURT:  That's a good start.

19          In your questionnaire you raised your issue of

20  medical issue and doctors appointments.  I think you said you

21  need an injection or infusion once every six weeks.

22          Is that an all-day --

23          THE JUROR:  It's a three-hour, and it's scheduled

24  for next Tuesday, so then it would be six weeks from then

25  also.

1          THE COURT:  So it would be one day a week every six
2   weeks?
3          THE JUROR:  Yeah, just one day.
4          THE COURT:  Is it morning or afternoon?
5          THE JUROR:  It's whenever I can get in, but usually
6   it's morning.
7          THE COURT:  Could you schedule them -- there will
8   be at least one day a week when we only sit half a day.  So
9   can you schedule them in the afternoons?
10          THE JUROR:  I could.  I don't know how late she
11   schedules.  Maybe like early afternoon I could.  I think she
12   likes to get out of there by, like, 3:00.
13          THE COURT:  So you're talking about starting around
14   noon.
15          THE JUROR:  Possibly, yeah.
16          THE COURT:  And I don't know anything about this
17   condition.
18          THE JUROR:  It's rare.
19          THE COURT:  Is there anything about it that affects
20   your ability to concentrate or sit?
21          THE JUROR:  No.  Like, anybody that has back pain,
22   sometimes you need to stretch, that kind of thing, but not --
23   to sit for a long period, like, I would get uncomfortable but
24   I could.
25          THE COURT:  Well, we give you breaks, we give you

1    time to stand up and stretch.  If a juror wanted to listen to

2    testimony standing in the back of the jury box, that would be

3    fine, too.  So it's not meant to be boot camp.

4              THE JUROR:  Yeah.

5              THE COURT:  And you'll see when I'm up there, I'll

6    sit up and down, too, because, I don't have those -- my back

7    bothers me and I move around.  So we'll give you ample

8    opportunities to do that.  It's just working out the

9    schedule, the infusion time every six weeks.  And the first

10   one is scheduled for this Tuesday?

11             THE JUROR:  Yes.

12             THE COURT:  The other thing you raised your hand on

13   a question about --

14             THE JUROR:  I'm a nurse.

15             THE COURT:  You're a nurse.  Is there anything

16   about your experience as a nurse that you think would affect

17   your ability to be a fair juror in this case?

18             THE JUROR:  I don't think so.

19             THE COURT:  When you said "I don't think so," do

20   you have reservations about that, or is that just a figure of

21   speech?

22             THE JUROR:  No.  Yes, yes.

23             THE COURT:  And so you know we're on a Government

24   shutdown these days.  Everyone knows, right?

25             THE JUROR:  Mm-hmm.

1          THE COURT:  So we do pay our jurors, but there may
2    be a delay in paying jurors in this case.  You would be paid.
3    Can you manage that delay?
4          THE JUROR:  Yeah.
5          THE COURT:  Okay.  Any follow up for her?
6          MR. WYSHAK:  No, Your Honor.
7          MS. WILKINSON:  No.
8          THE COURT:  You can step out.  Thank you.
9          THE CLERK:   Should they --
10         THE COURT:  Why don't they hold her for a second.
11   Medical hardship?
12         MS. WILKINSON:  The problem is, Your Honor, you
13   have another juror who also is going to have a court date.
14   So if we have all these people who have different times that
15   they --
16         THE COURT:  See, the other guy I don't really --
17         MS. WILKINSON:  Believe him?
18         THE COURT:  -- believe he's going to need a court
19   date.  But this obviously -- you know --
20         MS. WILKINSON:  This is serious.
21         THE COURT:  It's on the first day.  We'd have to
22   probably push off opening statements for a day, which I know
23   that's tempting for all of you at this point, but that's the
24   day we're supposed to open, right?
25         MR. TYRRELL:  We're opening Monday.

```
 1              MR. WYSHAK:  We're opening Monday.

 2              THE COURT:  I thought you guys asked for Tuesday,

 3     but that's fine.  We could sit a half day that Tuesday, or I

 4     bet that appointment is in the morning.

 5              MS. MINER:  That appointment is going to be in the

 6     morning.  I would take her out for medical.  She wrote it in

 7     her questionnaire, so obviously she's concerned about it.

 8              THE COURT:  She's got a legitimate issue.  She's

 9     going to miss half a day every six weeks.

10              MR. WYSHAK:  We can let her go.

11              THE COURT:  Let her go?

12              MS. WILKINSON:  Yes.

13              MS. MINER:  Yes.

14              THE COURT:  Too bad.

15              MR. TYRRELL:  So excused?

16              THE COURT:  So excused.  Nobody's objecting to her

17     being excused, right?  It sounds like it's by agreement to

18     me.

19              How are you?

20              THE JUROR:  Good, thanks.  How are you?

21              THE COURT:  Ms. Cherian?

22              THE JUROR:  Yes.

23              THE COURT:  Did I get that right?

24              THE JUROR:  Cherian.

25              THE COURT:  We were just following up on the
```

```
1   written questionnaires and the questions that I asked this
2   morning.
3             Did you have a chance to look at the witness list?
4             THE JUROR:  Yes.
5             THE COURT:  Did you know anyone on there?
6             THE JUROR:  No.
7             THE COURT:  Okay.  And just I see you work for
8   Partners HealthCare.  During the course of this trial -- you
9   know we're in a Government shutdown now, and during the
10  course of this trial, our jurors will be paid but there may
11  be a delay in paying them.  Could you manage that?
12            THE JUROR:  Yeah.
13            THE COURT:  Yeah?
14            THE JUROR:  I don't know.
15            THE COURT:  I think Partners -- do you know if
16  Partners pays you for jury service?
17            THE JUROR:  Should be three days.  I think my
18  manager said three days.
19            THE COURT:  Partners doesn't pay you for more than
20  that?
21            THE JUROR:  I don't know.  I didn't ask my manager.
22            THE COURT:  Okay.  If you were selected as a juror
23  and the payment is delayed, could you manage that?
24            THE JUROR:  Yes, I could.
25            THE COURT:  And just a couple of other questions.
```

1          I see you have three kids, and at least two of them

2     are involved in the health care industry.

3          THE JUROR:  Yes, yes.

4          THE COURT:  Is there anything about their jobs or

5     your experience with their jobs that you think would affect

6     your ability to be a fair juror in this case?

7          THE JUROR:  No.

8          THE COURT:  Any follow-up questions for her?

9          MS. MINER:  No.

10         MR. YEAGER:  I noticed, Ms. Cherian, that you

11    answered number 10:  Do you have any difficulty reading or

12    understanding English, and you said "yes."

13         THE JUROR:  Reading.  More understanding on the law

14    or anything, I don't understand that.

15         THE COURT:  Is English your first language?

16         THE JUROR:  No.

17         THE COURT:  If we explain the law to you, can you

18    follow along?

19         THE JUROR:  Yes.

20         THE COURT:  Did you have any trouble understanding

21    my questions this morning?

22         THE JUROR:  I understand the questions.  But if

23    somebody talk very fast, I don't understand that.

24         THE COURT:  Okay.  Did you understand my questions

25    this morning?

```
1                    THE JUROR:  Yes.

2                    THE COURT:  Because I talk pretty fast.  And if you

3      -- if someone was talking too fast, would you be willing to

4      raise your hand and ask them to slow down?

5                    THE JUROR:  Yes.

6                    THE COURT:  Anything else?  Okay.  You can step

7      out.  Why don't you hold her for a second, please.

8                    THE CLERK:  Can you hold her back there.

9                    THE JUROR:  Thank you.

10                   MR. WYSHAK:  I don't know.  Do you think she'll be

11     able to follow along?

12                   THE COURT:  She works for Partners HealthCare as a

13     medical records clerk.

14                   MS. MINER:  Her children are very well educated.

15                   MS. WILKINSON:  She was able to converse with you

16     and she understood.  If she's worried about technical issues,

17     I think that's true for a number of people.

18                   THE COURT:  That was my impression of it as well.

19     Okay.  She's fine.

20                   THE CLERK:  She can go down next.  16, Juror Number

21     16.

22                   THE COURT:  How are you?

23                   THE JUROR:  Fine, Your Honor.

24                   THE COURT:  Mr. Gulick?

25                   THE JUROR:  Gulick, very good.
```

1          THE COURT:  Thank you.  I was just saying sometimes

2     I get them right and sometimes I really don't get them right.

3          THE JUROR:  That's real close.

4          THE COURT:  I'm going to do some follow-up on the

5     written questionnaire and oral questions.

6          I know you said you have significant hearing loss

7     in one ear.  Do you think if you're sitting as a juror in

8     that box and there was someone testifying from up there that

9     you would be able to hear them?

10          THE JUROR:  In the box?  It's my left ear, so, you

11     know, if I'm, like, close here.  Where it really bothers me

12     is, like, in a small room where there's a lot of background

13     noise, I have trouble picking up conversations that way.

14          THE COURT:  Hopefully there's no background noise

15     in our courtroom.  It's just the witness.

16          THE JUROR:  To deliberate when you get to a jury

17     room.  I've never been in one.

18          THE COURT:  So the witness testifies from up there

19     and the lawyer will be someplace close to where Mr. Wyshak is

20     right now.  Would you be able to hear the question and the

21     answer if there was only just the one person talking?

22          THE JUROR:  Yeah, as long as I'm focused.  It's,

23     like, when somebody comes up on one side of me and I'm not

24     expecting it, he can talk for a long time.  Until they tap

25     me, I'm not hearing him.

1              THE COURT:  You know who has that gift?  My

2      children.

3              THE JUROR:  It's a skill.

4              THE COURT:  It is a skill.

5              You have two kids.  One is an undergraduate and one

6      is in graduate school.  What is the graduate student doing?

7              THE JUROR:  He's getting a master in social work.

8      He just started at the Oakland Salvation Army, for internship

9      placement.

10             THE COURT:  And I see that your wife is a doctor

11     and a lawyer.

12             THE JUROR:  No.  She works for a ADOSA, which is a

13     nonprofit.  They have counselors, lawyers, physicians where

14     they try and coordinate activities, and that's her nonpaying

15     job.

16             THE COURT:  Is there anything about her interaction

17     with doctors or lawyers that you think would affect your

18     ability to be a fair juror in this case?

19             THE JUROR:  No, not -- she just started that job,

20     so there's been, like, zero, I've had zero association with

21     any of that.

22             THE COURT:  And do you think if you're picked for a

23     juror in this case you can refrain from talking to your wife

24     about the specifics of it, given her job, for the duration of

25     the trial?

1           THE JUROR:  I'm doing a good job so far.

2           THE COURT:  Skill my husband has, too.

3           You say you had a close call with a driver who was

4      under the influence of opioids.

5           THE JUROR:  That I did.

6           THE COURT:  So, obviously, was -- is there anything

7      about that experience that you think would affect you're a

8      ability to be fair in this case?

9           THE JUROR:  That I thought a lot about this week,

10     and I really -- in the interim I also read some stories about

11     people coming back from Afghanistan and Iraq, basically.  And

12     the Army, the service, is not doing enough to get them off

13     opioids.  I really struggle with, you know, how close I came

14     to getting hurt or worse.

15          THE COURT:  Well, look.  The issue in this case,

16     it's not whether you like or you don't like opioids, right?

17          THE JUROR:  Well, I think someone's making a lot of

18     money off of them or else they wouldn't be so prevalent.

19          THE COURT:  Some people might be and some people

20     might not be.  And making money off of opioids, for better or

21     worse, is not a crime in this country.

22          So the question is -- but you're entitled to all

23     those views, especially when you were almost -- there's

24     nothing wrong with those views.

25          But do you think you could put those views aside

1   and listen fairly to the evidence and the law as I give it to

2   you?

3            THE JUROR:  That's my job as an engineer, is to try

4   and evaluate everything, come to a fair, come to the right

5   decision.

6            THE COURT:  When you started talking about the

7   military and Afghanistan, was the guy that almost hit you

8   ex-military?

9            THE JUROR:  I never heard whatever happened to him.

10  The police took him out of the car, found some needles, and I

11  talked to the police.  I was the one that called 911, so I

12  had to stick around and do all the reporting.  And I asked,

13  you know, was that guy okay.  They said, We hit him with

14  Narcan and he woke right up and that was that.

15           You know, I looked in the police log, and the only

16  thing that showed up was a car off the road, you know.  There

17  was, like, no story.

18           THE COURT:  Did you read anything this weekend

19  about this case?

20           THE JUROR:  No.

21           THE COURT:  And --

22           THE JUROR:  Although when I got home last Thursday,

23  she goes, my wife goes, There was an article in The Globe

24  that the Federal Court is needing a large number of jurors.

25  Is that you?  I go, Don't talk to me anymore.

1          THE COURT:  I think we might have given you an

2     inconvenient excuse for not talking to your wife.

3          THE JUROR:  She --

4          THE COURT:  I wanted to circle back on this.

5     Obviously, this instance is a company that was involved in

6     the manufacture and sale of an opoid.  But regardless of what

7     the product is that these defendants are involved with,

8     they're entitled to a fair trial.

9          THE JUROR:  Right.

10         THE COURT:  So it may well be that, you know, there

11    are some people that feel so strongly about opioids that they

12    can't be a fair juror, and there's other people who have a

13    view of opioids but can focus on evidence and make a

14    determination about whether the Government has met its burden

15    of proof.

16         THE JUROR:  I would like to think I fall into that

17    latter category.

18         THE COURT:  So I would -- you would like to think

19    that.  I need a little more certainty from you one way or the

20    other.

21         THE JUROR:  I'll -- I would like to do that.  Yeah.

22    I think I want -- I think I can make that leap.

23         THE COURT:  Do you have reservations about your

24    ability to make that leap?  It's fine to think about it.  I

25    see you're being thoughtful about it.  But thinking about it

1    and having real reservations about your ability to do it are

2    sort of two different things.

3              THE JUROR:  I've thought a lot.  I think I can get

4    past it and make a fair decision.

5              THE COURT:  When you say you "think" --

6              THE JUROR:  Percentage or am I absolutely sure?

7    No.

8              THE COURT:  I guess I need to push back on you

9    about, I mean, if you were a defendant in this sort of case,

10   would you want you on your jury?

11             THE JUROR:  Yes.

12             THE COURT:  Why?

13             THE JUROR:  I think I -- you know, issues of, you

14   know -- I think I can listen, process information and make a

15   good decision.

16             THE COURT:  You answered "yes" to the question

17   about, is there anything beyond the topics we've already

18   discussed that might prevent you --

19             THE JUROR:  That was this opoid thing I wanted to

20   talk about.

21             THE COURT:  Follow-up for anyone?

22             MR. KENDALL:  If I may, Your Honor.

23             THE COURT:  Let's -- he got to it first.  You're

24   next.

25             MR. WYSHAK:  Just, so maybe I misunderstood, but if

1    you're sitting facing this way and the lawyers are back here,

2    are you going to be able to hear the question?

3              THE JUROR:  Well, I guess, is there a PA system?

4              THE COURT:  Yeah.

5              THE JUROR:  Okay.  If you're the only one talking

6    or if the lawyer is the only one talking, yes.

7              MR. WYSHAK:  Okay.

8              THE JUROR:  In the other courtroom I could hear you

9    and I was all the way in the back.  It was a little bit of a

10   struggle.

11             THE COURT:  If you can hear me, you'll certainly be

12   able to hear Mr. Wyshak.

13             Mr. Kendall?

14             MR. KENDALL:  Yes.  Mr. Gulick, you made a comment

15   earlier, if you could just explain your thoughts on this.

16   You said that somebody's making a lot of money off of them.

17             Can you just give us your thoughts to flesh out

18   that concept?

19             THE JUROR:  Well, it's just the wide availability

20   of the -- of these opioids.  Or at least in my limited

21   experience they seem to be widely available, that if there

22   wasn't a profit motive in there, they wouldn't -- they would

23   not be so freely available.

24             I don't know where the money goes.  I have not dug

25   into that whole industry.  It seems like, you know, to my

1    case, to my view, that, you know, profit is what motivates

2    people and here we are.

3              MR. KENDALL:  Okay.  Thank you.

4              THE COURT:  I want -- anybody else?

5              MR. HORSTMANN:  What exactly does your wife do for

6    -- is she a social worker?

7              THE JUROR:  No.  She -- her previous role was

8    basically training the area presidents and it's strictly --

9    it's -- and now this new job, I'm still struggling with it

10   myself.  But, you know, ADOSA has a number of physicians,

11   nurses and, I guess, attorneys.  The big three.  And they try

12   to get these people -- like, physicians are the key ones.

13   They try and bring doctors over from Israel, work with

14   doctors here, you know, publicize those and publicize those

15   events.  You know, a lot of them are public service.  They do

16   a lot of breast cancer awareness, testicular cancer awareness

17   and that ultimately leads to fundraising, too.

18             I can't be more specific than that because I'm not

19   100 percent clear.

20             MR. TYRRELL:  Your Honor --

21             THE COURT:  Let me, and then you can have chance.

22             If you came to understand that there were people

23   that were making money off the sale of Subsys, which is the

24   opioid at issue in this case, would that affect your view of

25   whether or not the Government had met its burden?

1          THE JUROR:  I don't think so, not knowing what the

2   specific charges are.  I don't think that's particularly

3   relevant to what's going on.

4          MR. TYRRELL:  Thank you for your sincere responses.

5          You said, I think, that you think you can get past

6   it.  What is the "it"?

7          THE JUROR:  Well, the "it" is I was almost fairly

8   close to getting seriously injured or worse based on somebody

9   driving under the influence of opioids.  He almost got two

10  other people and himself -- you know -- and, you know, it's a

11  big problem in this country.  And I don't know.  It gives me

12  pause about, you know, are we, as a country, doing the right

13  thing with respect to how we deal with opioids and, you know,

14  the people that have issues with them.

15         MR. TYRRELL:  Thank you.

16         THE COURT:  All right.  He can step out.  Hold him.

17         THE CLERK:  Okay.  Just hold him, though.

18         MR. WYSHAK:  Fine with us.

19         MR. KENDALL:  I think he should be excused.

20         MR. TYRRELL:  I think he's concerned about a bias

21  and maybe he'll be able to hear in the courtroom, but he's

22  potentially going to be deliberating.

23         THE COURT:  I'm not excusing him on the hearing

24  issue.  I think he was perfectly fine with that.

25         MR. KENDALL:  Your Honor, he's a very intelligent,

1    analytical, well-intentioned man.  I liked him and he knows

2    what he's supposed to do as a juror and he wants to do that,

3    but he has all these emotional responses.  First thing out of

4    his mouth is their opening statement.  There's too many

5    opioids in this country.  People are making money off of it.

6              THE COURT:  We're not going to excuse jurors who

7    think there's too many opioids in this country and people are

8    making money off of it.

9              MR. KENDALL:  That's the first thing in his mind,

10   Your Honor.  That's what he raised.  We may all agree with

11   that, generally, but it's an emotional issue for him.  He was

12   almost killed by a driver under opioids.  He immediately

13   thinks about the people making money off of it and they're

14   the ones at fault.

15             Your Honor, he's -- compare him to the Deloitte

16   guy.  They're both analytical people, going through their

17   thought progressions.  He's got a lot more bias.

18             MS. WILKINSON:  It's the personal connection, Your

19   Honor.  We know people have a very hard time setting aside

20   they've been personally affected, and he said that over and

21   over again.  When he was asked what the "it" was, was it

22   personal, he was almost hit himself, and he has a view.

23             So to me it's that connection that he keeps

24   raising.  And he struggled when you were asking him.  I mean,

25   you had to ask him eight different times.

```
1              THE COURT:  Because I think he's -- I think he's --
2    I think there are a lot of thoughtful people that won't say
3    something is 100 percent this or zero percent that, people
4    that just see things in a more nuanced way, and that was my
5    impression of him.
6              Bring him back in for a second.
7              THE CLERK:  Can you bring him back in.
8              THE COURT:  Sorry.
9              THE JUROR:  That's all right.
10             THE COURT:  We're working hard to get a fair juror
11   here.
12             THE JUROR:  I understand.
13             THE COURT:  And there is some concern that your
14   experience with opioids is too fresh and too recent for you
15   really to be able to put it out of your mind and be fair
16   about this.
17             What do you think about that?
18             THE JUROR:  It is very fresh in my mind.  I would
19   agree with that statement.
20             THE COURT:  Okay.  All right.  Thanks very much.
21             THE CLERK:  17.
22             THE COURT:  Excuse -- hold on.  What do you guys
23   want to do about lunch?
24             MS. WILKINSON:  Have some.
25             MR. KENDALL:  20 minutes.
```

1        MR. TYRRELL:  What time is it?

2        MS. WILKINSON:  No later than 12:30.

3        THE COURT:  Okay.  So let's let at least some more

4  of these people go.  I'm happy to have an early lunch or late

5  lunch.  I think recessing at 1:00 is going to be a big

6  mistake, so I'd like to get everybody in and out.  Either we

7  are early or late.  Number 17.

8        THE CLERK:   Juror Number 17.

9        THE COURT:  Yes.

10        THE COURT:  Ms. Griffin, right?

11        THE JUROR:  Yes.

12        THE COURT:  How are you?

13        THE JUROR:  Good.  How are you?

14        THE COURT:  I'm good, thanks.

15        So we're following up on the written questionnaires

16  and the oral questioning from this morning.

17        Did you have a chance to look at the witness list?

18        THE JUROR:  Yes.

19        THE COURT:  Did you know anybody on there?

20        THE JUROR:  No.

21        THE COURT:  That's a good start.

22        I see from your questionnaire that you're concerned

23  about the financial hardship if you're picked to serve on a

24  jury.

25        THE JUROR:  Yes.

```
 1              THE COURT:  Have you had a chance to talk to them,
 2      because I would be utterly shocked Liberty Mutual wouldn't
 3      be --
 4              THE JUROR:  Yes, I talked to HR.  They pay for it.
 5      No limit also.  I was concerned if there was a limit of days.
 6      There is not.
 7              THE COURT:  Some companies have them.  I was -- I
 8      would be surprised if Liberty Mutual would be one of them.
 9              Does anybody have anything else for her?
10              MR. TYRRELL:  No.
11              THE COURT:  Okay.  You can go.
12              THE JUROR:  Great.  That was easy.
13              THE COURT:  Thank you.
14              Everybody ready for Juror 18?
15              MS. WILKINSON:  We'll leave it to you, Your Honor.
16              THE CLERK:  Juror Number 18.
17              THE COURT:  How are you?
18              THE JUROR:  Good morning, Your Honor, and everyone
19      else here.
20              THE COURT:  Mr. Footit?
21              THE JUROR:  Correct.
22              THE COURT:  Did I get that right?
23              THE JUROR:  You did.
24              THE COURT:  We're following up on the written
25      questionnaires and on the questions from this morning.
```

1          THE JUROR:  Okay.

2          THE COURT:  Okay.  And this might take a few

3    minutes because you answered a lot of them "yes."  And I

4    think we'll start from the back.

5          You said there were other things you wanted to tell

6    THE COURT about your ability to serve fairly and that there

7    were topics beyond what we discussed.

8          THE JUROR:  Yes.  I can probably start by saying

9    that this was dinner talk between my wife and I a couple of

10   years back when it first occurred.  She works for a

11   pharmaceutical medical device company, and I guess the talk

12   came about at her place of employment, and she had mentioned

13   it to me.

14         And then coming back last week, I had brought up

15   the subject and we got talking a little bit.  And my wife has

16   done quite a bit of work with the FDA, and she explained to

17   me some of the things that goes on and the dos and don'ts, I

18   should say, about the industry.

19         THE COURT:  Well, so in terms of the dos and

20   don'ts, the law, I will tell you about the law and what it

21   allows and what it doesn't.

22         Do you think that you could decide this case based

23   on what I tell you, or you would be influenced by your

24   conversations with your wife?

25         THE JUROR:  I don't feel that I could be impartial.

1          THE COURT:  Why?

2          THE JUROR:  Why?  Because I've already -- I already

3     have a decision that these people are guilty from what I know

4     of the business.  And I don't know a lot, I'm in

5     construction, but my wife has been in the business for a long

6     time.

7          THE COURT:  I am going to let you go, but I want to

8     tell you that making a decision about somebody's guilt or

9     innocence before you've heard any of the evidence is really

10    not what this country is about.

11         THE JUROR:  No, it is not.  And I have to say maybe

12    I'm wrong doing this, but that's just my gut feeling right

13    here.

14         THE COURT:  Then I'm going to let you go because

15    they're entitled to a fair jury.  It's just not really how it

16    works in our country.

17         THE JUROR:  I understand, Your Honor.

18         THE COURT:  All right.  You can go.

19         THE CLERK:  19.  Juror Number 19.

20         THE COURT:  Yes, please.

21    Ms. Hazelton, correct?

22         THE JUROR:  Yes.

23         THE COURT:  How are you today?

24         THE JUROR:  I'm good.  And yourself?

25         THE COURT:  I'm good, thank you.

```
 1              We're just doing some follow-up on the written
 2     questionnaires and then the oral questioning from this
 3     morning.
 4              THE JUROR:  Okay.
 5              THE COURT:  The first thing I notice on your
 6     questionnaire is that you've had some personal experience
 7     with opioids.  You had an adult foster child who died from
 8     Fentanyl and family members who have struggled with opioid
 9     addictions.
10              THE JUROR:  Yes.
11              THE COURT:  Do you think you could put those
12     experiences aside and listen fairly to the evidence in this
13     case?
14              THE JUROR:  Absolutely I could.
15              THE COURT:  You do, okay.  How long ago -- I'm
16     sorry about your foster son, but how long --
17              THE JUROR:  It was my foster daughter.
18              THE COURT:  I'm sorry.
19              THE JUROR:  Two years ago.
20              THE COURT:  And so the -- I mean, the drug at issue
21     here is called Subsys, but it does involve Fentanyl.
22              THE JUROR:  Right.
23              THE COURT:  Do you think despite your personal
24     experience you could listen to the evidence fairly in this
25     case?
```

1            THE JUROR:  Yes, I do.

2            THE COURT:  Then you raised your hand on, have you

3    or any member of your family or close friends been the

4    subject of a criminal investigation, been arrested, charged

5    or convicted for any crime, felony more than a misdemeanor --

6    sorry -- more than a traffic violation.

7            THE JUROR:  Yes.

8            THE COURT:  Can you tell us about that?

9            THE JUROR:  I had a family member many years ago, I

10   was actually a child when it happened, who was convicted of

11   murder.  Served eight years and has come out successful.

12           THE COURT:  Successful or un --

13           THE JUROR:  Successful.  He's been a very

14   successful person.

15           THE COURT:  Is there anything about that or your

16   family's experience with the criminal justice system that you

17   think would affect your ability to be a fair juror?

18           THE JUROR:  No, not at all.

19           THE COURT:  Then you raised your hand, have you or

20   any member of your family been a witness in a criminal case

21   or victim of crime.

22           THE JUROR:  Yes.  Well, the murder.  One of my

23   other cousins was a witness to a crime.

24           THE COURT:  And anything about that, your

25   relationship with that cousin, that would make it difficult

```
1    to be --

2              THE JUROR:  No, not at all.

3              THE COURT:  Good, okay.

4              Last thing, or maybe not the last thing because

5    these people get a chance after I do, but the Government is

6    on this partial shutdown.

7              THE JUROR:  Yeah.

8              THE COURT:  So jurors get paid in our cases, but

9    the payment may be delayed, depending on what happens with

10   the shutdown.  Could you manage that?

11             THE JUROR:  Yes.

12             THE COURT:  Okay.

13             THE JUROR:  Because I believe my job would still

14   pay me.

15             THE COURT:  Okay.  A lot of them do.  Some don't.

16   I just -- I don't want to --

17             THE JUROR:  And I work a separate job besides my

18   normal job.

19             THE COURT:  What's your second job?

20             THE JUROR:  I just do DoorDash, which is

21   deliveries, on my own time to keep income up.

22             THE COURT:  Okay.  Follow-up for her?  Okay.

23             Thanks very much.  You can go.

24             THE JUROR:  Okay.

25             THE COURT:  Sorry, Karen.  Tell me, did I ask you
```

1    if you looked over the witness list?

2              THE JUROR:  No, you didn't ask me that.

3              THE COURT:  Did you look over the witness list?

4              THE JUROR:  Yes, I did.  And the last page, with

5    Caremark and Express Scripts, I don't have any personal,

6    like, except for they're -- my insurance company uses Express

7    Scripts and CVS Caremark.  That's who I have to use.

8              THE COURT:  Is that a records -- okay.  They won't

9    be prominently in this case but there might be records.

10   Would that affect your ability --

11             THE JUROR:  No, not at all.

12             THE COURT:  Thanks very much.  You can go.

13             THE CLERK:  She can go down.  Juror 20.

14             THE COURT:  Yes.

15             How are you?

16             THE JUROR:  Good.

17             THE COURT:  Mr. Potvin?

18             THE JUROR:  Yeah.

19             THE COURT:  Did I get that right?

20             We're just doing some follow-up on the written

21   questionnaires and the questioning from this morning.

22             Did you have a chance to look at that witness list?

23             THE JUROR:  Yes.

24             THE COURT:  Did you know anybody on there?

25             THE JUROR:  No.

1          THE COURT:  On your written questionnaire, you say

2     you're a Type I diabetic and it's not particularly well under

3     control.

4          THE JUROR:  No, it's not.

5          THE COURT:  Would that affect your ability to sit

6     as a juror?

7          THE JUROR:  For sitting long periods of time, if I

8     end up eating or driving or something, like, I end up having

9     to go to the bathroom a lot.

10          THE COURT:  Well, that we can manage.  And what we

11     normally -- we don't sit more than two hours without giving

12     you an opportunity to go and have a snack, and then whenever

13     anybody needs a bathroom break, we give it to them.

14          THE JUROR:  Okay.

15          THE COURT:  Is there anything about your medication

16     that affects your ability to focus or concentrate?

17          THE JUROR:  No.

18          THE COURT:  So as long as we sort of accommodate

19     with food and bathroom you can --

20          THE JUROR:  Yes.

21          THE COURT:  Okay.  All right.

22          Then some of these questions that you answered

23     "yes" to, I just want to go over.

24          The question was, do you have positive or negative

25     opinions regarding the pharmaceutical industry or people that

1   work for them, including sales reps, that could affect your

2   ability to be a fair juror?  And you raised your hand on that

3   one.  Can you tell me what the issue is?

4           THE JUROR:  Basically the way I look at it is a lot

5   of the people that work for them, pharmaceutical companies,

6   stuff like that, they're mainly in it for the money.  They're

7   not in it for the actual health of the people and stuff like

8   that.  They're actually in it for the money and trying to

9   sell doctors on every little thing, just this or that, just

10  trying to make a penny.

11          THE COURT:  So that may be true of some companies

12  and may not be true of some companies.  I don't actually have

13  an opinion on that.  But do you think that you could put

14  aside that view of pharmaceutical companies and listen to the

15  evidence in this case and the law and make a determination,

16  or do you start with a bias against pharma companies or

17  people that work for them?

18          THE JUROR:  I've always been biased towards it.

19  Basically, you know, pharmaceutical companies are always out

20  for the money.

21          THE COURT:  Okay.  Thanks very much.  You can go.

22          THE CLERK:  He can go down.

23          Number 25.

24          THE JUROR:  Good morning, Your Honor.

25          THE COURT:  Ms. Pinhancos?

```
1          THE JUROR:  Close.

2          THE COURT:  What is it?

3          THE JUROR:  Pinhancos.

4          THE COURT:  I try.

5          THE JUROR:  Valiant effort.

6          THE COURT:  We are following up on the written

7   questionnaires and some of the oral questions that we asked

8   this morning.

9          Did you have a chance to look at that witness list?

10         THE JUROR:  I did.

11         THE COURT:  Did you know anybody on there?

12         THE JUROR:  I believe I am professionally

13  acquainted with Rosenberg, Gerald Rosenberg, if he was a pain

14  management doctor from Rhode Island.  I don't know if that

15  was the same one or not.

16         THE COURT:  What's your relationship with him?

17         THE JUROR:  I'm a physician assistant in

18  orthopedics, spine in particular.  We've had a few mutual

19  patients that we would have them care for.

20         Also when he started having some difficulties

21  within his own practice regarding his narcotic prescriptions,

22  patients would come to our office trying to continue their

23  pain management.

24         THE COURT:  So you obviously have some familiarity

25  with pain and pain patients and some medical background.  I'm
```

1    going to go through these questions one at a time, but given

2    sort of your, what we just talked about, do you have

3    confidence in your ability to sit as a fair and impartial

4    juror in this case, or do you have reservations on that?

5              THE JUROR:  I have reservations.

6              THE COURT:  Flesh that out for me.

7              THE JUROR:  Fentanyl is a very strong drug.  I

8    don't like prescribing it.  I have patients that are on it.

9    Not because of me but because they came to me, continuing on

10   it with no desire to stop.  I think there's a time and a

11   place for these drugs.  I think we, as a society in the

12   medical field, have turned to try to make people happy and

13   not always dealing with the pain that they're actually

14   dealing with, maybe internally as well as physically.

15             It's hard for me.  I prescribe them.  I'm in a

16   surgical practice, the doctor I work with, so we do use them

17   for short term, but our number one goal is to never create a

18   further problem.  And we've just seen it explode in this

19   country in the last couple of years about how dangerous these

20   type of drugs can be.

21             THE COURT:  So all of those beliefs are -- I mean,

22   they're thoughtful and they're based on your experience, and

23   you're certainly entitled to those views.

24             Are you saying you have reservations about your

25   ability to put them aside and listen to the evidence in this

1    case and make an impartial decision about whether or not the

2    Government has met its burden of proof?

3                    THE JUROR:  It's going to be hard just because I

4    know what these medicines are used for.  And knowing what

5    I've seen in the medical field about how these medications

6    get prescribed, it would be very hard to feel impartial in

7    some way.

8                    THE COURT:  The physician she said she knew, is he

9    going to testify?

10                   MR. YEAGER:  I don't think so.

11                   MR. WYSHAK:  But there will be testimony about him.

12                   MR. YEAGER:  Alleged co-conspirator, Your Honor.

13                   THE COURT:  And you know him?

14                   THE JUROR:  Professionally I know what happened

15   with his practice.

16                   THE COURT:  Okay.  Why don't you step out for just

17   a second.

18                   THE JUROR:  Sure.

19                   THE CLERK:   Hold her, please.

20                   THE COURT:  Do you want me to keep going with her?

21   Anybody?

22                   MS. WILKINSON:  No.

23                   MR. WYSHAK:  I like her.

24                   THE COURT:  I like her, too.

25                   MR. TYRRELL:  I thought the son of the physician

```
 1    was a witness.
 2              MS. WILKINSON:  She's going to know some of the
 3    facts, Your Honor.
 4              THE COURT:  I like her, too.  She's obviously
 5    thoughtful.  I'm just not sure she can be a fair juror.  If
 6    you want, if you want me to press on --
 7              MR. WYSHAK:  No, that's okay.
 8              THE CLERK:  27.
 9              THE COURT:  How fast can you guys have lunch?
10    1:00?
11              MS. WILKINSON:  Sure.  Whatever is best for the
12    jurors and you, Your Honor, we're fine.
13              THE COURT:  Can everyone manage 1:00?
14              MS. WILKINSON:  Yes.
15              MR. TYRRELL:  Yeah, for sure.
16              THE COURT:  Let's see where we are for these three.
17              27, please.
18              THE CLERK:  27.
19              THE COURT:  How are you?
20              THE JUROR:  Good.  How are you?
21              THE COURT:  You can sit down.
22              THE JUROR:  Thank you.
23              THE COURT:  Ms. Carrim?
24              THE JUROR:  Yes.
25              THE COURT:  Did I pronounce that right?
```

1          THE JUROR:  Yeah.

2          THE COURT:  We're just doing some follow-up on the

3    written questionnaire and then the questions I ask this

4    morning.

5          Did you have a chance to look through that witness

6    list?

7          THE JUROR:  Yes.

8          THE COURT:  Did you know anybody on it?

9          THE JUROR:  No.

10          THE COURT:  Okay.  You say on here that you have

11    some difficulty understanding English.

12          THE JUROR:  Yes.

13          THE COURT:  So did you understand everything I was

14    saying this morning?

15          THE JUROR:  Not much.

16          THE COURT:  No?

17          THE JUROR:  Some.

18          THE COURT:  All right.  All right.  So you didn't

19    understand the questions I was asking today?

20          THE JUROR:  Some I had doubt about that.

21          THE COURT:  Because when you say that you have

22    trouble with the terminology, we can explain the terminology

23    to you.  But if you have trouble with conversational English,

24    that's harder.

25          THE JUROR:  Yes, I think with conversation.

1   Because if somebody talk fast, I won't be able to grab it

2   right away.

3           THE COURT:  Okay.  Thanks very much.  You can step

4   out.

5           Hold on to her for a minute, please.  Okay?

6           THE CLERK:  Hold her out back.

7           THE COURT:  Does anyone want me to press on with

8   her?

9           MR. WYSHAK:  No.

10          MS. WILKINSON:  No, Your Honor.

11          MS. MINER:  No.

12          THE CLERK:  Just 27, 28.  She wasn't out there yet.

13  Juror Number 28.

14          THE COURT:  How are you?

15          THE JUROR:  Great.  How are you?

16          THE COURT:  Ms. Horwath?

17          THE JUROR:  Yes.

18          THE COURT:  How are you today?

19          THE JUROR:  I'm doing well.  How are you?

20          THE COURT:  Good.  You're going to be our last

21  juror before lunch.

22          THE JUROR:  Nice.  Good for you guys.

23          THE COURT:  You can either choose the cafeteria

24  food or not choose it.

25          THE JUROR:  Not.

1          THE COURT:  We're just following up on the oral and

2     written questionnaires.

3          Did you have a chance to look at that witness list?

4          THE JUROR:  Yes.

5          THE COURT:  Do you know anybody on that?

6          THE JUROR:  I didn't recognize any names, no.

7          THE COURT:  You raised your hand about the question

8     of, have you or any member of family or close friends been

9     the subject of a criminal investigation, arrested, charged or

10    convicted for anything other than a minor traffic violation.

11         THE JUROR:  So maybe 2005 my father had a DUI.  But

12    I'm not sure.  That was like a "not sure."

13         THE COURT:  You did the right thing by raising your

14    hand.  If you're not sure, you should definitely raise your

15    hand.

16         Is there anything about that experience or his

17    experience with THE COURT system, with law enforcement that

18    you think would affect your ability to be a fair juror?

19         THE JUROR:  No.  I didn't even really know what was

20    going on at the time.

21         THE COURT:  Okay.  So as you probably know, we're

22    in the middle of the Government shutdown.  So we do pay our

23    jurors, but that payment might be delayed because of the

24    shutdown.  If you're selected for the jury, can you manage

25    that?

```
 1              THE JUROR:  Yeah.  I have a job, I work in a
 2    school, so I think I would still be getting my salary through
 3    that.  I'm not sure how they would -- I think they would have
 4    to get like a long-term sub or something.  I'm a little
 5    worried about how they would --
 6              THE COURT:  Do you teach full time?
 7              THE JUROR:  I'm a speech language pathologist, so I
 8    provide IEP services and it's full time, yeah.
 9              THE COURT:  Okay.  You can step out.
10              THE JUROR:  Okay.  Thank you.
11              THE CLERK:  Should they hold her.
12              THE COURT:  No.  They can let her go.
13              So what do you want to do about 28?  I hate taking
14    a whole classroom full of IEP kids and having a long-term sub
15    in there.  I would -- it's my practice to dismiss on the
16    teachers.
17              MR. WYSHAK:  Okay.
18              THE COURT:  But she didn't raise it earlier.  I'm
19    certainly willing to hear you on it.
20              MR. WYSHAK:  I don't want to fight a losing battle,
21    so we'll agree.
22              MS. WILKINSON:  She said she was worried about it,
23    Your Honor.  We think she should be excused.
24              THE COURT:  It's just the teachers.  I'm going to
25    excuse her.
```

```
1              29 is not here?

2              THE CLERK:  No.  We sent them to lunch.

3              THE COURT:  29 is a teacher, too.

4              All right.  Let's make it 1:00.  35 minutes.  Okay?

5     You can leave your stuff.  Please avoid the jurors in the

6     cafeteria.  Avoid everybody in the cafeteria since you have

7     no idea who the jurors are.

8                   (Recess, 12:23 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    **** AFTERNOON SESSION ****

2              THE CLERK:  Juror 29.

3              THE COURT:  Ms. Beckett, correct?

4              THE JUROR:  Yes.

5              THE COURT:  How are you?

6              THE JUROR:  Good.  How are you?

7              THE COURT:  I'm good.  Thank you.  Did you have

8    lunch in our cafeteria?

9              THE JUROR:  I did.

10             THE COURT:  How was it?

11             THE JUROR:  It was delicious.  I had a nice

12   sandwich.

13             THE COURT:  We'll have to pass that on, a happy

14   customer.

15             THE JUROR:  Yeah, the sandwich lady was very nice.

16             THE COURT:  If you're ever here on a Wednesday,

17   it's Buffalo chicken day.  Every Wednesday it's Buffalo

18   chicken day.

19             MR. TYRRELL:  In Patriots town you eat Buffalo

20   chicken?

21             THE COURT:  It's delicious.  Very popular, Buffalo

22   chicken.

23             We're just following up on the questionnaires.  I'm

24   so loathe to tell you this because you look like such a fair

25   person.  I often let teachers go because of the inconvenience
```

1    to the entire classroom full of kids, unless you would like

2    to be here.

3                    THE JUROR:  If you want me to be here, I'll be

4    here.  I'm the type of person that -- I'm a state worker.

5    Like, I get it.  I do have very nice bosses right now that

6    they already got me a tentative permanent sub.  They

7    understand this.  They understand that this is an obligation.

8    It's one of those things, if you need me, I'm here.  But if

9    you don't, then I'll go back to my classroom.

10                   THE COURT:  Well, then, we will keep you here for

11   now.  Did you have a look at that?

12                   THE JUROR:  I did.

13                   THE COURT:  Do you know anybody on there?

14                   THE JUROR:  I know no one on there.

15                   THE COURT:  Do you get paid by your school district

16   for jury service?

17                   THE JUROR:  I do.

18                   THE COURT:  Otherwise I would have to discuss with

19   you the government shutdown and how we will pay you, but it

20   will be delayed, and make sure you could manage that.

21                   Does anybody else have any questions for -- oh, the

22   school vacations.

23                   THE JUROR:  Yes.

24                   THE COURT:  We're to be determined what we do about

25   school vacations.  If there's a lot of jurors for whom those

```
 1    two weeks are mission critical, we'll make other
 2    arrangements; but if not, we'll give you plenty of advanced
 3    notice.  I think it's fair to say we'll probably only sit for
 4    one of those two weeks.
 5                THE JUROR:  Excellent.
 6                THE COURT:  Anybody have any other questions for
 7    her?
 8                MS. WILKINSON:  No, Your Honor.
 9                THE COURT:  You can go.
10                THE JUROR:  Who do I give these to?
11                MR. McALEAR:  Those two gentlemen back there.
12                THE CLERK:  Number 32.
13                THE COURT:  How are you?
14                THE JUROR:  Good.  And yourself, Your Honor?
15                THE COURT:  So we're following up on the
16    questionnaires.
17                THE JUROR:  Yes.
18                THE COURT:  Just to make sure, you're
19    Mr. Fitzgerald, right?
20                THE JUROR:  Yes, I am.
21                THE COURT:  You first said that you've done jury
22    duty before.
23                THE JUROR:  Yes.
24                THE COURT:  Civil?  Criminal?
25                THE JUROR:  Criminal.
```

1        THE COURT:  State?  Federal?

2        THE JUROR:  State.

3        THE COURT:  When was that?

4        THE JUROR:  Approximately two years ago.

5        THE COURT:  Is there anything about that experience

6   that you think would affect your ability to be fair and

7   impartial in this case?

8        THE JUROR:  No.

9        THE COURT:  And then let's see, have you or any

10  member of your family or close friend have any experience

11  with Medicare, insurers, or other agents involved in the

12  healthcare industry that could affect your ability to be

13  fair?

14        THE JUROR:  Medicare in particular?

15        THE COURT:  Well, what were you thinking when you

16  answered yes to the question?

17        THE JUROR:  Just my son got injured in high school,

18  a broken nose, and they wouldn't cover the cost because they

19  called it rhinoplasty.  It's not really the same.

20        THE COURT:  I take your point.  Do you have any

21  sort of such strong negative feelings about them that you

22  think that --

23        THE JUROR:  No.

24        THE COURT:  Okay.  And then you have a family

25  vacation during February school break.

1           THE JUROR:  Correct.

2           THE COURT:  You said your wife, youngest son, and

3    in-laws.  Does that include you, or are you going to stay

4    home anyway?

5           THE JUROR:  That included me.

6           THE COURT:  We don't actually make people miss

7    prepaid vacations.  If you're selected on the jury, we'd

8    likely take that week off.

9           THE JUROR:  Okay.

10          THE COURT:  And then the other issue that you

11   raised was employment.  Jury duty is just an inconvenience

12   for anybody that's employed.  It's really hard to dismiss

13   people for that.  Generally people's companies pay.  Have you

14   talked to your company about that?

15          THE JUROR:  Somewhat, just for backup for last

16   Thursday and today.  And working on making -- trying to bring

17   someone on board or have someone else cover in case I do get

18   selected.

19          THE COURT:  They would pay you for that?

20          THE JUROR:  I haven't broached that subject yet.

21   But no one has raised the point that they wouldn't.

22          THE COURT:  Okay.  Most of these bigger companies

23   pay people for jury duty.  If it turns out that they're not

24   going to, you can let us know and we'll see if we can help

25   you out with that.

1          THE JUROR:  I don't foresee an issue.

2          THE COURT:  Any other questions for Mr. Fitzgerald?

3          MR. YEAGER:   Just what is Cresa Boston?

4          THE JUROR:  Cresa Boston, it's kind -- it stands

5    for Corporate Real Estate Service Advisors.  They do

6    corporate leasing, leasing negotiations.  I deal with project

7    management to fit up if, say, a company moves from one

8    location to a new location, we build out the new location,

9    relocate them in, and close down the other one.

10         MR. YEAGER:  Okay.  Thank you.

11         THE COURT:  Anybody else?  Okay.  You're excused.

12   Thank you.

13         THE CLERK:  33.

14         THE COURT:  Mr. Berglund, right?

15         THE JUROR:  Yup.

16         THE COURT:  How are you?

17         THE JUROR:  Pretty good.  How are you.

18         THE COURT:  I'm good, thanks.  We're following up

19   on the written questionnaires and oral questions from this

20   morning.  Have you done jury duty before?

21         THE JUROR:  Yes.

22         THE COURT:  State or federal?

23         THE JUROR:  State.

24         THE COURT:  Civil or criminal?

25         THE JUROR:  Criminal.

1           THE COURT:  How long ago was that?

2           THE JUROR:  Six months ago.

3           THE COURT:  Anything about that experience you

4    think would affect your ability to be a fair juror in this

5    case?

6           THE JUROR:  No.

7           THE COURT:  Did you have a chance to look over that

8    witness list?

9           THE JUROR:  Yes.

10          THE COURT:  Do you know anyone on there?

11          THE JUROR:  No.

12          THE COURT:  We asked about positive or negative

13   opinions regarding the pharmaceutical industry or people that

14   work for pharma companies, including sales reps, that might

15   affect your ability to be a fair and impartial juror.

16          THE JUROR:  I built pharmaceutical equipment for

17   the last 25 years.

18          THE COURT:  You build it or you bill it?

19          THE JUROR:  I design it and build it.

20          THE COURT:  Tell me how you think that would affect

21   your ability to be fair and impartial.

22          THE JUROR:  Bias to the pharmaceutical companies

23   probably.

24          THE COURT:  They pay the bills for you, right?

25          THE JUROR:  That's right.

1          THE COURT:  I understand your general positive

2    feelings about the industry, but would you be able to listen

3    to the evidence and make an assessment about whether people

4    that worked for a particular company, whether the government

5    would be able to prove beyond a reasonable doubt their

6    participation in an offense, or do you think you start

7    biased?

8          THE JUROR:  I'm sure I could.

9          THE COURT:  You're sure you could?

10         THE JUROR:  Yeah.

11         THE COURT:  If you or a family member or close

12   friend ever worked in the pharmaceutical or healthcare

13   fields.  Is that you?

14         THE JUROR:  Yes.

15         THE COURT:  Anyone else?

16         THE JUROR:  No.

17         THE COURT:  Is there anything else beyond the

18   topics we've already discussed that might prevent you from

19   serving as a neutral juror?

20         THE JUROR:  I'm just a single parent, so it's going

21   to be hard for me to do.

22         THE COURT:  I saw that you wrote that in your

23   questionnaire.  Your kids are above the age where we can

24   easily excuse you for that.  The primary caretakers of much

25   younger children we can dismiss.  We don't sit beyond 4:00.

1   Could you manage that?

2           THE JUROR:  I'm the only one.  Their mom's not

3   around.  My mom is not around.  It's only me.

4           THE COURT:  It's the 13-year-old.  The older one is

5   on her own?

6           THE JUROR:  Yes.

7           THE COURT:  How does she get to and from school?

8           THE JUROR:  Me.

9           THE COURT:  Does she ever walk?

10          THE JUROR:  No.

11          THE COURT:  How long is it?

12          THE JUROR:  A mile.

13          THE COURT:  My kids walk a mile.

14          THE JUROR:  I assume mine could, too.

15          THE COURT:  It will be about four days a week that

16  we sit a full day.  The other day, it would be a half day.

17  So it wouldn't be a problem that3 day?

18          MR. YEAGER:  All their activities, it's me.

19          THE COURT:  It's hard for me to let a juror go

20  without --

21          THE JUROR:  I'm just telling you what it is.  I'm

22  not telling you anything.

23          THE COURT:  Our local rules let me let a single

24  parent or a primary caretaker for a younger child go, but I

25  really can't let you go on that ground.  I don't know that

1   you'll be selected for this jury, but it's just a tough one

2   for me.

3               THE JUROR:  Okay.

4               THE COURT:  Will you be paid by your company if

5   you're on jury duty?

6               THE JUROR:  Three days.

7               THE COURT:  Did you talk to them about paying you

8   for longer?

9               THE JUROR:  I just talked to them and they said it

10  was three days.

11              THE COURT:  We pay you for jury duty, but because

12  of the government shut down it's going to be delayed.  Could

13  you manage or no?

14              THE JUROR:  It's going to be hard.  I have alimony,

15  too.  It's a lot more than 50 bucks a day.

16              THE COURT:  It goes up to 60 after the first week.

17              THE JUROR:  It's a lot more than that, too.

18              THE COURT:  Does anybody have any follow-up for

19  him?

20              MR. YEAGER:  Just briefly, Your Honor.

21              So you had some arrests back in the '90s?

22              THE JUROR:  Yep.

23              MR. YEAGER:  Anything about those that are going to

24  affect your ability to be fair and impartial if there's law

25  enforcement witnesses?

1           THE JUROR:  No.

2           MR. YEAGER:  Do you feel like you were treated

3     fairly by the court system and the police at the time?

4           THE JUROR:  Yes.

5           THE COURT:  I forgot some questions.  I'm glad I

6     didn't let you go.  You said you'd read about this case.

7     What have you read about it?

8           THE JUROR:  I heard about it because I'm in the

9     pharmaceutical industry.

10          THE COURT:  Do you remember anything you read

11    specifically?

12          THE JUROR:  No.  I know where it came from and I

13    know the drug.

14          THE COURT:  Is there anything about what you read

15    or that you can remember reading that's going to affect your

16    ability to be a fair and impartial juror?

17          THE JUROR:  Probably not.

18          THE COURT:  You have a friend that's gone through

19    rehab?

20          THE JUROR:  Yep.

21          THE COURT:  Anything about that experience that you

22    think will affect your ability to be fair?

23          THE JUROR:  No.  He was just hooked on opioids.

24          THE COURT:  Follow-up, anyone?  Okay.  You can go.

25          MS. WILKINSON:  I have concerns about his financial

1    hardship plus his daughter, as a single parent, and having to

2    drive her.  If he has a financial hardship, I don't know how

3    he's going to be able to get around it.  It seems like he's

4    going to be angry to be here.

5           MR. YEAGER:  He really didn't say anything that

6    justifies challenge for cause.

7           THE COURT:  That would be the situation.

8           MS. MINER:  Except the financial.

9           THE COURT:  He didn't say he couldn't do it.  He

10   said it would be hard.

11          MS. WILKINSON:  I think it was the way he didn't

12   want to say it in front of everyone.  He said that would

13   never cover his alimony, let alone the rest of his bills.

14          THE COURT:  How does he have alimony and the kids?

15          MS. WILKINSON:  I can think of lots of ways,

16   unfortunately.

17          THE COURT:  He obviously didn't want to be here,

18   but there isn't really a reason to strike him for cause.

19          MR. TYRRELL:  As the son of a single parent, it

20   seemed like it was a pretty difficult set of circumstances

21   for him.  He was very forthcoming.  And he's willing to do

22   what he's required to do, but I just think that we can find

23   people who don't have the same distractions.  I think we're

24   doing pretty well in terms of numbers.

25          THE COURT:  See, I don't.

```
1            MR. YEAGER:  If we want we can bring him in and put
2      it right to him, can you do this or not?
3            THE COURT:  Is he still here?
4            THE CLERK:  No.  He just went down already to the
5      second floor.
6            THE COURT:  I can leave him as a maybe.  I'm
7      doubting he's anybody's favorite, right?
8            MR. KENDALL:  He's mine.  I like him.
9            MR. YEAGER:  He likes the pharma industry, the
10     first one.
11           THE COURT:  I'm surprised to hear from you.
12           MS. WILKINSON:  Someone who is under that kind of
13     stress, they never do well.  They always want to get off.
14     They don't know the magic words.  But to me, he said what he
15     needed to say.
16           THE COURT:  Karen, don't worry about it.  I can
17     leave him as a maybe.  It's not a big deal.
18           THE CLERK:  34.
19           THE COURT:  Yes.  Ms. Dacosta.
20           THE JUROR:  Hi.
21           THE COURT:  How are you?
22           THE JUROR:  Good.  How are you?
23           THE COURT:  We are just following up on the written
24     questionnaires and the oral questioning from this morning.
25     Did you have a chance to look at that witness list?
```

1          THE JUROR:  I did.

2          THE COURT:  Do you know anyone on there?

3          THE JUROR:  No.

4          THE COURT:  You answered yes to the question that

5    you or someone close to you been a party to a lawsuit.

6          THE JUROR:  I wasn't sure -- I'm a property

7    manager.  Like sometimes I have to go to court for evictions

8    or damages and things like that.  Does that count or not?

9          THE COURT:  You're right to raise your hand.  The

10   next question is, is there anything about your experience

11   with the court system or those cases that you think would

12   affect your ability to be a fair juror in this case?

13         THE JUROR:  No.

14         THE COURT:  Looking at your questionnaires, you

15   were talking about different hardships, and you mentioned

16   child care.  What's the situation there?

17         THE JUROR:  I'm usually the person who drops my son

18   off at daycare.  My mom usually gets my daughter on the bus.

19   So I would just have to make arrangements for them for before

20   and after school.

21         THE COURT:  Could you do that?

22         THE JUROR:  Yeah.

23         THE COURT:  You have a cousin that became addicted

24   to Percocet after having kidney stones.

25         THE JUROR:  Yeah.

```
1              THE COURT:  Obviously this case involves an opioid.
2    Is there anything about your cousin's experience that would
3    affect your ability to be a fair juror in this case?
4              THE JUROR:  I don't think so.
5              THE COURT:  When you say "I don't think so," do you
6    have reservations about that?
7              THE JUROR:  No.  I feel like she recovered and
8    she's okay.
9              THE COURT:  How long ago was it?
10             THE JUROR:  It was like ten years ago.
11             THE COURT:  In terms of your job, have you talked
12   to them about the fact that you might be picked for jury
13   duty?
14             THE JUROR:  Mm-hmm.
15             THE COURT:  What did they say about paying you?
16             THE JUROR:  They said they would have to look into
17   it.  They said we'd figure out my salary.  She said you won't
18   get gypped.  I think it's, what, $50 a day.  She'll deduct
19   and pay me the difference.
20             THE COURT:  It's 50 for the first week or first two
21   weeks.
22             MS. McDONOUGH:  It's $600.  Once it reaches $600 --
23             THE COURT:  So it goes up to $60 after a certain
24   number of days.  I'm not for sure how many.  Because of the
25   federal government shutdown, everybody is going to get paid
```

1    but it's going to be delayed.  Could you manage with the

2    payment being delayed?

3              THE JUROR:  Yeah.

4              THE COURT:  Would that be a problem?

5              THE JUROR:  That's fine.

6              THE COURT:  Follow up for her?

7              MR. YEAGER:  Nothing.

8              THE COURT:  Thanks.  You can go.

9              THE JUROR:  Thank you.

10             THE COURT:  Could have gotten excused on the child

11   care, if she asked.

12             THE CLERK:  36.

13             THE COURT:  Ms. Foley.

14             THE JUROR:  Yes.

15             THE COURT:  How are you?

16             THE JUROR:  Good.

17             THE COURT:  We are following up on the written

18   questionnaires and then the oral questions from this morning.

19   Did you have a chance to look at that witness list?

20             THE JUROR:  I did.

21             THE COURT:  Did you know anyone on there?

22             THE JUROR:  No.

23             THE COURT:  I'm just going to go through these

24   questions one at a time.  You served jury duty previously?

25             THE JUROR:  Correct.

```
1              THE COURT:  State or federal?
2              THE JUROR:  State.
3              THE COURT:  Criminal or civil?
4              THE JUROR:  Criminal.
5              THE COURT:  Was there anything about that
6    experience that you think would affect your ability to be a
7    fair juror in this case?
8              THE JUROR:  No.
9              THE COURT:  You or someone close to you was a party
10   to a lawsuit.
11             THE JUROR:  Right.
12             THE COURT:  Can you tell us about that.
13             THE JUROR:  It was just a lawsuit, a dispute
14   between family members with a death of a grandmother.
15             THE COURT:  How long ago was that?
16             THE JUROR:  Like two months ago.
17             THE COURT:  Two months ago?
18             THE JUROR:  Yes.
19             THE COURT:  Is there anything about your experience
20   with the court system or lawyers or --
21             THE JUROR:  I wasn't involved with any of that.  It
22   was just my father-in-law.
23             THE COURT:  There's nothing about the experience
24   that you think would affect your ability to be fair?
25             THE JUROR:  I don't think so.
```

1            THE COURT:  And then feelings positive or negative

2    about pharmaceutical companies marketing drugs to doctors.

3            THE JUROR:  I'm a nurse.  I have dealings with

4    them.  But feelings about them?

5            THE COURT:  We're looking for bias.  Do you feel so

6    strongly one way or the other that you think it would affect

7    your ability to be a fair juror in this case?

8            THE JUROR:  I don't think so.  I'm trying to, like,

9    think.  If anything negative, I feel like sometimes maybe

10   drugs get pushed maybe before they're ready.  That would be

11   my only --

12           THE COURT:  So do you think -- whatever views you

13   have about that, and you're certainly entitled to your views,

14   do you think you could put aside whatever thoughts you have

15   in that direction and listen to the evidence in this case and

16   the law as I give it to you and make a decision in this case

17   based just on that?

18           THE JUROR:  I think I could.

19           THE COURT:  You do?

20           THE JUROR:  (Juror nods in the affirmative.)

21           THE COURT:  Whether you say you think, do you have

22   reservations about that?

23           THE JUROR:  No.

24           THE COURT:  Is that just terminology?

25           THE JUROR:  Just terminology.

1          THE COURT:  We asked a question about the FDA,

2     off-label uses.  Any feelings about off-label use of

3     medications that could affect your ability to be a fair and

4     impartial juror?

5          THE JUROR:  I don't think so.

6          THE COURT:  Again when you say you don't think so,

7     do you have reservations about that?

8          THE JUROR:  No.  I think off-label use can be good

9     or bad.

10          THE COURT:  You, family member, close friend ever

11     worked in the pharmaceutical or healthcare field.  Are you

12     referring to yourself?

13          THE JUROR:  Yes.

14          THE COURT:  Anybody else?

15          THE JUROR:  My mother-in-law is a nurse.  Obviously

16     I have friends that are doctors or nurses.

17          THE COURT:  Is there anything about any of their

18     experiences or your conversations with them that you think

19     would affect your ability to be fair?

20          THE JUROR:  I don't think so.

21          THE COURT:  All right.  Just in looking at your

22     questionnaire, you say you're slightly hard of hearing.

23          THE JUROR:  (Juror nods in the affirmative.)

24          THE COURT:  Did you have any trouble hearing my

25     questions this morning?

1      THE JUROR:  A little bit at the beginning.  Then it
2  was better.
3      THE COURT:  The witness is going to testify from
4  that stand right there.  And the jurors are sitting somewhere
5  in here.  And we can sit you wherever was most comfortable
6  for you.  The questioning is going to be done pretty much
7  from Mr. Wyshak is sitting now.  There's microphones in the
8  courtroom.  The only person talking is the lawyer that's
9  asking the question and then the witness answering the
10  question generally speaking.
11      Do you think you would have any trouble hearing
12  what was going on under these circumstances?
13      THE JUROR:  I don't think so.
14      THE COURT:  And then in terms of keeping hydrated
15  and moving, we'll give you water whenever you want.  We don't
16  ask jurors to sit for more than two hours without a break.
17  And even during those two hours if we have a sidebar, I tell
18  the jurors to move around.  If you need a break, you can ask
19  for it.  You can stand in the back of the box and listen.
20      Does that alleviate any concern you have?
21      THE JUROR:  As far as that goes, yes.
22      THE COURT:  And then you're concerned that the
23  length of the trial would interfere with your son and getting
24  him around.  He is of such an age that it is hard for me
25  to -- in fact, it's basically not possible for me to --

1        THE JUROR:  I saw it was 10 or something like that.

2        THE COURT:  Yes.

3        THE JUROR:  He goes to a school that's a distance.

4   It's not like he can take the bus or has that kind of option.

5        THE COURT:  We won't sit past 4:00, and at least

6   one day a week we'll sit only until 1:00.  So I know it's an

7   n inconvenience.  Would you be able to make provision for

8   that?

9        THE JUROR:  I haven't figured that out yet.  At the

10  moment all I have is my husband to rely upon.  So he has to

11  work.  I don't have a lot of family members that I can rely

12  upon.  I have to figure that out.

13       THE COURT:  Carpooling?

14       THE JUROR:  He goes to private school.  So it's

15  like 45 minutes away.  No one really lives in my area that I

16  could carpool with.

17       THE COURT:  It is above the age where I can

18  easily --

19       THE JUROR:  I had to write it down because it

20  definitely is a concern for the length of time.

21       THE COURT:  We would try to work with you.

22       THE JUROR:  I think the other piece is also another

23  concern.

24       THE COURT:  DCF.  What are you specifically worried

25  about with the DCF proceeding?

1          THE JUROR:  Well, just that we were -- we're in the

2    process of trying to adopt right now.  We're up for a

3    reevaluation.  Today was actually the appointment.  That

4    actually had to be cancelled.  It has to be done by the end

5    of this month in order for us to continue with the process.

6    I'm sort of concerned between that and if we do get a child

7    that sort of comes to us, we won't be available.

8          THE COURT:  It's also hard for me to excuse

9    somebody on something that's sort of as uncertain as this.

10   But if you get a child, like a maternity leave sort of

11   situation, we would make arrangements for that, if you got a

12   child during these 14 weeks.  But short of that, there's not

13   really much I can do.

14         THE JUROR:  Okay.

15         THE COURT:  Does anybody have any followup for her?

16         MR. YEAGER:  No, Your Honor.

17         THE COURT:  Okay.  Thanks.  You can go.

18         She's another one I don't have a real reason to

19   strike her.  We have the alternates.  If she gets a child,

20   it's hard for me not to let her go as an alternate.  I don't

21   think there's much I can do in the interim.  Okay?

22         THE CLERK:  37.

23         THE COURT:  Mr. Wood.

24         THE JUROR:  Yes.

25         THE COURT:  How are you?

```
1            THE JUROR:  Very well, thanks.
2            THE COURT:  Did you have a chance to look at that
3    witness list?
4            THE JUROR:  Yes, I did.
5            THE COURT:  Did you know anybody on there?
6            THE JUROR:  No, I did not.
7            THE COURT:  We're just following up on the
8    questionnaires and the questioning from this morning.
9            THE JUROR:  Sure.
10           THE COURT:  You said you've done prior jury
11   service.
12           THE JUROR:  I served on a jury state civil case in
13   Lawrence probably like five, seven years ago or more.
14           THE COURT:  Anything about that experience that you
15   think would affect your ability to be a fair juror in this
16   case?
17           THE JUROR:  I don't think so, no.
18           THE COURT:  Will your employer pay for your jury
19   service?
20           THE JUROR:  I don't know.  I don't know.
21           THE COURT:  You haven't asked.
22           THE JUROR:  You know, I did briefly communicate
23   with our VP of HR, but before I got into a lot of the
24   details, I guess I thought I would wait to find out if it was
25   worth engaging her.
```

```
1              THE COURT:  Most of the bigger companies will pay
2       for jury service.  But you should check.
3              THE JUROR:  I will.
4              THE COURT:  I'm expecting that your company will,
5       but you can let the jury people know if that's not the case.
6       Okay?
7              THE JUROR:  Sure.
8              THE COURT:  Any other followup for him?
9              MR. YEAGER:  Nothing from the government, Your
10      Honor.
11             THE COURT:  Thanks very much.  You're excused.
12             THE CLERK:  39.
13             THE COURT:  39, yes.  Ms. Chen, how are you?
14             THE JUROR:  Good.  How are you?
15             THE COURT:  So you answered yes to a bunch of
16      questions, and I assume they all relate to your employment at
17      Sanofi.
18             THE JUROR:  Yeah.
19             THE COURT:  What do you do there?
20             THE JUROR:  I'm a service manager, ITS service
21      manager.  It's a QC, quality control.
22             THE COURT:  Obviously that's a pharmaceutical
23      company.
24             THE JUROR:  Yeah.
25             THE COURT:  Given that you work for a
```

1    pharmaceutical company, do you think you could be a fair and

2    impartial juror in this case, or do you think you start off

3    biased one way or the other?

4            THE JUROR:  I think I'm more towards the

5    pharmaceutical company.

6            THE COURT:  You're what?

7            THE JUROR:  More towards the pharmaceutical

8    company.  I've been working with the pharmaceutical company

9    for almost 25 years.  So I'm familiar with a lot of stuff.  A

10   little bit biased with pharmaceutical.

11           THE COURT:  I know you have plans to go visit with

12   your dad.

13           THE JUROR:  Yeah.  That's not -- yeah, I do have a

14   plan to.  And also I have a special-needs son that lives with

15   me and needs care.  That's another point I wanted to say.

16           THE COURT:  I want to get back to this

17   pharmaceutical company thing.

18           THE JUROR:  I'm a little nervous now.

19           THE COURT:  That's fine.  Most of these people are

20   really nice.  You shouldn't be nervous.  I know.  It's a new

21   thing.

22           THE JUROR:  It's kind of -- yeah.

23           THE COURT:  Someone should tell you a good lawyer

24   joke and it would make you relax.

25           I want to push back a little more on this

1    pharmaceutical thing.  There's not a pharmaceutical company

2    on trial, but these people all worked for a pharmaceutical

3    company.  Do you think you'd be able to listen to the

4    evidence and make a decision based just on the evidence, or

5    do you think you would start favoring one side or the other?

6            THE JUROR:  I'm not sure on that part.  The only

7    concern I have is in that room when you talk about the

8    different -- ask the different questions, for me to

9    understand the question, you speak very quick.

10           THE COURT:  I do speak very quick.

11           THE JUROR:  Some questions I didn't get.  That's

12   why at the beginning I didn't raise my hand because -- I

13   didn't quite sure what the question.  But later on with the

14   pharmaceutical question, then I can listen carefully and pay

15   more attention and catch the word.

16           THE COURT:  Do you think if you sat on the jury you

17   would have difficulty understanding the testimony?

18           THE JUROR:  That's my concern.  That's most my

19   concern, if they speak too quick.  Yeah.

20           THE COURT:  Why don't up step out for just a

21   second.  Just hold her back there.

22           Just seems like a constellation of problems.  Yeah?

23           MS. MINER:  Yes.

24           THE COURT:  Anybody want me to forge forward with

25   her?

```
 1                MS. WILKINSON:  Yeah.

 2                MR. KENDALL:  I'd like to.  She's going to get

 3    paid.

 4                THE COURT:  She's going to get paid.  She's having

 5    trouble with English.  Her son is in a wheelchair.  She has a

 6    planned trip to China, and she's told me twice that she's

 7    biased.

 8                MR. KENDALL:  I thought you said that the planned

 9    trip wasn't --

10                THE COURT:  She said it wasn't her thinking, but

11    it's on her questionnaire.  We haven't even gotten to the

12    opioid question where she said she saw it on the news.  I'm

13    happy to bring her back in and go through it question by

14    question.

15                MR. KENDALL:  I would appreciate that, Your Honor.

16                THE COURT:  That's fine.  Let's bring her back in.

17                Sorry.  Few more questions.

18                THE JUROR:  Okay.

19                THE COURT:  You raised your hand yes about whether

20    you have any feelings about pharmaceutical companies

21    marketing drugs to doctors that could effect your ability to

22    be fair.

23                THE JUROR:  Yes.  For that part, I kind of like if

24    you talk to the doctor directly it's kind of -- I don't know.

25                THE COURT:  It's okay.  That's why we're here.
```

1    We're here to talk to you a little bit and find out whether

2    you think you can be a fair juror in this case.  Not every

3    case is for everybody.  You should feel free to express your

4    views openly so we can make an assessment about whether this

5    is a good case for you.  Okay?

6              THE JUROR:  For marketing point, I think the doctor

7    know better.  So if you explain to them and if it would

8    benefit the patient.  I don't like to say marketing.  I just

9    don't like the marketing part.  If you know the benefit of

10   the drug and the doctor supports and gives to the patient,

11   it's not a marketing.

12             THE COURT:  So the fact that a sales rep might have

13   a conversation with a doctor or someone from the doctor's

14   office, do you think that would affect your ability to be a

15   fair juror?  Do you have concerns about that?

16             THE JUROR:  I do.  I do concern that.  I don't want

17   to -- I don't want the drug to be kind of like a furniture

18   you can sell to somebody.  The doctor should make a judgment.

19             THE COURT:  Are you saying having an issue whether

20   they talk to someone other than the doctor, or you think

21   off-label marketing -- you think having a sales rep in a

22   doctor's office is okay or you think it's not okay?

23             THE JUROR:  Not okay.  I don't like it.

24             THE COURT:  If there was evidence that there was

25   some of that going on, that people were -- sales reps were

1    going to a doctor's office, would that affect your ability to

2    be fair.

3                THE JUROR:  Yes.

4                THE COURT:  Okay.  Thanks very much.  You can go.

5    You're all set.

6                MR. KENDALL:  You convinced me.

7                THE COURT:  I gave it a fair shot for you.

8                MR. KENDALL:  It was extremely helpful, Your Honor.

9    It was definitely what we need.

10                MR. YEAGER:  I think the last question sort of is

11    evidentiary in nature.

12                THE COURT:  I was having trouble communicating with

13    her.

14                MR. YEAGER:  I don't have a problem with the

15    decision.

16                THE COURT:  I agree with you, but I was having --

17                MR. KENDALL:  She evoked a strong bias.

18                THE COURT:  I take your point.  He's not concerned

19    about her.  He's concerned about other witnesses.

20                MR. YEAGER:  When you get that.

21                THE COURT:  I was having trouble communicating with

22    her, so I had to sort of simplify it.

23                MS. MINER:  I think the issue she said was not the

24    issue was the issue.

25                THE CLERK:  41.

```
1              THE COURT:  Mr. Joyce.
2              THE JUROR:  Yes, Your Honor.
3              THE COURT:  How are you?
4              THE JUROR:  Good.  How are you.
5              THE COURT:  I'm good.  Thank you.  We're just
6    following up on the written questionnaires and then the oral
7    questions from this morning.  Did you have a chance to look
8    at the witness list?
9              THE JUROR:  Yes.
10             THE COURT:  Did you recognize any names on the
11   list?
12             THE JUROR:  No.
13             THE COURT:  Okay.  This morning you answered yes to
14   the question about whether you or any member of your family
15   or close friend have been the subject of a criminal
16   investigation, arrested, charged, or convicted of anything
17   other than a minor traffic violation.
18             THE JUROR:  Right.
19             THE COURT:  Can you tell us a little bit more about
20   that?
21             THE JUROR:  I was arrested when I was 16 for
22   drinking on a public way.
23             THE COURT:  Youthful indiscretion.
24             THE JUROR:  That's what I chalk it up to be.
25             THE COURT:  Was there anything about that
```

1    experience with the court system or lawyers or law

2    enforcement that you think would affect your ability to be a

3    fair and impartial juror in this case?

4            THE JUROR:  No.

5            THE COURT:  Is your company going to pay you if

6    you're selected for jury duty?

7            THE JUROR:  Yes.

8            THE COURT:  Great.  Otherwise I was going to tell

9    you that your juror pay might be delayed because of a partial

10   government shutdown.

11           Follow up questions for Mr. Joyce?

12           MR. YEAGER:  Nothing.

13           MS. WILKINSON:  No.

14           MR. KENDALL:  I have one.  Mr. Joyce, you have a

15   child that's an attorney.

16           THE JUROR:  Yes.

17           MR. KENDALL:  Can you tell us about the type of

18   work that he does?

19           THE JUROR:  He is a prosecutor in the district

20   attorney's office in New York City.

21           MR. KENDALL:  Manhattan's DA's office.

22           THE JUROR:  Yes.

23           THE COURT:  Anything about his job that would bias

24   you one way or another?

25           THE JUROR:  No.

```
 1              THE COURT:  Anyone else?  Thanks.
 2              THE JUROR:  You're welcome.
 3              THE COURT:  You're set.  Thank you.  I meant to ask
 4      him that myself and I forgot.
 5              42, please.  Mr. Cabral?
 6              THE JUROR:  Yes.
 7              THE COURT:  How are you?
 8              THE JUROR:  Okay.
 9              THE COURT:  We're following up on the oral
10      questions from this morning and the written questionnaire
11      from last week.  Did you have a chance to look at that
12      witness list?
13              THE JUROR:  Yes.
14              THE COURT:  Did you know anybody on there?
15              THE JUROR:  No.  Other than CVS and Express
16      Scripts.  My family has gotten medications from before, but
17      that's it.
18              THE COURT:  They're not going a central focus in
19      this case.  There will be records produced by those
20      companies.  Is there anything about your interaction with
21      either organization that you think would affect your ability
22      to be a fair juror in this case?
23              THE JUROR:  No.
24              THE COURT:  Cut right to the chase here.  I see you
25      have a prepaid vacation in April.  Is that over the school
```

1    vacation week?

2              THE JUROR:  Yes, it is.

3              THE COURT:  We don't make people cancel prepaid

4    vacations.  If you're selected for the jury, we'll be taking

5    that week off.

6              THE JUROR:  Okay.

7              THE COURT:  Or the trial will be over.  We won't

8    make you cancel a prepaid vacation.

9              THE JUROR:  Okay.

10             THE COURT:  Now, you answered -- the question was

11   you may hear testimony during the course of this trial from

12   witnesses who work or have worked in law enforcement or for a

13   federal agency.  And the question was would you be inclined

14   to either believe or disbelieve testimony solely because it

15   was coming from a law enforcement witness.

16             THE JUROR:  I think maybe a little bit.  I have

17   four family members that are in law enforcement and two in

18   the New Bedford police department, both sergeants, and an

19   uncle and cousin in the -- one is in MCI in Framingham.  The

20   other one, he's retired now, but he used to be at

21   Bridgewater.

22             I'm not saying it would absolutely, but especially

23   the two police officers in New Bedford, I'm very close to

24   them.  I realize not everybody -- you have people from all

25   walks of life, but I would think I would probably tend a

1    little bit more weight to that side, I think, maybe.  I'm not

2    saying for sure.

3              THE COURT:  The point is when a witness gets on the

4    stand, the juror is to evaluate their testimony based just on

5    their testimony, their demeanor, all the things you use to

6    evaluate the credibility of any other witness.

7              THE JUROR:  Right.

8              THE COURT:  So do you think that if a law

9    enforcement witness took the stand you could evaluate their

10   testimony fairly?

11             THE JUROR:  Yeah.

12             THE COURT:  It's fine to have respect for law

13   enforcement.

14             THE JUROR:  Right.

15             THE COURT:  The question is, would you be able to

16   evaluate their testimony and, for example, discount it if it

17   wasn't credible?

18             THE JUROR:  Yeah.  I guess if it was obvious it

19   wasn't credible to me, yeah, it would be.

20             THE COURT:  Could you evaluate the testimony of a

21   law enforcement witness like the testimony of any other

22   witness?

23             THE JUROR:  Yeah.  I guess so.  I guess so.

24             THE COURT:  I guess I want to understand where you

25   would start.

1      THE JUROR:  I would listen to the testimony, and I

2   guess, yeah, evaluate what I hear.  I guess I'd be all right

3   with it, yeah.

4      THE COURT:  Do you have reservations about your

5   ability to fairly evaluate the testimony of someone that

6   works for law enforcement?

7      THE JUROR:  Probably not.  I just felt like I do

8   have people that I have a high opinion of and all that.  I

9   know everybody is that way.  I just want to make sure that --

10   yeah.  I think it would be okay evaluating.

11      THE COURT:  The next question was any experience

12   with law enforcement personnel, positive or negative, that

13   could affect your ability.

14      THE JUROR:  That's along the same lines.

15      THE COURT:  And then there's the question about the

16   FDA and off-label uses of medications.

17      THE JUROR:  If the FDA only approves for certain

18   uses, that's probably the way it's supposed to be used.

19   Maybe I didn't understand the question fully.

20      THE COURT:  I will eventually instruct you on the

21   law in this case if you're selected for this jury.  The FDA

22   approves a drug for a certain purpose.  But once a drug is in

23   the marketplace, a doctor can prescribe it for whatever

24   purposes he or she thinks is appropriate.  And that's called

25   off-label prescribing.

1        THE JUROR:  If it's legal, then fine.  It's not my

2   field.  I didn't --

3        THE COURT:  And then have you, a family member,

4   close friend worked in the pharmaceutical or healthcare

5   fields?  Is there anything about that experience that you

6   think would bias you one way or the other?

7        THE JUROR:  The only thing I wanted to say about

8   that, again not knowing the details about what this fully is

9   about, my wife does hospice care.  It's a very tough thing to

10  do.  I just felt like if it was something to do with

11  defrauding people or systems in place to help that, it may be

12  a tough thing for me to swallow, I guess.

13       THE COURT:  Are you talking about hospice care in

14  particular?

15       THE JUROR:  Yeah.  That's what she does is hospice,

16  Southcoast visiting nurse.  She works with a lot of people

17  dying of cancer.  It's a sensitive topic, I guess.

18       THE COURT:  The sensitive topic is hospice -- what

19  exactly is the sensitive topic?

20       THE JUROR:  Just again if people were defrauding

21  either directly or system in place to help people that are

22  going through those types of processes, it would just -- I

23  don't know, I think it would be tough for me.  I'm biased

24  about that maybe.

25       THE COURT:  Are you talking about kind of like

1    individual patient sort of fraud?

2              THE JUROR:  Or even systems in place that help

3    those people.  It's a very tough thing watching people go

4    through that.  My and what my wife goes through just helping

5    those people.  I don't even know what it's about, really, how

6    I feel about that.

7              THE COURT:  The sorts of allegations in this case

8    don't go to individual -- I don't know.

9              Do you want to have at that?

10             MR. YEAGER:  The allegations don't concern hospice

11   care or people who are receiving medication for end-of-life

12   situations.

13             THE JUROR:  Okay.

14             MS. WILKINSON:  That's not true.

15             THE COURT:  That's why I stopped myself.

16             MR. YEAGER:  The drug is prescribed to some people

17   who have cancer and are treated with cancer or other

18   difficult diseases that cause pain.

19             THE JUROR:  Okay.

20             MR. KENDALL:  May I ask a question, Your Honor?

21   Mr. Cabral, I wanted to revisit the issue that the judge was

22   discussing about law enforcement witnesses, just to get a

23   little more detail.

24             If you had a law enforcement witness and a non-law

25   enforcement witness, just starting with that and no more, is

1    it more likely you would give more credibility to the law

2    enforcement witness than the non one?  Do they start off with

3    a step ahead?

4            THE JUROR:  I guess without knowing specific

5    exactly what was being said, I guess probably yeah.  I would

6    put more weight towards what someone in law enforcement would

7    say versus someone else, I guess.

8            MR. KENDALL:  Thank you.  That's all I needed to

9    ask.

10           MS. WILKINSON:  Could I ask a followup?

11           THE COURT:  Yes.

12           MS. WILKINSON:  Mr. Cabral, in this case, the

13   medicine can be used for cancer patients in palliative care

14   or hospice.  But it's also being used off-label.  Would that

15   bother you?  Because it's only indicated for the cancer

16   patients.

17           THE JUROR:  When she explained that it's legal for

18   a doctor to do that, then I guess not in that case.  I didn't

19   understand what that meant when she initially said it.

20           THE COURT:  I want to myself follow up on this law

21   enforcement question.  We're really relying on you to sort of

22   think about where you stand on this.

23           In some respects we're all raised to respect law

24   enforcement people, right?  Mr. Kendall's point of view, if

25   you have two people standing outside the theatre and one of

1    them says to you, "Run, there's a fire" and the police

2    officer says "Don't run, there's no fire," you could maybe

3    put more credence on what the law enforcement witness was

4    telling you.  But as you look around the situation, could you

5    listen to both people and look to see if there was a fire and

6    assess?

7              THE JUROR:  If all things being equal.  That's why

8    I said without knowing the context of what's being said.

9    Once I hear the content, then obviously you evaluate

10   yourself, too.

11             THE COURT:  Anything else from anybody?  Okay.

12             MR. YEAGER:  I do have one, Your Honor.

13             THE COURT:  Go ahead.

14             MR. YEAGER:  Could you tell us what you do for a

15   living?

16             THE JUROR:  I'm a chemical supervisor for Waters

17   Corporation.

18             MR. YEAGER:  What is Waters Corporation?

19             THE JUROR:  They make cylinders for HPLC, used in

20   the medical field for evaluating.  To be used in different

21   diseases, stuff like that.

22             MR. YEAGER:  Okay.  Thank you.

23             THE COURT:  I guess I should ask.  Will your

24   company pay you for jury duty?

25             THE JUROR:  Yes, they will.

1          MS. WILKINSON:  Could we ask you something?

2          THE COURT:  Yes.  If you can just step outside for

3     a second.

4          MS. WILKINSON:  I want to be careful not to say too

5     much about the facts of the case, but he talked about being

6     concerned if there were even systems in place that were being

7     defrauded.  Part of the government's allegation is that

8     they're saying we are trying to evade the DEA controls.  It's

9     directly on-point on the REMS in a process that keeps track

10    of the prescribers and the patients and whether they got the

11    warnings.

12         MR. YEAGER:  I think you've got to ask what he

13    meant by "systems."

14         THE COURT:  On the law enforcement question, I

15    think he's fine.  We raise people to -- you're not supposed

16    to -- if you have two people telling you contradictory

17    things, you're supposed to be able to evaluate it.

18         MR. KENDALL:  I would disagree, Your Honor.  The

19    more important thing is what Beth raised is there's going to

20    be particular issues of DEA regulatory issues.  And the DEA

21    people are going to testify.  So the people that he's

22    predisposed to believing and favoring are the witnesses on

23    this issue.

24         MS. WILKINSON:  Your Honor, he brought it up.

25    You're right we all respect them, but most people don't come

```
 1    in and say they would lean towards those people.  And he has
 2    a good reason.  He knows a lot of people.
 3              MR. YEAGER:  Can I add one thing.  The reason I
 4    screwed it up when you asked me to do that is because the
 5    drug is for the treatment of cancer.  But the allegations in
 6    this case are there's very little sales that go on with
 7    oncologists.  I was struggling with the idea associated with
 8    that.  It might play to what he's saying.  It's going to come
 9    up with witnesses.
10              THE COURT:  Do you want him gone, too?
11              MR. YEAGER:  I'm concerned about him, Your Honor.
12              THE COURT:  Then I'll let him go.  If you're going
13    to agree to strike him, I'm happy to strike him.
14              THE CLERK:  He can go down.  43.
15              THE COURT:  Ms. Fane-Hervey?
16              THE JUROR:  Yes.
17              THE COURT:  Do I have that right?
18              THE JUROR:  Yes.
19              THE COURT:  How are you today?
20              THE JUROR:  I'm good.  Thank you.
21              THE COURT:  We are just following up on the written
22    questionnaires from the other day and then the questions from
23    this morning.  Did you have a chance to look at that witness
24    list?
25              THE JUROR:  I did.
```

1          THE COURT:  Did you know anyone on there?

2          THE JUROR:  No.

3          THE COURT:  And then you answered yes to the

4    question have you or a family member or a close friend ever

5    worked in the pharmaceutical or healthcare fields and if

6    there was anything about that experience that might affect

7    your ability to be fair.

8          THE JUROR:  Well, I haven't.  My daughter is a

9    nurse.  That's the only reason I put it.

10          THE COURT:  Yes.  She is a nurse.  Is there

11    anything about her being a nurse that you think would affect

12    your ability to be fair in this case?

13          THE JUROR:  No.

14          THE COURT:  I guess that's all I have for her.  Any

15    followup from anybody else?

16          MS. WILKINSON:  No, thank you.

17          THE COURT:  Thanks.  You're all set.  She's

18    entitled to be excused, right?

19          MR. KENDALL:  What number are we on?

20          THE COURT:  44.

21          MR. TYRRELL:  Single parent with a six-year-old.

22          THE COURT:  She's entitled to be excused.

23          MS. WILKINSON:  She's asked for hardship.

24          THE COURT:  Did you object to striking her?

25          MR. YEAGER:  I hadn't really focused on the age of

1  the child, Your Honor.

2          THE COURT:  I'm happy to go through it and see what

3  she wants to do.

4          MR. YEAGER:  It's fine.  You can strike her.

5          THE COURT:  Strike her.  Okay.

6          THE CLERK:  She can just go down.  45.

7          THE COURT:  Mr. Yurewicz?

8          THE JUROR:  Yes.  Perfect.  How are you?

9          THE COURT:  I have not been perfect all day.  I'll

10  take it when I can get it.  Thank you.

11          THE JUROR:  All right.

12          THE COURT:  We're doing some followup on the

13  written questionnaires and then the oral questions from this

14  morning.  Did you have a chance to look at the witness list?

15          THE JUROR:  The witness list?

16          THE COURT:  A sheet of paper with all those names.

17          THE JUROR:  Oh, yes, I did.  I'm sorry.

18          THE COURT:  Did you recognize any names on there?

19          THE JUROR:  No.

20          THE COURT:  Just on your questionnaire, you note

21  that you have Crohn's and may need to use the bathroom

22  unexpectedly.  We can take a recess whether anybody needs to

23  use the bathroom.  Not just you.  I find we take a lot of

24  bathroom breaks.  If you need to use the bathroom, we'd

25  recess for that.  Does that alleviate your concern?

1          THE JUROR:  Yes.

2          THE COURT:  I notice also the diabetes.  We take

3    breaks.  We have snacks at all the breaks.  People stand up

4    and stretch when we have sidebars.  We really try not to make

5    it overly physically taxing on anybody.  Okay?

6          THE JUROR:  Yeah.

7          THE COURT:  Do you have any other questions about

8    that?

9          THE JUROR:  No.  That was a major concern for me.

10         THE COURT:  And the questions from this morning.

11   We discussed the fact that an indictment does not give rise

12   to any presumptions or inferences that somebody is guilty of

13   a crime.  It's just a way to charge people.  And you had said

14   that you might be so influenced by the fact that these

15   defendants were charged with a crime that it could affect

16   your ability to be fair.  Can you talk to me about that?

17         THE JUROR:  I guess -- and maybe I don't

18   understand.  I guess if they've been charged with guilty,

19   then I don't understand why I would --

20         THE COURT:  They haven't been found guilty.  The

21   federal government is allowed to charge people with crimes,

22   and then a jury makes a determination about whether the

23   government has been able to prove each element of the charged

24   offense beyond a reasonable doubt.  A person is not found

25   guilty of a crime unless the government proves guilt beyond a

1    reasonable doubt.  Do you understand that?  Do you have any

2    questions about that?

3              THE JUROR:  No.  I think I'm all set.  I guess I

4    thought it was a separate part of it that they were already

5    found guilty for.

6              THE COURT:  No.  The fact that someone's been

7    charged with a crime, it's an allegation.  Do you think that

8    even knowing that they've been charged with a crime that you

9    could fairly and evaluate whether the government had proven

10   that they had committed that crime?

11             THE JUROR:  I think I probably could.

12             THE COURT:  I need to push you a little harder on

13   that.  Think.  Could you do it or do you have reservations

14   about your ability to do it?

15             THE JUROR:  I think I might have some reservations.

16   Being that I guess if guilty is in my -- being charged

17   guilty, not found guilty, is in my mind that I might lean

18   that way.

19             THE COURT:  They're not charged guilty.  It's just

20   a charge.  Right?  The police grab somebody and charge them

21   with a crime.  It's not the police's job to make a

22   determination about guilt or innocence.  That's for a jury.

23   So there's nothing guilty in the charge.  It's just a charge.

24             THE JUROR:  All right.

25             THE COURT:  I want to make sure you understand the

1    concept and then I want you to tell me if you think you can

2    be fair or you think you can't be fair.  I want to make sure

3    you don't get hung up on the terminology.

4              THE JUROR:  I think that's what I'm getting hung up

5    on is the guilty.  I guess I'm getting hung up on that.

6              THE COURT:  Do you think that because someone's

7    been charged with a crime that they're more likely to be

8    guilty of that crime?

9              THE JUROR:  No, not necessarily.  I guess I would

10   have to hear the details.

11             THE COURT:  Listen to the evidence, and you'd

12   listen to the law as I gave it to you, and then you'd be able

13   to start with a clean slate and evaluate whether or not the

14   government had proved its case or not?

15             THE JUROR:  Yes.  I would say yes.  I will say yes.

16             THE COURT:  Are you saying yes just to humor me or

17   because that's what you really believe?

18             THE JUROR:  That's what I believe.

19             THE COURT:  Okay.  You said that -- we said you may

20   hear testimony from witnesses who work in law enforcement.

21   And then I asked if you had any feelings or experience with

22   law enforcement personnel, one way or the other, positive or

23   negative, that could affect your ability to be fair and

24   impartial.

25             THE JUROR:  Like I said, I have a huge respect for

1    police and what they do.  For the most part -- I mean, I see

2    lots on TV.  But I feel that the police most of the time are

3    right.  I feel that that's their job.  I feel that that's

4    what they do.  I feel that they're professional in what they

5    do.  Is that --

6                THE COURT:  Yes.  So if you had a law enforcement

7    witness on the stand, would you be inclined to believe him,

8    just knowing his job description?

9                THE JUROR:  Yes.

10               THE COURT:  Okay.  Why don't you just step outside

11   for just a second.  Just hold him for a second.  Let me ask

12   you before you go.

13               The last question was is there anything you'd like

14   to tell the Court about your ability to serve fairly that we

15   hadn't mentioned?  The very last question.

16               THE JUROR:  I don't think I -- I might have, but I

17   can't think of anything else.

18               MR. KENDALL:  Can I ask one thing?

19               THE COURT:  Do you want me to keep going?

20               MR. KENDALL:  Mr. Urwitz, it says you're retired.

21   Could you tell us what career you retired from?

22               THE JUROR:  I retired from banking.

23               MR. KENDALL:  What did you do in banking?

24               THE JUROR:  Most of -- I worked for 44 years.  Most

25   of that was in retail banking, branch manager.  Did some

1    private bank, a little bit in the loan department, but the

2    majority of it was in retail banking.

3              THE COURT:  There's only two questions left.  Do

4    you have want me to keep going?

5              MR. KENDALL:  Sure.

6              THE COURT:  I'm not going to excuse you.  You have

7    to stay.

8              THE JUROR:  Okay.

9              THE COURT:  One of the questions that we asked was

10   when the FDA approves a drug, it's for generally certain

11   medical uses, but a doctor is allowed to prescribe the drug

12   for other uses in his medical judgment.  And that's called

13   off-label use.  The question was do you have any feelings or

14   opinions about the off-label use of medicines that could

15   affect your ability to be a fair and impartial juror?

16             THE JUROR:  No.  I guess I misunderstood the

17   question.  If the doctor prescribed it to me.  I guess I

18   heard that as like buying it off the shelf or something

19   versus it being prescribed.

20             THE COURT:  Okay.  And then you or a family member

21   or close friend worked in the pharmaceutical or healthcare

22   fields.  Is that, I take it your domestic partner?

23             THE JUROR:  My domestic partner does as well as his

24   sister does as well.

25             THE COURT:  Is there anything about the fact that

1    you have those people that are close to you that work in the

2    healthcare industry that would affect your ability to be a

3    fair and impartial juror?

4              THE JUROR:  Again, just being honest, I do -- his

5    sister works -- she's an addiction nurse.  So I have heard of

6    fentanyl or whatever.  I have not heard of this drug that you

7    mentioned.

8              THE COURT:  Subsys.

9              THE JUROR:  Right.  I haven't heard her ever

10   mention that or anything like that.  We get together

11   occasionally and haven't since we started this.  She does

12   talk a little bit about her job and what she does and the

13   different drugs and how people either react to them or don't

14   react to them or whatever.

15             THE COURT:  Does the fact that that's her job, do

16   you think that would affect your ability to be fair?  Does it

17   bias you one way or the other?

18             THE JUROR:  No.  No.  I just wanted to just make it

19   clear that I do know.

20             THE COURT:  That's perfectly fair.  Any followup?

21             MR. HORSTMANN:  Just with respect to your partner,

22   what practice, what type of practice is he the office manager

23   for?

24             THE JUROR:  For an endocrine.

25             MR. HORSTMANN:  As the office manager, does he have

1  to deal with pharmaceutical and medical supply

2  representatives?

3          THE JUROR:  Yeah, he does.

4          THE COURT:  You can step out.  This time you can

5  really step out.  Hold him there, please.

6          THE JUROR:  Thank you.

7          THE COURT:  Anyone?

8          MS. WILKINSON:  He should be excused.

9          THE COURT:  I agree.

10          THE CLERK:  He can go down.

11          THE COURT:  46, please.

12          THE JUROR:  This is intimidating.

13          THE COURT:  I keep telling everybody we're almost

14  all nice.  Ms. Brooks, correct?

15          THE JUROR:  Yes.

16          THE COURT:  We're just doing some followup on the

17  questionnaires.  I just want to start by saying that I

18  generally excuse teachers if they want to be excused, just

19  because it's so disruptive to so many kids.  And I have two

20  third-graders.

21          THE JUROR:  Third grade is what I teach.

22          THE COURT:  I saw that.  What's your view on that?

23          THE JUROR:  I would prefer to be dismissed.

24          THE COURT:  Okay.  Are you going to show up for

25  school every single day?

```
1                THE JUROR:  I am.

2                THE COURT:  You're excused.

3                THE JUROR:  Thank you.

4                THE COURT:  47 is a full-time student.  Why could

5     we not agree on 47?

6                MS. WILKINSON:  We did.

7                THE CLERK:  They did.

8                THE COURT:  Okay.  48.  Come on in.  Ms. Hardman?

9                THE JUROR:  Yes.

10               THE COURT:  How are you?

11               THE JUROR:  Good.  How are you?

12               THE COURT:  Good, thank you.  We're doing some

13    follow up on the oral questions this morning and the written

14    ones from last week.  Did you have a chance to look at that

15    witness list?

16               THE JUROR:  No.  There were some names that were

17    common, but they were so far away that I don't think.  It was

18    just like a last name.

19               THE COURT:  You work for Walmart.

20               THE JUROR:  Yes.

21               THE COURT:  Have you talked to Walmart about

22    whether or not they'd pay you for jury duty.

23               THE JUROR:  I've gotten two different answers in

24    our actual, I guess, employee handbook.  It's all electronic.

25    It does say it pays you for the length of the duration of
```

1    your jury duty.  And then when I spoke to personnel, they

2    said three days.  But I'm not really in a hardship situation.

3              THE COURT:  We do pay people for jury duty, but

4    that government shutdown, I'm sure you've heard so much about

5    at this point, pay is delayed.

6              THE JUROR:  That's fine.

7              THE COURT:  Jurors will be paid, but it will be

8    delayed.  You'd be okay?

9              THE JUROR:  Yes.  Our house is fully paid for.  Our

10   cars are paid.  We're fortunate.

11             THE COURT:  I don't want to put anyone in a

12   difficult position.

13             THE JUROR:  I appreciate that.  Thank you.

14             THE COURT:  Not just me.  I don't think any of us

15   here want to put anyone in a difficult situation.  That's one

16   thing we can all agree upon.

17             Any followup questions?

18             MS. WILKINSON:  No, Your Honor.

19             MR. KENDALL:  No, Your Honor.

20             MR. YEAGER:  No.  We're fine.

21             THE COURT:  You're excused.  Go ahead.  You're

22   done.

23             THE CLERK:  50.

24             THE COURT:  Come on in.  Mr. MacDonald.

25             THE JUROR:  Hello.

```
 1              THE COURT:  Do I have the right guy?
 2              THE JUROR:  Yeah.
 3              THE COURT:  How are you doing?
 4              THE JUROR:  Good.  How are you?
 5              THE COURT:  I'm good.
 6              THE JUROR:  That's good.
 7              THE COURT:  We're doing some followup on the
 8     written questionnaires from the other day and then the
 9     questioning from this morning.  Did you have a chance to look
10     at that witness list?
11              THE JUROR:  Yes.
12              THE COURT:  Did you know any names on that?
13              THE JUROR:  No.
14              THE COURT:  Just running through some of the
15     questions from this morning, I asked if you or any member of
16     your family or close relatives have been the subject of a
17     criminal investigation or arrested, charged, or convicted of
18     anything other than a minor traffic violation.  Can you tell
19     us about that?
20              THE JUROR:  I don't remember the details, but most
21     of my cousins have been in and out of jail for various
22     things.  One of my cousins is in jail right now for assault.
23     I don't remember.
24              THE COURT:  Are you close to any of the cousins
25     that have been incarcerated?
```

1         THE JUROR:  Yeah.

2         THE COURT:  Is there anything about their

3    interactions with the criminal justice system or their

4    dealings with law enforcement or anything else that you think

5    would affect your ability to be a fair and impartial juror in

6    this case?

7         THE JUROR:  No.

8         THE COURT:  Okay.  You also, I asked a question

9    about the fact -- the fact that an indictment has been filed

10   doesn't create any sort of presumption or inference of guilt.

11   No one is presumed to be guilty.  It is the government's job

12   to proof guilt beyond a reasonable doubt, and that's for a

13   jury to determine.

14        And I think you had said you might be so influenced

15   by the fact that these people were charged with a crime that

16   it could affect your ability to sit fairly.  Can you tell me

17   about that?

18        THE JUROR:  I mean if they're being charged with

19   something, there must be something behind it.

20        THE COURT:  You think just the mere fact that

21   they've been charged makes it more likely that they committed

22   a crime?

23        THE JUROR:  I mean, they'd have to have some sort

24   of evidence to arrest them and charge them.

25        THE COURT:  Would you be able to fairly listen to

1    all the evidence and make a decision based on the case, or do

2    you start off thinking that they're guilty?

3                   THE JUROR:  I mean I'd -- I could probably be fair

4    about it.

5                   THE COURT:  When you say you could probably, does

6    that mean you could be, or it means you have reservations

7    about whether you could be?

8                   THE JUROR:  I'd probably have reservations.

9                   THE COURT:  Okay.  Thanks very much.  You can go.

10                   THE JUROR:  Okay.  Thank you.

11                   THE COURT:  He had something for everybody, too,

12   but --

13                   THE CLERK:  52.

14                   THE COURT:  Are you Ms. Xavier?

15                   THE JUROR:  Yes.

16                   THE COURT:  How are you?

17                   THE JUROR:  I'm fine.  Thank you.

18                   THE COURT:  We're doing some followup from the

19   questions from this morning and the written questionnaire

20   from last week.

21                   THE JUROR:  Okay.

22                   THE COURT:  Did you have a chance to look at that

23   witness list?

24                   THE JUROR:  Yes.

25                   THE COURT:  Do you recognize any names?

1            THE JUROR:  No.

2            THE COURT:  I see that you are a certified nursing

3     assistant, and you've heard something about this case.  You

4     know it has some -- it touches on the medical field.  Is

5     there anything about your job that you think would make it

6     difficult for you to be fair and impartial in this case?

7            THE JUROR:  No.

8            THE COURT:  You answered the question have you, a

9     family member, or close friend ever worked in the

10    pharmaceutical or healthcare fields.  Are you talking about

11    yourself?

12           THE JUROR:  No.  It's for the CNA's.  It's

13    something I work in the pharmacy or something like that.

14           THE COURT:  When you answered this question, is

15    there anyone besides you that's worked in the pharmaceutical

16    or healthcare field that you're thinking about?

17           THE JUROR:  No.  Nobody.

18           THE COURT:  You say there's nothing about your

19    experience in the pharmaceutical or healthcare field --

20           THE JUROR:  No.

21           THE COURT:  -- that would affect your ability to be

22    fair?

23           Any followup for her?

24           MR. YEAGER:  Is Belmont Manor Nursing, is that a

25    nursing home?

1          THE JUROR:  Yes.

2          MR. YEAGER:  What do you do as a nurse's assistant?

3          THE JUROR:  Help the lady to provide them care like

4     bathroom, brush their teeth, and then make them to sleep or

5     feed them to eat.  So they if they can't be able to feed

6     themself, I help them to eat.

7          THE COURT:  Have you talked to your employer about

8     whether they would pay you if you're selected for jury duty?

9          THE JUROR:  They said only three days they can pay

10    and the rest of them I have to talk to them about it.  Maybe

11    they can pay me by a sick day or something like that.

12         THE COURT:  So you'd have to use all your sick

13    days?

14         THE JUROR:  Yeah.

15         THE COURT:  And your vacation?

16         THE JUROR:  Yeah.

17         THE COURT:  We do pay people for jury duty.  It's

18    $50 a day for the first couple of weeks and then it goes to

19    $60 a day.  Because of the government shutdown, that's going

20    to be delayed.  Would that be a hardship for you?

21         THE JUROR:  It would be hard.

22         THE COURT:  Could you do it or no?

23         THE JUROR:  It's going to be hard because I have to

24    pay my rent and something like that.  I have three kids.

25         THE COURT:  How much of a hardship?

```
1              THE JUROR:  How much?

2              THE COURT:  Could you do it or you couldn't do it?

3              THE JUROR:  Definitely for the money, but it's

4    going to be hard for me because I have to pay the rent.  Most

5    of the bill is on my account, something like that.  I'm the

6    only one in my family work hard.  My husband is a valet

7    driver who doesn't have enough money.

8              THE COURT:  Followup for her?

9              MR. TYRRELL:  No.

10             THE COURT:  If you can just step out for a minute.

11             THE JUROR:  Okay.

12             MR. YEAGER:  We agree.

13             MS. WILKINSON:  Your Honor, it's the same as

14   Number 33, though.  She didn't say the magic words.  I don't

15   see how she's any different.

16             THE COURT:  No, it's not the same as 33.  This was

17   beyond a financial hardship.  I couldn't understand most of

18   what she said.

19             MR. KENDALL:  I think she understood you though.

20             THE COURT:  I know.  But in order to deliberate.

21             MR. KENDALL:  She speaks accented English.

22             MS. WILKINSON:  Right.

23             THE COURT:  Do you all want to keep her?

24             MS. WILKINSON:  I do if we're not dismissing the

25   other fellow.  I would suggest put her on the maybe list,
```

1   too.

2              MR. KENDALL:  I like her.  I want her to serve, but

3   I'm a little concerned about her economics.  I don't know if

4   she's not as forceful as other people might be to state her

5   self-interests.  But other than the economics, I thought she

6   was fine.

7              MR. YEAGER:  I think she clearly demonstrated

8   financial hardship.

9              THE COURT:  I think she didn't have a conclusive

10  answer on that, right?  She was going to go back and talk to

11  them.  I'll put her on the maybe list.  I that's fair.

12             THE CLERK:  You can send her down.  Number 54.

13             THE COURT:  How are you?

14             THE JUROR:  Good.  Thank you.  How are you?

15             THE COURT:  I'm good, thank you.  Ms. Mayotte.

16             THE JUROR:  Mayotte.

17             THE COURT:  I've done worse.  We're just doing some

18  followup on the questionnaires.  Did you have a chance to

19  look at that witness list?

20             THE JUROR:  Yes, I did.

21             THE COURT:  Did you know anyone on there?

22             THE JUROR:  No, I didn't.

23             THE COURT:  You work for a company -- it looks like

24  a subsidiary of Microchip.  Have you talked to them about

25  whether or not they'd pay you while you're doing jury duty?

1          THE JUROR:  They said probably.

2          THE COURT:  I think most of the big companies do.

3          THE JUROR:  They gave me a policy that said a

4    nonexempt employee gets paid four days.  And then I was,

5    like, well, I'm exempt so would I get paid.  And they're like

6    probably.  I'm like, okay.  I have a laptop, so I'm presuming

7    if needed I'd work at home at night, I'd work before I come

8    in the morning.  I'd go in the weekend if I needed.  I think

9    I could make it work.

10         THE COURT:  Great.

11         THE JUROR:  If they're not going to pay me, I'll

12   just hand my laptop in.

13         THE COURT:  You can check with them.  I think most

14   of these bigger companies do pay.  If they don't, we do pay

15   you.  It's $50 a day for the first couple of weeks and then

16   goes to $60.  But because of the government shutdown that I'm

17   sure you've been hearing about, juror pay is going to be

18   delayed.  You can check with your company and let us know.  I

19   think you'll be okay, but we're trying to make sure for

20   people that are relying on the juror funds that they can deal

21   with the delay in pay.

22         THE JUROR:  Okay.  If they couldn't pay me, I think

23   if you called them, that would really help.

24         THE COURT:  And I'm happy to make that call.  It

25   would not be the first of such calls that I've made.

```
1              THE JUROR:  Exactly.  Nothing like hearing from a
2     federal judge.
3              THE COURT:  I like that principle.  Does anybody
4     have any followup questions for her?
5              MS. WILKINSON:  No.
6              MR. KENDALL:  No.
7              MR. YEAGER:  I do.  I see your daughter goes to
8     Gordon College.
9              THE JUROR:  Yes.
10             MR. YEAGER:  Do you have any religious beliefs that
11    might impede you from judging others?
12             THE JUROR:  No.  I'd have to listen to the case and
13    listen to each defendant, whatever you guys bring, and listen
14    to the law and then just have to make my own decision.
15             THE COURT:  Thanks.  You can go.
16             THE JUROR:  Thank you.
17             THE CLERK:  55.
18             THE COURT:  You are Ms. Coffill.
19             THE JUROR:  Yes.
20             THE COURT:  How are you?
21             THE JUROR:  All right.  How are you guys.
22             THE COURT:  Good.  Getting tired of sitting in this
23    chair, but otherwise fine.  We're just doing some followup
24    from the written questionnaires and the oral questions this
25    morning.  Did you get a chance to look at that witness list?
```

1        THE JUROR:  Yes.

2        THE COURT:  Do you know anybody on there?

3        THE JUROR:  No.

4        THE COURT:  Great.  And then some of the questions

5   that you answered yes to this morning, had you or any members

6   of your family or close friends been the subject of a

7   criminal investigation or been arrested, charged, or

8   convicted for anything other than a minor traffic violation.

9   Can you tell us about that?

10       THE JUROR:  My brother-in-law was in jail for

11  molesting his stepdaughter.

12       THE COURT:  How long ago was that?

13       THE JUROR:  Goodness.  Like ten years ago at least.

14       THE COURT:  Are you close to him?

15       THE JUROR:  Not really.

16       THE COURT:  Is there anything about his experience

17  or your family's experience with the court system or law

18  enforcement that you think would affect your ability to be a

19  fair juror in this case?

20       THE JUROR:  No.

21       THE COURT:  And then have you, a family member, or

22  anyone close to you been a party to a lawsuit?

23       THE JUROR:  I had a bankruptcy.  So I'm not sure if

24  that qualifies as a lawsuit.

25       THE COURT:  Is there anything about your experience

1    with the court system that you think would impede your

2    ability to be fair and impartial in this case?

3              THE JUROR:  No.

4              THE COURT:  And then the last question you answered

5    yes to is you or a family member or a close friend worked in

6    the pharmaceutical or healthcare fields.  Is there anything

7    about that to that would impede your ability to be a fair and

8    impartial juror?

9              THE JUROR:  I worked as a unit secretary, so I saw

10   a lot of people who had a hard time with medication.  They

11   would get mad if you resuscitated them because you took them

12   off their high.  Or the nurses had trouble with patients

13   wanting more medication because they were addicted and they

14   just had to wait that specific amount of time before they

15   could get their medication.

16             THE COURT:  It sounds like you've had some

17   experience -- those are opioids that you're talking about or

18   other drugs?

19             THE JUROR:  I don't really know because I was the

20   secretary and I really didn't look at what medications they

21   were on.  I just saw the effects of what it did to the

22   patient and my coworkers.

23             THE COURT:  You've had experience with addiction,

24   it sounds like, or you've seen it professionally.  Is there

25   anything about your experience with addiction or those drugs

```
 1    or the medical environment that you think would affect your
 2    ability to be a fair juror in this case?
 3            THE JUROR:  No.  Just knowing that it's hard for
 4    people to get over their addiction.  That's all.
 5            THE COURT:  I don't want to overly pry here, but
 6    you say you take a medication that can make it hard to stay
 7    awake.
 8            THE JUROR:  I have anxiety and depression and
 9    bipolar, and the three meds that I'm on, they make it so
10    that -- I've been doing good so far, but sometimes I can just
11    sit down at home and zonk out.  That's the only thing.
12            THE COURT:  We sit a relatively long day, but we
13    don't sit longer than two hours at a time.  Whenever anybody
14    wants water or wants to get up and move around a little bit,
15    we let people do that.
16            THE JUROR:  That should be fine.
17            THE COURT:  Those conditions are all being
18    controlled now with the medication?
19            THE JUROR:  Yes.
20            THE COURT:  Okay.  The hardship with your children
21    and your mother and your grandmother.  Your kids are too old
22    for me to excuse you for that.
23            THE JUROR:  Okay.
24            THE COURT:  Do you think you can manage it?
25            THE JUROR:  I'm hoping so.  My son has oppositional
```

```
1    defiance disorder, ADHD, and anxiety.  And they're trying to
2    say conduct disorder, which means learning different
3    behaviors about how to help him so it doesn't get worse.
4              THE COURT:  What does that involve?
5              THE JUROR:  A wrap-around team, which we already
6    have in place.  And my husband and I have to learn
7    dialectical behavior therapy.  And I hear it's intense.
8    That's all I know.  I don't know when it would be happening.
9    I think it's like two to three hours a week.
10             THE COURT:  The training, his --
11             THE JUROR:  Our training.
12             THE COURT:  Two to three hours a week for how long?
13             THE JUROR:  I haven't been told yet.
14             THE COURT:  Do you know when it is supposed to
15   start?
16             THE JUROR:  I know that it's been put in.  So maybe
17   a couple of weeks we'll transition out from family therapy to
18   that.
19             THE COURT:  Will they be able to do that sort of
20   late afternoons or evenings or weekends, or do you know?
21             THE JUROR:  I don't know yet.  I don't know the
22   schedule.
23             THE COURT:  Okay.  Followup from anyone?
24             MR. YEAGER:  No, Your Honor.
25             MS. MINER:  Can we keep her?
```

1          THE COURT:  Just hold her outside?

2          MS. MINER:  Yes.

3          THE COURT:  Can you just step out for a second.

4          THE CLERK:  Just hold her back there.

5          MS. MINER:  Your Honor, two things.  One, she's in

6   family therapy.  I thought, and I might be wrong, that the

7   age was ten.  And her daughter --

8          THE COURT:  The thing is that she works is the

9   problem.

10          MS. WILKINSON:  Maybe, Your Honor, if you asked her

11   about her family therapy.  She says she's doing that now and

12   then she has to transition to therapy a couple of hours a

13   week.

14          THE COURT:  We'd have to let her go if she started

15   this family therapy from that.  She's got a pretty full

16   plate.

17          MS. WILKINSON:  Right.

18          THE COURT:  What's the government's view?

19          MR. YEAGER:  We'll agree to cause.

20          THE COURT:  She can go.

21          THE CLERK:  She can go downstairs.

22          THE COURT:  We're about to bring in Juror

23   Number 57, and we have up to 78 here.

24          THE CLERK:  There's 12 left.

25          MR. KENDALL:  So we've done 38.

```
1                THE COURT:  Something like that.
2                MR. KENDALL:  50 tomorrow sounds good.
3                MR. YEAGER:  We have another 50 out of that pool
4      left?
5                THE COURT:  We have close to 200 in the pool.
6                MR. YEAGER:  Left?
7                THE COURT:  No.  We started with about 200.  We
8      have about 150 left.
9                MR. TYRRELL:  150 after the ones we did today?
10               THE CLERK:  Yes.  The next 50 for tomorrow.
11               THE COURT:  We'll start a bit earlier.
12               THE CLERK:  57.
13               THE COURT:  Mr. Locke?
14               THE JUROR:  Yes, Your Honor.
15               THE COURT:  You have nice handwriting.
16               THE JUROR:  Thank you.
17               THE COURT:  I can read everything you wrote.
18               THE JUROR:  Thank you, Your Honor.
19               THE COURT:  We're doing followup on the written
20     questionnaire from the other day and the oral questions from
21     this morning.  Did you have a chance to look at that witness
22     list?
23               THE JUROR:  Yes, I did.
24               THE COURT:  Did you know anyone on there?
25               THE JUROR:  No, I did not.
```

1    THE COURT:  And then you answered yes to the fact
2    that you have been a juror before.
3    THE JUROR:  Yes, I have.
4    THE COURT:  Criminal or civil?
5    THE JUROR:  Criminal.
6    THE COURT:  State or federal?
7    THE JUROR:  State.
8    THE COURT:  How long ago?
9    THE JUROR:  It had to be at least 15 years, maybe
10   longer.
11   THE COURT:  And was there anything about that
12   experience that you think would affect your ability to be
13   fair in this case?
14   THE JUROR:  Not at all, no.
15   THE COURT:  I see you work for the Postal Service.
16   I'm assuming that the Postal Service will pay you through
17   your jury duty.
18   THE JUROR:  Yes, they will.
19   THE COURT:  Any followup for Mr. Locke?
20   MS. WILKINSON:  No.
21   MR. KENDALL:  Mr. Locke, you mentioned you have two
22   children employed by the City of Boston.
23   THE JUROR:  Yes, I do.
24   MR. KENDALL:  Can you tell us what they do?
25   THE JUROR:  One does HVAC for area buildings around

1      the city, and the other one works for the mayor's office.

2                  MR. KENDALL:  What's he do for the mayor?

3                  THE JUROR:  He's a liaison to Charlestown, to where

4      he grew up.

5                  MR. KENDALL:  Thank you.

6                  THE COURT:  Anybody else?

7                  MR. YEAGER:  Yes.  You had some contacts with the

8      law back in the '80s and '90s.

9                  THE JUROR:  Minimal.

10                 MR. YEAGER:  Anything about those that would affect

11     your ability to be fair?

12                 THE JUROR:  No.

13                 MR. YEAGER:  Do you have any hard feelings to the

14     police?

15                 THE JUROR:  No, I don't.

16                 MR. YEAGER:  Do you think you were treated fairly

17     by the criminal justice system?

18                 THE JUROR:  Absolutely, yeah.

19                 MR. YEAGER:  Okay.

20                 THE COURT:  Thank you, Mr. Locke.  You can go.

21                 MR. HORSTMANN:  What is your date of birth?

22                 THE JUROR:  12/3/60.

23                 THE COURT:  You're good.

24                 THE JUROR:  Thank you, Your Honor.

25                 THE COURT:  He's fine, right?

```
1              MS. WILKINSON:  Yes.

2              THE CLERK:  60.

3              THE COURT:  Mr. Russell?

4              THE JUROR:  Hi.  How are you?

5              THE COURT:  Good.  How are you?

6              THE JUROR:  Good.  Thank you.

7              THE COURT:  We're just doing some followup on the

8       questions from this morning and the written questionnaire

9       from the other day.

10             THE JUROR:  Okay.

11             THE COURT:  Did you have a chance to look at that

12      witness list?

13             THE JUROR:  Yes, I did.

14             THE COURT:  Did you know anyone on there?

15             THE JUROR:  I did not.

16             THE COURT:  The questions from this morning, the

17      first one you answered yes to is if you or any member of your

18      family or close friends have been the subject of a criminal

19      investigation, arrested, charged, or convicted of anything

20      other than a minor traffic violation.

21             THE JUROR:  Correct.

22             THE COURT:  Can you hum a few bars for us?

23             THE JUROR:  Sure.  My nephew unfortunately is a

24      drug dealer and he's been arrested for that.  He got out.  He

25      got rearrested.
```

1          THE COURT:  Is there anything about what he does or

2     your family's interaction with the law enforcement system or

3     lawyers or anything about that experience that you think

4     would affect your ability to be a fair juror in this case?

5          THE JUROR:  My brother-in-law was a police officer.

6     He passed away.  I have two relatives that work in the

7     federal prison down in Plymouth.  And I have a niece that

8     passed away from an overdose.

9          THE COURT:  You have a little bit of everything.

10         THE JUROR:  Yeah.

11         THE COURT:  Let's start with your niece.  I'm sorry

12    about that.  Is there anything about your family's experience

13    with her situation that you think would affect your ability

14    to be a fair juror in this case?

15         THE JUROR:  Affect me?  No.

16         THE COURT:  Do you think you could listen to the

17    evidence, listen to the law, and be fair?

18         THE JUROR:  Yes.

19         THE COURT:  And then the fact that you have

20    relatives that work in law enforcement, do you think that

21    that would affect your ability to be a fair juror in this

22    case?

23         THE JUROR:  No, I don't believe so.

24         THE COURT:  You could listen to the testimony of

25    law enforcement officers and evaluate it just like you would

1    evaluate the testimony of any other witness?

2            THE JUROR:  That is correct.

3            THE COURT:  We talked about the fact this morning a

4    little bit that an indictment does not give rise to any

5    presumptions or inferences regarding a person's guilt.  It's

6    just an allegation.  And that it's the government's job to

7    prove those allegations beyond a reasonable doubt and the

8    jury's job to decide whether the government has met its

9    burden of proof.

10           The question was, is there anyone here who might be

11   so influenced by the fact that these people were charged with

12   a crime in an indictment that could affect your ability to

13   serve.  Can you tell us about that?

14           THE JUROR:  The name Michael Gurry.

15           THE COURT:  Yeah.

16           THE JUROR:  I have employees that work for me with

17   the name Gurry.  If he's born in Massachusetts, he may be

18   related to him.

19           MS. MINER:  He's not, no.

20           THE JUROR:  Okay.

21           THE COURT:  But just to back it up a little bit.

22   The fact that you could listen to the testimony of someone in

23   law enforcement like anybody else and evaluate the testimony

24   fairly.

25           THE JUROR:  Yes.

1          THE COURT:  The last question that you answered yes

2   to, I said is there anything beyond the topics we've already

3   discussed that could prevent you from serving as a neutral

4   juror?

5          THE JUROR:  Just the hardship.  I have a letter

6   from my company.

7          THE COURT:  Let's see it.  So they are basically

8   saying that they are busy.  They're short a supervisor due to

9   a medical issue and they would like to postpone his service

10  on jury duty to a later date in the year.  You're supposed to

11  deal with this before you show up at all, because once you're

12  here I have you.  Have you talked to them about whether

13  they're going to pay you?

14         THE JUROR:  I did not pull out the handbook to see.

15         THE COURT:  They're saying this event goes three

16  weeks.  Is that three consecutive weeks?

17         THE JUROR:  We have a Kaizen event going on right

18  now.

19         THE COURT:  What's a Kaizen event?

20         THE JUROR:  That's where you tear a part of the

21  factory down and rebuild it to make it quicker, better, more

22  efficient.  We have people from South Carolina, Mexico,

23  Christiansburg --

24         THE COURT:  Does anyone else want to see this?

25         What is jury selection going to be at this point?

1          MS. McDONOUGH:  They usually ask for it prior to
2    coming.
3          THE COURT:  That's what I thought.  Do you have any
4    followup for him before we transfer this up?
5          MR. YEAGER:  I guess my question will be if you're
6    required to serve, are you going to hold it against the Court
7    or the parties?
8          THE JUROR:  No.
9          MR. YEAGER:  You'd do your job and be fair and
10   impartial?
11         THE JUROR:  Yes.
12         MS. MINER:  And if you're required to serve, will
13   you be concerned at all about any adverse employment affects
14   to you?
15         THE JUROR:  I hope not.
16         MR. TYRRELL:  I wasn't sure --
17         THE JUROR:  I mean, what I will do is I'll see my
18   boss and ask him if I can come in after the jury is done,
19   after serving whatever time.  Say it's 9:00 to 3:00.  When I
20   get out of here, just go to work.  We have a second shift.
21         MS. MINER:  How long would you have to work at
22   night?
23         THE JUROR:  I've got to make sure things get out
24   the door.
25         MR. KENDALL:  Mr. Russell, I believe we go to 4:00.

```
1                THE COURT:  Guys.  Enough.  Okay?
2                MR. KENDALL:  And then you'd drive to Wareham, in
3      the Wareham area.
4                THE JUROR:  It would be Plympton, Mass.
5                MR. KENDALL:  That's probably a couple of hours
6      during rush hour?
7                THE JUROR:  For sure, yes.
8                MR. KENDALL:  So you would start work at probably
9      6:00 or 7:00?
10               THE JUROR:  Yes.
11               MR. KENDALL:  How long would your shift be?
12               THE JUROR:  To 11:00.
13               THE COURT:  You can step out for a second.
14               You wanted to keep at it to disqualify?
15               MR. KENDALL:  I just wanted to try to find out if
16     he was going to be able to pay attention.
17               MR. TYRRELL:  I had a question about the indictment
18     answer.  I wasn't sure.  You asked the question and --
19               THE COURT:  That's not what you were trying to do.
20               MR. TYRRELL:  You made a connection to Gurry, which
21     I thought was something else.
22               THE COURT:  Right.  I circled back around it.  I
23     can't really let him out on a work hardship where his company
24     is not saying it's a hardship.  They're just asking for it to
25     be delayed.
```

1            There may be other reasons to let him out.  To keep

2    at somebody like that to try to get rid of him is not the way

3    we're going to do this.  It's not the way we're doing it all

4    the day long.  I know his view on this.

5            MS. MINER:  That being said, I have had people in

6    cases where they go to work on the second shift and they come

7    in, and they come in and fall asleep.  They're tired.  If you

8    have to be here from basically 9:00 to 4:00 and you work 4:00

9    to 11:00 or 4:00 to 10:00, I think that's a lot to ask

10   people.

11           MS. WILKINSON:  Your Honor, he probably didn't ask

12   in advance because he didn't think it would be a 12- to

13   14-week trial.  So to get penalized just because he didn't

14   ask in advance.  I know you're supposed to, but I think most

15   people don't assume they're going to come --

16           MR. YEAGER:  Let's make him a maybe.

17           THE COURT:  The company's letter doesn't say he

18   can't do it.  They know about the civic duty.  They need him

19   for three weeks.  This is the first week.  He'll already be

20   through the first week before we get started.

21           What's the government's view?

22           MR. YEAGER:  We don't think he should be

23   disqualified for cause.  But if you want to put him on a

24   maybe list, maybe we can get some additional information.

25           THE COURT:  I'll put him on the maybe list.  We

1    actually have three maybe's.  I have a fourth one that I

2    marked maybe myself.  If we get enough qualified, I'd like to

3    let all four of those go.  If we don't, we'll have to think

4    of something different.

5              MS. MINER:  Your Honor, is your fourth maybe coming

6    up?

7              THE COURT:  We already did it.  My fourth maybe

8    was, I think she was the nurse that had medical issues of her

9    own.  The maybes that I have -- let me give you the numbers.

10             The ones that I put down as maybes are 33, 11 -- it

11   was Robin Foley.  33, 36, 11, and this guy.  I'm sorry.  16.

12             THE CLERK:  11 was excused.

13             MR. TYRRELL:  52 was a maybe.

14             THE COURT:  Hold on, please.  I could have easily

15   gotten one of these in the wrong file.

16             Was 11 excused?  I'm sorry.  36.  I'm reading Juror

17   Number 11 on my list.  33, 36, 52, and 60.  I would like to

18   let all four of those go if we can qualify enough jurors.

19             This guy's got a prepaid vacation, two of them,

20   neither one of which are is during a school vacation week.

21   He has a vacation scheduled.  Do you want to make sure he's

22   paid for it?

23             MR. YEAGER:  That's why we left him on.

24             THE COURT:  All right.  Bring him in.  He's got a

25   host of others.  63, bring him in.  We'll do this.

```
1              Mr. Graff?

2              THE JUROR:  Yes, Your Honor.

3              THE COURT:  How are you?

4              THE JUROR:  I'm all right.  How are you.

5              THE COURT:  I'm good, thanks.  You have a vacation

6    scheduled for the first week in April and the first week of

7    February?

8              THE JUROR:  Yes, ma'am.

9              THE COURT:  Is that just scheduled vacation or is

10   that prepaid vacation?

11             THE JUROR:  It's scheduled back in October.  We

12   always pick in October for the year.

13             THE COURT:  Are you going somewhere?

14             THE JUROR:  I'm actually on my way to Florida to

15   see my aunt and uncle for the February one.  And then April,

16   I'm kind of doing like little trips here and there.

17             THE COURT:  Have you bought plane tickets?

18             THE JUROR:  No.  I'm driving to Florida.

19             THE COURT:  You're driving?

20             THE JUROR:  Yes, ma'am.

21             THE COURT:  Are you out any money for those

22   occasions.

23             THE JUROR:  Do I have any money?

24             THE COURT:  Are you out any money?

25             THE JUROR:  No.  I'm staying with my aunt and my
```

```
1    uncle.  So they're not charging me.
2             THE COURT:  All right.  I see you work for the
3    Suffolk County Sheriff's Department.
4             THE JUROR:  Yes, ma'am.
5             THE COURT:  You know this is a criminal case?
6             THE JUROR:  Yes.
7             THE COURT:  Do you think you can be fair and
8    impartial in a criminal case?
9             THE JUROR:  To be honest with Your Honor, no, I
10   don't.
11            THE COURT:  Okay.  I'm going to excuse you.
12            THE JUROR:  I appreciate it.
13            THE COURT:  You should be able to be fair and
14   impartial.
15            THE JUROR:  I should.  But I looked at this list,
16   Your Honor, and I'm like -- some of the names are familiar,
17   but they're obviously from different states.  So I can't
18   determine whether or not they did time or if they're illegal
19   and did time.  I worked with immigration at the sheriff's
20   department.
21            THE COURT:  You know you're supposed to -- everyone
22   is presumed innocent until they're proven guilty in front of
23   the jury.
24            THE JUROR:  I understand that.
25            THE COURT:  That's what makes America great.  If
```

1   someone in your family is accused of a crime, you would like

2   them to have the benefit.

3            THE JUROR:  I don't even want to say the word, but

4   I'm institutionalized.  I've been there 15 years and I see

5   the negative all the time, unfortunately.

6            THE COURT:  All right.  You're excused.

7            THE JUROR:  Thank you, Your Honor.

8            MS. McDONOUGH:   Juror 64.

9            THE COURT:  Mr. Alves?

10           THE JUROR:  Yes.

11           THE COURT:  We're doing some followup from the oral

12  questions from this morning and the written questionnaires

13  from last week.  Did you have a chance too look at that

14  witness list?

15           THE JUROR:  I did, yes.

16           THE COURT:  Do you know anybody on it?

17           THE JUROR:  No.  None of them are familiar to me.

18           THE COURT:  Let's go through these questions from

19  today.  You or any member of your family or close friends

20  been the subject of a criminal investigation or been

21  arrested, charged, or convicted for anything other than a

22  minor traffic violation?

23           THE JUROR:  Yes.

24           THE COURT:  Tell me about that.

25           THE JUROR:  My cousin is in court right now in

1    Missouri.  He was arrested for assault and battery and

2    domestic violence.  He's waiting for his trial.  I don't know

3    where that stands at this point.  I've also had two other

4    cousins, one for drug addiction and trafficking, selling, and

5    another one for reckless operation of a vehicle.

6              THE COURT:  Anything about your experience, your

7    family's experience with the courts, law enforcement,

8    lawyers, that you think would affect your ability to be fair

9    in this case?

10             THE JUROR:  No, not that I can think of.

11             THE COURT:  You or any member of your family or

12   close friend been a witness in a criminal case or a victim of

13   a crime?

14             THE JUROR:  I've been robbed twice, once at my home

15   and once in my car.

16             THE COURT:  Anything about that experience that you

17   think would affect your ability to be a fair juror?

18             THE JUROR:  I wish we had caught the people who had

19   did it, but other than that, no.

20             THE COURT:  I talked this morning about the fact

21   that an indictment does not give rise to any presumptions or

22   inferences of guilt.  It's just a charging document and that

23   it's the government's job to try and prove its case.  It's

24   for the jury to decide if the government has proven each

25   element of the offense charged beyond a reasonable doubt.

1          THE JUROR:  Mm-hmm.

2          THE COURT:  The question was, is there anyone here

3    that might be so influenced of the fact that they've been

4    charged with a crime in an indictment that they couldn't be

5    impartial?  You answered yes to that.  Could you flesh that

6    out?

7          THE JUROR:  I guess it's just a personal bias.  I

8    do think that ultimately if you end up in one of these rooms,

9    you probably did something wrong.  Whether it's an indictment

10   that's brought against you that says that happened, it's

11   usually not by accident.

12         THE COURT:  You know our system is founded on the

13   fact that you're innocent until proven guilty.

14         THE JUROR:  I know.  That's why I'm not a lawyer.

15         THE COURT:  You're the executive director

16   responsible for the civic development of a bunch of kids.

17         THE JUROR:  I know.  And I don't do -- that's not a

18   lesson I necessarily preach there.  It's just my own

19   personal -- it's the way I was brought up.  I'm sorry.

20         THE COURT:  So your view is if someone is charged

21   with something, then they probably did something.

22         THE JUROR:  It's just been my experience that it's

23   rare that that many mistakes happen, that somebody would be

24   brought in here and it was wrong place, wrong time, or

25   something along those lines.

```
 1              THE COURT:  Okay.  Thanks very much.  You can step
 2     outside for just a minute.
 3              THE JUROR:  Sure.  Which way do I go?
 4              THE COURT:  That way.
 5              THE CLERK:  Hold him back.
 6              THE COURT:  Does anybody want me to march through
 7     these other questions?
 8              MS. WILKINSON:  No.
 9              MS. MINER:  No.
10              THE COURT:  He can go.
11              MS. McDONOUGH:  Juror Number 66.
12              THE COURT:  How are you?
13              THE JUROR:  I'm all right.
14              THE COURT:  Mr. Razumovskiy?
15              THE JUROR:  Yes.
16              THE COURT:  Did I get that right?
17              THE JUROR:  Yes.
18              THE COURT:  We're following up the oral questions
19     from this morning and the written ones from the other day.
20     Did you have a chance to look at that witness list in your
21     hand?
22              THE JUROR:  Sure.
23              THE COURT:  Do you recognize any of those names?
24              THE JUROR:  No.
25              THE COURT:  I saw in your questionnaire that
```

1    English is your second language.

2              THE JUROR:  Correct.

3              THE COURT:  Did you have any trouble this morning

4    understanding my questions?

5              THE JUROR:  Well, that's what I wanted to talk

6    about.  As it was going further, yeah, I felt like it was

7    getting more difficult for me to keep up sometimes.

8              THE COURT:  Is that because of how fast I'm

9    talking, or do you have trouble with some of the words that

10   I'm saying?

11             THE JUROR:  I guess the terminology is not clear.

12   And sometimes the entire sentences are vague.

13             THE COURT:  Do you think that if you were in the

14   jury on this case you'd be able to follow what was happening?

15             THE JUROR:  I can't say.  Based on what I heard

16   this morning, not 100 percent.

17             THE COURT:  Because your English seems good, very

18   good.

19             THE JUROR:  Right.  In the simple terms.  I was a

20   little intimidated this morning.  I'm not saying that I won't

21   be able.  It will be a concern.

22             THE COURT:  Let me ask you a few other questions.

23   An indictment is a set of allegations.  No presumptions or

24   inferences of guilt follow from an indictment.  It's just a

25   way to charge someone with a crime.  And then it's the

1    government's job to try to prove their guilt beyond a

2    reasonable doubt.  And nobody is guilty of a crime in this

3    country unless a jury finds that the government has proven

4    the case beyond a reasonable doubt.  Do you understand that?

5              THE JUROR:  I understand because I heard it before.

6              THE COURT:  Yeah.

7              THE JUROR:  But if I heard it for the first time,

8    it would have been not as simple as it is for you.

9              THE COURT:  You raised your hand yes to the

10   question that when I asked is there anyone who might be so

11   influenced by the fact that these people were charged with a

12   crime in an indictment that it could affect your ability to

13   sit as a fair juror.

14             THE JUROR:  Right.  So I wasn't sure.  I can

15   describe basically what the background is.

16             THE COURT:  Okay.

17             THE JUROR:  I think I read on the news about the

18   case.  The name John Kapoor sounds familiar to me.  I think I

19   read about this case.  It was either on CNN or BBC.  It was a

20   high-profile case, from what I know.

21             THE COURT:  What do you think you heard?

22             THE JUROR:  I heard that there was some

23   pharmaceutical company that was under scrutiny, and it's

24   related to the opioid crisis.  That's the conclusion I drew.

25             THE COURT:  Because you heard a news report on it,

1    do you think that would affect your ability to listen to the

2    evidence and make a decision just based on the evidence?

3              THE JUROR:  I remember my opinion when I read the

4    article.

5              THE COURT:  Which was what?

6              THE JUROR:  Because I answered -- I raised my hands

7    to other questions as well.

8              THE COURT:  Yes.

9              THE JUROR:  That related to the industry in

10   general.  And I felt that the industry itself in a way shares

11   the responsibility for what happened.  So my opinion was that

12   it's good that something is happening.

13             THE COURT:  That what is happening?

14             THE JUROR:  That there is that scrutiny and that

15   there is this investigation.

16             THE COURT:  Scrutiny is one thing and this

17   investigation is another.  Do you think because this

18   investigation happened it makes it more likely that these

19   people are guilty?

20             THE JUROR:  That's the feeling I had when I read

21   the news, yes.

22             THE COURT:  Do you think you could be a fair juror?

23             THE JUROR:  I can't say.  I can't say no, but I

24   guess it's for you to decide.  This is what I know.  This is

25   what the background is.

1          THE COURT:  You also answered yes to some of the

2    other pharmaceutical industry questions about the FDA and

3    off-label use.

4          THE JUROR:  Right.  So there was a question about

5    friends.

6          THE COURT:  Yes.

7          THE JUROR:  So I have friends who are in the

8    industry.  I remember one of them told me something that made

9    a big impression on me that basically the standard in the

10   industry when a new drug is introduced, the recommendation is

11   built on the basis of whether it has a positive impact

12   through a particular course.  He described it that it made

13   sense.

14         It doesn't take any side effects in consideration.

15   So if, for instance, you have pain in your leg and the

16   suggestion is to remove your leg, you will have no pain in

17   your leg anymore.  Therefore it's a good suggestion.  That's

18   how I see the standard based on his description.

19         THE COURT:  Okay.  I'm going to ask you to just

20   step outside for just a second.

21         THE CLERK:  Just hold him back there.

22         THE COURT:  Did anyone want me to keep at him?

23         MS. WILKINSON:  No.

24         MR. YEAGER:  No.

25         MS. WILKINSON:  He should be excused.

1          THE COURT:  His English is better than mine.

2          MR. TYRRELL:  It was pretty entertaining about

3    removing the leg.

4          MS. McDONOUGH:  Juror Number 67.

5          THE COURT:  Mr. Fennessey.  Did I get that right?

6          THE JUROR:  Correct.

7          THE COURT:  I take that as a small victory.  We're

8    just doing some followup on the oral and written questions

9    from the last few days.  Did you have a chance to look at the

10   witness list?

11         THE JUROR:  I did.

12         THE COURT:  Did you know anyone on there?

13         THE JUROR:  No.

14         THE COURT:  You answered this morning the question

15   about you, any members of your family, or close friends been

16   the subject of a criminal investigation or arrested, charged,

17   or convicted of anything other than a minor traffic

18   violation.

19         THE JUROR:  1966.  The judge dismissed it.

20         THE COURT:  Who was charged?

21         THE JUROR:  I was involving swapping plates on a

22   car.  I was 16.  He said your explanation sounds fishy, but

23   there's a reasonable doubt.  It was dismissed.  Other than

24   that, an OUI in the mid '70s out of state.

25         THE COURT:  Anything about those experiences with

1   the courts or law enforcement or lawyers that you think would

2   affect your ability to be a fair juror in this case?

3               THE JUROR:  No.

4               THE COURT:  And I see that you are self-employed.

5               THE JUROR:  Yes.

6               THE COURT:  So we pay people for jury duty, but

7   with the government shutdown, with which I'm sure you're

8   familiar --

9               THE JUROR:  It's not a factor.

10              THE COURT:  I was going to say we do pay you, but

11  we'll be late.

12              Anybody have any followup for Mr. Fennessey?

13              MR. TYRRELL:  No.

14              MS. WILKINSON:  No.

15              THE COURT:  You're all set.  Thank you.

16              THE CLERK:  72.

17              MS. McDONOUGH:  Juror Number 72.

18              THE COURT:  Mr. McManus?

19              THE JUROR:  Yes.

20              THE COURT:  How are you?

21              THE JUROR:  Good.  Thank you.

22              THE COURT:  We're doing some followup on the oral

23  and written questions from the last few days.  Did you have a

24  chance to look at that witness list before you came in here?

25              THE JUROR:  Yes, ma'am.

1      THE COURT:  Did you know anyone on it?

2      THE JUROR:  No.

3      THE COURT:  I guess we'll start over here.  You

4   raised your hand, you or any member of your family or close

5   friends been the subject of a criminal investigation, been

6   arrested or charged or convicted for anything other than a

7   minor traffic violation?

8      THE JUROR:  My daughter.

9      THE COURT:  When was that?  What was that?

10      THE JUROR:  It was four or five years ago,

11   destruction of property.

12      THE COURT:  Was she convicted?

13      THE JUROR:  It was without a finding, I think.

14      THE COURT:  Is there anything about your experience

15   with your daughter or your family's experience with the

16   courts, law enforcement, lawyers, that you think would affect

17   your ability to be fair in this case?

18      THE JUROR:  No, ma'am.

19      THE COURT:  The next question was if you, a family

20   member, or anyone close to you been a party in a lawsuit.

21      THE JUROR:  Yes.  That was my wedding reception.

22   One of my guests was punched by my first cousin and he hit

23   his head and almost died.  So there was several lawsuits that

24   I was involved.

25      THE COURT:  How long ago was that?

1          THE JUROR:  30 years ago.

2          THE COURT:  Anything about that experience that you

3    think would affect your ability to be a fair juror in this

4    case?

5          THE JUROR:  Not today.

6          THE COURT:  What do you mean?

7          THE JUROR:  I think maybe if it was ten years ago

8    it happened, yeah.  I wasn't too happy about it.  But not

9    today.

10          THE COURT:  Which part were you not happy about?

11          THE JUROR:  Just being sued when we didn't feel we

12    were a party.

13          THE COURT:  And then the last question that I think

14    you answered yes to, is there anything else beyond these

15    topics we've already discussed that might prevent you from

16    serving as a neutral juror?

17          THE JUROR:  I was scheduled to go on vacation.

18          THE COURT:  We'll get to your question which has

19    that.  It says you're scheduled to go on vacation the end of

20    February --

21          THE JUROR:  The beginning of February.

22          THE COURT:  What are the dates?

23          THE JUROR:  This is the itinerary, if you'd like to

24    look at it.  I don't have my glasses.

25          THE COURT:  Are these in March?

1          THE JUROR:  End of February, beginning of March.

2          THE COURT:  This is a March 2 flight.  March 2 from

3    Ft. Lauderdale to Boston.  That must be the end of the trip.

4    February 21 to March 2.  February 21 is President's Week.

5          THE CLERK:  February 21 is a Thursday of that week,

6    though, and it's the following whole week after.  So that

7    would be after February vacation.  It's the week after

8    February vacation, most of it.

9          THE COURT:  Aside from vacation issues, does anyone

10   have any other questions for him?

11         MR. YEAGER:  Just what did you do before you

12   retired?

13         THE JUROR:  I was a water treatment plant operator.

14         MR. YEAGER:  Where?

15         THE JUROR:  North Andover.

16         THE COURT:  Anyone else?  Okay.  You're excused.

17   Thank you.

18         THE CLERK:  He can go down.

19         THE COURT:  That's a prepaid vacation from the

20   middle of President's Week, the whole next week, and then

21   he'll be back the week after.  Unless anyone thinks we'll be

22   done by then.

23         MR. YEAGER:  I wish.

24         THE COURT:  Any objection to him being excused?

25   It's a prepaid vacation.

```
 1              MR. YEAGER:  No.

 2              MR. TYRRELL:  No, Your Honor.

 3              MS. McDONOUGH:  Juror Number 73.

 4              THE COURT:  Ms. Hawks, right?

 5              THE JUROR:  Yes.

 6              THE COURT:  How are you?

 7              THE JUROR:  Good.  How are you.

 8              THE COURT:  Good.  Thank you.  We're doing some

 9   followups on the written questionnaires from last week and

10   the oral questions this morning.  Did you have a chance to

11   look at that witness list?

12              THE JUROR:  I did.

13              THE COURT:  Do you know anybody on there?

14              THE JUROR:  No.

15              THE COURT:  Just to start off, you're a nurse at

16   the Beth Israel.

17              THE JUROR:  Yes.

18              THE COURT:  It seems like you've had contact with

19   patients who come in with an overdose.

20              THE JUROR:  Correct.

21              THE COURT:  Or opioid addictions.

22              THE JUROR:  Correct.

23              THE COURT:  Do you think that you could -- do you

24   think that you could sit as a fair juror on this case?

25              THE JUROR:  I don't think I could.
```

1          THE COURT:  Why?

2          THE JUROR:  Almost every shift, I deal with people

3     who are addicted to narcotics.  It takes a great deal of our

4     time because they're -- I don't blame them for it, but

5     they're watching the clock.  And every three hours, they want

6     their pain meds.  You end up spending a lot of time with

7     those patients instead of with patients you're supposed to be

8     taking care of.

9          THE COURT:  When you say you don't think you could

10    sit as a fair juror on this case, is that because -- why is

11    that?

12         THE JUROR:  Couple of reasons.  I see how the

13    pharmaceutical companies influence at lower levels.  And the

14    opioid crisis that's going on as well, I see that firsthand.

15    And it makes me have very little sympathy for those this

16    charge of those corporations.

17         THE COURT:  Okay.  I'm going to ask you to step out

18    for just a second.

19         THE CLERK:  Just have her wait back there.

20         THE COURT:  Does anybody want me to forge forward

21    with her?

22         MR. YEAGER:  No, Your Honor.

23         MS. WILKINSON:  No, Your Honor.

24         MR. TYRRELL:  No.

25         MS. McDONOUGH:  Juror Number 74.

```
1            THE COURT:  Mr. Hannon?
2            THE JUROR:  Good afternoon.
3            THE COURT:  How are you?
4            THE JUROR:  Good.
5            THE COURT:  What are you reading?
6            THE JUROR:  Robert Parker.
7            THE COURT:  Just doing some followup on the
8    questionnaires from the other day and the oral questions from
9    this morning, did you have a chance to look at that witness
10   list?
11           THE JUROR:  Yes.  The only name is 85.  I work for
12   a small real estate company.  The owner of the company is
13   Sean Horan.  I don't know Bridget, but I don't know if it's
14   his cousin Joe's wife or not.  I know they're in the Boston
15   area.
16           MR. YEAGER:  FBI analyst, Your Honor.
17           THE COURT:  Did you say his niece?
18           THE JUROR:  It was a cousin.
19           THE COURT:  Do you know what she does?
20           THE JUROR:  I think they are both in the mortgage
21   industry like the Newton area.
22           THE COURT:  I don't think it's the same person.
23           THE JUROR:  Okay.
24           THE COURT:  Just to follow up on some of the
25   answers that you gave this morning, prior jury service.
```

1          THE JUROR:  Yes.  Barnstable.

2          THE COURT:  Civil or criminal?

3          THE JUROR:  It was criminal.

4          THE COURT:  How long ago?

5          THE JUROR:  I was teaching, so it was back in the

6     '90s.

7          THE COURT:  Anything about that experience that you

8     think would affect your ability to be a fair juror in this

9     case?

10          THE JUROR:  No.

11          THE COURT:  You or any member of your family or

12    close friends been the subject of a criminal investigation or

13    arrested, charged or convicted for anything other than a

14    minor traffic violation?

15          THE JUROR:  I had a friend who was drunk driving

16    and killed somebody when we were 19 and 20.  I had an

17    uncle -- I don't know all the details.  I was young.  It

18    involved some embezzlement with a bank.  He never did any

19    jail time.  I don't know if it was dismissed.  Those are the

20    only two that I can think of that were close.

21          THE COURT:  And one was in the '90s.  When was the

22    other?

23          THE JUROR:  My friend was in the '90s.  My uncle

24    was when I was a teenager, say 35 some-odd years ago.

25          THE COURT:  Anything about those cases, your

1    family's interaction with the courts or law enforcement or

2    lawyers that you think would affect your ability to be a fair

3    juror in this case?

4         THE JUROR:  No.

5         THE COURT:  I'm guessing as a real estate agent

6    that you work on commission.

7         THE JUROR:  (Witness nods in the affirmative.)  I

8    do.  But we are a property management company so I do have a

9    base salary.

10        THE COURT:  We pay jurors, but because of the

11   government shutdown, which I'm sure you've been reading

12   about, we are going to pay our jurors but the pay is going to

13   be delayed.  Can you manage that?

14        THE JUROR:  Honestly, it's going to be -- two or

15   three months is difficult.  I understand.  That's why I

16   checked no, based on what they're saying.  It's difficult on

17   everyone, but --

18        THE COURT:  I'm sort of trying to sort out the

19   difference between inconvenience, would prefer not, and real

20   true hardship.

21        THE JUROR:  I'll probably have to use some credit

22   cards or ask for some help if I were sitting on this jury for

23   two or three months, as far as finances, for sure.

24        THE COURT:  We'll sit until 4:00 most days, 10:00

25   4:00, so you'd have some time before and after.  The fifth

1    day we do generally half a day.  Some weeks we'll only sit

2    four days.  Does that improve that situation for you?

3              THE JUROR:  It's tough because of the property

4    management aspect.  I run the office.  I can make calls, but

5    most of what I do I have to be there.  And the brief

6    conversation I had with both employers, I don't know how

7    that's going to financially work out.  He's not going to pay

8    me my full salary for sure.  I got that.

9              THE COURT:  Is he going to pay the difference

10   between what we pay you and what you make?

11             THE JUROR:  I didn't press him on that.  I don't

12   believe so, based on our discussion.

13             THE COURT:  Did you retire from teaching?

14             THE JUROR:  No.  I left.  I joke that I retired.  I

15   was only 30.  I hit 30 and I had to make a decision.  I still

16   got the gray hair either way.  No, I couldn't do another -- I

17   coached.  I couldn't do another 30 years, 40 years.  Sorry.

18             THE COURT:  I have little kids.  I'm truly in awe

19   of people that manage to teach for their whole career.

20             THE JUROR:  My wife is a second-grade teacher.

21   She's counting the years.

22             THE COURT:  You're going to have to flesh this out

23   for me a little bit.  I normally -- work hardships are hard

24   for me to discharge people on, but in part that's because we

25   pay people.  And with the pay going to be delayed, I have a

1    little more latitude than I otherwise would.  If you're going

2    to tell me that it's kind of an inconvenience, but you know

3    jury duty is important, I'm going to keep you on.  But if

4    you're going to tell me it's a true hardship, then I will at

5    least consider letting you go.  I need to have a clear

6    understanding from you where we are.

7            THE JUROR:  The definition of true hardship, there

8    are bills that are going to have to be paid somehow that we

9    don't have the money for.  So whether that's a credit card --

10   it's tax season, so my final taxes are due.  I'll have to

11   find the money somewhere.  The 50 dollars a day, 250 a week,

12   that doesn't pay half the mortgage.

13           THE COURT:  It goes up to 60 after the first two

14   weeks.

15           THE JUROR:  I'm in.  I won't even go home tonight

16   to the Cape.

17           I understand the severity and the commitment and

18   the civic duty.  Am I going to be in some debt, owing to my

19   parents or some credit card?  Yes, based on my quick

20   discussion.  The other part-time job that I do, that's always

21   been if I don't work, I don't get paid.  So there's nothing

22   there.  And I didn't get into it in true detail with my boss,

23   but there are only three of us.  One, she's a part-time

24   receptionist.  It's going to be hard for him.  The indication

25   I got was financially I'm not going to -- he's not going to

```
 1   cover what the difference is.
 2            THE COURT:  Okay.  Anybody have any followup
 3   questions for him?
 4            MR. TYRRELL:  No.
 5            MS. WILKINSON:  No.
 6            THE COURT:  You can go.  Thanks very much.
 7            MS. WILKINSON:  He can go down.
 8            THE COURT:  Leave him as another maybe?
 9            MS. WILKINSON:  When he says he's going to go in
10   debt --
11            MR. TYRRELL:  His willingness to soldier on is
12   admirable, but he's going to run up his credit cards?
13            MR. YEAGER:  We'll agree.
14            THE COURT:  Fred, you're like a broken man over
15   there.
16            MR. YEAGER:  I'll tell you to me, driving here from
17   Brewster every day is the real issue.
18            THE COURT:  He would probably I get a hotel but
19   probably not now.
20            MR. YEAGER:  The jurors.
21            THE COURT:  90 miles.  They get a hotel.
22            THE CLERK:  75.
23            THE COURT:  Yes.  Ms. Jaynes?
24            THE JUROR:  Yes.
25            THE COURT:  How are you?
```

```
1              THE JUROR:  Good, thank you.
2              THE COURT:  Thank you for waiting so patiently
3     today.
4              THE JUROR:  Of course.
5              THE COURT:  It's getting long.  I hope you brought
6     a good book.
7              THE JUROR:  No.
8              THE COURT:  That should be on that jury form, bring
9     good book.  It's a tragic oversight.
10             We're doing some followup to the questions from
11    this morning and then from last week.  You, any member of
12    your family, or close friends been the subject of a criminal
13    investigation or arrested, charged, or convicted for any
14    crime other than a minor traffic violation.  Can you tell us
15    about that?
16             THE JUROR:  I have a 22-year-old autistic son.  He
17    just moved from one program to another program.  The program
18    he's moved into is not appropriate for him so he's had some
19    acting out behaviors.  He did act out towards one of the
20    staff and he was arrested.
21             THE COURT:  When was that?
22             THE JUROR:  That was in September.
23             THE COURT:  Is there anything -- we'll talk about
24    your son.  I know you've got that in the questionnaire.
25    We'll get to that.
```

1              Separate from that, is there anything about your

2    interaction with the courts or law enforcement or lawyers or

3    anything about that experience that you think would affect

4    your ability to be a fair juror in this case?

5              THE JUROR:  It's hard to say.  I think the judge

6    should not have put him in jail, knowing that he's autistic

7    and his behavior is -- I just wish they'd take him to the

8    hospital instead.

9              THE COURT:  Yes.

10             THE JUROR:  So now my 22-year-old son who is

11   autistic is thinking I'm a bad person, I'm a bad person,

12   whenever he makes a mistake.  So would it affect my opinion

13   on a case, towards you, other people?  I can't say that, no.

14   I think the judge basically doesn't understand autistic

15   children or young adults.  And I thought it was very sad that

16   that happened.

17             THE COURT:  Is it fair to say that you had a bad

18   experience with one judge, one courtroom, one situation, but

19   you feel you can put that aside and look independently at

20   this case?

21             THE JUROR:  I would say yes.

22             THE COURT:  And then have you or family member or

23   anyone close to you been a party to a lawsuit?

24             THE JUROR:  I wasn't sure about that question.  But

25   no, I have not.

1          THE COURT:  Okay.  What were you thinking when you
2    answered?
3          THE JUROR:  My son was in one school and the school
4    system was asked to move him out of one program.  And that
5    program and the school system went back and forth as to
6    whether or not he should stay or be moved out.  And I went to
7    the hearing, but I was not a party to it.  It's just that I'm
8    his guardian.  I wasn't sure.  You had asked a question
9    whether I'm actually a party to that or no.  But no, I just
10   had to show up.
11         THE COURT:  Was there anything about that
12   experience?  It sounds like it was in a courtroom again?
13         THE JUROR:  Administrative law.  No.  It's fine.
14         THE COURT:  The last question you answered yes to
15   this morning was you, family member, or close friend ever
16   worked in the pharmaceutical or healthcare fields.  And if
17   so, was there anything about that experience that would
18   affect your ability to be a fair juror?
19         THE JUROR:  I would say I work at the Board of
20   Registration in Medicine.  So I consider that part of
21   healthcare.  We license physicians at the board of medicine.
22   It's the state licensing board here in Massachusetts.
23   Basically what I do is I'm an investigator.  So I look at all
24   the information, interview people.  But I do not make
25   decisions.  I just gather the information.

1        THE COURT:  Is there anything about your job -- I

2   know you put here on the written form that it involves

3   complaints against physicians and acupuncturists.

4        THE JUROR:  Correct.

5        THE COURT:  Is there anything about your job that

6   you think would affect your ability to be a fair juror in

7   this case?

8        THE JUROR:  No.  Because I don't think all doctors

9   are guilty or -- they're just like anybody else.  And I have

10  lots of cases where there's just no reason for it to be a

11  case, in my eyes.

12       THE COURT:  Okay.  I think what's left on here is

13  your son.  I see you need to be available for meetings, phone

14  calls, and interviews.  Tell me what that is going to entail

15  in the next couple of months.

16       THE JUROR:  I don't know.  I've been trying to get

17  him into a new program since September.  Gone back and forth

18  with the Department of Developmental Services.  And basically

19  I'm at the point now where I actually had to hire an attorney

20  to help me get him services because he really needs to be in

21  a different group home or an evaluation type of situation.

22  So it's basically just waiting for an opening at another

23  program.  That's why I'm saying I don't know.  I live by my

24  phone.  But I think most people nowadays do live by their

25  phone.

1          THE COURT:  Yes.  If you're selected to be a juror

2     in this case, we sit generally 10:00 to 4:00.  You can have

3     your phone up here.  You can be on your phone until 10:00.

4     We take a lunch break at 12:00.  You can have your phone

5     then.  We take another lunch break midafternoon.  You'd have

6     access to your phone.  We're done at 4:00.  That's the

7     schedule I generally want to stick to four days a week.  The

8     fifth day, we'd sit a shorter day and you'd have the

9     afternoon free, so you'd be done by 1:00.  There may be

10    occasional days where we don't sit at all.  Is that

11    manageable?

12          THE JUROR:  Yes.

13          THE COURT:  Any followup questions?

14          MR. KENDALL:  You work with The Board of

15    Registration in Medicine.  Does that ever involve physician

16    contacts with pharmaceutical or other type of healthcare

17    companies?  And if so, could you just tell us about that.

18          THE JUROR:  Are you saying do I contact

19    pharmaceutical companies?

20          MR. KENDALL:  When you're doing investigations for

21    the board, are the issues ever related to contacts between

22    physicians and pharma companies?

23          THE JUROR:  I would say not really.  I don't

24    contact pharmaceutical companies.  There may be complaints

25    about doctors who are using too much medication, but I don't

```
1    contact the pharmaceutical companies.  What I do is I look at
2    another database to see what the prescribing history is.
3              THE COURT:  Anybody else?  Thanks.  You're free to
4    go.
5              THE JUROR:  Thank you.
6              THE COURT:  She's fine, right?
7              MR. HORSTMANN:  I don't think she's fine.  I think
8    we should challenge her for cause.  She's well within a
9    number facts in this case as an investigator.  She's a cop
10   who investigates doctors.
11             THE COURT:  She was very clear that some are
12   behavioral guilt and some are not.  I'm not going to get rid
13   of her for cause.  I thought you would have liked her.
14             MR. HORSTMANN:  No.
15             THE COURT:  76.
16             MS. McDONOUGH:  Juror 76.
17             THE COURT:  Mr. Simas.
18             THE JUROR:  Simas.
19             THE COURT:  How are you?
20             THE JUROR:  Good.  How are you.
21             THE COURT:  I'm good, thanks.  We're just doing
22   some followup on the oral questions from this morning and the
23   written questionnaire from the other day.
24             THE JUROR:  Sure.
25             THE COURT:  You work for Blue Harvest Fisheries.
```

1          THE JUROR:  Correct.

2          THE COURT:  Sales rep.

3          THE JUROR:  Yes.

4          THE COURT:  Have you talked to them about whether

5     or not they would pay you if you're selected for this jury?

6          THE JUROR:  I went over it briefly, but I think

7     their policy is only three days.  They pay for the first

8     three days, and technically today is the second.

9          THE COURT:  What's your view on that?  Are you

10    going to be able to -- I can call -- how big a company are

11    they?

12         THE JUROR:  They're fairly small.  They were bought

13    by a private equity company.  They are like five companies

14    together.  Really not that big.

15         THE COURT:  Private equity companies generally --

16    businesses generally pay their employees for jury duty.

17         THE JUROR:  Okay.

18         THE COURT:  But some don't.  Did you talk to them

19    about it?

20         THE JUROR:  Our HR department is just one woman.  I

21    went to her office and just said that I had to come back

22    today and I asked what the policy was.  And she said company

23    policy is they pay for the first three days of jury duty.

24    And like I said, today is the second.

25         THE COURT:  Then did you say what if my jury

1    service is longer than three days?

2            THE JUROR:  No.  I told her the expectation we were

3    given was going to be multiple weeks, and she didn't really

4    give me much back.  I'm not too sure, to be 100 percent

5    honest with you.

6            THE COURT:  We do pay people for jury duty, but

7    because the government is shut down, it's $50 a day for the

8    first two weeks and $60 a day after that.  We pay your

9    parking, pay any expenses.

10           THE JUROR:  Yeah.

11           THE COURT:  Even that money is going to be delayed

12   because of the shutdown.

13           THE JUROR:  The payment, that's not he a big deal.

14   I'm not worried about that.

15           THE COURT:  Anybody have anything else for him?

16           MR. YEAGER:  No.

17           THE COURT:  Okay.  You're all set.  Thank you.  Did

18   you take a look at that witness list?

19           THE JUROR:  Yes.

20           THE COURT:  Did you know anyone on there.

21           THE JUROR:  No.

22           THE COURT:  Great.  Thanks.  You're good to go.

23           THE JUROR:  Awesome.  Thank you.

24           THE COURT:  He's good, right?

25           MR. YEAGER:  Yes.

```
1                 MS. WILKINSON:  Yes.

2                 THE CLERK:  78, last one.

3                 THE COURT:  I'm not sure I have of the strength to

4      do this last one.

5                 MS. McDONOUGH:  Juror 78.

6                 THE COURT:  Mr. Carretta?

7                 THE JUROR:  Yes, I am.

8                 THE COURT:  How are you?

9                 THE JUROR:  Good.  Thank you.

10                THE COURT:  Thank you for your patience today.

11                THE JUROR:  Absolutely.

12                THE COURT:  I notice that you work at Brigham and

13     Women's.

14                THE JUROR:  Yes.

15                THE COURT:  Social worker.

16                THE JUROR:  Yes.

17                THE COURT:  You note on your questionnaire that you

18     have a lot of experience with patients or family members who

19     have used opioids, and you have seen some of the negative

20     impacts on them and their families.

21                THE JUROR:  Correct.

22                THE COURT:  So this case is not really a referendum

23     on whether you like or dislike opioids.  The government has

24     brought certain charges, and now they have to prove those

25     charges beyond a reasonable doubt.  And it's the jury who
```

1    will make the determination about whether or not the

2    government has proved its charges.

3             Do you think you could listen to this case and be a

4    fair and impartial juror or your view on opioids is so strong

5    that you could not be a fair juror?

6             THE JUROR:  It would be very hard for me, Your

7    Honor, to really.  I doubt myself in that respect.

8             THE COURT:  Tell me more about that.

9             THE JUROR:  Well, I've been a clinical social

10   worker for 28 years.  My position at the Brigham is a new

11   one.  I'm actually going to be a year there in March.

12            But prior to that I used to work for the Cambridge

13   Health Alliance.  My position there was more involved with a

14   wide range of clinical issues.  Among those, the substance

15   abuse program.  So I worked extensively there.

16            Also I worked for the Center For Homicide

17   Bereavement at the Cambridge Hospital.  So I've been exposed

18   to at least the clinical point of view, the human point of

19   view, the impact of the opioids in the life of my patients,

20   the ones who survive, but also their loved ones, parents,

21   spouses.

22            I think it would be a little challenging for me to

23   be totally impartial one way or another.

24            THE COURT:  Okay.  Why don't you step outside for

25   just a second.

```
1              THE JUROR:  Yes.

2              THE COURT:  Anyone want me to keep at it with him?

3              MS. MINER:  No.

4              MR. YEAGER:  No.

5              THE COURT:  Call it a day.

6              THE CLERK:  That was our last one, Jim.

7              THE COURT:  Where's my atta girl?

8              MR. McALEAR:  Way to go, Judge.

9              THE COURT:  Let's start at 9:30 tomorrow.  Voir

10   dire will be in order.  We should be able to start at 9:30.

11   We'll meet in here and go over there together.  All right?

12             MS. WILKINSON:  Yes, ma'am.

13             MR. KENDALL:  How many do we have?

14             MS. WILKINSON:  19 yeses and four maybes.

15             THE COURT:  That's not right.  I had 22 altogether.

16             MS. WILKINSON:  It's 23.

17             THE CLERK:  I have 23, but then there's all the

18   maybe's, too.

19             MR. KENDALL:  What's the precise target we're

20   looking for, Your Honor?

21             THE COURT:  We need 40.  If we're going to get rid

22   of the maybes, we need 44.  If we are going to give ourselves

23   a cushion because we're going day to day, we should probably

24   do 50.

25             MS. WILKINSON:  I think we need 50.
```

1          MR. KENDALL:  If we run a full day tomorrow, most

2     likely we'll go the next day as well.

3          THE COURT:  Yes.  Who's opening?

4          MR. WYSHAK:  Dave.

5          MR. YEAGER:  Mr. Lazarus.

6          THE COURT:  Is everyone going to open?

7          MS. WILKINSON:  Yes.

8          MS. MINER:  Yes.

9          THE COURT:  How long is the government opening?

10          MR. YEAGER:  An hour.

11          THE COURT:  What are you guys thinking for your

12     openings?

13          MS. WILKINSON:  I think we were thinking we would

14     be 45 to 55 minutes, and these guys 20 to 30.

15          MR. TYRRELL:  20 to 30 for each of the other four.

16          THE COURT:  You're thinking an hour and the other

17     four it would be two hours total.

18          MS. WILKINSON:  I'm going to aim for 45 minutes.

19          MR. TYRRELL:  Yeah.  Two hours total for the four.

20          THE COURT:  That gets us to four hours of openings.

21     Unless you feel otherwise, we won't plan on a witness the day

22     of openings.  I think it's easier not to have someone

23     standing around all day.  We'll open and then call it a day.

24          I will try and send around the preliminary charge

25     tomorrow.  I know you have some comments on theirs.  I see

Case 1:16-cr-10343-ADB   Document 881   Filed 07/24/19   Page 227 of 229

227

1    why you have some comments on theirs, but I'll try and

2    circulate something and then you guys can have at it.  That's

3    a long charge.  That's probably at least half an hour.

4              MS. WILKINSON:  I think it's too long.  We could

5    actually try again.

6              THE COURT:  You guys have enough to do.  Why don't

7    I take the next shot at it.

8              MS. WILKINSON:  That would be great.

9              THE COURT:  You want me to give the preliminary

10   charge before openings, I take it.

11             MS. WILKINSON:  Yes.

12             MS. MINER:  Yes.

13             MR. YEAGER:  Yes.

14             THE COURT:  It still seems like we should be able

15   to get that all done in a day.

16             THE CLERK:  He said they'll be ready at 9:15.

17             MR. McALEAR:  We'll have them ready at 9:15.

18             MS. WILKINSON:  Let's start then.

19             THE COURT:  The only issue is my husband's flight

20   is cancelled.  I will shoot for 9:15.  I may be a couple

21   minutes late.  I got here today by 9:00.  I got here at 8:50.

22   It's hard when my husband is traveling.  We'll start as close

23   to 9:15 as possible.

24             MR. STOJILKOVIC:  Your Honor, would it help for us

25   to bring the 50 or so copies of the witness list.

1          THE COURT:  I thought you were going to say would

2    it help if you would drop my kids off.  Yeah.  If you could

3    bring the copies of the witness lists, that would be great.

4          MR. KENDALL:  Do you know which numbers are being

5    brought in tomorrow from 79 to --

6          MS. WILKINSON:  We know.

7          THE COURT:  I dismissed one other.

8          MS. WILKINSON:  And you told us.  Yes.

9          THE COURT:  It's the next 50 minus the ones you

10   haven't agreed to:

11         Jim, do you know what number that gets us up to for

12   tomorrow?

13         MR. McALEAR:  I don't.

14         MR. STOJILKOVIC:  I believe it's number 230.

15         THE COURT:  If we get 20 out of every 50, we should

16   be fine and not bring in another pool.

17         All right.  Anything else we can do today?

18         MS. MINER:  No, thank you.

19         THE COURT:  All right.  See everyone tomorrow.

20         (Court recessed at 3:50 p.m.)

21

22

23

24

25

```
 1                    - - - - - - - - - - -

 2                       CERTIFICATION

 3

 4         I certify that the foregoing is a correct

 5    transcript of the record of proceedings in the above-entitled

 6    matter to the best of my skill and ability.

 7

 8

 9

10    /s/ Joan M. Daly                January 22, 2019

11    /s/ Kelly Mortellite

12

13    _____          _____

14    Joan M. Daly, RMR, CRR           Date
      Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25
```