1          UNITED STATES DISTRICT COURT

2            DISTRICT OF MASSACHUSETTS

3  _____

4  UNITED STATES OF AMERICA,

5              Plaintiff,        Criminal Action
                                 No. 16-CR-10343-ADB
6  v.
                                 January 29, 2019
7  MICHAEL J. GURRY, RICHARD M.  Pages 1 to 259
   SIMON, SUNRISE LEE, JOSEPH A.
8  ROWAN, and JOHN KAPOOR,

9              Defendants.

10 _____

11

12

          TRANSCRIPT OF JURY TRIAL -- DAY 7
13    BEFORE THE HONORABLE ALLISON D. BURROUGHS
           UNITED STATES DISTRICT COURT
14       JOHN J. MOAKLEY U.S. COURTHOUSE
             ONE COURTHOUSE WAY
15           BOSTON, MA  02210

16

17

18

19

20

21        KELLY MORTELLITE, RMR, CRR
           JOAN M. DALY, RMR, CRR
22         Official Court Reporter
       John J. Moakley U.S. Courthouse
23      One Courthouse Way, Room 5507
           Boston, MA  02210
24         joanmdaly62@gmail.com

25

```
 1    APPEARANCES:

 2

 3    FOR THE GOVERNMENT:

 4            FRED WYSHAK
              K. NATHANIEL YEAGER
              DAVID G. LAZARUS
 5            Assistant U.S. Attorneys
              United States Attorney's Office
 6            John Joseph Moakley Federal Courthouse
              1 Courthouse Way
 7            Suite 9200
              Boston, Massachusetts 02210
 8            617.748.3100
              fred.wyshak@usdoj.gov
 9            nathaniel.yeager@usdoj.gov
              david.lazarus2@usdoj.gov
10

11    FOR THE DEFENDANT MICHAEL J. GURRY:

12            TRACY A. MINER
              MEGAN A. SIDDALL
13            Demeo LLP
              200 State Street
14            Boston, Massachusetts 02109
              617.263.2600
15            tminer@demeollp.com
              msiddall@demeollp.com
16

17    FOR THE DEFENDANT RICHARD M. SIMON:

18            STEVEN A. TYRRELL
              PATRICK J. O'TOOLE, JR.
19            Weil, Gotshal & Manges LLP
              100 Federal Street
20            Boston, Massachusetts 02110
              617.772.8365
21            steven.tyrrell@weil.com
              patrick.otoole@weil.com
22

23

24

25
```

APPEARANCES (continued):


FOR THE DEFENDANT SUNRISE LEE:

        PETER C. HORSTMANN
        Law Offices of Peter Charles Horstmann
        450 Lexington Street
        Suite 101
        Newton, Massachusetts 02466
        617.723.1980
        pete@horstmannlaw.com


FOR THE DEFENDANT JOSEPH A. ROWAN:

        MICHAEL KENDALL
        ALEXANDRA I. GLIGA
        White & Case, LLP
        75 State Street
        Boston, Massachusetts 02109
        617.939.9310
        michael.kendall@whitecase.com
        alexandra.gliga@whitecase.com


FOR THE DEFENDANT JOHN KAPOOR:

        BETH WILKINSON
        KOSTA S. STOJILKOVIC
        Wilkinson Walsh Eskovitz
        2001 M Street NW
        Washington, D.C. 20036
        202.847.4000
        bwilkinson@wilkinsonwalsh.com
        kstojilkovic@wilkinsonwalsh.com

        AARON M. KATZ
        BRIEN T. O'CONNOR
        Ropes & Gray
        Prudential Tower
        800 Boylston Street
        Boston, Massachusetts 02199
        617.951.7385
        aaron.katz@ropesgray.com
        boconnor@ropesgray.com

1              P R O C E E D I N G S.

2              (The following proceedings were held in open

3    court before the Honorable Allison D. Burroughs, United

4    States District Judge, United States District Court, District

5    of Massachusetts, at the John J. Moakley United States

6    Courthouse, One Courthouse Way, Boston, Massachusetts, on

7    January 29, 2019.)

8              THE COURT:  Just to recap, I have three motions

9    pending, right?  I have the motion to quash.  I have what you

10   are calling the motion in limine number 13, and then there's

11   the one about the legal advice.

12             I managed to take home the motion on the motion to

13   quash last night, but I forgot the memorandum in support, and

14   you just filed yours last night, so I haven't had a chance to

15   read that.

16             What about the other two?  When do you need to be

17   heard on that?

18             MR. LAZARUS:  The motion to quash is not the

19   government's motion.

20             THE COURT:  No, I know.  Not yours, the other

21   side's.

22             MR. LAZARUS:  With respect to that, actually,

23   yesterday, or yesterday afternoon, Mr. Katz filed a response

24   in opposition to that third party's motion about their

25   subpoena issues, but in that, he moved for relief, he asked

1    for evidence to be suppressed if the Court rules against him.

2              So I would just ask, the government is not a party

3    to that motion.  If there's going to be a motion requesting

4    our evidence be suppressed, I would ask it be put in an

5    actual motion and we get notice and an opportunity to deal

6    with it.

7              I read their response last night, just to see what

8    was going on in that aspect with the third party, and I

9    happened to see our potential trial evidence was the subject

10   of the motion as well, and that just seemed improper to me.

11             THE COURT:  Okay.  I haven't read -- I read the

12   motion but not the memorandum.  And I saw that he -- I

13   printed yours out this morning, I saw that you filed a

14   declaration, but I haven't read any of it either.

15             MR. KATZ:  Yes.

16             THE COURT:  So let me take a look at it today,

17   hopefully during the break, and we can reassess where we are.

18             I'm actually -- in the middle of a trial, I'm not

19   going to make him, unless I need it, file a formal motion,

20   but I'll give you a chance to respond.

21             MR. LAZARUS:  And I would at least just ask for

22   notice that we should read this third-party litigation, these

23   materials.

24             As you know, Your Honor, we're very busy.  I

25   happened to read it last night thinking it had nothing to do

1    with us and I caught this at the end, this relief is directed

2    at us.  So I'm not asking for formality.  I'm just asking for

3    notice.

4              THE COURT:  That's fine.  That's perfectly

5    reasonable.

6              Let me see what it is.  I don't want you to respond

7    to it unless there's a reason to respond it because I know

8    everybody is busy.

9              MR. LAZARUS:  Thank you, Your Honor.

10             MR. KATZ:  I don't have anything more.

11             THE COURT:  Nice to see you standing, Mr. Katz.

12             MR. LAZARUS:  With respect to the other two

13   motions, the motions are the, what you're calling motion in

14   limine 13, and then the one dealing with advice of counsel.

15             There's a little more time on that one, and we'd

16   like an opportunity to supplement a little bit of our

17   argument on it because yesterday, I think in Mr. Kapoor's

18   opening, the jury was told that the company received a

19   subpoena, that they retained outside counsel who said

20   everything is good, and then there was other argument to the

21   jury.

22             So the jury was left with the impression yesterday

23   that a subpoena was served on Insys' outside counsel saying

24   everything is fine, which is actually factually inaccurate

25   and is completely contrary to the position that the defense

1    has taken thus far, including in response to our motion in

2    limine for advance notice if they plan to assert an

3    advice-of-counsel defense.

4         So the posture of that motion changed yesterday, so

5    we just want to a chance to evaluate that.  We think they've

6    opened a door now.  We think we were already on solid ground,

7    but the way the jury was presented this issue yesterday makes

8    it more important that not only are we able to bring in these

9    compliance officers who were giving business advice but that

10   we now have to tell the jury that, in fact, the board, the

11   defendant and others, were not told everything is fine.

12        THE COURT:  Okay.  I'll hear you.

13        I did read your response to that last night.  I

14   didn't dig into it in any big way.  Same as you read the

15   third-party motion, I read this one just to see what was

16   going on, at least on the first round.

17        And I have to say a compliance officer giving

18   compliance advice seems very close to the line to me, and I'm

19   not discounting your proposal, which we sort of take it as it

20   comes during trial, but it seems very close to the line to

21   me.  Like, it's hard to think how a lawyer acting in a

22   compliance capacity wasn't giving any legal advice.

23        MR. LAZARUS:  I would encourage the Court to take

24   it as it comes because the testimony from Danielle Davis, for

25   example, is she happened to be a lawyer but she was acting in

1    a compliance role.  And so any time somebody happens to have

2    a JD and they're hired in compliance, it's very different.  I

3    mean, the Court knows that every compliance officer is not

4    acting as a lawyer.  They don't necessarily have the same

5    skills that an outside counsel might have or other areas of

6    focus.  Their focus is on this compliance aspect.

7              And so that was the case here, and so I was -- I

8    would just ask the Court to take it as it comes.

9              THE COURT:  Well, I'm open to that.  It seems to me

10   when you have a lawyer giving compliance advice, it's hard to

11   imagine that the law requires this never comes out of their

12   mouth, right?

13             MR. LAZARUS:  Because that's their interpretation

14   as a compliance officer, giving business advice on the

15   compliance side of things.

16             THE COURT:  But if you're a lawyer giving

17   compliance advice and they say, this is my compliance advice,

18   and it's informed by the fact that the law requires X, are

19   you going to take the position that's not legal advice?

20             MR. LAZARUS:  That's compliance advice.  If they

21   were not a lawyer and they were a compliance officer, they

22   would say the same thing.  They would say, this is what the

23   law says, this is what we need to do.  They would evaluate

24   whether speaker fees are reasonable.  They would talk about

25   fair market value of contracts.  They would do all of those

1   things without the legal degree.

2          So the law degree gives them no different basis to

3   be arguing that.  It's part of who they are as an employee

4   giving the compliance advice, but they're not acting as a

5   lawyer.  It is not -- it does not deserve the same type of

6   protection that the attorney-client privilege provides.

7          THE COURT:  All right.  So, I mean, as I say, I

8   haven't dug into it, but I'm willing to entertain the idea

9   and take it as it comes.

10          MS. WILKINSON:  Your Honor, I want to talk about

11   the argument counsel just made about that we opened the door

12   yesterday.

13          I pulled the transcript.  What I said was the board

14   said everything was okay.  So on line 24 on page 109:

15          So if something happened in about December of 2013,

16   the government issued a subpoena to the company.  The board

17   met.  They hired lawyers, did all the things you're supposed

18   to do and said, we're in good shape, we'll cooperate and

19   we're going to go forward.  I'm talking about what the board

20   said, not what the lawyers told them.  So the board is

21   saying, we're in good shape.  The board says, we're going to

22   cooperate and we're going forward.  Mike Babich said the same

23   thing.  In fact, he got on television.  Then I showed the

24   CNBC.

25          So I was not saying what the lawyers said to them.

1    I was saying the board is looking at this.  They know they

2    have their lawyers in place.  They're going to cooperate and

3    go forward.

4            That's certainly not waiving privilege.  We've been

5    very careful about that.  We don't get to waive the privilege

6    anyway, as you know, but we are not saying that, you know,

7    Skadden Arps told the company, or our clients, that

8    everything they did was okay and we don't -- there's lots of

9    information in there that we're not privy to.  So we don't

10   know exactly what he said.  But I certainly wasn't suggesting

11   that, when you read the transcript carefully.

12           THE COURT:  Well, I'm not ready to go forward on

13   that anyway.  They want a chance to supplement it, so go

14   ahead and take that, Mr. Lazarus.

15           What's the schedule on the motion in limine 13?  Do

16   we -- when does that need to be --

17           MR. LAZARUS:  It's your motion.

18           MR. STOJILKOVIC:  Your Honor, we did read their

19   response.  I don't want to inundate the Court, but we do have

20   some disagreements with their response.  If it would be

21   helpful, I can submit a reply brief.  If it would be helpful

22   to hear from me orally, we can do that.  I don't think that's

23   something we need for today.

24           THE COURT:  Okay.

25           MR. LAZARUS:  And I would ask, I think

1    Mr. Quinlivan is the one working on our response, Your Honor,

2    so I will work with counsel, but I want to make sure the

3    right people are in the room when we have those arguments.

4            THE COURT:  That's fine.  I don't want you to -- I

5    don't want to have a witness on the stand and someone tell me

6    this needs to be resolved at sidebar.  I want to give us time

7    to be thoughtful about it.

8            MR. LAZARUS:  It's a defense motion, but I don't

9    believe it's going to come up today.

10           MR. STOJILKOVIC:  We don't either, Your Honor.

11           MR. LAZARUS:  Things that will come up today have

12   to do with exhibits.  So we agree with defense that we're

13   going to send the night before a list of the exhibits we

14   think we'll get to the next day with the full understanding

15   that we may update them, we may change it, but just as a

16   courtesy to try to speed up as much as we can.

17           So we did that last night, and they were nice

18   enough to send us objections this morning.  We've reviewed

19   those.  We've been back and forth a little bit, but we have a

20   few disagreements on a few items, so there's just a few areas

21   I just want to flag for the Court that I expect are going to

22   be coming up today.

23           First of all, it's my understanding that we have,

24   in theory, stipulations as to the authenticity of certain

25   categories of documents.  Like, documents from Insys, we all

1     agree are authentic.  Documents from E.J. Financial we all

2     agree are authentic.  So that basic, bare bones, it is what

3     we say it is, we all agree on, is my understanding.  Counsel

4     can correct me if I'm wrong.

5          Beyond that we have Insys documents that were

6     produced by the company that have been certified.  So we have

7     certificates of authenticity, and we also have a table that

8     was certified by the same records custodian that says that

9     for all of these different Bates numbers, INS and a number

10    and INS-BOS and a number, these are business records.  It

11    lays the 803-6 foundation and it satisfies 902.11.  So those

12    are certified authentic business records.

13         So our position is that because they're certified

14    authentic business records, they can come into evidence once

15    we lay a foundation for them of what they are and they become

16    relevant.  So we plan to show witnesses on the stand today

17    and other times certified business records, emails and

18    spreadsheets and PowerPoint presentations that that witness

19    may be party to or may not be, but either way, the witness

20    can look at the document and say, okay, this is an Insys

21    email.  I recognize the names that are on here.  The dates

22    are during the course of the conspiracy.  And they can lay an

23    evidentiary and relevance foundation for the document, and

24    they're certified business records satisfying 902.11, 803.6.

25         So there's no requirement that a witness can only

1  testify about their own documents, but defense has taken that

2  position today, and so that's going to come up with a number

3  of documents that we're going to show witnesses.

4           And so to require us to bring in everybody who was

5  on a particular email or to bring them out of order just

6  flies in the face of the whole point of 902.11 and 803.6, and

7  we wanted to bring that to the Court's attention.

8           That's the first issue.

9           THE COURT:  Hold on.  So to the extent that -- I

10  mean, I will hear you on it.

11           It seems to me that to the extent that they're

12  saying this person worked at Insys, this is the date, this is

13  basic, that sort of information is fine.  But are you

14  anticipating having a witness testify about the content of an

15  email that they're not a party to?

16           MR. LAZARUS:  Absolutely, Your Honor.  We -- so we

17  plan to ask the witness to look at a document, for example,

18  what is this?  This looks like an Insys email.  I see on here

19  the To and From are names I recognize as Insys employees

20  during this time period.  We would plan to move it based on

21  the certifications that we've given counsel fully into

22  evidence, Your Honor, and then we would publish it and have

23  the witness talk about it to the extent that they're capable

24  of talking about it.

25           So that's going to depend on a question-by-question

1    basis like any other document, whether that witness -- that

2    witness is competent to move it into evidence between their

3    foundation and the certification.  Whether they're then

4    competent to answer all our lines of questioning about it is

5    a totally separate issue.

6            And so there's also argument that defense has

7    raised about 803.5 and hearsay within hearsay.  So to the

8    extent that these documents are chain emails, the chains

9    themselves will also satisfy hearsay exceptions, Your Honor.

10   And even if they don't -- and we believe that they will and

11   we'll show that on an exhibit-by-exhibit basis, Your Honor.

12   Even if they don't, the remedy there would be to redact the

13   part of the email chain that would not satisfy the hearsay

14   requirement, but the record itself is a business record.

15   They're largely to or from these defendants or other

16   co-conspirators or agents of these defendants.  They satisfy

17   numerous exceptions to the hearsay rule under 801(d)(2), and

18   so there's no reason that these records can't come in.

19           And I was frankly shocked to see that they've taken

20   a position that a witness can only testify about an email

21   that they were on, even if they have knowledge about it.

22           MR. STOJILKOVIC:  Your Honor, we do object, and I

23   just want to frame the discussion.

24           Counsel disclosed to us a number of emails or

25   number of documents on which today's witnesses were included.

1    They sent them, they received them, they're somehow in the --

2    communication.  That's not what this goes to.

3          And counsel is right, we're not going to object on

4    authenticity grounds.  We have a draft stipulation.  We

5    haven't executed it, but I don't think either side is going

6    to contest the authenticity of the documents that Insys

7    produced.

8          But authenticity under 901, and even a

9    certification under 902 does not make every single email in

10   the possession of Insys admissible, admissible for the truth

11   under 803.

12         I point the Court, and I have -- I can pass this up

13   to you, United States v. Ferber from this district.  It is

14   not the law that any document found in the files of a

15   business which pertained in any way to the functioning of

16   that business would be admitted willy-nilly as a business

17   record.

18         Also, cite to U.S. v. Cone, Fourth Circuit decision

19   from 2013.  "While properly authenticated emails may be

20   admitted into evidence under the business records exception,

21   it would be insufficient to survive a hearsay challenge

22   simply to say that since the business keeps and receives

23   emails, then, ergo, all those emails are business records

24   falling within the ambit of Rule 803."

25         MR. LAZARUS:  I agree with everything he just said.

1          THE COURT:  Okay.  I agree with everything, too.  I

2    think the issue is, first of all, they don't all come in

3    because there's a need for relevance and he says he's going

4    to cover the relevance.

5          And then just because something is kept doesn't

6    make it a business record.  It has to meet the other

7    requirements for business record.

8          So I think we can -- so far we're all in agreement.

9          MR. STOJILKOVIC:  Okay.  Then I think what's

10   missing here is that the certificate and the testimony of the

11   Insys custodian who turned over these records is simply that

12   these were records were, you know, in, you know, emails in

13   Insys' system or other records that were in Insys' files.

14         I don't think we have a witness today for these

15   documents that we're concerned about.  Anyone can say, you

16   know, how this document was assembled.  I don't think it's

17   appropriate to show emails to witnesses who are not anywhere

18   on the email chain.

19         I mean, and I want to make clear, this is not an

20   attempt to complicate things, but today's -- you know,

21   there's a lot of emails that the government wants to put in

22   between Mr. Burlakoff and other people who are not testifying

23   today.  They'll have an opportunity to do that.

24         THE COURT:  So let me stop you for a second.

25         I've been around this issue before and there are

1    many things that are business records, but a lot of times the

2    emails are not business records.

3             MR. LAZARUS:  Your Honor --

4             THE COURT:  How are we going to get there?

5             MR. LAZARUS:  So these emails have been certified

6    as business records.  They have the certifications.  And the

7    person who's testifying second today, Maury Rice, was the

8    head of IT.  He signed all but three of the Insys

9    certifications.  The other three were signed by one guy who

10   was an IT person who swears that he also had authority to

11   certify those ranges of Bates numbers.  They have all the

12   criteria for 803.6.

13            The burden is on the defense to show the records

14   are not reliable once that happens.  They have no reason to

15   argue they're not reliable.  The idea that the witness needs

16   to come in and say that they compiled or prepared a business

17   record is preposterous.

18            THE COURT:  Well, I'm not saying that.  I'm just

19   saying that -- I mean, for example, when you work for the

20   government, emails are business records.  They're kept in the

21   normal course, right?  There's many other companies where

22   they have some emails and they don't because they're not kept

23   in the ordinary course.  They just have some and they don't

24   have some.  So you need some foundation about the practices.

25            MR. LAZARUS:  The certification that they have that

1   we've turned over with every production from Insys, Your

2   Honor, says -- it sets out, "I, Maury Rice, attest that I'm

3   employed by Insys Therapeutics, Inc.; that my official title

4   is executive director of technical operations; that I've been

5   appointed the keeper of records for Insys.  Each of the

6   records included in the Bates number ranges listed below is

7   the original or a duplicate of the original records in the

8   custody of Insys Therapeutics."

9           Then it provides the information.

10          Then it goes on to say, "I further state that these

11  records were made at or near the time of occurrence by the

12  matters set forth by or from information transmitted by a

13  person with knowledge of those matters.  These records were

14  kept in the course of regularly conducted business activity,

15  and it was the regular practice of this business to make such

16  records."

17          And then, "I certify that the foregoing is true and

18  accurate to the best of my knowledge and belief."  Then it's

19  signed, dated and certified to meet the requirements of the

20  rule in lieu of testimony.

21          THE COURT:  So is that person that's on that

22  certification going to testify?

23          MR. LAZARUS:  He is second today, Your Honor, yes.

24          THE COURT:  Yes.  And he needs some of these emails

25  before he or she testifies.

1          MR. LAZARUS:  With the first witness, yes, Your

2     Honor.

3          THE COURT:  Because, I mean, it may be that on

4     cross-examination they can establish these are not kept in

5     the ordinary course.

6          MR. LAZARUS:  That may very well be, Your Honor.

7     They have not raised that.  I think that the argument against

8     the emails is perhaps that they're hearsay.  And to the

9     extent that there's a hearsay argument, they come in because

10    they're going to be to or from the defendants, they're going

11    to be statements of co-conspirator, statements of agents and

12    so on.

13         THE COURT:  So they are right about that.  You have

14    to have an independent basis for each hearsay or --

15         MR. LAZARUS:  That's correct.  And I don't believe

16    they have a good faith basis to challenge the fact that these

17    are not business records.  They had certifications, there was

18    grand jury testimony from Maury Rice attesting to the

19    certifications.

20         So the idea, now the argument is they're authentic

21    records but not kept in the ordinary course, I just don't

22    think that fits with any position that they've taken so far,

23    Your Honor.

24         THE COURT:  Okay.

25         MR. KENDALL:  Your Honor, a couple of things.

1      The second witness is an IT guy.  Apparently the

2 government thinks he can rule on the admissibility of

3 business records because he filed a form affidavit that the

4 government gave him to submit.  The issue that we're

5 concerned about is not authenticity.  There's a lot of totem

6 pole hearsay in there.

7      So whether the person has knowledge as required

8 under 80 -- they took the book away from me -- but, you know,

9 the first prong of the business record rule, does the person

10 have knowledge.  A lot of the stuff the person doesn't have

11 knowledge.  It's embedded in some things they have knowledge,

12 some stuff they don't have knowledge.  So it's got to be a

13 record-by-record analysis, which we'll do beforehand, and

14 we'll pick our shots, not to waste people's time.

15      The second thing, Your Honor, is I know, like, one

16 of the first ones coming up for Holly Brown, it's got -- I

17 would suggest not business record information but more

18 important, it's got information that never went to our

19 clients.  It's something from Holly Brown to Mike Babich.

20 She says, Oh, this doctor looks like a pill mill.  What is

21 the relevance of that?  It didn't go to any of our clients.

22 It doesn't affect our state of mind in any which way.

23      If Mr. Babich wants to testify when he's hired for

24 the government that he thought he was selling to pill mills,

25 that's one thing, but it has nothing to do with --

1          THE COURT:  That's a relevance objection.

2          MR. LAZARUS:  And it actually gets forwarded to

3   Sunrise Lee, Your Honor, that same email.  And there's other

4   bases for its admissibility, and we're happy to address it as

5   it comes in.

6          MR. KENDALL:  The point being, the fact the

7   gentleman is going to say, yeah, these are emails from our

8   server, is not the issue.  The issue is what you're going to

9   have to rule on.  And we will pick our shots and only bring

10  the ones where we think it's necessary.

11         THE COURT:  And I am happy to be able to say that

12  as a legal matter, I agree with everything all of you have

13  said, and I think we're going to have to take it document by

14  document.

15         MR. LAZARUS:  Thank you, Your Honor.  There are

16  other issues.

17         THE COURT:  We can try to maybe do some of them

18  during the break, not have too many sidebars while they're

19  sitting here.  Just a suggestion.

20         Go ahead, Mr. Lazarus.

21         MR. LAZARUS:  Thank you, Your Honor.

22         So there's another objection that was raised that

23  is similar but has to do with Exhibit 253, which is a lengthy

24  email from Alec Burlakoff to Sales All, a number of other

25  people, to Rich Simon, Joe Rowan, Sunrise Lee and Mike Gurry,

1   Your Honor.

2           And so attached to that lengthy email about the

3   success of the company and various metrics is an article from

4   a publication that has to do with the company, and Mike

5   Babich is quoted in there.  It was attached to the email that

6   we're introducing that went to all of these defendants.  So

7   they're objecting to the inclusion of the attachment.

8           MS. WILKINSON:  Not to all the defendants.

9           MR. LAZARUS:  Sorry.  Not to defendant Kapoor, Your

10  Honor, but as this is a joint trial, it went to all the other

11  defendants.  So they're objecting just to the attachment.

12  And perhaps it will be helpful when it in comes up to deal

13  with it then.  I just wanted to flag that for the Court as

14  well.

15          THE COURT:  So is it suffice to give the jury an

16  instruction that the article doesn't come in for the truth of

17  the matter asserted but just comes in for the fact that they

18  received it?  Does that solve the problem?

19          MR. LAZARUS:  That's our position.

20          MR. STOJILKOVIC:  Your Honor, our concern is, one,

21  I don't understand the relevance of, this is just an article

22  attached --

23          THE COURT:  What's it about?

24          MR. STOJILKOVIC:  It's about Mike Babich and the

25  job he's doing as CEO in pharmaceutical press coverage.  And

1       it characterizes, you know, things that are going on.

2               I don't know why it's relevant to anyone's state of

3       mind.  It also has embedded hearsay in it.  Of course Mike

4       Babich is testifying at some point in this trial, so we'll

5       have the best witness to talk about what Mike Babich was

6       doing and not doing.  And so I don't see the relevance,

7       except as offered for the truth.  And there is the hearsay

8       problem.

9               THE COURT:  Well, I will give an instruction that

10      the article doesn't come in for the truth, but you're going

11      to have to make the relevance showing.

12              MR. LAZARUS:  That's fine, Your Honor, it's

13      referenced in the email.

14              I would also just note in their opening they played

15      a video of Mike Babich talking about things going on in the

16      company as if that somehow was relevant to the proceedings.

17      The article is similar to that.  And so it's an inconsistent

18      statement in one position then the other position -- but I

19      would take the Court's offer to take it as it comes.

20              In addition to that, there's just a minor -- two

21      other minor matters.  One, there is a composite exhibit that

22      at some point we'll seek to introduce entirely, which is

23      Exhibit 116, which is a packet of documents that were

24      prepared and given to the board of directors having to do

25      with bad conduct at this company.  And in that packet, there

```
 1    are text messages to or from Brett Szymanski who is expected
 2    to testify third today.
 3             So what we plan to do is to show the witness the
 4    packet, Exhibit 116, and have him identify the text messages
 5    that he's involved in within that packet, and move to
 6    introduce those exhibits and publish those today that he's a
 7    party to and not to publish the other ones, and to admit
 8    those de bene subject to further connection and argument
 9    later, pending the Court's ruling on some of the other
10    issues.
11             MS. WILKINSON:  Your Honor, we strongly object to
12    that.  We're supposed to call it Exhibit 116.  It's marked
13    Confidential and Subject to Attorney-Client Work Product and
14    Attorney-Client Privileges.  They're covered over with their
15    exhibit sticker Skadden Arps --
16             MR. LAZARUS:  Accidentally, Your Honor.
17             MS. WILKINSON:  -- Skadden Arps.  They put it
18    together for the board in August 2014.  If they want to
19    introduce text messages from Mr. Szymanski, just introduce
20    the text messages.  Why do they need to put this in?  It's
21    totally improper.  They can get the text messages, they have
22    them, and put those in.
23             I mean, you haven't ruled on this issue.  We
24    strongly objected to Skadden Arps' -- you know, part of their
25    advice to the board was putting these documents together and
```

1    providing them, selecting them for them and giving them

2    advice at a board meeting on August 7, 2014.  That is at the

3    heart of the attorney-client privilege so --

4              MR. LAZARUS:  This is --

5              THE COURT:  Hold on.

6              MS. WILKINSON:  To put that in front of the jury

7    would be improper.

8              MR. LAZARUS:  Or not.

9              THE COURT:  He's not going to show the whole packet

10   to the jury at this point.  He's only interested in the text

11   messages.

12             Is there some way to show him the text messages in

13   a more isolated way?

14             MR. LAZARUS:  Absolutely.  We can pull them out.

15   That's fine, Your Honor.  We'll do it as --

16             THE COURT:  Call it 116A or something, and we'll

17   see if the rest of it comes in or doesn't.

18             MR. LAZARUS:  We'll add it to the witness list and

19   designate however -- and we'll proceed that way.  That's

20   fine.

21             MS. WILKINSON:  Your Honor, why couldn't they

22   introduce -- since they have the text messages separately,

23   why even pull them out of here?  They have copies of them

24   separately.

25             MR. LAZARUS:  These are not duplicative exhibits.

1          MS. WILKINSON:  You don't have copies of these text

2   messages for Mr. Szymanski that didn't come in this document.

3          MR. LAZARUS:  I guess I'm confused why it matters.

4          THE COURT:  I'm not sure what the difference is.

5          MS. WILKINSON:  Because they're trying to get this

6   document in, Your Honor.

7          THE COURT:  Maybe they will and maybe they won't,

8   but he's going to -- today, what's going to come in, is the

9   text messages.  And you can number them 116A, but you're not

10   going to show to the jury that it is part of this larger

11   document --

12          MR. LAZARUS:  Or even ask him where they come from.

13          THE COURT:  He's just going to show the text

14   messages.

15          MR. LAZARUS:  They're his text messages.

16          MS. WILKINSON:  Of course they are.  We're not

17   disputing they're his text messages.

18          THE COURT:  So you're going to put them up in a way

19   that the jury sees the text messages but there's not --

20   they're not made to understand their part of the package --

21          MR. LAZARUS:  Correct.

22          MS. WILKINSON:  Your Honor, I have another request.

23          THE COURT:  He had one more, too, right.

24          MR. HORSTMANN:  I have one, too, Your Honor.  It

25   concerns the first witness.

1          THE COURT:  Do they all have to be done by 12:00?

2          MS. WILKINSON:  Talk fast.

3          MR. LAZARUS:  I already talk fast.  The last item,

4    I'll be very brief.

5          With Maury Rice, he was the director of IT.  He set

6    up all the infrastructure at Insys.  He's going to testify

7    second.  There's a sketch of the floor plan of the office

8    space, which is not controversial.  We sent it over last

9    night.  We had previously sent over handwritten notes of the

10   agent who did a walk-through in December of the space and

11   took photographs.

12         Counsel is unhappy that they got this formal floor

13   plan of Insys last night, and so I understand that they're

14   going to object on the basis of untimely disclosure.  And I

15   would just ask the Court to allow us to show him the floor

16   plan of the office space at Insys' business's office.  It's a

17   one-floor, not-complicated floor plan, Your Honor.

18         MR. STOJILKOVIC:  Your Honor, we're not trying to

19   gum things up, but what we got last night was a about 20-page

20   memorandum that had been prepared on December 21 and

21   delivered to Mr. Lazarus on December 21, including the floor

22   plan and other materials.  We also got about 130 photographs

23   that the government has had since that date.  And, you

24   know --

25         MR. LAZARUS:  That we're not introducing.

1          THE COURT:  I'm going to let him show him the floor
2     plan.
3          MR. LAZARUS:  They've had the rough notes since
4     December 14.  This --
5          THE COURT:  You're just putting in the floor plan,
6     right?
7          MR. LAZARUS:  The floor plan and four photographs
8     of the building.  They introduced plenty in their opening
9     yesterday at the outset --
10          MS. WILKINSON:  You won, you won.
11          MR. LAZARUS:  Thank you, Your Honor.
12          MS. WILKINSON:  On these documents where, for
13     example, our client is not copied, which is almost all the
14     documents the government is going to show today, we would
15     like some process either for you to give a limiting
16     instruction or for the government not to keep referring to
17     the defendants received this.
18          Obviously, you told the jury over and over again
19     that each defendant deserves individual consideration, and,
20     of course, it's a very important point to us.  These
21     documents are not relevant to Dr. Kapoor.  There's no
22     evidence that he saw these documents, especially what they
23     call the pill mill email, which to us is very prejudicial and
24     should be excluded, you know, for our client.  So I don't
25     know how you want to handle that.  I don't want to have to

1    pop up all the time, if you could give some kind of limiting

2    instruction.

3         MR. WYSHAK:  We object to any limiting instruction.

4    It's a conspiracy.  These are co-conspirator statements.  The

5    Bain case, which is 20 or 30 years old, once you jump on the

6    train, you're part of the conspiracy.  You assume all the

7    baggage of the train.  This knowledge is knowledge of the

8    co-conspirators, and the defense gets tagged with it.  That's

9    just the way the law is.  So a limiting instruction is

10   totally inappropriate for co-conspirator statements.

11        THE COURT:  I think that's right.  Although, when

12   we get to the final instructions, if you want something in

13   there about how to evaluate evidence, I'm happy to give it to

14   you then.  Unless you can give me some case law or some

15   guidance on why that's appropriate at this stage, I'm not

16   going to give a limiting instruction.

17        MS. WILKINSON:  We will, Your Honor, because this

18   happened in the Rifle case and there was a lot of -- because

19   there was -- there were gaps between the people, what they

20   were saying in the supposed conspiracy at the bottom of the

21   chain and the top, those documents were not always used

22   against the defendant, and there were limiting instructions.

23   And so we think we're entitled to the same thing.

24        There is not -- I understand what Mr. Wyshak is

25   saying generally about co-conspirator statements, but that

1    doesn't mean every single statement is attributable,

2    especially even under a 403 analysis when there's been no

3    evidence thus far introduced that he had any knowledge of

4    that statement.

5            THE COURT:  There may be isolated instances where

6    that's true.  Let's talk about them hopefully at a break and

7    we can also do it at sidebar.

8            MS. WILKINSON:  Well, I just want to make that

9    objection on this pill mill exhibit.  I don't know the

10   number.  It's 2, Exhibit 2.

11           THE COURT:  Who is that coming in through this

12   morning?

13           MR. WYSHAK:  Holly Brown.

14           THE COURT:  First witness?

15           MR. WYSHAK:  Yes.

16           THE COURT:  So let's take it as it comes.

17           Guys, I'd really like to get the jury out.  Do we

18   have to do this before noon?

19           MR. KENDALL:  It will take me one minute.

20           THE COURT:  He has his two, though, so you have one

21   minute each.

22           MR. KENDALL:  Procedurally, can we first object to

23   the first co-conspirator statement and then that will be an

24   ongoing objection.  And then when we get to Petruzziello, if

25   the government says it comes in for business records or

1   whatever, we can raise the 401 or 403 issues of relevance at
2   that time.
3           I think it's a pretty routine way to do it, Your
4   Honor.  I just want to make sure we don't waive anything.
5           THE COURT:  No, I understand.
6           MR. KENDALL:  Otherwise, we've got to object every
7   time.
8           THE COURT:  No.  I'm happy to have a standing
9   objection on co-conspirator hearsay statements, but just make
10  sure that if you have some other objection to it, that's the
11  objection you're preserving.
12          MR. KENDALL:  Right, Your Honor.  But if you rule
13  it's not a co-conspirator statement, they're going to say
14  it's a business record anyway and we're going to come back
15  and say it needs a relevance analysis.
16          THE COURT:  That's fine.  But just, if there's
17  objections other than that --
18          MR. KENDALL:  Yes, I understand we have to make
19  them.
20          THE COURT:  Yes, because I don't want to be
21  ambushed later on by saying --
22          MR. LAZARUS:  I just want to understand what the
23  "that" is.  Is it just the hearsay co-conspirator
24  declaration, or is it also relevance?
25          THE COURT:  Just the co-conspirator hearsay

1    declaration.  That's what he asked for.

2          MR. KENDALL:  Then if there's any relevance issue,

3    if we win on the co-conspirator issue, that they try to get

4    around it by saying it's a business record, even if it's not

5    a co-conspirator statement.  It may be a business record but

6    it won't be relevant to our defendants.

7          THE COURT:  Anything that I can do on the record

8    later on we can do on the record later on.  But I don't want

9    to be -- I don't want to be ambushed by the fact that later

10    on we had this objection standing for everything.

11          Your objection will go to co-conspirator hearsay

12    statements, and then I will hear you on other objections that

13    become relevant once I've ruled on that.

14          MR. KENDALL:  At the end of the case?

15          THE COURT:  Yes.

16          MR. KENDALL:  Fine, Your Honor.

17          MR. HORSTMANN:  May we approach, Your Honor?

18          THE COURT:  Yes.

19          MR. HORSTMANN:  Your Honor --

20    **SIDEBAR:**

21          THE COURT:  Guys, when you guys have this much

22    stuff you want to talk about, we have to start right at 9:30.

23    I don't want to do this.

24          MR. HORSTMANN:  I was here at 8:00.

25          THE COURT:  We all just sat here and then at 9:40 I

1   was like, well, can we talk about the motions.  If you have

2   stuff to talk about, that's why I'm here.  You can't let me

3   waste that ten minutes then have the jury come out ten

4   minutes late.

5               MR. HORSTMANN:  With respect to the first witness,

6   Your Honor, Holly Brown, she clearly has a strong belief that

7   my client had a sexual relationship with Dr. Madison.  It

8   leaks out regardless of what questions Mr. Wyshak is going to

9   ask.

10              So when I object, I just want the Court to

11  understand it, that her basis of knowledge isn't always what

12  she saw, what she heard, what she may have read.  It's

13  sometimes what she heard from other people.  It's sometimes

14  innuendo.  She speaks in innuendos.

15              THE COURT:  So who is doing the --

16              MR. WYSHAK:  Me.  I'm just going to ask what she

17  knows.

18              THE COURT:  Just ask how she knows stuff.  So if

19  she says they were having an affair, you have to follow up

20  and say, how do you know that.

21              MR. WYSHAK:  I think she's going to say that they

22  had a relationship and -- but I don't know.

23              MR. KENDALL:  Maybe he can lay the foundation

24  before the conclusion.

25              MR. WYSHAK:  Yeah.  I'm just going to ask her what

1    she observed about the relationship.

2         THE COURT:  If she starts to veer away from that,

3    I'll try and bring her back.

4         MR. TYRRELL:  Your Honor, I've sat very quietly,

5    haven't said a word, and I just have a question for the

6    government.  I think my issue can wait until noon.  The

7    composite org chart, you don't plan to put that in before

8    noon, do you?

9         MR. LAZARUS:  My org chart, the one on opening?

10        MR. TYRRELL:  Yeah.

11        MR. LAZARUS:  I may show it to a witness, but I'm

12   not planning to introduce it.

13        MR. TYRRELL:  I have an objection to that, Your

14   Honor.  I think it was fine for him to use it during opening,

15   it's going to be part of his argument, but it's not a

16   business record.  They created it.  We have other org charts

17   that are business records that more accurately reflect the

18   lines of reporting.  So I object to using it with the

19   witness.  I have one that I can cue up for Your Honor that's

20   a more accurate depiction.

21        THE COURT:  Do you want to use his until noon?

22        MR. LAZARUS:  I'll do whatever the Court wants.

23        THE COURT:  I would just like to get the jury out.

24        MR. TYRRELL:  It's 5281.  Yours is 1731, but the

25   more accurate --

1    MR. LAZARUS:  But I also have other org charts.

2    THE COURT:  Let's just deal with it at noon.

3    MR. TYRRELL:  Which other ones do you have a --

4    MR. LAZARUS:  I sent it to you last night, the 2012

5  org chart.

6  (End of sidebar.)

7    (Jury enters the courtroom.)

8    THE CLERK:  Court is in session.  Please be seated.

9    THE COURT:  Good morning, everybody.  We're going

10  to get right to it.

11    Government, call your first witness, please.

12    MR. WYSHAK:  Yes, United States calls Holly Brown.

13    THE CLERK:  You can step right up.

14    HOLLY BROWN, Sworn.

15    THE CLERK:  Can you please state your name and

16  spell your last name for the record.

17    THE WITNESS:  My name is Holly Brown, B-r-o-w-n.

18  DIRECT EXAMINATION BY MR. WYSHAK:

19  **Q.**  Good morning, Ms. Brown.  How old are you, ma'am?

20  **A.**  36.

21  **Q.**  And what do you do for a living?

22  **A.**  I work in pharmaceutical sales.

23  **Q.**  Can you tell us a little bit about your educational

24  background?

25  **A.**  Sure.

1              So I have a bachelor of science degree in

2    psychology from Iowa State, and then I have a doctorate of

3    chiropractic from Palmer College of Chiropractic.

4    **Q.**   And when did you graduate from Palmer College?

5    **A.**   2011.

6    **Q.**   Now, you told us that you work in pharma.  Who do you

7    work for now?

8    **A.**   I work for Kaleo Pharmaceuticals.

9    **Q.**   And can you briefly tell us what you do for them?

10   **A.**   I'm a sales rep in downtown Chicago, and I sell within

11   the allergy space for them, it's an epinephrine auto

12   injector, so similar to EpiPen.

13   **Q.**   And how long have you been doing that?

14   **A.**   With Kaleo, for about two and a half years now.

15   **Q.**   Is that where you reside, in the Chicago area?

16   **A.**   Yes.

17   **Q.**   At some point did you work for a company called Insys?

18   **A.**   Yes.

19   **Q.**   And approximately when was that?

20   **A.**   About February to March of 2012 until December of 2012.

21   **Q.**   All right.  Was that right after you graduated from

22   Palmer College?

23   **A.**   Yes.

24   **Q.**   Had you had prior experience in the pharma industry?

25   **A.**   No.  I pretty much went straight from grad school.  This

1    was my first professional job out of school.

2    **Q.**  And can you tell us how you went about becoming employed

3    by Insys?

4    **A.**  I had, for certain reasons, been looking outside of the

5    chiropractic industry and was just applying for jobs in

6    medical sales.  I came across Insys, interviewed for the

7    company and pretty soon got the job in Chicago as a sales rep

8    for Insys.

9    **Q.**  And who did you interview with?

10   **A.**  Mike Hemenway, who was my regional sales manager, and

11   Michael Babich.

12   **Q.**  Okay.  When you say he was your sales manager, what does

13   that mean?

14   **A.**  So he oversaw the Midwest region.  So there were reps

15   across the country, of course, and then he oversaw reps

16   within the Midwest.  So there were about nine of us in and

17   around Illinois and in a few other different states as well.

18   **Q.**  Okay.  And did you interview with anybody else?

19   **A.**  I don't think so, no.

20   **Q.**  All right.  Did you interview with Mike Babich?

21   **A.**  Yes, Mike Babich was there at the initial interview that

22   I went to.

23            THE COURT:  Mr. Wyshak, can I interrupt you for a

24   second.  Can you do me a favor and pull that microphone

25   towards you.

1          MR. WYSHAK:  Sorry, Your Honor.

2          THE COURT:  Thanks.

3    **Q.**  When you were hired, can you tell us what your salary

4    structure was?

5    **A.**  So our base salary was 40,000 a year, and then it was

6    communicated to us that the expectation that our bonus

7    compensation would be about $10,000 a quarter.  So basically

8    doubling our base salary.

9    **Q.**  When you say "bonus compensation," what does that mean?

10   **A.**  So most sales representatives in pharmaceuticals are on

11   some sort of bonus system where their earnings are partially

12   dependent on your sales performance.

13   **Q.**  Is that like a commission?

14   **A.**  A commission, yes.

15   **Q.**  Was there a particular rate for commissions?

16   **A.**  Sorry, what?

17   **Q.**  In other words, was there a particular percentage of

18   commissions?

19   **A.**  Like I said, just the expectation was going to be about

20   $10,000 a quarter.  I don't remember exactly how they had

21   that broken down.

22   **Q.**  All right.  Now, when you first were employed by Insys,

23   what were you selling?  What was your job?

24   **A.**  I was selling Subsys, which is a sublingual fentanyl

25   spray.

1    **Q.**  Anything else?

2    **A.**  No, that's it.

3    **Q.**  Was that the only product that Insys had on the market at

4    the time?

5    **A.**  At the time, yeah.

6    **Q.**  And when you were first hired, was the product actually

7    on the market?

8    **A.**  So we were hired prelaunch and were trained to launch the

9    product and bring it to market.

10   **Q.**  And so when you were initially hired, did you have any

11   training?

12   **A.**  Yeah.  So we started out with, I think it was about a

13   week of home training where they sent materials and packets

14   for us to read through with, you know, little quizzes and

15   tests to take afterwards.  And then we were trained on-site

16   in Arizona at the home office for about a week.

17   **Q.**  All right.  So the home training, can you tell us what

18   those materials generally were about?

19   **A.**  So it was just packets of information, company

20   information, processes, product information, background

21   information about pain and, you know, the disease that we

22   were selling into, and then a lot of product information as

23   well.

24   **Q.**  And then you told us you went to Arizona?

25   **A.**  Mm-hmm.

1    **Q.**   And when was that?

2    **A.**   It was either in March or April, I think.

3    **Q.**   Had the product been launched by then?

4    **A.**   No, it was still prelaunch.

5    **Q.**   This was still prelaunch?

6    **A.**   Mm-hmm.

7    **Q.**   And what happened when you went for training in Arizona?

8    **A.**   In Arizona, it was really a lot of solidifying our

9    messaging surrounding the product.  You know, executives from

10   the company gave, you know, speeches and seminars, you know,

11   to get everybody pumped up for prelaunch.  It was a lot of

12   practicing back and forth our messaging and how that was

13   going to sound in the field.

14   **Q.**   All right.  Did you receive any compliance training?

15   **A.**   I don't remember anything major regarding compliance

16   training.  I guess the thing that I would say about that is

17   that usually in on-site training, that's the largest part,

18   like, the whole thing is all about compliance and what you

19   can do and say in the field, and I don't remember there being

20   a lot of emphasis on that.

21   **Q.**   I want to show you --

22            MR. WYSHAK:  May I approach, Your Honor?

23            THE COURT:  Yes.

24            MR. WYSHAK:  It's been marked Exhibit 1.

25   **Q.**   Can you just take a look at that and tell us if you

1    recognize that.

2    **A.**   Yeah.  So this is the Subsys device.  It's just, it looks

3    like a little, you know, Binaca spray and is meant to spray

4    right under your tongue.

5    **Q.**   That was what you were selling, basically?

6    **A.**   Yeah.

7            MR. WYSHAK:  If we could put up on the screen

8    what's been marked Government's Exhibit 481.

9    **Q.**   Can you see that, Ms. Brown?

10   **A.**   Yeah.

11   **Q.**   Just for the -- sorry.

12           MR. WYSHAK:  Just for the witness at this point,

13   Your Honor, and the parties.

14   **Q.**   Do you recognize that?

15   **A.**   Yeah, it's the package insert for the product.

16   **Q.**   Okay.  And what is a package insert?

17   **A.**   A package insert is just drug information.  So it's, you

18   know, dosing information, a little bit about

19   pharmacokinetics, contraindications, drug interactions,

20   adverse events, that kind of thing.

21   **Q.**   Okay.  And is this something that comes with the

22   prescription bottle which has been marked Government Exhibit

23   1?

24   **A.**   Yeah, it would be included with each prescription.

25   **Q.**   Are you familiar with the package insert?

1    **A.**   Yes.

2    **Q.**   Did you receive training on the package insert?

3    **A.**   Yes.

4    **Q.**   At the March training?

5    **A.**   Yes.

6            MR. WYSHAK:  I offer Exhibit 1 and Exhibit 2, Your

7    Honor.

8            MS. WILKINSON:  No objection.

9            MR. TYRRELL:  No objection, Your Honor.

10           THE COURT:  They're admitted.

11           (Exhibit 1 admitted into evidence.)

12           (Exhibit 2 admitted into evidence.)

13   BY MR. WYSHAK:

14   **Q.**   Okay.  Now, I'd like to --

15           THE COURT:  Hold on a second.  No objection from

16   any of you?

17           MR. HORSTMANN:  No objection, Your Honor.

18           MS. MINER:  No objection.

19           THE COURT:  Go ahead.

20           MR. WYSHAK:  Can we keep that on the screen.

21   **Q.**   So if you could, I'd just like to walk through this a

22   little bit.

23           MR. WYSHAK:  If you could highlight the first --

24   well, so can the jury see it now, Your Honor?  Has it been

25   published?

1          THE COURT:  Sure.

2          MR. WYSHAK:  Highlight the first side of that

3    screen to the extent you can.  Can you blow it up?  Okay.

4    **Q.**  Can you see that --

5    **A.**  Yeah.

6    **Q.**  -- Ms. Brown?

7    **A.**  Uh-huh.

8    **Q.**  Okay.  So what was Subsys?

9    **A.**  Subsys was a fentanyl product.  It was put into a device

10   for rapid absorption and therefore was a rapid-acting

11   fentanyl.

12   **Q.**  Okay.  And directing your attention to the top of the

13   page there, it says something "fentanyl sublingual spray."

14   Is that correct?

15   **A.**  Yeah.

16   **Q.**  What does that mean, sublingual?

17   **A.**  It means the product is delivered under the tongue for

18   purposes of quicker absorption.  The mucosa is very thin and

19   easily absorbs certain molecules.  So the idea was that the

20   drug would be delivered very quickly to the bloodstream.

21   **Q.**  Okay.  And going down there's a sentence that says, "Due

22   to the risk of fatal respiratory depression, Subsys is

23   contraindicated in opioid non-tolerant patients and in

24   management of acute or postoperative pain, including

25   headaches and migraines."

1          So can you explain a little bit about what that

2    means.

3    **A.**   Yeah.  So it just means that the product, because of the

4    strength and onset of action being so quick, is

5    contraindicated for patients who do not have any tolerance to

6    an opiate.  So it requires that a patient be probably on some

7    other type of opiate for a period of time before this and

8    then also be on an opiate during the duration of their

9    treatment with Subsys.

10   **Q.**   Okay.  And did you become familiar with what kind of

11   opiate medications were on the market at that time?

12   **A.**   Yes.

13   **Q.**   Can you name a few?

14   **A.**   Competitors of this or just other opiates in general?

15   **Q.**   In general.

16   **A.**   So, you know, things that patients would have been on

17   prior to this would have been OxyContin, Norco, any different

18   thing like that, I guess.

19   **Q.**   And if you scroll down a little bit to "Indications and

20   Usage," it says, "Subsys is an opioid agonist indicated for

21   the management of breakthrough pain in cancer patients 18

22   years of age and older who are already receiving and who are

23   tolerant to opioid therapy for their underlining persistent

24   cancer pain."

25          What does that mean, the indication?  Were you

1   trained about that?

2   **A.**   Yeah, so it's -- the indication states it's meant to be

3   for cancer patients who are in some type of pain and had been

4   on previous treatment for their pain.

5   **Q.**   And did you receive any training about what you should

6   say to doctors regarding what this medicine is indicated for?

7   **A.**   Initially the directive was to make sure that you mention

8   the actual indication at least once to the physician.  It was

9   sort of implied to get through that kind of quickly.  And

10   then once you had mentioned the full indication one time, we

11   were supposed to drop the word "cancer" and just talk about

12   breakthrough pain in general.

13   **Q.**   And did you have an understanding of why you were trained

14   to drop the "cancer"?

15   **A.**   I think it was because --

16           MS. MINER:  Objection.

17           MR. HORSTMANN:  Objection.

18           THE COURT:  Basis?

19           MS. MINER:  Her understanding, without foundation

20   that somebody told her.

21           THE COURT:  Lay a foundation, please.

22           MR. WYSHAK:  I think I did.

23   **Q.**   You just testified that you had training regarding what

24   you were supposed to say to physicians regarding the

25   indication for this drug, correct?

1   **A.**  Yes.

2           THE COURT:  If you can flush out who the training

3   was from, please.

4   **Q.**  All right.  You told us you went to a training in

5   Arizona?

6   **A.**  Yes.

7   **Q.**  Was that, like, at a national sales meeting?

8   **A.**  Yes.

9   **Q.**  Can you tell us who the speakers were at the training?

10   **A.**  There were a handful of people.  I remember Mike Babich

11   speaking to the group in general, and then we would break

12   into, I guess you would call them break-out sessions where

13   our regional sales manager would kind of take over and give

14   directive and have us practice speaking things, like the

15   indication and how we were going to say this in an office.

16   **Q.**  So that would have been something that Mike Hemenway had

17   told you?

18   **A.**  Yes.

19   **Q.**  So what did he tell you about dropping the "cancer"?

20   **A.**  I think the idea was that physicians could use this

21   product off-label in any way that they wanted.  And we would

22   be calling on oncology doctors, but even more than that we

23   would be calling on pain management physicians.  So the pain

24   management physicians may or may not have been using this

25   drug for cancer patients.

1          MR. WYSHAK:  Okay.  And if we can move over to the

2     top of the next side of the product insert.

3     **Q.**   Okay.  So there's a list here of "Contraindications."

4     What does that mean?

5     **A.**   Contraindications are reasons that a person should not be

6     put on a drug.  So it could be that they're on another

7     product that would interact.  It could be, in this case, that

8     they're not opiate-tolerant at this point.  Could be age.

9     Could be any of those things.

10    **Q.**   So it says "opioid non-tolerant patients."  What does

11    that mean?

12    **A.**   It means that patients that don't have a built-up

13    tolerance to opiates, meaning they had been on some sort of

14    opiate previously and probably, currently, were not

15    appropriate patients for Subsys.

16    **Q.**   Okay.  And it says "management of acute or postoperative

17    pain, including headache, migraine and dental pain."

18    **A.**   Yes.

19    **Q.**   You shouldn't use it if you have headaches or migraines?

20    **A.**   Correct.

21    **Q.**   Or "hypersensitivity to fentanyl"; is that correct?

22    **A.**   Yes.

23    **Q.**   And it says, "Warnings and Precautions," correct?

24    **A.**   Yes.

25    **Q.**   And can you read the first one there?

1   **A.**   "Clinically significant respiratory and CNS depression

2   can occur.  Monitor patients accordingly."

3   **Q.**   What does that mean?

4   **A.**   It means that if a patient is exposed to this product,

5   there is potential for an adverse reaction for any number of

6   reasons but that respiratory depression can occur.

7   **Q.**   That means you stop breathing, right?

8   **A.**   Yes.

9   **Q.**   And the next one?

10  **A.**   "Full and consumed Subsys units contain medicine that can

11  be fatal to a child.  Ensure proper storage and disposal."

12          MR. WYSHAK:  Okay.  If we could just move back to

13  the first side and scroll down to -- right there.  That line

14  that begins "Contains fentanyl," can you highlight that?

15  **Q.**   It says, "Contains fentanyl, a Schedule II controlled

16  substance with abuse liability similar to other opioid

17  analgesics."

18          Do you know what that means, a Schedule II

19  controlled substance?

20  **A.**   Yes.  It's a product that has potential for abuse because

21  of different reasons, tolerance, feelings of euphoria or

22  whatever.  It's a designation that the FDA puts on certain

23  drugs to make the rules around prescribing it a little more

24  stringent, a little more monitored.

25          MR. WYSHAK:  If we could turn to the next -- it

1    would be page 3 of the package insert.  Down to "Abuse

2    potential."  Could you highlight that section, please.

3    **Q.**   Can you read that for us, Ms. Brown?

4    **A.**   "Subsys contains fentanyl, an opioid agonist and a

5    Schedule II controlled substance with an abuse liability

6    similar to other opioid analgesics.  Subsys can be abused in

7    a manner similar to other opioid agonists, legal or illicit.

8    This should be considered when prescribing or dispensing

9    Subsys in situations where the physician or pharmacist is

10   concerned about an increased risk of misuse, abuse or

11   diversion."

12   **Q.**   Next paragraph?

13   **A.**   "Because of the risk for misuse, abuse, addiction and

14   overdose, Subsys is prescribed only through a restricted

15   program required by the Food and Drug Administration called

16   'Risk Evaluation and Mitigation Strategy' under the

17   Transmucosal Immediate Release Fentanyl REMS Access Program.

18   Outpatients, health care professionals who prescribe to

19   outpatients, pharmacies and distributors must enroll in the

20   program."

21   **Q.**   Okay.  And did you receive training about this TIRF REMS

22   program?

23   **A.**   Yes.

24   **Q.**   Can you briefly explain it to the jury?

25   **A.**   Yeah.  So it was something put in place by the FDA that

1    requires that both patients and prescribers and pharmacists,

2    like it said, are aware of the risks for abuse and side

3    effects with this particular drug.  So all of these people

4    had to sign, basically, a form that said that they understood

5    what these risks were.

6            MR. WYSHAK:  Could you go to the top of that page

7    where it says "Respiratory Depression."

8    **Q.**  Could you read that for us?

9    **A.**  "Fatal respiratory depression has occurred in patients

10   treated with Transmucosal Immediate Release Fentanyl products

11   such as Subsys, including following use in opioid

12   non-tolerant patients and improper dosing.  The substitution

13   of Subsys for any other fentanyl product may result in fatal

14   overdose."

15           MR. WYSHAK:  If we go to the next page, please.

16   Highlight that paragraph.

17   **Q.**  Could you please read us that first paragraph?

18   **A.**  "Individually titrate Subsys to a dose that provides

19   adequate analgesic and minimizes side effects.  The initial

20   dose of Subsys to treat episodes of breakthrough cancer pain

21   is always 100 micrograms.  When prescribing, do not switch

22   patients on a microgram-per-microgram basis from any other

23   oral transmucosal fentanyl product or Subsys, as Subsys is

24   not equivalent on a microgram-per-microgram basis with any

25   other fentanyl product."

1    **Q.**  And did you have an understanding -- were you trained

2    about what that means, switching?

3    **A.**  Yeah.  It means that you can't -- for a patient that's on

4    a competitor product to Subsys, you can't just switch

5    somebody who is on 400 micrograms of something else to 400

6    micrograms of Subsys because the pharmacokinetic profile is

7    different per product.

8    **Q.**  What does that mean?

9    **A.**  It just means that the absorption is going to be

10   different.  In the case of Subsys, the idea was that it was

11   absorbed more quickly through the transmucosal system than

12   through other ways which, you know, the mode of delivery

13   differed depending on different drugs in the class.

14   **Q.**  And the fact that it's transmitted more quickly, does

15   that increase the risk of fatal overdose?

16   **A.**  Yes.

17        MR. WYSHAK:  If you go to page 8, 5.2.  "Important

18   information prescribing."

19        Could you highlight that.

20   **Q.**  Could you read that for us, Ms. Brown.

21   **A.**  "Important information regarding prescribing and

22   dispensing Subsys is not bioequivalent with other fentanyl

23   products.  Do not convert patients on a

24   microgram-per-microgram basis from other fentanyl products.

25   When dispensing, do not substitute a Subsys prescription for

1    any other fentanyl products.  Substantial differences exist

2    in the pharmacokinetic profile of Subsys compared to other

3    fentanyl products that result in clinically important

4    differences in the rate and extent of absorption of fentanyl.

5    As a result of these differences, the substitution of the

6    same dose of Subsys for the same dose of any other fentanyl

7    product may result in a fatal overdose."

8    **Q.**   And that's what you just told us, correct?

9    **A.**   Yes.

10          MR. WYSHAK:  If you could go to page 14, section

11   9.1.  Right there.

12   **Q.**   Could you read that for us?

13   **A.**   "Fentanyl is a Schedule II controlled substance that can

14   produce drug dependence of the morphine type.  Subsys may be

15   subject to misuse, abuse and addiction."

16   **Q.**   Thank you.  All right.  Now, after this training in

17   Arizona, I assume you went back to Chicago?

18   **A.**   Yes.

19   **Q.**   And at some point did the product hit the market?

20   **A.**   Yes.

21   **Q.**   And how did you go about finding doctors to market this

22   product to?

23   **A.**   Before launch we had been given an iPad that had

24   preloaded data into it specific to our territory.  So we had

25   a list of physicians that we were supposed to call on, and

1    these physicians were ranked of importance through a decile

2    system that was based on their history of prescribing within

3    the opiate market, in particular, the fentanyl market.

4    **Q.**   Okay.  When you say they were ranked, who ranked the

5    physicians?

6    **A.**   It was something that was done by corporate.  I don't

7    know who exactly was responsible for that.  But it was,

8    again, based on the amount of opiate product they were

9    prescribing historically.

10   **Q.**   And what was the ranking system?

11   **A.**   So it was a 1 through 10 system with 10 being doctors

12   basically of most importance who were writing the most

13   opiates, and particularly fentanyl drugs within the class,

14   and 1 being doctors of least importance who are writing the

15   fewest prescriptions.

16   **Q.**   And did you receive any directions regarding which

17   doctors to target?

18   **A.**   Yeah.  We were targeting mostly the doctors who were of

19   high decile.  So, you know, anything 5 and above really with

20   the highest attention on, you know, the higher decile

21   doctors.

22   **Q.**   All right.  Now, at this point in time, were there other

23   fentanyl drugs on the market that were competitors of Subsys?

24   **A.**   Yeah, there were a handful.  There were probably five or

25   six other immediate-relief fentanyl products that were direct

1    competitors.

2    **Q.**   And do you remember the names of some of them?

3    **A.**   There was Fentora, Actiq, Abstral, Lazanda.  That might

4    be all that I remember.

5    **Q.**   Okay.  And can you tell us what your territory was?

6    Where were you marketing Subsys?

7    **A.**   I was a Chicago north rep so I had most of downtown

8    Chicago and then called on doctors as far north as Warsaw,

9    Wisconsin.

10   **Q.**   And the doctors who were on your target list, basically,

11   what was their practice?

12   **A.**   It was mostly pain management physicians who had been

13   writing these types of products in any amount of quantity.

14   We had oncologists on our target list, but generally they

15   were lower decile and not of as much importance as the pain

16   management physicians.

17   **Q.**   Okay.  And can you tell us a little bit about actually

18   what you would do, what was your day like, how did you try to

19   sell Subsys?

20   **A.**   So we spent most of our time visiting these physicians'

21   offices.  We would ask for time with the physician to speak

22   and teach them about the product.  This typically occurred

23   over a lunch.

24          So offices would allow drug reps to schedule

25   lunches and set aside time for the doctor to come in and hear

1    your product presentation.

2    **Q.**   Okay.  And can you tell us what the reception was by the

3    community of doctors that you were trying to market Subsys

4    to?

5    **A.**   In my territory anyway, the reception -- I was met with a

6    lot of hesitancy.  You know, there are already a number of

7    these types of drugs on the market.  I think opiate-

8    prescribing had been looked at a little bit more stringently

9    in recent years so doctors were just kind of concerned.  I

10   mean, it was the type of product that they didn't usually

11   have -- I don't want to say a lot of use for, but they

12   typically didn't have too many patients that they thought

13   were appropriate for this type of product.

14          So, you know, I think most of them agreed that it

15   was a good product in terms of delivery and the time of

16   onset.  But like I said, most of them were just hesitant and

17   didn't have a whole lot of patients that they thought they

18   would use this for.

19   **Q.**   Do you know what the word or the term "prior

20   authorization" means?

21   **A.**   Yes.

22   **Q.**   And what does that mean?

23   **A.**   A prior authorization is something that insurance

24   companies will put in place when somebody has submitted a

25   claim for a drug and they initially deny it because it's not

1  on formulary or they don't want to cover it for whatever

2  reason.  They require prior authorization to cover,

3  basically, which means they send paperwork back to the

4  physician asking for justification for why the patient needs

5  this particular product as opposed to something that might be

6  on their formulary or deemed as cheaper or whatever.

7          So the process is the physician fills out this

8  paperwork, gives their justification, sends it to the

9  insurance company, and then the insurer will make a second

10  decision as to whether or not they're going to cover the

11  product.

12  **Q.**  And was Subsys generally subject to a requirement of a

13  prior authorization?

14  **A.**  Usually, yeah.

15  **Q.**  Did that impact your ability to market Subsys?

16  **A.**  Yeah, it made it tough, for sure, and it was something

17  that was a little bit unexpected going into it for most of

18  us, not having a lot of experience in the pharmaceutical

19  industry.  As doctors began to try Subsys, they were usually

20  met with these prior authorizations that we sort of didn't

21  have an understanding of how to deal with.

22  **Q.**  And how did doctors react when they were required to

23  obtain prior authorizations?

24  **A.**  Not happily.  It's something that most physicians loath,

25  whether it's Subsys or any other product.  Prior

1    authorizations are a pain for most of them to fill out.

2    **Q.**  And in terms of dealing with these marketing issues, did

3    you have meetings with Mike Hemenway, or how did you go about

4    discussing strategy?

5    **A.**  We had weekly conference calls with Mike Hemenway, my

6    boss at the time.  And, you know, as these prior

7    authorizations became more and more of an issue, this became

8    more and more the topic of discussion for these conference

9    calls, strategizing how to encourage doctors to complete

10   them, and, you know, ideas for getting them done, basically.

11   **Q.**  All right.  Now, I want to bring you to a national sales

12   meeting in September of 2012.  But prior to that meeting, can

13   you describe how successful you were in selling Subsys?

14   **A.**  I had some initial success getting physicians to try the

15   product, but as I mentioned, most of them had, you know, told

16   me that they didn't have a ton of patients appropriate for

17   this.

18          So, you know, physicians tried it.  They were met

19   with issues with the prior auth.  They didn't have a ton of

20   patients anyway.  So my volume did not maintain, and by

21   September I was struggling.

22   **Q.**  Now, in September of 2012, did you attend a national

23   sales meeting?

24   **A.**  Yes.

25   **Q.**  And where was that?

1    **A.**   That was in Arizona.

2    **Q.**   Were there any significant changes regarding the sales

3    structure at Insys that occurred in combination with that

4    national sales meeting?

5    **A.**   Yeah.  So at some time prior to this meeting, the VP of

6    sales had departed from the company.  I'm not exactly sure

7    why or why that happened, but there was no VP of sales.  And

8    then at the time of the sales meeting right before it

9    happened, my manager, Mike Hemenway, was let go from the

10   company.

11   **Q.**   Okay.

12   **A.**   As well as some other managers that I didn't interact

13   with, I think.

14   **Q.**   Okay.  And who replaced the VP of sales?

15   **A.**   Alec Burlakoff.

16   **Q.**   And who replaced Mike Hemenway?

17   **A.**   Sunrise Lee was my new manager.

18   **Q.**   Had you ever met Ms. Lee before?

19   **A.**   No.

20   **Q.**   So how did it come about that you were introduced to her?

21   **A.**   So they flew us in for the sales meeting the night before

22   the meeting was supposed to happen, and I met her the next

23   morning, actually, on the elevator on the way to breakfast.

24   So just before the meeting started.

25   **Q.**   Okay.  I don't know if you can see her in the courtroom.

1   **A.**   She's just there.

2              MR. WYSHAK:   Indicating the defendant, Your Honor.

3              THE WITNESS:   What's that?

4              MR. WYSHAK:   Let the record indicate the witness

5   has identified Ms. Lee.

6              THE COURT:   Yes, the record will reflect that.

7   BY MR. WYSHAK:

8   **Q.**   So you met her at this national sales meeting?

9   **A.**   Yes.

10  **Q.**   All right.  Now, can you tell us how things changed?  I

11  mean -- well, did things change as a result of Mr. Burlakoff

12  and Ms. Lee assuming these new positions?

13             MR. HORSTMANN:   Objection, Your Honor.  Unwind the

14  question a little bit --

15             MR. WYSHAK:   I can unwind it.

16             THE COURT:   Yes, thank you.

17  **Q.**   Can you tell us what, if anything, Mr. Burlakoff

18  communicated to the salespeople about his strategy at this

19  meeting?

20  **A.**   Yeah.  So I think at this time a lot of the sales force,

21  including myself, were pretty beaten down.  The pressure to

22  sell in volume was really high, and I think there was only a

23  small handful of reps across the country that were meeting

24  those expectations.  So, you know, the pressure was on to,

25  obviously, increase sales of Subsys.

1          When Alec Burlakoff came on board, it was kind of

2     a, okay, we're going to toss the old rule book out the window

3     and start with a new plan of attack.  So that included

4     conversations surrounding speaker programs, it included

5     conversations about finding, he would call it your whale

6     doctor, your one prescriber that was really going to carry

7     most of your business for you.

8          And he insisted that each territory had a whale

9     prescriber, and it was just about finding who that person was

10    and finding somebody who, number one, had the volume and who,

11    number two, would be willing to work with me as the rep and

12    Insys as the company.

13    **Q.**  So can you describe that a little more?  I mean, what

14    is -- a whale is a doctor?

15    **A.**  Yeah.  You know, I mean, the descriptions were never

16    super clear.  So it was kind of a lot of expecting us to read

17    between the lines.  But I think what he meant, again, was a

18    physician who was writing a lot in the opiate market and that

19    also might be open to working very closely with a

20    pharmaceutical company mainly through the execution of

21    speaker programs.

22    **Q.**  Okay.  Now, when you went back to Chicago, you started

23    working with Ms. Lee?

24    **A.**  Yes.

25    **Q.**  Can you describe the difference between her management

1   style and Mike Hemenway's management style?

2   **A.**   Well, Mike Hemenway was a very typical, from what I know

3   now, sales manager in pharmaceuticals.  He had a background

4   in it.  You know, he was responsible and organized about

5   keeping us organized and on task and strategizing and things

6   like that.  Obviously knew the industry very well.

7          Sunrise, on the other hand, didn't seem to have any

8   sort of background either in health care or in

9   pharmaceuticals.  Nobody really knew exactly what her

10  background was.  And she just didn't have, you know, the

11  organizational or education, it seemed, to manage a sales

12  team within pharma.

13  **Q.**   Did you ever ask her what she had done prior to becoming

14  a regional sales manager for Insys?

15  **A.**   Yeah.  The question came up, you know, in casual

16  conversation.  And it was never quite clear.

17          So at first, I was under the impression --

18          MR. HORSTMANN:  Objection.

19  BY MR. WYSHAK:

20  **Q.**   Well, tell us, to the extent you can, what she said to

21  you about that.

22  **A.**   At first she said that she had been involved in either --

23  she was a massage therapist or owned a massage therapy

24  company.  And then at some point she said that she had had a

25  degree in biochemistry.

1    **Q.**  All right.  So let's talk a little bit about speaker

2    programs.  Can you describe to the jury what the concept --

3    maybe that's a bad question.

4              What did you understand a speaker program to be?

5    **A.**  Well, at this point in my career I had never done one.

6    But basically I understood it to be an event where a

7    physician would make a presentation about the product to a

8    group of other physicians or people that were supportive to

9    him.  So, you know, staff or whatever.  And then that person

10   would get paid an honoraria to do that, but the discussion

11   obviously needed to be to prescribers about the product.

12   **Q.**  So it was about educating other people who were going to

13   be prescribing this product?

14   **A.**  Yes.

15   **Q.**  And so how would you go about doing that?  What would you

16   do to get somebody to speak and put together a program?

17   **A.**  Well, with Insys, the idea was that it was somewhat up to

18   the rep to find a physician that was, number one, using

19   Subsys, and then, number two, interested enough in it and the

20   company to agree to do a speaker program, somebody who was

21   interested in doing it.

22             I ended up, in my territory, getting someone sort

23   of appointed as a speaker that was used.  But basically that

24   person has to go through training, you know.  They do an

25   online training for it, and they're supposed to be confined

1  to a set -- like a slide deck that is provided by the

2  company.

3  **Q.**  Okay.  And do you remember who that person was initially?

4  **A.**  So in the early, early days, it was Dr. Pantel Fischer,

5  and she did maybe one program within a doctor's office at a

6  launch, and then later my main speaker became Dr. Paul

7  Madison.

8  **Q.**  Okay.  So let's talk a little bit about Dr. Madison.  Was

9  he one of the doctors on that initial target list of high

10  decile doctors?

11  **A.**  Yeah, he was one of my higher decile doctors for sure and

12  probably wrote more opiates than I would venture to say

13  almost any other physician in my target list.

14  **Q.**  Okay.  And did you begin -- had you approached him prior

15  to the national sales meeting in September of 2012?

16  **A.**  Yeah.  So from the time we launched the product until the

17  national sales meeting, I had been calling on him fairly

18  regularly.  I became a little bit uncomfortable at some point

19  into this just because of the type of doctor and location and

20  all of that that he was at, but he never -- I don't think he

21  ever prescribed one Subsys prescription before any of this.

22  I had been relatively unsuccessful with him.  He kind of gave

23  me the brush-off and just didn't have much time of day for

24  me.

25  **Q.**  All right.  So where was he located?

1   **A.**   He had two offices.  One was in Melrose Park at the time

2   and the other one was in Michigan City, Indiana.

3   **Q.**   All right.  And which office did you visit, both offices?

4   **A.**   Eventually I went to the one in Indiana, but at first I

5   was just going to the Melrose Park office.

6   **Q.**   And can you describe what kind of operation he was

7   running at that location?

8   **A.**   Yeah.  It was markedly different than pretty much all of

9   the physicians that I called on.  It was in this little kind

10  of dingy strip mall in a not-so-nice area of town.  The first

11  time I went in there I walk in and there's a guy sitting

12  behind the desk counting this big wad of cash out of a safe.

13  The patients that hung around the office were people that

14  looked like they probably had some kind of problem.  Like I

15  said, just very different from other offices that I called

16  on, really disorganized.  Dr. Madison may or may not have

17  shown up on time or at all.  It was just kind of a

18  free-for-all.

19  **Q.**   Were you uncomfortable?

20  **A.**   Yes.

21  **Q.**   And why was that?

22  **A.**   It just didn't seem like a good place to be.  I had

23  actually been warned about this office by Mike Hemenway

24  previously.  It's sort of notorious in the area.  I had done

25  a Google search beforehand as well, and you can find all

1   kinds of unsavory information about Dr. Madison and the

2   physician who was -- had taken the practice over for who had

3   previously lost his license.

4   **Q.**   And who was that of?

5           MR. HORSTMANN:  Objection, Your Honor.

6           MR. KENDALL:  Objection, Your Honor.

7           THE COURT:  Basis?

8           MR. KENDALL:  Relevance.

9           THE COURT:  See if you can lay a foundation for

10  that, please.

11  BY MR. WYSHAK:

12  **Q.**   So this other physician, had you visited his office?

13  **A.**   So he worked still, even though he had lost his license,

14  out of the Melrose Park office.  It had been his previously,

15  and he still stayed at that office kind of managing things

16  behind the scene and had Dr. Madison take over prescribing

17  basically where he had left off.

18  **Q.**   What was his name?

19  **A.**   Dr. Joe Giacchino.

20  **Q.**   You said he lost his license?

21          MR. KENDALL:  Objection, Your Honor.  Don't know

22  that she's been part of that process --

23          THE COURT:  Basis for her knowledge of whether or

24  not he lost his license, please.

25  **Q.**   How do you know?

1  **A.**  So there's public reports --

2          MR. KENDALL:  Objection, Your Honor.  What she

3  reads in the newspaper --

4          THE COURT:  If you want to --

5          MR. KENDALL:  Just objection, Your Honor.

6          THE COURT:  Overruled.  But let her finish the

7  answer, please.

8  **A.**  You can get online and find articles that detail his

9  lawsuit and the case that he had, I think, sexually assaulted

10  or abused a patient in exchange for opiate prescriptions and

11  had a long history --

12          MR. HORSTMANN:  Objection.

13          MS. MINER:  Objection, Your Honor.

14          MR. KENDALL:  Objection.

15          THE COURT:  So just for the jurors, what she's

16  reading in a newspaper article she doesn't know if it's true

17  or not.  She's just reading it in a newspaper.  So it doesn't

18  come in for the truth of the matter asserted, but it comes in

19  for her understanding of it.  Okay.

20  BY MR. WYSHAK:

21  **Q.**  You went to Dr. Madison's office.  During the period you

22  were at Insys, how many times did you go there?

23  **A.**  I mean, it was supposed to be a weekly event that we

24  would see our top decile doctors.

25          It went that way in the very beginning, and then

1    after I continued to get the brush-off and felt uncomfortable

2    there, I would go in much less frequently.  So maybe once a

3    month.  Once every two weeks if I felt like I really had to.

4    **Q.**  Did you meet this doctor at that time?

5    **A.**  Yes.

6    **Q.**  Did you have conversations with him?

7    **A.**  Yeah.  So in the beginning I did several lunch meetings

8    with him, and, again, was never really able to capture his

9    attention.

10           MR. HORSTMANN:  Can we know who "him" is, Your

11   Honor?

12           THE COURT:  Can you clarify which of the two

13   doctors you're talking about.

14   **Q.**  Dr. Giacchino, had you met him?

15   **A.**  I had met him but --

16           MR. HORSTMANN:  Objection, Your Honor.

17           THE COURT:  Excuse me?

18           MR. HORSTMANN:  Objection.

19           THE COURT:  Basis?

20           MR. HORSTMANN:  Relevance.

21           MS. WILKINSON:  Right.  Relevance.

22           THE COURT:  Overruled.

23   **A.**  Yes, I had met him not for the purpose of going into call

24   on Dr. Giacchino but for the purpose of going to call on Dr.

25   Madison.  But Dr. Giacchino was often there in the Melrose

1    Park office at the desk doing something.

2    **Q.**  All right.  Now, you told us that you had been

3    unsuccessful with Dr. Madison; is that right?

4    **A.**  Yes.

5         MR. WYSHAK:  Can we put Exhibit 2 on the screen

6    just for the witness.  Can you go to the caption.  The

7    header.

8    **Q.**  So this is a -- what is this?

9    **A.**  This is an email that I had sent.  So I think at this

10   point, Mike Babich had stepped in and had sort of overtaken

11   the role of VP of sales from what I remember, and this was an

12   email -- we were required at one point to basically give

13   justification to why some of our top doctors were not

14   prescribing, and I think this was something that was

15   requested to --

16   **Q.**  All right.  Basically an email from you to Mike Babich?

17   **A.**  Yes.

18        MR. WYSHAK:  Can we scroll down to the bottom, last

19   page.  Stop.  Okay, right there and go to the header.

20   **Q.**  Do you see the header there?

21   **A.**  Yes.

22   **Q.**  There's an email from Mike Babich to you; is that

23   correct?

24   **A.**  Yes.

25   **Q.**  Dated?

1    **A.**  August 1, 2012.

2    **Q.**  So this will be an email before Alec Burlakoff took over,

3    or Sunrise Lee took over, correct?

4    **A.**  Yes.

5              MR. WYSHAK:  I offer it, Your Honor.

6              MR. HORSTMANN:  Objection.

7              MS. WILKINSON:  Objection.

8              THE COURT:  Basis?

9              MS. WILKINSON:  Relevance.

10             MR. KENDALL:  Relevance and hearsay, Your Honor.

11             MS. WILKINSON:  And 403, Your Honor.

12             THE COURT:  All right.

13             MR. KENDALL:  Can we go to sidebar?

14             THE COURT:  If you want to have a sidebar, you can.

15   I'm going to overrule the relevance objection.  I'm going

16   to -- I'll see you at sidebar.

17   **SIDEBAR:**

18             MR. WYSHAK:  If we start -- why don't we start at

19   the beginning.  So Mike Babich sends her, in August, an email

20   basically instructing her to basically give him a breakdown

21   on these doctors who are listed here.

22             THE COURT:  Okay.

23             MR. WYSHAK:  There's about ten of them, I think,

24   maybe a little more.  What she's doing with those doctors.

25             So he's instructing her, basically, to report about

1    her efforts in trying to sell Subsys to those doctors who are

2    on her target list.  So she does that.

3            She responds to him with the report, and

4    particularly regarding Dr. Madison, she reports upon her

5    success with him, which is negative, and reports to him that

6    he's running a pill mill.

7            And I think that, Your Honor, number one, you know,

8    it shows knowledge on the part of the CEO of this company

9    that one of the top ten referred targets is a pill mill

10   operator.

11           Furthermore, things change after Sunrise Lee

12   becomes the regional manager based upon what we think is her

13   relationship with Dr. Madison.  All of a sudden he becomes

14   Miss Brown's top subscriber.

15           So I just want to lay out the history of her

16   efforts with Dr. Madison, what she's reporting back to

17   headquarters, that she continues to see him and basically

18   continues to strike out until Sunrise Lee shows up.

19           THE COURT:  Okay.

20           MS. WILKINSON:  Your Honor, there's no evidence

21   that this went to Dr. Kapoor.  This is to Mr. Babich, and

22   it's a detailed report about her interactions.  And talking

23   about -- shared a pill mill, and this other doctor, Dr. Ring,

24   he seems a little more responsible, he also runs a pill mill.

25           It seems extraordinarily prejudicial to our client

1    when there's no evidence he was aware of that.

2              THE COURT:  I'm going to let him have this.

3              MR. TYRRELL:  May I be heard on this?

4              My client hadn't even started working at the

5    company at this point, so I'm going to renew the request for

6    a limited instruction, if I may make may record, I

7    understand --

8              THE COURT:  Can I have a suggestion before and then

9    you can make the record.

10             MR. TYRRELL:  Sure.

11             THE COURT:  So I would be willing to give them a

12   legal instruction to the effect that once that -- that they

13   should focus on the -- they should be aware of the fact that

14   not everything goes to everybody, and unless and until a

15   conspiracy is proven, that's the way it is.  But once a

16   conspiracy is proven, it all comes in as to everybody that's

17   on the conspiracy from the time they join.

18             So if you guys want to craft that over lunch, I'm

19   happy to give something like that.

20             MS. WILKINSON:  Could we just ask that you say

21   racketeering conspiracy and not just a conspiracy.

22             THE COURT:  Sure.

23             MS. WILKINSON:  Thank you.

24             THE COURT:  Figure out the law.  I'm not going to

25   give it -- I would normally wing it on an instruction, but

1    given the conspiracy charge in the racketeering case, I'm not

2    willing to do it.  But if you want to craft something, that

3    I'm happy to do it.

4            MR. TYRRELL:  May we wait to publish the document

5    to the jury until that instruction is given?  I think it's

6    important to give it simultaneously.

7            THE COURT:  No.  Lunch is in an hour.

8            MS. MINER:  There's also --

9            MR. TYRRELL:  One -- my last point is I understand

10   Mr. Wyshak's train analogy.  I never used it myself, BUT I

11   understand it.  BUT there's not a strict liability standard

12   for acts of co-conspirators.  There's a foreseeability

13   concept that goes along with it.  And I appreciate Your Honor

14   giving A temporal limiting instruction, that's helpful, but I

15   think going forward, you know, I think his idea of what acts

16   are attributable to what co-conspirators in his view I think

17   is a little broader than the law.

18           MR. WYSHAK:  Well, the case is U.S. v. Bain.  It's

19   the First Circuit.

20           THE COURT:  I actually think he's right about the

21   law.  If you want to brief it beyond that, you can.

22           MR. KENDALL:  I have a different issue.

23           THE COURT:  She's first.

24           MS. MINER:  Thank you.

25           This document also contains hearsay within hearsay.

1    Even in the paragraph about Dr. Madison she's talking about

2    his medical assistants.  "He has agreed to try and help me

3    out, but I know he is afraid after -- outbursts.  In this

4    paragraph, she's talking about all these other things she has

5    heard from people in different people's offices that we don't

6    know who they are.

7            MR. WYSHAK:  You know, it goes to the knowledge of

8    Babich and --

9            MS. MINER:  My client wasn't even there.

10           MR. WYSHAK:  -- and the other executives of what

11   the caliber of doctors are, and now Dr. Madison becomes one

12   of their premier national speakers, this pill mill operator.

13           THE COURT:  Keep your voice down.

14           MR. TYRRELL:  You found your voice finally.

15           MR. WYSHAK:  Sorry.

16           It goes to their knowledge.  Whether it's true or

17   not, this is what she's reporting.

18           THE COURT:  Yes.  So I will also -- in fact, I will

19   right now give the hearsay limiting instruction because that,

20   I feel like I can do that without getting into too much

21   trouble.

22           MR. KENDALL:  I have a separate issue.

23           I don't think he's proven yet she joined the

24   conspiracy.  She may have joined it after this.  At the time

25   she sends this, there's no indication that she's looking to

1    sell drugs to people who are medically unnecessary, to bribe

2    someone, pr to do anything.  He does not have -- she's not a

3    member of the conspiracy.  So she's not saying this in

4    furtherance.  I think his timing is off.  I don't know when

5    she joins the conspiracy.

6            MS. MINER:  I don't think she was even identified

7    as a co-conspirator.

8            MR. WYSHAK:  Well, she is --

9            MS. WILKINSON:  She doesn't believe she is and

10   there hasn't been a foundation for it.

11           THE COURT:  Well, she doesn't have to believe that

12   she's a --

13           MR. KENDALL:  But you need to lay a foundation she

14   does something factually to show she has the intent to

15   distribute drugs, bribe or commit insurance fraud.  I don't

16   think she's done that yet.

17           MR. WYSHAK:  I don't think that every statement

18   that's made needs to be admitted as a co-conspirator

19   statement.  The reason that this is being admitted is for the

20   fact that it was said, and it shows knowledge on the part of

21   other members of the conspiracy.  Evidence prior to -- I

22   mean, assuming this conspiracy did not begin in August,

23   although I think other evidence will show that there have

24   been -- I think Matt Napoletano will testify that he

25   initially told Dr. Kapoor that using a speaker program was a

```
1    way to get money in the pocket of doctors and they did have a
2    speaker program prior to this.
3           I think that statements made, even if they
4    theoretically were prior to the conspiracy, are admissible to
5    show, again, the nature of the relationship between the
6    parties, the criminal intent that develops as a result.
7           MS. WILKINSON:  Your Honor, there's two different
8    ways to get it in.  Co-conspirator statements and then as you
9    just said --
10          MR. WYSHAK:  It's --
11          MS. WILKINSON:  Excuse me.  Can I finish -- I
12   respectfully disagree, it's very broad.  If it is on notice,
13   which sounds like he was changing, it certainly doesn't come
14   in against all the people that aren't on this email.  He just
15   changed the entire basis for it coming in.  She has not been
16   proven to be a co-conspirator.  They have not shown this is a
17   statement in furtherance.  So if it is for notice, it should
18   be only as to the people who were on email to show their
19   state of mind at the time.
20          MR. KENDALL:  May I add one thing?
21          THE COURT:  No, his turn.
22          MR. LAZARUS:  801(d)(2)(D), it's not just a
23   co-conspirator declaration.  She is also an agent and it
24   comes in on that exception.
25          MS. MINER:  But, Your Honor, that's the basis -- my
```

1    client wasn't even there, so she can't be an agent of the

2    people that are not there.

3            MR. KENDALL:  She's not the agent for Joe Rowan.

4            MR. TYRRELL:  Or my client, who was not even there.

5            MR. KENDALL:  Your Honor, we're missing an

6    important fact of the government's theory.  If Burlakoff

7    takes over the national sales operation, he becomes this

8    corrupt influence and gets everybody.  He doesn't take it

9    over until --

10           MR. WYSHAK:  That's not our theory.

11           MR. KENDALL:  If I could finish without

12   interruption.

13           This is before -- Napoletano is going to say the

14   speaker program was being run correctly at this time.  This

15   was a good speaker program.  The crime of the conspiracy

16   didn't start until after August 1.  Burlakoff comes in, I

17   think, October in the new role.

18           MR. WYSHAK:  He's hired in June.

19           MR. KENDALL:  If I could finish please, Fred.

20           They have to lay a foundation that there's a

21   factual basis to think people are actually conspiring and

22   breaking the law.  We've heard nothing as of August 1 to

23   establish that.

24           MR. WYSHAK:  So Burlakoff --

25           MR. KENDALL:  Babich is going to testify in another

1    week or two.  If they lay the foundation, they can put it in

2    with Babich, but there's no reason to put it in now when

3    there's no --

4            MR. WYSHAK:  I think the witness is perfectly

5    competent to testify about an email that she sent to the CEO

6    of this company who is lead defendant's right-hand man and

7    confidant.

8            Furthermore, Your Honor, he is hired in June of

9    2012.  The reason he is promoted to senior VP of sales is

10   because his southeast region did so well, which is where

11   Mr. Rowan works, and particularly did well utilizing the

12   speaker program that had been in existence prior to that.

13           This was not a scheme that Alec Burlakoff starts in

14   September of 2012.  This is something that was ongoing.

15           THE COURT:  This is what I'm going to do for the

16   time being.

17           She can testify about it.  We're not going to put

18   it in front of the jury.  We'll figure out if there's a

19   limiting instruction at lunch.

20           And she'll still be on at noon, right?

21           MR. WYSHAK:  Well --

22           THE COURT:  On direct?

23           MS. WILKINSON:  You don't have another hour on

24   direct with you her, do you?

25           MR. WYSHAK:  I have a lot of stuff to go through,

 1    but I think that this is, you know --

 2              THE COURT:  She can testify about it.  I'm going to

 3    let you show it to the jury, but I want to figure out -- I

 4    don't want to show it to the jury until we figure out if

 5    there's an appropriate limiting instruction that goes with

 6    it.

 7              MR. KENDALL:  Your Honor, I don't mean to be

 8    difficult, but I'm going to be --

 9              THE COURT:  Of course you don't.  You never do.

10              MR. KENDALL:  What is the basis for the admission?

11    Are you finding that the conspiracy has been established as

12    of August 1?

13              THE COURT:  No.  I'm finding that it is a

14    communication from her to him, and whether it comes in -- it

15    comes in as her impressions of what's happening, and then who

16    it comes in against is what I want to hash out over a

17    limiting instruction.

18              MR. KENDALL:  If I may respectfully, Your Honor,

19    her state of mind and his state of mind prior to the

20    conspiracy is irrelevant at this point.

21              THE COURT:  There hasn't been enough evidence to

22    determine the concept of the conspiracy.

23              MR. KENDALL:  Right.  So it can't come in for the

24    state of mind.  If I may suggest, they're going to have

25    Babich in a week.  Let them lay the proper foundation.  You

1    can't take them back once it's -- you can let it in with

2    Babich.

3            THE COURT:  I am going to let her testify about

4    what her impressions -- that she was asked by Babich what she

5    was doing with these doctors and that she conveyed to him her

6    impressions of these people.

7            MR. TYRRELL:  Without reading the document.

8            THE COURT:  Without reading the document.

9            MS. WILKINSON:  We still object to that basis, Your

10   Honor.

11           MR. KENDALL:  Can we get it without saying the word

12   "pill mill"?  If he does it orally, it's as bad as the --

13           THE COURT:  No.  I believe she's entitled to

14   testify what her impression of these doctors was.

15           MR. KENDALL:  If it's not in furtherance of the

16   conspiracy, who cares what her state of mind is?

17           THE COURT:  The first point is they get to build

18   their case.  I'm going to give another limiting instruction

19   on the hearsay.  We're not going to show the document or read

20   the document, but she can say that she was asked this by

21   Babich and she gave him the following information, and we'll

22   figure out about the exhibit at lunch.

23           MR. KENDALL:  Can we preserve our objection instead

24   of popping up --

25           THE COURT:  Yes.

1          MR. WYSHAK:  Just one more, Your Honor.

2              If this had occurred and there were not subsequent

3    conduct between the members of the conspiracy and Dr.

4    Madison, I would say that they had a legitimate gripe.  But

5    Dr. Madison becomes one of their most prolific writers, one

6    of their highest paid speakers.  He is termed a national

7    thought leader.  And this all happens after she has

8    communicated to Babich, the CEO, that this guy is running a

9    pill mill.

10         THE COURT:  I'm going to let you have it generally

11   speaking.  What I'm concerned about is whether or not they

12   get a limiting instruction about who it goes to.  Okay?

13         So get the testimony, I'll give an instruction.

14   (End of sidebar.)

15         THE COURT:  You guys are going to know the law

16   after this trial is over.  But hearsay is not generally

17   admissible.  So what somebody tells somebody else who is not

18   on the witness stand is not generally admissible if it's

19   coming in for the truth of the matter asserted.  But if

20   she -- but you can testify as to what you heard, but that

21   doesn't mean it's true.  It just means it's what she heard or

22   what her impression was.

23         So there's going to be some testimony that comes in

24   that will be based on things that she has been told or heard,

25   but the person that told it to her or that she heard it from

1     is not on the witness stand so it doesn't come in for the

2     truth of the matter asserted.  But you can consider it for

3     basically her state of mind, what she was thinking as a

4     result of hearing that information.  You can't conclude that

5     the information was true because that person is not on the

6     stand.  You haven't heard from them.  They haven't been

7     cross-examined.  Okay?

8          So that's an instruction you'll get over and over

9     again, but that's sort of the gist of it; that there's some

10    information that comes in for the limited purpose of what's

11    on her mind, but it doesn't come in for the truth unless the

12    witness that actually gave her the information is on the

13    stand.  Okay?

14         Go ahead, Mr. Wyshak.

15    BY MR. WYSHAK:

16    **Q.**  So, again, directing your attention to Exhibit 2 and to

17    that first email to you from Mike Babich, is it fair to say

18    he's giving you an instruction?

19    **A.**  I can't see the email.  Yes.

20    **Q.**  And what is his instruction to you?

21         MS. WILKINSON:  Your Honor, I'm going to object.

22    The witness is looking at, therefore, reading the document

23    after what we just discussed.

24         MR. WYSHAK:  She can use the document to refresh

25    her recollection.

1        THE COURT:  She can look at the document to refresh

2   her recollection, but at this point the document is not going

3   to be read to the jury until we sort out the ancillary issues

4   around the document.

5        MR. KENDALL:  I don't think she said she had a

6   failure of recollection, Your Honor.

7        THE COURT:  She can look at the document as long as

8   she's not testifying -- as long as she's not reading it.

9   BY MR. WYSHAK:

10  **Q.**  Do you have that memorized?

11  **A.**  No, but I know the gist of it.

12       MR. KENDALL:  Objection.

13       THE COURT:  She's testified -- ask her about the

14  document without her looking at it.  She said she has no

15  failure of recollection.

16  **Q.**  Did you receive an instruction from Mike Babich on or

17  about August 1?

18  **A.**  Yes.  It was just asking for a brief update on the high

19  decile physicians that we were supposed to be calling on.

20       So he was asking per, you know, where I was at, why

21  they weren't prescribing or, you know, where they were in the

22  sales process.

23  **Q.**  And he gave you a list of physicians he wanted you to

24  report about.  Is that fair to say?

25  **A.**  Yes.

1    **Q.**  Was Dr. Madison one of those physicians?

2    **A.**  Yes.

3    **Q.**  And did you, in fact, respond to his email and report on

4    Dr. Madison?

5    **A.**  Yeah, I did.  I reported, you know.

6            MR. KENDALL:  Objection, Your Honor.  Just --

7            THE COURT:  Yes.  Go ahead.

8    **Q.**  And tell us the substance of what you reported back to

9    Mike Babich about Dr. Madison.

10   **A.**  I took it as an opportunity to let somebody in a higher

11   position know what I was experiencing and that I was

12   uncomfortable with this office.  I explained to him that I

13   thought the operation at Dr. Madison's office was a fairly

14   shady one and that I was uncomfortable there, and that

15   basically he wouldn't give me the time of day and was not

16   really interested in Subsys.

17   **Q.**  And is it fair to say that you reported weekly on your

18   efforts with Dr. Madison?

19   **A.**  Yeah.  It was asked of us for a while to make these

20   weekly reports to update Mike, I suppose, about where we were

21   in the process with these people.

22           MR. WYSHAK:  Okay.  And if we could go to Exhibit

23   668.  Just for the witness.  If we could go to number 7.

24   **Q.**  Without telling us the substance of this document, can

25   you tell us the date of it?

1  **A.**  I believe it was probably sometime in August.

2          MR. WYSHAK:  I'm sorry, could you go back to the

3  first page and highlight the header.

4          THE WITNESS:  It was September 17 --

5          MR. WYSHAK:  Okay.

6          THE WITNESS:  -- 2012.

7          MR. WYSHAK:  And then go to page 7.  I'm sorry,

8  number 7.

9  **Q.**  So on September 17, you were again reporting to

10  Mr. Babich; is that fair to say?

11  **A.**  Yes.

12  **Q.**  On your efforts with Dr. Madison?

13  **A.**  Yes.

14  **Q.**  And if you look at paragraph 7 there, you're reporting on

15  numerous efforts that you made with Madison between August

16  and September; is that correct?

17  **A.**  Yes.

18          MS. WILKINSON:  Your Honor, I'm going to object.

19  Again, referring to a document before she says she needs her

20  recollection refreshed because it's got the same issue --

21          MR. WYSHAK:  I'll offer the document in evidence,

22  but they objected, so I'm trying to do this --

23          THE COURT:  Yes.  Because I'm -- the document is

24  going to come in.  I just want to resolve the issues we

25  discussed at sidebar.

1       So go ahead, Mr. Wyshak.

2    BY MR. WYSHAK:

3    **Q.**  As of the date that you reported to Mr. Babich on

4    September 17, were you successful in getting Dr. Madison to

5    write a prescription for Subsys?

6    **A.**  No, not at all.

7    **Q.**  All right.  Now, when Sunrise Lee becomes your

8    supervisor, does she come to Chicago at some point?

9    **A.**  Yeah.  She made a trip to Chicago fairly immediately

10   after the sales meeting.

11   **Q.**  Okay.  And did you have a conversation with her about

12   Dr. Madison?

13   **A.**  Yeah.  It was requested that for this particular meeting

14   they wanted me to set up a lunch with Dr. Madison, and her

15   coming into town, I understood, was specifically to meet with

16   him.

17   **Q.**  And did you do that?

18   **A.**  Yes.

19   **Q.**  And what happened at that lunch?

20   **A.**  So I catered in lunch for the office.  She came with me.

21   I had the usual talk with him about product information.  She

22   chatted with him a little bit, and then at the end of the

23   meeting she slipped him her business card and basically said,

24   If you would like to chat with me about this, kind of off the

25   record, give me a call.

1   **Q.**   Okay.  And did you subsequently have a conversation with

2   her about Dr. Madison?

3   **A.**   Yeah.  So Dr. Madison had reached out to her at some

4   point after that and had requested that they get together and

5   meet at a bar for drinks or appetizers or whatever.

6   Initially she expected me to attend this with her.  I had

7   plans to go out of town and then she kind of agreed, yeah,

8   maybe it would be better if I just meet with him myself.  He

9   may feel more comfortable that way.  So she went and met with

10  him I think at a hotel bar downtown.

11  **Q.**   And how would you describe Ms. Lee's sales technique by

12  this time?

13  **A.**   I would say that she did not have a very scientific- or

14  product-focused approach.  I think it was more social in

15  nature.  Definitely kind of sexually suggestive.

16          MR. HORSTMANN:  Objection, move to strike.

17          THE COURT:  If you could lay a foundation about

18  what she observed.

19          MR. WYSHAK:  Yes.

20  **Q.**   What causes you to say her technique was sexually

21  suggestive?

22          MR. HORSTMANN:  Objection.

23          THE COURT:  Overruled.  He can lay the foundation.

24  **A.**   I think, I mean, in the way she dressed, and again with

25  just --

1    **Q.**   What did she wear?

2    **A.**   On the verge of professional, but it was, you know, a lot

3    of times cleavage or just a little more sexual than I would

4    say an average sales rep would typically dress.  And

5    particularly for meetings we took, I remember showing up to a

6    dinner that Alec Burlakoff was attending and I had on, you

7    know, a button-down shirt and pants, what I would normally

8    wear to work, and she asked me why I was dressed so

9    conservatively.

10   **Q.**   Anything else about her sales technique?

11   **A.**   No.  Just like I said, that it was always kind of very

12   social in nature and often included things like meeting

13   outside of the office, or, you know, outside of a work

14   setting.

15   **Q.**   And did she go out for drinks with Dr. Madison?

16   **A.**   Yes.

17   **Q.**   And after that meeting with Dr. Madison, did she report

18   something to you?

19   **A.**   Yes.  So it was the next week and she said that

20   Dr. Madison had agreed at this meeting or this occasion that

21   she went out with him to write Subsys and that I was now

22   supposed to be spending my time focusing on Dr. Madison and,

23   you know, spending my efforts and time there with him.

24   **Q.**   So he was supposed to be your whale, so to speak?

25   **A.**   Yes.

1   **Q.**  And did you, in fact, start spending more time at

2   Dr. Madison's office?

3   **A.**  Yeah.  I mean, it was basically the direction that I

4   could pretty much forget about the rest of my territory and

5   my prescriptions needed to be coming from him.

6   **Q.**  How often would you go to his office after this meeting

7   with Sunrise?

8   **A.**  At least once a week, sometimes twice a week, depending

9   on the week.  More in the beginning of his writing and then,

10  you know.

11  **Q.**  Did Sunrise Lee ever go with you to Dr. Madison's office?

12  **A.**  Yeah.  There were several occasions where she either went

13  with me or just kind of showed up as I was there, and, you

14  know, I didn't know or expect that she was going to be there.

15  **Q.**  And how successful did you become with Dr. Madison?

16  **A.**  So at this point Dr. Madison definitely started writing a

17  lot of Subsys.  You know, most of his patient population was

18  certainly opiate-tolerant and it seemed to me like he was

19  taking every opportunity to put patients on Subsys that he

20  could.

21  **Q.**  Did he have a lot of cancer patients?

22  **A.**  No.

23  **Q.**  Do you know what percentage of his patient population

24  started using Subsys?

25  **A.**  It would be speculation, and I don't know that I was

1    there long enough to make that judgment.

2    **Q.**  Okay.  So did Dr. Madison become a speaker?

3    **A.**  Yeah.  So then he was appointed as the main speaker in

4    Chicago.

5              MR. WYSHAK:  All right.  Could we put 669 up.

6    **Q.**  Do you see that on the screen, Ms. Brown?

7    **A.**  I can't read it.

8    **Q.**  You can't read it?

9              MR. WYSHAK:  Let's go to the bottom of the page of

10   that first email.  So it will be -- if you just go to the

11   bottom and highlight the header.

12   **Q.**  Do you see the header there?

13   **A.**  Yes.

14   **Q.**  Okay.  And what is this?

15   **A.**  It's an email that I sent to Sunrise on October 4.

16   **Q.**  All right.  October 4, 2012?

17   **A.**  Yes.

18   **Q.**  Correct?

19   **A.**  Yes.

20             MR. WYSHAK:  And now if we go to the next page,

21   which is this email itself, highlight the last paragraph.

22   **Q.**  Are you reporting to Sunrise --

23   **A.**  Yes.

24   **Q.**  -- about Dr. Madison?

25   **A.**  Yeah.

```
 1              MR. WYSHAK:  Your Honor, I offer 669.
 2              MR. HORSTMANN:  No objection.
 3              THE COURT:  Anyone?  It's admitted.
 4              (Exhibit 669 admitted into evidence.)
 5              MR. WYSHAK:  All right.  Can we put it on the
 6       juries' screen.
 7       Q.  Could you read that highlighted paragraph?
 8       A.  I said, "Dr. Madison did ask that I lay off his Illinois
 9       clinic for now but asked that I camp out in his Indiana
10       clinic on Wednesdays.  He did mention that the Fentora rep
11       made lots of promises to him regarding speaker programs that
12       he never followed through with.  I think it is important that
13       we keep Dr. Madison happy where Fentora couldn't."
14       Q.  Okay.  So you had a conversation with Dr. Madison about
15       being a speaker?
16       A.  Yes.
17              THE COURT:  Sorry.  What's the date of this email,
18       please?
19              MR. WYSHAK:  October 4, 2012.
20              If we could move up the email chain to the next
21       one, up.  Highlight the header for the next one.
22       Q.  So the next document in this chain is an email from Alec
23       Burlakoff to you and to Sunrise Lee; is that correct?
24       A.  Yes.
25       Q.  And you had cc'd Mr. Burlakoff on that previous email; is
```

1    that correct?

2    **A.**  Yes.

3          MR. WYSHAK:  If we could highlight the body of that

4    email.

5    **Q.**  So Mr. Burlakoff says, "Let's make good on our commitment

6    to use Dr. Madison as a Subsys thought leader.  I am very

7    comfortable utilizing him as much as once a week, and he is

8    clearly an expert in the ROO market.  His knowledge,

9    expertise and ability to provide a credible presentation on

10   the ROO market is well documented over the past decade.

11   Let's move forward with getting programs scheduled

12   specifically using Dr. Madison to present via SciMedica as

13   soon as possible.  Lastly, please work with Sunny to assist

14   you in putting these programs together in a most efficient

15   manner."  Is that correct?

16   **A.**  Yes.

17   **Q.**  Sunny is who?

18   **A.**  Yes.

19   **Q.**  Who is Sunny?

20   **A.**  Sunrise Lee.

21   **Q.**  So let's talk about this concept that Dr. Madison is a

22   thought leader.

23          Did he strike you as a thought leader in the

24   medical community in Chicago?

25   **A.**  No, certainly not.  He was, as I mentioned earlier, sort

1    of notorious in the area of running the type of clinic that

2    he ran.  And I remember being concerned at the time that I

3    would be unable to get other physicians within the community

4    to attend these programs because everybody knew who

5    Dr. Madison was and certainly didn't respect him or the way

6    that he practiced medicine.

7    **Q.**  And did that turn out to be true, that you had a

8    difficult time getting people to come hear him speak?

9    **A.**  Yes, that was true.

10             MR. WYSHAK:  If we go up to the last, the top of

11   this page.

12   **Q.**  That's an email that is part of this chain that's asking

13   Matt Napoletano --

14   **A.**  Yes.

15   **Q.**  -- to get Dr. Madison trained to speak on Subsys; is that

16   correct?

17   **A.**  Yes.

18   **Q.**  And this is October 5, right?

19   **A.**  Yes.

20   **Q.**  And you are cc'd on this as well as Sunrise Lee; is that

21   correct?

22   **A.**  Mm-hmm, yes.

23             MR. WYSHAK:  All right.  If we could go to 1764.

24   Go to the header.

25   **Q.**  This is a email from you?

1    **A.**   Yes.

2    **Q.**   To Sunrise Lee?

3    **A.**   Yes.

4    **Q.**   About Dr. Madison?

5    **A.**   Yes.

6          MR. WYSHAK:  I offer it.

7          THE COURT:  Any objection?

8          MR. KENDALL:  No.

9          THE COURT:  He said no objection.  It's admitted.

10         (Exhibit 1764 admitted into evidence.)

11         MR. WYSHAK:  Can we highlight the body?

12   **Q.**   So you're reporting to Sunrise Lee about Dr. Madison; is

13   that correct?

14   **A.**   Yes.

15         MR. WYSHAK:  Can you highlight that first

16   paragraph.

17   **Q.**   So you say, "I spent today in the offices of Dr. Ring and

18   Madison to follow up with and help process PAs."  What's a

19   PA?

20   **A.**   Prior authorization, as I mentioned earlier, things that

21   insurance companies put in place when they don't initially

22   want to cover a product.

23   **Q.**   And what involvement would you have in processing a prior

24   authorization for a physician?

25   **A.**   A lot of times there was a lot of confusion surrounding

1    this paperwork and/or irritation that they had to do one at

2    all.  And so it was a lot of working with office managers and

3    things like that to basically give them advice as to how to

4    deal with these.

5    **Q.**  And what did you actually do?

6    **A.**  It was a lot of, you know, discussing prior auths that

7    had been shot back.  They would give reasons sometimes as to

8    why we had a letter of medical necessity that had been

9    approved for use, and, you know, I would give them that and

10   help with, you know, suggestions for filling that out and

11   just getting it back to the insurance company.

12   **Q.**  Did you get access to patient files in Dr. Madison's

13   office?

14   **A.**  Yeah, they typically had a stack of Subsys patients set

15   aside with prior auths that had been shot back.  So yes, I

16   saw those.

17   **Q.**  And what would you do in relation to the patient files?

18   **A.**  His office staff, I think Jennifer was her name, and I

19   would going through those and put the prior auths together

20   along with a medical letter of necessity if it was needed and

21   have it faxed back to the insurance company.

22   **Q.**  Did you understand at this point in time the rules

23   regarding HIPAA?

24   **A.**  I understood HIPAA rules from the place of being a

25   chiropractor, certainly, but I didn't know what the rules

1    were from the perspective of being a salesperson, and it had

2    been communicated to us that this was what we were supposed

3    to be doing.

4    **Q.**   And who communicated that to you?

5    **A.**   It was initially mentioned at the national sales meeting

6    by Alec.  At one point I was still not having a lot of

7    success with Dr. Madison right away, and he suggested that I

8    call one of the other reps, her name was Erica, in

9    California, who I think had really gotten on board with

10   filling out these prior auths, or at least assisting with

11   them in offices.  So he had me call her in order for her to

12   give me the directive that that's what I should be doing

13   rather than having him give it to me directly.

14          But it was, like I said, something that was almost

15   implied or maybe directed that this is what we were supposed

16   to be doing.

17          MR. WYSHAK:  Can we put up 504.  Blow it up.  I

18   don't know if you can see -- let's blow up just the first

19   part.

20   **Q.**   Do you recognize this document?

21   **A.**   Yes.  This is the approved medical necessity letter that

22   we had all been using.

23   **Q.**   And is it a document you were familiar with?

24   **A.**   Yes.

25   **Q.**   Did you use this document in trying to get prior

1   authorizations for Dr. Madison's patients?

2   **A.**   Yeah, it was something we were able to hand out to the

3   physician in his office for them to use.

4   **Q.**   And when did you get this document?

5   **A.**   It was emailed to us from somebody at corporate.  I don't

6   remember who, specifically, that person was.

7              MR. WYSHAK:  I offer it, Your Honor.

8              MS. MINER:  Your Honor, can we get a timeframe?

9   **Q.**   When did you first begin using this type of a letter?

10  **A.**   I don't remember when, specifically, this was given to

11  us.  I don't know.

12  **Q.**   Okay.  Well, was it at least at the time that you were

13  doing prior authorizations for Dr. Madison?

14  **A.**   Yes.

15  **Q.**   Did you have it?

16  **A.**   Yes.

17             MR. WYSHAK:  I offer it.

18             MS. MINER:  Objection.

19             THE COURT:  Basis?

20             MS. MINER:  Timing, and she doesn't know where she

21  got it or when she got it.  Lack of foundation.

22             THE COURT:  Overruled.

23             (Exhibit 504 admitted into evidence.)

24             MR. WYSHAK:  All right.  So this is sort of a --

25  can you put it up on the screen.

1    **Q.**   So this is sort of a fill-in-the blank, right?

2    **A.**   Yes.

3    **Q.**   And who have would actually filled in these blanks on

4    this type of a letter?

5    **A.**   Either Dr. Madison or one of his office staff that were

6    familiar with the patient in the case.

7    **Q.**   Okay.  Did you assist in drafting these letters?

8    **A.**   I was able to make suggestions, you know.  A lot of times

9    something like this would list past medications that had

10   failed or for some reason or another a patient might not be

11   able to take a medication via certain routes, orally or

12   whatever, so those were reasons that were given to put on

13   these letters.

14   **Q.**   So this is a letter that Insys wrote, correct?

15   **A.**   Yes.

16   **Q.**   And if you look at the first full paragraph there, it

17   says, "He/she," the second sentence, "He/she has difficulty

18   swallowing and digesting oral medications and is in almost

19   constant and severe pain."

20            What is the significance of difficulty swallowing

21   and digesting oral medication?

22   **A.**   So because Subsys was administered sublingually, you

23   bypass the need to swallow the medication.  And so it had

24   been figured out by somebody at some point that that

25   statement was a successful statement in getting these

1    approved by the insurance companies.

2    **Q.**   It was a way to get coverage, right?

3    **A.**   Yes.

4    **Q.**   You told us before that a lot of these patients were

5    taking Oxycodone or OxyContin?

6    **A.**   Yes.

7    **Q.**   Right.  And are those pills?

8    **A.**   Yes.

9    **Q.**   And were these the kind of patients who were being

10   switched to Subsys?

11   **A.**   Yes.

12   **Q.**   So if you can swallow a pill, you don't need the

13   sublingual spray, do you?

14   **A.**   Yes.  Or yes, I agree with what you said.

15   **Q.**   Yet Dr. Madison would sign these letters?

16   **A.**   Yes.

17           MR. WYSHAK:  Could you go down a little bit in this

18   document.  Just scroll down.  Put it back to normal size.

19   That second full paragraph, little above that.

20   **Q.**   So this letter goes on to say, "In an effort to control

21   his pain and improve his quality of life, he/she has been

22   prescribed the following medications."  And what's the point

23   of including that information?

24   **A.**   So this is just meant to showcase the list of other

25   products that the patient had been on, I think mostly

1  indicating that the patient had been on these products and

2  their pain was still not adequately controlled and therefore

3  needed Subsys.

4  **Q.**  And did you assist in gathering that kind of information

5  from patient files?

6  **A.**  Yeah.  I mean, it was the medication list.  Whatever the

7  current medication list was in the file is what they were

8  instructed to put there.

9         MR. WYSHAK:  Okay.  And can we do the bottom.

10  **Q.**  The last part of this reads, "A combination of obviously

11  the above drugs at the highest dose available tends to abate

12  pain fairly well.  However, severe breakthrough pain

13  continues to be a problem with a frequency that is

14  debilitating to this unfortunate patient."

15         It doesn't say "breakthrough cancer pain," does it?

16  **A.**  No.

17  **Q.**  And who came up with this language, "breakthrough pain"?

18  **A.**  I don't know.

19  **Q.**  But this is on the form you got; is that correct?

20  **A.**  Yes.

21  **Q.**  From Insys?

22  **A.**  Yes.

23  **Q.**  So they dropped the "cancer," correct?

24  **A.**  Yes.

25  **Q.**  All right.  And, again, this letter is sent to who?

1    **A.**   It's something that we were able to give to doctors at

2    offices that were managing prior auths.

3    **Q.**   And what did the doctor do with the letter?

4    **A.**   Fill it out and send it back to the insurance company

5    along with the prior authorization paperwork.

6            MR. WYSHAK:   Okay.   I'm sorry.   If we go to back to

7    now Exhibit 1764, which I believe is evidence.

8    **Q.**   You report in this email to Sunrise Lee that, "I will

9    spend each Tuesday and Wednesday in Dr. Madison's office.

10   Tuesday is a good day to go in and help process PA issues

11   from the prior week and that way I do not have to spend time

12   doing it Wednesday when the most important thing for me to do

13   is stick by Madison's side and collect scripts."

14           What does that mean?

15   **A.**   So Tuesdays his office manager was usually in the Indiana

16   office alone doing paperwork like this.   It was an

17   opportunity for me to go in there and help her with the PAs

18   that had come through for Subsys.

19           Wednesday was a day when Dr. Madison was in there

20   seeing patients and was the day that I was instructed to be

21   in there with him, you know, helping with paperwork that was

22   required to send a prescription in.

23   **Q.**   Okay.   When you say "stay by his side," does that mean

24   physically?

25   **A.**   Yeah.

1    **Q.**   Would you physically?

2    **A.**   Yeah, sometimes, mm-hmm.

3    **Q.**   And the next paragraph says, "Were you able to speak with

4    Dr. Madison last week regarding speaker training?  Just give

5    me a heads-up so I know where we stand on that for tomorrow

6    when I spend the day with him."

7            So who was it that was talking to Dr. Madison about

8    speaker training?

9    **A.**   I mean, it was -- I was asking Sunrise if she knew

10   anything about it, but I think it was maybe Matt Napoletano

11   that was supposed to be coordinating this with him.

12           I do remember that we had kind of an issue getting

13   him trained, and I don't know where the problem was in timing

14   with that.

15           MR. WYSHAK:  Okay.  Can we put 1762 up on the

16   screen and highlight the heading.  Just the heading.  Sorry.

17   **Q.**   So this is a email from Teresa Grasso.  Did you know who

18   she was?

19   **A.**   I don't remember her specifically, but apparently she

20   worked for SciMedica, which was the group that did the

21   logistics for the planning of these speaker programs.

22   **Q.**   And it's to you and Mr. Burlakoff?

23   **A.**   Yes.

24   **Q.**   Copying Sunrise Lee and Matt Napoletano, right?

25   **A.**   Yes.

1   **Q.**  And it regards his speaker training?

2   **A.**  Yes.

3          MR. WYSHAK:  I offer it.

4          THE COURT:  Any objections?

5          MR. TYRRELL:  No objection.

6          MS. WILKINSON:  No objection.

7          MR. KENDALL:  No objection.

8          MR. HORSTMANN:  No objection.

9          MS. MINER:  No objection.

10          THE COURT:  It's admitted.

11          (Exhibit 1762 admitted into evidence.)

12          MR. WYSHAK:  Can I have the body, just the body --

13   the body.

14   **Q.**  So essentially this is telling you that he's set up for

15   speaker training, correct?

16   **A.**  Yes.

17   **Q.**  And was this a prerequisite before he could actually do

18   it?

19   **A.**  Yes.

20   **Q.**  Now, I'd like to bring your attention to an event at a

21   restaurant called Roka.

22   **A.**  Yes.

23   **Q.**  And what was that location?

24   **A.**  Roka was a restaurant in River North, downtown Chicago.

25   **Q.**  And do you know who owned it?

1   **A.**   Yes.   John Kapoor.

2   **Q.**   And how did that location fit in to speaker programs?

3   **A.**   It was the location that all of our speaker programs took

4   place.   I don't remember who specifically made the

5   reservations there, but it was just the expectation that all

6   the Chicago programs happen there.

7   **Q.**   Okay.   And do you recall attending a dinner at Roka with

8   Dr. Madison, Ms. Lee, Alec Burlakoff, Larry Dillehay?

9   **A.**   Yes.

10   **Q.**   Was that a speaker program?

11   **A.**   I believe it was intended to be, yes.

12   **Q.**   Okay.   Was this sometime after Dr. Madison was trained?

13   **A.**   Yes, I believe so.

14   **Q.**   And can you tell us -- first you went to dinner; is that

15   correct?

16   **A.**   Yes.

17   **Q.**   And to the best of your recollection, who attended the

18   dinner?

19   **A.**   It was myself, Sunrise, Larry Dillehay, Matt Napoletano,

20   and then Jody Havens, who was the Chicago south rep at the

21   time.

22   **Q.**   Mm-hmm.   And were there -- there was a group of doctors

23   there who were listening to Dr. Madison speak about Subsys?

24   **A.**   Not that I remember.

25   **Q.**   Yet he was being paid to attend that event?

1    **A.**  I think so.

2    **Q.**  And approximately how long did the dinner last?

3    **A.**  I mean, we were probably there for at least a couple of

4    hours.

5    **Q.**  Okay.  And what happened after the dinner ended?

6           MR. HORSTMANN:  Your Honor, may we know when this

7    was?

8           THE COURT:  Time, please.

9    **Q.**  To the best of your recollection, when would you say this

10    occurred?

11    **A.**  It was sometime around Halloween.  I don't know when the

12    specific date was.

13    **Q.**  So we know that based upon the last exhibit, which was

14    October 5, that Dr. Madison had been qualified to be a

15    speaker, I guess, right?

16    **A.**  Yes.

17    **Q.**  The training was set up for that day?

18    **A.**  (No response.)

19           MR. WYSHAK:  And if we could go quickly to 681.

20    Just blow up the header there.

21    **Q.**  What is this email?

22    **A.**  I don't know what it's regarding specifically, but I see

23    that they had speakers listed on there as of October 9, 2012,

24    and Dr. Madison was the speaker.

25    **Q.**  But that's from this guy Sean Yu?

1    **A.**   Yes.

2    **Q.**   To all of the sales staff, right?

3    **A.**   Yes.

4    **Q.**   And you are cc'd on there, H. Brown.  That's you?

5    **A.**   Yeah.

6    **Q.**   And this is dated October 9, correct?

7    **A.**   Yes.

8              MR. WYSHAK:  I offer it.

9              THE COURT:  Any objection?

10             MS. MINER:  No.

11             THE COURT:  It's admitted.

12             (Exhibit 681 admitted into evidence.)

13             MR. WYSHAK:  Can we show the body and publish it

14    for the jury.

15   **Q.**   And who is Sean Yu?  Did you know him?

16   **A.**   I think he had something to do with sales analytic, but I

17   don't remember him specifically.

18   **Q.**   And he's saying, "Sales team.  Included is a list of the

19   new Subsys adopters just from yesterday.  Congratulations to

20   all the SSPs who have achieved this."

21             And there are two new doctors, right?

22   **A.**   Yes.

23   **Q.**   One is Roberts and one is Madison?

24   **A.**   Yes.

25   **Q.**   Madison is yours, right?

1    **A.**   Yes.

2    **Q.**   And you're an SSP?

3    **A.**   Yes.

4    **Q.**   So, again, we're in October and you believe that this

5    event after Dr. Madison was trained as a speaker, after he

6    started writing Subsys, this event occurred shortly after

7    that?

8    **A.**   Yes.

9    **Q.**   So now you told us you were at Roka, you had dinner.

10   What happened after that?

11   **A.**   After dinner, myself, Sunrise and Dr. Madison went to a

12   club called The Underground.  We walked in and sat down.  Got

13   bottle service and --

14   **Q.**   Let's back up a little bit.  So what is The Underground?

15   **A.**   The Underground is kind of -- or it used to be a trendier

16   club in Chicago, you know, open really late.

17   **Q.**   And what is bottle service?

18   **A.**   It's when you sit down and a waitress brings you a bottle

19   of whatever it is that you ordered, some kind of liquor,

20   usually, champagne maybe, with mixers and all of that, and

21   you have a table to yourself and you're just basically

22   serving yourself and being waited on.

23   **Q.**   And how much does bottle service generally cost?

24   **A.**   Depends on where you are, but I would say probably at

25   least 500 and up.

1    **Q.**  And who went to The Underground?

2    **A.**  It was me, Jody, the south rep, and Sunrise and

3    Dr. Madison.

4    **Q.**  All right.  So another sales rep, Jody Havens?

5    **A.**  Yes.

6    **Q.**  Was she at the dinner at Roka?

7    **A.**  Yes.

8    **Q.**  And what happened at The Underground?

9              MR. HORSTMANN:  Objection.  Sidebar.

10             THE COURT:  All right.  We're going to have a

11   sidebar now.  I think I'm going to release them for lunch.

12             So your lunch is scheduled to come up at 12:00, so

13   you may have to entertain yourselves with no food for seven

14   minutes, and we'll come back at quarter of 1:00.  Okay?

15             (Jury exits the courtroom.)

16   **SIDEBAR:**

17             MR. HORSTMANN:  Your Honor, we're now at The

18   Underground.  The government's case has gone, in my opinion,

19   as follows.  Dr. Madison has been approached by various sales

20   reps at this point that they're at The Underground.  He is a

21   prescriber of Subsys.  At this point in The Underground he is

22   in the speaker program.  And the only point in putting the

23   rest of The Underground story in is to --

24             THE COURT:  Okay.  Hold on.

25             MR. HORSTMANN:  -- my client's reputation.  It's

```
 1    not a bribe.  It's not a kickback.
 2              THE COURT:  I don't know what the rest of the story
 3    is.
 4              MR. KENDALL:  There was a lap dance.
 5              MS. MINER:  They're going to a say it was a lap
 6    dance.
 7              MR. WYSHAK:  I think the evidence, Your Honor,
 8    clearly shows that the witness had made repeated weekly
 9    attempts to solicit Dr. Madison to prescribe Subsys and she
10    had struck out until Ms. Lee comes on to the stage, so to
11    speak, and she goes out for these drinks with Dr. Madison and
12    all of a sudden now Dr. Madison is prescribing Subsys and
13    he's on the speaker payment plan.
14              And they go out to this restaurant, and instead of
15    acting as a professional, a person who is in a high
16    management position in this pharmaceutical company which is
17    marketing this very dangerous drug, she starts performing a
18    lap dance on Dr. Madison.  He has his hands on her breasts
19    and they are kissing and it's, you know, apparent that she is
20    using her physical --
21              THE COURT:  Wiles.
22              MR. WYSHAK:  -- physical attributes to get
23    business.  I think it's as clear as the day is long.
24              MR. HORSTMANN:  The deal was already done.  It's
25    not anything --
```

```
 1              THE COURT:  I know, Mr. Horstmann.  I get why you
 2    don't like this piece of evidence, but I think it comes in.
 3              Is that the best argument that you have?
 4              MR. HORSTMANN:  Your Honor, if it's a bribe, if
 5    that's what his case is, he's already on board.  The
 6    government's case is in.
 7              THE COURT:  It's supposed to be a speaker program,
 8    right?
 9              MR. WYSHAK:  Yeah, and he's on board.  This is the
10    beginning.
11              MR. HORSTMANN:  She'll testify differently on
12    cross.
13              MR. WYSHAK:  He could have stopped writing at any
14    minute if he didn't get the inducement.
15              THE COURT:  Speaker program, nobody shows up.  So
16    instead of him leaving, he gets a lap dance.  It's not savory
17    but --
18              MR. KENDALL:  Your Honor, he gets paid $1700 or
19    $1600, apparently.
20              THE COURT:  Plus a lap dance.
21              MR. KENDALL:  That's the whole point, Your Honor.
22    People socialize in the business world.  There's no evidence
23    here that she was prostituting herself and trading a social
24    relationship for business.  Lots of people socialize with
25    their clients and their customers.  There's nothing
```

1   inappropriate about that.  Your Honor, to assume that it's an

2   act of prostitution --

3          THE COURT:  I'm not assuming it's an act of

4   prostitution.

5          MR. KENDALL:  She's socializing with him in a way

6   many of us here would not think appropriate.  That's not to

7   say that's an inducement or a quid pro quo.

8          MR. WYSHAK:  This is a frivolous argument.

9          THE COURT:  That's something the jury can decide.

10          MR. HORSTMANN:  Under 403 --

11          THE COURT:  That is your best argument.

12          MR. HORSTMANN:  It might be more probative if this

13   occurred before the prescriptions, before the speaker

14   program.  But to put it afterwards, it tilts the other way.

15   It's clearly more prejudicial than probative.  He's already

16   on board.

17          MR. KENDALL:  It's a gratuity, not a bribe, Your

18   Honor, and a gratuity is not relevant to the case.

19          MR. TYRRELL:  You should tone it down a little bit.

20   You don't have to use the words "lap dance."  Can we say

21   "dance provocatively"?  Do we have to get to "fondling her

22   breasts"?

23          THE COURT:  Yes, I think --

24          MR. WYSHAK:  She's entitled to testify to what she

25   observed.

1          MR. TYRRELL:  But that's a characterization.

2          MR. WYSHAK:  This is a young kid.  She just

3   graduated college.  It's her first job in the pharma

4   industry, and this is how her managers --

5          THE COURT:  Look.  I think you're entitled to it,

6   but I think that it's a fair point that if you could tone it

7   down, could we avoid the touching of the breasts, just sort

8   of give a general overview of what some of us might deem to

9   be inappropriate physical interaction with her.  If you want,

10  sitting on his lap --

11         MR. HORSTMANN:  It's like adult entertainment.

12         MR. WYSHAK:  Further --

13         MR. TYRRELL:  He also hasn't laid a foundation that

14  she even knows what a lap dance is.

15         THE COURT:  Do you want him to lay the foundation?

16         MR. WYSHAK:  I would also say this, Your Honor.  If

17  this were, as Mr. Horstmann wants to argue, a single event

18  where she went out and had drinks with him and he wrote and

19  that was the end of it, that might be a better argument.  But

20  this is a continuing course of conduct.

21         THE COURT:  I'm going to let you have it in.  I

22  applaud Mr. Horstmann and his comrades for doing as best a

23  job as they can with what is a clearly very probative but

24  also prejudicial piece of evidence.

25         So I just -- given the inflammatory nature of it,

```
 1    just ratchet it down a little bit.  You can have it.
 2            MR. WYSHAK:  Okay.
 3            THE COURT:  Wait.  As long as here we're here, on
 4    the other email -- I forget which the exhibit number it is.
 5            MR. KENDALL:  Exhibit 2.
 6            MR. STOJILKOVIC:  There was another one.
 7            MR. KENDALL:  And there was a later version of
 8    that.
 9            THE COURT:  It seems to me from the evidence that
10    I've heard that she joined the conspiracy by early October
11    but not by -- not in September.  So I think that -- I think
12    it comes in but under an agency theory.  So that would be
13    against those for whom she is an agent.
14            So I will give a limiting instruction on people
15    that weren't with the company and that it's an agency theory.
16            MR. STOJILKOVIC:  Your Honor, on that we would just
17    object that she was an agent of Insys.  Insys is not a
18    defendant in the case.  It is true that our client is the
19    chair -- they're chairmen of the board.  That doesn't mean
20    that anything any employee does is attributable or admissible
21    against him.
22            MR. KENDALL:  Who does the Court find is the
23    principal that's responsible for her knowledge?  I don't
24    think -- it's not within the relevance of any of our clients
25    that she's going to report this to them.  My client is a rep
```

```
1   out in Florida.
2             THE COURT:  Right.  So you're entitled to a
3   limiting instruction on it.
4             MR. KENDALL:  It's clearly a 401 issue.  It's --
5             MR. WYSHAK:  It's clearly relevant.  It's not 401.
6             MR. KENDALL:  Relevant to who is the issue.
7             MR. WYSHAK:  I suggest that --
8             THE COURT:  Well, it's hard to sort out relevance
9   because we don't know -- was it Babich or Burlakoff?
10            MR. WYSHAK:  Babich.
11            THE COURT:  So we don't know what Babich did with
12  it, okay?  But I will give you a limiting instruction at this
13  point in time that it certainly goes to what she told Babich.
14  I think it goes to what she told Kapoor.
15            MS. MINER:  But nobody else.
16            MR. STOJILKOVIC:  What I would note is what is
17  clear on the issue is that email -- in terms of what I've
18  seen in the evidence, it was never forwarded to John Kapoor.
19  So I object to the instruction that says kind of
20  constructively this is notice to Kapoor.  I think to say this
21  is notice to Babich, if Mr. Babich comes here and says, you
22  know, that he relayed it or something, that's a different
23  issue.  But I haven't seen this in the discovery.  The email,
24  I am confident, never goes to my client.
25            MR. KENDALL:  I don't think any of our five --
```

```
 1              MS. MINER:  No.  Mine wasn't even there.
 2              THE COURT:  I don't know what the next testimony
 3    is, but she passes it on to Babich.  I think it comes in for
 4    that.
 5              MR. KENDALL:  We don't know if Babich is in the
 6    conspiracy yet.
 7              THE COURT:  We don't, but he's testifying after
 8    her, so I'm going to let them build their case.  But I will
 9    give a limiting instruction on the agency theory.
10              MR. TYRRELL:  As to people who were not employed at
11    the time.
12              MS. MINER:  She didn't report to.
13              THE COURT:  Not employed or that -- at the moment
14    that it is only -- what do you want to do about Kapoor?  I
15    don't want to be out on the limb on this, under an agency
16    theory, not a co-conspirator theory.
17              MR. LAZARUS:  I think, Your Honor, I
18    would recommend, like you said, it would only be to people
19    she reported to, not to people employed -- not as a factual
20    question limited for them but in terms of admissibility, I
21    think that's the safe way to go.
22              MR. KENDALL:  Who do you contend she's reporting to
23    at this time period?
24              MR. LAZARUS:  She --
25              THE COURT:  Certainly Babich.  What about Kapoor?
```

1          MR. LAZARUS:  So Your Honor is inquiring -- my

2     position as to Babich and Kapoor, Your Honor, I think under

3     the agency theory the Court has to find by a preponderance

4     that there is an agency relationship between them.

5          And so here, John Kapoor was the chairman of the

6     board.  There will be testimony where early in the case the

7     testimony would be that he was very involved in all of this

8     and that he controlled Babich's actions.

9          So Kapoor is the chairman of the board, Babich acts

10    on his behalf, Babich is doing his bidding when he's telling

11    the employees things, and so she's reporting to Babich.

12         MR. STOJILKOVIC:  If I may --

13         THE COURT:  Is it for me or the jury to determine

14    the agency relationship?

15         MR. LAZARUS:  For the Court to determine

16    admissibility, you have to find by a preponderance that

17    there's an agency relationship existing.

18         MR. STOJILKOVIC:  Your Honor, may I be heard on

19    that?

20         As you heard in opening, part of our defense is

21    that our client didn't know about certain things.  Now he was

22    involved and the testimony -- we're talking about a four-year

23    period.  Some things he knew about.  Some things he didn't.

24    It is inappropriate to admit any statement provided to anyone

25    at Insys on the theory that it goes to our client's

1    knowledge, I don't know how we can -- when our client

2    disputes ever having notice of that fact.

3              And I also think it's unnecessary at this point,

4    because we have Mr. Babich coming, we know that her direct

5    report at that time, it was to Hemenway and Babich, and that

6    email is Hemenway/Babich.  They can pick it up from Babich

7    on.

8              THE COURT:  I think that's the safer way to do it.

9              MR. WYSHAK:  It's black letter law, though, Your

10   Honor, I mean, especially in a RICO conspiracy.  Not every

11   member of the conspiracy has to know what every other member

12   of the conspiracy was doing.  That's the nature of RICO.

13             MR. KENDALL:  It's not a co-conspirator statement.

14             THE COURT:  I completely agree with you, but she's

15   not a member of a conspiracy.

16             MR. WYSHAK:  But Babich is.

17             THE COURT:  Then it would come in --

18             MR. WYSHAK:  It doesn't mean that the conspiracy

19   existed --

20             THE COURT:  All I'm suggesting is that we put it in

21   against her, against Babich.  Defer on the rest of them until

22   we've heard from Babich.

23             MR. WYSHAK:  Okay.

24             MR. KENDALL:  Your Honor, can I just say two

25   things?  With respect to the agency issue, it has to be

1    within the agent's responsibilities to be gathering this

2    information and relaying it.

3            MR. WYSHAK:  He instructed her to do it.

4            MR. KENDALL:  If -- if you don't interrupt me,

5    Fred.

6            So if I'm the chairman of a company and I've got a

7    million employees, everything told to a million people is not

8    within the scope of what they're going to relay to me.

9            THE COURT:  I'm not totally sure that's true,

10   right, but he makes a good point, that it's not the

11   corporation that's charged.

12           MR. KENDALL:  Right.

13           THE COURT:  The whole part --

14           MR. KENDALL:  Yes.  The second point, Your Honor,

15   is, I'm just harping on this, a statement to Babich, if

16   people aren't in a conspiracy with him is, I would say,

17   highly prejudicial without any relevance to the case.  He can

18   know all the wrong things in the world.  If he's not part of

19   a conspiracy, who cares?

20           THE COURT:  So I'm limiting it.  She's on the stand

21   now.  Something has come to first and something has to come

22   second.  You can decide whether she's the chicken or the egg.

23   But what I'm going to do now is it's going to come in for the

24   fact this is what she said to Babich.  I will give a limiting

25   instruction that at this point in time she's giving the

1    information to Babich and that you can't -- however you guys

2    want to word it, but the gist of it is that there isn't any

3    basis to hold it against the others at this point.  Now, what

4    Babich says he does with it --

5           MR. KENDALL:  May I ask, then, Your Honor, so we

6    can reduce this amount of colloquy amongst us, if the

7    government could now give us a proffer of when is the date

8    they think the conspiracy is established and what facts

9    they're relying on to show it as of that date?

10           MR. WYSHAK:  I think you have criminal conduct

11   right from the beginning, Your Honor.  I think she testified

12   that, you know, in her initial training back in March they

13   were already telling them to engage in off-label marketing.

14           MR. KENDALL:  That's not charged in this case, Your

15   Honor.

16           MR. WYSHAK:  It doesn't matter whether it's

17   charged.

18           MR. KENDALL:  It's not even illegal.

19           MR. WYSHAK:  Who says it's not illegal?

20           THE COURT:  Hold on, hold on.  There may well have

21   a conspiracy in March, I don't know yet, but she's not a

22   member of it in March.

23           MR. KENDALL:  Our clients aren't a part of that.

24           MR. WYSHAK:  If she's engaged in selling the

25   product pursuant to their instructions to, you know, drop the

1   cancer, you know, mention it the first time you talk to a

2   doctor then just talk about breakthrough pain after that, to

3   engage in HIPAA violations by reviewing patient files, you

4   know, this company from day one is trying to cut corners to

5   sell this product.

6              THE COURT:  That may be.  But in terms of

7   co-conspirator hearsay statements in March, there isn't

8   enough now to make her a member of the conspiracy.  The HIPAA

9   violations I don't think happened until October.

10             MR. WYSHAK:  With her.

11             THE COURT:  You may be able to establish a

12  conspiracy, but I don't at the moment --

13             MR. WYSHAK:  Okay.

14             THE COURT:  -- conspiracy is October 4.

15             MR. WYSHAK:  I'm not saying that the government

16  concedes that the conspiracy did not begin until after Alec

17  Burlakoff --

18             THE COURT:  I'm not going to make them do a proffer

19  at this point.  If you want a limiting instruction given at

20  quarter of 1:00 or tomorrow, whenever you want it -- how much

21  longer do you have with her?

22             MR. WYSHAK:  Probably an hour.

23             MR. TYRRELL:  When the doctor comes in.

24             THE COURT:  We're not going to get to the next

25  break.  If you want a limiting instruction around that

1    document, someone is going to have to draft it over lunch.

2            MR. TYRRELL:  One last thing on behalf of

3    Mr. Horstmann, one last thing.  I'm just asking that

4    Mr. Wyshak speak with Ms. Brown and tell her that she should

5    not say "lap dance" or talk about fondling breasts, dancing

6    provocatively or in a sexually suggestive manner or something

7    like that.

8            THE COURT:  He doesn't have to cleanse it to the

9    point of Mr. Rogers' neighborhood.

10           MR. WYSHAK:  I'll ask her not to use the term "lap

11   dance."  She will say she was sitting on him, and he was

12   touching parts of her body inappropriately.  How is that?

13           THE COURT:  That's fine.

14           MR. LAZARUS:  What time would you like us back?

15           THE COURT:  I'm going to bring the jury back at

16   quarter of 1:00.  So if you want me to look over the limiting

17   instruction, come back at 12:35 or 20 of.

18           MR. LAZARUS:  Thank you, Your Honor.

19           (End of sidebar.)

20           (Recess taken 12:11 p.m.)

```
1                    **** AFTERNOON SESSION ****

2            THE CLERK:  All rise for the jury.

3            (The jury enters the courtroom.)

4            THE CLERK:  Court is back in session.  Please be

5    seated.

6            THE COURT:  Mr. Wyshak, do you want me to begin

7    with the limiting instruction?

8            MR. WYSHAK:  Sure.

9            THE COURT:  As you all may recall, there were two

10   exhibits this morning that the witness testified about.  We

11   had a long sidebar about it.  You actually weren't shown

12   those exhibits because I deferred ruling on them.  I am now

13   going to admit those two exhibits with the following

14   instructions.

15           Exhibits 2 and 668 are not being admitted for the

16   truth of the matters asserted.  At this time, you may only

17   consider them for state of mind and notice as of the date of

18   the emails to Ms. Brown, Mike Babich, and with respect to

19   Exhibit 668, Alec Burlakoff.

20           So in other words, the people that were copied on

21   the email got the information and you can consider that

22   information for the fact that they were put on notice for

23   what was in the email.

24           Again, you can't accept what was in the emails as

25   truth because it's just her conveying her impressions of what
```

1     she -- what was what was in her mind.

2               Is that satisfactory?

3               MR. TYRRELL:  Yes, Your Honor.  Assuming it

4     preserves our objection.

5               THE COURT:  Go ahead, Mr. Wyshak.

6               MR. WYSHAK:  Thank you, Your Honor.

7     BY MR. WYSHAK:

8     **Q.**  Ms. Brown, before we broke we were talking about the

9     events that occurred at the Underground --

10    **A.**  Yes.

11    **Q.**  -- after the Roka dinner.  Again, tell us who went to the

12    Underground?

13    **A.**  It was myself, Sunrise, Jodi Havens, and Dr. Madison.

14    **Q.**  I think you told us you got bottles served to you at a

15    table?

16    **A.**  Yes.

17    **Q.**  What happened after that?

18    **A.**  Jodi and I were up dancing just kind of back and forth.

19    At some point we turned around.  Sunrise had just been

20    hanging with Dr. Madison mostly, and she was sitting on his

21    lap, kind of bouncing around, and he had his hand sort of

22    inappropriately all over her on her chest.  At that point,

23    Jodi and I got a little bit uncomfortable, I think, and

24    decided to leave.

25    **Q.**  How did that impact you as an employee of this company?

1    MR. HORSTMANN:  Objection.

2    THE COURT:  Basis?

3    MR. HORSTMANN:  Relevance.  403.

4    THE COURT:  Overruled.

5  **A.**   It was a disappointment.  Certainly something that I as

6  an employee was not willing to engage in, and I would assume,

7  you know, most of the other women as well.

8    MR. HORSTMANN:  Objection.  Move to strike.

9    THE COURT:  Certainly something that I as an

10  employee was not willing to engage in.  That's her answer.

11  Anything that she assumes after that is stricken from the

12  record and you shouldn't consider it.

13  BY MR. WYSHAK:

14  **Q.**   Well, did you feel like you were getting a message about

15  what tactics to use to market this product?

16    MR. HORSTMANN:  Objection.

17    MS. WILKINSON:  Objection.

18    THE COURT:  Sustained.

19  BY MR. WYSHAK:

20  **Q.**   Is it fair to say that Dr. Madison engaged in these

21  so-called speaking events after he was trained?

22  **A.**   Yes.

23  **Q.**   And between the time he was trained in October and the

24  time you left in December, approximately how many times do

25  you think you set up a speaker event for him?

1    **A.**   I think it was probably five or six times.

2              MR. WYSHAK:  Could we put 1759 up on the screen.

3    And if we can scroll down to the initial email and zoom in on

4    the header.

5    BY MR. WYSHAK:

6    **Q.**   Okay.  So this is an email from Alec Burlakoff to you; is

7    that correct?

8    **A.**   Yes.

9    **Q.**   November 8?

10   **A.**   Yes.

11   **Q.**   If you can, take a look at the body.  Zoom in on the

12   body.  Talking about a dinner involving Dr. Madison, correct?

13   **A.**   Yes.

14             MR. WYSHAK:  I offer it, Your Honor.

15             MS. WILKINSON:  No objection.

16             THE COURT:  It's admitted.

17             (Government Exhibit No. 1759 admitted.)

18   BY MR. WYSHAK:

19   **Q.**   So Alec Burlakoff is asking you to send him the names of

20   the five clinicians that were at Roka.

21             Is that where you always held these dinners, at

22   Mr. Kapoor's restaurant?

23   **A.**   Yes.

24   **Q.**   He's asking you for the five clinicians who were there.

25   What's that all about?

1    **A.**   Generally with the speaker program, it's expected that

2    the attendees of the program are other physicians that would

3    be potentially writing the product at some point.  So they're

4    there to learn.

5            But that was not always the case or the directive

6    with the speaker programs that we were having with

7    Dr. Madison.  In fact, I don't think I ever had one where

8    there were five clinicians in attendance.

9    **Q.**   So I think you told us that this company SciMedica was

10   running these speaker programs for a while?

11   **A.**   Yeah.  They were running the logistics, I think.

12   **Q.**   And this appears to be a program that had not been

13   scheduled.  Is that what's going on here?

14   **A.**   I wouldn't remember the details of it, but it looks like

15   at this point we were still using SciMedica to put the pieces

16   of it together.

17   **Q.**   He says, "I am working to get this covered as an official

18   ISP.  We were late submitting the program due to

19   Dr. Madison's last-minute confirmation."

20   **A.**   Yeah.  I'm remembering that this happened.  It was sort

21   of a last-minute thing.  I don't know if it was Sunrise or

22   somebody that was in town to meet with him, but it happened

23   kind of last minute, so we didn't have time to put the

24   paperwork through SciMedica that you would normally submit to

25   the have a speaker program.  But it was allowed to happen.

1  **Q.**  Why was it such an emergency to set up a speaker program

2  for him?

3  **A.**  I think Dr. Madison was probably anxious to get paid for

4  a program, and I think Insys was probably anxious to pay him

5  to do one.

6          MS. WILKINSON:  Objection.  Move to strike.

7          THE COURT:  It's sustained.  You can't testify

8  about things that might have been in somebody else's mind.

9  She thinks he was probably anxious to get paid.  And then

10  strike her answer with regards to what she thought Insys

11  might have wanted.

12  BY MR. WYSHAK:

13  **Q.**  I notice Mr. Burlakoff uses the term clinicians, five

14  clinicians.

15  **A.**  Mm-hmm.

16  **Q.**  Does that mean that they weren't doctors who were

17  prescribing writers for opiates?

18          MS. WILKINSON:  Objection.  Again to what he meant

19  by that.

20          THE COURT:  You can ask her about her

21  understanding.

22  BY MR. WYSHAK:

23  **Q.**  Were there five doctors who were actual prescribers of

24  opiates who attended a dinner like this?

25  **A.**  No.  There might have been friends of the doctor, but

1    mostly it was never physicians that were assigned to me, you

2    know, that I was supposed to be selling Subsys to.

3    **Q.**  Were these dinners that you were putting together for

4    Dr. Madison events intended to educate the medical community

5    in the Chicago area?

6    **A.**  Yes.

7    **Q.**  They were?

8    **A.**  They were, yes.

9    **Q.**  Is that what happened?

10   **A.**  No.

11   **Q.**  Why don't you explain to us what really happened?

12   **A.**  My understanding of the definition, "clinicians," was

13   that it was something that was something that was never fully

14   defined.  I knew I would have trouble getting physicians from

15   the Chicago community to attend.  I'm sure I communicated

16   that to the company at some point.

17           So it was just kind of considered acceptable for

18   the physician to invite sort of whomever he wanted to these

19   events, whether it be other doctors who were friends of his.

20   At one time there was someone who did like colonoscopies that

21   came.  So a friend of his again, but obviously not involved

22   with Subsys at all.

23   **Q.**  Okay.  And you had a slide deck for these presentations,

24   correct?

25   **A.**  I didn't.  But I think he was supposed to have had one,

1   yes.

2   **Q.**   He was supposed to have a slide deck?

3   **A.**   Yeah.

4   **Q.**   That's like a PowerPoint?

5   **A.**   Yes.

6   **Q.**   Did he actually get up and make a speech using the

7   PowerPoint?

8   **A.**   No.  If Subsys was mentioned at all, he would usually

9   stand up and say this is a product that I support.  The

10  company is sponsoring this dinner, but there was usually very

11  little product information given at these dinners.

12  **Q.**   So how would you actually describe these events?

13  **A.**   Mostly as social outings.  Just a reason to gather people

14  and have dinner and pay Dr. Madison for it.

15  **Q.**   And why would the company want to pay Dr. Madison to take

16  him out to dinner with some of his friends?

17             MS. WILKINSON:  Objection, Your Honor.

18             MR. WYSHAK:  Okay.  I'll withdraw that.  That's a

19  bad question.

20  BY MR. WYSHAK:

21  **Q.**   Did you discuss with Sunrise Lee the fact that you really

22  couldn't get real doctors to attend these events?

23  **A.**   I don't remember who I specifically discussed it with,

24  but yeah, it was certainly a concern that was raised.

25             MR. KENDALL:  Objection, Your Honor.  Move to

1   strike.  Doesn't remember who it was.

2          THE COURT:  I'm not going to strike it.  The jury

3   heard the answer.

4   BY MR. WYSHAK:

5   **Q.**  Did you have an understanding based upon your role as a

6   salesperson and organizer of these events why the company

7   would subsidize dinner for Dr. Madison and his friends?

8          MS. WILKINSON:  Objection.

9          MR. KENDALL:  Objection.

10          THE COURT:  Overruled.

11  **A.**  It was made clear that the speaker programs were going to

12  be the new vehicle for garnering partnerships with physicians

13  at the national sales meeting that we went to in Arizona.

14  And that the idea was that these weren't truly meant to be

15  educational programs, but they were meant to be rewards

16  basically for the physicians that we had on board

17  prescribing.  So it was sort of a tit for tat relationship.

18  BY MR. WYSHAK:

19  **Q.**  And did Dr. Madison, in fact, prescribe Subsys as a

20  result of this relationship that you began with him?

21  **A.**  Yes.

22          MR. WYSHAK:  Could we put 1758 up on the screen and

23  zoom in on the header.

24  **Q.**  This is an email from Sunrise Lee to you, correct?

25  **A.**  Yes.

1    **Q.**   Dated November 9, 2012?

2    **A.**   Yes.

3    **Q.**   If you could, go to the body.  And that's about

4    Dr. Madison, right?

5    **A.**   Yes.

6              MR. WYSHAK:  I offer it.

7              THE COURT:  Any objection?

8              MS. MINER:  No.

9              THE COURT:  It's admitted.

10             (Government Exhibit No. 1758 admitted.)

11             MR. WYSHAK:  Can we publish it?

12   BY MR. WYSHAK:

13   **Q.**   All right.  So here Sunrise Lee is asking you, "I need to

14   know ASAP:  How many prescriptions Madison has written to

15   date; confirmed scheduled speaker programs for each speaker;

16   requested scheduled programs for each speaker."

17             What's she asking you there?  What did you

18   understand she was concerned about?

19   **A.**   My perception of this email was that pressure was being

20   put on me to continue pressuring Dr. Madison to keep up his

21   prescribing habits.  The idea was that for physicians who

22   were speakers, that if we were going to continue --

23             MR. HORSTMANN:  Objection.  Move to strike.

24             THE COURT:  I'm not going to strike it.  But she

25   answered your question.  So ask your next question.

1    BY MR. WYSHAK:

2    **Q.**  I think you were trying to explain the linkage --

3           THE COURT:  What was she asking you?  What did you

4    understand?  Her perception of the email was that pressure

5    was being put on her to continuing pressuring Dr. Madison.

6    And then ask your next question.

7    BY MR. WYSHAK:

8    **Q.**  Okay.  Was there a linkage between giving doctors speaker

9    events and their prescription-writing habits?

10    **A.**  Yes.  So it was expected that for physicians who were

11    being paid to speak for us that they maintain and/or continue

12    to exceed their old writing habit.  So if there was a drop in

13    their prescription writing, it was immediately looked at and

14    questioned and then turned around on me to continue to put

15    pressure on him that if he's going to keep doing these

16    programs, he needs to keep his writing up.

17    **Q.**  Okay.  And did you receive some of that pressure from

18    Sunrise Lee?

19    **A.**  Yes.

20           MR. WYSHAK:  Could we put 1757 up on the screen.

21    And zoom in on the header.

22    BY MR. WYSHAK:

23    **Q.**  So this is an email from you to SciMedica and Sunrise Lee

24    about Paul Madison, correct?

25    **A.**  Yes.

1          MR. WYSHAK:  I offer it, Your Honor.

2          MS. WILKINSON:  No objection.

3          THE COURT:  It's admitted.

4          (Government Exhibit No. 1757 admitted.)

5          MR. WYSHAK:  Can we go to the body, please.

6     BY MR. WYSHAK:

7     **Q.**  All right.  So now this is November 12.  "Here is a

8     last-minute request to do a speaking program for Dr. Madison

9     this Friday 11/16 at Roka Akor.  Reservation has already been

10    made and Dr. Madison has been confirmed.  Let me know if you

11    need anything else."

12              Is that fair to say?

13    **A.**  What's that?

14    **Q.**  Did I read that correctly?

15    **A.**  Yes.

16    **Q.**  So again, this is now at least the third speaker event

17    we've talked about?

18    **A.**  Probably.

19    **Q.**  Was this another one of those social events?

20    **A.**  Yes.

21          MR. WYSHAK:  Can we put up 1765.  Again zoom in on

22    the header.

23    BY MR. WYSHAK:

24    **Q.**  This is from Alec to you, Alec Burlakoff to you; is that

25    correct?

1    **A.**   Yes.

2    **Q.**   Dated November 13?

3    **A.**   Yes.

4    **Q.**   Go to the body, to the last line.  And again you

5    reference Dr. Madison; is that right?

6    **A.**   Yes.

7            MR. WYSHAK:  I offer it.

8            THE COURT:  Any objection?  Admitted.

9            (Government Exhibit No. 1765 admitted.)

10           MR. WYSHAK:  Can we publish it?  Can we go to the

11   header for this one?  I'm sorry.  For that email.

12   BY MR. WYSHAK:

13   **Q.**   So originally you send this to Sunrise Lee and cc Alec

14   Burlakoff, correct?

15   **A.**   Yes.

16   **Q.**   And your last line there is, "Busy day at Madison's

17   office today.  Will report back with a bunch of RXs tonight."

18           What's that mean, RXs?

19   **A.**   That's shorthand for prescription.

20   **Q.**   So Dr. Madison is completing his part of the deal here?

21   **A.**   Yes.

22   **Q.**   If you go up to the top, Burlakoff says, "Thanks for the

23   update, all sounds great."  Is that correct?

24   **A.**   Yes.

25           MR. WYSHAK:  Can we put 1755 up.  Zoom in on the

1    header.

2    **Q.**   This from Sunrise Lee to your sales team, correct?

3    **A.**   Yes.

4    **Q.**   And also blind copied to you, correct?

5    **A.**   Yes.

6    **Q.**   Dated November 26, 2012.

7             MR. WYSHAK:  And if you go to the body.  Zoom in on

8    the body.

9    **Q.**   It's about the speaker program, correct?

10   **A.**   Yes.

11            MR. WYSHAK:  I offer it.

12            MS. WILKINSON:  No objection.

13            MR. TYRRELL:  No objection.

14            MR. HORSTMANN:  Sidebar, Your Honor.

15            THE COURT:  Sidebar?

16            MR. HORSTMANN:  Please.

17            THE COURT:  Okay.

18            (The following was held at sidebar.)

19            MR. HORSTMANN:  Your Honor, there are going to be

20   instances of emails, which it's our position were actually

21   authored by Alec Burlakoff that he sends out over Sunrise's

22   email address.  I think this is the first one that has been

23   offered.  I would ask the Court to mark it for i.d..  And if

24   Burlakoff is here to authenticate it, it should come in.  But

25   otherwise, I don't think it should unless my client

1    testifies.

2           MR. WYSHAK:  It says it's from SLee@atInsys.com.

3           MR. KENDALL:  He'd wake up and get on her laptop

4    and send her emails.

5           THE COURT:  What's the basis for not admitting it?

6           MR. KENDALL:  She didn't send it.

7           THE COURT:  It looks like she sent it.

8           MR. KENDALL:  Your Honor, Burlakoff is their

9    witness.  They know he was sending out emails fraudulently.

10   To give it to the jury and say it's her email when it's

11   Burlakoff's.

12          MR. HORSTMANN:  It doesn't sound like her, Your

13   Honor.

14          THE COURT:  No.  It sounds like a different voice.

15   You're free to argue that.  It came from her email address.

16          MS. WILKINSON:  But they know that, Your Honor.

17          MR. WYSHAK:  They know what?

18          MS. WILKINSON:  They know that Alec Burlakoff got

19   on Sunrise Lee's email late at night when they were together

20   and sent out emails under her name.  If they don't --

21          MR. WYSHAK:  I inquired because I think Peter had

22   brought it up.  According to Alec, it was right at the very

23   beginning when she started.  He showed her how to use email.

24   And he did a few emails, showed her how to send them out.

25   And according to him, that was it.

1              MS. WILKINSON:  This is right around the time she

2      started.

3              MR. WYSHAK:  This is now November 26.

4              MR. KENDALL:  It's 11:45 p.m.

5              MR. HORSTMANN:  Maybe Mr. Vien will have to testify

6      because I was told something different.

7              MR. WYSHAK:  Really?

8              THE COURT:  Mr. Wyshak is going to cross-examine

9      Mr. Vien?

10             MR. HORSTMANN:  That will be fun.

11             MR. KENDALL:  I think they'll be hugging each

12     other, Your Honor.

13             MS. WILKINSON:  The narrative is that he would get

14     up late at night when they were together.  This is an 11:45

15     p.m. email.

16             MR. WYSHAK:  Whether or not she received it from

17     Sunrise Lee or from Alec Burlakoff, it's the content that I'm

18     interested in.  Whether it's from him or her, it's a

19     co-conspirator statement, and it's admissible.

20             MS. WILKINSON:  That's not really the point.  The

21     point is he asked the question it's from Sunrise Lee, for the

22     jury to believe it was her statement.

23             THE COURT:  Why don't you just rephrase it and say

24     it came from her email.

25             MR. WYSHAK:  Okay.

 1              MR. HORSTMANN:  Prejudicial if it's not her.

 2              THE COURT:  You can deal with it on

 3     cross-examination.

 4              MR. WYSHAK:  How does he get access to her laptop?

 5              MR. KENDALL:  He rolled over and started typing.

 6              MR. WYSHAK:  Sounds like aiding and abetting and

 7     acting in concert.

 8              MR. HORSTMANN:  It's not in the office.

 9              THE COURT:  Just switch it up to the email.  If you

10     want to make argument later on that you don't actually have

11     any idea when he is actually typing the keys.

12              (End of sidebar.)

13     BY MR. WYSHAK:

14     Q.  Ms. Brown, again if I can direct your attention to the

15     header for this email.

16              THE COURT:  This is going to be admitted.

17              (Government Exhibit No. 1755 admitted.)

18     BY MR. WYSHAK:

19     Q.  So this appears to come from the mailbox or the email

20     account of Sunrise Lee.  Is that fair to say?

21     A.  Yes.

22              MR. WYSHAK:  I offer it.

23              THE COURT:  Admitted.

24              MR. HORSTMANN:  Same objection, Your Honor.

25              THE COURT:  Preserved.  It's admitted.

1      MR. WYSHAK:  If you could zoom in on the body.

2  BY MR. WYSHAK:

3  Q.  This email says that, "We have for the most part depleted

4  our speaker program budget for 2012."  And under "Important"

5  there he says, "Please do not submit any additional requests

6  for speaker programs to take place in 2012."  And if you go

7  down about halfway, he's talking about planning for 2013; is

8  that correct?

9  A.  Yes.

10  Q.  And he says about halfway down, "I want a ridiculous

11  number of programs scheduled for January of 2013, and I want

12  them scheduled before the holiday break.  This sets the tone

13  for our 'thought leaders' and reminds them all that Insys is

14  serious and ready to go for a big Subsys year in 2013.  We

15  are not letting up.  In fact, we are just getting started.

16  This vehement message to our thought leaders is an absolute

17  necessity in order to solidify an appropriate beginning to a

18  stellar 2013.  Failure to get these programs for 2013

19  scheduled will unquestionably result in this territory's late

20  start and a PIP."

21      So what is a PIP?

22  A.  A PIP is a performance improvement plan.  So it's

23  something that's put in place for a salesperson when they're

24  considered to be underperforming.  And it usually has

25  performance goals lined out for them that they have to

1    achieve by a certain timeframe.  Otherwise, they'll typically

2    be fired.

3    **Q.**  What was your reaction to the threat of being placed on a

4    PIP?

5    **A.**  I'm sorry.  What was that?

6    **Q.**  What was your reaction to this threat of being placed on

7    a PIP?

8    **A.**  You know, it's certainly kind of a threatening email, and

9    it was something that we were all -- or I, anyway, was

10   concerned about all the time.  There were reps being let go

11   every week, and so it was something we were all concerned

12   about.  And the directive to get the speaker programs and

13   things scheduled again just confirmed sort of the strategy

14   that was to be used to continue having these doctors write

15   for the next year.

16          MR. WYSHAK:  Could we put up 195.  If you could go

17   down to the -- scroll down to the bottom and put that header

18   up first.

19   BY MR. WYSHAK:

20   **Q.**  So this is an email from Sunrise Lee to Alec Burlakoff;

21   is that right?

22   **A.**  Yes.

23   **Q.**  And regarding Dr. Madison?

24   **A.**  Yes.

25          MR. WYSHAK:  I offer it, Your Honor.

1          MR. HORSTMANN:  I object, Your Honor.  For purposes

2     of this witness, I object.  How does this come in?

3          MR. WYSHAK:  She's copied on it above.

4          MR. HORSTMANN:  I'm sorry.  I didn't see that.

5          THE COURT:  Scroll up.

6          MR. HORSTMANN:  Okay.  Sorry.  I withdraw the

7     objection.

8          THE COURT:  It's admitted.

9          (Government Exhibit No. 195 admitted.)

10          MR. WYSHAK:  If we can publish it and go to the

11     first one.

12     BY MR. WYSHAK:

13     **Q.**  So this is Sunrise Lee telling Alec Burlakoff, "As you

14     know, Dr. Madison is a dedicated Subsys advocate who is

15     determined to get as many docs on board with Subsys as

16     possible.  I know that our ISP budget is pretty much

17     depleted.  However, Dr. Madison would like to do an

18     additional ISP" --

19          That's a speaker program, right, ISP?

20     **A.**  Yeah.

21     BY MR. WYSHAK:

22     **Q.**  -- "next week with some docs that he has outsourced."

23          Is that fair to say, she's --

24     **A.**  Yes.

25     **Q.**  So after the last exhibit we saw where Mr. Burlakoff

1    says -- or coming out of Sunrise Lee's account says no more

2    speaker programs, now she's asking for an additional one for

3    Dr. Madison?

4    **A.**  Yes.

5          MR. WYSHAK:  And if we can go back up to the top,

6    that header, zoom in.

7    **Q.**  So the response is from Alec Burlakoff.  He sends an

8    email to Desiree Hollandsworth.

9          Do you know who she was?

10   **A.**  I only remember that she was involved towards the end

11   with coordinating these programs.  I think maybe instead of

12   SciMedica.  That's about all I remember.

13   **Q.**  And you and Sunrise Lee are copied on this; is that

14   right?

15   **A.**  Yes.

16   **Q.**  And Mr. Burlakoff is essentially asking for Dr. Madison

17   to get another speaker event, correct?

18   **A.**  Yes.

19   **Q.**  And he says, "Dr. Madison is well known and highly

20   respected amongst Dr. Dilaha, Matt Napoletano, Insys, and the

21   medical community as a whole."

22          Was Dr. Madison highly respected amongst the

23   medical community in Chicago?

24          MS. WILKINSON:  Objection.  Foundation.

25          MR. HORSTMANN:  Objection.

1          THE COURT:  You're going to need to set a

2     foundation for that.

3          MR. WYSHAK:  I think she's testified about it.

4          THE COURT:  I think she has, too, but the question

5     still requires a foundation.

6     BY MR. WYSHAK:

7     **Q.**  You knew many doctors in your role as a sales rep for

8     Insys?

9     **A.**  Yes.

10    **Q.**  You talked to them?

11    **A.**  Yes.

12    **Q.**  You asked them to come hear Dr. Madison speak?

13    **A.**  Yes.

14    **Q.**  As a result of those conversations, did you learn he had

15    a reputation in the medical community?

16    **A.**  Yes.

17    **Q.**  And what was that?

18    **A.**  That he was not respected or practicing responsible

19    medicine.

20    **Q.**  Mr. Burlakoff goes on in the second paragraph to say,

21    "Dr. Madison's strong efforts to facilitate the attendees of

22    this program may have come at an untimely juncture.  But he's

23    been extremely instrumental in helping to bring ISPs together

24    by personally recruiting/confirming local physicians whom he

25    felt would be extremely responsive to our product."

1          Is that true?

2    **A.**  He certainly brought people to the events, but they were

3    people who would have no reason whatsoever to write Subsys.

4    **Q.**  His friends?

5    **A.**  His friends.

6          MR. WYSHAK:  Could we put 192 up and if we could go

7    to the header.

8    BY MR. WYSHAK:

9    **Q.**  And this is from -- I'm sorry.

10         MR. WYSHAK:  92.  Did I say 192?  Sorry.  There is

11   an email covering that?  There it is.  Okay.  If we can zoom

12   in on the header.

13   **Q.**  So again, this is from that individual, Sean Yu?

14   **A.**  Mm-hmm.

15   **Q.**  And to sales RSMs.  That includes you?

16   **A.**  No.  That would be the regional sales managers.  So

17   Sunrise.

18         MR. WYSHAK:  If we can go to the body.

19   **Q.**  Do you see the sort of spreadsheet that's attached here?

20   **A.**  Yes.

21   **Q.**  Was this a document that you would have access to?

22   **A.**  Certain data files were sent out to us, eventually daily,

23   that included prescription data as far as what had been

24   written in the previous days by all of our physicians.

25   **Q.**  So this would be sent to the RSMs.  That's the regional

1    sales managers; is that right?

2    **A.**  Yes.

3    **Q.**  Would Sunrise Lee distribute this to the sales staff?

4    **A.**  Yes, I believe so.

5    **Q.**  And did this include information about your doctors?

6    **A.**  Yes.

7           MR. WYSHAK:  I offer it, Your Honor.

8           MR. HORSTMANN:  I object, Your Honor unless this

9    witness can say she saw it.

10   BY MR. WYSHAK:

11   **Q.**  Was this something that you saw in the ordinary course of

12   business, the spreadsheets about sales in your area?

13   **A.**  Yes.  Initially there was sales data sent out I believe

14   once a week on Fridays, and then eventually it changed to

15   every day sales data was sent out to all of us.

16          MR. WYSHAK:  I offer it, Your Honor.

17          MR. HORSTMANN:  Same objection, Your Honor.

18          THE COURT:  I'm going to admit that.  She says she

19   saw the data on a weekly if not daily basis.  It's admitted.

20          (Government Exhibit No. 92 admitted.)

21          MR. WYSHAK:  If we can publish it.

22   BY MR. WYSHAK:

23   **Q.**  And then directing your attention to, the Bates number

24   here is 4750937 of the spreadsheet.  It's about six pages in.

25   It's Bates Number 4750937.

1        MR. WYSHAK:  Can we put the ELMO on?  It might be
2   easier.
3        THE CLERK:  You have to turn the power on down the
4   bottom.
5        MR. WYSHAK:  I think you can see it now.
6   BY MR. WYSHAK:
7   **Q.**  Can you see that on your screen?
8   **A.**  Yes.
9   **Q.**  So this is Dr. Madison.  Is that fair to say?
10  **A.**  Yes.
11  **Q.**  And that's you, Holly Brown?
12  **A.**  Yes.
13  **Q.**  At this point in time, according to this document, he has
14  24 patients on Subsys?
15  **A.**  Yes.
16  **Q.**  Is that correct?
17       I'm also going to show you another spreadsheet
18  which is part of this exhibit.  Can you see Madison there?
19  **A.**  Yes.
20  **Q.**  And that's you, Holly Brown?
21       MR. TYRRELL:  What page?
22  BY MR. WYSHAK:
23  **Q.**  You can see there the trend line for Dr. Madison; is that
24  right?
25  **A.**  Yes.

1          MS. WILKINSON:  Your Honor, we don't have that

2     attached to this.  We don't know if we didn't print out the

3     right thing, but we don't have that spreadsheet attached.

4          THE COURT:  Why don't you show it to her, please,

5     or them.

6          MR. WYSHAK:  I'm sure they have that document, Your

7     Honor.

8          THE COURT:  They may and they may not.  But to move

9     things along, make sure they can see it now.

10         MS. WILKINSON:  That's the problem.  I don't have

11    any objection, Your Honor.  I think there was some confusion,

12    but I don't have any objection.

13         THE COURT:  That's fine.  There's a lot of paper in

14    this case.  These things are going to happen.  I just want to

15    make sure you had ample opportunity to see it.  Are you all

16    set?

17         MS. WILKINSON:  I don't think anybody else has.

18         THE COURT:  Does anybody else want to look at it

19    before he goes on?

20         MR. WYSHAK:  Am I all set?

21         THE COURT:  Has everyone seen it now that wants to?

22    Okay.  Go ahead, Mr. Wyshak.

23    BY MR. WYSHAK:

24    Q.  Just pointing out, Ms. Brown, so again it's Dr. Madison,

25    right?

1    **A.**   Yes.

2    **Q.**   And if you follow over on this side, they're graphing out

3    the trends for sales for doctors; is that right?

4    **A.**   Yes.

5    **Q.**   And this was information that was provided to you?

6    **A.**   I don't remember this specifically, but we were always

7    aware of our trends, whether it was through this or other

8    data that we received.

9    **Q.**   And this indicates that -- do you know how to read the

10   graph?

11   **A.**   I don't know what timeframe this was over, but it's

12   looking like he was steady, dropped down, went back up.  So

13   for whatever reason he dropped down in writing for a while,

14   but I don't know what the time period was.

15   **Q.**   But you received this kind of data?

16   **A.**   Yeah.

17   **Q.**   Whether it was in this form or some other form?

18   **A.**   Yes.

19   **Q.**   Regarding the writing trends of your doctors; is that

20   right?

21   **A.**   Yes.

22          MR. WYSHAK:  Can we put 1760 up.

23          THE COURT:  Mr. Wyshak, did you ask for 1760 or

24   1716?

25          MR. WYSHAK:  60, Your Honor.

```
 1                    THE COURT:  Okay.
 2    BY MR. WYSHAK:
 3    Q.   This is an email from you to Desiree Hollandsworth?
 4    A.   Yes.
 5    Q.   About Dr. Madison, right?
 6    A.   Yes.
 7                    MR. WYSHAK:  I offer it.
 8                    THE COURT:  Any objection?
 9                    MS. WILKINSON:  None.
10                    MR. TYRRELL:  No objection.
11                    THE COURT:  It's admitted.
12                    (Government Exhibit No. 1760 admitted.)
13    BY MR. WYSHAK:
14    Q.   And this is dated December 12 of 2012?
15    A.   Yes.
16    Q.   Can you read it for us?
17    A.   It says, "Hi, Desiree.  Dr. Madison is wondering what
18    address you will be sending his speaker program checks to.
19    Let me know.  Thanks, Holly."
20    Q.   He's interested in getting paid?
21    A.   Yes.
22                    MR. WYSHAK:  I'm almost done, Your Honor.
23                    THE COURT:  Do you want that exhibit admitted?
24                    MR. WYSHAK:  Yes.  I'm sorry.  Did I not offer it?
25                    THE COURT:  I don't think so.  Any objections?
```

1      MS. WILKINSON:  He did offer it.

2      THE COURT:  Did he?

3      MS. WILKINSON:  Yes.

4      THE COURT:  Either way, it's admitted now.

5  BY MR. WYSHAK:

6  **Q.**  Are you familiar with something called the switch

7  program?

8  **A.**  Yes.

9  **Q.**  And what was that?

10  **A.**  The switch program, so there were typically two kinds of

11  patients that would be on Subsys.  It would be either

12  new-start patients who had never been on a fentanyl product

13  before, or it would be patients who were and had been on a

14  competitor product.

15      So there was a directive at some point to target

16  the switch patients with the idea that patients who had been

17  on a competitor product for some time before we came along

18  would likely be at a higher dose just because they'd been on

19  it for a while and built tolerance.

20      So it was thought that those patients were maybe

21  more valuable to the company because the company made money

22  the higher the dose was of the drug.  And so we were supposed

23  to go focus on getting those switch patients in order to

24  secure patients on higher doses of Subsys.

25  **Q.**  Okay.  And if you remember the product insert that we

1     went over earlier this morning --

2     **A.**  Yes.

3     **Q.**  -- you were supposed to start that dosage for Subsys

4     at --

5     **A.**  Always at 100 micrograms.

6     **Q.**  Always at 100.  So was there any pressure to increase the

7     dosage?

8     **A.**  Yes.  Especially for patients who, as I mentioned, were

9     on a higher dose of a competitor product.  100 micrograms is

10    required when they made the switch over to Subsys; it was the

11    required starting dose.  So the concern was that they would

12    abandon using Subsys because they were titrated down to such

13    a low dose and had to go through the titration process again

14    to get back up to an acceptable level of pain management

15    because they'd been used to a higher dose of a different

16    product.

17    **Q.**  And was there a commission structure for dosages?

18    **A.**  Yes.  I don't remember specifically the details, but I do

19    know that we got paid more for the higher doses.  So the

20    highest dose we would get paid out the most on, and then it

21    would move on down from there.

22    **Q.**  Now, over the course -- you told us you left in December

23    of 2012?

24    **A.**  Yes.

25    **Q.**  But over the course of that fall of 2012 into the winter

1    while you were still there, can you describe the relationship

2    between Dr. Madison and Sunrise Lee?

3    **A.**   It was pretty casual and social.  I know that they

4    communicated fairly often.  Programs were sometimes scheduled

5    that I didn't know about that maybe he had requested through

6    her or something like that, and I would be let to know about

7    it later.  But they maintained a high level of contact

8    outside of the work setting and outside of business hours.

9    **Q.**   Did they have a social relationship?

10   **A.**   I think so.

11   **Q.**   Now, you told us you left in December of 2012?

12   **A.**   It was the very end of December.  It may have been the

13   first couple of days in January, but right around then.

14   **Q.**   And why did you leave?

15   **A.**   I had been job searching for quite some time, really even

16   before Alec and Sunrise and everybody was brought to the

17   scene.

18   **Q.**   Why were you looking for another job?

19   **A.**   I just -- you know, things started out fairly normally

20   but got more intense and more questionable as time went on.

21   So I just personally started to feel uncomfortable with what

22   was going on, and then particularly when I was directed to be

23   spending all this time with Dr. Madison, who I had expressed

24   having concern spending time with from the very beginning.

25          I was just not comfortable at my job.  I was not

1    comfortable with the directions that were being given to us

2    as far as how we were supposed to perform our job.  Yeah, it

3    took me a little while to find something else in the

4    industry, but I did eventually and left as soon as I could.

5    **Q.**  Did you lose any money when you left?

6    **A.**  Yes.  So I never made much in the way of bonuses until

7    that last fourth quarter, that fall into the winter that you

8    were mentioning, because Dr. Madison had started writing.

9            And so that fourth quarter would have been the

10   quarter that I was really up for making any significant

11   amounts of money.  However, I walked away from that bonus

12   when I did take my next job in pharmaceuticals because I was

13   just anxious.  I didn't even care.  I have just wanted to get

14   out.

15   **Q.**  And do you recall approximately how much that would have

16   been?

17   **A.**  I think it was between 10 and $12,000, which to me was

18   significant at the time.

19   **Q.**  And after you left Insys, did you have occasion to bump

20   into Dr. Madison and Sunrise Lee again?

21   **A.**  I did run into them again.  It was accidental.  But I was

22   in downtown Chicago, and I was walking past Roka Akor.  I

23   think it was probably a Friday or Saturday night, and ran

24   into Dr. Madison standing outside.

25           I had said hello.  And he said, oh, yeah, Sunrise

1   is in there with -- I think it was whoever the sales rep that

2   took my place or something afterwards was there.

3           So I went in and just said hello, but they were, I

4   think, having another speaker program of some sort.

5   **Q.**   And approximately how long was that after you left?

6   **A.**   That would have been in the summer of 2013.  So six

7   months or so later.

8   **Q.**   Right after you left Insys, did something happen to

9   Dr. Madison?

10          MS. WILKINSON:  Objection.

11          THE COURT:  Basis?

12          MR. KENDALL:  Foundation.  Hearsay.  Relevance.

13   103.

14          THE COURT:  Let me see you at sidebar, please.

15          (The following was held at sidebar.)

16          THE COURT:  What happened to him?

17          MR. WYSHAK:  He got arrested.  However, after he

18   was arrested they continued to use him.  They continued to

19   pay him money to speak.  He's still promoted as a national --

20          THE COURT:  How does she know he's arrested?

21          MR. WYSHAK:  It was common knowledge, public

22   knowledge.

23          MS. MINER:  The paper probably.

24          MR. WYSHAK:  Are you disputing that he was

25   arrested?

```
 1              MS. MINER:  You don't get it in through this
 2    witness.
 3              MR. WYSHAK:  Do you want me to put in a newspaper
 4    article?
 5              THE COURT:  Stop.  Is he going to testify?
 6              MR. WYSHAK:  No.  Is he in jail?
 7              MR. YEAGER:  Not in jail yet.
 8              MR. WYSHAK:  Not yet.  He was convicted.
 9              THE COURT:  None of your witnesses are going to
10    jail.
11              MS. WILKINSON:  Exactly.  You're getting it.
12              MR. KENDALL:  Your Honor, she's clearly not part of
13    the conspiracy.  So what she knows through a hearsay source
14    is not relevant.  If he wants to put in that Sunrise is aware
15    of his arrest, let him put it in through Babich or Burlakoff
16    or whatever.
17              MR. WYSHAK:  She's aware of his arrest as well.
18              THE COURT:  I don't think it comes in through her.
19              MR. KENDALL:  What she knows is not relevant at
20    this point.
21              MR. WYSHAK:  It's a frivolous objection because the
22    evidence is obviously admissible.
23              THE COURT:  It is frivolous in the sense that it's
24    going to come in, but I don't think you get it in through
25    this witness now that they've made the objection.
```

1          MR. WYSHAK:  All right.

2          MR. KENDALL:  Thank you, Your Honor.

3          (End of sidebar.)

4    BY MR. WYSHAK:

5    **Q.**  One last question.  At some point in time after you left

6    Insys, you were paid to provide information to a third party;

7    is that correct?

8    **A.**  Yes.

9    **Q.**  Who was that?

10   **A.**  They were hedge fund analysts, I believe.

11   **Q.**  What was the purpose of talking to them about?

12         MR. KENDALL:  Objection.  Relevance.

13         THE COURT:  Hold on a second.

14         I can't assess the relevance without another

15   sidebar, right?  I don't know what the evidence is.  Do you

16   want to take another sidebar?

17         MR. WYSHAK:  No.  I was just going to ask her how

18   much she was paid.  It's more in the nature of *Giglio* thing.

19         MR. KENDALL:  I don't think it's relevant, but I

20   don't care, Your Honor.

21         THE COURT:  You objected.

22         MR. KENDALL:  I objected to the whole context.

23   What she gets paid for a consultation, it's not relevant.

24         MR. WYSHAK:  I'll withdraw the question.

25         THE COURT:  All right.

```
1                    MR. WYSHAK:  Thank you very much, Ms. Brown.  I
2       have no further questions at this time.
3                    THE COURT:  Cross?
4                    MS. WILKINSON:  Yes, Your Honor.
5                              CROSS EXAMINATION
6       BY MS. WILKINSON:
7       Q.  Good afternoon, Ms. Brown.
8       A.  Hello.
9       Q.  We've never met before, correct?
10      A.  Right.
11      Q.  I just want to ask you a few questions, some background
12      questions and a few follow-up things on the things you
13      discussed with Mr. Wyshak.
14                   You were just talking about switching patients from
15      other competitor products, correct?
16      A.  Yes.
17      Q.  And the most widely used competitor product at the time
18      was Actiq, right?
19      A.  Yes.
20      Q.  There was a generic version of Actiq?
21      A.  Yes.
22      Q.  And there was a branded version of Actiq?
23      A.  Yes, that's right.
24      Q.  And many of the physicians that you were working with had
25      a lot of their patients on Actiq, right?
```

1   **A.**   Yes.

2   **Q.**   So when you were trying to get them to switch to a

3   product called Subsys, you thought it was a better product,

4   right?

5   **A.**   Well, it was up to the physician to decide if he thought

6   it was a better product.  I was just there to present the

7   information.

8   **Q.**   But you thought it had benefits in comparison to the

9   other product, right?

10   **A.**   Inasmuch as I was trying to sell it, but I don't know

11   that I had a strong opinion about that one way or another.

12   **Q.**   Well, you wrote emails about that, didn't you, talking

13   about how good the product was and how useful it was?

14   **A.**   I don't know.  I don't remember.

15   **Q.**   Okay.  We'll talk about that in a minute.

16          And you suggested that when people are switching

17   from one product to the other, they have to start at 100

18   micrograms, right?

19   **A.**   Yes.

20   **Q.**   Now, are you aware or were you involved at all with

21   Insys's interaction with the FDA and their approval of their

22   label?

23   **A.**   No.

24   **Q.**   And are you aware or did you ever look at the 2013 label

25   of Subsys?

1    **A.**   No.  I would have been gone by then.

2    **Q.**   You sold Lazanda for a while, didn't you?

3    **A.**   Yes.

4    **Q.**   That's a competitor product, isn't it?

5    **A.**   Yes.

6    **Q.**   Did you do that after or before you were working for

7    Insys?

8    **A.**   After.

9    **Q.**   So you still had to know about the other products like

10   Subsys, right?

11   **A.**   Yes.

12   **Q.**   And so you must have been aware, and I want to show you

13   defendant's Exhibit 5022.

14          MS. WILKINSON:  If you could put that up on the

15   screen, please.

16   **Q.**   Can you see here that this is also a Subsys label or

17   patient insert, as you called it?

18   **A.**   Yes.

19   **Q.**   And look down at the bottom right-hand corner.  Can you

20   read when it was revised?

21   **A.**   7/2013.

22   **Q.**   And let's turn to, if we could, page 4 of that.  And do

23   you that there's a table --

24          MR. WYSHAK:  Objection.  If there's no foundation,

25   I don't know where we're going with this.  She's never seen

1    it.  It was after she worked at the company.

2            THE COURT:  Overruled.

3    BY MS. WILKINSON:

4    **Q.**  Take a look at Table Number 1 there.  Do you see that?

5    **A.**  Yes.

6    **Q.**  Does that talk about initial dosing recommendations for

7    patients on Actiq?

8    **A.**  Yes.

9    **Q.**  Does that, in fact, show that you do not have to start at

10   100 micrograms if the patient is on different doses of Actiq,

11   let's say 600 micrograms?

12   **A.**  Yes.

13   **Q.**  So it was not, was it, required that a patient who is on

14   a different dose of Actiq, a higher dose, start at

15   100 micrograms of Subsys, right?

16   **A.**  Well, it was at the time that I was selling Subsys.

17   **Q.**  But that was changed, wasn't it?

18   **A.**  Yes.

19   **Q.**  And that was approved by the FDA.  You understand that

20   these labels or patient inserts are always approved by the

21   FDA, right?

22   **A.**  Yes.

23   **Q.**  When you first started at Insys, you worked for a

24   Mr. Mike Hemenway; is that right?

25   **A.**  Yes.

1   **Q.**   And you said he was a normal sales manager?

2   **A.**   Yes.

3   **Q.**   You had no complaints in working for him professionally?

4   **A.**   I don't know that it matters.  I didn't like him

5   personally, but he was fine as a manager.

6   **Q.**   He never asked you to do anything inappropriate, right?

7   **A.**   No.  Well, I mean, pushing for the higher doses and

8   things like that was certainly something he put pressure on

9   us to do, which was something I was uncomfortable with.  But

10   I don't know that he ever directly asked us to do something,

11   not that I remember.

12   **Q.**   All right.  When you worked for Mr. Hemenway, you were

13   targeting the high decile prescribers of -- the TIRFs, as we

14   call them, right?

15   **A.**   Yes.

16   **Q.**   You received that instruction from Mr. Hemenway when you

17   first started?

18   **A.**   Yes.

19   **Q.**   Let's take a look at Exhibit 5177, please.  Do you

20   recognize this email to you from Mr. Hemenway?

21   **A.**   Yes.

22   **Q.**   It's dated March 5, 2012, right?

23   **A.**   Yes.

24           MS. WILKINSON:  Your Honor, we'd move to admit

25   5177.

```
 1                THE COURT:  Any objection?
 2                MR. WYSHAK:  No.
 3                THE COURT:  5177 is admitted.
 4                (Defendant Exhibit No. 5177 admitted.)
 5                THE COURT:  You didn't move to admit the one before
 6      that, 5022.
 7                MS. WILKINSON:  Because she said she wasn't as
 8      familiar what it.  We can get it in through someone else.
 9                THE COURT:  Fine.  I wanted to make sure.
10      BY MS. WILKINSON:
11      Q.  Let's take a look down.  This is called an M.D. alignment
12      report, right?
13      A.  Yes.
14      Q.  In this report, Mr. Hemenway is sending you a list of
15      physicians, right?
16      A.  Yes.
17      Q.  And he's giving you some rankings, correct?
18      A.  Yes.
19      Q.  And the first ranking is ROO decile, right?
20      A.  Yes.
21      Q.  And ROO is rapid onset opioid?
22      A.  Yes.
23      Q.  And then he's giving you the Fentora decile, right?
24      A.  Yes.
25      Q.  So he's showing you how much this doctor prescribes the
```

1    competitor drug Fentora, right?

2    **A.**   Yes.

3    **Q.**   And you received this and you used this to help you

4    determine which doctors you should target first, right?

5    **A.**   Yes.

6    **Q.**   That is not inappropriate, correct?

7    **A.**   No.

8    **Q.**   And you had the Fentora data in March 5, 2012, right when

9    Subsys was coming out on the market, right?

10   **A.**   Yes.

11   **Q.**   It's basically a call list, right?

12   **A.**   Yes.

13   **Q.**   There are about 70 doctors on that list?

14   **A.**   I can't see the rest of it, but yes, probably.

15   **Q.**   If you need to look at more of it, just let us know.

16           Many are pain specialists, right?

17   **A.**   Yes.

18   **Q.**   Some are neurologists?

19   **A.**   Yes.

20   **Q.**   Anesthesiologists?

21   **A.**   Yes.

22   **Q.**   Oncologists?

23   **A.**   Yes.

24   **Q.**   Now, I think you've told us before that most oncologists

25   do not prescribe these types of pain medications, right?

1    **A.**   Typically not.

2    **Q.**   Particularly not TIRFs, right?

3    **A.**   Yes.

4    **Q.**   And that includes Lazanda, Actiq, Abstral, all the

5    others, right?

6    **A.**   Yes.

7    **Q.**   And often oncologists refer their cancer patients who

8    they are treating to a pain specialist to address their pain,

9    right?

10   **A.**   Yes, that's right.

11   **Q.**   So it was much harder to find oncologists who would

12   prescribe a TIRF because they weren't prescribing any of the

13   competitors, right?

14   **A.**   Right.

15   **Q.**   But you still did try to approach some of those?

16   **A.**   Yes.

17   **Q.**   After you first started as a sales rep, did Mr. Hemenway

18   go on what's called a ride-along with you?

19   **A.**   Yes.

20   **Q.**   Is that where your manager goes with you to see how

21   you're doing interacting with the physicians?

22   **A.**   Yeah.  They spend the day with you and make office calls

23   with you and kind of critique what you're saying and how

24   you're presenting it.

25   **Q.**   Did Mr. Hemenway give you some guidance after he had been

1   out with you on a ride-along?

2   **A.**   I'm sure he did.

3   **Q.**   Let's take a look at Exhibit 5166, please.  Do you

4   recognize this email from Mr. Hemenway to you on April 4,

5   2012?

6   **A.**   Yes.

7           MS. WILKINSON:  Your Honor, we'd move for admission

8   of 5166.

9           THE COURT:  Any objection?

10          MR. WYSHAK:  No, Your Honor.

11          THE COURT:  It's admitted.

12          (Defendant Exhibit No. 5166 admitted.)

13  BY MS. WILKINSON:

14  **Q.**   In this email, Mr. Hemenway is complimenting you, saying

15  you were very well versed on the clinical information with

16  Subsys, right?

17  **A.**   Yes.

18  **Q.**   You had been well trained?

19  **A.**   Yes.

20  **Q.**   And you yourself were diligent, right?

21  **A.**   Yes.

22  **Q.**   He asked you to try to figure out a way to maximize your

23  time in the areas, meaning kind of take advantage of one

24  ordinary group of doctors, right, and not have to drive back

25  and forth go out of your way.

**A.**   Yes.

**Q.**   And he told you to try to work on your top decile targets as much as possible, right?

**A.**   Yes.

**Q.**   He even told you to get a lot of face time with targets like Dr. Wilkin, Dr. Caner, and Dr. Ring, right?

**A.**   I can't see that.

MS. WILKINSON:  Let's go down, if we could.

**Q.**   Sorry about that.

**A.**   Yes.

**Q.**   You can put that back up.  You can see on Number 2 -- why don't we go there -- "Engage the office staff as much as possible.  Don't be shy.  Open up and try to get to know the staff.  You are a very likeable person so let them see that. It will go a long way."

You didn't take that guidance as anything other than encouragement, right?

**A.**   Right.

**Q.**   Not inappropriate?

**A.**   No.

**Q.**   Let's go down a little further if we could.  On Number 4, do you see that?

**A.**   Yes.

**Q.**   "Sell everyone and let them know you are new and you have a new product."

1          And you understood that Subsys was the newest

2    product on the market?

3    **A.**   Yes.

4    **Q.**   "Try to see nurses and let them know about the product so

5    they can get excited.  The more you tell them now, the more

6    they will listen later."  Right?

7    **A.**   Yep.

8    **Q.**   So it was important not to just educate the physicians

9    but the staff who helped the physicians, right?

10   **A.**   Yes.

11   **Q.**   And the type of advice Mr. Hemenway gave you was typical

12   sales manager stuff, right?

13   **A.**   Very typical.

14   **Q.**   And the traditional sales model?

15   **A.**   Yes.

16   **Q.**   And you didn't believe at the time that you were doing

17   anything inappropriate, right?

18   **A.**   No.

19   **Q.**   Let's go on to April of 2012 after the launch.  I want to

20   show you Exhibit 5167.

21          Do you recognize that email from Mr. Hemenway to

22   you as well as a few others on April 13, 2012?

23   **A.**   Yes.

24   **Q.**   And if we could go down.  Mr. Hemenway is writing to you,

25   talking about certain individuals in your territory, right?

1     **A.**   Yes.

2     **Q.**   And in the second paragraph, he's talking about three

3     specific doctors and that they have all used TIRFs in the

4     past, right?

5     **A.**   Yes.

6     **Q.**   And he says, "Please follow up with them and sell them on

7     Subsys.  All of their info is on the attached sheet."  Right?

8     **A.**   Yes.

9     **Q.**   And these are oncologists?

10    **A.**   The only one that I recognize here is a pain management

11    physician, anesthesiology.

12    **Q.**   Okay.  Let's turn to the next page, then, if we could.

13    There's a list of a lot of doctors.  Do you see that?

14    **A.**   Yes.

15    **Q.**   And if we go to Number 13, Dr. Connie Ferraro, she's an

16    oncologist, right?

17    **A.**   It says so.  I don't know who she is.

18    **Q.**   There it is.  13.

19    **A.**   Yes.  It says she's an oncologist.

20    **Q.**   Number 23, Dr. Katherine Kefer?

21    **A.**   Yep.  Also oncology.

22    **Q.**   Number 29, Dr. Erin McMenamin?

23    **A.**   Yep.  Oncology.

24    **Q.**   Did you get regular lists of physicians for consultation

25    from Mr. Hemenway during the spring of 2012?

1    **A.**   Like I said, we got the initial list, and I'm not sure

2    whether they changed much over the course of time.

3    **Q.**   Now, when he mentions to you that they're all former

4    TIRF -- or they prescribe TIRFs, he's suggesting to you that

5    they are candidates for finding patients who will switch,

6    right?

7    **A.**   Yes.

8    **Q.**   And so at the time, there was a switch strategy in place.

9    I'm not sure it was clear when you were testifying earlier,

10   but the switch strategy started from the very beginning when

11   Subsys was launched on the market, right?

12   **A.**   Yeah.  It was certainly a type of patient that we were

13   supposed to be considering.

14   **Q.**   It made sense, right, because those patients had already

15   determined that they needed a TIRF, right?

16   **A.**   Yes.

17   **Q.**   And you were trying to persuade those doctors that there

18   were other benefits like the spray technology, right?

19   **A.**   Yes.

20   **Q.**   You didn't have to use the lollipop, so you didn't have

21   the danger to children or people around them, right?

22   **A.**   Right.

23   **Q.**   And you didn't have the teeth rotting and other stories

24   you heard from people who used the Actiq lollipop?

25   **A.**   Right.

1    **Q.**  And you didn't have the mouth sores from the Fentora,

2    right?

3    **A.**  Right.

4    **Q.**  Were those things that you talked about with the

5    physicians when you were trying to get them to switch?

6    **A.**  Yes.

7    **Q.**  Did you have some success in getting physicians to

8    switch?

9    **A.**  As I mentioned early on, I had a handful of physicians.

10   I couldn't tell you if they were new-start patients or switch

11   patients at this point.  I just don't remember.  But people

12   tried it and dabbled a little bit in the beginning.

13   **Q.**  Let's take a look at TX 5169, please.  I'm sorry.

14   Exhibit 5169.

15           Do you recognize this email that you forwarded to a

16   friend, but it was originally from Mr. Hemenway to the sales

17   team, called "Success Strategy"?

18   **A.**  Yes.

19   **Q.**  Dated May 11, 2012?

20   **A.**  Yes.

21           MS. WILKINSON:  Your Honor, we'd move to admit

22   5169.

23           MR. WYSHAK:  No objection.

24           THE COURT:  Admitted.

25           (Defendant Exhibit No. 5169 admitted.)

1    BY MS. WILKINSON:

2    **Q.**  Now, in this email, Mr. Hemenway is writing to the whole

3    sales team, but he's talking about something you did, right?

4    **A.**  Yes.

5    **Q.**  And he's talking about the success, you see he's

6    highlighted it, about what you did to help doctors switch,

7    right?

8    **A.**  Yes.

9    **Q.**  And he said, "When discussing making the switch to

10   doctors, it helps put it in perspective to remind them we are

11   not switching the pharmacology on their patients, only the

12   delivery system."  Right?

13   **A.**  Yes.

14   **Q.**  "Switching is not changing the drug, only the delivery

15   system.  Great job, Holly."  Right?

16   **A.**  Yes.

17   **Q.**  He knows you did that because, if we go down below, you

18   told him that's exactly what you did, right?  You wrote him

19   an email, right, that's addressed to Mike?

20   **A.**  Yes.

21   **Q.**  Go up a little bit, please.  Thanks, Randall.  And you're

22   describing exactly what you did in Dr. Caner's office and

23   what you told him, right, about the medication?

24   **A.**  Yes.

25   **Q.**  And you said -- down there at the bottom, you say, "They

1    have all agreed to write one more prescription for current

2    medications in addition to a Subsys prescription so that

3    patients have what they are they are comfortable with during

4    the titration process."  Right?

5    **A.**  Yes.

6    **Q.**  And "titration" means the patients get the 100-microgram.

7    But if that does not give them pain relief, they're going to

8    take more, right?

9    **A.**  Yes.

10   **Q.**  And I think you were showed at the very beginning of your

11   testimony the Subsys -- you may even still have it up there,

12   the Subsys spray, right?  And this is only a single dose in

13   there, right?

14   **A.**  Yes.

15   **Q.**  If it's a 100-microgram dose, that's all you can get out

16   of it, right?  But when someone is prescribed it, they may be

17   prescribed to use three a day or four a day depending on

18   their medical condition, right?

19   **A.**  That's right.

20   **Q.**  And if they got a prescription for 30 days, they would

21   get -- let's say they had 3 a day times 7 is 21, right?

22   **A.**  Right.

23   **Q.**  And then times 4.  That's what they would pick up once

24   they were authorized from their pharmacy, right?

25   **A.**  Yes.

1  **Q.**  So even if a doctor started someone at 100 micrograms, if

2  they didn't get pain relief, they themself could pick up

3  another spray and give themselves an additional dose, right?

4  **A.**  Yes.

5  **Q.**  And that's true with Fentora as well, right?

6  **A.**  I think so.  I'm not an expert though.

7  **Q.**  If you get more pills, and they are 100 micrograms a

8  pill, if it doesn't give the patient the pain relief they're

9  looking for, once they have those pills they can take a

10  second one, right?

11  **A.**  I believe so, yes.

12  **Q.**  Now, when you spoke to these physicians, they were

13  interested in the science behind and the clinical studies

14  behind Subsys, right?

15  **A.**  Yes.

16  **Q.**  And they asked you on occasion to see those clinical

17  studies, right?

18  **A.**  Yes.

19  **Q.**  So there's clinical information in the label or the

20  patient insert, right?  But Insys and others published the

21  studies in peer-reviewed journals talking about their

22  clinical studies, right?

23  **A.**  Yes.

24  **Q.**  Let's take a look at Exhibit 5170.  This is an email from

25  you to a mellis@peoplepc.com address, right?

1    **A.**   Yes.

2    **Q.**   On May 21, 2012?

3    **A.**   Yes.

4    **Q.**   Do you recognize this?

5    **A.**   I don't remember it specifically, but yes.

6    **Q.**   But this would have been from you?

7    **A.**   Yes.

8             MS. WILKINSON:  Your Honor, we'd move in 5170.

9             MR. WYSHAK:  No objection.

10            THE COURT:  Admitted.

11            (Defendant Exhibit No. 5170 admitted.)

12   BY MS. WILKINSON:

13   **Q.**   This is to a Dr. Ellias.  Did you call on Dr. Ellias?

14   **A.**   Yes.

15   **Q.**   You say here, "I have not forgot gotten your request for

16   copies of the studies related to Subsys."

17            You say you didn't have the digital files.

18            "I hope after your chat you were able to identify a

19   few patients that might be appropriate candidates for a

20   Subsys upgrade," right?

21   **A.**   Mm-hmm.

22   **Q.**   You called it an upgrade because you thought it was a

23   better medication than the others on the market, right?

24   **A.**   I don't remember why I used that terminology

25   specifically, if it was a directive or if I just came up with

1    that.

2    **Q.**   You used it repeatedly, right?

3    **A.**   I don't remember, but maybe.

4    **Q.**   Now, sometimes physicians were concerned about

5    medications because of either the price or whether the

6    patient's insurance company would actually pay for the

7    medication, right?

8    **A.**   Yes.

9    **Q.**   So sometimes even if a doctor liked a certain medication,

10   they may not be able to prescribe it to their patient because

11   their insurance company didn't cover that particular

12   medication, right?

13   **A.**   Right.

14   **Q.**   And in a class of drugs like the TIRFs, sometimes one

15   medication was on a formulary and covered by an insurance

16   plan and the other was not, right?

17   **A.**   Right.

18   **Q.**   And doctors would discuss that with you, right?

19   **A.**   Yes.

20   **Q.**   Sometimes frustrated because they wanted to give a

21   patient a specific medication, but they knew it wasn't

22   covered?

23   **A.**   Yes.

24   **Q.**   And that happened on occasion with Subsys?

25   **A.**   Yeah.  More often than occasion, I would say.

1    **Q.**   And it happened with Fentora, right?

2    **A.**   Sure.

3    **Q.**   Let's look at Exhibit 5171.  It's an email from you on

4    May 25, 2012, to Mr. Hemenway, right?

5    **A.**   Yes.

6    **Q.**   And it's talking about, the subject matter is state

7    Medicaid, right?

8    **A.**   Yes.

9    **Q.**   You're talking about Subsys, that you went and actually

10   tried to check to see whether Medicaid covered Subsys, but it

11   was not preferred, right?

12   **A.**   Right.

13   **Q.**   They would reimburse for Fentora, right?

14   **A.**   Apparently so.

15   **Q.**   And you said, "Maybe in the future we will be included

16   since we are cheaper."  Right?

17   **A.**   Yes, I said that.

18   **Q.**   So at the time, Subsys was cheaper than Fentora yet

19   Medicaid was willing to pay for Fentora and not Subsys,

20   right?

21   **A.**   Yeah.  I guess that was my understanding at the time.

22   **Q.**   Now, look at the next sentence.  You say, "I was bummed

23   because yesterday I had a conversation with Dr. Wilkin about

24   a patient he would love to put on Subsys but she is a state

25   aid patient."

```
1              MR. WYSHAK:  Is this in evidence?

2              MS. WILKINSON:  I just moved it.

3              THE COURT:  5170.

4              MR. WYSHAK:  71.

5              THE COURT:  5171 is not in.  5170 is in.

6              MR. WYSHAK:  I don't object to it.

7              MS. WILKINSON:  I probably didn't say the number

8     right, Your Honor.  517 --

9              THE COURT:  There was 5170, right?

10             MS. WILKINSON:  Yes.

11             THE COURT:  5170 is in.  Any objection to 5171?

12             MR. WYSHAK:  No.

13             THE COURT:  That's in also.

14             (Defendant Exhibit No. 5171 admitted.)

15    BY MS. WILKINSON:

16    Q.   Okay, Ms. Brown.  Take a look at it again, if you could.

17    You're recounting a conversation with a doctor who said they

18    would like to use Subsys for their patient, but because she's

19    a state aid patient they could not do that, right?

20    A.   Correct.

21    Q.   You say, "After that lunch with Dr. Madison today, been

22    practicing my most charming smile.  Have a nice long

23    weekend."  Right?

24    A.   Yes.

25    Q.   So you're talking about Dr. Madison back in May to
```

1    Mr. Hemenway long before Sunrise Lee is hired, right?

2    **A.**  Yes.

3    **Q.**  Or before Mr. Burlakoff takes over as vice president of

4    sales?

5    **A.**  Yes.

6    **Q.**  When you interacted with physicians, you would often hear

7    the stories of the particular patient and how the drug or

8    medication was helping that patient, right?

9    **A.**  Yes.

10   **Q.**  And sometimes they told very compelling stories about how

11   the medication was helpful, right?

12   **A.**  Yes.

13   **Q.**  Do you recall -- well, let's take a look at Exhibit 5178.

14   This is an email from you to Mr. Hemenway, again on June 12,

15   2012, right?

16   **A.**  Yes.

17             MS. WILKINSON:  Move in Exhibit 5178.

18             MR. WYSHAK:  No objection.

19             THE COURT:  Admitted.

20             (Defendant Exhibit No. 5178 admitted.)

21   BY MS. WILKINSON:

22   **Q.**  If we go down to the body of the email, you're talking

23   about Dr. Hasan, right?

24   **A.**  Yes.

25   **Q.**  Do you remember what kind of doctor she was?

1   **A.**   I believe pain management.

2   **Q.**   And she is talking here about one of her patients who's a

3   cancer patient, right?

4   **A.**   Yes.

5   **Q.**   Who had a terminal diagnosis, right?

6   **A.**   Yes.

7   **Q.**   It says that the woman at that point had been outliving

8   her dire prognosis for quite some time, right?

9   **A.**   Yes.

10  **Q.**   But she had used all the other TIRFs up to their maximum

11  dose.  She had exhausted all of those other options, right?

12  **A.**   Yes.

13  **Q.**   And Dr. Hasan was excited because Subsys had a higher

14  dose and she could write a prescription for her, right?

15  **A.**   Yes.

16  **Q.**   And even though she was a cancer patient, she was denied

17  that drug because it turns out the patient wasn't on state

18  aid, right?

19  **A.**   Yes.

20  **Q.**   And Dr. Hasan was so upset about that that she thought --

21  and thought Subsys was necessary that she wanted to make an

22  appeal, right?

23  **A.**   Yes.

24  **Q.**   And you wanted to help her with that?

25  **A.**   Yes.

1    **Q.**  And do you recall whether that patient ever was able to
2    obtain Subsys?
3    **A.**  I think the patient actually passed in the meantime.
4    **Q.**  Between the time the insurance company said no or the
5    insurance program said no?
6    **A.**  Yes.
7    **Q.**  She passed away?
8    **A.**  Yes.  I think so, if I'm remembering it correctly.
9    **Q.**  At the bottom of this email, you talk about a cancer
10   center and that you are reviewing Subsys with them, and
11   you're hoping to talk to a group of oncologists there, right?
12   **A.**  Yes.
13   **Q.**  All of them are D1.  When you say D1, you mean they were
14   in the lowest decile, right?
15   **A.**  Yes.
16   **Q.**  Because they don't prescribe any of the TIRFs, right?
17   **A.**  Yes.
18   **Q.**  But you were still making an effort to try and get them,
19   right?
20   **A.**  Yes.
21   **Q.**  On occasion, did you and your fellow salespeople receive
22   emails from Mr. Babich about quarterly sales data and
23   expectations for you as a sales representative?
24   **A.**  Yes.  I don't remember specifically what that looked
25   like.

1    Q.  All right.  Take a look at Exhibit 5182, please.  This is

2    an email from Mr. Babich on June 25, 2012, to all sales reps.

3    You were there at the time, right?

4    A.  Yes.

5    Q.  So you would have received this email?

6    A.  Yes.

7                MS. WILKINSON:  We move in 5182.

8                THE COURT:  Any objection?

9                MR. WYSHAK:  Oh.  No, Your Honor.

10               THE COURT:  Admitted.

11               (Defendant Exhibit No. 5182 admitted.)

12   BY MS. WILKINSON:

13   Q.  Let's go down to the first paragraph.  And he's talking

14   about the final quarter, right, promoting Subsys?

15   A.  Yes.  The final week of the first quarter.

16   Q.  In the second sentence he says, "It's easy to say things

17   like do such as I am in sales, but you are all different and

18   you are selling relief that changes patients' lives.  Giving

19   relief faster, more powerful, and in a convenient way is our

20   simple message.  But you all have seen some patients you are

21   affecting and you know it's so much more than that."  Right?

22   A.  Yes.

23   Q.  Trying to get everyone kind of revved up?

24   A.  Mm-hmm.

25   Q.  And down below he says "Thanks" --

1           MS. WILKINSON:  Skip one.  Down where it says

2     "Thanks to marketing."

3     Q.  And you're RSM.  Those are regional sales managers?

4     A.  Yes.

5     Q.  "We have almost 50 speakers scheduled to come to Chicago

6     for the live speaker training."  Right?

7     A.  Yes.

8     Q.  So certainly at that time you were not -- you and the

9     company was not focused on one or two high prescribers,

10    right?

11    A.  No.

12    Q.  You were at that very early point training 50 speakers

13    just in Chicago, right?

14    A.  Yes.

15    Q.  And I think you mentioned the Roka restaurant that

16    Dr. Kapoor owns.  You know he owns multiple restaurants?

17    A.  Yes.

18    Q.  And he was not there at Roka when you were doing your

19    training session?

20    A.  No.

21    Q.  Or dinner, right?

22    A.  No.

23    Q.  So these 50 doctors were coming in to get specific

24    training on how to become a speaker?

25    A.  Right.  These weren't 50 speakers from Chicago, but from

1   across the company, yes.

2   **Q.**  This was just, what, three months after the launch of

3   Subsys, right?

4   **A.**  Yes.

5   **Q.**  And the goal at that time was to get as many speakers as

6   you could, right?

7   **A.**  Yes.

8   **Q.**  And then have as many doctors or support staff attend

9   those dinners so you would educate as many people as

10  possible?

11  **A.**  Yes.

12  **Q.**  And the idea was when physicians and their staff heard

13  about the drug, they would then want to go out and prescribe

14  it to their patients, right?

15  **A.**  Yes.

16  **Q.**  If it were appropriate?

17  **A.**  Yes.

18  **Q.**  But the idea was to get exposure to as many of those

19  physicians, right, not to this small tiny group of

20  physicians?

21  **A.**  That's right.

22  **Q.**  Now, let's go down to the bottom of the email, if we

23  could.  And he says "Key Hits," and he's talking about how to

24  talk about the product.  And he says, "Tell docs to write the

25  same as they would Actiq and Fentora.  And for the four

1    doctors still using Abstral and Lazanda, well, get those

2    patients on the best drug."

3             Is that some kind of reference to the fact that

4    Abstral and Lazanda weren't as popular?

5    **A.**   Yes.  Definitely they weren't as popular.

6    **Q.**   And it says here, the same indication as Actiq and

7    Fentora.  That's because all the TIRFs had the one indication

8    for breakthrough cancer pain, right?

9    **A.**   Yes.

10   **Q.**   He says, "You will make more money the more units and

11   higher dose you sell, right?

12   **A.**   Yes.

13   **Q.**   "This is never changing so continue to discuss with your

14   writers how to ensure the patient is getting proper pain

15   relief."  Right?  So he ties that higher dose to the proper

16   pain relief?

17   **A.**   Yes.

18   **Q.**   "We have heard stories where 800 micrograms of Subsys

19   works for some patients that was on a 1200 Actiq and we have

20   heard others say it isn't strong enough in this scenario.

21   Remember, encourage your doctor to practice medicine as he or

22   she sees fit and to use their clinical judgment," right?

23   **A.**   Yes.

24   **Q.**   And that's what you always did, right?

25   **A.**   Yep.

1   **Q.**  You never encouraged a doctor to prescribe something that

2   a patient didn't need?

3   **A.**  Not on purpose, no.

4   **Q.**  As you were working in the summer of 2012 and trying to

5   find more prescribers, you were also looking for more

6   speakers at that time, right?

7   **A.**  Yes.

8   **Q.**  So that happened again in the summer before Mr. Burlakoff

9   became the head of sales, vice president of sales, and before

10  Ms. Lee came to the company, right?

11  **A.**  Yes.

12  **Q.**  So you and others had been talking about having a speaker

13  program and preparing for it, right?

14  **A.**  Yes.

15  **Q.**  And at that time, as you say, the speaker program was on

16  the right track, right?

17  **A.**  Yes.  I thought so.

18  **Q.**  Let's take a look at Exhibit 5179, please.  This is an

19  email from you to Tomasa Lagunas, right?

20  **A.**  Yes.

21  **Q.**  On July 17, 2012?

22  **A.**  Yes.

23          MS. WILKINSON:  We'd move 5179.

24          MR. WYSHAK:  No objection.

25          THE COURT:  Admitted.

```
 1                 (Defendant Exhibit No. 5179 admitted.)
 2                 THE COURT:  Could I ask you how much more you have
 3      with her?  Only because it's time for their break, and I
 4      am --
 5                 MS. WILKINSON:  Sure.  We can take the break right
 6      now, Your Honor.
 7                 THE COURT:  Are you sure?
 8                 MS. WILKINSON:  Yes, of course.
 9                 THE COURT:  I'm going to give you have a 15-minute
10      break.  We'll see you back.
11                 THE CLERK:  All rise for the jury.
12                 (The jury exits the courtroom.)
13                 (Court recessed at 2:16 p.m.)
14                 THE CLERK:  All rise for the jury.
15                 (The jury enters the courtroom.)
16                 THE CLERK:  Court is back in session.  Please be
17      seated.
18                 MS. WILKINSON:  Your Honor, we moved in 5167 and
19      5182.  The government has no objection.
20                 THE COURT:  51 --
21                 MS. WILKINSON:  67.
22                 THE COURT:  Yes.
23                 MS. WILKINSON:  5182.
24                 THE COURT:  I think 5182 is already in.
25                 MS. WILKINSON:  5179 is the one we were discussing.
```

```
1              THE COURT:  That's already in, too.
2    BY MS. WILKINSON:
3    Q.  Ms. Brown, if we could just go back for a minute, 5179.
4              You're writing to Tomasa.  You're talking about
5    visiting with him, right?
6    A.  Yes.
7    Q.  He works with Dr. Candido?
8    A.  Tomasa was, I believe, the office manager for
9    Dr. Candido.
10   Q.  You say there in the middle, "I know how busy your office
11   is, so if you become aware of an appropriate patient for
12   Subsys, would you please remind him to give Subsys a try,"
13   right?
14   A.  Yes.
15   Q.  And there you were being clear, you meant if the patient
16   needed Subsys?
17   A.  Yes.
18   Q.  You weren't trying to get someone on it who didn't need
19   it?
20   A.  No.
21   Q.  You say, "Of course we would like to encourage our
22   speakers to become clinical experts in using the product as
23   they will be advocating it to other physicians."  Right?
24   A.  Yes.
25   Q.  There where you're using the word clinical, you're very
```

1    clear, right?

2    **A.**   Mm-hmm.

3    **Q.**   It's not subtle.  You're saying they need to learn how to

4    use the product, know the risks and benefits, so when they

5    talk to other doctors they can tell them those things, right?

6    **A.**   Yes.  And this was a doctor who had really been wanting

7    to be a speaker.  He was a speaker for a lot of products.  It

8    was just something he did a lot of.  He was doing all the

9    things, but he had yet at this point to really have any

10   clinical experience with it.

11   **Q.**   It made sense for him to get clinical experience because

12   other doctors are coming to learn about that product, right?

13   **A.**   Yes.

14   **Q.**   The reason they want to hear from a doctor and not from

15   you, no disrespect, is because they want to hear from one of

16   their colleagues who actually has used it with their patient

17   and understands from a clinical perspective how it works,

18   right?

19   **A.**   Yes, that's right.

20   **Q.**   So there was nothing wrong with telling him that he

21   needed to become a clinical expert and start prescribing it

22   before he became a speaker, right?

23   **A.**   Right.

24   **Q.**   Until Mr. Burlakoff came to be the senior vice president

25   or vice president for sales, you enjoyed working at Insys,

1    right?

2    **A.**  I did in the beginning.  Pressure built over time.  As I

3    mentioned before, the beginning seemed okay, yeah.

4    **Q.**  Mr. Burlakoff became the vice president for sales

5    sometime in August 2012, right?

6    **A.**  Yeah.  I believe so.

7    **Q.**  Let's look at an email you wrote in July to Mr. Babich.

8    This is Exhibit 5184.  So this is just a month before.  And

9    it started, you see from the bottom where you wrote it, you

10   wrote it on July 6, 2012, right?

11   **A.**  Yes.

12   **Q.**  Do you recall this email?

13   **A.**  Yes.

14           MS. WILKINSON:  We move in or offer 5184.

15           MR. WYSHAK:  I have no objection to any of these.

16           THE COURT:  Admitted.

17           (Defendant Exhibit No. 5184 admitted.)

18   BY MS. WILKINSON:

19   **Q.**  Ms. Brown, you're saying here to Mr. Babich, who was the

20   CEO, right?

21   **A.**  Yes.

22   **Q.**  You wrote directly to him?

23   **A.**  Yes.

24   **Q.**  And you're thanking him and saying you're very proud to

25   work for him at Insys, right?

1   **A.**   Yes.

2   **Q.**   At that time, you had just won a contest, sales contest,

3   your region?

4   **A.**   What had happened is I think our region was really close

5   to winning the sales contest.  We were sort of the underdogs

6   at that time.  And so they had given us -- I think it was a

7   thousand dollars or something like that for being really

8   close.  It was just something nice that they did for us.

9   **Q.**   I want to talk about some of the language that's used in

10  emails.  Sometimes when you're writing an email, right,

11  you're not always writing it for posterity's sake, right?

12  **A.**   Right.

13  **Q.**   And sometimes you may use phrases you don't mean exactly

14  the way they may look years after when someone is trying to

15  decipher your intent or meaning, right?

16  **A.**   Yes.

17  **Q.**   So let's take a look at an email you wrote on Friday,

18  July 27, 2012.

19          MS. WILKINSON:  It's Exhibit 5172, and we offer it

20  if there's no objection from the government.

21          MR. WYSHAK:  Yeah.  No objection.

22          THE COURT:  Admitted.

23          (Defendant Exhibit No. 5172 admitted.)

24  BY MS. WILKINSON:

25  **Q.**   This is when you're writing to Mr. Hemenway who is still

1  your supervisor at the end of July, right?

2  **A.**  Yes.

3  **Q.**  You're talking about your third-quarter goals, right?

4  **A.**  Yes.

5  **Q.**  That's typical in sales?

6  **A.**  Yes.

7  **Q.**  Project, kind of tell your boss what you're going to do

8  and try and achieve those goals?

9  **A.**  Yes.

10  **Q.**  So you talk about your main objective for that quarter is

11  to get as many D6s through 10s writing.  Those are those

12  high-decile doctors?

13  **A.**  Yes.

14  **Q.**  And "As such, many prescriptions will be written for new

15  patients, and I expect copay card usage to be high."  Right?

16  **A.**  Yes.

17  **Q.**  You didn't think there was anything wrong with that,

18  right?

19  **A.**  No.

20  **Q.**  You talk about it, "Consequently, I believe the way for

21  me to make the largest amount of money in payout this quarter

22  is by gaining market share."  Right?

23  **A.**  Yes.

24  **Q.**  When you go down to the second paragraph, you say, "I

25  plan to change my approach with some of my doctors as well.

1    I have learned in the first quarter that people often don't

2    do what they say they will do, and it is going to take more

3    pressure for me to keep these physicians accountable."

4    Right?

5    **A.**   Yes.

6    **Q.**   You certainly weren't saying that you were trying to

7    bribe physicians, were you?

8    **A.**   No.

9    **Q.**   Holding them accountable doesn't mean bribing them?

10   **A.**   No.

11   **Q.**   You also say, "I plan to question them directly about

12   past promises," right?

13   **A.**   Yes.

14   **Q.**   "And ask that they follow through.  Also, I plan to

15   profile patients more with my docs, especially now that the

16   message is out."  Right?

17   **A.**   Yes.

18   **Q.**   When you say "past promises," you didn't promise a doctor

19   if he prescribed or she prescribed that you would pay them in

20   speaker fees, right?

21   **A.**   No.  What I meant by "past promises" in this instance was

22   a lot of times, I think, doctors in an effort to sort of shoo

23   you out of their office will say, oh, I promise to put the

24   next patient that comes through the door that's appropriate

25   on this product.  And so that's what I was referring to.

1  **Q.**   So sometimes when they say that, it's just a pleasant way

2  to say you can leave now?

3  **A.**   That's just to pacify me, yes.

4  **Q.**   You say, "I plan to profile more with my docs."

5          What do you mean by that?

6  **A.**   We were encouraged to sort of paint pictures or create

7  stories just surrounding some of the pain that some of these

8  patients would go through and sort of get them to try and

9  identify and like, oh, yeah, I remember this patient had a

10  really hard time with this or that.  So that's what I meant

11  by "patient profiling."

12  **Q.**   Kind of make it real for the doctors?

13  **A.**   Yes.

14  **Q.**   This is a patient and maybe that would trigger in them a

15  memory because most of these physicians see a lot of

16  patients, don't they?

17  **A.**   Yes.

18  **Q.**   Most of the pain specialists see a very difficult

19  population of patients, right?

20  **A.**   Definitely.

21  **Q.**   Many of those patients have multiple illnesses?

22  **A.**   Yes.

23  **Q.**   Many have been on pain medications for quite some time?

24  **A.**   Yes.

25  **Q.**   Some of those patients lie to their physicians?

1    **A.**   Yes.

2    **Q.**   And they go see other physicians to get medications?

3    They have to be tested?

4    **A.**   Yes.

5    **Q.**   So it's not an easy area of medicine to practice, is it?

6    **A.**   Not at all.

7    **Q.**   And you said you also, the bottom of the next paragraph,

8    "I plan to spread the Subsys message as far as I can while

9    still focusing on my top-decile physicians."   Right?

10   **A.**   Yes.

11   **Q.**   And the point of that is, you want as many people to know

12   about Subsys as possible, right, because you believe in it?

13   **A.**   Within my universe, right.

14   **Q.**   But you know that the physicians who have the most

15   patients that would already be the right patients for this

16   drug are the ones that you should focus on, right?

17   **A.**   Yes.

18   **Q.**   And that's something common in the pharmaceutical

19   industry, right?

20   **A.**   Yes.

21   **Q.**   Nothing unusual about targeting the high-decile

22   prescribers regardless of the medication?

23   **A.**   No.   That's usually the method.

24   **Q.**   Now, let's take another look at an email from August 9,

25   2012, that you wrote also to Mr. Hemenway.   It's

1    Exhibit 5174.  Do you see that email?

2    **A.**  Yes.

3                MS. WILKINSON:  Your Honor, we move in 5174.

4                MR. WYSHAK:  No objection.

5                THE COURT:  Admitted.

6                (Defendant Exhibit No. 5174 admitted.)

7    BY MS. WILKINSON:

8    **Q.**  I believe you mentioned Dr. Fisher in your direct

9    examination, right?

10   **A.**  Yes.

11   **Q.**  You're talking to your boss about some of your programs,

12   right, and some of your doctors?

13   **A.**  Mm-hmm.

14   **Q.**  And you say, "Below is a list of the doctors I think

15   should be invited"?

16   **A.**  Yes.

17   **Q.**  Are those ones you think should be invited to be speakers

18   or to attend a speaker program?

19   **A.**  I think I was referring to just their attendance at a

20   speaker program.

21   **Q.**  And these are different doctors in the Chicago area?

22   **A.**  Yes.

23   **Q.**  You say, "I think it would be great if we could get the

24   bigger speaker" -- if you could go down a little bit -- "from

25   Bill's territory to do the program."  Right?

195

1    **A.**  Yes.

2    **Q.**  "Otherwise I think we should go with Dr. Pantle-Fisher

3    for several reasons," right?

4    **A.**  Mm-hmm.

5    **Q.**  "The first one is I think she is less likely to be

6    competitive with these doctors because she practices strictly

7    downtown," right?

8    **A.**  Yes.

9    **Q.**  And the reality of that is doctors don't want other

10   doctors to steal their patients, right?  So they feel a

11   little competitive?

12   **A.**  Right.

13   **Q.**  So she practices downtown, and these other doctors

14   practice out in the suburbs?

15   **A.**  Yes.

16   **Q.**  And you say, "Secondly, I think it will prompt her to

17   write more."  Right?

18   **A.**  Yes.

19   **Q.**  So you are saying that if you make her a speaker, you

20   believe she will prescribe more, right?

21   **A.**  Yes.  And in the same vein that I was referring to

22   Dr. Candido that these speakers obviously need to be very

23   familiar with how this drug works in execution.

24   **Q.**  But there you're tying the speaker and the speaker fee

25   together with the prescriptions, but you're not saying you're

1    paying for those prescriptions, right?

2    **A.**  Right.

3    **Q.**  You're saying you hope, you think it will prompt her to

4    write more, right?

5    **A.**  Yes.

6    **Q.**  And that is your hope every time you go see a physician,

7    right?

8    **A.**  Sure.

9    **Q.**  Whether you make them a speaker or you go to their

10    office, right?

11    **A.**  Yes.

12    **Q.**  And that doesn't mean that you were trying to bribe

13    Dr. Fisher, right?

14    **A.**  No.

15    **Q.**  You were not, were you?

16    **A.**  I was not, no.

17    **Q.**  And you gave other reasons for why she could be a

18    speaker.  You talk about "Dr. Joshi is currently maxed out

19    and has no other patients to put on Subsys," right?

20    **A.**  Yes.

21    **Q.**  Because if they don't have patients who need it, they're

22    not going to use it, right?

23    **A.**  That's right.

24    **Q.**  You say, "Also, I think her demeanor is confident and

25    competent, and she runs an excellent practice and I think she

1    would be well respected by other physicians."

2              That's all about Dr. Fisher, right?

3    **A.**   Yes.

4    **Q.**   So you thought she was an ideal candidate to be a speaker

5    and hopefully to prescribe more?

6    **A.**   Yes.

7    **Q.**   We talked earlier and you talked in your direct

8    examination about higher doses and what would be called

9    titration, right?

10   **A.**   Mm-hmm.

11   **Q.**   And you understand that the titration was based or the

12   recommendations for the titration was based on a clinical

13   study, right?

14   **A.**   Yes.

15   **Q.**   And let's take a look at an email you received on

16   August 17, 2012, from Mr. Hemenway.  See if you recognize

17   that.  It's Exhibit 5175.  It's got some colored pictures on

18   there.

19              MS. WILKINSON:  If you go down a little bit so she

20   can see that, Randall.

21   **Q.**   Do you see that?

22   **A.**   Yes.

23   **Q.**   And you would have received that as a member of the sales

24   team, right?

25   **A.**   Yes.

```
 1                 MS. WILKINSON:  We move in 5175.
 2                 MR. WYSHAK:  No objection.
 3                 THE COURT:  Admitted.
 4                 (Defendant Exhibit No. 5175 admitted.)
 5                 MS. WILKINSON:  Thank you.
 6     BY MS. WILKINSON:
 7     Q.  Here at the top he calls you --
 8                 THE COURT:  So is 5174.  No one waited for me to
 9     say yes, but I'll say yes now.
10                 MS. WILKINSON:  Sorry.  We're trying to keep it
11     moving.
12                 THE COURT:  That's all right.
13     BY MS. WILKINSON:
14     Q.  This is Mr. Babich calling you all pain kickers, right?
15     A.  Yes.
16     Q.  It's kind of another one of those rah-rah sales things?
17     A.  Yes.
18     Q.  He says, "I want to show you the importance of getting
19     physicians to titrate their patients to the appropriate
20     dose."  Right?
21     A.  Yes.
22     Q.  He's talking about the science of it?
23     A.  Yes.
24     Q.  And you can see in bold, if you can down, he says in the
25     last column, "You will see that 56 percent of the
```

1    prescriptions for Actiq are in the 800 micrograms or higher,"

2    right?

3    **A.**   Mm-hmm.

4    **Q.**   That's the competitor that you're trying to get them to

5    switch from, and he's saying over half of them are in a

6    higher dose, right?

7    **A.**   Yes.

8    **Q.**   Those patients or those prescriptions.

9            "This is the direction we must head.  You will also

10   notice that 26 percent of our WAC comes from 800 micrograms,

11   but the 800 micrograms only accounts for 16 percent of our

12   units.  As you move up, you generate more money," right?

13   **A.**   Yes.

14   **Q.**   So yes, you generate more money on the higher dose,

15   right?  But more of these patients who are switching are

16   already on higher doses, right?

17   **A.**   Yes.

18   **Q.**   And he then shows you, go down a little bit further, the

19   diagrams, right, that support those numbers that he's

20   providing to you?

21   **A.**   Mm-hmm.

22   **Q.**   And that was the type of information you were getting

23   about the dosing when you were there, right?

24   **A.**   Yes.  At that time, yeah.

25   **Q.**   Now, when you were working with doctors, you followed up,

1   if you could, to give them more information, again to try and

2   persuade them to prescribe Subsys?

3   **A.**   Mm-hmm.

4   **Q.**   You followed up with, as you said, pain specialists but

5   also with cancer doctors or other people who prescribed the

6   medications?

7   **A.**   Yes.

8   **Q.**   Let's take a look at Exhibit 5181, which is an email from

9   you on September 20 to Dr. Ellias, dated September 20, 2012.

10   Do you see that?

11   **A.**   Yes.

12   **Q.**   If we go down, do you see your name at the bottom?

13   **A.**   Yes.

14         MS. WILKINSON:  We move in 5181.

15         MR. WYSHAK:  No objection.

16         THE COURT:  Admitted.

17         (Defendant Exhibit No. 5181 admitted.)

18   BY MS. WILKINSON:

19   **Q.**   Up at the top you say, "I hope I find you well.  I wanted

20   to touch base with you regarding a program I am planning.  I

21   would like to do a program at the cancer center at your

22   hospital and have you speak for it."  Right?

23   **A.**   Yes.

24   **Q.**   Do you recall what kind of doctor Dr. Ellias was?

25   **A.**   Yes.

1    **Q.**   What kind?

2    **A.**   Pain management.

3    **Q.**   Because he prescribed so many of these types of drugs,

4    you wanted him to come speak to oncologists and other staff

5    who support oncologists, right?

6    **A.**   Yes.

7    **Q.**   Because he had more expertise in the area?

8    **A.**   Yes.

9    **Q.**   Let's go down, if we could, to also.

10          "My company has asked reps to pass long the

11   titration message.  We are seeing many patients in the field

12   not being titrated to the appropriate therapeutic dose

13   quickly enough and therefore they are not getting adequate

14   relief."  Right?

15   **A.**   Yep.

16   **Q.**   "Obviously not because the product has failed, but

17   because they are on too low of a dose."  Right?

18   **A.**   Yes.

19   **Q.**   And if you need that breakthrough pain relief, you need

20   it right away, right?

21   **A.**   Yes.

22   **Q.**   Someone who has that kind of intense pain doesn't really

23   wan to wait around, right, for the right dose?

24   **A.**   Right.

25   **Q.**   "We just ask that you keep in close contact with your new

1    Subsys patients and remember the wide dosage range

2    available."

3    **A.**   Mm-hmm.

4    **Q.**   So there you were telling them about your experience, but

5    you were not telling them to put a patient on a specific

6    dose, right?

7    **A.**   Correct.

8    **Q.**   You were just telling them this is what happens and you

9    need to look out for that with your patient or otherwise

10   they're going to think Subsys doesn't work just because they

11   got the wrong dose, right?

12   **A.**   Right.

13   **Q.**   Now, this is in September, and around that time that's

14   when Mr. Burlakoff takes over the sales programs, right?

15   **A.**   Yes.

16   **Q.**   Now, he didn't officially run the speakers program,

17   right?

18   **A.**   Not in the beginning, no.

19   **Q.**   Mr. Napoletano did that for marketing or at least

20   approved those speakers?

21   **A.**   I think so in the beginning, yeah.

22   **Q.**   But Mr. Burlakoff liked to have influence apparently over

23   some of who those speakers were, right?

24   **A.**   Yes.

25   **Q.**   And things changed a lot, from your perspective, when

1    Mr. Burlakoff took over, right?

2    **A.**   Yes, they did.

3    **Q.**   There was kind of an in-crowd and an outside crowd?

4    **A.**   Yes.

5    **Q.**   You were not in the in-crowd, right?

6    **A.**   I was not.

7    **Q.**   Thankfully.  And Mr. Burlakoff sent emails, right?  Do

8    you know whether he texted?  Did he ever text you?

9    **A.**   He didn't text me frequently, but he used that as a means

10   for communication frequently, yes.

11   **Q.**   Did he sometimes use that as a means to communicate

12   things differently than he wanted to communicate to the

13   entire sales force?

14   **A.**   Yes.

15   **Q.**   And did you ever learn whether he actually got on other

16   people's computers, like Ms. Lee, and sent emails from other

17   people?

18   **A.**   I don't know that I ever knew of that happening, but it

19   wouldn't have surprised me.

20   **Q.**   And we were looking at the exhibit the government showed

21   you, 1759, if we could look at that again.  And that's from

22   Mr. Burlakoff in November right before you left.  And if you

23   go back to the bottom where the email starts, he's actually

24   writing to you directly, right?

25   **A.**   Mm-hmm.

1   **Q.**  And at the very end, instead of saying talk to Ms. Lee or

2   talk to someone else, he writes in big letters, "Call me if

3   you run into some difficulties," right?

4   **A.**  Yes.

5   **Q.**  And you interpreted that as him saying you can have

6   access just to me and we can talk about any issue, right?

7   **A.**  Yes.  As in don't involve anybody else in this.  Please

8   just contact me directly.

9   **Q.**  And you didn't believe that was appropriate, did you?

10  **A.**  No.

11  **Q.**  And you didn't do it, did you?

12  **A.**  I don't remember, but I don't think so.

13  **Q.**  Thank you very much.  That's all I have.

14          THE COURT:  Did you move the admission of 1759?

15          MS. WILKINSON:  Yes.

16          THE CLERK:  That was already in.

17          THE COURT:  It was already in.  Okay.

18          MR. HORSTMANN:  May I proceed, Your Honor?

19          THE COURT:  You may.

20                          CROSS EXAMINATION

21  BY MR. HORSTMANN:

22  **Q.**  Good afternoon, Ms. Brown.

23  **A.**  Hello.

24  **Q.**  You had described earlier in your testimony an issue that

25  you had with my client's attire, correct?

1    **A.**  Yes.

2    **Q.**  And you felt at that she dressed a little too sexy for

3    your taste, correct?

4    **A.**  Yeah.

5    **Q.**  And you had a problem as well, didn't you, with

6    Dr. Madison?

7    **A.**  Yes.

8    **Q.**  And you have been critical of his appearance?

9    **A.**  Yes.

10   **Q.**  From time to time, correct?

11   **A.**  Mm-hmm.

12   **Q.**  Isn't it true that you have described him as a large

13   black man in a leisure suit?

14   **A.**  Yes.

15   **Q.**  Is that correct?

16   **A.**  Mm-hmm.

17   **Q.**  And you've also called him a giant black man in a leisure

18   suit, correct?

19   **A.**  He's very tall, yes.

20   **Q.**  How tall would you say he is?

21   **A.**  Oh, I don't know.  Over 6 foot 5.

22   **Q.**  And you didn't like going to his Illinois office,

23   correct?

24   **A.**  No.

25   **Q.**  Because it was in a part of town that you didn't like to

1    go to, correct?

2    **A.**   Among other things.  But yes.

3    **Q.**   And at that time, you didn't know that he had an Indiana

4    practice, correct?

5    **A.**   I might have known it just through researching him, but I

6    never went to it.

7    **Q.**   Was that in your territory?

8    **A.**   No.  It was outside of my geographic territory.

9    **Q.**   You described his practice as a pill mill, correct?

10   **A.**   Yes.

11   **Q.**   And that's because there were patients there who were

12   being seen for various conditions involving pain and

13   receiving prescriptions for those conditions, correct?

14   **A.**   No.  That wasn't the only reason that I thought that.

15   **Q.**   Well, you didn't like the appearance of the people who

16   were being seen in Dr. Madison's office, correct?

17   **A.**   It looked a little bit sketchy to me, yes.

18   **Q.**   You didn't like how they dressed either, right?

19   **A.**   I don't know if I liked it or disliked it.  It just

20   seemed very different from some of the offices that I went

21   into otherwise.

22   **Q.**   And when you visited Dr. Madison's office from time to

23   time, you had an opportunity to meet with his staff, correct?

24   **A.**   Yes.

25   **Q.**   And he had people working for him, right?

1    **A.**   Yes.

2    **Q.**   How many people were in his office?

3    **A.**   Working for him usually, I don't know, three or four

4    maybe.

5    **Q.**   It was a very busy practice, correct?

6    **A.**   Yes.

7    **Q.**   And there was nobody there who was doing prior

8    authorizations, correct?

9    **A.**   No, I would say that there probably were, but I don't

10   know specifically how the day-to-day went for them.

11   **Q.**   Did you ever meet somebody whose specific assignment it

12   was to do prior authorizations?

13   **A.**   I don't know.

14   **Q.**   And during this time period, you had -- well, let me back

15   up.

16            During the summer of 2012, you had occasion to

17   describe your visits to Dr. Madison's office to Mr. Hemenway,

18   correct?

19   **A.**   Yes.

20            MR. HORSTMANN:  Can we have 668, which is in

21   evidence, I believe.  Page 3, I believe.  Further on, I

22   believe.  Keep going.  I'm sorry.  It's alphabetical.  This

23   we go.  Dr. Madison.

24   **Q.**   Mr. Wyshak talked to you about this email on direct

25   examination, correct?

**A.**  Yes.

**Q.**  But he didn't talk to you about the great lunch that you

had with Dr. Madison on August 10 of 2012, did he?

**A.**  No.

       MR. WYSHAK:  I object to this now.  They objected

to my --

       THE COURT:  Okay.  Mr. Horstmann, you can ask about

the rest of that email but without the narrative.  Okay?

BY MR. HORSTMANN:

**Q.**  You described for Mr. Hemenway the lunch that you had

with Dr. Madison on August 10 as having been great, correct?

**A.**  Yes.

**Q.**  And that he promised to give Subsys a try, correct?

**A.**  Yes.

**Q.**  And you also described him as forgetful and lazy, and you

had made two stops to see him to keep him on track, correct?

**A.**  Yes.

**Q.**  And then if we may go further down, you also saw him on

August 17, a week later, correct?

**A.**  Apparently, yes.

**Q.**  And that's what you're -- you're doing a weekly check-in

on Dr. Madison to see if you can squeeze a Subsys

prescription out of him, right?

**A.**  A lot of these visits were fabricated.  We were required

to make reports back to our boss about progress.  It always

1    was about progress.  So as I mentioned earlier, I wasn't

2    particularly comfortable calling on this office, so often

3    times some of these were kind of just made up.

4            MR. KENDALL:  Your Honor, I move to strike that

5    because of the business records exception under reliability.

6            THE COURT:  Hold on, please.  Overruled.

7    BY MR. HORSTMANN:

8    **Q.**  As you sit here today, do you remember which ones you

9    lied to your boss about?

10   **A.**  No.

11   **Q.**  So how many of these would you say are true?

12   **A.**  I don't know.  Like I mentioned earlier, I would go in

13   there every two weeks, once a month maybe when I felt like I

14   really had to.

15   **Q.**  And when you started seeing Dr. Madison at the Indiana

16   office, it was a much different experience, correct?

17   **A.**  What, office to office you mean?

18   **Q.**  Yes.

19   **A.**  It was different in some ways, yes.

20   **Q.**  You had no problem sitting next to him, as you testified,

21   assisting his staff with the prior approvals, correct?

22   **A.**  It wasn't that I didn't have a problem with it, but I was

23   required to, to keep my job.

24   **Q.**  And you did that every week, sometimes twice a week after

25   he started prescribing, correct?

**A.**   Yes.

**Q.**   Is that a yes?

**A.**   Yes.

**Q.**   And how many prior approvals during that period of time do you think you helped push through to insurance companies?

**A.**   I couldn't really even speculate.  I don't know.

**Q.**   How many could you do in a day?

**A.**   I mean, I wasn't sitting there pumping out paperwork to insurance companies every day.  But I don't know.  I would say on average they were probably working on four or five at a time.

**Q.**   And once again, these prior approvals were for patients who were already taking a competitor's drug, either Fentora or Actiq, and switching them over to Subsys, correct?

**A.**   Not necessarily.  That might have been the case, it might have been --

**Q.**   It's true for --

          MR. WYSHAK:  Let her answer the question.  I object to him interrupting her answer.

BY MR. HORSTMANN:

**Q.**   Are you finished with your answer?

**A.**   No.  It would have been one of the two types of patients, either a new start or a product switch.  It was patient dependent, obviously.

**Q.**   Would you agree that a vast majority of Dr. Madison's

1  Indiana patients were being switched from prior medicines

2  rather than new patients?

3  **A.**  I couldn't say if it was more than 50 percent.  I don't

4  know.

5  **Q.**  Your memory doesn't assist you today, does it?

6  **A.**  Not for that particular question, no.

7  **Q.**  All right.  With respect to the time period of August

8  through September of 2012, there were a lot of exciting

9  things going on to assist the sales staff at that period of

10  time at Insys, correct?

11  **A.**  You would have to let me know what you meant by

12  "exciting."

13  **Q.**  You had a new VP of sales, correct?

14  **A.**  Yes.

15  **Q.**  Who had different ideas about how to run a sales force,

16  correct?

17  **A.**  Yes.

18  **Q.**  You had the ability to assist clients, doctors, with

19  prior approvals, correct?

20  **A.**  Yes.

21  **Q.**  And that was something you were being encouraged to do,

22  correct?

23  **A.**  Yes.

24  **Q.**  You had a speaker program now that was being administered

25  through SciMedica, correct?

1    **A.**   Yes.

2    **Q.**   You had something called the switch program, which was

3    helping you switch patients off competitors' medications,

4    correct?

5    **A.**   Yes.

6    **Q.**   And you had the experience and good will that you had

7    built up with some of these doctors that you had visited for

8    the first six months that you were employed at Insys,

9    correct?

10   **A.**   Yes.

11   **Q.**   All right.  And Sunrise Lee begins her employment around

12   September 17 of 2012, correct?  You first met her at the

13   national sales meeting?

14   **A.**   Yes.

15   **Q.**   And so she happens to arrive at the same time that all of

16   these fabulous new programs are happening, correct?

17   **A.**   Yes.

18   **Q.**   And one of the doctors that you have her meet very early

19   on in her employment is Dr. Madison, correct?

20   **A.**   That was at the directive of the company, though.  I

21   wouldn't have chosen to take her there if it were up to me.

22   **Q.**   Okay.  But Mr. Burlakoff directed you to, right?

23   **A.**   Yes.

24   **Q.**   It's during that meeting that you say she slipped him a

25   business card, correct?

1    **A.**   Yes.

2    **Q.**   Slipped isn't really what happened, is it?  It wasn't

3    secret, was it?

4    **A.**   It wasn't secret, but I think that there was a certain

5    tone to it.

6    **Q.**   Well, you said that it was your opinion that there was a

7    certain sexuality to Ms. Lee's presence to begin with, right,

8    that you didn't like?

9    **A.**   Yes.  That's how it seemed to me.

10   **Q.**   So if she slipped a male a business card or gave a male a

11   business card, you would look at that critically to begin

12   with, right?

13   **A.**   No.  It was in the communications surrounding it which

14   implied that he was supposed to contact her sort of outside

15   of this office setting if he wanted to discuss things

16   further.

17   **Q.**   But it was done right in front of you, right?

18   **A.**   Yep.

19   **Q.**   And you were still the primary contact for Dr. Madison,

20   right?

21   **A.**   Yep.

22   **Q.**   And he was your client, right?

23   **A.**   Yep.

24   **Q.**   He never was switched over to Sunrise Lee as a client,

25   correct?

1    **A.**   No.

2    **Q.**   And you were the one who maintained daily, weekly,

3    monthly contact with him, right?

4    **A.**   Yep.

5    **Q.**   In your emails that you've now admitted are false that

6    you were sending to your supervisor --

7                MR. WYSHAK:  I object to that.  It's one email.

8                THE COURT:  The jurors will remember the testimony.

9    It's overruled.  Go ahead, Mr. Horstmann.

10   BY MR. HORSTMANN:

11   **Q.**   In your report to your supervisor in which you now have

12   admitted that you lied about certain meetings with

13   Dr. Madison, you describe having lunches with Dr. Madison,

14   correct?

15   **A.**   Yes.

16   **Q.**   Did you ever have lunch with Dr. Madison?

17   **A.**   Yes.

18   **Q.**   Okay.  So that was true?

19   **A.**   Yes.

20   **Q.**   You felt comfortable enough going out of the office to

21   have a lunch with Dr. Madison?

22   **A.**   Oh, I never went outside of the office.

23   **Q.**   But you brought him lunch and sat down and had lunch with

24   him in the office, right?

25   **A.**   Yes.

1    **Q.**   Okay.  Could we have number 5173, please.  Showing you

2    what's been marked as Defendant's Exhibit 5173 from Friday,

3    July 27, 2012.  Do you remember that email?

4    **A.**   I don't remember it specifically, but yes, I see it.

5    **Q.**   Can you look down at the bottom -- actually in the middle

6    where Dr. Madison's name is?

7    **A.**   Yep.

8    **Q.**   And read it to yourself what you put there.

9    **A.**   It says, "Madison.  Saw once this week.  Dr. Madison is

10   inattentive, forgetful, and too lazy to learn anything new.

11   I have been working more with his MA who is the one who

12   actually knows what is going on with the patients.  The MA,

13   however, is afraid of Dr. Madison, just like everybody else

14   in the office.  So my concern is that he won't insert his

15   opinion. "

16   **Q.**   Do you remember writing that?

17   **A.**   I remember feeling this way, yes.

18   **Q.**   Well, was this true when you wrote it?

19   **A.**   Yes.

20   **Q.**   This wasn't one of your lies to your boss?

21   **A.**   No.  I don't think so.  I remember working with his MA,

22   so it happened at one point.

23   **Q.**   Okay.  Can we have 5176.  Showing you what's been

24   premarked as Defendant's Exhibit 5176.  I'd ask you to take a

25   look at the email and tell me whether you remember writing

1  this.

2  **A.**  Yes.

3  **Q.**  This is an email you wrote to Sunrise with a cc to Alec

4  Burlakoff on November 14, correct?

5  **A.**  Yes.

6  **Q.**  And in this email --

7          MR. HORSTMANN:  I'd move it into evidence.

8          THE COURT:  Which?  5176?

9          MR. HORSTMANN:  Yes.  5176.

10         MR. WYSHAK:  No objection.

11         THE COURT:  Did you mean to move in 5173?

12         MR. WYSHAK:  No objection to that either.

13         MR. HORSTMANN:  In looking at it, I thought it was

14  already in.  I'll move it in and we can sort it out.

15         THE COURT:  No objections to 5173 or 5176.

16         MR. WYSHAK:  No, Your Honor.

17         THE COURT:  Okay.  They're both admitted.

18         (Defendant Exhibit Nos. 5173 and 5176 admitted.)

19  BY MR. HORSTMANN:

20  **Q.**  Directing your attention again to the November 14, 2012,

21  email that you wrote to Sunrise, you indicated that you had

22  one prescription from Madison that day?

23  **A.**  No.  I indicated that I had three, but one was a

24  600-microgram refill.

25  **Q.**  You emphasized that, correct?

1  **A.**  Yes.

2  **Q.**  You thought that was important for them to know, correct?

3  **A.**  Mm-hmm.

4  **Q.**  And you also wanted to let them know that there was good

5  news regarding insurance coverage for two patients of

6  Dr. Madison's, correct?

7  **A.**  Yes.

8  **Q.**  And there was nothing wrong with that, right?

9  **A.**  No.

10  **Q.**  And that you were getting new approvals every week in

11  Madison's office, correct?

12  **A.**  Yes.

13  **Q.**  And then you wanted to let them know in particular that

14  the Fentora rep had, pardon my language, pissed off

15  Dr. Madison, correct?

16  **A.**  Yes.

17  **Q.**  And that was important for them to know, correct?

18  **A.**  Yes.

19  **Q.**  Were you lying to Sunrise when you sent this email?

20  **A.**  I don't think so.

21  **Q.**  Because this was easy to track, right?  The three

22  prescriptions were easy to track?

23  **A.**  Right.

24  **Q.**  Directing your attention to Exhibit 5185, not in

25  evidence, directing your attention to this email.  Do you

1   remember writing this?

2   **A.**   Again not specifically, but I remember the time, yes.

3   **Q.**   Do you remember receiving the response from

4   Mr. Burlakoff?

5   **A.**   Again not specifically.

6           MR. HORSTMANN:  Move this into evidence.

7           MR. WYSHAK:  No objection.

8           THE COURT:  Admitted.

9           (Defendant Exhibit No. 5185 admitted.)

10  BY MR. HORSTMANN:

11  **Q.**   In this email on October 24, you're reporting to Ms. Lee

12  and Mr. Burlakoff that you had seven prescriptions today from

13  Madison, correct?

14  **A.**   Yes.

15  **Q.**   Mr. Burlakoff's response is "Fantastic news," correct?

16  **A.**   Yes.

17  **Q.**   These are prescriptions that are being issued while

18  you're sitting in the office, right?

19  **A.**   Yes.

20  **Q.**   You're able to collect them and count them and summarize

21  them for Ms. Lee and Ms. [sic] Burlakoff after you leave the

22  office that day, right?

23  **A.**   I mean I didn't have them in my hand to count, but the

24  idea was that we had these enrollment forms that were given

25  to each patient, you know, basically as a prescription and

1    sent over to Linden Care.  So that's how I knew the number.

2    **Q.**  But these emails were true, correct?

3    **A.**  Yes.

4    **Q.**  Directing your attention to 5187, which is not in

5    evidence, did you have a chance to review that email?

6    **A.**  Yes.

7    **Q.**  Do you remember receiving that email from Mr. Burlakoff?

8    **A.**  Again not specifically, but I remember the time, yes.

9              MR. HORSTMANN:  Move this into evidence, Your

10   Honor.

11             MR. WYSHAK:  No objection.

12             THE COURT:  Admitted.

13             (Defendant Exhibit No. 5187 admitted.)

14   BY MR. HORSTMANN:

15   **Q.**  And this email talks about an event that's going to take

16   place on the evening of November 6, correct?

17   **A.**  Yes.

18   **Q.**  And this is Mr. Burlakoff specifically telling you with a

19   cc to Ms. Lee that he's going to be in Chicago Tuesday

20   evening, correct?

21   **A.**  Yes.

22   **Q.**  And the plan is to have Sunnie partner up with another

23   local rep to get some customers to Roka, correct?

24   **A.**  Yes.

25   **Q.**  And that Alec was going to get some additional doctors to

1  the same dinner, correct?

2  **A.**  Yes.

3  **Q.**  And he wanted to do one big dinner that Tuesday, right?

4  **A.**  Mm-hmm.

5  **Q.**  And down at the bottom he says it's all about the

6  dinners, correct?

7  **A.**  Yes.

8  **Q.**  And these were not just sales meetings.  These were

9  networking opportunities, correct?

10  **A.**  Yes.

11  **Q.**  And you were encouraged to develop personal, friendly

12  business relationships with doctors, correct?

13  **A.**  Certainly friendly business relationships, yes.

14  **Q.**  These dinners provided the sales reps an opportunity to

15  do that, correct?

16  **A.**  Yes.

17  **Q.**  And you were encouraged to socialize and mingle with the

18  doctors who were there, right?

19  **A.**  I think this only maybe happened that one time.  But I

20  suppose for this event, yes.

21  **Q.**  Do you remember doctors being at Roka on November 6?  Do

22  you remember this happening?

23  **A.**  I remember Alec being in town for this.  I remember

24  Dr. Madison being there.  I don't remember a whole lot else

25  about it.  The meetings kind of ran together at some point.

1    It's hard for me to tease out the details.

2    **Q.**  So a lot of these events have sort of run together in

3    your mind, correct?

4    **A.**  Yeah.

5    **Q.**  There's a fair amount of socializing with doctors and

6    your work colleagues that went on during this period of time,

7    correct?

8    **A.**  Yes.

9    **Q.**  And is this the speaker program that ended in several of

10   you going to the Underground?

11   **A.**  I don't know that it was this one.  Again, I can't

12   remember, you know, the specific details.

13   **Q.**  Alcohol was involved as well, correct?

14   **A.**  Yes.

15   **Q.**  And there was a fair amount of alcohol consumed at these

16   events, correct?

17   **A.**  Yes.

18   **Q.**  So that's affected your memory as well, correct?

19   **A.**  Yes.

20            MR. HORSTMANN:  I think 195 is already in evidence,

21   correct?  It's a long day, Your Honor.  I'm sorry.

22            THE COURT:  Karen says it's already in.

23   BY MR. HORSTMANN:

24   **Q.**  All right.  195.  Do you remember talking about this

25   email with Mr. Wyshak?

1    **A.**  Yes.

2    **Q.**  And there are a fair amount of people on this email,

3    right?

4    **A.**  Yes.

5    **Q.**  And this is the -- these are the people that you remember

6    being at Roka that spilled over into the Underground,

7    correct?

8    **A.**  Yes.  I believe it was this night.

9    **Q.**  Okay.  It wasn't Halloween, as you remembered; it was a

10   month later, correct?

11   **A.**  Perhaps.

12   **Q.**  And with respect to the event itself, do you remember

13   being asked to complete an attendance sheet for SciMedica for

14   this event?

15   **A.**  So there was an event that happened right at Halloween,

16   and I think this was maybe a separate one from that one that

17   I was referring to.  So this was another event.  And I don't

18   remember at that point what the directive was about sign-in

19   sheets or anything about that.

20   **Q.**  Could the one that you remember being around Halloween be

21   the one that he we just talked about as being November 6?

22   **A.**  It could have been.

23   **Q.**  Would there have been two speaker programs back to back

24   on two nights involving the same speaker?

25   **A.**  There could have been, yeah.

1    **Q.**  Could have been.  Okay.  Do you remember speaker programs

2    taking place on the 5th and 6th of November?

3    **A.**  It was definitely a possibility, but I don't know if that

4    was the case or not.

5              MR. HORSTMANN:  Your Honor, may I use the ELMO just

6    for the witness?

7              THE COURT:  Of course.

8    BY MR. HORSTMANN:

9    **Q.**  Showing you what has been premarked as defendant's

10   Exhibit 5214, I'd ask you if you remember that type of form

11   generally.

12   **A.**  Yeah.  They were used at one point as a sign-in sheet.

13   **Q.**  Okay.  And do you recognize any of the handwriting on

14   this particular sheet?

15   **A.**  Well, yeah.  I recognize my own.

16   **Q.**  And your name's on it as the rep, correct?

17   **A.**  Yes.

18             MR. HORSTMANN:  Your Honor, I'd offer this as

19   Defense Exhibit --

20             THE COURT:  -- 5214.  Any objection?

21             MR. WYSHAK:  No.

22             THE COURT:  It's admitted.

23             (Defendant Exhibit No. 5214 admitted.)

24             MR. HORSTMANN:  May we publish it to the jury?

25   BY MR. HORSTMANN:

1    **Q.**  Without going back to it, on direct exam you were

2    questioned about an email where Mr. Burlakoff was requesting

3    follow-up names and signatures from you for attendees at a

4    Madison speaker program, correct?

5    **A.**  Yes.

6    **Q.**  And this appears to be a Madison speaker program that

7    occurred on November 5 of 2012, correct?

8    **A.**  Yes.

9    **Q.**  And you're listed as the rep, and you sign off with your

10   signature at the top, correct?

11   **A.**  Yes.

12   **Q.**  And the speaker signs off as well, correct?

13   **A.**  Yes.

14   **Q.**  Do you recognize that to be Dr. Madison's signature?

15   **A.**  I wouldn't remember what that looked like.

16   **Q.**  And this is a dinner program, correct?

17   **A.**  Yes.

18   **Q.**  Directing your attention down to the bottom of the form,

19   there's a reference to SciMedica group, correct?

20   **A.**  Yes.

21   **Q.**  So this is a form that's prepared by SciMedica group

22   pursuant to whatever contract they had with Insys at that

23   point in time, correct?

24   **A.**  Yes.

25   **Q.**  And that's where you're supposed to submit this

1    attendance log was to SciMedica, correct?

2    **A.**   Yes.

3    **Q.**   All right.  And this lists three additional doctors who

4    were at this particular speaker program, correct?

5    **A.**   Yes.

6    **Q.**   And were you responsible for collecting their names and

7    signatures?

8    **A.**   Yes.

9    **Q.**   And are these accurate, to the best of your knowledge?

10   **A.**   Yes.

11   **Q.**   You didn't falsify anybody's signature on these?

12   **A.**   No.

13   **Q.**   This was a legitimate speaker program put on by Insys for

14   Dr. Madison on November 5 of 2012, correct?

15   **A.**   Yes.

16   **Q.**   Directing your attention to the event that occurred at

17   the Underground, was this the first time that you had ever

18   been to the Underground?

19   **A.**   I think so, yes.

20   **Q.**   And do you recall receiving any instructions from

21   Mr. Burlakoff before going to the Underground with Ms. Havens

22   and Ms. Lee and Dr. Madison?

23   **A.**   No, I didn't receive anything from him directly, I don't

24   think.

25   **Q.**   Okay.  How would you describe the Underground?

1    **A.**   A club, you know, loud, a little trashy.

2    **Q.**   Not your style?

3    **A.**   Not my style.

4    **Q.**   There are a fair amount of half-dressed people walking

5    around the club at any point in time?

6    **A.**   Yes.

7    **Q.**   And some fairly promiscuous dancing going on, correct?

8    **A.**   Yes.

9    **Q.**   You didn't like it there, did you?

10   **A.**   No.  It wasn't my kind of place.

11   **Q.**   All right.  And you had a fair amount to drink that

12   night, right?

13   **A.**   Yes.

14   **Q.**   And at one time you claim you looked over and you saw

15   something happening between Ms. Lee and Dr. Madison, correct?

16   **A.**   Yes.

17   **Q.**   And you had been warned about Dr. Madison by your prior

18   supervisor, correct?

19   **A.**   Yes.

20   **Q.**   And you had been warned that he had a certain reputation

21   with female sales reps, correct?

22   **A.**   Maybe.

23   **Q.**   You're not remembering that?

24   **A.**   Well, yeah.  I guess so, by Mike, yes.

25   **Q.**   And what you saw was consistent with the warning that

1    Mr. Hemenway had given you, correct?

2    **A.**  Yes.

3    **Q.**  Dr. Madison appeared to be taking advantage of Ms. Lee,

4    correct?

5    **A.**  Yes.

6               MR. HORSTMANN:  May I have one moment, Your Honor?

7               THE COURT:  Yes.

8               MR. HORSTMANN:  No further questions, Your Honor.

9               MS. MINER:  Just a few, Your Honor.

10              THE COURT:  Go ahead.

11                          CROSS EXAMINATION

12   BY MS. MINER:

13   **Q.**  Good afternoon, Ms. Brown.

14   **A.**  Hello.

15   **Q.**  I know it's been a long day, so I'm going to be quick.

16   **A.**  That's okay.

17   **Q.**  You testified after the launch of Subsys you started

18   detailing doctors in your territory on the medication to try

19   to get them to prescribe the medication, right?

20   **A.**  Yes.

21   **Q.**  In the course of your early detailing, you learned that

22   managed care presented some obstacles to doctors prescribing.

23   Isn't that fair?

24   **A.**  Yes.

25   **Q.**  Some plans wouldn't cover Subsys at all, would they?

1   **A.**   No, they wouldn't.

2   **Q.**   And other plans required prior approval, right?

3   **A.**   Yes.

4   **Q.**   And prior approval involves paperwork going back and

5   forth?

6   **A.**   Yes.

7   **Q.**   To the insurance company?

8   **A.**   Yes.

9   **Q.**   That's not limited to Subsys, right?

10  **A.**   No.  It happens with all kind of drugs.

11  **Q.**   It happens in all the class of drugs?

12  **A.**   Yeah.  For the most part.

13  **Q.**   And it also happens in all sorts of branded drugs having

14  other indications, right?

15  **A.**   Yes.

16  **Q.**   And doctors' offices don't like to do it, do they?

17  **A.**   They don't like it, no.

18  **Q.**   In fact, the prior approval process was often a nightmare

19  for doctors.  Isn't that fair?

20  **A.**   Yes.  They would say that.

21  **Q.**   And you heard complaints from doctors and their staffs

22  about the process, right?

23  **A.**   Yes.

24  **Q.**   And you had never been given any training in prior

25  authorizations, right?

1    **A.**   No.  It was my first exposure to them.

2    **Q.**   And you had no history with the insurance industry,

3    right?

4    **A.**   No.

5    **Q.**   And in your experience, a lot of prior approvals for

6    Subsys were being denied at first, right?

7    **A.**   Yes.

8    **Q.**   And they were being denied for all sorts of reasons,

9    right?

10   **A.**   Yes.

11   **Q.**   Sometimes the doctor's office didn't put the right

12   information on it, right?

13   **A.**   Right.

14   **Q.**   Sometimes it was missing a phone number, right?

15   **A.**   Yes.

16   **Q.**   It was a pain, right?

17   **A.**   Yes.

18   **Q.**   If a prior approval was denied, the doctor's office could

19   appeal that through the insurer, right?

20   **A.**   Right.

21   **Q.**   That was even more time consuming?

22   **A.**   Yes.  That was something they were even less likely to

23   do.

24   **Q.**   And that was even more work for the doctors office?

25   **A.**   Yes.

1    **Q.**  And sometimes in that process, the insurance companies

2    required what was called a letter of medical necessity; is

3    that right?

4    **A.**  Yes.

5            MS. MINER:  If we could have Exhibit 504, which is

6    in evidence, on the screens, please.  Thank you.

7    **Q.**  And on direct examination you testified about this form

8    letter of medical necessity letter, correct?

9    **A.**  Yes.

10   **Q.**  You don't recall who gave you this at corporate, right?

11   **A.**  I don't remember where it came from.

12   **Q.**  You don't even remember when you got it, right?

13   **A.**  No.

14   **Q.**  But it was given to you by somebody that you could use

15   with doctors' offices?

16   **A.**  Yes.

17   **Q.**  Now, this was just a form, right?

18   **A.**  Yes.

19   **Q.**  To fill it out, doctors were supposed to go through the

20   patient's file, correct?

21   **A.**  Yes.

22   **Q.**  And where it says in the middle, "In an effort to control

23   his pain and improve his quality of life, he or she has been

24   prescribed the following medications."

25            And the intent there was for the doctor to write

1    down the medications that that patient had tried and failed,

2    right?

3    **A.**   Yes.

4    **Q.**   And they would get that information from the patient

5    file, right?

6    **A.**   Yes.

7    **Q.**   You never made up a medication to put on that list, did

8    you?

9    **A.**   No.

10   **Q.**   You never told a doctor to make up any medication?

11   **A.**   No.

12   **Q.**   And if you go to the next paragraph, the second line, it

13   says, "However, severe breakthrough pain continues to be a

14   problem."

15            Do you see that?

16   **A.**   Yes.

17   **Q.**   You were asked on direct that it doesn't say "severe

18   breakthrough cancer pain," correct?

19   **A.**   Right.

20   **Q.**   Because doctors could prescribe it for any patient,

21   correct?

22   **A.**   Right.

23   **Q.**   So this form doesn't say "cancer."  It's not representing

24   that it's a cancer patient, right?

25   **A.**   Right.

1    **Q.**  It refers to whatever diagnosis that patient had.  Isn't

2    that fair?

3    **A.**  Yes.

4    **Q.**  You yourself never drafted these letters, right?

5    **A.**  No.

6    **Q.**  The doctor's office did it, correct?

7    **A.**  Right.

8    **Q.**  You might guide them or tell them -- or help fax things,

9    but you didn't sit there and write the information, correct?

10    **A.**  No.

11    **Q.**  And you never told a doctor's office to lie on any of

12    these forms, did you?

13    **A.**  No.

14    **Q.**  To your knowledge, when you were there, no doctor did lie

15    on these forms, correct?

16    **A.**  I don't think so.  Not that I knew of.

17    **Q.**  Now, at some point during your tenure, Insys entered into

18    an arrangement with a pharmacy called Linden Care.  Do you

19    recall that?

20    **A.**  Yes.

21         MS. MINER:  If I could have Exhibit 5185, just for

22    counsel and the witness, please.  I'm sorry.  This is in

23    evidence.  So everybody can see it.

24    **Q.**  So this is an email where you're talking about the

25    prescriptions went to Linden Care?

1    **A.**   Yes.

2              MS. MINER:  If I could have 5165, which I don't

3    believe is in evidence.  So just counsel and the -- and if

4    you could look at the header.

5    **Q.**   This is an email from Mike Gurry, correct?

6    **A.**   Yes.

7    **Q.**   To sales all?

8    **A.**   Yes.

9    **Q.**   That would have included you, correct?

10   **A.**   Yes.

11   **Q.**   It's dated October 23, correct?

12   **A.**   Yep.

13             MS. MINER:  I'd move its admission.

14             MR. WYSHAK:  No objection.

15             THE COURT:  Admitted.

16             (Defendant Exhibit No. 5165 admitted.)

17   BY MS. MINER:

18   **Q.**   This is an email informing the sales about the

19   partnership with Linden Care, correct?

20   **A.**   Yes.

21   **Q.**   And that actually helped the sales reps to some extent,

22   correct?

23   **A.**   Yes, to some extent it did.

24   **Q.**   Because if doctors' offices didn't know how to do them or

25   didn't want to do them it, Linden Care in certain states

1    would help out?

2    **A.**   That was the idea, yeah.

3    **Q.**   And your doctors utilized that?

4    **A.**   Yes.

5    **Q.**   As a tool, correct?

6    **A.**   Yes.

7    **Q.**   After working at Insys, you went to a company called

8    Depomed, correct?

9    **A.**   Yes.

10   **Q.**   And that markets a drug called Lazanda, correct?

11   **A.**   Yes.

12   **Q.**   That's another one of these TIRF REMs, correct?

13   **A.**   Yes.

14   **Q.**   It's a competitor to Subsys, correct?

15   **A.**   Yes.

16   **Q.**   And you encountered the same type of prior approval

17   issues with Lazanda, correct?

18   **A.**   Yes.

19   **Q.**   Lazanda also had a program for its patients that would

20   help them through the prior authorization.

21   **A.**   Yes.

22   **Q.**   It was called signature support?

23   **A.**   Yes.

24   **Q.**   Do you recognize this form?

25   **A.**   Yes.

1    **Q.**  Is that the form that Depomed used?

2    **A.**  Yes.

3           MR. WYSHAK:  I object to this.  What's this got to

4    do with this case?  It's irrelevant.

5           THE COURT:  You mean you object on relevance?

6           MR. WYSHAK:  Yes.

7           THE COURT:  Are you going to link this up,

8    Ms. Miner?

9           MS. MINER:  Can we approach?

10          THE COURT:  Yes.  Take a stretch if you all want.

11          (The following was held at sidebar.)

12          MS. MINER:  Your Honor, I would offer this.  It's a

13   similar program at Depomed, competitor.  I will link it up.

14   Part of what they did is do market research to find out what

15   other -- this is an Insys document.  It came from Insys.  It

16   came actually from the government.

17          MR. WYSHAK:  It's not an Insys document.

18          MS. MINER:  It came from the government to us

19   through Insys.  And I think the fact that other companies

20   have similar programs doing similar things is relevant.

21          MR. WYSHAK:  First off, it's beyond the scope of

22   direct.  I didn't ask anything about this subject matter.

23   This was brought up, I think, by one of defense counsel on

24   cross.  I don't know what the relevance of this is with this

25   particular witness.  It may be some other witness you can get

1    this in through.

2              MS. MINER:  Mr. Wyshak skipped that part of her

3    employment.

4              THE COURT:  Are you going to question her -- Is the

5    amount of questions you're going to going to take more or

6    less time than this side bar?

7              MS. MINER:  Much less.

8              THE COURT:  Okay.  Go ahead.

9              MR. KENDALL:  Thank you, Your Honor.  Can we make

10   that a precedent?

11             (End of sidebar.)

12   BY MS. MINER:

13   Q.   Exhibit 5213 --

14             THE COURT:  -- which has not been admitted, right?

15             MS. MINER:  I'd move its admission, Your Honor.

16             THE COURT:  They object.  It's overruled.  It's

17   admitted --

18             MS. MINER:  Thank you.

19             THE COURT:  -- subject to you linking it up.

20             (Defendant Exhibit No. 5213 admitted.)

21   BY MS. MINER:

22   Q.   This is a form with the similar types of information that

23   was required by Insys, right?

24   A.   Yes.

25   Q.   So this was nothing new to you at Depomed, right?

1   **A.**   No.

2          MS. MINER:  Nothing further, Your Honor.

3          MR. TYRRELL:  I'll be very brief, Your Honor.

4          THE COURT:  Why do you guys keep telling me you're

5   going to be very brief?  Am I putting time pressure on

6   anybody?

7          MR. TYRRELL:  I am true to my word.

8                       CROSS EXAMINATION

9   BY MR. TYRRELL:

10  **Q.**   Good afternoon, Ms. Brown.

11  **A.**   Hello.

12  **Q.**   We've never met.  My name is Steven Tyrrell, and I

13  represent Rich Simon.  You and I have never met, have we?

14  **A.**   No.

15  **Q.**   Likewise, you've never met Mr. Simon, have you?

16  **A.**   No.  I don't even know which one --

17  **Q.**   Do you still have Exhibit 1 in front of you?

18  **A.**   Yes.

19  **Q.**   I think you told us before that's an individual unit of

20  Subsys, correct?

21  **A.**   Yes.

22  **Q.**   And those Subsys units would come in different strengths,

23  100, 200, 400, 600 and 800 micrograms, correct?

24  **A.**   Yes.

25  **Q.**   So if a patient had received a prescription, a refill,

1    and had been titrated up to a higher dose, say

2    1200 micrograms, they would actually have to take two of

3    those in order to address their breakthrough pain, correct?

4    **A.**  Yes, that's right.

5    **Q.**  So for someone like that that was experiencing, let's

6    say, four episodes of breakthrough pain a day, they would

7    actually have eight for the day, correct?

8    **A.**  Yes.

9    **Q.**  And a 30-day prescription would then be 240 units,

10   correct?

11   **A.**  Yep.

12           MR. TYRRELL:  Thank you.  I have nothing further.

13           MR. KENDALL:  Nothing, Your Honor.

14           THE COURT:  Just for the jury.  We have direct, we

15   have cross, we have redirect, and recross.  But we don't do

16   any more than that.  The government has the option of

17   redirect.

18           MR. WYSHAK:  Yes.  Thank you, Your Honor.

19                        REDIRECT EXAMINATION

20   BY MR. WYSHAK:

21   **Q.**  Ms. Brown, is there a difference between a sales pitch

22   and science?

23   **A.**  A sales pitch and what?

24   **Q.**  Science?

25   **A.**  Yes.

1   **Q.**   Now, maybe it's easier if I use the ELMO.  You were asked

2   on cross-examination, for example, Defendant's Exhibit 5169.

3   But this is a email from Mike Hemenway to his sales team,

4   right?

5   **A.**   Yes.

6   **Q.**   And in that first paragraph there's some bold language?

7   **A.**   Mm-hmm.

8   **Q.**   And it says, "When discussing making the switch with

9   doctors, it helps put it in perspective to remind them we are

10  not switching the pharmacology on their patients, only the

11  delivery system."

12          Now, is that a sales pitch, or is that the science?

13  **A.**   I mean, that's referring -- it's not a completely

14  accurate statement.  So I think it's kind of a mash-up of

15  trying to put science into a sales statement.

16  **Q.**   All right.  It's a sales pitch, right?

17  **A.**   Yeah.

18  **Q.**   It's to try to convince the doctors.  In fact,

19  Defendant's Exhibit 5022, which is the revised package

20  insert, specifically says --

21          MR. KENDALL:  Can we not show the Post-its, Your

22  Honor?

23          THE COURT:  Post-it off.  Karen is telling me this

24  is not admitted.

25          MR. WYSHAK:  Well, I offer it then.

```
1              MS. WILKINSON:  No objection, Your Honor.
2              MR. TYRRELL:  No objection.  Without the Post-it.
3              THE COURT:  I wasn't saying you couldn't admit it.
4    I was just saying it was not admitted.  If there's no
5    objection and you want it admitted, 5022 is admitted.
6              (Defendant Exhibit No. 5022 admitted.)
7    BY MR. WYSHAK:
8    Q.  Looking at when it starts with "When dispensing," can you
9    see that on your screen?
10   A.  Yes.
11   Q.  "When dispensing Subsys, do not substitute a Subsys
12   prescription for any other fentanyl product.  Substantial
13   differences exist in the pharmacokinetic" --
14             You know that word, right?  How do you say that?
15   A.  -- "pharmacokinetic profile" --
16   Q.  Okay.
17             -- "of Subsys compared to other fentanyl products
18   that result in clinically important differences in the rate
19   and extent of absorption of fentanyl.  As a result of these
20   differences, the substitutions of the same dose of Subsys for
21   the same dose of any other fentanyl product may result in a
22   fatal overdose."
23             Again, this document that you were shown by defense
24   is more of a sales pitch than the science, right?
25   A.  Yes.
```

1    **Q.**  This one also, Defendant's Exhibit 5175.  This is about,

2    again, the switch, starting where my finger is.

3              "Our titration message" --

4              I don't know if you can see that.

5              "Our titration message must be clear, concise, and

6    delivered on each column.  The last column you'll see

7    50 percent of the prescriptions for Actiq are in the 800

8    micrograms or higher.  This is the direction we must head.

9    You will also note that 26 percent of our" --

10             What is WAC with the dollar sign?  What does that

11   mean?

12   **A.**  Wholesale acquisition cost.

13   **Q.**  Okay.

14             -- "come from the 800 micrograms, but the 800

15   micrograms only accounts for 16 percent of our units.  As you

16   move up, you generate more money."  Right?

17   **A.**  Yes.

18   **Q.**  More money for you, correct?

19   **A.**  Yes.

20   **Q.**  And more money for the company?

21   **A.**  Yes.

22   **Q.**  Again this is something, a message you're being sent to

23   try to incentivize you to have doctors titrate up; is that

24   right?

25   **A.**  Yes.

1  Q.  And in fact, I think it's Ms. Wilkinson asked you about

2  this titration issue.  And again showing you what's

3  Defendant's Exhibit 5022 and the chart --

4          MS. WILKINSON:  Your Honor, we'd just ask again the

5  yellow sticky not be --

6          MR. WYSHAK:  I'm sorry.

7  BY MR. WYSHAK:

8  Q.  If you look at this chart, again, this is the FDA product

9  insert?

10 A.  Yes.

11 Q.  Right?  The science doesn't equate Actiq doses with

12 Subsys doses, right?

13 A.  Not directly.

14 Q.  As a matter of fact, it's 200 of Actiq to 100 of Subsys.

15 For the 800 which they're talking about in that last email,

16 it's 200, correct?

17 A.  Yes.

18 Q.  So there's not a-one-to one correlation --

19 A.  No.

20 Q.  -- for a Subsys dose to an Actiq dose.  Is that fair to

21 say?

22 A.  That's correct.

23 Q.  So again, this is a little sales pitch that Defendant's

24 Exhibit 5175, your boss is sending you to try to get you to

25 give a message to doctors, right?

A.   Yes.

Q.   And again this one, 5182.  Right where my finger is there.  He's telling you, "Giving relief faster, more powerful, and in a convenient way is our simple message."

So we talked about that a little bit, too, didn't we?  The faster acting effects of Subsys makes it more dangerous; is that right?

A.   Yes.

MR. WYSHAK:  That's all I have, Your Honor.

THE COURT:  Recross anyone?

MS. WILKINSON:  Just two things, Your Honor.  I just need to find them.

MR. WYSHAK:  I do have one more question.  Sorry.

BY MR. WYSHAK:

Q.   Mr. Horstmann asked you about this event at the Underground and whether Dr. Madison was taking advantage of Ms. Lee.  Do you remember that question?

A.   Yes.

Q.   So did you see Dr. Madison forcibly acting in any way to force Ms. Lee to do what it was she was doing?

A.   No.  It didn't seem forced.

Q.   Was she objecting?

A.   No.

Q.   To the activity?

A.   No.

1    **Q.**  Was she participating in the activity?

2              MR. HORSTMANN:  Objection.

3              THE COURT:  Overruled.

4    **A.**  Yes, from what I could see.

5    BY MR. WYSHAK:

6    **Q.**  Okay.  Without getting into the lurid details -- okay, I

7    won't.

8              Did she ever say to you after that event that there

9    was any force used at all in that incident?

10   **A.**  No.

11   **Q.**  Okay.

12             MR. WYSHAK:  Thank you.

13                        RECROSS EXAMINATION

14   BY MS. WILKINSON:

15   **Q.**  Ms. Brown, in 5022, which is the label for Subsys that

16   shows the conversion chart for Actiq and Subsys --

17   **A.**  Mm-hmm.

18   **Q.**  -- that's just where you start, the initial dosing,

19   right?  It's not saying where you end up.  It's saying if

20   someone was on 600 micrograms of Actiq, you need to start

21   them on Subsys at 200, right?

22   **A.**  Yes.

23   **Q.**  Do you see where it says up there "Initial Dosing,"

24   right?

25   **A.**  It's not pulled up, but yes.

1    Q.   And then you can titrate up from there, correct?

2    A.   Yes.

3    Q.   This is not a chart, as counsel just suggested, that's

4    supposed to say what dose equals another dose.  It's just

5    saying if you are on this dose you're supposed to start in

6    Subsys on this?

7    A.   That would be correct, yes.

8    Q.   Now, almost all the warnings that you were read early in

9    the case or early in the examination about the dangers of

10   Subsys are the exact same warnings and dangers on Lazanda,

11   right?

12   A.   Yes.

13   Q.   You've become familiar with that label, right?

14   A.   Yes.

15   Q.   It has the same format, right, because the FDA regulates

16   the format?

17   A.   Yes.

18   Q.   It talks about the risk of respiratory depression?

19   A.   Yes.

20   Q.   Abuse, addiction?

21            MR. WYSHAK:  I object.  This is beyond the scope of

22   redirect.

23            THE COURT:  True.

24            MS. WILKINSON:  Okay.  I have one more, Your Honor.

25            THE COURT:  You can have one more.  But he's right,

```
 1   it's beyond the scope.
 2   BY MS. WILKINSON:
 3   Q.  And does it also warn of death?
 4   A.  Yes.
 5           MS. WILKINSON:  That's all.
 6           THE COURT:  Anybody else?  Get yourself to a
 7   microphone, Mr. Horstmann.  Pick a microphone.  You have to
 8   pick one.
 9                       RECROSS EXAMINATION
10   BY MR. HORSTMANN:
11   Q.  Ms. Brown, I believe you testified earlier that
12   Dr. Madison was 6-5, correct?
13   A.  Yes.
14   Q.  How much did he weigh?
15   A.  Oh, gosh.  I don't know.  300-plus.
16   Q.  300-plus?  And Sunrise Lee is every bit of --
17   A.  Very small.
18   Q.  -- 4 foot 3, 100 pounds soaking wet?
19   A.  Yes.
20   Q.  Both of them were very inebriated that night?
21   A.  Yes, I would assume so.
22   Q.  And you were, too, correct?
23   A.  Yes.
24   Q.  Okay.
25           MR. HORSTMANN:  Okay.  No further questions.
```

1          THE COURT:  Okay.  You are excused.

2          MR. WYSHAK:  May we approach?

3          THE COURT:  Yes.

4          (The following was held at sidebar.)

5          MR. WYSHAK:  So we could start with another

6     witness, but I do teach Tuesday nights.

7          THE COURT:  I'm not going to make you start a new

8     witness.  This has been a very efficient day.  I'm not going

9     to make you start another witness.  The jurors are asking

10    about our schedule for the next few weeks.  I'm thinking

11    subject to all of your schedules, that next Friday would also

12    be a half day.

13         MS. WILKINSON:  Great.

14         THE COURT:  And 2/8 would also be a half day.

15         MS. WILKINSON:  Is that a Friday?

16         THE COURT:  That's also a Friday.

17         MR. YEAGER:  That's the next two Fridays we're

18    talking about?

19         THE COURT:  Next two Fridays.

20         MR. TYRRELL:  This Friday is 2/1, that's a half day

21    and then the 8th.

22         THE COURT:  And 2/13 I have to do half day because

23    I have Harvard arguments in the afternoon.

24         MS. WILKINSON:  Good luck.

25         THE COURT:  2/18 is President's Day, we'll take

1   that whole day off.  2/27 is a Wednesday, which I also need

2   off.  I have a sick kick who has a procedure that day.

3           MR. TYRRELL:  Are we off that week?

4           THE CLERK:  They asked that.

5           MS. WILKINSON:  There's someone on there.  Can we

6   let them go while we're doing it?

7           THE COURT:  I want to tell them.

8           MS. MINER:  Can we just get up to that week?

9           THE COURT:  Up to the 2/27?

10          MS. MINER:  No.  Up to the 18th.

11          MR. TYRRELL:  Can we make the inquiry of them?

12          THE COURT:  I can.  That's what I was going to ask

13  you.  Do you want me to ask them or do you want me to hold

14  off?

15          MS. MINER:  I would ask, Your Honor.

16          MS. WILKINSON:  Let us talk about our schedule

17  first.

18          MR. TYRRELL:  I thought based on who we had picked

19  that we were going to be off that week.

20          THE COURT:  My notes don't reflect that we picked

21  anyone.

22          MS. WILKINSON:  I think we know the juror, and

23  we'll be able to bring it to her and it will make it easier.

24          THE COURT:  We'll give them the next couple of

25  weeks.  And then just so you know -- actually I'm going to

1      let them go.  Can you guys stay here for a second?

2                                    (End of sidebar.)

3          THE COURT:  The government is ready to go with its

4      next witness, but it doesn't seem to make a lot of sense to

5      start.  I know you guys have been asking about the schedule

6      for the next few weeks so you can plan.  Let me give you at

7      least the next three weeks.  We'll sit a half day this Friday

8      for February 1.  We will sit a half day next Friday which is

9      February 8.  We will sit a half day the next week on

10     Wednesday which is February 13.

11         So for those of you that need to do your

12     Valentine's Day shopping you'll have Wednesday afternoon.

13     And that will give you -- we'll give you what comes after

14     that tomorrow.

15         My usual warnings.  Keep an open mind.  We're just

16     getting going here.  No communications to any people or any

17     social media outlet.  And the no homework rule.  Don't do any

18     independent research or anything that may have intrigued you

19     here today.  And we will see you at 10:00 tomorrow.  Okay?

20     Thanks, everybody.

21         THE CLERK:  All rise for the jury.

22                     (The jury exits the courtroom.)

23         THE COURT:  Could I see counsel back at sidebar.

24     (The following was held at sidebar.)

25         THE COURT:  This is just an FYI.  Jon Saltzman from

1    The Globe, apparently he was notified about that juror that

2    made the --

3              MR. KENDALL:  He contacted me as well.

4              MS. MINER:  He contacted everybody, Your Honor.

5              THE COURT:  Through the Clerk's office we've

6    responded to him and told him that the juror was not in

7    violation of our court order, and that nobody is seeking to

8    have him removed.  So that's just an FYI.  It was done

9    through the Clerk's office and not by the Court.

10             MS. WILKINSON:  They don't have enough to write

11   about.

12             MR. KENDALL:  He missed my opening, that's why.

13             THE COURT:  I just feel like it's better to not

14   have them speculating about it.  Just an FYI that we did

15   that.  Karen says there's some other juror trying to make her

16   escape.  Karen says she's been professing all day that she

17   has a note to give Karen, and Karen keeps putting her off.

18   She's off collecting the note right now.

19             MS. WILKINSON:  Which one?

20             THE COURT:  I think it's number five.  I think it's

21   the one whose mother has the MRI on Friday.  The one with a

22   smile on her face.  I'm hoping that the MRI is in the

23   afternoon.  We're already sitting a half day that day.  I'm

24   hoping that solves that problem.  That's this Friday.  That's

25   what the original complaint was.  The original complaint was

1    there was an MRI on Friday.

2            MR. KENDALL:  Your Honor, may I raise an

3    evidentiary issue.  You don't have to rule on it, but you can

4    think about it and address it in the morning.

5            THE COURT:  Thank you.

6            MR. KENDALL:  You don't have to rule on it now.

7    I'm not pressing for you to give a decision.  We can decide

8    it tomorrow if that's convenient for you.  The witness

9    testified that she put in false entries into those weekly

10   updates.  There's four exhibits that are relevant to that.

11   Exhibit 2 and then three others.  She reiterates the same

12   thing.  She testified she falsified the entries.

13           THE COURT:  It's just like your billing at White &

14   Case.

15           MR. KENDALL:  Your Honor, it's like Yale Strogoff's

16   records from his junkyard.  Touche you could say.  It is

17   exactly the issue of her client when she was in private

18   practice.

19           THE COURT:  Misunderstood.

20           MR. KENDALL:  Your Honor, and the records were

21   excluded for failure to meet 803(6)(E), preparation is not

22   otherwise untrustworthy, the prerequisite for the business

23   records.  The government didn't lay a foundation and ask its

24   witness were they done with reliability.  The record seemed

25   like it got skimmed over in laying the foundation.

1    I'd ask you to reconsider if that meets the

2    standard of 803(6)(E) because they clearly were not prepared

3    in a way that they were reliable.  Just the opposite.  They

4    purposely were prepared to deceive.  I know it's a ridiculous

5    objection ...

6         THE COURT:  It is.

7         MR. KENDALL:  I'm making fun of the government

8    saying all of our objections are ridiculous.

9         MR. LAZARUS:  Your Honor, we disagree.

10        THE COURT:  I'm shocked to hear that.

11        MR. LAZARUS:  In any event, the witness Maury Rice

12   testifies tomorrow and will include those records.  The

13   argument, as I understand, was there was false information

14   that was put in there.  It still is business record that was

15   kept in the ordinary course.  It was still information sent

16   to her boss.  The fact that the information that she put in

17   may not have been accurate, it was still prepared in the

18   ordinary course.

19        MR. KENDALL:  Your Honor, the government is

20   ignoring the point.  803(6)(E) says in addition to everything

21   she says they also have to be prepared in a way that was

22   trustworthy.  If she falsifies things, it can never be

23   prepared in a was that it was trustworthy.

24        THE COURT:  I will look at it tonight.  My

25   understanding is trustworthy means it's an accurate rendition

1    of that which she's putting into the record.

2          MR. KENDALL:  She has to have personal knowledge

3    and record that personal knowledge accurately.  That was the

4    Strogoff junkyard records.  They had personal knowledge and

5    then put in the wrong numbers purposefully.  That's why they

6    didn't qualify.

7          THE COURT:  I will look at it.  Don't hold your

8    breath on that objection.

9          MR. LAZARUS:  In any event, Your Honor, I believe

10   the record is the portion she was testifying about,

11   particularly Dr. Madison and his shady pill mill, that was

12   accurate.  Anything else they were talking about these other

13   events, we disagree, but we would ask the Court to look at

14   that carefully.

15         MS. WILKINSON:  The only part they want in, Your

16   Honor.

17         MR. KENDALL:  Your Honor, going forward when they

18   lay the foundation, can we have them do it according to Hoyle

19   and go through each issue, whether the person had knowledge

20   that this is accurate, because otherwise we're going to get

21   more false stuff coming in because somebody certified it who

22   never read it and knows nothing about it.

23         MR. LAZARUS:  First of all, there's no obligation

24   that the person has read all of the records that they're

25   putting in and certifying as business records.  That's clear.

1    Second of all, I'll put in whatever foundation the Court

2    would like.  We turned over timely certifications for all

3    these documents.  They comply with 902(11).  They don't need

4    any additional evidence of authenticity.  They don't need

5    testimony.  The law is clear on that.

6            If counsel is not satisfied with the

7    certifications, that's fine.  But I will note that for all

8    the other records that counsel asks us to consider, we're

9    going have to take another look at how to handle documents.

10   We're going to be here forever.

11           THE COURT:  Stop.  No, we're not.  I will take a

12   look at the issue tonight.  Don't hold your breath on the

13   success of that motion.  You have should not torture them by

14   going through their certificates tonight.

15           MR. LAZARUS:  Understood, Your Honor.

16           THE COURT:  I don't know where Karen is.  Her

17   failure to return is not a good sign.

18           Let me know what your thoughts are on February

19   vacation.  Personally I'd rather forge forward to get it

20   done.  I just looked at the top sheets.  You can check and

21   then I'm happy to give them the option.  I'm happy to stand

22   silent on it.

23           MR. STOJILKOVIC:  One of the jurors checked it

24   would make a difference if we're off those weeks.  It's one

25   of the jurors in the front row.

1          MR. LAZARUS:  We would like to push forward.

2          MR. TYRRELL:  The other thing is, I think, I don't

3    remember how exactly you framed it with them, but I think you

4    suggested that we might give up that week.  Others may have

5    made plans.  I will tell you that I have made plans, but

6    they're business plans.  They're not personal plans.  So it's

7    going to be difficult for me.  If you say I have to be here,

8    I'm going to be here.

9          THE COURT:  I'd like to be done by April vacation.

10          MR. TYRRELL:  I would, too.  I'm from out of town.

11          THE COURT:  Personally I'd prefer to forge forward,

12    but I'm going to accommodate the jurors.

13          MR. YEAGER:  You could think about splitting the

14    baby.

15          THE COURT:  Half a week.  We could do that.

16          MR. TYRRELL:  It's the Tuesday and Wednesday that

17    are difficult me.

18          (Court recessed at 4:03 p.m.)

19

20

21

22

23

24

25

1                  - - - - - - - - - - -

2                     CERTIFICATION

3

4          I certify that the foregoing is a correct

5   transcript of the record of proceedings in the above-entitled

6   matter to the best of my skill and ability.

7

8

9

10  /s/ Joan M. Daly                    January 29, 2019

11  /s/ Kelly Mortellite

12

13  _____        _____

14  Joan M. Daly, RMR, CRR              Date
    Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25

1                          INDEX OF WITNESSES

2    WITNESS                                              PAGE

3

     HOLLY BROWN
4

         Direct Examination By Mr. Wyshak ...................   35
5        Cross Examination By Ms. Wilkinson..................  156
         Cross Examination By Mr. Horstmann..................  204
6        Cross Examination By Ms. Miner......................  227
         Cross Examination By Mr. Tyrrell....................  237
7        Redirect Examination By Mr. Wyshak..................  238
         Recross Examination By Ms. Wilkinson................  244
8        Recross Examination By Mr. Horstmann................  246

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        E X H I B I T S

 2     Government Exhibit                              Received

 3        1759      .....................................    124

 4        1758      .....................................    130

 5        1757      .....................................    132

 6        1765      .....................................    133

 7        1755      .....................................    137

 8        195       .....................................    140

 9        92        .....................................    144

10        1760      .....................................    148

11

12
       Defendant Exhibit                               Received
13
          1        .....................................     42
14
          2        .....................................     42
15
          504      .....................................     96
16
          669      .....................................     90
17
          681      .....................................    105
18
          1762     .....................................    102
19
          1764     .....................................     93
20
          5177     .....................................    161
21
          5166     .....................................    164
22
          5169     .....................................    169
23
          5170     .....................................    173
24
          5171     .....................................    176
25
```

1    5178    ....................................    177

2    5182    ....................................    178

3    5179    ....................................    185

4    5184    ....................................    188

5    5172    ....................................    189

6    5174    ....................................    194

7    5175    ....................................    198

8    5181    ....................................    200

9    5173    ....................................    216

10   5176    ....................................    216

11   5185    ....................................    218

12   5187    ....................................    219

13   5241    ....................................    223

14   5165    ....................................    233

15   5213    ....................................    236

16   5022    ....................................    240

17

18

19

20

21

22

23

24

25