1              UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3    _____

4    UNITED STATES OF AMERICA,

5                   Plaintiff,            Criminal Action
                                          No. 16-CR-10343-ADB
6    v.
                                          January 30, 2019
7    MICHAEL J. GURRY, RICHARD M.         Pages 1 to 261
     SIMON, SUNRISE LEE, JOSEPH A.
8    ROWAN, and JOHN KAPOOR,

9                   Defendants.

10   _____

11

12
                     TRANSCRIPT OF JURY TRIAL -- DAY 8
13          BEFORE THE HONORABLE ALLISON D. BURROUGHS
                     UNITED STATES DISTRICT COURT
14               JOHN J. MOAKLEY U.S. COURTHOUSE
                        ONE COURTHOUSE WAY
15                     BOSTON, MA  02210

16

17

18

19

20

21

22
                     JOAN M. DALY, RMR, CRR
23                   Official Court Reporter
               John J. Moakley U.S. Courthouse
24            One Courthouse Way, Room 5507
                     Boston, MA  02210
25               joanmdaly62@gmail.com

```
 1   APPEARANCES:

 2
     FOR THE GOVERNMENT:
 3
            FRED WYSHAK
 4          K. NATHANIEL YEAGER
            DAVID G. LAZARUS
 5          Assistant U.S. Attorneys
            United States Attorney's Office
 6          John Joseph Moakley Federal Courthouse
            1 Courthouse Way
 7          Suite 9200
            Boston, Massachusetts 02210
 8          617.748.3100
            fred.wyshak@usdoj.gov
 9          nathaniel.yeager@usdoj.gov
            david.lazarus2@usdoj.gov
10

11   FOR THE DEFENDANT MICHAEL J. GURRY:

12          TRACY A. MINER
            MEGAN A. SIDDALL
13          Demeo LLP
            200 State Street
14          Boston, Massachusetts 02109
            617.263.2600
15          tminer@demeollp.com
            msiddall@demeollp.com
16

17   FOR THE DEFENDANT RICHARD M. SIMON:

18          STEVEN A. TYRRELL
            PATRICK J. O'TOOLE, JR.
19          Weil, Gotshal & Manges LLP
            100 Federal Street
20          Boston, Massachusetts 02110
            617.772.8365
21          steven.tyrrell@weil.com
            patrick.otoole@weil.com
22

23

24

25
```

1    APPEARANCES (continued):

2

3    FOR THE DEFENDANT SUNRISE LEE:

4            PETER C. HORSTMANN
             Law Offices of Peter Charles Horstmann
             450 Lexington Street
5            Suite 101
             Newton, Massachusetts 02466
6            617.723.1980
             pete@horstmannlaw.com

7

8    FOR THE DEFENDANT JOSEPH A. ROWAN:

9            MICHAEL KENDALL
             ALEXANDRA I. GLIGA
10           White & Case, LLP
             75 State Street
11           Boston, Massachusetts 02109
             617.939.9310
12           michael.kendall@whitecase.com
             alexandra.gliga@whitecase.com

13

14   FOR THE DEFENDANT JOHN KAPOOR:

15           BETH WILKINSON
             KOSTA S. STOJILKOVIC
16           Wilkinson Walsh Eskovitz
             2001 M Street NW
17           Washington, D.C. 20036
             202.847.4000
18           bwilkinson@wilkinsonwalsh.com
             kstojilkovic@wilkinsonwalsh.com

19
             AARON M. KATZ
20           BRIEN T. O'CONNOR
             Ropes & Gray
21           Prudential Tower
             800 Boylston Street
22           Boston, Massachusetts 02199
             617.951.7385
23           aaron.katz@ropesgray.com
             boconnor@ropesgray.com

24

25

```
1                    P R O C E E D I N G S
2              (The following proceedings were held in open court
3    before the Honorable Allison D. Burroughs, United States
4    District Judge, United States District Court, District of
5    Massachusetts, at the John J. Moakley United States
6    Courthouse, One Courthouse Way, Boston, Massachusetts, on
7    January 30, 2019.)
8              THE COURT:  I think we need a hearing date on this
9    motion to quash.  Anybody have any suggestions?  I won't
10   discuss anything that can't be -- I just need a date.  I
11   don't need too pick it before --
12             MR. KATZ:  I think having it sooner rather than
13   later would be great.
14             THE COURT:  I agree.
15             MR. KATZ:  They need time to gather up the
16   documents.  My understanding is they're not going to have a
17   witness come in from the company for another month or so.  I
18   think if we can hold it in the next week, that will be
19   helpful.
20             THE COURT:  Like when?  Like 4:00 one day?  Or 1:00
21   on Friday?
22             MR. KATZ:  Or this Friday would be fine as well.
23             THE COURT:  I already have a full afternoon this
24   Friday.
25             MR. KATZ:  Monday would be fine.
```

1          THE COURT:  Monday at 4:00?  I already have

2     something Monday at 4:00.  Hold on.  How about February 5 at

3     4:00?

4          MR. KATZ:  That works for us.

5          THE COURT:  February 5 at 4:00.

6          MR. KATZ:  Do you want me to contact the Kobre &

7     Kim lawyers?

8          THE COURT:  They entered appearances, right?

9          MR. KATZ:  I think they did.

10         MR. LAZARUS:  Is this also a motion to suppress or

11    just a motion to quash?

12         MR. KATZ:  It is not a motion to suppress.  All

13    we're saying is if you rule the documents are irrelevant,

14    that necessarily means the testimony would be irrelevant as

15    well.

16         MR. LAZARUS:  If that's the case, then we do have

17    an interest in participating.

18         THE COURT:  You're welcome to participate.  Is

19    Tuesday at 4:00 fine for you?

20         MR. LAZARUS:  Any time.

21         THE COURT:  Plus it's an open courtroom.  My

22    inclination is to make them produce.  To the extent you're

23    talking to them, you can tell them to --

24         MR. LAZARUS:  I don't control them.

25         THE COURT:  You'd offered to give up on Number 6,

1    right?

2              MR. KATZ:  Reluctantly, but yes.  Yes.  And we're

3    willing to do a sampling approach.

4              MR. LAZARUS:  Should we wait until they're here,

5    Your Honor?

6              THE COURT:  Right now?

7              MR. LAZARUS:  Just to have the hearing on it.  I

8    don't speak for them.

9              THE COURT:  I'm not having a hearing.  I'm still

10   trying to figure out what's at issue.  There's Number 6.

11             MR. KATZ:  I think the core issue is going to end

12   up being coverage policies, which are relatively simple.  And

13   then the patient files, the prior authorization records which

14   are patient specific that can be easily redacted, and they

15   simply show what the diagnosis was and what the approval was.

16             THE COURT:  Is that 1 through 4 and 7?

17             MR. KATZ:  I would say it's 1 through 4.  7, I

18   believe just from memory, is just the coverage policies.

19             THE COURT:  I looked again last night.  It seems

20   like you've given up on 6 already, reluctantly.

21             MR. KATZ:  We were willing to -- yes, we were

22   willing to let that go by the wayside as a compromise

23   position.

24             THE COURT:  There was another one that looked

25   pretty broad to me that maybe is burdensome.  But now I can't

1    remember which one.  I thought there were two of them.  It

2    might have been 5 and 6.

3              MR. KATZ:  That may be right.  There were a couple

4    about having rebates and how they do the formularies, which I

5    know no PBM wants to give up, no PBM wants to discuss that.

6    So it's really the patient records I think is the core.

7              THE COURT:  Is that 1 through 4?

8              MR. KATZ:  That would be 1 through 4, yes.

9              THE COURT:  Those are the four that look the most

10   obvious to me.  To the extent the government is talking to

11   them, I'm not feeling very sympathetic on 1 through 4.

12             MR. LAZARUS:  If I speak to them, I'll let them

13   know.  They're not making their own decisions.  They don't

14   answer to me.

15             THE COURT:  I'm just saying, you have them on your

16   witness list.  If you're talking to them, tell them I'm not

17   very sympathetic on 1 through 4.  I'm not telling you to call

18   them.  I'm just saying if you happen to have them in this

19   week.

20             MR. KATZ:  Thank you, Your Honor.

21             THE COURT:  I want to talk about the two other

22   motions, but I'm reluctant to do much more without

23   Mr. Kendall.

24             MR. STOJILKOVIC:  This is just an update.  At the

25   end of the day yesterday --

1          THE COURT:  Juror 34.

2          MR. STOJILKOVIC:  That's right.  She's the one who

3    checked the box.  I don't think she wrote something, so I

4    don't know beyond checking the box.

5          THE COURT:  The options are that we stand silent on

6    that week and just tell them they have the Monday off.  We

7    can raise it with them and see if it makes a difference to

8    anybody.  The options are, I guess, take the week off, take

9    just the Monday off, or split the baby and take Monday,

10   Tuesday, Wednesday off.

11         MS. MINER:  Your Honor, my preference, not that

12   that matters.  I have a doctor's appointment on Tuesday, and

13   I have a hearing in superior court, which again I can push

14   off, on Wednesday.

15         THE COURT:  Why don't I offer it to the jurors and

16   see what they want to do.

17         MS. MINER:  Great.

18         THE COURT:  We'll get them warmed up for their

19   decision making.

20         MR. WYSHAK:  Your Honor, I'm not sure about this,

21   but we got some reports yesterday that when the defense was

22   showing the witness exhibits that they were being published

23   to the jury before they were admitted into evidence.

24         THE COURT:  Karen says no.

25         THE CLERK:  I didn't put anything on that wasn't

```
1    in.
2              MR. WYSHAK:  I doubted that that was true, but I
3    just --
4              THE COURT:  Reports from the jurors?
5              MR. WYSHAK:  No.  From somebody in the audience.
6    So they weren't being published to the jury.
7              THE CLERK:  No.
8              MR. WYSHAK:  I didn't think so.
9              THE COURT:  Not that we don't screw up, up here,
10   but I've never known Karen to do that.  Mr. Kendall, your
11   motion on the business records is denied.  I think I have
12   full discretion on it.  And as far as I'm concerned it goes
13   to the weight, not to the admissibility of the record.
14             MR. KENDALL:  Thank you, Your Honor.
15             THE COURT:  On the privilege motion, Mr. Lazarus,
16   I'm willing to take it as it comes.  But what's the remedy
17   going to be if you step over the line or the witness steps
18   over the line?  Is Mr. Hobart prepared to waive the privilege
19   if the privilege gets waived?  What's going to happen?
20             MR. LAZARUS:  Your Honor, we think that's a
21   possibility, but we'd have to leave it to him.  If we could
22   confer on this and come back to the Court later today or
23   tomorrow morning with our position on that, a curative we
24   would recommend.  But let us just discuss it, if we may, and
25   we'll get back to you.
```

1      MR. STOJILKOVIC:  Your Honor, I will just note that

2 we have heard from Mr. Hobart since we filed our motion that

3 Insys is not waiving the privilege.

4      THE COURT:  I understand that they don't want to

5 waive the privilege.  But if they have a witness that gets on

6 the stand and talks about legal advice that they've given,

7 then I'm wondering what I'm supposed to do at that point.

8      MR. STOJILKOVIC:  Your Honor, I don't think that

9 the defense at that point will be able to deal with it even

10 if there is a waiver because there are files we don't have.

11 There are files we haven't reviewed.

12      And so if there is a general privilege waiver, that

13 requires us to prepare and to cross people on it and to

14 figure out what's in there that's helpful to us, what's in

15 there that's cross material to us.  And for that reason, that

16 wasn't the relief we sought.  The relief we sought was to not

17 have this kind of selective practice and to make sure the

18 witnesses don't get called who are going to talk about

19 privileged matters.

20      MS. WILKINSON:  Your Honor, I would add that we

21 opened that they weren't waiving the privilege.  We relied on

22 that.  It's not just one witness.

23      THE COURT:  I think they're planning on not waiving

24 the privilege.

25      MS. WILKINSON:  But that's just not a remedy then.

1          THE COURT:  What I'm agreeing to do --

2          Sorry, Joan.  I'm talking over you.

3          What I'm agreeing to do is assume that the

4   privilege is not being waived and rule on it to the extent

5   that there's objections made during the testimony.  I don't

6   know what these witnesses are going to say.  Maybe you don't

7   either.  Maybe you do.  If I'm taking it piece by piece and

8   the line gets crossed, then what happens?  A curative

9   instruction?  Strike the testimony?

10         MS. WILKINSON:  I think both, Your Honor.  I think

11  you'd have to strike the testimony and give a curative

12  instruction because there's no way -- if they waive the

13  privilege, we would have the ability to look at all the

14  documents, which is what we need, of everything Skadden Arps

15  did, for example.  They were in the company for years.  I

16  think the company paid them over $30 million.

17         So there's a lot of documents, as I understand.  We

18  haven't seen a lot of them.  I don't know how we could

19  properly cross examine them even if Insys changes its mind

20  now because it's cooperating with the government and says,

21  oh, we'll waive.

22         MR. LAZARUS:  We'll get back to the Court on our

23  recommendation.  Their decision to open while there was a

24  pending motion is their own.

25         MS. WILKINSON:  No, it's not the motion.

1          THE COURT:  I think that was a fair thing to do for

2    them to rely on the fact that there was no privilege waiver.

3          MR. LAZARUS:  They told the jury that outside

4    counsel says everything was fine.

5          MS. WILKINSON:  No, I didn't.

6          THE COURT:  That's not what they said.

7          MR. LAZARUS:  It was all part of one long sentence,

8    Your Honor.  They got outside counsel.  They looked at

9    everything.  They said everything is fine, they said they'll

10   do what they have to do, they'll cooperate.  It was one long

11   sentence.  The inference was clearly linking outside counsel

12   with that whole chain of events.

13         THE COURT:  I'm not sure that's true.  I'm also not

14   sure it isn't true.  I don't know.

15         MS. WILKINSON:  As I pointed out yesterday, I was

16   talking about the board, what the board was doing.

17         THE COURT:  I don't know if he's talking about that

18   same sentence or the different sentence.  The sentence she

19   read yesterday clearly went to the board.  Insys says they're

20   not going to waive.  Let's just move from there.

21         In terms of the fraud by omission -- and maybe I'm

22   looking at these motions at night when I'm tired -- but it

23   seems to me that the government is taking the position that

24   the omission is the fact that there were kickbacks.  That

25   seems like an omission to me.

1          But it seems to me that the half truth, which seems

2    more like a half truth, is the idea that the prescription was

3    medically necessary.  It seems like when you tell an

4    insurance company that they need to pay for a prescription

5    that there's an implicit assertion in there that the

6    prescription is necessary.

7          MR. YEAGER:  Half truths are -- under case law we

8    said -- I think it was *Bonilla*, Your Honor.

9          The half truths -- you're challenging my memory,

10   Your Honor.  I think the case we cited was *Bonilla*, and it

11   talks about half truths.

12         That's different than omission.  A lot of the

13   language that the cases use go back and forth about what

14   omission is.  Some omissions are okay.  That doesn't mean

15   it's fraud by omission.

16         So I agree with Your Honor that there are times

17   when there are half truths told, but I do not agree that it

18   is the definition of fraud by omission raising the concerns

19   that they've raised.

20         The basis for kickbacks -- to go back more

21   importantly, the basis for kickbacks is when they

22   affirmatively offer up a prescription that is false, then

23   that's an affirmative act.  It's not an omission.  They're

24   saying here's a prescription.  By its very nature, it's not a

25   prescription.  It's an order that was obtained by a bribe.

1  As a matter of law, federal law, it's not actually a

2  prescription.  So the prescription itself as it's offered is

3  an overt act of misleading both patients and insurers.

4  MR. STOJILKOVIC:  Your Honor, what the government

5  just represented is something that it cannot possibly prove

6  in this case.  What the government is arguing is that there

7  are a lot of speaker payments, which it characterizes as

8  bribes.  But the government is never going to be able to

9  prove that every prescription written by those doctors lacks

10  medical necessity.  The government isn't even arguing that.

11  None of their witnesses are going to say that.

12  So the best the government can show is that, or

13  attempt to show, is that certain prescriptions, which will be

14  a small minority, but certain prescriptions may lack medical

15  necessity.

16  And so there's two levels of problems.  One if the

17  government's position is every time a doctor is allegedly

18  bribed and it isn't disclosed, that's fraud.  That's where we

19  disagree.  That's just based on the bribe based on the

20  omission.  If the government can link it up to a particular

21  prescription, there needs to be some kind of evidence that

22  the folks at the IRC knew and understood that the

23  prescription lacked medical necessity.  You can't just

24  assume, which is what the government is doing, that every

25  time there's an alleged improper financial payment then all

the prescriptions lacked medical necessity.  In fact, their
own witnesses are not going to say that.  The doctors are not
going to say that.

And number two, every time somebody in the IRC sees
an off-label prescription, they should equate it somehow with
lack of medical necessity.  If the government wants to argue
in this case that a handful of particular prescriptions
lacked medical necessity, then we can have a fight over who
knew about that or didn't know about that.

Our motion concerns with the broad approach, which
is that the government is saying all these alleged bribe
payments are fraud and they're fraud because the bribe wasn't
disclosed.  And that's where that assertion and assumption
that every time there's a bribe the prescriptions lack
medical necessity.  That's the connection they'll never be
able to make.  And that's what our motion goes to.

MR. YEAGER:  So first to respond.  First of all,
the case is a conspiracy case.  It's an agreement to go bribe
doctors, A, to write false scrips that deprive patients of
their honest services; and B, to provide scrips for which
there's -- to cease the doctor's medical judgment.

With regard to that, we don't have to prove any
specific act.  We can offer up examples of that, as the Court
and we've talked about on other motions is admissible in
conspiracy cases.  The act of the bribe, the money that is

1    paid for the bribe or the ABL that is given free services is

2    given in exchange for what is purported to be a prescription.

3    That's the act, that's the act of fraud.

4          When the prescription is written, it's not a real

5    prescription as a matter of law.  I don't have to prove

6    anything as far as it's concerned.  As a matter of law, an

7    order purporting to be a prescription written outside the

8    course of a legitimate medical practice is not a

9    prescription.  It's an overt act.  To take that prescription

10   and give it to anyone as if it is a prescription is an overt

11   act.  It's a fake document.

12         THE COURT:  Maybe I'm being thick here, but if you

13   take a bribe, right, and then you write a prescription that

14   you would have written anyway, are you still saying that's an

15   overt act?  There's no quid pro quo, on an individual

16   prescription, just say.

17         MR. YEAGER:  That's a dangerous road to go down.

18   Yes, once you take a bribe and write the prescription, if any

19   part of writing that prescription has nothing to do with the

20   medical needs of the patient, you are being bribed to write

21   that.  You have to be dedicated solely to the patient.

22         Whether they would have written the prescription or

23   not is not relevant to the omission part, Your Honor, because

24   once they write the prescription, it's not a prescription.

25   It's a fake document because it was written outside the

1  ordinary course of medical practice.

2          And that's the act that we're trying to say.  I

3  would ask the Court -- I know the way it's written from the

4  defense, it obfuscates the government's position.  We tried

5  to respond back and lay it out.  The Court said that you want

6  to learn more about it.

7          And our reply, our response with regard to that,

8  I'd ask the Court to take a close look at the cases that we

9  cite.  Because their cases don't stand up in terms of First

10  Circuit case law.  And this is standard stuff.  It's common

11  to have this problem with fraud cases, and there's a lot of

12  cases that we cite where courts deliberate back and forth

13  about what is an affirmative misrepresentation and what is

14  not.

15          And I think clearly when you read through those

16  cases and you compare it to the evidence in this case, you'll

17  see that we're not actually bringing a fraud by omission case

18  here.  We could with regard to patient services, but -- with

19  regard to honest services.  But in this case because there's

20  an affirmative act of offering a fake prescription, there is

21  affirmative evidence that's not simply a fraud by omission.

22          MR. STOJILKOVIC:  Your Honor, I don't want to hold

23  us up.  A couple of quick points.  This is near and dear to

24  us.  We filed a second motion to dismiss, dealing in part

25  with these arguments.

1           Number one, the government, I know the government
2    asserts and the indictment alleges that part of the object of
3    the conspiracy was prescriptions without medical necessity.
4    The government has been walking that back and back because
5    their witnesses can't deliver on it.
6           When Mr. Babich pled guilty, the agreement that he
7    pled guilty to was to -- the object was to switch people off
8    of the competing drugs.  And what his statement of fact says
9    is he realized, he says, at some point that there was a risk
10   of lack of medical necessity, not that it was the object.
11   And the agreement to switch somebody off of Fentora or Actiq
12   to Subsys does not, certainly not per se, implicate a lack of
13   medical necessity.
14          If I just may, Mr. Yeager.
15          Number two, we'll see how the evidence comes in.
16   But I don't think we're going to see or hear evidence in this
17   case that doctors were committing -- certainly not to any of
18   these defendants about particular prescriptions or particular
19   patients.  If there were evidence of agreements, it's a
20   general agreement to prescribe.
21          But third, Your Honor, if Mr. Yeager's right, then
22   every single anti-kickback statute violation is a RICO
23   predicate.  And it's just not.  I understand that
24   the violation is a RICO predicate.  Because according to
25   Mr. Yeager, if a doctor prescribes following a bribe, that

1    prescription is false.  It's not a prescription; it's a

2    false, improper drug distribution.  That's just not the law.

3              A doctor could be acting on financial motivation

4    and still prescribe it to people who need it.  A doctor might

5    say, okay -- and perhaps this does implicate the

6    anti-kickback statute -- but might say, okay, I'll take

7    someone's money and I'm going to take my patients off of

8    drug A and prescribe them drug B, which is a competitor drug,

9    but I'm going to do it to the patient pool that is medically

10   qualified and appropriate for drugs A and drugs B.

11             So we can't just make that assumption.  And their

12   whole theory for why every bribe is a fraud is premised on

13   that assumption.  It's wrong in the case law, and it would

14   literally convert the anti-kickback statute into RICO

15   predicate where it is specifically excluded from the

16   predicates of RICO.

17             MR. YEAGER:  Both assertions are flat out wrong.

18   First of all, when you prescribe Fentora or Lazanda or any of

19   these other cases, we have never once fought the court or

20   them on whether or not a doctor has the right to write

21   off-label.

22             The reason we haven't fought on that is because a

23   decision for a doctor to write off-label is a medical

24   decision.  The doctor is exercising his medical judgment

25   about what is appropriate.

1         And simply writing a competitor drug just because
2    they're similar drugs, it's not okay.  The label says it flat
3    out.  A doctor can make that decision, but that decision is
4    absolutely a medical judgment decision.  The label says it.
5         It came up yesterday in court.  Just to say, well,
6    this drug is very similar versus others, I agree that in
7    terms of proving this case, it's not the most powerful
8    argument that we have to make.  But as a matter of law, it's
9    not close.  There's examples, and you'll hear some of them as
10   the case goes on this week, where people were bribed to write
11   the drug for people who didn't need it flat out, and that's
12   going to come up more and more.
13        But as a matter of law, he's dead wrong.  In he's
14   right about off-label marketing, what they've said repeatedly
15   is doctors can do it.  Yeah, they can do it because it's
16   medical judgment.  Simply switching a drug is a medical
17   decision.
18        Secondly and more importantly, he's wrong about the
19   prescriptions.  I'm not saying every anti-kickback statute
20   violation is a violation of RICO predicate.  I'm saying when
21   controlled substances are involved and the DEA Controlled
22   Substances Act and the regulations to carry it out explicitly
23   state that an order purporting to be a prescription written
24   outside the ordinary course of medical judgment is not a
25   prescription, then as a matter of law he's wrong.

1          THE COURT:  Okay.  I'll take a look at it tonight.
2     I'm bringing the jury in at 10:00.  Take your minute.
3          MR. KENDALL:  One point.  I'll be very brief.
4          I think the problem with Mr. Yeager's argument is
5     he's taking the government's view of the False Claims Act
6     case law and trying to graft it on to honest services and
7     fraud.  What he's saying may be certain issues that we see
8     arise in civil false claims act cases.  You know, you make
9     one payment, everything flows through, you have this implicit
10    obligation to disclose.  There's a whole lot of case law that
11    deals with that.  It's just not appropriate.  They picked
12    their poison.  They wanted to bring in honest services of
13    fraud case.  They've got to follow that case law, not the
14    False Claims Act.
15         MR. YEAGER:  I disagree with Mr. Ackerly's point.
16    I'm following the case law with regard --
17         MR. KENDALL:  That was a different trial.
18         THE COURT:  Okay.  I'll take another look at it
19    tonight.  I just wanted some clarification.
20         Karen, is that the jury?  Are they here?
21         THE CLERK:  All rise for the jury.
22         (The jury enters the courtroom.)
23         THE CLERK:  Court is in session.  Please be seated.
24         THE COURT:  Good morning, everybody.  Thank you
25    again for being here right on time.

1          Government, call your next witness, please.

2          MR. LAZARUS:  Good morning, Your Honor.  Thank you.

3    The United States calls Maury Rice.

4          THE CLERK:  Can you please raise your right hand.

5          (MAURY RICE duly sworn by the Deputy Clerk.)

6          THE CLERK:  Thank you.  You may be seated.  Could

7    you please state your name and spell your last name for the

8    record.

9          THE WITNESS:  My name is Maury Vincent Rice.  Last

10   name is R-I-C-E.

11         MR. LAZARUS:  Your Honor, may I proceed?

12         THE COURT:  You may.

13         MR. LAZARUS:  Thank you.

14                    DIRECT EXAMINATION

15   BY MR. LAZARUS:

16   **Q.**  Good morning, Mr. Rice.

17   **A.**  Morning.

18   **Q.**  There should be some water there if you need it and some

19   cups.

20         What city and state do you live in?

21   **A.**  Gilbert, Arizona.

22   **Q.**  What's the nearest big city?

23   **A.**  That's a suburb of Phoenix.

24   **Q.**  Phoenix, Arizona?

25   **A.**  Yes.

1   **Q.**   About how long have you lived in Arizona?

2   **A.**   Almost 40 years.

3   **Q.**   At some point did you work at a company called Insys

4   Therapeutics?

5   **A.**   Yes.

6   **Q.**   What was your job there?

7   **A.**   I was the IT manager.

8   **Q.**   I'll come back to your time at Insys in a minute.

9          Can you just tell the jury a little bit about your

10  job and employment history before you got hired at Insys?

11  **A.**   Sure.  I started in back office operations at a print

12  shop, working in the service department and customer service.

13  From there, I was a technician and an account executive for a

14  computer service company.  From there, I was with the Greater

15  Phoenix Economic Council for nine years as the IT manager.

16  And then from there, I was with Insys Therapeutics for just

17  over ten years.

18  **Q.**   Before you worked at Insys, immediately before, you were

19  at the Greater Phoenix Economic Council; is that right?

20  **A.**   Correct.

21  **Q.**   What is the Greater Phoenix Economic Council?

22  **A.**   Business development organization funded by the city and

23  the county.

24  **Q.**   Your role there was in the IT department?

25  **A.**   Yes.

1    **Q.**  Through your work there, did you have occasion to come

2    into contact with people at Insys Therapeutics?

3    **A.**  Yes.  We helped relocate them from Illinois.

4    **Q.**  To where?

5    **A.**  To Phoenix.

6    **Q.**  About when was that?

7    **A.**  2007.

8    **Q.**  And who were some of the people that you personally were

9    dealing with from Insys in 2007 as they were relocating?

10    **A.**  Mike Babich.  He was the COO at the time.  Jon McGarity

11    was the chief executive officer, and Troy Ignelzi was the

12    business development representative.

13    **Q.**  During your time at Insys, did Mike Babich remain the

14    COO?

15    **A.**  No.  He was later CEO when we relieved Jon McGarity of

16    his position.

17    **Q.**  And you said "we."  Was that a decision you made?

18    **A.**  No.  The company.  "We" is the company.

19    **Q.**  How did it come to be that you went from the Greater

20    Phoenix Economic Council to Insys.  What happened?

21    **A.**  Well, GPEC, as it's called, helped relocate Insys

22    Therapeutics to Phoenix.  Troy Ignelzi was our business

23    development representative at the time and he worked with

24    them to find a site and to relocate to Phoenix.  They

25    subsequently hired Troy and they said that they needed

1    somebody in the building for IT support, did he know anyone,

2    and he referred me.

3    **Q.**   When you joined Insys, that was in 2007?

4    **A.**   Yes.

5    **Q.**   Do you know about how many employees there were?

6    **A.**   I believe I was employee 25.

7    **Q.**   You were the 25th employee?

8    **A.**   Correct.

9    **Q.**   And what were your duties and responsibilities at Insys?

10   **A.**   Primarily the computer systems network, managing the

11   email system, and also to work with the construction team for

12   their -- we were building out the lab when I first started.

13   So I had some prior construction experience, and I worked

14   with them to complete the construction.

15   **Q.**   A little bit of a jack-of-all-trades?

16   **A.**   Right.

17   **Q.**   So Insys, you said a lab.  Insys is a pharmaceutical

18   manufacturer, right?

19   **A.**   Correct.  We had an R&D facility in our building.

20   **Q.**   In the building in Phoenix was research and developments?

21   **A.**   Right.

22   **Q.**   Was manufacturing done on-site?

23   **A.**   No.

24   **Q.**   At any point -- by the way, when did you leave Insys?

25   **A.**   July of 2017.

1   **Q.**  So at any point while you were working for Insys from '07

2   to '17, those ten years you were there, was manufacturing

3   done on-site by Insys?

4   **A.**  Not in Phoenix.  We had a manufacturing site in Round

5   Rock, Texas.

6   **Q.**  So when you joined Insys in about 2007, were there any

7   drugs on the market for distribution at that point?

8   **A.**  No, not by the company, no.

9   **Q.**  Did the company remain -- talking about the time period

10  between 2007 and 2012, okay?  You're familiar with Subsys,

11  right?

12  **A.**  Yes.

13  **Q.**  So about when did Subsys launch?

14  **A.**  2013.  2012, sorry.

15  **Q.**  In between when you joined the company and the Subsys

16  launch, were there any drugs on the market?  Any Insys drugs

17  on the market?

18  **A.**  I don't believe so, no.

19  **Q.**  And what about the company size?  Can you tell the jury a

20  little bit about the company size between 2007 and the launch

21  of Subsys?

22  **A.**  When I came on in 2007, we were preparing for a product

23  approval and potentially an IPO.  Neither of those things

24  happened.  And so we ended up removing staff that had been

25  put in place for a potentially publicly traded company.  So

1    we ended up with myself, Mike Babich to run the office, and

2    eight or nine clinical and R&D staff.

3    **Q.**   So the company downsized?

4    **A.**   Yes.

5    **Q.**   You said IPO.  What are you referring to there?

6    **A.**   Initial public offering.  So we had anticipated going

7    public if the market was favorable, and we had a product

8    launch.

9    **Q.**   And what type of product was it that at that point you

10   were anticipating getting approval that did not?

11   **A.**   That was our Dronabinol product, synthetic THC.

12   **Q.**   Was that a spray like Subsys?

13   **A.**   No.  It was a capsule.

14   **Q.**   Are you familiar with John Kapoor?

15   **A.**   Familiar?

16   **Q.**   Yes.

17   **A.**   Yes.

18   **Q.**   Have you met him?

19   **A.**   I have.

20   **Q.**   Was he a part of Insys Therapeutics when you joined in

21   2007?

22   **A.**   Yes.

23   **Q.**   How do you know?

24   **A.**   He was the founder of the company.

25   **Q.**   About when did you meet John Kapoor?

1    **A.**   Also in 2007.

2    **Q.**   From the time period 2007 until the launch of Subsys, how

3    often, if at all, would you see John Kapoor at the Insys

4    offices?

5    **A.**   Maybe once a week.

6    **Q.**   Did you have personal interactions with him during that

7    time?

8    **A.**   Occasionally.

9    **Q.**   If you could, look around the courtroom and let us know

10   if you see him here, please.

11   **A.**   I do.

12   **Q.**   Could you point to him and let us know what he's wearing?

13   **A.**   He's wearing a blue tie and a dark jacket.

14          MR. LAZARUS:  Your Honor, if the record could

15   reflect he's identified Mr. Kapoor.

16          THE COURT:  Yes.

17   BY MR. LAZARUS:

18   **Q.**   Mr. Rice, I want to talk to you about around the time

19   Subsys launched.  You said there had been layoffs.  Did the

20   company ramp up back its size in anticipation of the launch?

21   **A.**   Yes, we did.

22   **Q.**   About how large did the sales staff get?

23   **A.**   We launched with 50 sales reps.

24   **Q.**   What were your duties and responsibilities with respect

25   to getting the sales staff onboarded?

1    **A.**   To create email addresses and provide them with the

2    equipment that they needed for their calls in the field.

3    **Q.**   And was that also true for other employees of Insys,

4    whether they were sales staff or administrative staff or

5    otherwise?

6    **A.**   Yes.

7    **Q.**   So you were one of the people on the first day that the

8    new employee has to go see and do checklists and sign

9    paperwork and things?

10   **A.**   Correct.

11   **Q.**   Did you have any hiring or firing authority?

12   **A.**   No.

13   **Q.**   What about direct reports, people working for you?

14   **A.**   Not until shortly before launch.  I had one report.

15   **Q.**   At around launch, you had one report?

16   **A.**   Yes.

17   **Q.**   Who did you report to?

18   **A.**   Mike Babich.

19   **Q.**   How are you compensated, by the way?

20   **A.**   Salary plus discretionary bonus.

21   **Q.**   Who decided the bonus?

22   **A.**   Mike, Mike Babich.

23   **Q.**   Did Insys have a board of directors around the time of

24   launch?

25   **A.**   Yes.

1   **Q.**   Do you know what role, if any, John Kapoor had on the

2   board?

3   **A.**   I believe he was chairman.

4   **Q.**   At the time of launch, was Insys still located in

5   Phoenix?

6   **A.**   Yes.

7   **Q.**   At some point did it move?

8   **A.**   We did.

9   **Q.**   Where did you go?

10  **A.**   Chandler, another suburb of Phoenix.

11  **Q.**   About how far -- for those of us who don't know about

12  Arizona, about how far is Chandler from Phoenix?

13  **A.**   The borders touch.  From location to location was

14  approximately 5 miles.

15  **Q.**   When you moved to Chandler, do you remember the address?

16  **A.**   444 South Ellis.

17  **Q.**   What was that location like?  Describe it for the jury,

18  please.

19  **A.**   It was an industrial business park, approximately 21,000

20  square feet, one floor.

21  **Q.**   Typical office building?

22  **A.**   Yes.  With our lab facilities inside as well.

23  **Q.**   And again, the lab for research, not for manufacturing?

24  **A.**   Correct.

25  **Q.**   I'm going to show you Exhibit 1767 for identification.

1          MR. LAZARUS:  Your Honor, may I approach the

2    witness?

3          THE COURT:  You may.

4          MR. LAZARUS:  Thank you.  May I also retrieve the

5    easel, Your Honor?

6          THE COURT:  Yes.

7          MR. LAZARUS:  Thank you.

8    BY MR. LAZARUS:

9    **Q.**  So just before this is in evidence, if it's all right

10   with the Court, I'll just ask you a couple of questions here

11   with this just facing you.  Can you see this all right?

12   **A.**  Yes.

13   **Q.**  Do you recognize this?

14   **A.**  Yes.

15   **Q.**  What is this?

16   **A.**  That's the building on Ellis, 444 South Ellis.

17   **Q.**  Is this a floor plan of the building?

18   **A.**  It is.

19   **Q.**  And is this floor plan how the floor plan was basically

20   laid out in -- I didn't actually ask you.

21          About when did you move to Ellis?

22   **A.**  That would have been late 2012.

23   **Q.**  So is this what the floor plan approximately looked like

24   at that point?

25   **A.**  Approximately, yeah.

1    **Q.**  Are there some noticeable differences that you see?

2    **A.**  A couple.  When we first moved in, the lab space closest

3    to you was cubicles.  We converted it.  And the small lab

4    space in the back of the building was also warehouse space

5    that we added.

6    **Q.**  But in terms of the general layout and size and

7    dimensions of this other than those two noticeable changes,

8    is this a fair and accurate representation of what that space

9    looked like?

10   **A.**  Yes.

11              MR. LAZARUS:  Your Honor, I'd offer this exhibit.

12              MR. STOJILKOVIC:  No objection.

13              THE COURT:  It's admitted.

14              (Government Exhibit No. 1767 admitted.)

15              MR. LAZARUS:  If we could also please publish

16   Exhibit 1767 to the jury in addition to the enlargement.

17   Thank you.  If it's all right with Your Honor, may he stand

18   up and approach the exhibit?

19              Sir, if you could just stand up and walk over to

20   the exhibit, I'm going to ask a few questions.

21              THE COURT:  If any of you can't see, feel free to

22   move around.

23   BY MR. LAZARUS:

24   **Q.**  Sir, just a few very basic questions about this floor

25   plan.  Can you just sort of orient us?  Where do you walk

1   into the space?  What are we looking at?

2   **A.**   This is the lobby with the front doors here.  Board room.

3   This is the lobby entrance door with the board room directly

4   in front.

5   **Q.**   Is your office somewhere on there?

6   **A.**   I was right here adjacent to the front reception area.

7   **Q.**   If you could please put an MR with that marker on that

8   space and circle it.

9   **A.**   [Witness does as requested.]

10  **Q.**   Did Mike Babich have an office there?

11  **A.**   Yes.

12  **Q.**   At some point did his office move from one spot to

13  another?

14  **A.**   Yes, it did.

15  **Q.**   If you could please put an MB1 for where Mike Babich's

16  original office was and an MB2 for where it moved.

17  **A.**   [Witness does as requested.]

18  **Q.**   And if you could mark the board room, sir, with BR.  And

19  we're almost done with the markings for you.

20  **A.**   [Witness does as requested.]

21  **Q.**   Now, did John Kapoor have an office there?

22  **A.**   We had space available for him, yes.

23  **Q.**   You said there was space available for him?

24  **A.**   Right.

25  **Q.**   If you could put a JK where that was, please.

1    **A.**   [Witness does as requested.]

2    **Q.**   Now, in terms of your observations -- actually you can

3    sit down and I'll ask you some more questions.  Thanks very

4    much, sir.

5            THE COURT:  Bring that microphone back towards your

6    mouth.

7            MR. LAZARUS:  Thank you, Your Honor.

8    BY MR. LAZARUS:

9    **Q.**   All right, Mr. Rice.  Thank you.

10           In terms of John Kapoor having space there, from

11   your observations from having your office by the entrance --

12   did you go to work there every day at that space?

13   **A.**   Yes.

14   **Q.**   How often would you see John Kapoor actually use the

15   office space that was set aside for him?

16   **A.**   Rarely.

17   **Q.**   And what about John Kapoor coming in and working from the

18   space?  Did you see that?

19   **A.**   Rarely.

20   **Q.**   Did you see him come and meet with people?

21   **A.**   Yes.

22   **Q.**   About how often would that happen?

23   **A.**   Again, weekly at least.

24   **Q.**   And where would he meet with people generally, John

25   Kapoor?

1   **A.**   Generally in the board room.

2   **Q.**   And that's where you indicated a BR on the floor

3   schematic there?

4   **A.**   Yes.

5   **Q.**   As Insys continued after it moved to this space on Ellis,

6   did it ever expand into additional space?

7   **A.**   Yes.

8   **Q.**   Where?

9   **A.**   We ended up expanding into a couple different locations.

10   We had a facility on Frye Road immediately after this one.

11   We also expanded into a new corporate space and one other

12   office space.

13   **Q.**   I'm going to break that down a little bit.

14          So Frye Road, where is that compared to this

15   building?

16   **A.**   Frye Road would be oriented up at the top of this board.

17   It's very close.  It's one of the border streets for this

18   complex.

19   **Q.**   How short a walk?

20   **A.**   Five minutes.

21   **Q.**   About when did the Frye Road office open?

22   **A.**   2013.

23   **Q.**   And at that point did this office remain?

24   **A.**   Yes.

25   **Q.**   And what, if anything, were your responsibilities in

1  setting up this space and then the Frye Road space?

2  **A.**   Both IT infrastructure, computers, networking, phone

3  systems, things like that.   I also coordinated the move and

4  did the site selection for the sites themselves.

5  **Q.**   Were the locations networks together?

6  **A.**   They were.

7  **Q.**   They could communicate electronically with one another?

8  **A.**   Yes.

9  **Q.**   They had Internet connections, things like that?

10  **A.**   Yes.

11  **Q.**   Was it the Ellis and the Frye locations the same phone

12  system?

13  **A.**   No.

14  **Q.**   I'll come back to that in a few minutes.   I want to talk

15  a little bit more about the IT set up.

16          You said earlier when a new employee came on board,

17  one of your responsibilities was to give them an email

18  address?

19  **A.**   Correct.

20  **Q.**   How did the email addresses lay out for an employee at

21  Insys in terms of their name, the abbreviations?   What would

22  every employee be issued?

23  **A.**   Our standard was first initial, last name @insysrx.com.

24  **Q.**   So, for example, you'd be mrice@insysrx.com?

25  **A.**   Correct.

1   **Q.**  What happens if there was a common name and there were

2   multiple employees with that?

3   **A.**  Then we would use first name dot last name.

4   **Q.**  In that case, it would be maury.rice@insysrx.com?

5   **A.**  Correct.

6   **Q.**  And did each and every employee of Insys receive an

7   @insysrx.com email address?

8   **A.**  Yes.

9   **Q.**  If you know, did John Kapoor have an Insysrx email

10  address?

11  **A.**  He did.

12  **Q.**  About when did he get that?

13  **A.**  When he became CEO in 2015.

14  **Q.**  At some point, did John Kapoor become CEO of Insys?

15  **A.**  Yes.

16  **Q.**  Was Mike Babich still with the company at that point?

17  **A.**  No.

18  **Q.**  So after Mike Babich left, John Kapoor stepped in?

19  **A.**  Correct.

20  **Q.**  At that point he was issued an Insysrx email address?

21  **A.**  Yes.

22  **Q.**  How did Insys collect and store email that was sent and

23  received by its employees?

24  **A.**  Initially I had an archiving server that would collect

25  email as it went through the server.  Later we migrated to a

1    cloud-based Office 365 from Microsoft.

2    **Q.**   Let me understand first.  When it was on-site, you had a

3    system.  What happened?  Somebody ends an email.  Can you

4    explain where it goes, how you keep a copy, those sorts of

5    things?

6    **A.**   We hosted our own email server.  So the physical server

7    was on-site, and email was sent and received from that

8    machine.  I had a separate server that would connect to that.

9    It would make a copy of each email that went in and out of

10   the system in real time.

11   **Q.**   Basically it was, in layperson's terms, two big computers

12   and they were talking to each other?

13   **A.**   Yes.

14   **Q.**   The one that was your computer to copy information from

15   the other computer, how accurate, if at all, was the

16   information you were copying?

17   **A.**   It was exact.  It was a copy of the email that went.

18   **Q.**   So you were backing up and preserving that data?

19   **A.**   Correct.

20   **Q.**   Once it was backed up, could the data be changed or

21   altered?

22   **A.**   No.

23   **Q.**   By the way, I don't know if I asked you this.  I asked

24   you about John Kapoor.  But other board members for the board

25   of directors of Insys, did they have Insysrx email addresses?

1   **A.**   No.

2   **Q.**   Are you familiar with the names Mike Gurry, Joe Rowan,

3   Richard Simon, Sunrise Lee?

4   **A.**   I am.

5   **Q.**   Matt Napoletano?

6   **A.**   Yes.

7   **Q.**   Have you met each of those people?

8   **A.**   Yes.

9   **Q.**   Alec Burlakoff?

10   **A.**   Yes.

11   **Q.**   And at one point or another you worked with them, right?

12   **A.**   Correct.

13   **Q.**   Some of them didn't actually work at headquarters,

14   correct?

15   **A.**   Correct.

16   **Q.**   In what circumstance or circumstances would you meet

17   them?

18   **A.**   At sales meetings or if they were in the office for

19   training sessions, things like that.

20   **Q.**   If a sales employee or a sales manager or director was in

21   the field and had a problem with their company-issued iPad or

22   getting their email working or anything of a technical

23   nature, was there a system so they could contact someone at

24   Insys for help?

25   **A.**   We did have a support system, yes.

1    **Q.**   And who oversaw that system?

2    **A.**   I did.

3    **Q.**   And if an employee was in the field, did they have a

4    salesperson -- or management -- did they have company-issued

5    cell phones?

6    **A.**   Not in the beginning, no.

7    **Q.**   When you say "the beginning," what do you mean?

8    **A.**   At launch, they only had iPads.  They used their own cell

9    phones.

10   **Q.**   When you say they used their own cell phones, were they

11   able to connect somehow through an app or something to

12   insysrx.com to get their Insysrx email, or did they have to

13   use their own Yahoo or Gmail?

14   **A.**   Initially they were able to install it on their own

15   personal device, but we preferred that they use the iPad for

16   that.

17   **Q.**   If an employee was in the field doing Insys business,

18   were they using their personal email addresses or their

19   insysrx.com email addresses?

20   **A.**   They were instructed to use their Insys email address.

21   **Q.**   When they were in the field and they used that Insys

22   email address, would it still go through those two big

23   computers that you had in Arizona?

24   **A.**   Yes.

25   **Q.**   So it would go through the main server and it would get

1  copied and archived on your archive server, for lack of a

2  better word?

3  **A.**  Correct.

4  **Q.**  Just to be clear, Michael Gurry's email address, based on

5  your system, would be mgurry@insysrx.com?

6  **A.**  Correct.

7  **Q.**  And Joe Rowan would be jrowan@insysrx.com?

8  **A.**  Yes.

9  **Q.**  And so on?

10  **A.**  Yes.

11  **Q.**  Just want to talk a little bit about records with you.

12  At some point, were you designated by Insys to be what's

13  called a custodian of records?

14  **A.**  I was.

15  **Q.**  What did that involve?

16  **A.**  I was instructed to certify on behalf of the company that

17  the records that we produced for various inquiries were true

18  and accurate.

19  **Q.**  By "inquiries," do you mean subpoena requests and other

20  requests from outsiders?

21  **A.**  Yes.

22  **Q.**  And did you work with the company to review and certify

23  that certain documents were accurate?

24  **A.**  I worked directly with outside counsel.

25  **Q.**  Are you familiar with the term "Bates number"?

1   **A.**   Yes.

2   **Q.**   What's a Bates number?

3   **A.**   It's a uniquely identifying number attached to each

4   record.

5   **Q.**   And in this case, were unique numbers issued to each

6   piece of paraphernalia that was turned over, and they started

7   with something like INS and a number or INS-BOS and a number

8   or something similar?

9   **A.**   That's my understanding, yes.

10  **Q.**   Did you personally Bates-number these items?

11  **A.**   I did not.

12  **Q.**   But once they were Batesed, did you certify them on

13  behalf of the company?

14  **A.**   Yes, I did.

15  **Q.**   The company authorized you to do that?

16  **A.**   Yes.

17  **Q.**   I'm going to show you a binder of information.

18          MR. LAZARUS:  May I approach again, Your Honor?

19          THE COURT:  Of course.

20          MR. LAZARUS:  Your Honor, thank you for your

21  patience.  Thank you for your patience, Your Honor, and the

22  jury.

23  BY MR. LAZARUS:

24  **Q.**   Okay, sir.  I have a binder for you.  Take your time.

25  Take a look through it.  You've seen it before though, right?

1    **A.**   Yes, sir.

2    **Q.**   What do you recognize that binder to be?

3    **A.**   These are copies of the documents that I signed on behalf

4    of the company to certify document production.

5    **Q.**   And so do those documents certify that the documents that

6    were produced are true and accurate copies of the documents

7    that were produced?

8    **A.**   Yes.  Unless otherwise specified.

9    **Q.**   Even where they are not being specified as business

10   records for Insys, are they still being specified that

11   they're accurate copies of what Insys had in its possession

12   and turned over?

13   **A.**   Yes.

14   **Q.**   So through there, are there also -- in addition to the

15   certifications that you signed, are there certifications that

16   another authorized record custodian signed?

17   **A.**   Yes, there are a couple at the end.  I was already gone

18   from the company at that time.

19   **Q.**   Just from looking at the document, who signed it?

20   **A.**   Adam Brumm.

21   **Q.**   Let me back up.

22          Towards the beginning, there's two tables in there

23   of additional documents?

24   **A.**   Yes.

25   **Q.**   Are you familiar with those tables?

**A.**   Yes.

**Q.**   And are the documents that are in those two tables --
were accurate, true and accurate copies of those documents
also produced?

**A.**   Yes.

**Q.**   With respect to Insys -- you can close that for now.
Thank you, sir.

         With respect to Insys emails that were produced,
what was your role?  What was your participation in producing
emails from the Insysrx server or back up server to outsiders
upon requests in connection with this case?

**A.**   I worked directly with outside counsel for the requests.
I would get the name of a person, a custodian, and typically
a date range.  And it was my position to provide all of the
email for that particular person according to the date range
specified.

**Q.**   So in other words, if you were asked just hypothetically
to gather emails for John Doe from 2012 to 2015, what steps
would you take to go get those?

**A.**   On the archiving server, I would create a query for that
email address and that date range.  And then once it was
ready, I would export it into a PST which was then sent to
outside counsel.

**Q.**   So in other words, you would go to your backup server and
pull that information?

1    **A.**   Correct.

2    **Q.**   And how accurate, if at all, were the copies on your

3    server that you pulled and produced?

4    **A.**   They were direct copies.

5    **Q.**   When you would pull an email, would it include

6    attachments if there were any?

7    **A.**   Yes, it would.

8    **Q.**   So the attachments -- would the attachments also be

9    accurate copies?

10   **A.**   Yes.

11   **Q.**   Were the email copies that were on that server made at or

12   around the time of occurrence?

13   **A.**   Yes.

14   **Q.**   Were the records kept in the ordinary course of regularly

15   conducted business activity?

16   **A.**   Yes.

17   **Q.**   And was it the regular practice of Insys to make and keep

18   emails and attachments like that?

19   **A.**   Yes.

20   **Q.**   I'm going to show just the witness, please, Exhibit 1488.

21   Let me enlarge a little bit for if you, sir.  Can you see

22   this on your monitor okay?

23   **A.**   Yes.

24   **Q.**   Let me show you the bottom just so you know what you're

25   looking at.  Here's the rest of the email.  Do you see this?

1    **A.**  Yes.

2    **Q.**  Going back to the top of this document, what's the date

3    on this document?

4    **A.**  September 14, 2012.

5    **Q.**  Did you receive this?

6    **A.**  I did.

7    **Q.**  And is this email a true and accurate copy of an email

8    that you received while you were employed at Insys?

9    **A.**  Yes.

10   **Q.**  I'm highlighting here.  Was this also received by Richard

11   Simon and Lee Sunrise at Yahoo.com?

12   **A.**  Yes.

13   **Q.**  As well as by Mike Gurry?

14   **A.**  Yes.

15              MR. LAZARUS:  Your Honor, I'd offer this exhibit.

16              MR. TYRRELL:  No objection.

17              THE COURT:  It's admitted.

18              (Government Exhibit No. 1488 admitted.)

19              MR. LAZARUS:  Would you please publish it.  Thank

20   you, Ms. Folan.

21   BY MR. LAZARUS:

22   **Q.**  So I have on the monitor here an email from Mike Babich.

23   At this point, if you know, September of 2012, what role did

24   Mike Babich have at Insys?

25   **A.**  CEO.

1   **Q.**  And there's a number of names on here.  I've highlighted

2   Mike Gurry, Richard Simon, Sunrise Lee.  Do you see this

3   here, Matt Napoletano.  Can you see that on the screen in

4   front of you, sir?

5   **A.**  Yes.

6   **Q.**  And up here, Holly Brown?

7   **A.**  Yes.

8   **Q.**  Taking a look at the "To" field, do you recognize any of

9   those names in addition to the ones I've highlighted?

10  **A.**  Yes.

11  **Q.**  How do you recognize them?

12  **A.**  I know most of them personally.

13  **Q.**  Who are they?

14  **A.**  Mostly sales representatives.

15  **Q.**  There's a few other items on here I want to review with

16  you as our IT witness right now.  It says here, Sales Team

17  Northeast, Sales Team Southeast.

18          What's the significance of those types of

19  designations?

20  **A.**  Those are distribution groups.  So they are comprised of

21  multiple people using one method of contact.

22  **Q.**  So if somebody emails Sales Team Northeast, it goes to

23  all the people on that list?

24  **A.**  Yes.  Everybody designated for that region or that area.

25  **Q.**  Here it says BCC.  What's the significance of a BCC?

1    **A.**   That's blind carbon copy.  That means that the recipients

2    would not see the people in that field as recipients.

3    **Q.**   So in other words, as an example on this email, the

4    people in the "To" and the cc wouldn't see that Dion Reimer,

5    yourself, and two other individuals received this email?

6    **A.**   Correct.

7    **Q.**   And that's something the sender can elect to do?

8    **A.**   Yes.

9    **Q.**   Can you read the subject here, please.  I'm highlighting

10   it.

11   **A.**   "Important announcements, promotion."

12   **Q.**   So again, this is September 14, 2012, right?

13   **A.**   Yes.

14   **Q.**   Now I'm going to go down to the body of the email.  Bear

15   with me for one moment, sir.  I assume you can relate to

16   technology problems.

17   **A.**   Just a little, yeah.

18   **Q.**   There we go.  Can you see that a little bit better on

19   your monitor now?

20   **A.**   Yes.

21   **Q.**   If you could, please, I'm going to ask for you to indulge

22   us and read a little bit.  If you could, read the first

23   paragraph for the jury, please.

24   **A.**   "Good morning.  We have all been witness to the

25   turnaround in the Southeast over the past two months.  Alec

1    has brought a fire to the region that was much needed, and

2    his knowledge in the marketplace is unmatched.  I personally

3    believe that he can and will bring the same fire across the

4    nation.  I am proud to announce that Alec has been promoted

5    to the VP of sales.  Please join me in congratulating him and

6    welcoming him to Phoenix as well, as he is bringing his

7    family out this weekend to get started."

8    **Q.**  Now, at this point, if you remember, you weren't in the

9    sales department, right?

10   **A.**  No.

11   **Q.**  But are you generally familiar with some of the

12   geographic regions over time?

13   **A.**  Yes, generally.

14   **Q.**  So was the Southeast a particular region that Insys had

15   designated for a certain sales team?

16   **A.**  Correct.

17   **Q.**  If you could, please, continue and read the next

18   paragraph, starting with "In addition."

19   **A.**  "In addition, we have brought in two new regional

20   managers in the Midwest and Mid-Atlantic.  Rich Simon will be

21   taking over the Midwest while Sunrise Lee will manage the

22   Mid-Atlantic.  I have had the chance to spend a great deal of

23   time with both Rich and Sunrise, and I can assure you that

24   they are beyond pumped to get started.  They are anxious to

25   meet their teams next Friday."

1    **Q.**  And the next paragraph, please?

2    **A.**  "We have come such a long way to crush the peon products,

3    and now we have our eyes firmly set on taking over Actiq and

4    Fentora."

5    **Q.**  Thank you, sir.

6         MR. LAZARUS:  If I could have just for the witness,

7    please, I'm going to show for identification Exhibit 1630.

8    **Q.**  Is that enlarged enough for you, Mr. Rice?  Can you see

9    that okay?

10   **A.**  Yes.  I can make it out.

11   **Q.**  Do you recognize it?

12   **A.**  I do.

13   **Q.**  What do you recognize it to be?

14   **A.**  This is an email that was sent by our HR director

15   announcing promotions for two employees.

16   **Q.**  And I'm going to highlight over here.  Do you see your

17   name on here?

18   **A.**  I do.

19   **Q.**  And Sunrise Lee?

20   **A.**  Yes.

21   **Q.**  Richard Simon and Michael Babich?

22   **A.**  Yes.

23   **Q.**  And others?

24   **A.**  Yes.

25        MR. LAZARUS:  Your Honor, I'd offer this exhibit.

```
 1              THE COURT:  Any objection?
 2              MR. STOJILKOVIC:  No.
 3              THE COURT:  It's admitted.
 4              (Government Exhibit No. 1630 admitted.)
 5              MR. LAZARUS:  Thank you, Your Honor.
 6              If we may publish, please, Ms. Folan.
 7   BY MR. LAZARUS:
 8   Q.  Sir, if you could, you said this email is from Jenna
 9   Grosshans at the top?
10   A.  Yes.
11   Q.  And the date?
12   A.  June 17, 2014.
13   Q.  I'm going to enlarge this a little bit more.  Is that a
14   little clearer for you?
15   A.  Yes.
16   Q.  You said your name is on here.  Richard Simon, Michael
17   Babich, those other names you see?
18   A.  Yes.
19   Q.  Down here in the cc, Brett Szymanski?
20   A.  Yes.
21   Q.  Did you ever meet Brett Szymanski?
22   A.  I did.
23   Q.  In what context?
24   A.  Again at sales meetings or training.
25   Q.  And here it says "Importance High."  What's the
```

1    significance in an email of that?

2    **A.**   In Outlook, you have the option to designate an email as

3    important with the little red exclamation point so that you

4    notice it.

5    **Q.**   And that's something a sender can choose to do?

6    **A.**   Yes.

7    **Q.**   Let me enlarge this bottom portion here.

8              Do you see the top it reads, "Good afternoon.

9    Effective July 1, 2014, Lyndsay and Brett Szymanski will be

10   promoted to district sales managers"?

11   **A.**   Yes.

12   **Q.**   And at the bottom, it looks like there's a note to IT.

13   It says, "Lindsey already has a laptop, but Brett will need

14   one ordered.  They will also need new business cards with

15   their information."

16   **A.**   Correct.

17   **Q.**   Who, if anyone, was this part of this email directed to?

18   **A.**   That would have been my department.

19   **Q.**   So in July of 2014, Brett Szymanski is, it looks like,

20   getting a promotion?

21   **A.**   Yes.

22   **Q.**   His manager is Sunrise Lee?

23   **A.**   Correct.

24   **Q.**   I'm going to show you -- just for the witness, please --

25   Exhibit 106.  Actually I'm going to go back and show you 1630

1  in evidence again.  Just one quick question about this one.

2  If you look, sir, on the blind copy line it says

3  kmccoy@insysrx.com?

4  **A.**  Yes.

5  **Q.**  But then in other places it's got the full name of people

6  like Daren Fila, Richard Simon, Michael Babich, and so on?

7  **A.**  Yes.

8  **Q.**  Can you explain what the distinction is there?

9  **A.**  Typically that means that the email address was manually

10  typed where the other people were selected from the "To" --

11  when you're writing an email, you can select who it goes to,

12  and it would resolve those names because it's on the same

13  server.  Typically when it shows just the email address, it

14  was typed manually.

15  **Q.**  Are those essentially functions of the email program

16  that's being used?

17  **A.**  Yes.

18  **Q.**  So kmccoy@insysrx.com is the same person as whatever that

19  name would have been spelled out?

20  **A.**  Correct.  It just didn't resolve the name from the active

21  directory.

22  **Q.**  By the way, before I move on, you mentioned earlier

23  something about migrating to Microsoft 365 for the email

24  server?

25  **A.**  Yes.

1  **Q.**  When that happened?  Were the emails also kept and

2  maintained and archived?

3  **A.**  Yes.  They have a litigation hold feature.

4  **Q.**  "Litigation hold," what does that generally mean?

5  **A.**  In the terms of Office 365, any email that was sent or

6  received was maintained, and we had a copy even if it was

7  deleted.

8  **Q.**  During the course of your employment at Insys, were you

9  familiar with a distribution list called

10  relayreporting@insysrx.com?

11  **A.**  Yes.

12  **Q.**  What was that?

13  **A.**  That was an email address that the business intelligence

14  department used.

15  **Q.**  I'm going to show you Exhibit 50.  I'll come back to

16  that.

17          In terms of monitoring for email addresses, did you

18  have of the capability of monitoring emails that employees,

19  either sales employees or managers, were sending and

20  receiving?

21  **A.**  I could through the archive server.

22  **Q.**  And how did that work mechanically?  What would you have

23  to do?

24  **A.**  There was an interface to log into, and I could enter an

25  email address and a date, if I wanted to, and pull up any

1    emails that were sent by that -- sent or received to that

2    email address.

3    **Q.**   How, if at all, was the access to that system restricted?

4    **A.**   Both logical and physical security.

5    **Q.**   What does that mean?

6    **A.**   Logical security is user credentials.  Physical security,

7    meaning that it was locked up in a room that only my

8    department had access to.

9    **Q.**   So in other words, it was locked in a room and only IT

10    could log on?

11    **A.**   Correct.

12    **Q.**   Thank you.  I'm going to switch gears now.  I want to

13    talk to you about the Insys call center.  Are you familiar

14    with that?

15    **A.**   Yes.

16    **Q.**   If I refer to that as the IRC, will you know that that's

17    what I'm talking about?

18    **A.**   Yes, that's fine.

19    **Q.**   Where was the Insys call center?

20    **A.**   When they were first developing it, they shared space in

21    the 444 South Ellis building.

22    **Q.**   When you say "they," who are you referring to?

23    **A.**   The initial employees, Liz Gurrieri and -- I don't recall

24    what order they came on staff.

25    **Q.**   Are you familiar with Mike Gurry?

1    **A.**   I am.

2    **Q.**   What involvement, if any, do you know that he had with

3    getting the call center set up?

4    **A.**   I believe Liz reported to him.

5    **Q.**   And in the beginning, you said they were at 444 South

6    Ellis.  That's the big schematic to your left there?

7    **A.**   Yes.

8    **Q.**   About where on that space -- and if it's easier for you

9    to stand up, please do so -- was the original call center set

10   up?

11   **A.**   In the cubicle area on the top left.

12   **Q.**   So now it basically has a grid of -- my eyes aren't

13   great, but it looks like about eight squares in the top left

14   corner?

15   **A.**   Yes.  There were actually ten cubicles back there.  But

16   yes.

17   **Q.**   At some point did the call center move?

18   **A.**   It did.

19   **Q.**   Where did it go?

20   **A.**   To one of the Frye Road locations, 2727.

21   **Q.**   That's about a five-minute walk away?

22   **A.**   Yes.

23   **Q.**   Do you know about when it moved there?

24   **A.**   Late 2012, I believe.

25   **Q.**   What, if any -- you said you helped them move.  In terms

1    of phone systems, can you explain for the jury the type of

2    phone system they had when they were still at Ellis and then

3    the type of phone system at Frye?

4    **A.**   At Ellis, they shared my small office phone system.  It

5    was a VoIP phone system, voice over IP.  And I assigned a few

6    phones to the employees that they had in the building in

7    those cubicles.

8              Later when they moved, they had their own phone

9    system, again another small office.  I believe it was an

10   Avaya phone system.

11   **Q.**   What does that mean, to have their own phone system?

12   **A.**   They had their own phone circuit and they received in and

13   made their own phone calls.

14   **Q.**   Was that something that you helped establish?

15   **A.**   Yes.

16   **Q.**   Is there like a provider who helped set that up and

17   provide service for that?

18   **A.**   The telecom provider was Cox Communications, and I had an

19   outside vendor that helped set up the phone system itself.

20   **Q.**   Did Mike Gurry have an office in the Ellis building?

21   **A.**   He did.

22   **Q.**   If you could -- do you still have the marker up there?

23   **A.**   I do.

24   **Q.**   Do you know where his office was?

25   **A.**   I believe he was where I'm going to mark it.

1    **Q.**  Okay.  Thank you.  Just to be clear, sir, did you spend a

2    lot of time in his office?

3    **A.**  Did I?

4    **Q.**  Yes.

5    **A.**  No.

6    **Q.**  But that's where you believe his office was?

7    **A.**  I believe so.

8    **Q.**  What about Liz Gurrieri?  Did Liz Gurrieri have an office

9    in Ellis?

10   **A.**  No.  She was in one of the cubicles that we talked about.

11   **Q.**  Up in that top left region?

12   **A.**  Correct.

13   **Q.**  When the call center moved to Frye, do you know whether

14   Liz Gurrieri had an office there?

15   **A.**  She did.

16   **Q.**  How do you know?

17   **A.**  I helped move her into it.

18   **Q.**  What about Mike Gurry?  Did he have an office there?

19   **A.**  No.

20   **Q.**  Where was his office when the call center moved to Frye?

21   **A.**  He remained in this building on Ellis.

22   **Q.**  The phone system that was in Ellis, you said that they

23   shared your small office phone system; is that right?

24   **A.**  Correct.

25   **Q.**  Did that phone system have the capability to either live

1    monitor or record incoming and outgoing telephone calls?

2    **A.**   No, it did not.

3    **Q.**   The phone system that was set up with the outside

4    contractor and Cox Communications in Frye, where the call

5    center moved to --

6    **A.**   Yes.

7    **Q.**   -- did that phone system, if you know, have the

8    capability of live monitoring or recording telephone calls?

9    **A.**   It was capable of recording.

10   **Q.**   At the inception, it was capable of recording?

11   **A.**   Correct.

12   **Q.**   And did anything change about that?

13   **A.**   No.

14   **Q.**   At some point were additional features added in terms of

15   the ability to also monitor?

16   **A.**   Not to that phone system.

17   **Q.**   Did they get a new phone system?

18   **A.**   They did.

19   **Q.**   Can you explain that, please.

20   **A.**   When they expanded, we bought another new phone system

21   that was capable of live monitoring phone calls.

22   **Q.**   And was it also capable of recording phone calls?

23   **A.**   It was.

24   **Q.**   Do you know whether either system, the first system or

25   the second system at Frye, each one was capable of recording,

1    right?

2    **A.**   Correct.

3    **Q.**   Do you know whether either one actually was used to

4    record calls?

5    **A.**   It was not.

6    **Q.**   How do you know?

7    **A.**   The feature wasn't enabled.

8    **Q.**   Do you know, were there discussions about monitoring and

9    recording that took place in this time period between 2012

10   and 2015?

11   **A.**   Yes.

12   **Q.**   Did you participate in any of those?

13   **A.**   I did.

14   **Q.**   Who did you have those conversations with?

15   **A.**   Liz Gurrieri.

16   **Q.**   Anybody else?

17   **A.**   Possibly.  Compliance probably would have been a part of

18   that at some point.

19   **Q.**   Did you ever talk to Mike Gurry about it?

20   **A.**   I don't believe so.

21   **Q.**   Did anybody ask you to work with an outside company to

22   look into recording and monitoring systems there?

23   **A.**   Not an outside company.  We bought the new phone system

24   so that it was capable of recording.

25   **Q.**   Do you know who made the decision not to activate that

1   feature to record those calls?

2   **A.**   I don't.

3   **Q.**   Did you make that decision?

4   **A.**   I did not.

5   **Q.**   When the call center's phone system was first set up, any

6   of the phone systems, were the outgoing phone numbers visible

7   on the caller ID, if you know, to people on the other end?

8   **A.**   They were.

9   **Q.**   At some point did that change?

10  **A.**   Yes.

11  **Q.**   What about it changed?

12  **A.**   The outbound caller ID was blocked or masked to be not

13  the phone number.

14  **Q.**   What would happen when a call was placed from the call

15  center to an outsider?  What would the outsider see if they

16  had caller ID?

17  **A.**   Either a series of zeros or no caller ID.

18  **Q.**   How is it that you know that, sir?

19  **A.**   I helped enact that, enable it.

20  **Q.**   And was that at some point after the call center was set

21  up?

22  **A.**   Yes.

23  **Q.**   So initially it wasn't blocked?

24  **A.**   Correct.

25  **Q.**   And then somebody asked you to add it later?

1    **A.**   Correct.

2    **Q.**   Do you recall who you had that conversation or

3    conversations with?

4    **A.**   I believe that was Liz Gurrieri.

5    **Q.**   Are you sure about it?

6    **A.**   Reasonably sure, yes.

7    **Q.**   At some point were you asked whether it was possible to

8    in addition to blocking the outgoing caller ID to sometimes

9    unblock that caller ID if necessary and also to provide --

10   whether it was possible to provide any email addresses that

11   didn't look like @insysrx.com?

12   **A.**   Yes.

13   **Q.**   And do you recall who you had that conversation or

14   conversations with?

15   **A.**   I believe that was Angel Alarcon.

16   **Q.**   And who is Angel Alarcon?

17   **A.**   She worked with Liz.  She was one of the first employees

18   for the department, I believe.

19   **Q.**   And did you, in fact, set up some sort of email that

20   didn't come back to insysrx.com?

21   **A.**   No.

22          MR. LAZARUS:  Your Honor, may I have one brief

23   moment to confer with counsel?

24          THE COURT:  Sure.

25          MR. LAZARUS:  Thank you for that opportunity, Your

1    Honor.  I have nothing further at this time.

2              THE COURT:  Cross?

3              MS. MINER:  Yes, Your Honor.

4                      CROSS EXAMINATION

5    BY MS. MINER:

6    **Q.**  Good morning, Mr. Rice.

7    **A.**  Good morning.

8    **Q.**  My name is Tracy Miner, and I represent Mike Gurry.

9    We've never met, have we?

10   **A.**  No.

11   **Q.**  Now, you were responsible for the IT department at Insys;

12   is that right?

13   **A.**  Correct.

14   **Q.**  And you reported to Mike Babich, right?

15   **A.**  Correct.

16   **Q.**  And that was true throughout your tenure until Mike

17   Babich left, correct?

18   **A.**  I believe that I reported to the CFO for a short time

19   before Mike left.

20   **Q.**  Do you know when that was?

21   **A.**  That would have been 2015.

22   **Q.**  And who was the CFO at that time?

23   **A.**  Darryl Baker.

24   **Q.**  You're familiar with the IRC, correct?

25   **A.**  Yes.

1    **Q.**   And you're familiar with Liz Gurrieri, right?

2    **A.**   Yes.

3    **Q.**   She was the manager of the IRC, correct?

4    **A.**   Correct.

5    **Q.**   And she held that position for a number of years, right?

6    **A.**   Yes.

7    **Q.**   And you dealt with her directly on IRC issues.  Isn't

8    that fair?

9    **A.**   Yes.

10   **Q.**   And when you talked about on direct moving the IRC to a

11   new building, when you moved the IRC to a new building,

12   Ms. Gurrieri actually had an office at the new building,

13   correct?

14   **A.**   She did.

15   **Q.**   Mr. Gurry kept his office -- well, kept his office at the

16   corporate headquarters, right?

17   **A.**   Correct.  He did not relocate.

18   **Q.**   And when Ms. Gurrieri was in corporate headquarters, she

19   didn't actually have an office.  She was just part of the

20   cubicle system, right?

21   **A.**   Correct.

22   **Q.**   Do you know how many employees the IRC had, related to

23   the IRC when they moved offices?

24   **A.**   I don't specifically.

25   **Q.**   The cubicles were getting kind of cramped at that point.

1    Isn't that fair?

2    **A.**   Yes.  We only had a few open spots to begin with.

3    **Q.**   And you were involved in setting up the phone system for

4    the IRC in the new building, correct?

5    **A.**   Correct.

6    **Q.**   In fact, you sourced and purchased the phone system

7    installed for that?

8    **A.**   Correct.

9    **Q.**   And you worked with both Mike Gurry and Elizabeth

10   Gurrieri on setting up that phone system, right?

11   **A.**   I worked with Liz directly on that.  I'm not sure I had

12   much involvement with Mike.

13   **Q.**   And you set up that phone system in the new building, you

14   had some discussions or communications with Mike Gurry about

15   the system.  Isn't that fair?

16   **A.**   I don't recall that specifically.

17          MS. MINER:  Could we have Exhibit 5204 for counsel

18   and witness eyes only, please.

19   **Q.**   Sir, do you see on your screen a series of emails?

20   **A.**   Yes.

21   **Q.**   The first one was from you to Mike Gurry?

22   **A.**   Correct.

23   **Q.**   And that's February 7, 2013?

24   **A.**   Correct.

25   **Q.**   And then Mike Gurry's response above it, February 8,

1    2013?

2    **A.**  Correct.

3    **Q.**  And these were made in the ordinary course of business;

4    is that right?

5                MR. LAZARUS:  I have no objection oh, Your Honor.

6                MS. MINER:  Can we publish it to the jury, please.

7                THE COURT:  Yes.

8                (Defendant Exhibit No. 5204 admitted.)

9    BY MS. MINER:

10   **Q.**  I direct your attention to your email at the bottom of

11   the page, the second full paragraph.  You were communicating

12   with Mike Gurry about some of the features of the phone

13   system for the new building, correct?

14   **A.**  Yes.

15   **Q.**  One of the things was the ability to record calls; is

16   that right?

17   **A.**  Correct.

18   **Q.**  And if you go to the second line, that system was going

19   to cost an additional $12,000; is that right?

20   **A.**  Correct.

21   **Q.**  And you needed Mike Gurry to approve those funds, did you

22   not?

23   **A.**  Yes.

24   **Q.**  And he did approve it, correct?

25   **A.**  I assume so.  I couldn't tell from this email.

1          MS. MINER:  If we could have 5205 on the screen.

2  **Q.**  And again, this is an email between you and Mike Gurry?

3          MR. LAZARUS:  No objection to this one either, Your

4  Honor.

5          THE COURT:  It's admitted.

6          (Defendant Exhibit No. 5205 admitted.)

7          MS. MINER:  If we could have it published, please.

8  BY MS. MINER:

9  **Q.**  This is an email from you to Mike Gurry a couple of weeks

10 later, February 27, 2013?

11 **A.**  Yes.

12 **Q.**  And if you go to the third bullet point, you're informing

13 Mr. Gurry that the call recording system is still on order

14 and should be installed in the next week or two.  Is that

15 right?

16 **A.**  Yes.

17 **Q.**  So the system was ordered, paid for, and installed, as

18 you recall it, correct?

19 **A.**  Yes.

20 **Q.**  At some point Ms. Gurrieri came to you and asked if the

21 calls from the IRC building could be blocked, correct?

22 **A.**  Yes.

23 **Q.**  I believe you testified that what that would do is the

24 receiver would either see a series of zeros or it would say

25 "Blocked"; is that right?

1    **A.**   Correct.

2    **Q.**   So the recipient would know that the call was blocked,

3    right?

4    **A.**   Correct.

5    **Q.**   And you dealt with Ms. Gurrieri on that issue, correct?

6    **A.**   Yes.

7    **Q.**   You didn't think you were doing anything wrong by setting

8    is up call blocking, did you?

9    **A.**   No.

10   **Q.**   Now, in October of 2013, do you recall there being an

11   issue with employees of the IRC logging onto websites and

12   doing personal business?

13   **A.**   I couldn't say for certain, but that was an ongoing issue

14   with everyone.

15          MS. MINER:  Could I have 5207 on the screen.

16   **Q.**   This is an email chain between you and Mike Babich and

17   Jenna Grosshans; is that right?

18   **A.**   Yes.

19          MS. MINER:  I'd move its admission.

20          MR. LAZARUS:  No objection, Your Honor.

21          THE COURT:  Admitted.

22          (Defendant Exhibit No. 5207 admitted.)

23          MS. MINER:  If we could have it published, please.

24          And if we could go down to the bottom, the first in

25   the series.  Thank you.

1  BY MS. MINER:

2  **Q.**  There's an email from you to Jenna Grosshans, correct?

3  **A.**  Yes.

4  **Q.**  Who was Jenna Grosshans, by the way?

5  **A.**  She was the director of human resources.

6  **Q.**  And that email -- and it was cc'd to Mike Babich,

7  correct?

8  **A.**  Yes.

9  **Q.**  And that email dealt with two issues, correct?

10  **A.**  Correct.

11  **Q.**  One was a chat room had been or a chat program had been

12  set up with the IRC?

13  **A.**  Well, they were using Google Chat instant messaging.

14  **Q.**  And there was also an issue with respect to Facebook and

15  other similar websites?

16  **A.**  Correct.  Social media and instant messaging.

17  **Q.**  And the issue was could you shut both of those systems

18  down, correct?

19  **A.**  Correct.

20  **Q.**  By the way, Mr. Gurry wasn't part of that Google Chat

21  thing, was he?

22  **A.**  Not to my knowledge.

23  **Q.**  If you go up a little bit, Mike Babich asks, he agrees

24  that they should be shut down, but he wanted Gurry to weigh

25  in on it.  Do you see that?

1    **A.**  Yes.

2    **Q.**  And that's Mike Gurry, correct?

3    **A.**  Correct.

4    **Q.**  And if we go up, you respond you can set up an

5    internal-only system, but you know he --

6             And that's referring to Mike Gurry, correct?

7    **A.**  I believe so.

8    **Q.**  -- was anxious to get the websites blocked, correct?

9    **A.**  Yes.

10   **Q.**  He, Mike Gurry, did not want the employees of the IRC to

11   be on social media sites such as Facebook and gambling sites,

12   correct?

13   **A.**  Correct.

14   **Q.**  And he, Mike Gurry, did not want to have an instant chat

15   room where the employees could chat with each other, correct?

16             MR. LAZARUS:  Objection, Your Honor.  Calls for

17   speculation.  That's not what's in this email.

18             THE COURT:  You can rephrase the question.

19   BY MS. MINER:

20   **Q.**  Mike Gurry told you that he didn't want -- excuse me.

21             Mike Gurry authorized the shutting down of the

22   Google instant message, right?

23   **A.**  I don't know that from this email.

24   **Q.**  Do you recall that in general?

25   **A.**  I believe so.

1    **Q.**  Now, from time to time issues arose at the IRC with

2    respect to the email server, correct?

3    **A.**  Specifically?

4    **Q.**  At some point, there was a policy put in place for the

5    IRC that the IRC should not have emails going in or out of it

6    with patient names on the subject line, correct?

7    **A.**  I don't know that specifically, but I would assume so.

8         MS. MINER:  If we could have 5208.

9    **Q.**  And this is a series of emails between you and Mr. Gurry

10   in February of 2013; is that right?

11   **A.**  Yes.

12        MS. MINER:  I'd move its admission.

13        MR. LAZARUS:  No objection.

14        THE COURT:  Admitted.

15        (Defendant Exhibit No. 5208 admitted.)

16   BY MS. MINER:

17   **Q.**  If we could go to the bottom, the first email.  It's an

18   email from you to Mike Gurry, correct?

19   **A.**  Yes.

20   **Q.**  And you were asking Mike Gurry to remind the sales force

21   not to put patient names in the email subject line, correct?

22   **A.**  Correct.

23   **Q.**  And Mr. Gurry responds and asks you for the specifics,

24   correct?

25   **A.**  Yes.

1   **Q.**  Does that refresh your recollection that there was a

2   policy that people were not supposed to put patient names in

3   the "Re" line?

4   **A.**  I don't know if it was a formal policy, but it was

5   something they should not be doing.

6   **Q.**  And that was communicated by you and others to the sales

7   staff, correct?

8   **A.**  I don't specifically recall telling them myself, but it

9   should have been.

10  **Q.**  And here you're asking Mike Gurry to do that, correct?

11  **A.**  Yes.

12  **Q.**  And he wants to know the particulars because he can't

13  find the offensive email; isn't that right?

14          MR. LAZARUS:  Objection, Your Honor.  Foundation as

15  to what Mr. Gurry knows.

16          THE COURT:  Sustained.

17  BY MS. MINER:

18  **Q.**  Let's walk through them, then.

19          So in response to your request that Mike Gurry

20  remind everyone not to put patient names on, Mike Gurry

21  responds and asks you to give him the time the email was

22  sent.  Do you see that?

23  **A.**  Yes.

24  **Q.**  And then you respond and say, well, originally at 12:53?

25  **A.**  Yes.

1  **Q.**  And then Mike Gurry says, "Not seeing anything.  Am I
2  copied?"
3        Do you see that?
4  **A.**  That's what it says, yes.
5  **Q.**  And then if you go up, you respond, "No, it was just
6  between Liz and Karen."
7  **A.**  Yes.
8  **Q.**  And the Liz you're talking about there was Liz Gurrieri,
9  are you not?
10  **A.**  Correct.
11  **Q.**  Now, in early 2014, there were discussions or
12  communications about whether the calls from the IRC could
13  actually be recorded, correct?
14  **A.**  I couldn't say for certain.
15        MS. MINER:  If we could have 5209 on the screen.
16  **Q.**  Do you see that these are a series of emails between you
17  and Liz Gurrieri, Angel Alarcon, and Mike Gurry?
18  **A.**  Yes.
19        MS. MINER:  I'm going to ask that these be
20  admitted.
21        MR. LAZARUS:  I just received them, Your Honor.
22  Could I have one brief moment.  I don't think I have an
23  objection; I just want to take a look at it.  I had it
24  before.  I received this in exhibit form.  No, I have no
25  objection, Your Honor.

1          THE COURT:  5209 is admitted.

2          (Defendant Exhibit No. 5209 admitted.)

3          MS. MINER:  Could it be published to the jury,

4    please.

5    BY MS. MINER:

6    **Q.**  And if you look at the bottom of the first page, it's an

7    email from Liz Gurrieri to you, correct?

8    **A.**  Yes.  Well, from me to Liz.

9    **Q.**  It's from Liz Gurrieri to you, correct?

10   **A.**  This one is, yes.

11   **Q.**  And she says, "We really need to monitor outbound calls

12   as well."  Correct?

13   **A.**  Yes.

14   **Q.**  "The majority of IRC calls are outbound," right?  "The

15   inbound calls should be recorded, but not for the purpose of

16   our individual QA QC process that we are in the process of

17   developing."  Right?

18   **A.**  Yes.

19   **Q.**  And you respond to Ms. Gurrieri that live monitoring was

20   currently possible, but you don't have the ability to know

21   which call you were picking up.  You'd just pick up an active

22   call, correct?

23   **A.**  Yes.

24   **Q.**  Does that refresh your recollection that, in fact, there

25   were communications about recording in early 2014?

1    **A.**  Yes.

2    **Q.**  And, in fact, at some point recording did happen.  Isn't

3    that fair?

4    **A.**  I don't believe so, no.

5           MS. MINER:  Could we have 5211 on the screen for

6    counsel and the witness.

7           MR. LAZARUS:  No objection to say this one, Your

8    Honor.

9           THE COURT:  Admitted.  Addict.

10   BY MS. MINER:

11   **Q.**  Do you see at the beginning this is an email from you to

12   Liz Gurrieri, dated April 7, 2014?

13          MR. LAZARUS:  Wait.  I'm sorry.  Is this 5210 or --

14          THE COURT:  5211.

15          MR. LAZARUS:  I have 5210.  I'm sorry.  I have no

16   objection to this one either.

17          THE COURT:  5211 or 5210?

18          MS. MINER:  5211.

19          THE COURT:  5211 is admitted.

20          (Defendant Exhibit No. 5211 admitted.)

21   BY MS. MINER:

22   **Q.**  You're forwarding a message to Liz Gurrieri on update on

23   phone recordings, correct?

24   **A.**  Yes.

25   **Q.**  You see at the bottom there's an email from Kevin --

**A.**   Scheidegger.

**Q.**   -- Scheidegger.  Who is he?

**A.**   He was the outside phone vendor.

**Q.**   And it states, "I hope your Monday is going well.  Last week we installed a new 24-channel Synway recording board in your Versadial system."

Is the Versadial system the system that was being used by the IRC?

**A.**   Yes.

**Q.**   "We have all but one channel recording."  Do you see that?

**A.**   Yes.

**Q.**   Does that refresh your recollection that calls were, in fact, recorded?

**A.**   For the purpose of testing the system.

**Q.**   And do you know how long they were recorded?

**A.**   Until it was determined that it was complete and functional.

**Q.**   And do you know if any of those calls were -- recorded were saved?

**A.**   I don't believe the system was in use at that time.

**Q.**   And later it was decided that there would be -- a call monitoring function would be added to the phone system.  Do you recall that?

**A.**   Yes.

1   **Q.**  And that allowed calls to be monitored by a monitor but

2   not recorded; is that right?

3   **A.**  Correct.

4   **Q.**  And did that go live at some point?

5   **A.**  It did.

6   **Q.**  And that was again an additional cost for the system?

7   **A.**  I believe that the system was capable of live monitoring

8   with this additional equipment installed.

9            MS. MINER:  If I could have 5196 on the screen.

10  I'm not going to move its admission.

11  **Q.**  Does that refresh your recollection that this required an

12  additional cost for the system?

13  **A.**  It would appear so, yes.

14  **Q.**  And that's consistent with your memory now, correct?

15  **A.**  Yes.

16           MS. MINER:  I have nothing further.

17           MR. TYRRELL:  I just have a few, Your Honor.

18                      CROSS EXAMINATION

19  BY MR. TYRRELL:

20  **Q.**  Good morning, Mr. Rice.

21  **A.**  Good morning.

22  **Q.**  You and I have never met before, have we?

23  **A.**  No.

24  **Q.**  I wanted to ask you a couple of questions about

25  Exhibit 1488, just to clarify a few things.

1          MR. TYRRELL:  If we could have that on the screen,

2     please, and highlight the second paragraph.

3     **Q.**  In the paragraph there, Mr. Babich says -- in talking

4     about the hiring of my client, Mr. Simon, he says, "I have

5     had a chance to spend a great deal of time with Rich."

6               Do you have any personal knowledge of whether or

7     not Mr. Babich before Mr. Simon was hired spent any time with

8     him at all?

9     **A.**  I don't, no.

10    **Q.**  So as far as you know, they may have never met before

11    other than maybe at an interview?

12    **A.**  Yeah, I have no way of knowing.

13    **Q.**  Great.  Thank you.

14             MR. TYRRELL:  I have nothing further.

15                        CROSS EXAMINATION

16    BY MR. STOJILKOVIC:

17    **Q.**  Good morning, Mr. Rice.

18    **A.**  Good morning.

19    **Q.**  I think I may be the last one up.  My name is Kosta

20    Stojilkovic, and I represent Dr. Kapoor.  We also have never

21    met, right?

22    **A.**  Correct.

23    **Q.**  I just want to make clear because you talked about

24    interfacing with outside counsel for Insys back when you

25    worked at the company, right?

1  **A.**   Correct.

2  **Q.**   I just want to make clear I was not one of those folks,

3  right?

4  **A.**   No.

5  **Q.**   You talked about being involved in gathering and

6  producing records from Insys, right?

7  **A.**   Yes.

8  **Q.**   And you were shown, on direct, some emails by the

9  government.  Were those among the emails that you gathered

10  and produced?

11  **A.**   Yes.

12  **Q.**   And you gathered and produced those emails after the

13  company received a subpoena, correct?

14  **A.**   Yes, correct.

15          MR. STOJILKOVIC:  May I approach the witness, Your

16  Honor?

17          THE COURT:  Yes.

18  BY MR. STOJILKOVIC:

19  **Q.**   Here you go, sir.  I'm showing you -- the top document

20  there has been marked for identification as Exhibit 688.

21          MR. STOJILKOVIC:  If we could also display it just

22  for counsel and the Court.

23  **Q.**   Sir, this is an email that you sent, correct?

24  **A.**   Yes.

25  **Q.**   And attached to that email is a subpoena and a cover

1    letter, correct?

2    **A.**   Correct.

3    **Q.**   And that is a subpoena that the company had received from

4    the government, correct?

5    **A.**   Yes.

6    **Q.**   And it asks the company to produce a variety of records,

7    right?

8    **A.**   I would assume so, without reading the entire document.

9    But yes.

10   **Q.**   Okay.  And you forwarded that subpoena to a number of

11   people, right?

12   **A.**   Correct.

13   **Q.**   One of those was Michael Babich?

14   **A.**   Yes.

15   **Q.**   One of those was a Leslie Zacks?

16   **A.**   Yes.

17   **Q.**   He was involved in providing legal advice at the time?

18   **A.**   Compliance, I believe, yes.

19   **Q.**   You also forwarded it to my client, Dr. Kapoor?

20   **A.**   Correct.

21   **Q.**   As well as to his personal assistant?

22   **A.**   Yes.

23              MR. STOJILKOVIC:  We can put that down off the

24   screen.

25              MR. LAZARUS:  I don't think it was offered.

1          MR. STOJILKOVIC:  My apologies.  If we can put it

2     back up for the Court.

3     BY MR. STOJILKOVIC:

4     **Q.**  What is the date you forwarded this subpoena?

5     **A.**  December 10, 2013.

6          MR. STOJILKOVIC:  Now we can put it down.

7     BY MR. STOJILKOVIC:

8     **Q.**  After the company got this subpoena, you became involved

9     in gathering records, right?

10    **A.**  Correct.

11    **Q.**  And you said as part of that process you communicated

12    with the company's legal counsel, correct?

13    **A.**  Correct.

14    **Q.**  I don't want you to, at any point today, talk about

15    conversation with the company's lawyers.  I just want to make

16    that clear.  If it seems like I'm asking you, I'm not, for

17    that.  Okay?

18    **A.**  Okay.

19    **Q.**  Setting aside whatever conversations you had with

20    counsel, the end result was that the company produced

21    records, correct?

22    **A.**  Yes.

23    **Q.**  And this was a big undertaking for you, correct?

24    **A.**  It was.

25    **Q.**  The company gathered and produced lots of emails?

1    **A.** Yes.

2    **Q.** The company gathered and produced other documents like

3    spreadsheets and other materials that the company had been

4    collecting?

5    **A.** Correct.

6    **Q.** And you also collected and produced certain materials

7    that had gone to the board of directors?

8    **A.** Correct.

9    **Q.** In fact, the company produced millions of pages of

10   documents in response to this subpoena, correct?

11   **A.** I'm sure.

12   **Q.** You don't know how many million?

13   **A.** No.

14   **Q.** Okay.  Dr. Kapoor never told you not to turn over company

15   records, did he?

16   **A.** No.

17   **Q.** No one from the board ever told you not to turn over

18   company records, right?

19   **A.** Correct.  No.

20   **Q.** And after the subpoena came in, in December of 2013,

21   Dr. Kapoor didn't abandon the company, did he?

22   **A.** No.

23   **Q.** To your knowledge, he didn't sell off his stock, did he?

24   **A.** Not that I'm aware of.

25   **Q.** He was a major shareholder, right?

1    **A.**   Yes.

2    **Q.**   The biggest shareholder?

3    **A.**   Yes.

4    **Q.**   Now I'd like to ask you some questions about the diagram

5    there.

6            MR. STOJILKOVIC:  Is it okay if I approach, Your

7    Honor?

8            THE COURT:  Of course.

9            MR. STOJILKOVIC:  Thank you.

10   BY MR. STOJILKOVIC:

11   **Q.**   So, sir, this layout is at the main office, correct?

12   **A.**   This was our corporate office at the time, yes.

13   **Q.**   And it's what's been marked and admitted as Exhibit 1767,

14   right?

15   **A.**   Yes.

16   **Q.**   Now, you indicated here with the letters JK a location

17   where you had set up an office for Dr. Kapoor, right?

18   **A.**   Yes.

19   **Q.**   Okay.  And you're sure it's in this particular location?

20   **A.**   Either that or the adjacent office.  But in that area,

21   yes.

22   **Q.**   So you're thinking it may be here, it may be here.

23   **A.**   It could be, yeah.

24   **Q.**   Could I just borrow your pen?  Thank you.

25           Regardless of where it was, you indicated that

1    Dr. Kapoor rarely used this office, right?

2    **A.**   Correct.

3             MR. LAZARUS:  Your Honor, if I may, just for

4    purposes of the record, counsel just added a question mark

5    after the initials that were on the board.  Thank you.

6             MR. STOJILKOVIC:  I did.

7             MR. LAZARUS:  Thanks.

8    BY MR. STOJILKOVIC:

9    **Q.**   And you said he would come into the office about once a

10   week?

11   **A.**   Yes.

12   **Q.**   Okay.  Now, you also indicated Mike Babich was initially

13   up here at the upper right?

14   **A.**   Correct.

15   **Q.**   And at some point he moved down to an opposite corner?

16   **A.**   Yes.

17   **Q.**   What about Alec Burlakoff?  Where was his office?  It was

18   right next to the first Mike Babich office?

19   **A.**   I believe it was in the far corner by the door, top

20   right.

21   **Q.**   Do you see where my finger is pointing to?

22   **A.**   I believe so, yes.

23   **Q.**   Okay.  Then I'm going to mark the location that we just

24   agreed on as Alec Burlakoff's office.  So for some period of

25   time, Mike Babich and Alec Burlakoff sat next to each other,

1    correct?

2    **A.**   I believe so.

3    **Q.**   You sat in the same building.  You interacted with the

4    two of them on occasion?

5    **A.**   Yes.

6    **Q.**   And you know that Mike Babich and Alec Burlakoff grew to

7    be friends over time?

8              MR. LAZARUS:  Objection, Your Honor.  This is

9    beyond the scope of this witness' testimony.

10             THE COURT:  I'm going to give him some latitude on

11   cross examination.

12             MR. STOJILKOVIC:  Thank you, Your Honor.  We only

13   want to bring you in here once, Mr. Rice.

14   **A.**   I don't know what the relationship was.

15   BY MR. STOJILKOVIC:

16   **Q.**   Okay.  Well, do you know that -- strike that.

17             Do you know that Mr. Babich at one point married a

18   woman who was working as a sales rep at Insys?

19   **A.**   I'm aware of that, yes.

20   **Q.**   Her name was Natalie, maiden name Levine, right?

21   **A.**   Yes.

22   **Q.**   And do you know that Alec Burlakoff is the one who

23   introduced the two of them?

24             MR. LAZARUS:  Objection.  Relevance and beyond the

25   scope.

```
1              THE COURT:  Are you going to link it up?

2              MR. STOJILKOVIC:  Yes.

3              THE COURT:  I'm going to give him some latitude on

4    cross examination.  I too don't want this witness to have to

5    testify twice.

6              For the jury, you have direct examination, and then

7    cross examination is usually limited to the scope of direct

8    examination.  But they would have the right to call the

9    witness back in again if there were topics they couldn't

10   touch on.  So I'm giving them wider latitude on cross to

11   hopefully avoid the witness having to come back twice.

12             MR. LAZARUS:  I would just add hearsay and

13   foundation to that objection, Your Honor, as to this witness

14   with that information.

15             THE COURT:  The question does not call for hearsay.

16   A.  Can you repeat the question?

17   BY MR. STOJILKOVIC:

18   Q.  Absolutely.  Do you know that Alec Burlakoff is the one

19   who introduced Mike Babich to his wife?

20   A.  No.

21   Q.  Okay.  You didn't know that.  Do you know that she had

22   been working under Alec Burlakoff in sales?

23   A.  No.

24   Q.  You knew she was a sales rep, right?

25   A.  Yes.
```

1   **Q.**  Who was the head of sales?

2   **A.**  Alec was, yes.

3   **Q.**  Now, you also mentioned in your testimony on direct that

4   at one point in time Mike Babich left of the company, right?

5   **A.**  Yes.

6   **Q.**  And at that point, Dr. Kapoor took over as CEO, right?

7   **A.**  Yes.

8   **Q.**  That was in December of 2015, right?

9   **A.**  Correct.

10   **Q.**  So as of December of 2015, Dr. Kapoor and the board had

11   relieved Mike Babich of his duties, right?

12   **A.**  Yes.

13   **Q.**  And by that time, they had also fired Alec Burlakoff,

14   right?

15   **A.**  I believe so, yes.

16   **Q.**  And at that time, December 2015, Dr. Kapoor still stuck

17   by the company, right?

18   **A.**  Yes.

19   **Q.**  In fact, he took over as CEO of the company, right?

20   **A.**  Correct.

21   **Q.**  He was approximately 70 years old at the time, right?

22   **A.**  I believe so.

23   **Q.**  He had had a successful career?

24        MR. LAZARUS:  Your Honor, objection to the

25   relevance of this.

```
 1              THE COURT:  Overruled.
 2    A.  He had?
 3    BY MR. STOJILKOVIC:
 4    Q.  He had had a successful career to that point?
 5    A.  Yes.
 6    Q.  He could have gone home and retired and certainly lived a
 7    comfortable living?
 8    A.  Sure.
 9    Q.  Instead he took over as CEO?
10    A.  Yes.
11              MR. STOJILKOVIC:  No further questions, Your Honor.
12              THE COURT:  Anybody else over there?
13              MR. HORSTMANN:  Briefly, Your Honor.
14              THE COURT:  Yes.
15                       CROSS EXAMINATION
16    BY MR. HORSTMANN:
17    Q.  Mr. Rice, you said you knew who Sunrise Lee was, correct?
18              THE COURT:  Into a microphone, Mr. Horstmann.
19    BY MR. HORSTMANN:
20    Q.  Mr. Rice, you said you knew who Sunrise Lee was, correct?
21    A.  Yes.
22    Q.  She did not have an office in any of the buildings you've
23    described, correct?
24    A.  No, sir.
25    Q.  Thank you.
```

```
1              THE COURT:  Anybody else?
2              MR. KENDALL:  Then I'll ask.
3                          CROSS EXAMINATION
4     BY MR. KENDALL:
5     Q.  Nor good did Joe Rowan, correct?
6     A.  Correct.
7              MR. WYSHAK:  Can we have a brief sidebar?
8              THE COURT:  Yes.
9              (The following was held at sidebar.)
10             THE COURT:  Just so you're clear, I understand the
11    relevance objection.  I was letting him have it because I
12    think it's a fair point that if he thought the company was in
13    big trouble, or whatever, that he would have chosen not to
14    stay around.
15             MR. LAZARUS:  And, Your Honor, I don't care if the
16    jury hears that.  I just didn't understand why the IT guy
17    needed to testify about it and why would he be brought back
18    to do that.  That's just to save us time.  There's a ton of
19    witnesses.
20             THE COURT:  I thought you were making a relevance
21    objection.  I thought it had some relevance, even though the
22    objection was not out of place.  What are we up here for?
23             MR. WYSHAK:  On that point, Your Honor, when the
24    defendants go beyond the scope of direct and go into a new
25    area with the witness and the Court allows it for, whatever,
```

1    convenience sake of not bringing back the witness, they're

2    essentially making the witness their witness at that point.

3           And on redirect examination we are allowed to cross

4    examine or lead the witness regarding questioning in that

5    area.  So I just want the record to be clear that if that's

6    what they're going to do, if that's the strategy, that then

7    on redirect we're able to cross examine.

8           THE COURT:  Well, first of all, if you all are

9    going to object to me broadening the scope of cross to not

10    bring these people all back, we can do it that way.  If

11    you're not going to make an objection in that way, we can

12    discuss the parameters of it.  I happen to think that leading

13    the witness is just -- it's just less effective, right?

14           MR. WYSHAK:  This was a gratuitous, unnecessary

15    cross.

16           THE COURT:  They could have called him back for

17    that.

18           MR. WYSHAK:  We can now -- they're putting his

19    character into issue.  We could spend two hours now cross

20    examining on all the bad things that Kapoor did and knew in

21    his life.  So there is a danger here, and they are treading

22    into that area.  And if they're going to continue with this,

23    we're going to sit on our rights now to cross examine and

24    explore those areas.

25           THE COURT:  I hear you, Mr. Wyshak.  First all, he

1    asked about three questions.  If you're going to cross

2    examine two hours on his character after those three

3    questions, you need to reorganize your redirect, number one.

4    If you don't want it handled that way, they can -- I'll make

5    them bring back all the witnesses.

6              MR. WYSHAK:  They can call whoever they want on

7    their case.

8              THE COURT:  If you want to lead them on redirect in

9    that area about Mr. Kapoor's personal life.

10             MR. WYSHAK:  I'm just raising this so it doesn't

11   become a pattern.

12             THE COURT:  That's fine.  I take your point.  It

13   was for convenience.  If you don't think it's at all helpful,

14   we can reevaluate.  If you want to lead this witness on

15   redirect, go ahead, on that personal area.

16             MR. STOJILKOVIC:  For the record, the witness was

17   asked on direct about Babich not being the CEO, Kapoor

18   becoming the CEO.  My questions were related to that.  I ask

19   questions from a defense perspective --

20             THE COURT:  We don't need to make a record on this.

21   The questions speak for themselves.  You asked questions that

22   were beyond that, I let it go.  I thought it was more

23   efficient.

24             MR. KENDALL:  Your Honor, just in one issue, on the

25   leading issue.  They've got deals with a lot of these

1  witnesses.  We don't have access at all.  The thought that he

2  can start leading extensively when he's got these promise

3  rewards inducements --

4            THE COURT:  I'll take it by witness.

5            MR. WYSHAK:  This is the rules of evidence.

6            THE COURT:  Stop.  I don't know that he had any

7  more access than you.

8            MR. KENDALL:  You've said all that I wanted to

9  hear, Your Honor.

10            (End of sidebar)

11            THE COURT:  Redirect, Mr. Lazarus?

12            MR. LAZARUS:  Yes, Your Honor.  Thank you.

13                    REDIRECT EXAMINATION

14  BY MR. LAZARUS:

15  **Q.**  Just a little follow up for you, Mr. Rice.

16  **A.**  Okay.

17  **Q.**  First of all, you were shown two documents, Exhibits 688

18  and 5196.  Neither of those were introduced into evidence.

19            MR. LAZARUS:  Your Honor, at this time I'd offer

20  those exhibits.

21            MS. MINER:  No objection.

22            THE COURT:  688 and 5196, they're admitted.

23            MR. STOJILKOVIC:  Counsel, which one was 5196?

24            MR. LAZARUS:  It was an email Ms. Miner showed.

25  You're welcome to look at this copy.

1          MR. STOJILKOVIC:  No objection, Your Honor.

2          THE COURT:  They're both admitted.

3          (Government Exhibit Nos. 688 and 5196 admitted.)

4          MR. LAZARUS:  Thank you, Your Honor.

5          If I could publish 688 at this time.

6          If you could enlarge the top portion so they can

7     see the head are and the content.

8     BY MR. LAZARUS:

9     **Q.**   Sir, are you able to see on the monitor in front of you?

10    **A.**   Yes.

11    **Q.**   Is this the email counsel was showing you where you're

12    forwarding the subpoena to John Kapoor and others?

13    **A.**   Yes.

14    **Q.**   And you were asked questions about gathering documents.

15    Do you remember generally those questions on cross

16    examination?

17    **A.**   Yes.

18    **Q.**   You were asked whether anybody told you to withhold

19    documents.  Do you remember that?

20    **A.**   Yes.

21    **Q.**   Did you make any determination about which documents

22    ought to be turned over and what happened with them after

23    they were collected by you and given to counsel?

24    **A.**   No.

25    **Q.**   Did you have decision-making authority about what was

1    done with those documents once you pulled them off the

2    server, for example?

3    **A.**   No.

4    **Q.**   Was that your job to decide what should and should not be

5    produced in response to the subpoena?

6    **A.**   No.

7    **Q.**   How did you know what to get?  I don't want to know the

8    specifics of the information you were given, but how did you

9    know what task to carry out in connection with that?

10   **A.**   I worked directly with outside counsel.  They gave me the

11   information.

12   **Q.**   You would go help them and get what they needed and give

13   it to them, right?

14   **A.**   Correct.

15   **Q.**   And once they had it, you had no control over what they

16   did with it, right?

17   **A.**   Correct.

18   **Q.**   This is brief.  I'll just read it to you, sir.  It's

19   Exhibit 5196.  It's the email you were shown from Mike Gurry

20   to you, Liz Gurrieri, and Angel Alarcon in April of 2014

21   about other options for the phone and network system.

22            Do you remember seeing that exhibit?

23   **A.**   Yes.

24   **Q.**   So you were asked a lot of questions on cross examination

25   about phone systems and recording systems and monitoring

1   systems.  Do you generally remember that line of questioning

2   by Ms. Miner?

3   **A.**   I do.

4   **Q.**   So just to be clear, was it that the system could record

5   and it was just never activated, or was it recording and it

6   was turned off?  What was going on with the phone system?

7   **A.**   Later when the phone systems were installed it was

8   capable of recording or recording and live monitoring, but

9   the recording was never implemented.

10  **Q.**   So it could do it, but that doesn't mean it happened?

11  **A.**   Right.

12  **Q.**   And along those lines, going back to the question about

13  nobody told you to withhold documents.  Do you remember that?

14  **A.**   Yes.

15  **Q.**   If an email is never created, did you have the capability

16  to find it and turn it over?

17  **A.**   No.

18  **Q.**   And your company, Insys, didn't provide email service to

19  John Kapoor until he became CEO in December of 2015, right?

20  **A.**   Correct.

21  **Q.**   So if John Kapoor or Nellie Oquendo, whose name was on

22  one of those emails -- do you know who she was?

23  **A.**   I do.

24  **Q.**   Who's she?

25  **A.**   She was his executive assistant.

1   **Q.**  Do you know any of his other executive assistant names?

2   **A.**  There was one other at the time.  I can't recall her

3   name.

4   **Q.**  Do you recognize the name Maria Rodriguez?

5   **A.**  Maria, maybe.  Not specifically.

6   **Q.**  Don't guess, sir.

7          Nellie Oquendo was one of his assistants?

8   **A.**  Yes.

9   **Q.**  If an email was sent from Nellie Oquendo or John Kapoor

10  or anybody else to Insys, would Insys have captured a copy of

11  that email using the system you described earlier?

12  **A.**  Yes.

13  **Q.**  But if an outsider sends an email to an outsider, your

14  system couldn't capture that, right?

15  **A.**  Correct.

16  **Q.**  So you only know about Insys stuff, right?  The things

17  that came from Insys or left from Insys, right?

18  **A.**  Correct.

19  **Q.**  You were asked questions about Mr. Kapoor's successful

20  career.

21  **A.**  Yes.

22  **Q.**  Do you have any idea of his net worth?

23  **A.**  Currently, no.

24          MR. STOJILKOVIC:  Objection.

25          THE COURT:  Hold on.

```
1              MR. STOJILKOVIC:  Objection.  Relevance.

2              THE COURT:  Overruled.

3      BY MR. LAZARUS:

4      Q.  At the time he was employed there, did you have any

5      understanding of his net worth?

6      A.  I believe public information indicated that he was worth

7      $3 billion at the peak.

8      Q.  And was that something that you discussed with people at

9      Insys periodically?

10     A.  It may have come up, but it wasn't a topic of discussion.

11     Q.  But did you know it then that he was a billionaire?

12     A.  Yes.

13     Q.  You were asked some questions about whether you set a

14     policy for the company to put patient information in the

15     subject line.  Do you remember that line of questioning?

16     A.  Yes.

17     Q.  Did you set a policy about that?

18     A.  No.

19     Q.  And finally, you were asked about the chat and the

20     external websites being discussed for restriction at the call

21     center.  Do you remember those questions?

22     A.  Yes.

23     Q.  So I believe in the email it said that the websites were

24     going to be blocked.  Do you know whether the call center had

25     chat capability after that?
```

1   **A.**   At the time, Google Chat was very difficult to block

2   without blocking basically the entire Internet.   And so we

3   did everything that we could to block that capability.

4   **Q.**   Do you know whether it actually worked?   Did you succeed?

5   **A.**   It worked partially, not reliably.

6   **Q.**   And could people, for example, even after you blocked

7   some external websites, log into their own personal Gmail

8   account if they wanted to while they were at work?

9   **A.**   Yes.

10   **Q.**   So if somebody was sitting there, they could log into

11   Gmail or Yahoo and email with one another through that

12   separate system, right?

13   **A.**   Yes.

14   **Q.**   And would you capture that?

15   **A.**   No.

16           MR. LAZARUS:   Nothing further.   Thank you, Your

17   Honor.   If I may, hold on one moment, Your Honor.   If I may

18   confer.   Mr. Wyshak reminds me of a few questions, if I may,

19   Your Honor.

20   BY MR. LAZARUS:

21   **Q.**   Mr. Rice, I asked you some questions in response to cross

22   examination about records being kept and maintained, and I

23   asked you about whether Mr. Kapoor had an Insys server that

24   you were able to go get information from.   Do you remember

25   those questions?

1   **A.**   Yes.

2   **Q.**   Do you know whether John Kapoor had his own email server

3   off-site somewhere?

4   **A.**   He had -- yes, he had his own system as well.

5   **Q.**   So Insys was insysrx.com.  Do you know what his system

6   was affiliated with?

7   **A.**   EJ Financial, his company.

8   **Q.**   And when you say "his company," what do you mean?

9   **A.**   That was Dr. Kapoor's own company.

10  **Q.**   And so, if you know, was there an EJ Financial email

11  server?

12  **A.**   Yes.

13  **Q.**   Yes, there was?

14  **A.**   Yes.

15  **Q.**   How do you know?

16  **A.**   Well, we communicated using it.  Nellie's email address

17  was an EJ Financial email address.

18  **Q.**   Do you know where he lived?

19  **A.**   Yes.

20  **Q.**   Where did he live?  Not the address but generally?

21  **A.**   North Central Phoenix.

22  **Q.**   And about how close to Insys was that?

23  **A.**   20 miles maybe.

24  **Q.**   Did you ever have occasion to go to his house?

25  **A.**   Yes.

1   **Q.**  Did you ever provide any technical services for him?

2   **A.**  I did.

3   **Q.**  About when was that?

4   **A.**  From 2007 through probably 2010.

5   **Q.**  What did you do?

6   **A.**  I would help Nellie with technical issues in the office,

7   printer installations, things like that.

8   **Q.**  And was the office at his house?

9   **A.**  Yes, it was.

10  **Q.**  But you weren't asked to collect any documents from that

11  location, right?

12  **A.**  No.

13  **Q.**  It somebody was asked to do that, that wasn't you, right?

14  **A.**  Correct.

15          MR. LAZARUS:  Nothing further, Your Honor.

16          MS. MINER:  Briefly, Your Honor.

17          THE COURT:  Yes.

18          MS. MINER:  Could I have an exhibit which is

19  admitted, 5211, on the screens, please.  If we could blow up

20  the first paragraph.

21                      RECROSS EXAMINATION

22  BY MS. MINER:

23  **Q.**  Mr. Scheidegger informed you that we currently have all

24  active work stations recording.  Do you see that?

25  **A.**  Yes.

1    **Q.**  And to your personal knowledge, you don't know when they

2    turned those recordings on, do you?

3    **A.**  This was during the installation of the system.

4    **Q.**  Do you know the date and time they turned it on, from

5    your personal knowledge?

6    **A.**  I couldn't say for certain, no.

7    **Q.**  And do you know the date and time from your personal

8    knowledge when they turned it off?

9    **A.**  Not specifically, no.

10                   MS. MINER:  Thank you.

11                   MR. TYRRELL:  One question, Your Honor.

12                        RECROSS EXAMINATION

13   BY MR. TYRRELL:

14   **Q.**  Just for completeness, Mr. Simon never had an office at

15   headquarters either, did he?

16   **A.**  No, he did not.

17                   MR. TYRRELL:  Thank you.

18                   THE COURT:  Anybody else?

19                   You're excused.  Thank you.  Call your next

20   witness, please.

21                   MR. YEAGER:  The United States calls Brett

22   Szymanski to the stand.

23                   THE CLERK:  Can you please raise your right hand.

24                   (BRETT SZYMANSKI duly sworn by the Deputy Clerk.)

25                   THE CLERK:  Thank you.  You may be seated.  Can you

1    please state your name and spell your last name for the

2    record.

3              THE WITNESS:  Yes.  Brett Szymanski.  Last name is

4    S-Z-Y-M-A-N-S-K-I.

5              MR. YEAGER:  May I proceed, Your Honor?

6              THE COURT:  You may.

7                        DIRECT EXAMINATION

8    BY MR. YEAGER:

9    **Q.**  Sir, good morning.

10   **A.**  Good morning.

11   **Q.**  Would you please tell us -- let's start and just tell us,

12   sir, where do you currently live?

13   **A.**  I live in Leonard, Michigan.

14   **Q.**  And are you from Michigan originally?

15   **A.**  Yes.

16   **Q.**  How far did you go in school, sir?

17   **A.**  Bachelor's degree.

18   **Q.**  When did you graduate?

19   **A.**  I graduated in 2009.

20   **Q.**  What was your degree in, sir?

21   **A.**  Bachelor of science in physical education.

22   **Q.**  Mr. Szymanski, you are testifying today pursuant to an

23   order of the Court which was requested by the United States.

24   Is that correct?

25   **A.**  Correct.

1    **Q.**  What is your understanding that that order provides?

2    **A.**  Immunity.

3    **Q.**  What is your understanding of immunity?

4    **A.**  That nothing I say will be used against me.

5    **Q.**  Do you know that you must -- with regard to your

6    testimony here today, you're required to testify truthfully?

7    **A.**  Yes.

8    **Q.**  Sir, let's start with what you did after college.  What

9    did you do for work after you graduated from Central

10   Michigan?

11   **A.**  So my first job after college, originally I wanted to get

12   into pharmaceutical sales, but I needed some

13   business-to-business sales experience.  In order to get that,

14   I took a job with a company called Multiband, which we sold

15   telecommunication products to basically apartments and

16   condos.

17   **Q.**  Sir, you dropped your voice there.

18         you sold telecommunication products to what?

19   **A.**  Apartments and condos.

20   **Q.**  And how long did you work for Multiband?

21   **A.**  About three years.

22   **Q.**  What did you do after working for Multiband?

23   **A.**  That's when I started with Insys Therapeutics.

24   **Q.**  And how did you find out about Insys Therapeutics?

25   **A.**  From my memory, I found it on just a basic job board

1   listing, like a job posting on an Internet job board, and

2   applied for it and got an interview, interviewed with the

3   current -- at the time, the current regional manager.

4   **Q.**   Who was that?

5   **A.**   Kathy Finch.

6   **Q.**   For the record, F-I-N-C-H?

7   **A.**   Yes.

8   **Q.**   I'm sorry?

9   **A.**   Yes.

10   **Q.**   Describe -- after that interview, did you interview with

11   anyone else?

12   **A.**   I did.   After that interview, she asked me to do a phone

13   interview with the then vice president of sales, Shawn Simon.

14   **Q.**   And for the record that's Shawn, S-H-A-W-N, last name

15   Simon, standard spelling?

16   **A.**   Yes.

17   **Q.**   Did you interview with Mr. Simon?

18   **A.**   I did.

19   **Q.**   What happened after that?

20   **A.**   After that, Kathy called me back, after the phone call

21   with Shawn Simon, and offered me the job.

22   **Q.**   So did you take the job?

23   **A.**   I did.

24   **Q.**   What was your first job with Insys?

25   **A.**   Specialty sales professional.

1  **Q.**  What is that?

2  **A.**  Essentially I was responsible for calling on physicians

3  within the assigned geography, which was the state of

4  Michigan.

5  **Q.**  And what was your pay as a specialty sales rep for Insys

6  Therapeutics?

7  **A.**  It was a $40,000 base salary included with uncapped

8  bonuses.

9  **Q.**  What exactly is an uncapped bonus?

10 **A.**  Uncapped bonus essentially is the more of the drugs that

11 you sold, the more money that you would make.

12 **Q.**  And when did you start your job?

13 **A.**  March of 2012.

14 **Q.**  Describe the training you received when you started.

15 **A.**  The initial training was we did at-home module trainings,

16 which were essentially reading material on different topics

17 followed by tests.  That was a couple of weeks prior to the

18 launch training that we did in Phoenix.

19 **Q.**  So you had that home training, which was like tests, and

20 then you went to Phoenix for additional training?

21 **A.**  Correct.

22 **Q.**  Let's start first with the at-home training.

23 **A.**  Okay.

24 **Q.**  What kind of training did you do at home?

25 **A.**  They were modules, fairly broad.  It was anything from

1  disease state to pharmacokinetics to compliance, human

2  resources, kind of all the broad encompassing trainings.

3  **Q.**  When you say "compliance," what do you mean?

4  **A.**  Compliance, essentially it was travel and expense

5  compliance.  It was the relationships with physicians

6  compliance.

7  **Q.**  When you say "relationships with physicians compliance,"

8  can you give us an understanding of what you were trained

9  about?  Not all the details.  We just want to understand the

10  broad categories.

11  **A.**  Yeah.  Essentially it was what we should and shouldn't do

12  in our relationship with physicians.  What we're allowed --

13  essentially if we went to -- if we brought them lunch, what

14  were the rules around that, what we were allowed to spend, so

15  on and so forth.

16  **Q.**  So what district were you assigned to?

17  **A.**  At the time, it was Michigan.

18  **Q.**  So you went to -- in addition to these modules, these

19  trainings at home, you went to Arizona as well, correct?

20  **A.**  Correct.

21  **Q.**  Can you just give us an understanding of what you did in

22  Arizona for training.

23  **A.**  Yeah.  Arizona was a week long, essentially a corporate

24  training.  We did sales role play.  A lot of the same things

25  as the modules but more of a hands-on, in-person approach.

1    And then it was also the different departments from the

2    company would come and conduct their trainings.

3    **Q.**   Describe your chain of command when you started working

4    in Michigan.

5    **A.**   When I started working, my direct manager -- I believe at

6    the time they were called regional managers -- was Lisa

7    Schecter.  And then above her it was Shawn Simon.

8    **Q.**   For the record, Ms. Schecter's last name was

9    S-C-H-E-C-H-T-E-R?

10   **A.**   Yes.

11   **Q.**   Mr. Simon was the person we talked about before, the VP

12   of sales; is that correct?

13   **A.**   Correct.

14   **Q.**   Who owned the company?

15   **A.**   Dr. Kapoor.

16   **Q.**   Did you have occasion to meet Dr. Kapoor in the course of

17   your employment at Insys Therapeutics?

18   **A.**   Yes.

19   **Q.**   Do you see him in the courtroom here today?

20   **A.**   Yes.

21   **Q.**   Would you please point to him and describe something that

22   he's wearing?

23   **A.**   A blue tie.

24            MR. STOJILKOVIC:  Your Honor, we'll stipulate to

25   this.  I don't think we need to do it with every witness.

1    MR. YEAGER:  Thank you.

2  BY MR. YEAGER:

3  **Q.**  How did you know which doctors or practitioners to sell

4  to in Michigan, sir?

5  **A.**  We were given an iPad that had a sales app on it.  And

6  essentially all the physicians that we were supposed to call

7  on were ranked on that app, along with their name and

8  address, by a decile number 1 through 10.

9  **Q.**  What does "decile" mean?  How did that work?

10  **A.**  So a decile 10 would be your -- at the time, it was the

11  highest prescriber of the competitive drugs.  And then a

12  decile 1 would be the lower prescriber of the competitive

13  drugs.

14  **Q.**  When you're talking about competitor drugs at the time,

15  what drugs were you referring to?

16  **A.**  At the time it was mainly Actiq and Fentora.

17  **Q.**  Just so we're all on the same page, what year is this

18  that you're starting out selling Subsys in Michigan?

19  **A.**  2012.

20  **Q.**  All right.  And the drug gets launched the last week of

21  March; is that correct?

22  **A.**  Correct.

23  **Q.**  So after the drug gets launched, what do you do?

24  **A.**  I start with the higher decile physicians and start to

25  drive around and introduce myself and meet everybody.

1    **Q.**   And who is Gavin Awerbuch?

2    **A.**   At the time, he was a decile 10 physician that was on the

3    list, practicing in Saginaw, Michigan.

4    **Q.**   For the record, his last name is Awerbuch,

5    A-W-E-R-B-U-C-H, correct?

6    **A.**   Yes.

7    **Q.**   When did you first meet Dr. Awerbuch?

8    **A.**   It was within the first couple of days that we were out

9    after training in the field calling on physicians.  And I

10   went to his office essentially to do a routine introduction

11   and sales call.

12   **Q.**   Describe your first meeting.

13   **A.**   My first meeting, met him quickly in between patients.

14   He mentioned to me that he had written two Subsys

15   prescriptions that day.  They were not able to be filled by

16   the pharmacy for -- I can't recall the exact reason they

17   couldn't get it.  And he also mentioned to me that he was on

18   a conference call, a prelaunch conference call with some

19   people from our company.

20   **Q.**   Describe how things went with Dr. Awerbuch after that

21   first meeting.

22   **A.**   So after the first meeting, he essentially told me that

23   he would like to -- he really liked the drug, and that he

24   would like to switch all of his short acting -- rapid-onset

25   opioid patients over to Subsys.  And then essentially from

1    there, I would call on him frequently.

2    **Q.**   What did you say?  What kind of medication he would turn

3    over?

4    **A.**   Rapid-onset opioid.

5    **Q.**   When you say that, what are you referring to?

6    **A.**   Actiq and Fentora.

7    **Q.**   What is the speaker program?

8    **A.**   The speaker program is where a physician that is trained

9    by the company would speak or present an approved slide deck

10   to their peers.

11   **Q.**   When did you, sir, first learn about speaker programs?

12   **A.**   I can't remember if it was -- it was either the module

13   training or the training in Phoenix.

14   **Q.**   You were taught just generally what they are?

15   **A.**   Generally what a speaker program is.

16   **Q.**   Do you remember who provided you that training?

17   **A.**   I don't.

18   **Q.**   What is the Insys speaker program?

19   **A.**   Insys speaker was essentially our version of what a

20   speaker program is.

21   **Q.**   So after orientation, when was the next -- when was the

22   first time the ISP, the Insys speaker program came up?

23   **A.**   It was -- I don't know the exact date.  It was shortly

24   after -- probably early summer when we were tasked to go out

25   and essentially find a speaker.

1   **Q.**  When you say "find a speaker," it was your responsibility

2   as a sales rep to figure out who the speaker should be?

3   **A.**  To -- it was our responsibility to identify and nominate

4   a speaker.

5   **Q.**  Who gave you that responsibility?

6   **A.**  That would be our manager at the time, Lisa.

7   **Q.**  Lisa Schecter?

8   **A.**  Yes.

9   **Q.**  So did you do that?  Did you nominate a speaker or

10  speakers?

11  **A.**  Yes.

12  **Q.**  Who did you nominate?

13  **A.**  I nominated Dr. Awerbuch, Dr. Lakkaraju and Dr. Wilson.

14  **Q.**  And guess on how to spell Lakkaraju?

15  **A.**  I can give you my best guess.  L-A-K-K-A-R-A-J-U.

16  **Q.**  Who was the last speaker you mentioned?

17  **A.**  Wilson.

18  **Q.**  So what was the process?  How did you nominate somebody?

19  **A.**  We would approach them and ask them if this was something

20  they were interested in doing.  If they were, we needed to

21  get a CV from them.  I'm not sure if there was a nomination

22  form or not at the time.  And then we would submit that to

23  our manager.

24  **Q.**  Did you do that with regard to all three, Awerbuch,

25  Wilson and Lakkaraju?

1    **A.**   Yes.

2    **Q.**   And describe what happened after you submitted their

3    names?

4    **A.**   After we submitted their names, they were approved and

5    then subsequently trained.

6    **Q.**   And when was training?

7    **A.**   It was late summer, I believe August of 2012.

8    **Q.**   Where was it?

9    **A.**   In Chicago.

10   **Q.**   All right.

11          MR. YEAGER:  May I please have the ELMO turned on,

12   please?  Your Honor, may I approach witness?

13          THE COURT:  Yes.

14          MR. YEAGER:  I think we have some technical issues

15   and I'm trying to work through it.

16          THE COURT:  Okay.

17   BY MR. YEAGER:

18   **Q.**   Sir, what I'm placing in front of you is marked

19   Exhibit 50 for ID.  Do you recognize that?

20   **A.**   I do.

21   **Q.**   Can you tell us what you're looking at?

22   **A.**   This is a report of the Subsys prescriptions by top

23   writers.

24   **Q.**   Are you familiar with that document or documents like it?

25   **A.**   I am.

1    **Q.**  How is that?

2    **A.**  It would be sent to us from a sales operations a person

3    name Xun.

4    **Q.**  Xun Yu?

5    **A.**  Yes.

6    **Q.**  First name X-U-N?

7    **A.**  Yes.

8    **Q.**  And with regard to Mr. Yu, he would send this to you,

9    Brett Szymanski, and other sales reps?

10   **A.**  Yes.

11   **Q.**  How would you receive it?

12   **A.**  Email.

13   **Q.**  Did you rely upon it?

14   **A.**  I did.

15   **Q.**  Tell us how you relied upon it.

16   **A.**  We relied upon it to see basically where we are in terms

17   of what prescriptions we're getting.  And also if a physician

18   would tell you I wrote three prescriptions this week, you

19   could go back and check to see if he actually did.

20          MR. YEAGER:  Okay.  So I think we're up and

21   running.  Just for the Court and the parties, not the jury,

22   if we could show Exhibit 50.

23   **Q.**  So you said you came to rely on these documents; is that

24   correct?

25   **A.**  Yes.

1    **Q.**  How frequently did you use them?

2    **A.**  Almost daily.

3    **Q.**  How would it help you?

4    **A.**  We could see what prescriptions were written, how many,

5    and by who.

6    **Q.**  And were you paid based upon what prescriptions were

7    written?

8    **A.**  Yes.

9            MR. YEAGER:  Your Honor, I offer this.

10           MR. STOJILKOVIC:  Your Honor, I object only on the

11   grounds that the witness has said he was emailed these kind

12   of documents.  And if we want to get this particular one in,

13   I'd ask that the email be also admitted.

14           THE COURT:  You mean the cover email?

15           MR. STOJILKOVIC:  Yes.

16           THE COURT:  I'm going to admit this now.  We can

17   take care of that at lunch.

18           MR. YEAGER:  I'm sorry?

19           THE COURT:  I am going to admit this now and we can

20   sort that out at lunch.

21           MR. YEAGER:  Thank you.

22           (Government Exhibit No. 50 admitted.)

23   BY MR. YEAGER:

24   **Q.**  Now, with regard to the email, sir, I'm going to place it

25   on the ELMO.  It's a big spreadsheet; is that correct?

1    **A.**  Yes.

2    **Q.**  Why don't you teach us how this works.

3              MR. YEAGER:  May this be published, Your Honor?

4              THE COURT:  Yes.

5              MR. YEAGER:  This is built for people much shorter

6    than me.

7              THE COURT:  Adjustable, Mr. Yeager.

8              MR. TYRRELL:  Your Honor, this is a different

9    document than what we've been provided as Exhibit 50.

10             MR. YEAGER:  I'm sorry, Your Honor.  I published

11   the wrong one.  I left the other one up there.  Thank you,

12   Mr. Tyrrell.

13   BY MR. YEAGER:

14   **Q.**  All right.  So that's Exhibit 50.  That's the document

15   you were just looking at, correct?

16   **A.**  Correct.

17   **Q.**  So I want to sort of orient you a little bit.  On the far

18   left-hand side, it follows columns over; is that correct?

19   **A.**  Correct.

20   **Q.**  The fourth line down -- strike that.

21             MR. YEAGER:  One moment, Your Honor.

22             THE COURT:  Mr. Yeager, would it help up out if we

23   took the lunch break now?

24             MR. YEAGER:  Yeah.  It might help.

25             THE COURT:  Five minutes early for lunch.  We'll be

1    back at quarter of.

2            One thing I'd like you all to think about at lunch.

3    I have think I gave you the schedule yesterday for which half

4    days we would have for the next three weeks.  That fourth

5    week after that is Presidents Day week.  We're not going to

6    sit that Monday.  I don't think anyone on this jury indicated

7    that they needed Presidents Week off, but I want to

8    accommodate.  I know that's a week people sometimes plan

9    vacations.

10           So the options are we don't sit that week, except

11   if there's a week we don't sit in the middle, it gets tacked

12   onto the end.  Or we do sit that week except for the Monday.

13   Or we can sort of split it down the middle and sit Thursday

14   and Friday but not Tuesday and Wednesday, which would give

15   you a five-day weekend.  If you guys want to sort out amongst

16   yourselves what your preference is, we will accommodate that.

17   So the schedule for Presidents Week.

18           THE CLERK:  All rise for the jury.

19           THE COURT:  I'll say we'll try and accommodate

20   that.

21           (The jury exits the courtroom.)

22           THE COURT:  So we'll be back at quarter of.

23   Mr. Yeager, they want the cover email attached to those

24   documents that came by email.  Can you make that happen?

25           MR. YEAGER:  Yes.

1        MR. LAZARUS:  I would also ask that there was an

2    email that counsel put in, I would ask for the same courtesy

3    from them.

4        MR. STOJILKOVIC:  Your Honor, that is actually an

5    issue.  The attachment to the email I didn't cover with the

6    witness in detail.  It's the government's subpoena.  I only

7    introduced the email that notice was sent.  I don't think we

8    should get into the weeds of the government subpoena.

9        THE COURT:  For the most part if you want the cover

10    emails attached, if we're going to go on sort of a rule of

11    completeness like that, they're going to be entitled to the

12    same courtesy.  I will exempt the subpoena from that rule

13    because I think it's a different animal.  Generally speaking,

14    tit for tat.

15        MR. STOJILKOVIC:  I understand.  Thank you, Your

16    Honor.

17        THE COURT:  See everyone at quarter of.

18        (Court recessed at 11:57 a.m.)

19        THE CLERK:  All rise for the jury.

20        (The jury enters the courtroom.)

21        THE COURT:  Mr. Yeager, whenever you're ready.

22        MR. YEAGER:  Thank you, Your Honor.  Thank you for

23    the opportunity to take a couple of remedial technology

24    lessons while the jury was at lunch.

25    BY MR. YEAGER:

1    **Q.**  Now, Mr. Szymanski, you were sworn, correct?

2    **A.**  Yes.

3    **Q.**  I was starting to ask you about what was -- for

4    identification you had pointed out Exhibit 50?

5              MR. YEAGER:  I'd ask that this be entered, Your

6    Honor.

7              THE COURT:  50?

8              MR. YEAGER:  50.

9              THE COURT:  I think it already was.  If it wasn't,

10   it is now.

11   BY MR. YEAGER:

12   **Q.**  If you could look down at the fourth line down, do you

13   see Dr. Awerbuch's name there?

14   **A.**  Yes.

15   **Q.**  So the top of this graph, I just want you to explain.

16   This is the prescriber's name; is that correct?

17   **A.**  Correct.

18   **Q.**  At the time, this came out weekly.  So this is the week

19   of September 28, 2012, correct?

20   **A.**  Correct.

21   **Q.**  There's nothing left to chance.  It says "Weekly Subsys

22   RX."  So that's prescriptions, right?

23   **A.**  Yes.

24   **Q.**  Talking about the top writers, correct?

25   **A.**  Yes.

1   **Q.**   Fourth line down is Gavin Awerbuch, correct?

2   **A.**   Yes.

3   **Q.**   That's your name, Brett Szymanski, correct?

4   **A.**   Correct.

5   **Q.**   This one, the one in the shaded, the one before, it's the

6   weekly average?

7   **A.**   Correct.

8   **Q.**   It's showing Awerbuch writing four prescriptions for

9   Subsys per week, correct?

10  **A.**   Correct.

11  **Q.**   If you look to the right of that, it takes several weeks

12  out and it shows you what the person is writing each week.

13  Is that correct?

14  **A.**   Correct.

15  **Q.**   So 3, 3, 2, 6, 4.  Correct?

16  **A.**   Yes.

17  **Q.**   And then the average comes from that; is that right?

18  **A.**   Yes.

19  **Q.**   So bottom line is, after you saw Gavin Awerbuch, when you

20  start to talk to him in early April of 2012, he starts to

21  write for you, correct?

22  **A.**   Yes.

23  **Q.**   And he's writing at a fair clip, four prescriptions a

24  week on average by the end of September 2012, correct?

25  **A.**   Yes.

1   **Q.**  All right.  Was this guy -- did you consider him an

2   important customer at that point?

3   **A.**  Yes.

4   **Q.**  Why?

5   **A.**  Because he was writing a lot of prescriptions in

6   comparison to other physicians I worked with.

7          MR. YEAGER:  If I could ask Ms. Folan if we could

8   transfer back over to the other system, I'd appreciate it.

9   And if I could ask for Exhibit 1488, which I believe is

10  already in evidence.  If we could zoom in on the top part of

11  the -- thank you.  Okay.

12  **Q.**  So this is an email that's in evidence.  It was sent

13  September 14, 2012.  It's from Mike Babich, correct?

14  **A.**  Yes.

15  **Q.**  If you look down, do you see your name on there, four or

16  five lines down from the left?

17  **A.**  Yes.

18  **Q.**  So you received this email?

19  **A.**  Yes.

20  **Q.**  All right.  It's announcing important -- it says

21  "Important announcements promotion."  Correct?

22  **A.**  Yes.

23  **Q.**  All right.  Now, if we could go back to the body of it, I

24  want to go over it with you.  I believe before we broke for

25  lunch you had told us that your direct reports, your chain of

1   command when you started there was a district manager named

2   Lisa Schecter, correct?

3   **A.**   Correct.

4   **Q.**   And then the vice president of sales was Shawn Simon,

5   correct?

6   **A.**   Yes.

7   **Q.**   Take a look at this email.  This is announcing the

8   promotion of Alec Burlakoff to be vice president, correct?

9   **A.**   Yes.

10   **Q.**   How did that happen?  Like who was Alec Burlakoff at the

11   time?

12   **A.**   At the time of his promotion, I believe he was a district

13   manager or regional manager.

14   **Q.**   And had you met Sunrise Lee yet?

15   **A.**   I had not.

16   **Q.**   So I direct your attention down to the bottom where it

17   says -- if you could just -- "We have come such a long way to

18   crush the peon products and now we have our eyes firmly set

19   on taking over Actiq and Fentora."  Is that right?

20   **A.**   Yes.

21   **Q.**   So Actiq and Fentora, they were your top two competitors;

22   is that correct?

23   **A.**   Correct.

24   **Q.**   Just to make a point of reference for the jury, when you

25   decided to become a sales rep and you started selling in

1    Michigan in August -- in April of 2012, Actiq -- the Actiq

2    generally was both generic and branded, but overwhelmingly

3    the market was dominated by the generic Actiq, correct?

4    **A.**   Yes.

5    **Q.**   Fentora was a branded drug, right?

6    **A.**   Yes.

7    **Q.**   All right.  Did you know Sunrise Lee at the time?

8    **A.**   No.

9    **Q.**   Did you meet her at some point?

10    **A.**   I did.

11    **Q.**   All right.  And I would ask if we could have Exhibit 175

12    just for the witness, please.  Sir, if you could look at the

13    To-From section on the top.  This is an email from Alec

14    Burlakoff to sales all; is that correct?

15    **A.**   Yes.

16    **Q.**   Now, you as a sales rep at the time were part of sales

17    all, correct?

18    **A.**   Correct.

19    **Q.**   It's copied to Mike Babich, Matt Napoletano, and

20    blind-copied to John Kapoor at EJ Financial; is that correct?

21    **A.**   Yes.

22    **Q.**   Did you receive this email?

23    **A.**   Yes.

24              MR. YEAGER:  Your Honor, I'd move to enter this.

25              MR. STOJILKOVIC:  No objection.

1    THE COURT:  Is that objection or no objection?

2    MR. STOJILKOVIC:  No objection.  I'm sorry.

3    THE COURT:  It's admitted.

4    MR. YEAGER:  May this be published, Your Honor?

5    THE COURT:  It may.

6    BY MR. YEAGER:

7    **Q.**  Everyone has the chance to see the "To" and "From."

8    Alec Burlakoff is -- at the time, he has become

9    vice president of sales; is that correct?

10   **A.**  Yes.

11   **Q.**  Where does Shawn Simon go?

12   **A.**  He was let go.

13   **Q.**  He was let go?

14   **A.**  Yes.

15   **Q.**  What about Lisa Schecter?

16   **A.**  She was let go as well.

17   **Q.**  So your new VP is Alec Burlakoff?

18   **A.**  Yes.

19   **Q.**  And your district manager is Sunrise Lee, correct?

20   **A.**  Yes.

21   **Q.**  If we could see the body of this email on September 17,

22   please.  Would you please read that out loud into the record.

23   "Good afternoon."

24   **A.**  "Please be advised that the hold on ISP --

25   **Q.**  Would you mind pulling the microphone over so folks can

1  hear you?

2  **A.**   Sorry.  "Please be advised that the hold on ISPs Insys

3  speaker programs will be lifted effective this Monday,

4  September 24."

5  **Q.**   Stop right there.  At some point there was an Insys

6  speaker program and it was stopped by the front office; is

7  that correct?

8  **A.**   Yes.

9  **Q.**   This is an email announcing that the ISPs are not going

10  to be able to continue, correct?

11  **A.**   Yes.

12  **Q.**   Go ahead.

13  **A.**   "With this being said, there is much to be discussed and

14  learned from a standpoint of ensuring that an effective

15  speaker program is properly put in place.  In other words,

16  how have you guaranteed that this future program will in fact

17  be a definitive success?  If you cannot guarantee that this

18  program will yield positive results, the program should not

19  take place.  Along those lines, a postponement of all

20  programs you have on the current books should be taken into

21  some serious consideration."

22  **Q.**   All right.  What about the next paragraph.

23  **A.**   "It is my understanding that many of you have been

24  strongly urged to schedule these programs as if the effort of

25  simply conducting a speaker program would serve as a feather

1  in your cap.  Activity does not necessarily equate to

2  productivity.  These programs have been offered to you as the

3  number one opportunity to grow your business.  Unfortunately

4  a scheduled speaker program does not by any means solidify a

5  return on investment.  Please understand that Insys sales

6  representatives do not get paid to be active.  Insys sales

7  representatives get paid to produce tangible results.  The

8  hungry, motivated sales representatives will be facilitating

9  as many ISPs as humanly possible because they know this is

10  the only likely road to the president's club.  The sales

11  representatives that are not willing to take a calculated

12  risk will inevitably find themselves in the middle or bottom

13  of the pack year after year."

14  **Q.**  Just stop for a second so we're all on the same page.

15       What's president's club?

16  **A.**  President's club was an award given to the top sales

17  representatives.

18  **Q.**  All right.  Keep going, please.

19  **A.**  "So the question many of you are asking to yourselves is

20  how can I possibly set up a program that is guaranteed for

21  success?  This is the question I want us all to address this

22  Friday" -- "at this Friday's upcoming meeting.  We will spend

23  much time addressing the key factors that must be put in

24  place in order to achieve this goal.

25  **Q.**  You haven't met Sunrise Lee.  They're talking about an

1    upcoming meeting.  Where is that meeting scheduled?

2    **A.**   Scottsdale, Arizona.

3    **Q.**   Did you go to that meeting?

4    **A.**   Yes.

5    **Q.**   Is that where you met Sunrise?

6    **A.**   Yes.

7    **Q.**   Do you see her in the courtroom today?

8    **A.**   Yes.

9    **Q.**   Could you point to her and describe an item of clothing

10   she's wearing?

11   **A.**   I can't see her clothing.

12   **Q.**   Why don't you stand up.

13   **A.**   It's a gray jacket.

14          MR. YEAGER:  If counsel stipulates to

15   identification, we don't need to go through this every time.

16          MR. HORSTMANN:  We'll stipulate.

17   BY MR. YEAGER:

18   **Q.**   With regard to Sunrise, you met her for the first time

19   when you were in Arizona when you were at this meeting.

20          So the first time that you met Ms. Lee was in

21   Arizona; is that correct?

22   **A.**   Yes.

23   **Q.**   So if we can go to the second page of this document,

24   please, and if you start at the top paragraph.  Do you see

25   that?

1    **A.**  Not great.

2          MR. YEAGER:  Actually if you cut it in half and

3    blow it up so everybody can read it, that would be great,

4    please.  Thank you.

5    **Q.**  Go ahead.

6    **A.**  "I will say this.  Your program will absolutely never be

7    successful if your speaker does not have at least ten times

8    more clinical experience than all of your attendees combined.

9    In your speaker is not an expert in the utilization of Subsys

10   in his or her clinical practice, then your speaker need not

11   speak for Insys anymore.  I would venture to say that if your

12   speaker does not have at least 20 patients on Subsys, quarter

13   to date, he or she should not be booked to speak at this

14   juncture.  You should cancel or suspend your programs until

15   you and your manager have had ample chance to think this

16   investment entirely through."

17   **Q.**  Stop right there.

18          Is that new?  Is that how you were instructed

19   previously, or is this different with regard to Burlakoff's

20   leadership?

21   **A.**  This was different than we were instructed.

22   **Q.**  How?

23   **A.**  Prior to, we kind of had free reign to schedule a program

24   with whomever, kind of when we wanted to schedule it.

25   **Q.**  In the past, did anyone tell you that you had to have a

1   certain number of patients on Subsys in order for a person to

2   be a prescriber?

3   **A.**  Not that I recall.

4   **Q.**  All right.  What about the next paragraph?

5   **A.**  "In closing, speaker programs are the only way to truly

6   solidify yourself as a top performing sales representative.

7   With this being said, you will no longer be allowed to

8   schedule a program without the approval of your manager.

9   Each and every program should not be booked without having

10  confirmed that your speaker does, in fact, have the ample

11  clinical experience I have alluded to."

12  **Q.**  I'm sorry.  Go ahead.

13  **A.**  After the paragraph?  Keep going?

14  **Q.**  Yes.

15  **A.**  "Speaker programs are a gift, but they are not to be

16  taken for granted.  Every dollar should be spent as if it

17  were coming directly from your personal bank account.  We

18  must prequalify all attendees including our speaker prior to

19  scheduling a program."

20  **Q.**  If we could just finish up at the bottom, please.  Go

21  ahead.

22  **A.**  "No uncalculated risk will be taken as it pertains to

23  Insys speaker programs moving forward.  Many of you know with

24  absolutely no question in the world that if you use a

25  specific speaker that the program will yield positive

1    results.  If you are one of those whom does not know this for

2    absolute sure, then you must hold off on the conduction of

3    these valuable speaker programs until you are.  Our goal is

4    to ensure that all speaker programs are a success for each

5    and every Insys sales representative.  Rest assured, we will

6    provide you the specific road map you will need to follow in

7    order to make this level of success a consistent reality."

8                MR. YEAGER:  All right.  So if you could, go up to

9    the part where it says "No uncalculated risks."  If you could

10   just highlight that for us, please.

11   **Q.**  Did you know what he was referring to when he said "No

12   uncalculated risks"?

13   **A.**  Not necessarily.

14   **Q.**  Just to show the jury, is there a last page to this?

15   It's just a signature line, correct?

16   **A.**  Yes.

17               MR. YEAGER:  Okay.  If we may please have just for

18   the witness Exhibit No. 0445.

19   **Q.**  Now, Mr. Szymanski, this is an email.  Who is it from?

20   **A.**  Alec Burlakoff.

21   **Q.**  And it's to who?

22   **A.**  Sales all and sales RSMs.

23   **Q.**  You're part of sales all, correct?

24   **A.**  Correct.

25   **Q.**  Copied to Mike Babich and Matt Napoletano?

1   **A.**   Yes.

2   **Q.**   Babich is the CEO.  Just for the record, Matt Napoletano

3   is the VP of marketing; is that right?

4   **A.**   Yes.

5   **Q.**   Who is the blind carbon copy to?

6   **A.**   jkapoor@ejfinancial.com.

7   **Q.**   What's the subject?

8   **A.**   30 unit effective dose savings program live, Wednesday,

9   9/19.

10  **Q.**   To be clear, this is the same day that the previous email

11  went out about no uncalculated risk; is that correct?

12  **A.**   Yes.

13  **Q.**   Do you recognize this email?

14  **A.**   I do.

15  **Q.**   All right.

16          MR. YEAGER:  Your Honor, I'd move to admit it.

17          MR. STOJILKOVIC:  No objection.

18          MR. TYRRELL:  No objection.

19          THE COURT: Admitted.  445.

20          (Government Exhibit No. 445 admitted.)

21          MR. YEAGER:  May it be published, Your Honor?

22          THE COURT:  Sure.

23  BY MR. YEAGER:

24  **Q.**   You see in the headline there --

25          MR. YEAGER:  If you can just go to the body of the

1  email, I'd appreciate it.

2  **Q.**  Mr. Szymanski, your reading skills are excellent.  Do you

3  mind following up with the rest of this particular email?

4  **A.**  Sure.

5     "Hello, Insys.  After today's conversation in the

6  home office, I felt it to be imperative that I send you an

7  email pertaining to the below correspondence you will be

8  receiving on a daily basis.  As you know by now, you will

9  receive an email with an example below each and every time a

10  prescriber in your territory writes a Subsys prescription at

11  100 micrograms or 200 micrograms.

12     "Please utilize the attached spreadsheet prepared

13  by Daren Fila, West Regional Sales Manager, to report back

14  within 24 hours on why the low dose was used and how the

15  doctor plans to titrate the patient to the effective dose.

16  You do not need to fill out every column, but the responses

17  we are receiving thus far are just too much vague in order

18  for us to formulate any worthy level of understanding behind

19  the clinician's action.

20     "I fully understand that a physician does what he

21  or she wants to do as it pertains to prescribing their

22  patients.  I am thrilled to see you are all generating so

23  many Subsys prescriptions.  I know it is not at all easy to

24  get a physician to initiate a new habit.  And this is exactly

25  what we are attempting to do."

1   **Q.**   Why don't we go down and try the rest of that.

2   **A.**   "So you are most likely asking why is the company

3   harassing me on a daily basis for doing a great job.  Each

4   new Subsys patient should be started at 100 micrograms per

5   the package insert.

6           "To be clear, the last thing we want to do is think

7   that we are harassing you for generating sales.  What we are

8   attempting to do is help you to maintain these newly

9   generated Subsys patients by rapidly informing you of the

10  fact that they wrote for a dose and number of units that is

11  simply not effective.  We are 100 percent sure that those

12  patients whom are prescribed 60 units of 100 micrograms do

13  not end up filling a prescription for Subsys the following

14  month.

15          "This is information that we feel obligated to

16  share with you as there is no good at all that comes out of

17  withholding the very data that will determine your quarterly

18  bonus payouts.  We understand that you are not out here to

19  give" -- "just to give away free product.  We know that your

20  goal is the same as ours.  The goal is to generate" --

21          MR. YEAGER:  May we please have the second page.

22  **Q.**   The goal to generate what?

23  **A.**   -- "Subsys patients who believe in the safety and

24  efficacy behind this product, hence these patients will

25  continuously refill their monthly prescriptions indefinitely.

1        "This of course equates to residual income for you.

2   This is how you reap your rewards for your unsurpassed

3   efforts in the field on a daily basis.  There is nothing more

4   frustrating to a salesperson who makes a sale only to learn

5   that the sales was returned shortly then after.  This, in

6   essence, is exactly what is happening with the majority of

7   the patients put on Subsys at 100 micrograms, 60 units."

8   **Q.**  And then how about the last two paragraphs.

9   **A.**  "In the case you as a salesperson are earning a

10  commission for a sale made, only you have that commission

11  revoked due to a return of product the following month.  You

12  recall spinning your wheels due to the fact that these

13  physicians are writing for an inferior dose.  Hence our

14  infatuation and obsession with the effective dose message.

15       "We must educate our physicians how to ensure their

16  patients find the effective dose.  I will go as far as to say

17  that we are truly better off dissuading a physician to

18  prescribe Subsys for 100 and 200 micrograms until we have had

19  ample time to review how clinical trial data with them via

20  the Rauck study.  After all, you only get once chance to make

21  a first impression.  Is this the lackluster impression we

22  want to make for our superior product?

23       "We will of course be discussing the subject matter

24  in far greater detail in this upcoming meeting.  We will do

25  so because we will inevitably fail miserably if we do not

1    vehemently drive home the effective dose message on every

2    sales call.  You as a sales force are way too talented and

3    hard working to fail due to an inferior dose being

4    prescribed.  We have a tremendous product and an even better

5    team of sales representatives.  Together we will utilize

6    every single piece of data, feedback, clinicals, information,

7    etc., to get the job done and reap the rewards of your

8    unprecedented efforts."

9    **Q.**  Thank you.

10            Mr. Szymanski, after you met Sunrise Lee in

11   Phoenix, directing your attention to the fall of 2012, was

12   there a time came that you introduced your new supervisor to

13   Gavin Awerbuch, Dr. Awerbuch?

14   **A.**  Yes.

15   **Q.**  Describe that for us.

16   **A.**  The first meeting that I can remember, to the best of my

17   recollection, was just a simple stop by at the office, at his

18   office in Saginaw, Michigan.

19   **Q.**  And what happened then?

20   **A.**  And then the next meeting that I remember with her and

21   Dr. Awerbuch, she had called me -- it was shortly after the

22   September meeting in Scottsdale -- and asked me to set up a

23   dinner with him.  "I have something very important to

24   discuss.  You cannot be there."

25            I said okay.  So I talked to Dr. Awerbuch.  I set

1    up the dinner near his office in Saginaw, and he asked, since

2    he did not know Sunrise that well at the time, if I could be

3    there.

4            I asked Sunrise that, and she agreed that I could

5    be at the meeting.

6    **Q.**   Okay.  About how long after that did you go to dinner?

7    **A.**   Yeah.  We went to dinner near his office.

8    **Q.**   I'm sorry?

9    **A.**   We went to dinner near his office.

10           MR. HORSTMANN:  Objection.

11           THE COURT:  Mr. Yeager, he's asking for a

12   timeframe.

13   BY MR. YEAGER:

14   **Q.**   Go ahead.  Do you know the time?

15   **A.**   After the phone call?

16   **Q.**   Yes.

17   **A.**   It was relatively quickly.  My best recollection is

18   within a few days.

19   **Q.**   The phone call was sometime after you returned from

20   Arizona in September, October 2012?

21   **A.**   Yes.

22   **Q.**   Do you have any more specific time period than that?

23   **A.**   I don't.

24   **Q.**   Okay.  So you go to dinner.  Who's at dinner?

25   **A.**   Myself, Sunrise, and Dr. Awerbuch.

1  **Q.**  Anyone else?

2  **A.**  No.

3  **Q.**  Describe the conversation at dinner.

4  **A.**  So the conversation at dinner, the important topic that

5  Sunrise wanted to discuss was essentially the fact that our

6  speaker programs were going to be changing drastically.  And

7  rather than spreading out the speaker programs amongst the

8  entire speaker bureau, we were picking essentially a top 20

9  or 30 list where all of our speaker programs would be done

10  through these top 20 or 30 physicians which were our top

11  prescribers.

12  **Q.**  How was it supposed to work?

13  **A.**  All the speaker programs that were allocated to you had

14  to go to these top prescribers.

15  **Q.**  Was it discussed at that particular meeting -- so if you

16  were picked as one of those prescribers, was experience with

17  the drug discussed in connection to being a speaker?

18  **A.**  Yes.

19  **Q.**  Describe that for us, please.

20  **A.**  The way that it was put, as our top 20 or 30 doctors with

21  the most clinical experience with Subsys.

22  **Q.**  The top 20 or 30 doctors with the most clinical

23  experience with Subsys; is that correct?

24  **A.**  Yes.

25  **Q.**  Did she say anything else?

1    **A.**   That was of the main point that I remember discussing.

2    **Q.**   All right.  So was there a conversation at all about what

3    would happen if he was not a top 20 or 30 prescriber in the

4    Insys speaker program?

5    **A.**   It was talked about there were the top 20 or 30, he

6    currently is, keep up the great work, you know, type of a

7    talk.

8    **Q.**   Okay.  What happened next?

9    **A.**   What happened next?  After the meeting?

10   **Q.**   Yes.

11   **A.**   So shortly after that meeting -- again I'm not sure

12   exactly how long, but it was shortly after, I received a

13   phone call from her that said -- you know, it was about my

14   daily business.  And she said I had 10 to 15 programs -- I'm

15   not sure of the exact number -- for Dr. Awerbuch this

16   quarter, and I need you to stop everything you're doing and

17   get them essentially set up for the quarter within the next

18   hour or two.

19   **Q.**   Where were you when that call was made?

20   **A.**   I was just driving down the road in Metro Detroit, making

21   sales calls.

22   **Q.**   So she told you to stop everything you're doing and in

23   the next hour do what?

24   **A.**   Set up the programs for the whole quarter that had been

25   allocated to Dr. Awerbuch.

1   **Q.**   So what are you thinking at this point?  What do you do?

2   **A.**   Should I tell you exactly what I thought?  I thought it

3   was bullshit because that's not how you're supposed to do it.

4   And how in the world can you set up a quarter's worth of

5   speaker programs in an hour?

6   **Q.**   So what happened?

7   **A.**   What happened was I said, okay, I'll do my best.  And I

8   went home.  And essentially you have to -- made them up the

9   best that you could as far as when you think you're going to

10  do the programs with who and who you think the audience would

11  be and submitted them.

12  **Q.**   Were they approved?

13  **A.**   Yes.

14  **Q.**   Describe the programs once those were approved.  What

15  were they like?

16  **A.**   The majority of them, there was no attendees.  Sometimes

17  the venue didn't even have a private room or availability.

18  There was conflicts with people's schedules because I had to

19  set them up three months in advance.  So they were very

20  difficult to run the way they're supposed to.

21  **Q.**   Did Dr. Awerbuch get paid the honorarium for that

22  particular --

23  **A.**   Yes.

24  **Q.**   Even for the ones that people didn't show up?

25  **A.**   Yes.

1    **Q.**  All right.  So what did you do when you realized that

2    people were not showing up to these things and he was still

3    getting paid?

4    **A.**  We continued to do them.

5    **Q.**  At some point did you have conversation with anyone about

6    it?

7    **A.**  I did.  I talked to Alec Burlakoff about it, and I just

8    said this is just impossible to do these programs this way.

9    Why do we have to set the whole quarter up within an hour of

10   one day?  It's just impossible to get attendees.

11             And basically he said, I don't care.  If you don't

12   want to do it, we'll find people that will.

13             And I said, well, what's your advice of getting

14   people to show up?

15             He goes, I don't care if people show up.  Stop at a

16   playground and get signatures, if you need to.

17   **Q.**  So when Burlakoff told you that, just to be clear, you

18   were being instructed to have Dr. Awerbuch paid honoraria for

19   speaking events in which you knew there would be no one

20   there, is that correct?

21   **A.**  Correct.

22   **Q.**  What was Dr. Awerbuch doing?  Was he still supposed to be

23   writing?

24   **A.**  Yes.

25   **Q.**  Did you know that this was wrong?

1   **A.**   Yes.

2   **Q.**   So what did you do?

3   **A.**   Regretfully, I continued to do it.

4   **Q.**   So you continued to arrange for speaker programs at which

5   Dr. Awerbuch would be paid money when there were no

6   attendees; is that right?

7   **A.**   Correct.

8   **Q.**   Did Dr. Awerbuch continue to write prescriptions for

9   Subsys as a result of being in the top 20 or 30?

10  **A.**   Yes.

11  **Q.**   You say that you regret doing it.  Why did you -- you

12  knew it was wrong, correct?

13  **A.**   Yes.

14  **Q.**   But you continued to do it?

15  **A.**   Yes.

16  **Q.**   I want to be crystal clear about this.

17          Did you agree to commit a crime?

18  **A.**   Yes.

19  **Q.**   What specifically did you agree to do?

20  **A.**   To essentially to pay honorariums to Dr. Awerbuch for

21  speaker programs that did not happen.

22  **Q.**   And who did you agree to do that with?

23  **A.**   Dr. Awerbuch and the company.

24  **Q.**   And so whose company?

25  **A.**   Whose company?

1    **Q.**   Yes.  When you say "company," are you referring to the

2    company or --

3    **A.**   Insys Therapeutics, the company.

4    **Q.**   What about Alec Burlakoff and Sunrise Lee?  Are you

5    referring to them?

6    **A.**   Yes.

7    **Q.**   With regard to your agreement to do this, how old were

8    you at the time?

9    **A.**   At the time, I was 26.

10   **Q.**   Why did you agree to commit a crime like that?

11   **A.**   You know, I think, this was my first pharmaceutical job.

12   I had wanted to do it for a very long time.  I was just

13   starting to do well, to learn the business.  You know, I

14   think I guess at the time I felt comfort, knowing that this

15   was not just isolated to the speaker programs being run like

16   this to myself.  This was widespread.  This was across the

17   whole company.

18   **Q.**   How do you know that?

19   **A.**   Just speaking -- I mean --

20              MR. TYRRELL:  Objection.  Lack of foundation.

21              MR. KENDALL:  Move to strike.

22              THE COURT:  Simmer down.

23              MR. YEAGER:  I'm just exploring his state of mind,

24   Your Honor.

25              THE COURT:  Okay.  Lay a better foundation for the

1    question and the answer, please.

2    BY MR. YEAGER:

3    **Q.**   All right.  So with regard to the September email where

4    you talked about uncalculated risk.  Do you remember that?

5    **A.**   Yes.

6    **Q.**   And then you had a meeting with Sunrise Lee; is that

7    correct?

8    **A.**   Yes.

9    **Q.**   So you had a meeting with Sunrise Lee; is that correct?

10   **A.**   Yes.

11   **Q.**   And after that meeting, you then had the phone call with

12   Sunrise Lee; is that correct?

13   **A.**   Yes.

14   **Q.**   What did you do?  You told us you were uncomfortable.

15   Did you talk to people about it?  Not what was said.  Did you

16   talk to people about it?

17   **A.**   Yeah.  I talked to many reps across the company.

18   **Q.**   And did you explain what was going on?

19   **A.**   Yes.

20   **Q.**   So at the point I asked you -- and did you talk to them

21   about what was going on in their districts?

22   **A.**   Yes.

23   **Q.**   At the point in which I asked you why you went ahead and

24   did this, you were talking about how it was widespread.  How

25   did you know it was widespread?

1   **A.**   Because the other reps that I spoke to --

2            MR. TYRRELL:  Objection.  Hearsay.  We don't know

3   who, we don't know when.  Truth of the matter asserted.

4   Other reps?  Sidebar?

5            MR. YEAGER:  Can I just ask one question?  Perhaps

6   we can move on.

7            THE COURT:  Ask your question.  You still have an

8   objection.  They're all employees of the company, okay?  All

9   the people he's identified.  Go ahead.

10  BY MR. YEAGER:

11  **Q.**   Mr. Szymanski, at the time that you chose to agree to

12  commit these crimes, did you believe that this was

13  widespread?

14  **A.**   Yes.

15  **Q.**   Now, with regard to that, you talked before,

16  Mr. Szymanski, about the fact that you had a $40,000 base

17  salary; is that correct?

18  **A.**   Yes.

19  **Q.**   And you had an uncapped bonus; is that correct?

20  **A.**   Yes.

21  **Q.**   And in addition at some point in 2013 the company went

22  public, correct?

23  **A.**   Correct.

24  **Q.**   Did you obtain stock as a result of the time that you

25  were working there?

1    **A.**  Yes.

2    **Q.**  During the course -- and when did you leave Insys

3    Therapeutics?  When was your last day?

4    **A.**  Not sure of the exact day, but it was in October of 2016.

5    **Q.**  And who was your primary doctor, your biggest doctor

6    while you were working there; in other words, that provided

7    you the most bonus money?

8    **A.**  Dr. Awerbuch.

9    **Q.**  From the time you started there in April of 2012 until

10   the time that you left, approximately how much money did you

11   make working for Insys Therapeutics?

12   **A.**  I would say anywhere from 1.5 to $2 million.

13   **Q.**  Did the money have anything to do with your decision to

14   agree to commit a crime?

15   **A.**  Yes.

16          MR. YEAGER:  If we could just for the witness,

17   Exhibit 1774, please.

18   **Q.**  Is that an email from you?

19   **A.**  Yes.

20   **Q.**  Do you know this email?

21   **A.**  Yes.

22   **Q.**  At some point did you attend a dinner with -- go ahead.

23   Why don't you read the email.

24   **A.**  Okay.

25          "Hi, Dr. Awerbuch.  Just wanted to say thank you

1      for taking the time to meet Alec and I for dinner last night.

2      It was a pleasure getting to spend some time with you outside

3      the office."

4      **Q.**   Strike that.  Stop.  I apologize.  I haven't offered it.

5              Do you recognize this email?

6      **A.**   Yes.

7              MR. YEAGER:  May I offer it, please?

8              THE COURT:  1774.  Any objections.

9              MR. STOJILKOVIC:  No objection.

10             MR. TYRRELL:  No objection.

11             (Government Exhibit No. 1774 admitted.)

12     BY MR. YEAGER:

13     **Q.**   I apologize.  With regard to Exhibit 1774, Mr. Szymanski,

14     could you read it.

15     **A.**   Yes.

16             "Hi, Dr. Awerbuch, just wanted to say thank you for

17     taking the time to meet Alec and for dinner last night.  It

18     was a pleasure getting to spend some time with you outside

19     the office.  I will be working on getting some additional

20     programs set up.  I can't think of anyone better to be our

21     go-to speaker.  Alec was very impressed with you and was

22     already looking forward to us all getting together soon, as

23     am I.

24             "As always, if there is anything you need at all,

25     please let me know.  Thank you, and I will see you soon."

1    **Q.**  Now, with regard to that email, do you remember going to

2    dinner with Dr. Awerbuch and Alec Burlakoff?

3    **A.**  I do.

4    **Q.**  Do you know when it was?

5    **A.**  The day before this email, so it would have been

6    October 2.

7    **Q.**  Do you remember the dinner?

8    **A.**  I do.

9    **Q.**  Who was there?

10   **A.**  Dr. Awerbuch, Alec, and myself.

11   **Q.**  Do you remember the conversation?

12   **A.**  Some of it.

13   **Q.**  All right.  So tell us your best memory.  Did they talk

14   about the ISP program while you were there?

15   **A.**  It was mentioned there during the dinner.  I don't

16   remember the specifics around the ISP program, but it was

17   brought up.

18           The specific topics that I remember wanting to talk

19   about or Dr. Awerbuch wanted to talk about was he was, I

20   guess, nervous that he was writing a lot of prescriptions.

21           And then also Alec wanted to talk to him about the

22   fact that he was writing low doses.

23   **Q.**  Do you know that that conversation about the volume of

24   prescriptions that he was writing, do you know if that

25   happened in that particular meeting?

1    **A.**   I believe, yeah, my memory is it was at that meeting.

2    **Q.**   What else was discussed at that particular dinner?

3    **A.**   The volume of prescriptions as well as talking about the

4    fact that he wrote low doses.

5    **Q.**   All right.  So if we could just go back to 445, which is

6    in evidence.  So 445.  In the middle part there's a

7    discussion there, you see in the middle, it's bolded.  Thank

8    you.

9           It says, "Why the low dose used and how the doctor

10   plans to titrate the patient to effective dose."

11          Now, tell us about that.  After you sell a doctor

12   and you convince them to write a prescription, was this easy

13   to do, to have that conversation with a doctor why did you

14   write it for a low dose?

15   **A.**   No.

16   **Q.**   Why?

17   **A.**   It was tough to do because he wrote a prescription that

18   he thought was the dose that he should write.  And you're

19   essentially going back and questioning his judgment of why he

20   wrote that strength.

21   **Q.**   And you're a sales rep, correct?

22   **A.**   Yes.

23   **Q.**   And what did Alec Burlakoff tell Gavin Awerbuch during

24   the dinner that we talked about on October 2?

25   **A.**   So he talked about the fact that the average of his

1   prescriptions was very low, within the one to 200 microgram

2   range, and essentially just asked why is it that you're

3   writing that when you should be -- we see patients do better

4   on the four to 800 microgram dosages.

5   **Q.**   Do you remember anything else during the conversation?

6   **A.**   Not specifically.

7   **Q.**   Did Dr. Awerbuch say anything about the dosages at that

8   time that you remember?

9   **A.**   Yes.  Dr. Awerbuch pushed back and said, the patients are

10   doing great on one and 200 micrograms.  I am not comfortable

11   increasing them for no reason.

12   **Q.**   What did Alec say?

13   **A.**   I think he basically agreed to it.

14   **Q.**   Okay.  So now if we could talk about what happened after

15   the dinner.

16        MR. YEAGER:  I want to take a look at Exhibit

17   No. 41, please.  Just for the witness, please.

18        MR. TYRRELL:  This is just for counsel and the

19   jury?

20        MR. YEAGER:  Yes.  Just for counsel.

21   BY MR. YEAGER:

22   **Q.**   This is an email from you to Sunrise Lee; is that

23   correct?

24   **A.**   Yes.

25   **Q.**   It's copied to Alec Burlakoff?

1    **A.**   Yes.

2    **Q.**   The subject is Dr. Wilson; is that correct?

3    **A.**   Yes.

4    **Q.**   Who is Dr. Wilson?

5    **A.**   He was one of our speakers at that time.

6    **Q.**   If you could scroll down, please, to the bottom.  If you

7    could show up that first email.  This is an email, it's an

8    email chain; is that correct?

9    **A.**   Yes.

10   **Q.**   The bottom one, what's the date on that?

11   **A.**   November 13, 2012.

12   **Q.**   From whom?

13   **A.**   From me.

14   **Q.**   To who?

15   **A.**   To Sunrise.

16   **Q.**   Do you remember this?

17   **A.**   Yes.

18   **Q.**   Is this a fair and accurate depiction of an email that

19   you sent?

20   **A.**   Yes.

21              MR. YEAGER:  Your Honor, I'd offer it.

22              MR. STOJILKOVIC:  No objection.

23              MR. TYRRELL:  No objection.

24              THE COURT:  Admitted.

25              (Government Exhibit No. 41 admitted.)

1          MR. YEAGER:  May this be published, Your Honor?

2          THE COURT:  Yes.

3    BY MR. YEAGER:

4    Q.   So what are you asking Sunrise in November?

5    A.   So what I'm saying, "Are we supposed to only be utilizing

6    the top writers as speakers or all of our trained" -- "all of

7    the trained speakers?  I have a program scheduled with

8    Dr. Wilson, but he does not have much Subsys experience, so I

9    was going to cancel.  Please let me know if I should and just

10   try to get Awerbuch more programs."

11   Q.   All right.  Let me understand this.  You said that there

12   were two -- sort of originally that you were allowed to go

13   find your own speakers, and then they changed things when

14   Burlakoff and Sunrise became your direct reports.  Is that

15   correct?

16   A.   Yes.

17   Q.   So what's the second part?  Are you saying -- what are

18   you trying to say here?

19   A.   Trying to say, listen, I have a program scheduled with a

20   doctor that doesn't have a lot of experience as a top writer.

21   Am I still able to do that, or should I just schedule it with

22   Dr. Awerbuch?

23          MR. YEAGER:  Okay.  If we could show the response

24   back, please.  Actually it's one down.  There you go.

25   Q.   What does Sunrise say back?

1    **A.**   It says, "Do not cancel Dr. Wilson's program.  As of now,

2    I want you to try to schedule as many programs as possible

3    for all of your speakers, especially Dr. Awerbuch.  I need

4    him to be as busy as he wants to be.  If you can schedule up

5    to three programs a week for him, that would be ideal.  I

6    need a list of your speakers, the number of prescriptions

7    they wrote, and the number of ISPs each has done.  After I

8    have this information, we will then discuss a detailed plan

9    of action."

10   **Q.**   So what did you understand "as busy as he wants to be" to

11   mean?"

12   **A.**   As many programs as he'd like to do.

13   **Q.**   And if we could just go to the next email up.  You

14   responded back with different doctors; is that correct?

15   **A.**   Yes.

16   **Q.**   Dr. Wilson had not spoken and he had one scheduled,

17   correct?

18   **A.**   Yes.

19   **Q.**   He had written six?

20   **A.**   Yes.

21   **Q.**   Dr. Awerbuch had spoken two times and you had scheduled

22   six including and looking for more; is that right?

23   **A.**   Yes.

24   **Q.**   He had written 180 prescriptions; is that right?

25   **A.**   Yes.

1    **Q.**  And then Dr. Lakkaraju had spoken one time and scheduled

2    two and has written 12 scripts; is that correct?

3    **A.**  Yes.

4    **Q.**  So without question, Dr. Awerbuch is your top writer at

5    the time?

6    **A.**  Yes.

7    **Q.**  So do you go out and you try to get him as many as three

8    a week?

9    **A.**  I remember scheduling as many as I was given to schedule.

10   **Q.**  Okay.  And how did that work?  Where did you go?  What

11   did you do?  Tell us about the speaker programs.

12   **A.**  So we would get a number of speaker programs to schedule.

13   **Q.**  I'm sorry to interrupt you.  Go ahead.

14   **A.**  We would have to pick a date, a restaurant, and who we

15   think would be attendees.

16   **Q.**  When you say a schedule, you've got a number of programs

17   to schedule, what does that mean?  Per quarter?

18   **A.**  Per quarter.

19   **Q.**  All right.  So you were told a number of programs

20   Dr. Awerbuch would get per quarter?

21   **A.**  Yes.

22   **Q.**  And you had to schedule all of them?

23   **A.**  Yes.

24   **Q.**  And how many is he doing a quarter?  Do you know?

25   **A.**  I'd say anywhere between 10 and 20.

1    Q.   So what's that like?  So a quarter is three months,

2    correct?

3    A.   Yes.

4    Q.   Four weeks in each month; is that right?

5    A.   Yes.

6    Q.   So that's 12 weeks total, correct?

7    A.   Yes.

8    Q.   And you got between 10 and 20 speaker programs, so that's

9    more than one a week; is that correct?

10   A.   Yes.

11   Q.   Where are you doing them?  Where are they occurring?

12   A.   Just various restaurants around Metro Detroit.

13   Q.   The situation you described before where there were no

14   one there or -- and he was getting paid, was that still going

15   on?

16   A.   Yes.

17   Q.   Were there times when there were people there?

18   A.   Yes.

19   Q.   And who came?

20   A.   Other physicians sometimes.  Sometimes it was his office

21   staff.

22   Q.   Stop right there.

23            Any of his office staff capable of prescribing

24   Subsys?

25   A.   There was physician assistants at periods of time that

1   could prescribe.

2   **Q.**   Were there office staff invited to these dinners that

3   could not prescribe?

4   **A.**   Yes.

5   **Q.**   Who else came to these dinners?

6   **A.**   Sometimes it was his family, friends.  My wife had came

7   to a dinner.

8   **Q.**   Anyone else?

9   **A.**   Not that I can think of.

10   **Q.**   Were there repeat attendees?

11   **A.**   Yes.

12   **Q.**   Tell us about that.

13   **A.**   So at the time I don't believe there was a cap on how

14   many people could attend a dinner.  So if you had a physician

15   in the area that you knew would go to any dinner you would

16   invite him to, you would invite him so you would have at

17   least one attendee.

18   **Q.**   Okay.  How often would people repeat?

19   **A.**   Anywhere maybe four to eight times a year.

20   **Q.**   Now, with regard to these programs, they're supposed to

21   be speaking engagements, is that correct, where he talks

22   about the drug and there's a PowerPoint presentation that's

23   provided, correct?

24   **A.**   Yes.

25   **Q.**   It's called a deck, correct?

1   **A.**   Yes.

2   **Q.**   When you're doing these speaker programs with repeat

3   attendees, is there any educational benefit to that offered?

4   **A.**   No.

5   **Q.**   How about to his family members?

6   **A.**   No.

7   **Q.**   How about to the people from his office?

8   **A.**   No.

9   **Q.**   And when there's no one there, how about then?

10   **A.**   No.

11   **Q.**   Did the speaker program require attendee sheets to be

12   signed?

13   **A.**   Yes.

14   **Q.**   Tell us about that.

15   **A.**   So any attendee that was at the speaker program was

16   supposed to sign an attendee sign-in sheet.

17   **Q.**   And what did it look like?

18   **A.**   It was just a list where the attendee could print their

19   name, sign their name, and date it.  And it had usually the

20   title and date of the program.

21   **Q.**   If you're doing 10 to 20 speaker programs a quarter and

22   there are people not showing up or there are repeat attendees

23   or people who aren't prescribers, how did you handle the

24   requirement that you had to have a sign-in sheet?

25   **A.**   So sometimes I would just make the names up on the

1    sign-in sheet.  Alec told me a trick of when you invite a

2    physician and he agrees to go, because they often cancel, you

3    have them sign the sign-in sheet.  So that's a way to get a

4    signature.  That's usually how we would get them.  Make them

5    up or do it that way.

6    **Q.**   Did anybody ever challenge the sign-in sheets that you'd

7    offer?

8    **A.**   Not that I remember.

9    **Q.**   When you'd say you made them up, did you just pick a name

10   or somebody that was already a physician?

11   **A.**   Sometimes it was a random name, and sometimes it was

12   physicians.

13   **Q.**   All right.

14            MR. YEAGER:  May I approach the witness, Your

15   Honor?

16            THE COURT:  Yes.

17            MR. YEAGER:  May I ask Ms. Folan -- I'll just ask.

18            Would you mind turning on the ELMO?

19   BY MR. YEAGER:

20   **Q.**   I'm showing you what is marked 0674-02.  Do you see that

21   there?

22   **A.**   Yes.

23   **Q.**   You looked at a previous exhibit that was similar to

24   that; is that correct?

25   **A.**   Yes.

1    **Q.**  This one is for what date?

2    **A.**  January 11, 2013.

3    **Q.**  And is it the same type of document?

4    **A.**  Yes.

5    **Q.**  Did you rely on these documents?

6    **A.**  Yes.

7    **Q.**  Did you look at these on a daily basis?

8    **A.**  Yes.

9    **Q.**  All right.

10            MR. YEAGER:  I'd offer this, Your Honor.

11            THE COURT:  Any objection.

12            MR. STOJILKOVIC:  No objection.  On this one.

13            THE COURT:  Admitted.

14            (Government Exhibit No. 0674-02 admitted.)

15            THE COURT:  What exhibit number is that?

16            MR. YEAGER:  I'm sorry, Your Honor.  It's 0674-02.

17   BY MR. YEAGER:

18   **Q.**  While I'm here, just the last page contains

19   Dr. Awerbuch's name as the last name on the page; is that

20   correct?

21   **A.**  Yes.

22   **Q.**  If you can go here, what is the weekly average at this

23   time?

24   **A.**  19.4.

25   **Q.**  So he's now -- before he averaged four prescriptions a

1    week?

2    **A.**   Yes.

3    **Q.**   Then as of January 11, 2013, he's averaging 19.4

4    prescriptions a week?

5    **A.**   Correct.

6    **Q.**   I want to go back and talk to you a little bit more about

7    the titration issue.  So you were told to talk to doctors,

8    correct?  And any time they wrote 100 mics to 200 mics; is

9    that right?

10   **A.**   Yes.

11   **Q.**   Did you get emails from people telling you when that

12   happened?

13   **A.**   Every day.

14   **Q.**   Tell me about that.

15   **A.**   I don't know if it was autogenerated or whatnot, but we'd

16   get an email every day that would show which physician wrote

17   a 100- or 200-microgram prescription, for how many dosages.

18            And then we were to respond to that email.  We were

19   supposed to go talk to the physician and ask him why he wrote

20   that, what his plan is to titrate them up, and then respond

21   to that email.

22   **Q.**   Mr. Szymanski, we talked about before how you had an

23   uncapped bonus; is that correct?

24   **A.**   Yes.

25   **Q.**   How did the bonus work?  Were you given a certain

1    percentage with regard to how much you made off each

2    prescription?

3    **A.**   It was a percentage of the cost of the prescription.

4    **Q.**   Do you remember now what percentage it was or percentages

5    it was?

6    **A.**   It was -- it varied.  I remember for a long period it was

7    10 percent of dosages 100 to 800 and then 12 or 12.5 for 12

8    or 1600.

9    **Q.**   So you got more money in uncapped bonus if the doctor

10   wrote for a higher script; is that correct?

11   **A.**   Yes.

12   **Q.**   The doctor wrote or the prescriber wrote a prescription

13   for 800 micrograms, you got a higher percentage of uncapped

14   bonus; is that correct?

15   **A.**   Yes.

16   **Q.**   All right.  Now, did the prices of the drugs -- there

17   were several different dosages, correct?

18   **A.**   Yes.

19   **Q.**   I'm going to test your memory.  Do you remember what they

20   were?

21   **A.**   100, 200, 400, 600, 800, 1200, and 1600 micrograms.

22   **Q.**   And did the cost -- without considering the percentages

23   that you made on the higher dosages, did the cost -- the

24   higher it went up, did it cost more?

25   **A.**   Yes.

1   **Q.**   So if the dose cost more regardless of what the

2   percentage was, you made more; is that right?

3   **A.**   Yes.

4   **Q.**   For instance, you made more on a 200-microgram dose than

5   you did on a 100-microgram dose?

6   **A.**   Yes.

7   **Q.**   And that would be true if it was just the same percentage

8   all the way across, correct?

9   **A.**   Yes.

10   **Q.**   But in fact, when you get to 800 mics, they increased the

11   percentage more, correct?

12   **A.**   Yes.

13   **Q.**   Mr. Szymanski, what are prior authorizations?

14   **A.**   Prior authorizations are a form the insurance company

15   uses basically to gather information about a patient in order

16   to approve or deny a certain medication.

17   **Q.**   Did Subsys require prior authorizations?

18   **A.**   Most often, yes.

19   **Q.**   So direct your attention to when you started in the

20   office in April of 2012 all the way through the end of 2012.

21            How were prior authorizations handled at

22   Dr. Awerbuch's office?

23   **A.**   When we started, it was done by a gal in the office named

24   Teesha.  She was responsible for all the prior

25   authorizations, not just Subsys.  So she would -- if he wrote

1    a prescription, she would do the prior authorization.

2    **Q.**   As the volume picked up -- and we saw that he was

3    averaging -- by the beginning of January 2013, there was

4    significantly more scripts written, correct?

5    **A.**   Yes.

6    **Q.**   In any event, regardless of January, the volume of

7    scripts that Dr. Awerbuch wrote took off, correct?

8    **A.**   Yes.

9    **Q.**   And what impact did that have on the prior authorization

10   paperwork had to be done?

11   **A.**   So they couldn't keep up with the prior authorization

12   paperwork in the office.

13   **Q.**   So what did you do?

14   **A.**   I helped them with it.

15   **Q.**   How did you help with prior authorizations?

16   **A.**   Can I ask a timeframe?

17   **Q.**   Are you familiar with something called the Insys

18   reimbursement center?

19   **A.**   Yes.

20   **Q.**   What is that?

21   **A.**   That is the department at Insys that would communicate

22   with the insurance companies and use our opt-in form to

23   initiate prior authorizations.

24   **Q.**   And that launched sometime in January of 2013, correct?

25   **A.**   Yes.

1    **Q.**   So let's talk about the time period before -- they call

2    it the IRC, right?

3    **A.**   Yes.

4    **Q.**   Let's talk about it before -- prior authorizations in

5    Dr. Awerbuch's office before the IRC launched.

6    **A.**   So before, I would help the girls in the office do it.

7    Prior to the IRC, they still were responsible for it.  But it

8    was essentially the majority of them were not getting done.

9    **Q.**   Who were the women that you helped?

10   **A.**   Teesha.

11   **Q.**   Anyone else at that time?

12   **A.**   At that time, not that I recall the names.

13   **Q.**   With regard to the help, describe what you mean by that.

14   **A.**   Just help them figure out which forms we needed to use,

15   what information was required, did the doctor need to write a

16   letter of medical necessity.  Certain things like that.

17   **Q.**   Did you help write letters of medical necessity?

18   **A.**   I don't remember if I ever physically wrote one.

19   **Q.**   Once the IRC launched, what kind of work did you do then?

20   **A.**   Once the IRC launched, they had a opt-in form that we

21   would fill out and then fax it to the department at the

22   company which would initiate the prior authorization from

23   that form to the insurance company.

24   **Q.**   And with regard to these forms, these opt-in forms, they

25   took several versions over the years; is that correct?

**A.**   Yes.

MR. YEAGER:  Just for the witness and counsel, can we please see 0792.  If you could show Mr. Szymanski the second page of that form, please.

**Q.**   This is filled out; is that correct?

**A.**   Yes.

**Q.**   Is this what an opt-in form looked like?

**A.**   Yes.

MR. YEAGER:  If we could just go to the next exhibit.  I'm going to have him go through all three.

**Q.**   Is this a fair and accurate depiction of what an opt-in form looked like when it first came on, when IRC first started?

**A.**   Yes.

MR. YEAGER:  I'd ask that this be entered.

MS. MINER:  No objection.

THE COURT:  Is this 792?

MS. MINER:  What's the number?

THE COURT:  792, I think.  Mr. Yeager, is this 792?

MR. YEAGER:  It is, Your Honor.  I'm sorry.

Your Honor, I offer this just for the record, I offer Exhibit 0792.  It has writing on it.  I'm offering it simply for an example of what a form looked like and not for the truth of the matter asserted on the form.

THE COURT:  Okay.  Did you all get that?  You can't

1    assume the information on the form is true, but it's just to

2    show you what a form looks like.

3                    (Government Exhibit No. 792 admitted.)

4                    MR. YEAGER:  With regard to -- is this admitted?

5                    THE COURT:  Yes.

6                    MR. YEAGER:  Thank you.  May it be published?

7    BY MR. YEAGER:

8    **Q.**  This is the authorization request from Insys; is that

9    correct?

10   **A.**  Yes.

11   **Q.**  Tell us how this would work.  There's a lot of different

12   information.  I just want to go through it relatively

13   quickly.  The first set of information is just the patient

14   information; is that correct?

15   **A.**  Yes.

16   **Q.**  And then after that there's the prescriber information.

17   That would be Gavin Awerbuch, correct?

18   **A.**  It looks like the insurance is below that.

19   **Q.**  You're right.  Yeah.

20   **A.**  Yeah.

21   **Q.**  And after that, prescriber?

22   **A.**  Yes.

23   **Q.**  And then below that, medication information?

24   **A.**  Yes.

25   **Q.**  That's where you would write in Subsys, the dosage,

1    correct?

2    **A.**   And the number of units.

3    **Q.**   And the number of units.  That's how many sprays come; is

4    that correct?

5    **A.**   Yes.

6    **Q.**   All right.  And then below that there's the pharmacy

7    that's going to be used; is that correct?

8    **A.**   Yes.

9    **Q.**   And then there's additional information, correct?

10   **A.**   Additional, yes.

11   **Q.**   It has a diagnosis code.  Do you see that?

12   **A.**   Yes.

13   **Q.**   And ICD-9 code, correct?

14   **A.**   Yes.

15   **Q.**   That's what insurers and doctors use to communicate about

16   the type of diagnosis that's been offered, correct?

17   **A.**   Correct.

18   **Q.**   Below that there's rationale for prior authorization.

19   Please select all that apply.  Is that right?

20   **A.**   Yes.

21   **Q.**   And then the doctor or staff are supposed to fill out and

22   explain what it was for; is that correct?

23   **A.**   Yes.

24   **Q.**   And then on the right, what are those boxes?

25   **A.**   Rationales why -- rationales why possibly a competitor

1    product shouldn't be approved.

2    **Q.**   All right.  Do you know what those are for?  Are you

3    familiar with something called tried and failed medications?

4    **A.**   Yes.

5    **Q.**   What are tried and failed medications?

6    **A.**   Medications that the patient may have tried at some point

7    and they didn't work for them.

8    **Q.**   All right.  And then this list of --

9              MR. YEAGER:  May I approach the witness, Your

10   Honor?

11             THE COURT:  Yes.

12   BY MR. YEAGER:

13   **Q.**   Can you read those different examples here.

14   **A.**   Yeah.  Patient has difficulty swallowing.  Cannot

15   tolerate medication by mouth.  Generic is not reliable for

16   this patient.  Provider preferred product.  Sleep disruption

17   with previous treatment.  Product patient is currently taking

18   contains sugar.  Inadequate analgesia effect.  Dental caries

19   or other.

20   **Q.**   This form comes from Insys Therapeutics, corrects?

21   **A.**   Yes.

22   **Q.**   At the bottom there's a section there that has the

23   signature of the doctor; is that correct?

24   **A.**   Yes.

25   **Q.**   This particular form did not have a signature of a

1   patient; is that right?

2   **A.**   Correct.

3   **Q.**   That's 0792.  I just want to quickly go through two

4   additional versions.

5           MR. YEAGER:  0586 just for the witness, please.

6   **Q.**   0586.  Do you recognize this form?

7   **A.**   Yes.

8   **Q.**   This is the second version that came out; is that

9   correct?

10  **A.**   I don't know in what order necessarily they came out in.

11  **Q.**   By it's a versus of the form; is that correct?

12  **A.**   Yes.

13  **Q.**   Again this one has physician signature at the bottom; is

14  that correct?

15  **A.**   Yes.

16  **Q.**   There's no place for the patient to sign, correct?

17  **A.**   Correct.

18  **Q.**   It's the assignment type of information, the diagnosis.

19  Do you see that there?

20  **A.**   Yes.

21          MR. YEAGER:  May I please offer this, Your Honor?

22          MS. MINER:  No objection.

23          THE COURT:  Admitted.

24          (Government Exhibit No. 586 admitted.)

25  BY MR. YEAGER:

1    **Q.**  If you could just go -- that's good.  So same stuff.

2    Patient information on the left, correct?

3    **A.**  Yes.

4    **Q.**  Prescriber information on the right?

5    **A.**  Correct.

6    **Q.**  Medication information in the middle?

7    **A.**  Yes.

8    **Q.**  Correct?  So that's where you put Subsys and the strength

9    and the dosage if you were going to request Subsys, correct?

10   **A.**  Yes.

11   **Q.**  On the right is pharmacy information; is that right?

12   **A.**  Yes.

13   **Q.**  Beneath that there's a line for the diagnosis?

14   **A.**  Yes.

15   **Q.**  And for the ICD-9 code?

16   **A.**  Correct.

17   **Q.**  And the diagnosis is what the reason for the drug, that

18   the drug is being prescribed, correct?

19   **A.**  Yes.

20   **Q.**  And ICD-9 code is the code used to describe the

21   diagnosis; is that right?

22   **A.**  Correct.

23   **Q.**  If we could go down to the bottom, please.  This is the

24   same type of this thing.  Rationale for prior authorization.

25   Please select all that apply.

1          Can you read those, Mr. Szymanski?

2    **A.**   Treatment failure with formulary equivalent medications.

3    Sorry.  It's kind of hard to read.  There we go.  Patient

4    stable --

5          MR. YEAGER:  May I approach the witness, Your

6    Honor?

7          THE COURT:  Yes.

8    BY MR. YEAGER:

9    **Q.**   This is easier to read.

10   **A.**   Yeah.  It's kind of blurry.

11         Patient stable on medication over three months due

12   to sample or previous insurance coverage.  Formulary

13   alternatives not clinically appropriate for this patient.

14   Possible drug interactions.  Patient cannot tolerate

15   formulary medication due to side effects.  Generic is not

16   reliable for this patient.  Provider preferred product.

17   Sleep disruption with previous treatment.  Patient is

18   diabetic, current product patient is taking is sugar based.

19   Application site irritation with previous product.

20   Inadequate analgesic effect.  Dental caries."

21   BY MR. YEAGER:

22   **Q.**   The last one I want to show you, and we'll move through

23   this relatively quickly, 0587.

24         MR. YEAGER:  Just for the witness, please.

25   **Q.**   Do you recognize this form?

1    **A.**   Yes.

2    **Q.**   This is another version of the opt-in form; is that

3    correct?

4    **A.**   Correct.

5    **Q.**   It contains much of the same information as before?

6    **A.**   Yes.

7    **Q.**   Did you use these forms?

8    **A.**   Why he.

9          MR. YEAGER:   May this be entered, Your Honor?

10          MS. MINER:   No objection.

11          THE COURT:   Admitted.

12          (Government Exhibit No. 587 admitted.)

13   BY MR. YEAGER:

14   **Q.**   I want to direct your attention to the bottom of this

15   particular form on the first page.   This is a two-page form;

16   is that correct?

17   **A.**   Yes.

18   **Q.**   And this particular form has a lengthy -- at the bottom

19   many, many more boxes to check; is that right?

20   **A.**   Yes.

21   **Q.**   It talks about some of the competitor doses there like

22   Abstral and Actiq and Fentora; is that right?

23   **A.**   Yes.

24   **Q.**   It has some of the other diagnoses we talked about

25   before, correct?

1    **A.**   Yes.

2    **Q.**   On the back page, if you can look at the second page, if

3    you look at the bottom of that page, there's a long

4    disclaimer, correct?

5    **A.**   Correct.

6    **Q.**   And at the bottom there's a place for a patient

7    signature; is that correct?

8    **A.**   Yes.

9    **Q.**   All right.  We needed to get those in just to sort of go

10   through and be able to talk about them in different

11   situations.

12          With regard to your testimony, Mr. Szymanski, did

13   you use these types of forms in the course of, or did you see

14   these types of forms used in the course of Awerbuch's office

15   corresponding with the IRC?

16   **A.**   Yes.

17   **Q.**   Tell us how it would work.

18   **A.**   So for each patient that he wrote a prescription for, the

19   majority of which needed a prior authorization, we would fill

20   out -- initially the office filled it out.

21          It became too much work.  I got permission from

22   Dr. Awerbuch that I could fill them out in his office when I

23   was there, so I started filling out the opt-in forms and

24   submitting them to the IRC.

25   **Q.**   Tell us how that would work.  How did you fill out -- how

1    would you go about doing that?

2    **A.**   He would write a prescription and tell me a certain

3    patient's name.  He had paper charts.  So I would go grab the

4    chart and fill out the opt-in form based on the information

5    in the chart.

6    **Q.**   Doctor Awerbuch gave you access to the patient files?

7    **A.**   Yes.

8    **Q.**   I want to go back to that in a second.

9         But with regard to the people in his office, you

10   talked about Teesha before, correct?

11   **A.**   Yes.

12   **Q.**   And you said that she struggled keeping up, correct?

13   **A.**   Correct.

14   **Q.**   Who is Brian Trask?

15   **A.**   He was the first area business liaison that was hired.

16   **Q.**   What is an area business liaison?

17   **A.**   They're responsible for the opt-in and insurance-related

18   tasks.

19   **Q.**   Who are they employed by?

20   **A.**   Insys Therapeutics.

21   **Q.**   And Brian Trask was an ABL?

22   **A.**   Yes.

23   **Q.**   What doctor's office or offices did he work?

24   **A.**   He worked at various but mainly it was Dr. Awerbuch.

25   **Q.**   Describe his work ethic, Mr. Trask's.

1   **A.**   It was not very good.   He had a big workload with the

2   volume of prescriptions that Dr. Awerbuch would write, and he

3   didn't want to work very many hours.

4   **Q.**   How did that work out?

5   **A.**   Not very well.

6   **Q.**   Okay.   So did the backlog get dealt with?

7   **A.**   So the backlog was helped -- they had a new person in the

8   office named Courtney.

9   **Q.**   Courtney Nagy, N-A-G-Y?

10  **A.**   Yes.

11  **Q.**   She worked part-time in the office at this time?

12  **A.**   I believe it was part-time.

13  **Q.**   Do you know?

14  **A.**   Yeah.   I think it was.   She worked in the office.

15  **Q.**   You interacted with her?

16  **A.**   Yes.

17  **Q.**   What were her responsibilities in the office that you

18  saw?

19  **A.**   Her responsibilities in the office were administrative

20  duties as far as mainly it was doing prior authorizations for

21  other drugs or devices.

22  **Q.**   For other drugs?

23  **A.**   Yeah.

24  **Q.**   Now, with regard to that at some point when you had --

25  with Mr. Trask's work ethic, did you ask for help?

1    **A.**   Yes.

2    **Q.**   Describe that.

3    **A.**   Well, I talked to Sunrise and said this is essentially

4    not working out, plus the fact that, you know, any other

5    physician that we called on that needed authorizations done

6    couldn't be done because Brian was in Dr. Awerbuch's office.

7    You know, the times that he did work was in there.

8             So she mentioned to me, what do you think about

9    hiring Courtney as an area business liaison and then Brian

10   can go help out with other accounts?

11            I thought it was a good idea, but I thought that we

12   should ask Dr. Awerbuch first because I didn't want to make

13   him mad.  So we asked him if it was okay if we hired her.  He

14   was essentially okay with it.  I don't know if she's related

15   to him somehow, but he thought that it was a good opportunity

16   and that she would make more money.

17   **Q.**   And so did Insys hire Courtney Nagy?

18   **A.**   Yes.

19   **Q.**   What was her role with Insys Therapeutics?

20   **A.**   She was area business liaison.

21   **Q.**   What did she do?

22   **A.**   She did all the prior authorization -- the opt-in forms.

23   **Q.**   Was anyone hired to replace Ms. Nagy in terms of her

24   previous work for Dr. Awerbuch working on other prior

25   authorizations?

1   **A.**   No.

2   **Q.**   Who did those?

3   **A.**   She did.

4   **Q.**   So Insys hired Courtney Nagy, and then she kept doing

5   what she did previously and in addition worked all the Insys

6   opt-ins; is that correct?

7   **A.**   Yes.

8   **Q.**   Who is Michael Gurry?

9   **A.**   He was the -- I'm not sure of his official title.  He was

10   originally the -- I remember him as the head of the IRC.

11   **Q.**   Do you see him in the courtroom here today?

12   **A.**   I do.

13   **Q.**   Would you please point to him and describe an item of

14   clothing he's wearing.

15   **A.**   Yellow tie.

16         MR. YEAGER:  Your Honor, may the record reflect

17   that the witness has identified Mr. Gurry?

18         THE COURT:  Yes.

19   BY MR. YEAGER:

20   **Q.**   With regard to Mr. Gurry, did you ever interact with him

21   in terms of the IRC and opt-ins?

22   **A.**   Yes.

23   **Q.**   Describe those conversations for us, please?

24   **A.**   A lot of the interaction was when the IRC launched anew,

25   we really didn't know what we were doing.  There was a lot of

information needed on the form.  I would call him oftentimes

and ask what information we actually needed to shorten the

process.  I asked him about certain diagnosis codes, certain

tried and failed medications that he was seeing a trend with

that needed to be on there to get certain drugs approved.

**Q.**  Did you explain to Mr. Gurry that you were a sales

representative?

**A.**  Yeah.

**Q.**  What did he say?

**A.**  He said technically you're not supposed to be doing the

opt-in forms, but you know, you've got to do what you got to

do.

**Q.**  All right.  Now, with regard to the IRC, did you talk to

somebody named Elizabeth Gurrieri?

**A.**  Yes.

**Q.**  Who is Ms. Gurrieri?

**A.**  She -- from my memory, she kind of transitioned into

Mike's role within the IRC.

**Q.**  Describe your conversation with her.

**A.**  Similar to Mike Gurry.

**Q.**  Did you have conversations with other IRC employees?

**A.**  Yes.  And then as time went on with the IRC, the majority

of the communication was through the IRC.  I call them

agents, representatives.

**Q.**  And with regard to your conversations with them, when you

1    were filling out the opt-ins or helping fill out opt-ins,

2    were there situations in which you were exploring whether or

3    not the patient had a history of cancer?

4    **A.**   Yes.

5    **Q.**   Describe that for the jury, please.

6    **A.**   So if a patient had history of cancer, we would select

7    the cancer -- we would basically write down their cancer

8    diagnosis.

9    **Q.**   And where did you learn to do that?

10   **A.**   Well, two part.  I remember Dr. Awerbuch saying, hey,

11   they have a history of cancer, you know, this is a good

12   patient.  Select cancer, they'll get approved.  And then

13   also, I don't know specifically which agents, but the agents

14   at the IRC.

15   **Q.**   You talked to someone at the IRC?

16   **A.**   Yes.

17   **Q.**   We're talking about history of cancer here.  Working on

18   the opt-ins, was the diagnosis that you could tell, was the

19   person written because the person had cancer?

20   **A.**   It was being written because they at some point

21   previously had cancer.

22   **Q.**   As far as you could fell, was the doctor treating pain

23   from cancer or was he treating some other pain and using the

24   history of cancer?

25             MS. MINER:  Objection.

```
 1              THE COURT:  Basis?

 2              MS. MINER:  Foundation.  Lack of knowledge.

 3              THE COURT:  Lay a better foundation, please.

 4   BY MR. YEAGER:

 5   Q.  Mr. Szymanski, did you have conversation or did you have

 6   an understanding of the importance of history of cancer with

 7   regard to obtaining prior authorization for Subsys?

 8              MR. KENDALL:  Objection.  Compound, Your Honor.

 9              THE COURT:  Overruled.

10   BY MR. YEAGER:

11   Q.  Go ahead.

12   A.  Yes.

13   Q.  Describe those, please.

14   A.  So the question was with the IRC or doctor?

15   Q.  First of all, did you have an understanding of the

16   importance of or how the history of cancer would work with

17   regard to getting authorization for prescriptions?

18   A.  Yes.

19   Q.  Where did you obtain that information?

20   A.  From the IRC.

21   Q.  Tell me what you understood the importance of a history

22   of cancer to be.

23   A.  So if they had a history of cancer and we wrote down

24   their cancer diagnosis codes, the likelihood of getting the

25   prescriptions approved was much more.
```

1    **Q.**  But did it matter whether or not Dr. Awerbuch was

2    actually treating the person for cancer pain at the time?

3    **A.**  Did it matter?

4         MR. STOJILKOVIC:  Objection.  Lacks foundation and

5    calls for medical opinion testimony.

6         THE COURT:  Sustained.

7    BY MR. YEAGER:

8    **Q.**  I'm not asking you your medical opinion.  I'm asking you

9    when you're filling out the forms, okay, and the diagnosis --

10   where did you get the diagnosis to put on the form?

11   **A.**  Sometimes he would tell me, and other times it would be

12   in the chart.

13   **Q.**  And how would you find the diagnosis in the chart?  Tell

14   us about that.

15   **A.**  There was a page that had all the current and previous

16   diagnoses on it.

17   **Q.**  So when you filled out the box that said diagnosis and

18   you were doing it on your own, how did you choose what

19   diagnosis the doctor was using to justify the prescription?

20   **A.**  We wouldn't.  We would usually just use the diagnoses

21   from the chart.

22   **Q.**  All right.  But if there were multiple diagnoses there,

23   what would you do?

24   **A.**  Use common ones that we would see, or you know, speaking

25   with the IRC we knew which ones had a higher likelihood of

1    getting approved.

2    **Q.**   In filling out the document, did you at times look for a

3    history of cancer within the medical record in order to get

4    it approved?  In other words, it was not written down by the

5    doctor, but you chose to look for the history of cancer?

6    **A.**   I remember on an instance seeing a lab report of a

7    history of cancer, and I used that.

8    **Q.**   Tell me about that.  Had the doctor used the history of

9    cancer at all to justify the diagnosis?

10   **A.**   I don't recall if he used it.  I just remember seeing the

11   history on my own.

12   **Q.**   Did you ever talk to Elizabeth Gurrieri or -- strike

13   that.

14             Did you ever talk to Elizabeth Gurrieri about

15   history of cancer?

16   **A.**   I don't recall exactly who I spoke to at the IRC about

17   it, but it was with them.

18   **Q.**   Directing your attention to April 2014.  At some point,

19   was Dr. Awerbuch arrested?

20   **A.**   Yes.

21   **Q.**   Were you there when it happened?

22   **A.**   I was not in his office.  I was on my way to his office,

23   and I pulled in the parking lot and saw various law

24   enforcement vehicles in the parking lot.

25   **Q.**   Describe what you did.

1    **A.**   I turned around and went home.

2    **Q.**   So you had pulled up to Dr. Awerbuch's office.  You saw

3    various law enforcement vehicles; is that right?

4    **A.**   Yes.

5    **Q.**   You didn't check to find out what was going on inside?

6    **A.**   No.

7    **Q.**   And you left?

8    **A.**   Yes.

9    **Q.**   Can you describe what you did after you left?

10   **A.**   I can't remember if it was a text or a call, but I

11   contacted Courtney, because I knew she was likely there at

12   the time, just to see what was going on.

13   **Q.**   Can you tell us, sir, did you ever talk to Dr. Awerbuch

14   again?

15   **A.**   I did.

16   **Q.**   Describe that, please.

17   **A.**   So we -- Alec and Rich Simon were in town, visiting for a

18   day or two seeing other customers.  And Alec requested that

19   he -- that I set up a meeting with Dr. Awerbuch for all of

20   us.

21   **Q.**   So we talked about Alec.  Who was Rich Simon?

22   **A.**   He was the director of sales.

23   **Q.**   Do you see him in the courtroom here today?

24   **A.**   I do.

25   **Q.**   Would you please point to him and describe an item of

1   clothing that he's wearing?

2   **A.**   He has a blue tie.

3          MR. YEAGER:   Your Honor, mayor the record reflect

4   that the witness has identified Richard Simon?

5          THE COURT:   Yes.

6   BY MR. YEAGER:

7   **Q.**   With regard to Mr. Simon and Mr. Burlakoff, they were in

8   town to see another doctor?

9   **A.**   Yes.

10  **Q.**   At some point did they end up with you seeing

11  Dr. Awerbuch?

12  **A.**   Yes.

13  **Q.**   How did that happen?

14  **A.**   So I set up the -- it was a lunch meeting with

15  Dr. Awerbuch and Alec and Rich, and we met him at a local

16  restaurant in Metro Detroit.

17          Alec said that he just wanted to kind of check in

18  and see how he was doing, so we met up with him.  I don't

19  remember a ton about the conversation other than Dr. Awerbuch

20  being -- just talking a lot about how he didn't have any

21  money, they froze all his assets, what is he supposed to do,

22  is there any way you guys can help me out, of that nature.

23  **Q.**   Describe how Dr. Awerbuch behaved during the meeting.

24  **A.**   He was acting really -- I knew him better than Alec and

25  Rich did.  When we got into the car after the meeting, I said

1    he was acting really strange, and I thought that he was

2    probably recording us.

3    **Q.**  Okay.  So describe what happened after the meeting with

4    Dr. Awerbuch.

5    **A.**  So Alec started freaking out, said he was going to get

6    sick to his stomach, pull over, when he thought he was being

7    recorded.  I didn't pull over.  He did not get sick.  But he

8    immediately called Mike Babich.

9    **Q.**  How do you know that he called Mike Babich?

10    **A.**  Because he told me.

11    **Q.**  Could you hear the conversation?

12    **A.**  I couldn't hear the conversation.  One thing I

13    remembered -- I couldn't hear obviously what Mike was saying.

14    I heard some of what Alec was saying.

15          What I remember from the conversation was Alec told

16    him we may have been recorded, but we didn't say anything

17    bad, and I bought him lunch, but I paid for it in cash.

18    **Q.**  And then what happened after that call?

19    **A.**  And then after that call, I remember him calling --

20          MR. STOJILKOVIC:  May we approach sidebar?

21          THE COURT:  Yes.

22          (The following was held at sidebar.)

23          THE COURT:  Go ahead.

24          MR. STOJILKOVIC:  Your Honor, I think where we're

25    going into now this witness is going to testify that Alec

1    Burlakoff called Dr. Kapoor, and I have three concerns about

2    that.

3            Number one, I think it's not going to be a

4    situation -- the witness was not on the phone, could not hear

5    what the conversation was.  And number two, Mr. Babich, who

6    has been repeatedly talked to by the government has not in an

7    MOI confirmed this call happened.

8            And I think anything this witness could relay about

9    that call would simply be hearsay from Alec Burlakoff.  It is

10   not -- it falls short of the Best Evidence Rule.  Which is if

11   Alec Burlakoff wants to relay the call, he can.

12           And I assume it's going to be speculation because I

13   doubt the witness could recall word for word what will Alec

14   Burlakoff was saying or what Alec Burlakoff told him.  It

15   can't come in as an exception to the co-conspirator hearsay.

16   I'm worried about the witness characterizing a phone call

17   that he didn't hear.

18           THE COURT:  None of those objections that you just

19   made will keep the call from coming in.  Is that what he's

20   going to testify to, about a call?

21           MR. YEAGER:  Is Burlakoff going to testify about a

22   call?

23           THE COURT:  No.  This witness.

24           MR. YEAGER:  He's going to testify that he called

25   John Kapoor.

1        THE COURT:  I'll take it as it comes.  But nothing

2   that you just said makes this question, whatever he answers,

3   inappropriate.  If he didn't hear, he didn't hear.  If he's

4   speculating, he's speculating.  I'll rule on those.  The fact

5   that he might speculate, this is not really what the Best

6   Evidence Rule goes to.

7        I hear your concerns, but there's nothing --

8        MR. STOJILKOVIC:  I can, hearing his answer,

9   reraise objections?

10       THE COURT:  Yes.

11       MR. TYRRELL:  Your Honor, I have a separate

12   concern.  I would like the witness to say what he's going to

13   say and not have Mr. Yeager lead him.  I think I've been

14   generous.

15       THE COURT:  Yes, you have been generous.

16       MR. YEAGER:  I've been deliberately trying to get

17   through it.

18       THE COURT:  Try not to lead.  This is obviously

19   important to them.  They're asking you not to lead this, so

20   please don't.

21       (End of sidebar.)

22   BY MR. YEAGER:

23   **Q.**  Mr. Szymanski, just to clarify, when was Dr. Awerbuch

24   arrested?  What month?

25   **A.**  It was either April or May of 2014.

1  **Q.**  With regard to the conversation in the car, who was

2  present in the car after the meeting with Dr. Awerbuch?

3  **A.**  Alec Burlakoff and Rich Simon.

4  **Q.**  And you described an effort by Alec Burlakoff to call

5  someone.  Do you remember that?

6  **A.**  Yes.

7  **Q.**  After that call, describe what happened.

8  **A.**  After he -- he called --

9  **Q.**  Let me go back.

10         You described a call to Mike Babich; is that

11  correct?

12  **A.**  Yes.

13  **Q.**  Describe what happened after the telephone call to Mike

14  Babich.

15  **A.**  Okay.  After of the telephone call to Mike Babich, he

16  called Dr. Kapoor.

17  **Q.**  How do you know he called Dr. John Kapoor?

18  **A.**  Because he told us to be quiet, he's calling Dr. Kapoor.

19  **Q.**  Who told you that?

20  **A.**  Alec.

21  **Q.**  Did he dial the phone after that?

22  **A.**  Yes.

23  **Q.**  Describe what you heard, not what people told you, what

24  you heard once he made that phone call.

25  **A.**  I don't remember a ton of that.  He didn't do a lot of

1   talking other than the fact that he had saw Dr. -- had saw

2   Dr. Awerbuch, had a meeting.

3   **Q.**  Who said that?

4   **A.**  Alec said that.

5   **Q.**  Do you remember anything else?

6   **A.**  I don't.

7   **Q.**  With regard to Sunrise Lee, did you talk to Ms. Lee --

8   how did you correspond with Ms. Lee?

9   **A.**  Via phone calls, emails, and text messages.

10  **Q.**  And let's talk about text messages.

11          What was your telephone number at the time?

12  **A.**  It was 616-719-6447.

13  **Q.**  And do you know Ms. Lee's telephone number at the time?

14  **A.**  Not exactly.

15  **Q.**  Okay.

16          MR. YEAGER:  May I approach witness?

17          THE COURT:  Yes.

18  BY MR. YEAGER:

19  **Q.**  Mr. Szymanski, there's a series of -- a manila folder in

20  front of you; is that correct?

21  **A.**  Yes.

22  **Q.**  If you could, just flip through those.  There's printouts

23  of texts.  Do you see that?

24  **A.**  Yes.

25  **Q.**  Take a look at them.

1        MR. YEAGER:  You were -- I believe we have a

2    stipulation with regard to the records authenticity.

3        THE COURT:  Okay.

4    BY MR. YEAGER:

5    **Q.**  Sir, are those text messages to and from you?

6    **A.**  Yes.

7    **Q.**  All right.  If we could -- almost done here.

8        MR. YEAGER:  If we could start -- may I please have

9    ELMO?

10   **Q.**  Have you had a chance to look at these exhibits?

11   **A.**  Yes.

12   **Q.**  You say that they're to and from you; is that correct?

13   **A.**  Yes.

14       MR. YEAGER:  May they be admitted, Your Honor?

15       THE COURT:  I need a number, first of all.

16       MR. YEAGER:  That's a fair point.  1537, 1546,

17   1547, 1543, 1541, 1545, 1548, 1549, 1550, and 1542 to start.

18   And then 1565, -66, -67, -68, -71, -72, -73, -74, -75, -76,

19   -77, -78, -79, and -80.

20       THE COURT:  Any objections to those?

21       MR. TYRRELL:  I don't know what they are.

22       MR. STOJILKOVIC:  Your Honor, there's no objection

23   on authenticity grounds.  I haven't had a chance to verify

24   that they're all relevant.

25       THE COURT:  It's time for their break.  Let's take

1    a break.  You can look at those during the break and we'll

2    resume.  2:30, okay?

3              THE CLERK:  All rise for the jury.

4              (The jury exits the courtroom.)

5              THE COURT:  All right.  2:30.  You're on break for

6    2:30 as well.  As for February vacation, they want to take

7    off Monday, Tuesday, and Wednesday and come back on Thursday

8    and Friday.  Just what you all wanted.

9              (Court recessed at 2:32 p.m.)

10             THE CLERK:  All rise for the jury.

11             (The jury enters the courtroom.)

12             THE CLERK:  Court is back in session.  Please be

13   seated.

14             MR. YEAGER:  May I proceed, Your Honor?

15             THE COURT:  You may.

16   BY MR. YEAGER:

17   Q.  Mr. Szymanski, you're previously sworn; is that correct?

18             THE COURT:  On the screen, this is one of the ones

19   we've already admitted, right?

20             MR. YEAGER:  Actually I think they wanted to look

21   at them, but I think there's no objection.

22             MR. STOJILKOVIC:  Thank you for the break, Your

23   Honor.  There is no objection.

24             THE COURT:  To this one or to all of them?

25             MR. STOJILKOVIC:  To all of them there is no

1   objection.

2            THE COURT:  All of those exhibits are admitted.

3            (Government Exhibit Nos. 1537, 1546, 1547, 1543,

4   1541, 1545, 1548, 1549, 1550, 1542, 1565, 1566, 1567, 1568,

5   1571, 1572, 1573, 1574, 1575, 1576, 1577, 1578, 1579, and

6   1580 admitted.)

7            MR. YEAGER:  May they be published?

8            THE COURT:  They may be published, but if you want

9   exhibit stickers on them you're going to have to let Karen

10  know which exhibit number.

11           MR. YEAGER:  I'll read them off as we go.

12  BY MR. YEAGER:

13  **Q.**  Currently on the screen is 1537.  Mr. Szymanski, could

14  you read this for us, please.

15  **A.**  "September 5 in Kzoo is confirmed with Rebecca and

16  physician as well as Awerbuch.  I have a program on the 5th

17  but I could move it to the 4th.  These doctors in Kzoo have

18  to do a Thurs."

19  **Q.**  So Kzoo is Kazoo, correct?

20  **A.**  Kzoo?

21  **Q.**  Yes.  What is that?

22  **A.**  It's short for Kalamazoo.

23  **Q.**  Who is Rebecca?

24  **A.**  Rebecca was another rep.

25  **Q.**  1546, please.  Go ahead.

1   **A.**  "I don't think that I will be able to give them another

2   program.  What attendees will be there?  Any important?"

3   **Q.**  That's from Sunrise to you?

4   **A.**  Yes.

5   **Q.**  15947, please.

6   **A.**  "I don't have any 100 percent confirmed yet."

7   **Q.**  That's from you to Sunrise?

8   **A.**  Yes.

9   **Q.**  1543, please.

10   **A.**  "Perfect."

11   **Q.**  1541, please.

12   **A.**  "Put the request in for the other program.  Ask Lakkaraju

13   if he can do the Birmingham program and I'll switch speakers.

14   Talk to Brian and have him cover that program."

15   **Q.**  Lakkaraju is a physician, correct?

16   **A.**  Correct.

17   **Q.**  Brian is Brian Trask?

18   **A.**  Yes.

19   **Q.**  1545, please.

20   **A.**  "Okay.  I doubt Lakkaraju will do it just because it is

21   two hours from where he lives, but Wilson or Bleiberg

22   probably will."

23   **Q.**  Thank you.  1548, please?

24   **A.**  "So what should I tell Emily about the Birmingham

25   program?"

1   **Q.**   This is you to Sunrise?

2   **A.**   Yes.

3   **Q.**   Who is Emily?

4   **A.**   Emily contacted the corporate office in terms of the

5   speaker programs.

6   **Q.**   She worked in the marketing unit?  Marketing?

7   **A.**   I'm not sure exactly.  I just remember she was a contact

8   for the speaker programs that we had.

9   **Q.**   Okay.  1549, please.

10   **A.**   "You don't want to tell her anything.  All communication

11   goes through me.  Just schedule Awerbuch to speak in Kzoo and

12   Lakkaraju will speak at Birmingham.  You can use it to both

13   of your advantage.  Tell him if he can't make it, he will

14   still get paid."

15   **Q.**   Do you know what she's talking about, you don't want to

16   tell her anything?  Do you know what that's about?

17   **A.**   You don't want to tell -- I think the issue is that we

18   double-booked the program.

19   **Q.**   Okay.

20   **A.**   We're trying to figure out which physicians to go to

21   which program.

22   **Q.**   She says, "Just schedule Awerbuch to speak in Kzoo and

23   Lakkaraju to speak in Birmingham.  You can use it both for

24   your advantage.  But tell him if he can't make it, he will

25   get paid."  Is that correct?

1    **A.**   Correct.

2    **Q.**   What is 1550?

3    **A.**   "Thanks.  You'll have to have Brian handle that program

4    so that it the program doesn't come up cancelled."

5    **Q.**   What does that mean?

6    **A.**   So he would have to be at the -- even if no physicians

7    showed up, he would have to be here so we wouldn't have to

8    cancel it.

9    **Q.**   Okay.  If we could now go to 1565, please.  That's from

10   you to Sunrise, correct?

11   **A.**   Yes.

12   **Q.**   What does it say?

13   **A.**   "Hi, Sunrise.  Will you be at the dinner tonight?"

14   **Q.**   1566, please.

15   **A.**   "Okay.  Sounds good.  I will see you there.

16   **Q.**   1567.

17   **A.**   "Yes."

18   **Q.**   That was reversed, correct?  She answered yes, and then

19   you said, "Okay, I'll see you there."

20            Do you want to go back?

21   **A.**   I said, "Okay, I'll see you there."

22            And then she said "Yes."

23   **Q.**   All right.  What's next?  1568.

24   **A.**   "I'm not sure Dr. Otting is supposed to be getting the --

25   I'm not sure Dr. Otting is supposed to be getting the

1    attendees because he wanted program.  He said minimum 4-5

2    from his practice but maybe more."

3    **Q.**   1571.

4    **A.**   "How many Q3 programs did Lakkaraju have this."

5    **Q.**   1572?

6    **A.**   "Is have to double-check, but I want to say two to four.

7    **Q.**   Is that supposed to be "I have to double-check," do you

8    think?

9    **A.**   I or I'd.

10   **Q.**   What's the next one?

11   **A.**   "Okay.  Is he back for a while now? "

12   **Q.**   Who is she referring to there?

13   **A.**   Is the doctor back for a while now, Dr. Lakkaraju.

14   **Q.**   Are you guessing or do you know?

15   **A.**   I'm guessing based on what it says.

16   **Q.**   What's the next one?  1574.  Sorry.

17   **A.**   "Yea.  No more vacations.  I talked to him about meeting

18   you and he's all about it."

19   **Q.**   1575, please.

20   **A.**   "Perfect.  See if he's available Monday or Tuesday next

21   week.  Bay City, right?"

22   **Q.**   1576, please.

23   **A.**   "Yup, I'll check with him."

24   **Q.**   1577.

25   **A.**   "In the meantime we need to see some more ROI before his

1    window is closed."

2    **Q.**  What does she mean by that?

3    **A.**  We need to see some more return on investment, which

4    means more prescriptions.

5    **Q.**  And return on investment, what does she need to see

6    before the return on investment?

7    **A.**  She needs to see more prescriptions written before we do

8    more programs.

9    **Q.**  Tell me about that.

10    **A.**  So he wasn't writing enough programs.  So she's saying we

11    need to see more return on investment on the programs that we

12    do.

13    **Q.**  What's going to happen if he doesn't have the more return

14    on investment?

15            MR. HORSTMANN:  Objection.

16            THE COURT:  That's sustained.

17            MR. YEAGER:  One moment, Your Honor.

18            THE COURT:  Yes.

19    BY MR. YEAGER:

20    **Q.**  If you could go back to 1571.  Do you see that?

21    **A.**  Yes.

22    **Q.**  Who is Lakkaraju?

23    **A.**  He's a doctor.

24    **Q.**  Is he a registered speaker?

25    **A.**  Yes.

1    **Q.**  These texts that we went through, is that who you're

2    referring to?

3    **A.**  Yes.

4    **Q.**  So the question from Sunrise to you is what?

5    **A.**  "How many Q3 programs did Lakkaraju have this."

6    **Q.**  And then it cuts off, correct?

7    **A.**  Yes.

8    **Q.**  And then your response back on 1572 is what?

9    **A.**  "I'll have to double-check, but I want to say two to

10   four."

11   **Q.**  So you're referring to the number of programs that

12   Lakkaraju has had that quarter, correct?

13   **A.**  Yes.

14   **Q.**  All right.  1573.  "Okay.  Is he back for a while now?"

15   Is that right?

16   **A.**  Yes.

17   **Q.**  Who was she asking about?  Who is he?

18   **A.**  Dr. Lakkaraju.

19   **Q.**  1574, what do you say?

20   **A.**  "Yeah.  No more vacations.  I talked to him about meeting

21   you, and he's all about it."

22   **Q.**  You're talking again about Lakkaraju, correct?

23   **A.**  Yes.

24   **Q.**  1575.

25   **A.**  "Perfect.  See if he's available Monday or Tuesday next

1    week.  Bay City, right?"

2    **Q.**  Who is he?

3    **A.**  Dr. Lakkaraju.

4    **Q.**  1576.  Who is 1576?

5    **A.**  "Yup.  I'll check with him."

6    **Q.**  And 1577.  "In the meantime we need to see more ROI

7    before his window is closed."  Is that right?

8    **A.**  Yes.

9    **Q.**  Who is his?

10   **A.**  Dr. Lakkaraju.

11   **Q.**  What is ROI?

12   **A.**  Return on investment.

13   **Q.**  Return on what investment?

14   **A.**  Investment of paying him to do a speaker program.

15   **Q.**  What does "return" stand for?

16   **A.**  That he would need to write more prescriptions before we

17   schedule more programs.

18   **Q.**  1578.  You're agreeing there, correct?

19   **A.**  Yes, I agree.

20   **Q.**  You're agreeing that Dr. Lakkaraju needs to write more

21   prescriptions in order to get more speaker programs?

22   **A.**  Yes.

23   **Q.**  All right.

24           MR. YEAGER:  May we please have the ELMO.  I just

25   want to check.  Is 1542 in?

1            THE COURT:  Yes.

2            MR. YEAGER:  Thank you.

3    BY MR. YEAGER:

4    **Q.**  We talked about return on investment just now, correct?

5    **A.**  Yes.

6    **Q.**  Is that a term you were familiar with at Insys

7    Therapeutics?

8    **A.**  Yes.

9    **Q.**  How are you familiar with it in reference to Insys

10   Therapeutics?

11   **A.**  In terms of the speaker programs.

12   **Q.**  And how?

13   **A.**  If a physician -- so we would hear you have to have a

14   return on your investment.  So if you had a speaker that was

15   giving a lot of programs, you had a return on investment in

16   terms of his writing more.

17   **Q.**  What would happen if the speaker did not write more?

18   **A.**  They would not be allocated any more programs.

19   **Q.**  Directing your attention to what is already marked 0050

20   in evidence.

21           MR. YEAGER:  Is this published to the jury?

22   **Q.**  Do you remember this chart?

23   **A.**  Yes.

24   **Q.**  So this fourth line down is Dr. Awerbuch, correct?

25   **A.**  Yes.

1    **Q.**  And this is from September 28, 2012, correct?

2    **A.**  Correct.

3    **Q.**  And the weekly average back then was four scripts a week;

4    is that correct?

5    **A.**  Yes.

6    **Q.**  Dr. Awerbuch was not yet speaking for Insys Therapeutics;

7    is that correct?

8            MR. STOJILKOVIC:  Objection.  Lacks foundation.

9    BY MR. YEAGER:

10   **Q.**  What time did you let Dr. Awerbuch speak?

11   **A.**  I'm not sure.  It could have been before this.  I'm not

12   sure when his first program was.

13   **Q.**  When was the conversation with Sunrise Lee when you sat

14   down with her and Dr. Awerbuch?  Was that before or after

15   this?

16   **A.**  That was after this.

17   **Q.**  How about the conversation with Alec Burlakoff?

18   **A.**  That was after this.

19   **Q.**  So at this point in September 28, 2012, he's averaging

20   four scripts a week, correct?

21   **A.**  Correct.

22   **Q.**  Next exhibit in evidence, 0674-02.  Do you remember this

23   chart?

24   **A.**  Yes.

25   **Q.**  Flip to the last page of the chart.

1         MR. STOJILKOVIC:  Your Honor, I'm going to object

2 to this as asked and answered.  We've literally done this

3 already.

4         MR. YEAGER:  I'm going to link it, Your Honor.

5         THE COURT:  Something different than you've done

6 before?

7         MR. YEAGER:  I am, yes.

8         THE COURT:  Okay.  Go ahead.

9 BY MR. YEAGER:

10 **Q.**  With regard to the last line, by January 2013 he's

11 writing how many prescriptions?

12 **A.**  19 -- well, 233 overall.  19.4 per week.

13 **Q.**  19.4 per week.  So he goes from 4 to 19.4, correct?

14 **A.**  Correct.

15 **Q.**  And how many -- by January 2013, how many speaker

16 programs is he doing per week?

17 **A.**  I would say at least one.

18 **Q.**  Was that a return on investment?

19 **A.**  It looks like it.

20 **Q.**  Well, how much money did you make off of his programs,

21 sir?

22 **A.**  A lot.

23 **Q.**  How much money did Insys Therapeutics make off his

24 programs?

25 **A.**  A lot.

1    **Q.**  He went from writing 4 a week to 19 a week.  Was that a

2    return on investment?

3    **A.**  Yes.

4    **Q.**  Thank you.

5           MR. YEAGER:  No further questions for this witness.

6           MR. HORSTMANN:  May I proceed, Your Honor?

7           THE COURT:  You may.

8                       CROSS EXAMINATION

9    BY MR. HORSTMANN:

10   **Q.**  Good afternoon, Mr. Szymanski.

11   **A.**  Good afternoon.

12   **Q.**  You've been in sales since you graduated from college,

13   correct?

14   **A.**  Correct.

15   **Q.**  And you've been in pharma or medical sales since 2012,

16   right?

17   **A.**  Correct.

18   **Q.**  You've been trained by multiple different companies

19   during that period of time into various sales techniques and

20   various products, right?

21   **A.**  Correct.

22   **Q.**  And you know that it's very important no matter what

23   you're selling to establish a good relationship, a friendly

24   relationship with the prospective customer, correct?

25   **A.**  Yes.

1    **Q.**  And you also know that it's important to be a good

2    listener when you are meeting with a prospective customer,

3    correct?

4    **A.**  That would be helpful.

5    **Q.**  Because that's one way you can find out what they really

6    want, correct?

7    **A.**  Correct.

8    **Q.**  All right.  And so when you went to the U.S. Attorney's

9    Office on January 4 of this month, you had a sales pitch in

10   mind, correct?

11   **A.**  No.

12   **Q.**  Well, when you went in, you knew that Mr. Burlakoff had

13   already changed his plea to guilty, right?

14   **A.**  Yes.

15   **Q.**  You couldn't sell them Burlakoff, right?

16   **A.**  Right.

17   **Q.**  And you knew that Mr. Babich was teed up to change his

18   plea the next week, right?

19   **A.**  I'm not sure if I knew that prior to that.  I'm not sure

20   of the dates.

21   **Q.**  But you knew he was cooperating at that time, right?

22   **A.**  Yes.

23   **Q.**  So you couldn't sell them Mr. Babich, right?

24             MR. YEAGER:  Objection, Your Honor.

25             THE COURT:  Basis?

1           MR. YEAGER:  It's argumentative, Your Honor.

2           THE COURT:  Overruled.

3   BY MR. HORSTMANN:

4   **Q.**  Do you want me to repeat my question?

5   **A.**  Yes, please.

6   **Q.**  You couldn't sell them Mr. Babich, right?

7   **A.**  I don't know what you mean by "sell."

8   **Q.**  Well, you knew they wouldn't be interested in any

9   incriminating information you might have on Mr. Babich

10  because he was already cutting a deal, right?

11  **A.**  I suppose so.

12  **Q.**  All right.  So you knew at that point in time that you

13  personally had some exposure for crimes that you committed,

14  right?

15  **A.**  Yes.

16  **Q.**  And you had two lawyers with you to help defend yourself

17  at that meeting, correct?

18  **A.**  Yes.

19  **Q.**  And that's because you were concerned about your own

20  personal exposure, right?

21  **A.**  Not necessarily.  I think talking to the federal

22  government, it's important to have attorneys with you no

23  matter what.

24  **Q.**  But you didn't pay for one.  You paid for two, right?

25  **A.**  Yes.

1    **Q.**  You paid for two lawyers to fly with you from Michigan to
2    attend this meeting, right?
3    **A.**  Yes.
4    **Q.**  All right.  And when you met at the U.S. Attorney's
5    Office, you did what you normally do at any sales meeting,
6    right?  You assess the situation, correct?
7    **A.**  I'm not sure.  I don't remember assessing the situation.
8    **Q.**  Well, they didn't ask you questions about Mike Babich,
9    did they?
10   **A.**  I don't recall if there were any about Mike Babich.
11   **Q.**  And this was three weeks ago, right?
12   **A.**  Correct.
13   **Q.**  All right.  And you don't recall -- well, they didn't ask
14   you any questions about Alec Burlakoff, did they?
15   **A.**  They did.
16   **Q.**  All right.  And you knew that they weren't really
17   interested in Alec Burlakoff at that time because he had
18   already changed his plea, right?
19   **A.**  They never told me who they were and were not interested
20   at the time.
21   **Q.**  All right.  But you knew that the five defendants in this
22   courtroom were still scheduled for trial, right?
23   **A.**  Yes.
24   **Q.**  And you knew that you had some personal exposure here,
25   correct?

1  **A.**  Correct.

2  **Q.**  So when you told them the events that you recall in 2012,

3  you wanted to make sure it was something they were interested

4  in, right?

5  **A.**  I told them the events based on what happened.

6  **Q.**  2012 was six and a half years ago.  How's your memory on

7  things that happened in 2012?

8  **A.**  Some of the memory is bad, and some things I remember.

9  **Q.**  Would you agree with me that the sequence of events

10  matters greatly in this case?

11          MR. YEAGER:  Objection.

12          THE COURT:  I'm going to sustain it because I don't

13  really understand the question.

14  BY MR. HORSTMANN:

15  **Q.**  All right.  Does your --

16          Do you have a good memory, as you sit here today,

17  as to when certain events took place with respect to other

18  events?

19          MR. YEAGER:  Objection.

20          THE COURT:  Basis?

21          MR. YEAGER:  It's pretty broad, Judge.  Events took

22  place relative to other events?

23          THE COURT:  He's asking if he remembers the

24  sequence.  It's fine.  Go ahead.

25  **A.**  I told them the sequence based on my memory.

1    BY MR. HORSTMANN:

2    **Q.**   Okay.  And if your memory is wrong, you're happy to admit

3    that, right?

4    **A.**   If it's wrong.

5    **Q.**   Now, with respect to speaker programs, do you remember

6    that there were plenty of speaker programs involving

7    Dr. Awerbuch in the summer of 2012 before you met Sunrise

8    Lee?

9              MR. YEAGER:  Objection.

10             THE COURT:  Basis?

11             MR. YEAGER:  I believe it's misleading, Your Honor.

12   May I talk to counsel?

13             THE COURT:  You can talk to him, but the witness

14   heard the question.  The witness can answer the question and

15   correct him if he's wrong.  If you want to talk to him and he

16   wants to talk to you, that's fine.

17             MR. HORSTMANN:  I don't think I have anything to

18   talk to you about at this point.  I'm happy to be wrong.

19             MR. YEAGER:  Objection withdrawn, Your Honor.

20             MR. HORSTMANN:  May we have 5252, please, for the

21   witness only.

22   BY MR. HORSTMANN:

23   **Q.**   Directing your attention to what has been premarked for

24   identification as Exhibit 5252.  Do you recognize that email?

25   **A.**   Yes.

1  **Q.**  And is that an email you sent to your boss on August 13

2  of 2012?

3  **A.**  Yes.

4  **Q.**  And does that relay certain information about speaker

5  programs that have been scheduled or have taken place in the

6  near future?

7  **A.**  I'm not sure if they're scheduled or if these are

8  requests.

9  **Q.**  Okay.  But there's quite a few of them on there, right?

10  **A.**  Yes.

11  **Q.**  Dr. Awerbuch is featured prominently in each and every

12  one of those, right?

13          MR. YEAGER:  Your Honor, I don't think I have the

14  proper exhibit.  Thank you.

15  BY MR. HORSTMANN:

16  **Q.**  Can we scroll done a little bit further.  And so there's

17  three speaker programs on the first page that Dr. Awerbuch is

18  involved in, correct?

19          MS. MINER:  Is this in evidence?

20          MR. HORSTMANN:  No.

21          MR. TYRRELL:  Do you want to offer it?

22          MR. HORSTMANN:  I'm happy to offer it at this time.

23          THE COURT:  Any objection?

24          MR. YEAGER:  No, Your Honor.

25          THE COURT:  Admitted.

1        (Defendant Exhibit No. 5252 admitted.)

2  BY MR. HORSTMANN:

3  **Q.**  Can we scroll down the first page, please.  Would you

4  agree on the first page there's four speaker programs that

5  are listed?

6  **A.**   It looks like there are four requested speaker programs.

7  **Q.**   You didn't send this email to waste your boss' time about

8  speaker programs you didn't think were going to happen,

9  right?

10  **A.**   Correct.

11  **Q.**   Okay.  So these were speaker programs that you

12  anticipated taking place at some point in the future,

13  correct?

14  **A.**  Correct.

15  **Q.**   On the date that they were scheduled, correct?

16  **A.**   Hopefully.

17  **Q.**   And that Dr. Awerbuch would attend and speak, correct?

18  **A.**   Not necessarily.  In the email you can see you had to

19  list three separate speakers.  I don't know if that was -- I

20  don't know the reason for it, but it looks like there's three

21  separate speakers listed for each program.

22  **Q.**   Well, it looks like at some point in time you knew very

23  well how to schedule speaker programs without Sunrise Lee,

24  right?

25  **A.**   To request speaker programs, yes.

1    **Q.**   Okay.  And you learned in the summer of 2012 that there

2    was a new third-party company that was going to manage the

3    speaker programs, correct?

4    **A.**   I don't recall.

5    **Q.**   Do you remember a company named SciMedica?

6    **A.**   I do remember that.

7    **Q.**   Do you remember communicating with a woman by the name of

8    Teresa Grasso at SciMedica?

9    **A.**   Not to my memory.

10   **Q.**   And do you remember submitting speaker requests directly

11   to Ms. Grasso?

12   **A.**   Not to my memory.

13   **Q.**   Well, once again we're going to test your memory with

14   some of these emails.

15   **A.**   Okay.

16   **Q.**   I believe you testified you first met Ms. Lee at the

17   training in Arizona, correct?

18   **A.**   Correct.

19   **Q.**   And at that point in time, you had never met her before,

20   right?

21   **A.**   Correct.

22   **Q.**   And she was introduced to you as a regional manager,

23   correct?

24   **A.**   Yes.

25   **Q.**   And after that, it's your testimony you had a meeting

1    with her and Dr. Awerbuch, correct?

2    **A.**   Yes.

3    **Q.**   And do you recall how that meeting was arranged?

4    **A.**   Yes.

5    **Q.**   And I believe your testimony was that she called you and

6    said she needed to meet with Awerbuch, right?

7    **A.**   Yes.

8    **Q.**   And do you have any record of that call at all?

9    **A.**   I don't.

10   **Q.**   Do you have any record of your response?

11   **A.**   I don't.

12   **Q.**   And do you recall receiving an email from her on

13   October 16 of 2012 -- I'm sorry.

14          Do you recall sending her an email on October 16

15   of 2012 in which you suggested that she come meet

16   Dr. Awerbuch on October 30?

17   **A.**   I don't recall that email.

18          MR. HORSTMANN:  May we have 5255, please.

19   **Q.**   Do you recall this email?

20   **A.**   It was from me.  I don't remember much more about it.

21   **Q.**   Okay.  But it's to Sunrise, correct?

22   **A.**   Correct.

23   **Q.**   And you're reporting to her that you were able to get a

24   dinner scheduled with Dr. Awerbuch on Tuesday, October 30,

25   correct?

1  **A.**  Correct.

2  **Q.**  And that that would be a great time for you to come,

3  correct?

4  **A.**  Yes.

5  **Q.**  And it certainly sounds like this is the first meeting

6  between the three of you, correct?

7  **A.**  I'm not sure if that's for our first meeting.

8  **Q.**  Well, you don't say the word "program," right?

9  **A.**  Right.

10  **Q.**  You say "dinner," right?

11  **A.**  Correct.

12  **Q.**  And that implies that it's just the three of you, right?

13  **A.**  Dinner scheduled -- a speaker program would be done at

14  dinner.

15  **Q.**  Okay.  So it could be a speaker program?

16  **A.**  Correct.

17  **Q.**  Another speaker program in addition to the four we talked

18  about, right?

19  **A.**  Yes.

20  **Q.**  And then you sent her another email as a follow-up to

21  this.  Do you remember that?

22  **A.**  I don't.

23      MR. HORSTMANN:  Can we have 5255, please.

24      THE COURT:  That was 5255, wasn't it?

25      MR. HORSTMANN:  I think they're out of sequence

1   here.  Could we have 5254, please.

2          THE COURT:  Do you want 5255 moved into evidence?

3          MR. HORSTMANN:  Yes.

4          MR. YEAGER:  5254.

5          THE COURT:  5255 is the one he just finished with.

6          MR. YEAGER:  No objection, Your Honor.

7          THE COURT:  Okay.  5255 is in.  Now you're on to

8   5254?

9          MR. HORSTMANN:  Yes.

10          (Defendant Exhibit No. 5255 admitted.)

11   BY MR. HORSTMANN:

12   **Q.**  Do you remember receiving this email from Ms. Lee on

13   September 17 of 2012?

14   **A.**  I don't remember it, but I received it.

15   **Q.**  Your name's on it, right?

16   **A.**  Correct.

17   **Q.**  And this was an introductory email from her to the sales

18   reps who were in her region, correct?

19   **A.**  Correct.

20   **Q.**  And after that you received -- you sent 5255, correct?

21   **A.**  After that email?

22   **Q.**  Yes.

23   **A.**  Yes.

24   **Q.**  All right.  So an entire month goes by in which there's

25   no contact between you and Ms. Lee in terms of setting up

1    meetings that is reported in email or text message, right?

2              MR. YEAGER:  Can I ask for a basis, Your Honor?

3              THE COURT:  It's cross examination.  He's asking

4    the question.  It's overruled.

5    **A.**  I don't know if there was communication via email or text

6    in between this time.

7    BY MR. HORSTMANN:

8    **Q.**  Okay.  If we can have 5256.  Do you recall this email?

9    **A.**  Sorry?

10   **Q.**  Do you recall this email?

11   **A.**  No.

12   **Q.**  It was from you to Sunrise on October 16 of 2012.

13   **A.**  Yes.  It was from me.

14   **Q.**  Okay.

15             MR. HORSTMANN:  I'd offer it, Your Honor.

16             MR. YEAGER:  No objection, Your Honor.

17             THE COURT:  5256 is admitted.

18             (Defendant Exhibit No. 5256 admitted.)

19   BY MR. HORSTMANN:

20   **Q.**  The subject line reads "Info for visit," correct?

21   **A.**  Correct.

22   **Q.**  And once again you write to her that "Dinner with

23   Awerbuch on Tuesday the 30th, 6:00 to 6:30, confirmed with

24   him."

25             Okay?  That sounds like the three of you, right?

1  **A.**  Yes.

2  **Q.**  Okay.  And you call it a visit because this was the first

3  time that you had the opportunity to visit with her and she

4  had the opportunity to visit with you, right?

5  **A.**  I'm not sure if that was the first time.

6  **Q.**  You didn't call it a meeting, right?

7  **A.**  I called it a visit.

8  **Q.**  You didn't call it a follow-up meeting.  This was a

9  visit, right?

10  **A.**  Right.

11  **Q.**  And in her first introductory email from September 17,

12  she says, "I'm looking forward to meeting with all of you,"

13  right?

14  **A.**  Yes.

15  **Q.**  Okay.  And to the best of your memory, there's no other

16  email correspondence between the two of you regarding

17  meetings in the 30 days between September 17 and October 16,

18  right?

19  **A.**  Yeah.  I don't remember.

20  **Q.**  The government hasn't showed you any emails, right,

21  during that period of time that show that you met?

22  **A.**  Not that I recall.

23  **Q.**  Okay.  And instead you received an email from

24  Mr. Burlakoff looking to set up a meeting with you, correct?

25  **A.**  I'm not sure.

1    **Q.**  Do you remember Mr. Burlakoff sent those very wordy

2    emails to the sales teams about his arrival as VP of sales?

3    **A.**  I remember the email from earlier, yes.

4    **Q.**  You talked about those on direct, right?

5    **A.**  Yes.

6    **Q.**  Do you remember Mr. Burlakoff wanting to come out and

7    visit you very early on after your return from Phoenix?  Do

8    you remember that?

9    **A.**  I don't remember the dates, no.

10          MR. HORSTMANN:  May we have 5259.

11    **Q.**  Do you recall this email chain?

12    **A.**  Yes.

13    **Q.**  And can you look at page 2 as well.  All right.  There's

14    an individual there by the name of Shantel who is referenced

15    in an email that you're cc'd on?

16    **A.**  Yes.

17    **Q.**  Who is Shantel?

18    **A.**  I don't remember what her title was.

19    **Q.**  She appears to be somebody who was in charge of handling

20    travel for the sales reps, correct?

21    **A.**  It looks that way.

22    **Q.**  Do you remember in the emails you discussed on direct

23    examination that one of Mr. Burlakoff's things was that he

24    was going to be meeting with the top prospects and the top

25    sales reps in the immediate future?  Do you remember that?

1    **A.**   An email?

2    **Q.**   Yes.

3    **A.**   I don't remember that.

4    **Q.**   You don't remember that?  You don't remember being told

5    that he wanted to meet with Awerbuch as someone who was high

6    on his list?

7    **A.**   Oh, I remember him voicing that to me, yes.

8    **Q.**   Okay.  So here we are on the 25th, within days of you

9    returning from Phoenix, and he is booking travel plans to

10   meet with you and Dr. Awerbuch, correct?

11   **A.**   Correct.

12   **Q.**   All right.  And that meeting took place, right?

13   **A.**   Yes.

14   **Q.**   And that's the meeting that you talked about on direct

15   examination, right?

16   **A.**   Correct.

17   **Q.**   And that's the meeting where he told you and Dr. Awerbuch

18   that his plan was to get Dr. Awerbuch as many speaker

19   programs as he could possibly do in the near future, right?

20   **A.**   I don't remember that exact statement.

21   **Q.**   Well, the purpose was -- the purpose of Mr. Burlakoff

22   paying a visit to Dr. Awerbuch and you was to get the speaker

23   programs rolling, right?

24   **A.**   That's not how I remember it.

25   **Q.**   How do you remember it?

1    **A.**  I remember it as he wanted to see top customers.  So we

2    set up a -- so I set up a dinner with my top customer,

3    Dr. Awerbuch.

4    **Q.**  For the purpose of talking about what?

5    **A.**  Whatever the subjects Alec wanted to talk about were.

6    **Q.**  Okay.  And you knew what was important to him based on

7    the prior email he sent to the sales staff, right?

8    **A.**  I don't know what prior email you're talking about.

9    **Q.**  In which he talked about moving the speaker programs

10   along for top prospects, right?

11   **A.**  Yes.

12   **Q.**  And you know that Dr. Awerbuch at this point in time was

13   a top prospect, right?

14   **A.**  Correct.

15   **Q.**  So that was the point of the meeting was to talk about

16   speaker programs, right?

17   **A.**  One point of the meeting.

18   **Q.**  You didn't need Sunrise Lee to come and meet with you a

19   month later to talk about speaker programs, did you?

20   **A.**  I'm not sure I know what you're asking.

21   **Q.**  When you talked about the dosage units that were being --

22   that Subsys was prescribed in, this was something that you

23   had received emails about previously from Mr. Babich,

24   correct?

25   **A.**  I don't remember who the email came from, but we did

1  receive those emails.

2  **Q.**  This was long before Sunrise ever wrote you the email

3  introducing herself, right?

4  **A.**  I'd have to look at the date of the email to be sure.

5           MR. HORSTMANN:  Can we have 5295, please.

6           THE COURT:  Mr. Horstmann, you know these aren't

7  being shown to the jury until you move them in, right?

8           MR. HORSTMANN:  Yes.  I thought I moved the last

9  one in.

10          THE COURT:  5254 is not in.  5259 is not in.

11          MR. HORSTMANN:  I would move them both in.

12          MR. YEAGER:  No objection, Your Honor.

13          (Defendant Exhibit Nos. 5254 and 5259 admitted.)

14          THE COURT:  5295 is not in.

15          MR. HORSTMANN:  I think I need to use the ELMO for

16  it.

17  BY MR. HORSTMANN:

18  **Q.**  Do you remember receiving an email from Mr. Babich on

19  August 13, 2012?

20  **A.**  I was a part of "sales all" on this email.  I don't

21  remember specifically receiving this.

22  **Q.**  All right.  And the subject matter on this email is

23  "Titration slide"?

24  **A.**  Yes.

25  **Q.**  And it has the various Subsys dosage units that are

1    available on it, correct?

2    **A.**  Yes.

3    **Q.**  All right.  And in the email he says, "If a doctor starts

4    a patient too low" --

5            MR. HORSTMANN:  I'm sorry.  I'm going to move this

6    in, Your Honor.

7            MR. YEAGER:  No objection.

8            THE COURT:  5295.  No objection.  Okay.

9            (Defendant Exhibit No. 5295 admitted.)

10   BY MR. HORSTMANN:

11   **Q.**  If a doctor starts a patient too low and does not see

12   that patient for two weeks, odds are the patient will come

13   back in a month and not be advocate because the doctor did

14   not walk him up the titration ladder."

15           Do you see that?

16   **A.**  Yes.

17   **Q.**  It's essentially the same thing that Mr. Burlakoff said

18   in his email, his introductory email to the sales staff that

19   Mr. Yeager went through with you on direct examination,

20   right?

21   **A.**  Similar.

22   **Q.**  Okay.  And so Sunrise Lee didn't invent titration, right?

23   **A.**  Correct.

24   **Q.**  She didn't -- she wasn't the first person to raise the

25   issue of titration with you, correct?

1   **A.**   Correct.

2   **Q.**   This was something that you had heard from Mr. Burlakoff

3   and Mr. Babich previously, correct?

4   **A.**   Yes.

5           MR. HORSTMANN:  I move 5295 in.

6           THE COURT:  I think you already did.

7           MR. HORSTMANN:  Now I want to make sure I do.

8   BY MR. HORSTMANN:

9   **Q.**   Showing you 5294, not in evidence.  Do you see those

10  emails?

11  **A.**   Yes.

12  **Q.**   Do you recognize that chain of emails?

13  **A.**   Yes.

14  **Q.**   These emails are to -- from Mr. Burlakoff, and there's --

15  in particular a response to an email from Dr. Awerbuch,

16  correct?

17  **A.**   Yes.

18          MR. HORSTMANN:  I'd move this in, Your Honor.

19          MR. YEAGER:  No objection, Your Honor.

20          THE COURT:  It's admitted, 5294.

21          (Defendant Exhibit No. 5294 admitted.)

22  BY MR. HORSTMANN:

23  **Q.**   The emails that I showed you earlier showed that there

24  was a meeting between you and Dr. Awerbuch and Mr. Burlakoff

25  on September 2 of -- on October 2 of 2012, correct?

1    **A.**  Yes.

2    **Q.**  So on the 3rd, the next morning, Dr. Awerbuch writes,

3    "Good morning.  I had a great evening.  Thanks for dinner."

4    To Alec Burlakoff, correct?

5    **A.**  Correct.

6    **Q.**  And he attaches the resume for his son, correct?

7    **A.**  Correct.

8    **Q.**  Okay.  And so that's something that might have been

9    discussed at that meeting, right?

10   **A.**  Yes.

11   **Q.**  Along with titration and speaker programs and other

12   things that were on Mr. Burlakoff's agenda, right?

13   **A.**  Yes.

14   **Q.**  And Ms. Lee --

15          MR. HORSTMANN:  Your Honor, I move 5294 in.

16          THE COURT:  I think you already did.  Better safe

17   than sorry, though.

18          MR. HORSTMANN:  Exactly.

19   BY MR. HORSTMANN:

20   **Q.**  Ms. Lee was not in attendance at this meeting, right?

21   **A.**  Correct.

22          MR. HORSTMANN:  May we have 5285, please.  This is

23   not in evidence.

24          Your Honor, this is a document that has a native

25   Excel file associated with it.  I propose to put both in

 1   evidence.

 2            MR. YEAGER:  May I speak with counsel briefly?

 3            THE COURT:  You may.

 4   BY MR. HORSTMANN:

 5   **Q.**   I believe you mentioned on direct examination that you

 6   had access to certain prescription records regarding

 7   physicians that were your clients, correct?

 8   **A.**   Correct.

 9   **Q.**   And were these actual what's known as TIRF records?

10   **A.**   I don't know --

11   **Q.**   Have you ever heard that term before?

12   **A.**   I've heard the term TIRF before.

13   **Q.**   Okay.  And it's actually a massive Excel spreadsheet that

14   allows you to search particular physicians over a period of

15   time and determine what trends may affect your clients and

16   area, correct?

17   **A.**   I'm not sure what all included.  I can't see the

18   document.

19   **Q.**   All right.

20            MR. HORSTMANN:  Can we show the witness 5285?

21            THE COURT:  Mr. Yeager, did we decide if you were

22   objecting to this or not?

23            MR. YEAGER:  May we be seen at sidebar very

24   briefly, Your Honor?

25            THE COURT:  Yes.

1              (The following was held at sidebar.)

2              MR. YEAGER:  This is what's called a relay report.

3       It's calculated.  It's -- you heard it's a REMS status.  The

4       time and prescription for a TIRF medication has to be

5       recorded by a third party.  It came up with Ms. Brown

6       yesterday.  The company records every single prescription.

7       It's 100 percent accurate.  It's done around the country.

8       Only to the company that is selling the drug.  And this

9       represents data for when?

10             MR. HORSTMANN:  I think this is the --

11             MR. STOJILKOVIC:  March 1, 2012, to December 31,

12      2013.

13             MR. HORSTMANN:  Two years.

14             MR. LAZARUS:  Is it only for Subsys?

15             MR. HORSTMANN:  Yes.

16             MR. YEAGER:  I'm happy to have it come in, but

17      there's a whole bunch of documents like this.  I want to make

18      sure we're all on the same page if these come in and we're

19      not challenging any of these.

20             MR. KENDALL:  I have to see each document.

21             MR. STOJILKOVIC:  This is an Insys production.

22             MR. YEAGER:  It is.

23             MR. STOJILKOVIC:  I think we worked out a general

24      agreement that that we stipulated to the Insys documents.

25             MR. LAZARUS:  To the authenticity city.  That was

1    it.  These were authentic.

2           THE COURT:  Why would there be a REMS report that

3    didn't come in?

4           MR. KENDALL:  I don't know.  But I don't want to

5    the buy a pig in a poke.  If it's like this, that's fine.

6    But I don't know what he's going to show me.

7           MR. HORSTMANN:  My purpose is simply to have the

8    Excel spreadsheet that's not in a format that's usable

9    searched by the tech person here to determine how many

10   prescriptions were issued by Dr. Awerbuch from the period of

11   time that he started, March 29 of 2012 to October 30 of 2012.

12   That's it.

13          MR. LAZARUS:  Does he need to do this?

14          THE COURT:  Can't somebody just stipulate to the

15   number?

16          MR. YEAGER:  What's the number?

17          MR. HORSTMANN:  204.

18          MR. YEAGER:  With all due respect to Mr. Horstmann,

19   he misstated the numbers in his opening statements.  I'm not

20   confident that the numbers are accurate.

21          THE COURT:  We don't have to do it through this

22   witness, but at some point can we figure out the number and

23   stipulate to it?

24          MR. YEAGER:  Yes.  I'm happy to put it in.  I don't

25   want to have to do this with other stuff.  Let's just put in.

```
 1              THE COURT:  That seems reasonable.

 2              MR. STOJILKOVIC:  That's fine with us, Your Honor.

 3              THE COURT:  Mr. Kendall.

 4              MR. KENDALL:  I'm not saying -- when he puts a

 5    document in front of me, I'll give you a principled response.

 6    If it's like this and it's the same, I'll give you a

 7    principled response.

 8              THE COURT:  I assume that all documents that are in

 9    this format that are REMS documents from Insys are going to

10    come in.

11              MR. YEAGER:  Thank you, Your Honor.

12              (End of sidebar.)

13              THE COURT:  5285 is admitted.

14              (Defendant Exhibit No. 5285 admitted.)

15    A.  Yes.  I can see it.

16    BY MR. HORSTMANN:

17    Q.  And have you ever reviewed a document like this or

18    received a document like this during your employment at

19    Insys?

20    A.  Yes.

21    Q.  And this allows you to check on your own clients and see

22    how many prescriptions they've written during a period of

23    time, correct?

24    A.  Yes.

25              MR. HORSTMANN:  I'm done with that exhibit.  Thank
```

1  you.

2  **Q.**  Directing your attention to 5260.  It's not in evidence.

3         Do you recall writing this email to Alec Burlakoff

4  on October 3?

5  **A.**  Yes.

6  **Q.**  And this was immediately after you met him that evening

7  with Dr. Awerbuch, right?

8  **A.**  Yes.

9  **Q.**  And the three of you discussed your plans at dinner,

10  right?

11  **A.**  I don't know what you mean by "plans."

12  **Q.**  What you were going to do regarding speaker programs,

13  right?

14  **A.**  I don't remember plans around what we were doing for

15  speaker programs at that dinner.

16  **Q.**  All right.  So let's break this down then.  Directing

17  your attention to the first line --

18  **A.**  Okay.

19  **Q.**  -- you say, "Just wanted to thank you again for

20  everything yesterday.  We implemented our new strategy and we

21  saw results within literally hours."

22         Do you remember saying that to Alec Burlakoff?

23  **A.**  I emailed it to him.

24         MR. HORSTMANN:  Move this in, Your Honor.

25         MR. YEAGER:  No objection, Your Honor.

1          THE COURT:  What's the number?  5260, it's

2    admitted.  Yes.

3          (Defendant Exhibit No. 5260 admitted.)

4    BY MR. HORSTMANN:

5    **Q.**  Those are your words, right, "our new strategy"?

6    **A.**  Yes.

7    **Q.**  And it's based on your meeting with Dr. Awerbuch and Alec

8    Burlakoff the night before, right?

9    **A.**  Sorry.  I'm just reading the full email.  Can you repeat

10   your question?

11   **Q.**  This was something that you wrote in response to the

12   subjects that were discussed at your dinner meeting with

13   Dr. Awerbuch and Alec Burlakoff on October 2 of 2012, right?

14   **A.**  Yes.

15   **Q.**  And you chose the words "new strategy," right?

16   **A.**  Correct.

17   **Q.**  And you used those two words not just in the first line,

18   but you also used them again when talking about crushing

19   Fentora, right?

20   **A.**  Yes.

21   **Q.**  And what you're reporting here is that you're going to be

22   getting three prescriptions by the end of the day, right?

23   **A.**  Yes.

24   **Q.**  And one while you were still in the office.  That's four

25   total, right?

1   **A.**   Correct.

2   **Q.**   And you're reporting that Awerbuch and Lakkaraju are your

3   go-to guys, right?

4   **A.**   Yes.

5   **Q.**   And you knew they were fans already, right?

6   **A.**   Yes.

7   **Q.**   And you're expecting the new strategy to take your

8   territory to the next level, right?

9   **A.**   Yes.

10  **Q.**   Okay.  And the new strategy that you're talking about

11  there is lots of speaker programs for Dr. Awerbuch, right?

12  **A.**   I'm not sure if that was all of it.  That could have been

13  part of the strategy.

14  **Q.**   Well, look at the last -- look at the second half of the

15  last sentence, "and next time Awerbuch will be treating us

16  for dinner."

17          What did you mean by that?

18  **A.**   He had a great time at the dinner.

19  **Q.**   It was all about what a good time you guys had?

20  **A.**   That's why he wanted to treat us to dinner next time.

21  **Q.**   It wasn't about how much money Dr. Awerbuch would be

22  receiving as a result of your new strategy with the speaker

23  program?

24  **A.**   That's my thought is we had a great time.  That's what he

25  mentioned to me the following day.

1          MR. HORSTMANN:  May I have a moment, Your Honor?

2          THE COURT:  Yup.

3    BY MR. HORSTMANN:

4    **Q.**  With respect to the communication that you had with

5    Sunrise Lee by text message -- and I'm not going to take you

6    through every one of them, but you recall going through them

7    in rapid pace at the end your direct examination?

8    **A.**  Yes.

9    **Q.**  With respect to those text messages, those are the kinds

10   of -- kind of communication, back-and-forth communication you

11   had with her regarding speaker programs after SciMedica was

12   terminated, correct?

13   **A.**  It must have been because it looked like we were

14   coordinating our own speaker programs.

15   **Q.**  And it was something that you were still required to do

16   as a sales rep in the field was to provide speaker programs

17   for clients like Dr. Awerbuch, right?

18   **A.**  Yes.

19   **Q.**  Okay.  And he was expecting those, right?

20   **A.**  Dr. Awerbuch?

21   **Q.**  Yes.

22   **A.**  Yeah.  I would assume he was expecting them.

23   **Q.**  He didn't care whether SciMedica had been terminated or

24   not.  He was expecting speaker programs based on your meeting

25   with him and Alec Burlakoff on October 2, right, of 2012?

1    **A.**  I don't know if it was from that meeting why he was

2    expecting them, but yes, he was expecting programs.

3    **Q.**  You're left out there without SciMedica, attempting to

4    schedule speaker programs for one of the biggest prescribers

5    of Subsys in the country in order to keep him happy, right?

6    **A.**  Can you ask that question again?

7    **Q.**  So you're out there in the field without SciMedica to

8    help you, and you still have to schedule speaker programs for

9    a doctor who's one of the biggest prescribers of Subsys in

10   the country, right?  You're left on your own to do that?

11   **A.**  Yes.

12   **Q.**  And you did the best you could with that, right?

13   **A.**  Yes.

14   **Q.**  But you cut some corners, right?

15   **A.**  As far as scheduling?

16   **Q.**  Yes.  And attendance and attendance sheets.

17   **A.**  I had -- the way that we were asked to schedule them

18   required me to cut corners.

19   **Q.**  You were doing what Alec Burlakoff told you to do, right?

20   **A.**  As far as schedule the programs?

21   **Q.**  Yes.

22   **A.**  The programs scheduling, they were allocated, came from

23   Sunrise.

24   **Q.**  Okay.  But you knew that Sunrise worked for Alec, right?

25   **A.**  I knew that.

1    **Q.**  And she didn't make up the dates, right?  You did.

2    **A.**  Correct.

3    **Q.**  So you provide the dates to Sunrise, right?

4    **A.**  Yes.

5    **Q.**  And you say who's going to be there on specific dates,

6    right?

7    **A.**  Correct.

8    **Q.**  And she reports back to Alec what's going on, right?

9    **A.**  Correct.

10   **Q.**  And then you show up for the speaker program, right?

11   **A.**  Yes.

12   **Q.**  So all Sunrise does is communicate between you and Alec,

13   correct?

14   **A.**  Communicate what?

15   **Q.**  About the speaker programs, right?

16   **A.**  I'm not sure her communication with -- what Alec was.

17   **Q.**  She was following the same instructions to schedule these

18   speaker programs, right?  This wasn't her idea?

19   **A.**  My thought was it was Alec Burlakoff's idea.

20   **Q.**  You think?

21   **A.**  That was my thought.  Nobody ever actually told us whose

22   idea it was.

23   **Q.**  Well, he did.  Right?  He told you many times.  He told

24   you in emails.  He told you at dinner meetings.  Schedule the

25   speaker programs.  It's his idea.

1    **A.**  I was referring to the way that we scheduled them.  I'm

2    sorry.

3              MR. HORSTMANN:  May I have a moment, Your Honor?

4              THE COURT:  Yes.

5              MR. HORSTMANN:  Before I leave the podium, have I

6    moved everything into evidence that I touched?

7              THE COURT:  I think so.  Karen?  Yes.

8              MR. HORSTMANN:  No further questions, Your Honor.

9                        REDIRECT EXAMINATION

10   BY MS. MINER:

11   **Q.**  Good afternoon, Mr. Szymanski.

12   **A.**  Good afternoon.

13   **Q.**  My name is Tracy Miner, and I represent Mike Gurry.

14             You began working for Insys in February of 2012,

15   correct?

16   **A.**  February or March.

17   **Q.**  Prior to the launch, right?

18   **A.**  Correct.

19   **Q.**  And the product was launched in March, right?

20   **A.**  Yes.

21   **Q.**  And Mr. Gurry was not with the company when you were

22   hired, right?

23   **A.**  I'm not 100 percent sure.

24   **Q.**  You don't recall him being there, do you?

25   **A.**  I don't recall meeting him.

1    Q.  After the product was launched, doctors started to write

2    it; isn't that right?

3    A.  Yes.

4    Q.  And you started to call on Dr. Awerbuch, right?

5    A.  Correct.

6    Q.  And in fact, Dr. Awerbuch had written prescriptions for

7    Subsys before you ever got to his office, right?

8    A.  Correct.

9    Q.  He was just having problems getting the insurance

10   companies to pay for them?

11   A.  At the time when he wrote them at the beginning, he was

12   having issues with the pharmacy ordering the product.

13   Q.  But he wasn't getting it done, in any event?

14   A.  Correct.

15   Q.  And there was a prior approval process required for

16   Subsys, right?

17   A.  In most occasions, yes.

18   Q.  And that was cumbersome for Dr. Awerbuch, right?

19   A.  Yes.

20   Q.  A lot of products have prior approval requirements,

21   right?

22   A.  Correct.

23   Q.  In fact, Dr. Awerbuch had a person in his office that

24   basically spent most of her time doing prior approvals.  Her

25   name was Teesha, I think you said?

1   **A.**   Yes.

2   **Q.**   She did them for Subsys, and she did them for other

3   products that Dr. Awerbuch was writing; isn't that right?

4   **A.**   Yes.

5   **Q.**   And initially when you had questions about insurance

6   process or reimbursement, you would call Mike Gurry.  Is that

7   fair?

8   **A.**   Yes.

9   **Q.**   And you recall being asked on direct about a letter of

10  medical necessity?

11  **A.**   Correct.

12  **Q.**   And you don't recall yourself ever writing them, correct?

13  **A.**   I don't recall, but I could have.

14  **Q.**   And that was something that was required if there was a

15  denial and the doctor appealed.  Isn't that fair?

16  **A.**   Correct.  Or sometimes it was required with an initial

17  prior authorization.

18  **Q.**   Fair enough.  And at some point you asked to -- you were

19  looking for a form that you could provide to the doctors.  Do

20  you recall that?

21  **A.**   A form?

22  **Q.**   A form of letter, a letter of medical necessity?

23  **A.**   Like an outline of one?

24  **Q.**   Yes.

25  **A.**   I remember trying to get one of those, yes.

1          MS. MINER:  Could we have 5261 on the screen.

2     **Q.**  This is an email chain between you and Mike Gurry.  Is

3     that fair?

4     **A.**  Yes.

5     **Q.**  Dated about September 10, 2012?

6     **A.**  Yes.

7          MS. MINER:  I'd move its admission.

8          MR. YEAGER:  No objection, Your Honor.

9          THE COURT:  Admitted.

10         (Defendant Exhibit No. 5261 admitted.)

11    BY MS. MINER:

12    **Q.**  If we could go down to the bottom of page 1.  And you see

13    where it says "Teesha," the second line in.

14         That's the woman at Dr. Awerbuch's office, right?

15    **A.**  Yes.

16    **Q.**  The lady in the office who does all the PA and appeals?

17    **A.**  Yes.

18    **Q.**  She would like a template or sample appeal, but I told

19    her that we cannot do that, but we will have Mike call you.

20    Correct?

21    **A.**  Yes.

22    **Q.**  And the Mike was Mike Gurry, right?

23    **A.**  Correct.

24    **Q.**  And if you go to the top, Mike Gurry responds and says

25    that he did, in fact, call Teesha at your request, right?

1    **A.**   Yes.

2    **Q.**   And that "I let her know we didn't have one of those

3    approved."

4            In other words, you didn't have a sample of a

5    letter of medical necessity ready, correct?

6    **A.**   Correct.

7    **Q.**   But they were in the process of seeing if they could

8    produce one for offices, right?

9    **A.**   Yes.

10   **Q.**   You've been in pharma a long time, correct?

11   **A.**   At this point?

12   **Q.**   No, no.  As you sit here today.

13   **A.**   I was in there for four and a half years in pharma.

14   **Q.**   And you know that sales reps are not allowed to give

15   stuff to doctors without it going through an approval

16   process, right?

17   **A.**   Yes.

18   **Q.**   You're not allowed to give homemade bread, in other

19   words?

20   **A.**   Correct.

21   **Q.**   And what Mr. Gurry is saying here is we have to get this

22   approved before we can give it to Dr. Awerbuch.  Isn't that

23   fair?

24   **A.**   Yes.

25   **Q.**   And you dealt with Mike Gurry until Liz Gurrieri came

1    along, correct?

2    **A.**   Yes.

3    **Q.**   And then once Liz Gurrieri came along, she took over the

4    IRC, correct?

5    **A.**   Correct.

6    **Q.**   You dealt with her or employees that worked directly for

7    her, correct?

8    **A.**   Yes.

9    **Q.**   And you would deal with her if the doctors had questions,

10   correct?

11   **A.**   Yes.

12   **Q.**   If you wanted your opt-in put to the top of the line;

13   isn't that correct?

14   **A.**   Yes.

15   **Q.**   And you actually asked for opt-ins to be put to the

16   beginning of the line occasionally, did you not?

17   **A.**   I could have.

18   **Q.**   Because that helped you and it helped your doctor, right?

19   **A.**   Yes.

20           MR. HORSTMANN:   And if I could have 5269 put on the

21   screen for the witness.

22   **Q.**   This is an email from you, correct?

23   **A.**   Yes.

24   **Q.**   To Liz Gurrieri, right?

25   **A.**   Correct.

1    **Q.**  And it relates to one of Dr. Awerbuch's patients, right?

2    **A.**  Correct.

3              MS. MINER:  I'd move its admission.

4              MR. YEAGER:  No objection, Your Honor.

5              THE COURT:  5269 is admitted.

6              (Defendant Exhibit No. 5269 admitted.)

7    BY MS. MINER:

8    **Q.**  This is an example of where you were asking Ms. Gurrieri

9    to put one of Dr. Awerbuch's patients at the top of the list,

10   correct?

11   **A.**  Yes.

12   **Q.**  In fact, this patient happened to be one of

13   Dr. Awerbuch's medical assistant's mother, correct?

14   **A.**  Yes.

15   **Q.**  So he wrote Subsys for the family member of one of his

16   assistants, right?

17   **A.**  Yes.

18              MS. MINER:  Nothing further.

19              MR. TYRRELL:  May I proceed, Your Honor?

20              THE COURT:  You may.

21              MR. TYRRELL:  Thank you.

22                          CROSS EXAMINATION

23   BY MR. TYRELL:

24   **Q.**  Good afternoon, Mr. Szymanski.

25   **A.**  Good afternoon.

1    **Q.**  You and I have never met, have we?

2    **A.**  No.

3    **Q.**  During your time at Insys, you never reported directly to

4    Rich Simon, and he never directly supervised you, correct?

5    **A.**  Correct.

6    **Q.**  You mentioned a meeting that took place in Michigan in

7    May of 2014 with Dr. Awerbuch, Mr. Burlakoff, you, and

8    Mr. Simon.  Do you recall the date of that meeting?

9    **A.**  I don't.

10            MR. TYRRELL:  Your Honor, could we pull up

11   Exhibit 5282, please, for the witness, the Court, and

12   counsel.

13            And if we could highlight the bottom email.

14   **Q.**  It's an email there from you to Mr. Simon, to Rich, dated

15   April 16, 2014.  Do you see that?

16   **A.**  Yes.

17   **Q.**  Looking at that, does that refresh your recollection as

18   to the date of the meeting being May 12 or May 13?

19   **A.**  If those are the days they ended up coming out.

20            MR. TYRRELL:  Your Honor, I'd move for the

21   admission of the exhibit.

22            MR. YEAGER:  No objection.

23            THE COURT:  5282 is admitted.

24            (Defendant Exhibit No. 5282 admitted.)

25   BY MR. TYRRELL:

1    **Q.**  So again, the initial email at the bottom there is dated

2    April 16.  Do you recall that Dr. Awerbuch had been arrested

3    about a week before the meeting actually took place, which

4    would have been on or about May 6?

5    **A.**  I remember it being shortly before the meeting.

6    **Q.**  So the plans for you to meet with Burlakoff and Rich had

7    actually been made weeks before Dr. Awerbuch was arrested,

8    correct?

9    **A.**  Yes.

10   **Q.**  So Rich was not there to talk about the arrest of the

11   doctor.  He was there actually to meet some of the doctors

12   that you had been calling on during your time with the

13   company?

14   **A.**  Yeah.  That was the purpose of the trip.

15   **Q.**  And in fact, this was the first time that Rich had ever

16   come to Michigan to meet with any of those doctors, including

17   Dr. Awerbuch?

18   **A.**  I'm not sure if that was his only time or not, to my

19   memory.

20   **Q.**  Well, do you remember any dates that he was there before?

21   **A.**  Before this?  No.

22   **Q.**  So focusing on the meeting with Dr. Awerbuch, isn't it

23   Dr. Awerbuch who called Burlakoff to request the meeting?

24   **A.**  I don't remember how it was initially arranged.

25   **Q.**  Wouldn't that have made sense if Dr. Awerbuch was trying

1   to record you, the person he'd been dealing with for years

2   and who was involved in these activities you've described,

3   and Mr. Burlakoff who he was dealing with, too?  Wouldn't it

4   make sense that he would call you or Alec to try and have

5   that meeting and record you?

6   **A.**   Yeah, it would make sense for him to contact myself.

7   **Q.**   And when you got to the meeting, you had to introduce

8   Rich to Dr. Awerbuch because he didn't know Rich, correct?

9   **A.**   I don't remember that part of the meeting.

10   **Q.**   And during the meeting, Alec and Dr. Awerbuch did all the

11   talking, correct?

12   **A.**   Majority of the talking, correct.

13   **Q.**   And the gist of the conversation was basically

14   Dr. Awerbuch saying "I need help," and Burlakoff putting him

15   off, correct?

16   **A.**   Correct.

17   **Q.**   And this is the one and only time that Rich ever came to

18   Michigan and met with Dr. Awerbuch or anybody else you were

19   calling on?

20   **A.**   From what I recall, yes.

21           MR. TYRRELL:  Thank you.  I have no further

22   questions.

23           MR. KENDALL:  A couple, Your Honor, if I may.

24                     CROSS EXAMINATION

25   BY MR. KENDALL:

1    **Q.**  Good afternoon, Mr. Szymanski.

2    **A.**  Good afternoon.

3    **Q.**  My name is Mike Kendall.  I represent Joe Rowan.

4           Fair to say, starting in the summer of 2015 for

5    your last year in Insys, you became a district manager and

6    you reported to Joe.  Is that correct?

7    **A.**  I remember reporting to Joe for a short period of time.

8    **Q.**  And that's when you became a DM or after you became the

9    DM?

10   **A.**  Could have been.

11   **Q.**  And things got realigned so Michigan was all of a sudden

12   reporting to Joe when it hadn't been before, correct?

13   **A.**  Yes.

14   **Q.**  And that was about a year after all the events with

15   Dr. Awerbuch had stopped, correct?

16   **A.**  Correct.

17   **Q.**  Thank you.

18          MR. STOJILKOVIC:  Your Honor, I do have some cross.

19   I don't know if you want me to get underway.

20          THE COURT:  How long do you have?

21          MR. STOJILKOVIC:  I'm not certain that I'll

22   complete it today.  I can start and go for ten minutes.

23          THE COURT:  He's trying to get home.

24          Mr. Yeager, do you have a lot of redirect?

25          MR. YEAGER:  I don't.

1    THE COURT:  Let's see if we can get him done.

2                    CROSS EXAMINATION

3    BY MR. STOJILKOVIC:

4    **Q.**  Good afternoon, sir.

5    **A.**  Good afternoon.

6    **Q.**  My name is Kosta Stojilkovic.  I represent Dr. Kapoor.

7    We've never met, right?

8    **A.**  Correct.

9    **Q.**  You testified a little bit about another doctor beyond

10   Awerbuch, right?

11   **A.**  Yes.

12   **Q.**  Dr. Lakkaraju, correct?

13   **A.**  Yes.

14   **Q.**  That was another of your big customers, right?

15   **A.**  I don't think he was a big customer.

16   **Q.**  Okay.  But you had emailed with Sunrise Lee about him,

17   right?

18   **A.**  Yes.

19   **Q.**  Okay.  And Dr. Lakkaraju is someone who liked Subsys from

20   fairly early on in your time at the company, right?

21   **A.**  Correct.

22   **Q.**  Can you take a look at what's been marked for

23   identification as Exhibit 5251.  It will come up on your

24   screen, for government counsel as well.

25            Do you recognize this is an email chain with the

1  bottom email on page 2 is from you, right?

2  **A.**  Yes.

3  **Q.**  This is to your immediate supervisor at the time, Lisa

4  Schecter, right?

5  **A.**  Correct.

6          MR. STOJILKOVIC:  I'd move the admission of 5251

7  and move to publish.

8          MR. YEAGER:  No objection.

9          THE COURT:  It's admitted.

10          (Defendant Exhibit No. 5251 admitted.)

11  BY MR. STOJILKOVIC:

12  **Q.**  If we could go to page 3.  You're reporting to your

13  supervisor at the time about Dr. Lakkaraju, right?  There's a

14  paragraph on him.  Do you see that?

15  **A.**  Yes.

16  **Q.**  And you said about him that he loves Subsys and is

17  starting to be his go-to ROO.  Right?

18  **A.**  Yes.

19  **Q.**  By "ROO," you meant in this class of rapid acting opioid

20  products?

21  **A.**  Correct.

22  **Q.**  And he's identifying more and more patients as we meet.

23          Was this a truthful report you were giving to your

24  supervisor, Ms. Schecter?

25  **A.**  Yes.

1  **Q.**  And this was before Alec Burlakoff had been elevated to

2  head of sales, right?

3  **A.**  It was in July.

4  **Q.**  This email was in July?

5  **A.**  Yes.

6  **Q.**  And Dr. Lakkaraju, let's be clear, he did do some speaker

7  events, right, as time went on?

8  **A.**  Yes.

9  **Q.**  Now, you testified on direct that if someone, a speaker

10  didn't write enough prescriptions, they would be cut from the

11  ISP.  Do you recall that?

12  **A.**  That they would be cut?

13  **Q.**  They would not get more speaker programs?

14  **A.**  Correct.

15  **Q.**  Okay.  You didn't mean to suggest that was the case every

16  time, did you?

17  **A.**  Not 100 percent of the time.

18  **Q.**  Well, and let me also ask you, you indicated on direct

19  that for someone to get a number of speaker programs, they

20  needed to be a high prescriber.  Do you remember that?

21  **A.**  Correct.

22  **Q.**  That wasn't true all of the time, was it?

23  **A.**  At a certain point it was.

24  **Q.**  Oh, really?  Now, sir, I've gone through the records, and

25  I'm not going to make had you go through one of these.  I'll

1    represent to you --

2              MR. YEAGER:  Objection.

3              MR. STOJILKOVIC:  I'll make a representation and

4    ask a follow-up question.

5              MR. YEAGER:  Representation, Your Honor?  Is he

6    testifying?

7              THE COURT:  Are you objecting to him saying "I'm

8    not going to make you go through these"?

9              MR. YEAGER:  No.  I'm objecting to him saying I'm

10   going to make a representation I've gone through the records.

11             THE COURT:  It is improper, but where are you going

12   with it?

13             MR. STOJILKOVIC:  I want to ask him about the

14   number of prescriptions that Dr. Lakkaraju wrote in 2012.

15             THE COURT:  Then just ask him.

16             MR. STOJILKOVIC:  Okay.

17   BY MR. STOJILKOVIC:

18   Q.  Would it be consistent with your recollection,

19   understanding that it's been a number of years, that

20   Dr. Lakkaraju wrote about 26 Subsys prescriptions in the

21   entirety of 2012?  Ballpark fair?

22   A.  Could be.

23   Q.  And is it consistent with your recollection that he got

24   paid $3,200 in speaker fees that year by Insys?  Ballpark?

25   A.  Could be.

1    **Q.**   Okay.  And by contrast, Dr. Awerbuch wrote 417 scripts,

2    give or take, in that year.  Ballpark fair?

3    **A.**   Fair.

4    **Q.**   And he was paid $8,000 in speaker fees in that year?

5    **A.**   In 2012?

6    **Q.**   Yes.

7    **A.**   Could be.

8    **Q.**   You have to reason to doubt that?

9    **A.**   Yeah.

10   **Q.**   Dr. Lakkaraju continued to be in the speaker program into

11   2013, 2014, and 2015, right?

12   **A.**   I'm not sure how long he was in the program.

13   **Q.**   Okay.  You don't have any reason to doubt that from

14   September 2014 to August 2015 he received $33,000 in speaker

15   payments?

16   **A.**   This was Dr. Lakkaraju?

17   **Q.**   Yes.

18   **A.**   I don't remember doing -- what were the dates?

19   **Q.**   Between September of 2014 and August of 2015,

20   Dr. Lakkaraju received $33,000 from Insys in speaker

21   payments.

22   **A.**   That doesn't sound right to me, but --

23   **Q.**   Had you been promoted by that point or in that range?

24   **A.**   I had been promoted to a district manager.  I also

25   believe around that point he had moved to San Diego.

1    **Q.**  I see.  So you may not have been tracking him at that

2    point?

3    **A.**  Correct.

4    **Q.**  Okay.  So you don't know whether or not he got $33,000

5    from Insys?

6    **A.**  I'm not sure.

7    **Q.**  And would it surprise you that during this period where,

8    according to the records, he got $33,000 from Insys, he wrote

9    a grand total of zero Subsys prescriptions?

10   **A.**  Yes.

11   **Q.**  Based on what you testified on direct, that wouldn't have

12   happened.

13   **A.**  Typically, no.

14   **Q.**  Now, I want to go through a couple of documents that you

15   were shown on direct.

16           MR. STOJILKOVIC:  Could we put up -- they're in

17   evidence -- Exhibit, first, 175 and publish it to the jury.

18   **Q.**  This is one email that Mr. Burlakoff sent to the sales

19   team on September 17.  Do you recall being asked about this

20   one?

21   **A.**  Yes.

22   **Q.**  Now, this email talks about getting speakers who have a

23   lot of clinical experience, right?

24   **A.**  Correct.

25   **Q.**  And it talks about wanting the speakers to have higher

1    prescription rates than their attendees, right?

2    **A.**  Yes.

3    **Q.**  And that's so that a speaker can educate his attendees or

4    her attendees, right?

5    **A.**  Yes.

6    **Q.**  It was pointed out to you, and you can see it on the

7    screen there, that a copy of this email went to my client,

8    Dr. Kapoor, right?

9    **A.**  Correct.

10   **Q.**  This email doesn't say anything about speaker programs

11   where there would be no attendees, does it?

12   **A.**  It does not.

13   **Q.**  Those kind of communications Alec Burlakoff had with you

14   directly and not on an email with Dr. Kapoor, right?

15   **A.**  I may have had conversations with Alec.  A lot of them

16   were with Sunrise.

17   **Q.**  You didn't just may have had conversations.  You

18   testified under oath on direct that when the new program came

19   into effect, you went and complained to Alec Burlakoff and he

20   told you "I don't care if speakers show up"?

21   **A.**  Correct.

22   **Q.**  That was your testimony today, right?

23   **A.**  Yes.

24   **Q.**  He don't put that in an email cc'ing Dr. Kapoor, did he?

25   **A.**  No.

1    **Q.**  And he told you "Do it or I will find somebody who will."

2    He didn't put that in an email cc'ing Dr. Kapoor?

3    **A.**  Not that I know of.

4    **Q.**  And that was his -- those were his words, not the words

5    of any defendant in this case, right?

6    **A.**  Yes.

7    **Q.**  You were also shown -- and I'd ask that it be

8    published -- 445.  This is the second email same day from

9    Mr. Burlakoff.  And this talks about titration, right?

10   **A.**  Yes.

11   **Q.**  And this one also again copies my client, Dr. Kapoor,

12   right?

13   **A.**  Correct.

14   **Q.**  And he says near the bottom of the first paragraph, "I

15   fully understand that a physician does what he or she wants

16   to do as it pertains to prescribing for their patients."

17         Do you see that?

18   **A.**  Yes.

19   **Q.**  So there's nothing in this email that would suggest to

20   Dr. Kapoor or anyone else reading it that physicians were not

21   making up their own minds about prescriptions?

22   **A.**  About the initial prescriptions, I would say that's

23   accurate.

24   **Q.**  Oh.  Okay.  And then the email talks about titration,

25   right?

1   **A.**   Yes.

2   **Q.**   And it says right there -- you have it in a good place,

3   Randall -- "Each new Subsys patient should be started at 100

4   micrograms per the package insert," right?

5   **A.**   Yes.

6   **Q.**   And that is what the FDA label says, right?

7   **A.**   Yes.

8   **Q.**   At least what it said in 2012?

9   **A.**   Yes.

10  **Q.**   So nothing inappropriate about that statement, right?

11  **A.**   No.

12  **Q.**   But you knew at the time, did you not, that

13  100 micrograms works for only a small minority of patients?

14  **A.**   It works per the label.

15  **Q.**   It works per the label for a grand total of 4 percent of

16  the patients, right?

17  **A.**   Correct.

18  **Q.**   The other 96 percent need more for it to work per the

19  label and the study cited in the label, right?

20  **A.**   Correct.

21  **Q.**   Okay.  And on page 2 of this document, Burlakoff

22  writes -- I'm in the second paragraph -- "I will go as far as

23  to say that we are truly better off dissuading a physician to

24  prescribe Subsys for 100 or 200 microgram until we have ample

25  time to review how clinical trial data with them via the

1  Rauck study."

2          Do you see that?

3  **A.**  Yes.

4  **Q.**  The Rauck study is the study that's cited in the label,

5  right?

6  **A.**  I believe so.

7  **Q.**  Okay.  The one that says that 100 micrograms only works

8  for 4 percent of the folks, right?

9  **A.**  Yes.

10  **Q.**  And 200 micrograms only works for 27 percent of the

11  folks?

12  **A.**  That's what the label says.

13  **Q.**  And the problem is that if a doctor prescribes a dose

14  that doesn't work to someone who has breakthrough cancer

15  pain, they're less likely to want to stay on Subsys, right?

16  **A.**  Can you ask that question one more time?

17  **Q.**  Absolutely.  The problem is that if a doctor prescribes a

18  dose to a patient that doesn't work for that patient, it's

19  not effective for that patient and the patient is not

20  titrated up to a higher dose, they're probably not going to

21  want to stick with Subsys?

22  **A.**  Correct.

23  **Q.**  And if they were coming from an Actiq or Fentora that was

24  providing some relief, they're probably want to go back to

25  something that worked, right?

1    **A.**   They could.

2            THE COURT:  How much do you have left?

3            MR. STOJILKOVIC:  More than a minute.

4            THE COURT:  More than five minutes?

5            MR. STOJILKOVIC:  Can I consult?

6            THE COURT:  Yes.  If he's between zero and five

7    minutes, can you guys manage it?

8            MR. STOJILKOVIC:  Your Honor, let me try to finish

9    it.

10           THE COURT:  Okay.  I don't want to rush you, but I

11   also -- if we can get this done for him, I'd just as soon do

12   that.

13           MR. STOJILKOVIC:  Absolutely.

14   BY MR. STOJILKOVIC:

15   **Q.**   Mr. Szymanski, are you aware that in 2013 the government

16   subpoenaed records from Insys?

17   **A.**   Yes.

18   **Q.**   Are you aware that they specifically sought records about

19   you?

20   **A.**   I don't recall.  I know they subpoenaed my records.

21   **Q.**   Okay.  But nobody from the government came to talk to you

22   about this case until one month ago, right?

23   **A.**   I don't recall if I had contact with them prior, but I

24   didn't speak to them about it.

25   **Q.**   Okay.  So the government sought your records in 2013, but

1   you first sat down with them a month ago, right?

2   **A.**  Yes.

3   **Q.**  And that was after they had already decided to charge

4   these defendants, right?

5   **A.**  Correct.

6   **Q.**  And they didn't charge you, right?

7   **A.**  Correct.

8   **Q.**  You haven't pled to anything?

9   **A.**  Correct.

10  **Q.**  In fact, your testimony today is pursuant to an immunity

11  agreement?

12  **A.**  Yes.

13  **Q.**  But you did commit crimes, right?

14  **A.**  Yes.

15  **Q.**  You conducted sham speaking events?

16  **A.**  Yes.

17  **Q.**  You were at a dinner with Alec Burlakoff where

18  Dr. Awerbuch agreed to such events?

19  **A.**  Yes.

20  **Q.**  When you showed up to Dr. Awerbuch and you saw the cops,

21  you did a U-turn and got out of Dodge, right?

22  **A.**  Correct.

23  **Q.**  You work in sales now, right?

24  **A.**  Yes.

25  **Q.**  Did you tell your new employer when you applied to them

1    that you had previously been conducting sham speaker events

2    at Insys?

3            MR. YEAGER:  Objection.  Relevance.

4            THE COURT:  Overruled.

5    **A.**  Can you rephrase the question?

6    BY MR. STOJILKOVIC:

7    **Q.**  Did you tell your current employer when you applied to

8    them for a sales job that while you were an Insys employee

9    you had been conducting sham speaking events and forging

10   names and signatures on forms?

11   **A.**  No.

12   **Q.**  And to your knowledge, the government is not going to

13   take your testimony today and send it to your employer so

14   that they have a fuller picture of who you are?

15   **A.**  Correct.

16   **Q.**  Pretty good deal, huh?  For you?

17   **A.**  I guess so.

18           MR. STOJILKOVIC:  Thank you, Your Honor.

19           THE COURT:  Anybody else?  Government?

20           MR. YEAGER:  Nothing, Your Honor.

21           THE COURT:  You're excused.  Thank you all for the

22   extra few minutes.  I'm sure everybody appreciates it.  Heard

23   you on vacation, so that week we'll be off Monday, Tuesday,

24   Wednesday.  We'll sit Thursday and Friday.

25           My instructions every night:  Keep an open mind,

1    don't communicate with anybody about the case, and no

2    homework.  Have a good night.  See you tomorrow at 10:00.

3              THE CLERK:  All rise for the jury.

4              (The jury exits the courtroom.)

1                    - - - - - - - - - - -

2                         CERTIFICATION

3

4          I certify that the foregoing is a correct

5     transcript of the record of proceedings in the above-entitled

6     matter to the best of my skill and ability.

7

8

9

10    /s/ Joan M. Daly               January 30, 2019

11    _____        _____

12    Joan M. Daly, RMR, CRR         Date
      Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX OF WITNESSES

2     WITNESS                                              PAGE

3

      MAURY RICE
4
          Direct Examination by Mr. Lazarus...................  22
5         Cross Examination by Ms. Miner......................  63
          Cross Examination by Mr. Tyrrell....................  77
6         Cross Examination by Mr. Stojilkovic...............  78
          Cross Examination by Mr. Horstmann.................  88
7         Cross Examination by Mr. Kendall....................  89
          Redirect Examination by Mr. Lazarus................  92
8         Recross Examination by Ms. Miner...................  100
          Recross Examination by Mr. Tyrrell.................  101

9

10    BRETT SZYMANSKI

11        Direct Examination by Mr. Yeager...................  102
          Cross Examination by Mr. Horstmann.................  201
12        Redirect Examination by Ms. Miner..................  232
          Cross Examination by Mr. Tyrell....................  238
13        Cross Examination by Mr. Kendall...................  241
          Cross Examination by Mr. Stojilkovic...............  243

14

15

16

17

18

19

20

21

22

23

24

25

E X H I B I T S

<u>Defendant Exhibit</u>                    <u>Received</u>

5204      . . . . . . . . . . . . . . . . . . .        66

5205      . . . . . . . . . . . . . . . . . . .        67

5207      . . . . . . . . . . . . . . . . . . .        68

5208      . . . . . . . . . . . . . . . . . . .        71

5209      . . . . . . . . . . . . . . . . . . .        74

5211      . . . . . . . . . . . . . . . . . . .        75

5251      . . . . . . . . . . . . . . . . . . .       244

5252      . . . . . . . . . . . . . . . . . . .       208

5254      . . . . . . . . . . . . . . . . . . .       218

5255      . . . . . . . . . . . . . . . . . . .       212

5256      . . . . . . . . . . . . . . . . . . .       213

5259      . . . . . . . . . . . . . . . . . . .       218

5260      . . . . . . . . . . . . . . . . . . .       227

5261      . . . . . . . . . . . . . . . . . . .       235

5269      . . . . . . . . . . . . . . . . . . .       238

5282      . . . . . . . . . . . . . . . . . . .       239

5285      . . . . . . . . . . . . . . . . . . .       225

5294      . . . . . . . . . . . . . . . . . . .       220

5295      . . . . . . . . . . . . . . . . . . .       219

| | Government Exhibit | | Received |
|---|---|---|---|
| 1 | | | |
| 2 | 41 | ...................... | 149 |
| 3 | 50 | ...................... | 114 |
| 4 | 445 | ...................... | 130 |
| 5 | 586 | ...................... | 167 |
| 6 | 587 | ...................... | 170 |
| 7 | 0674-02 | ...................... | 157 |
| 8 | 688 | ...................... | 93 |
| 9 | 792 | ...................... | 164 |
| 10 | 1488 | ...................... | 46 |
| 11 | 1537 | ...................... | 190 |
| 12 | 1541 | ...................... | 190 |
| 13 | 1542 | ...................... | 190 |
| 14 | 1543 | ...................... | 190 |
| 15 | 1545 | ...................... | 190 |
| 16 | 1546 | ...................... | 190 |
| 17 | 1547 | ...................... | 190 |
| 18 | 1548 | ...................... | 190 |
| 19 | 1549 | ...................... | 190 |
| 20 | 1550 | ...................... | 190 |
| 21 | 1565 | ...................... | 190 |
| 22 | 1566 | ...................... | 190 |
| 23 | 1567 | ...................... | 190 |
| 24 | 1568 | ...................... | 190 |
| 25 | 1571 | ...................... | 190 |

1

GOVERNMENT EXHIBITS (continued)

2

3        1572        ....................        190

4        1573        ....................        190

5        1574        ....................        190

6        1575        ....................        190

7        1576        ....................        190

8        1577        ....................        190

9        1578        ....................        190

10       1579        ....................        190

11       1580        ....................        190

12       1630        ....................         51

13       1767        ....................         32

14       1774        ....................        145

15       5196        ....................         93

16

17

18

19

20

21

22

23

24

25