## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

_____
)
UNITED STATES OF AMERICA,      )
)
v.                             )          DOCKET NO.: 16-10343ADB
)
SUNRISE LEE,                   )
              Defendant.       )          **LEAVE TO FILE GRANTED**
_____)         **ON 1/21/20.  (Doc. 1160)**

## DEFENDANT LEE'S SENTENCING MEMORANDUM AND INCORPORATED MOTION FOR DEPARTURE AND/OR VARIANCE FROM THE SENTENCING GUIDELINES[1]

NOW COMES the defendant, Sunrise Lee, ("Lee"), through counsel, and hereby moves this Honorable Court for a downward departure and/or variance pursuant to 18  U.S.C. § 3553 from the otherwise applicable guideline range both as recommended by the Probation Department in the Presentence Report, ("PSR"), and/or from the defendant's final Guideline Sentence as determined by the Court.[2]  The defendant also submits the instant Memorandum in support of the factual challenges and the legal

_____

[1] Lee joins in all arguments submitted by her codefendants in support of a reduction in any period of incarceration, forfeiture, fines and restitution.
[2] Lee will file objections to the PSR separately.

issues raised in her suggested revisions to the PSR which were not adopted

by the Probation Department as of the date of the filing of this

Memorandum.  In support thereof, counsel states the following:

## ARGUMENT

## A. THE LOSS CALCULATION IS INFLATED BEYOND ALL REASON, LOGIC AND IS PURE FICTION.

Assuming arguendo that this Honorable Court accepts the

Government's calculation or some portion thereof, it is respectfully urged

to depart from the Sentencing Guidelines and/or find sufficient variances

pursuant to the factors set forth in 18 U.S.C. § 3553. The First Circuit has

described the Guidelines method for calculating loss as crude standard.

*United States v. Cacho-Bonilla*, 404 F.3d 84, 92 (1st Cir. 2005); *United

States v. Parsons*, 141 F.3d 386, 392 (1st Cir. 1998).  The crudeness of the

calculation is on full display in the instant case where a defendant with no

criminal record is facing years in prison for a first offense in which there

was no direct evidence at trial that she personally made a false statement to

an insurance company or bribed a doctor.

The PSR incorrectly calculates the loss attributable to Lee as $17,854,641 in Medicare losses.  By calling this loss "conservative", which the PSR has adopted from the Government, the PSR hopes to persuade the Court from finding that any losses attributed to the crimes cannot be properly calculated or are simply impossible to calculate.  The Parties' and the Court's professed inability to calculate loss in this case should not be a deterrent to trying to get an accurate estimate any more than $17,854,641 should just be attributable to Lee because it is a nice big number.  On the contrary, it is pure fiction.

The loss calculation supported by the PSR includes phantom losses attributable to (1)others not prosecuted by the Government, (2) losses recovered by means other than criminal prosecution and/or (3) losses attributable to others more culpable than Lee for which she should not be jointly liable.  As a result, the PSR loss calculation represents both legal fiction and double counting.

Further, the Government must be estopped from claiming any losses where it and other state's have settled with Insys, Lee's employer, for vast amounts of money in excess of the losses claimed in the PSR.

In addition to the previous arguments, Lee submits the following arguments mitigate against any loss calculation being attributed to her:

### 1. Multiple Factors, Shared & Disproportionate Culpability Cannot be Ignored Just Because they are Complicated.

When a loss is the product of multiple factors, district courts may depart from the guidelines. *United States v. Gregorio*, 956 F.2d 341, 345-46 (1st Cir. 1992); *United States v. Carpenter*, 781 F.3d 599, 622-23 (1st Cir. 2015). Additionally, "role-in-the offense determinations are innately fact-specific. The court of appeals must, therefore, pay careful heed to the sentencing judge's views." *United States v. Rostoff*, 53 F.3d 398, 413 (1st Cir. 1995); *United States v. Belanger*, 890 F.3d 13, 36 (1st Cir. 2018).

Here, it is respectfully submitted that any loss calculation of loss must start from the top of the industry.

### a. Big Pharma's Exploitation of Women in Sales.

Exploiting women for financial gain is hardly a new concept.  However, the pharmaceutical industry has weaponized it to the point societal

indifference.  Every spring, college campuses are a buzz with pharmaceutical

recruiters looking to make a profit off of the new crop of graduating college

cheerleaders and models.  See *Ex-Drug Sales Rep. Tells All,* ABC News,

Marcus Baram, March 13, 2008.

https://abcnews.go.com/US/story?id=4438095&page=1.  Baram summarizes

the testimony of an Eli Lilly sales representative before Congress in March of

2008.  The representative testified that pharmaceutical industry thrives on

former models and cheerleaders with no background in science to reward

"physicians with gifts and attention for their allegiance to your product and

company despite what may be ethically appropriate."[3]  *Id.*  Despite this

ethically challenged approach to sales, the industry remains unchanged in its

approach.

What Alec Burlikoff did in this case was to take the next unethical but

logical step toward pharmaceutical dystopia.  He recruited women at

gentlemen's clubs, not Clemson or Alabama.  Besides the obvious ethical

variance from safe medical sales to hypersexualized "Wolf of Wall Street"

tactics, no consideration was given to the obvious training, experience **and**

---

[3] Baram colorfully describes his training session at Lilly in which he was the only one in his class with a degree in science.

**regulatory** vacuum into which these women were recruited.  Lee was encouraged by Burlikoff to:

## "SMILE & CLOSE"

The obvious inference from these words of wisdom were to flaunt her physical beauty and or sexuality until she closed the Subsys deal with each doctor.

This was not a foreign concept to Lee because of the rough side of the road she had been walking her entire life.  There is no doubt that Insys represented a major opportunity for her and because that opportunity was so great, it is unlikely that she ever contemplated the exploitative nature of it.

What is particularly troubling about this case is the role that Big Pharma plays in the perpetuation of classic hypersexualized stereotypes of women.  While Big Pharma is quick to use women for their ability to sell products to lonely overworked physicians, the same women are easily dispatched and demonized when they are exposed for doing the exact job that they were hired to do.  That is exactly what happened to Lee in this case.  She is being demonized for doing the exact job that Big Pharma expected her to do and that Alec Burlikoff and Insys expected her to do.

If Big Pharma was not in the business of exploiting women in exchange for profit, there would never have been a Sunrise Lee for the Court to sentence in this case.  This is not the same as the market downturn that was rejected by both the sentencing court and the First Circuit in *Carpenter*. Here, the playing field was established by business executives and Big Pharma long before Sunrise Lee and Insys were born and exist to this day.

The real fool's gold for women in this exploitative environment is the illusion that they have broken through the glass ceiling when in fact they are being exploited by the same male dominated Big Pharma system that has always exploited women under the guise of great pay.  For Lee, the reality was far more insidious.  She was given a managerial role without prior experience either in the industry or as a manager and repeatedly reminded of how good she was at her job through raises, bonuses, stock options and reviews.

Indeed, nothing in Lee's background had prepared her to confront this system.  She had worked in "clubs" where she had seen doctors, lawyers and business executives being entertained for business purposes by hypersexualized women.  Nothing at Insys seemed outside the normal range

of business activities she had witnessed in her prior life for many businesses including Big Pharma.

This kind of exploitation of women will continue until ethical or legal constraints are placed on an industry that is far too corrupt and dysfunctional to police itself and is annually praised by Wall Street for the huge amounts of revenue it produces.  Lee should not pay the price for a morally and ethically bankrupt system that she did not create and cannot fix.

### b. The Opioid Industry Should Have Been Boarded-Up 25 Years Ago and Completely Federalized.

It defies logic the nearly 20 years into an opioid crisis an unregulated brand new company (Insys) could (1) produce a single powerful Fentanyl product, (2) charge an absurd amount of money for it, (3) get Medicare to pay for it, (4) send former dancers into lonely weak doctor's offices to drive sales, (5) take the company public so that Wall Street can profit from this obscenity and all (5) with little or no oversight for 3 years.  It is difficult to describe such madness.

Nonetheless, Insys was able to take itself public nary a whispered complaint from the SEC, DEA, FDA or 50 state governments all of whom

might have asked the simple question how can we dispense such a powerful product without further exacerbating the current opioid crisis.

There is no question from the evidence at trial that Subsys represented an important break though in fast acting powerful pain relief.  While Insys and its investors clearly had an interest in getting Subsys to market as quickly and as profitably as possible, there was little or no thought given by anyone regulating the opioid industry as to whether this was the "best practice" for such a dangerous and highly addictive drug.

Subsys simply went to market fast as any new I-Phone, wool socks or steak knives would have.  It is inconceivable that this could occur without regulation 20 years into an opioid epidemic.  Lee had no reason to suspect that anything was amiss and should not be punished for the lack of industry regulations or for whatever percentage the Court determines the regulatory vacuum is to blame.

### c. The Government Must Be Estopped from Calculating Loss Based Upon Amounts Already Paid for By Insys.

Insys has already settled over $225,000,000 in claims brought against it by the federal government and various state governments.[4]  These claims more than reimburse any potential claimant for any loss attributable to Lee.

Insys agreed to pay $30,000,000 in fines and forfeiture under a deferred prosecution agreement with the Department of Justice.  Additionally, Insys agreed to pay $195,000,000 to resolve liability under the False Claims Act.

Pursuant to U.S.S.G. Section 2B1.1, Application Note 3, once these credits are applied to the losses claimed by the Government, there is no loss. Application Note 3 reads as follows:

> (E) Credits Against Loss. Loss shall be reduced by the following:
>
>> (i) The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected. The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.

---

[4] See Cook County Settlement, Infra.

Insys's SEC filings reveal Subsys settlements with the following jurisdictions in the following amounts:

| | |
|---|---|
| Oregon: | $1,100,000 |
| Illinois | $4,450,000 |
| New Hampshire: | $2,900,000 |
| Massachusetts: | $   500,000 |
| | |
| Total: | $8,950,000 |

https://insysrx.gcs-web.com/static-files/8c69c296-6fb0-4053-9c0d-4300f2b9fc40.

At a minimum, there needs to be an accounting for these settlements in any calculation of alleged loss and any other settlements that counsel has been unable to cull out of the voluminous SEC filings.  Without including these settlements, any loss calculation is pure fiction and constitutes over reaching by the Government.

### d.  By Overvaluing Lee's Alleged Conduct as Compared to Other Women Who Knowingly Committed Fraud Every Day For Insys, the Government is Further Exploiting Lee.

What the Government has done by charging Lee in this case and attaching a severe loss calculation to her is to say that a woman who is hired for the purpose of behaving in a hypersexualized manner as a sales manager

is more of a criminal than a woman who worked for the IRC and lied to dozens of insurance companies every day.

It is clear that the women who worked in the IRC who committed the actual mail and wire fraud walked away without any criminal charges. Lee did not talk to any insurance companies. However, because Lee's job at Insys included behaving in a hyperfeminine or hypersexualized manner toward doctors, her criminal charges and loss calculations should be greater than the women who behaved as drones and committed the actual crimes by lying to insurance companies.

There is no doubt that Lee was included in this case over the IRC women because of the way she presented herself AS A WOMAN, not because her conduct was any worse. Indeed, Lee's conduct was far less damaging than anyone working the IRC phone bank.

### e. The PSR's Loss Calculation Fails to Include Many Individuals Who Bear Greater Responsibility to the Alleged Victims than Lee.

The failure of the PSR to include noteworthy individuals in the loss calculation is the same as ordering Lee to serve their time. These individuals

had far greater roles in the alleged loss than Lee. These individuals include the following:

1. The IRC Claims Representatives (See Argument 1(d)).
2. Matt Napolitano (Insys Executive)
3. Brett Szymanski (Awerbuch's sales rep.)
4. Desiree Hollingsworth (Ran Insys Speaker Program)
5. Xun Yu (Insys IT)
6. Paul Madison, MD
7. Paul Madison's staff
8. Gavin Awerbuch's staff
9. Gerald Rosenberg's son (Insys sales rep.)

Any global loss calculation that does not include these individuals is pure fiction.

### f. The Awerbuch Losses do not pass the Causation Test Under U.S.S.G. 2B1.1 and Should Not be Passed on to Lee.

Central to the determination of loss is the determination that the criminal conduct caused the alleged losses. U.S.S.G. 2B1.1. Here, it is clear that Lee's conduct did not cause any of the losses sustained by the insurers of Awerbuch's patients. Awerbuch was on board with Subsys long before Lee arrived at Insys. Awerbuch was a leading prescriber of Subsys before Lee arrived. Brett Szymanski was the sales representative that handled Awerbuch before Lee arrived and during the entire time that Lee worked at Insys.

Lastly, Awerbuch testified that he "did it for Brett", meaning Brett Szymanski.

Additionally, Awerbuch was assessed $3,000,000 as his loss calculation at his sentencing hearing. *United States v. Gavin Awerbuch*, 16-CR-20636 (E.D.Mich. 3/7/18)(Sentencing Hearing, p.17).  Obviously, Brett Szymanski should be jointly and severally responsible for this loss, but he was given immunity by the Government.  Awerbuch's employees, Insys employees and the whole broken down system are also responsible for these losses, but will not be held accountable.

As a result, there is no evidence that Lee's conduct caused any of the losses sustained as a result of Awerbuch's fraudulent conduct.  Lee never wrote a prescription, issued an insurance claim form or wrote a check to Awerbuch.  Awerbuch's losses would have occurred whether Lee was hired by Insys or not.

### g. Lee Should Not Be Held Accountable For Any Unproven Loss Associated With Dr. Paul Madison.

On December 20, 2012, Madison was indicted by a federal grand jury for insurance related to his medical practice that occurred between 2006 and 2009. *United States v. Paul Madison,* 12-CR-1004 (N.D.Ill.).  Madison's

14

indictment had nothing to do with this case, with unlawfully prescribing opioids or Sunrise Lee.  Madison was charged and convicted of falsely billing insurance companies for a chiropractic procedure known as "Manipulation Under Anesthesia", ("MUA").  Despite the indictment, Madison apparently was permitted by the DEA to continue to prescribe controlled substances including Subsys.  It does not appear that any DEA enforcement action was ever undertaken against Madison's ability to prescribe controlled substances during the term of the conduct alleged in the instant case.

Furthermore, no charges were brought against Madison for receiving kickbacks, bribes or insurance fraud like the other providers in this case.  The only evidence that Madison was at all involved in the instant case in anyway are the few IRC messages that were recorded and played to the jury and the two patients who testified without clarity as to their experiences with Madison and Subsys.

More importantly, Insys settled a significant claim with the state of Illinois in Cook County for $4,450,000 which can only be attributable to Madison.  Insys' SEC filings describe the settlement as follows:

> In connection with the investigation by the Illinois Office of the Attorney General, such office filed a complaint against us on

behalf of the State of Illinois on August 25, 2016 in the Circuit Court of Cook County, Illinois, Chancery Division, asserting a claim for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act in connection with the sales and marketing of SUBSYS®. On August 18, 2017, the Circuit Court of Cook County entered a Final Judgment and Consent Decree which, among other things, provided for a monetary payment of $4,450,000 by Insys…payments where made prior to September, 2017.

https://insysrx.gcs-web.com/static-files/8c69c296-6fb0-4053-9c0d-4300f2b9fc40.

Accordingly, no losses can be attributed to Lee or any other defendant as a result of Madison's practice.  More importantly, Lee should not be saddled with the full loss allegedly associated with Madison's practice where Insys has paid for any alleged losses associated with Madison.

### 2. The PSR's 73% Adjustment to the Medicare Expenses is Pure Fiction and is not Based on Any Facts Derived from the Record.

At paragraph 121, the PSR levies a 73% loss calculation on the defendants for non-cancer related claims for 13 subscribers who billed Medicare through the IRC.  There are so many problems with using this method of calculation that cannot possibly fully addressed in the Memorandum.  If the PSR's greater point is that the calculation is so far north

of $9,500,000, Lee does not concede that this is trustworthy either.  Lee submits that the use of 73% is erroneous for the following reasons:

    a.  They study includes years 2010-2014, for which Subsys was not prescribed.

    b.  Subsys was not prescribed at all in 2010 or 2011;

    c.  Subsys was not prescribed for the entire period of 2012;

    d.  The percentage of non-cancer diagnosis' **DECLINES** steadily from 2010 through 2014;

    e.  A non-cancer diagnosis is not illegal or fraudulent *per se*;

    f.  It is impossible to tell if the diagnosis is fraudulent without more data;

    g.  72% is the actual percentage of non-cancer applications (p.6);

    h.  The study labels non-cancer patients as patients who did not have a cancer diagnosis in the calendar year of the prescription;

    i.  Using a broader definition of cancer resulted in a 7.2% level decrease in the percentage of noncancer patients or 65%;

j.  TIRF/REMS was implemented in March of 2012 and resulted in immediate reductions in non-cancer prescriptions rendering any pre-existing data or conclusions irrelevant;

k.  This was a broad product study and was not limited to Subsys;

l.  The study included products for which a non-cancer diagnosis was not required;

m. The study included the use of morphine and other opioids;

n.  The study appears to have been limited to patients without a known opioid tolerance of 60 morphine milligram equivalents per day overall by brand;

o.  Subsys was supposed to be prescribed only to patients who were opioid tolerant;

p.  Subsys was prescribed to patients who had utilized other TIRF products.

q.  Dr. Fleischman should be subject to cross-examination under the Sixth Amendment before his study is used in a manner for

which it may not have been intended and for conclusions that

may not have been accurately interpreted.

**B.    LEE'S ROLE AS A MANAGER IS GROSSLY OVERSTATED
       BY THE PSR**

As discussed, "..role-in-the offense determinations are innately fact-specific.

The court of appeals must, therefore, pay careful heed to the sentencing judge's

views." *United States v. Rostoff*, 53 F.3d at 413; *United States v. Belanger*, 890

F.3d at 36. The Court has indicated at the January 13, 2020 hearing that it intends

to enhance Lee's sentencing guideline calculation by three levels under U.S.S.G.

§3B1.1.  Lee respectfully disagrees with the application of this enhancement.  Even

in light of the conviction on the mail and wire fraud predicates, the trial evidence

did not show that Lee had more than a peripheral role in the IRC insurance fraud.

Lee also submits that, despite her managerial role in the sales organization, the

taped and testimony of IRC representatives did not show Lee defrauding insurance

companies.  There was also no evidence of her instructing her sales people to bribe

doctors with speaker programs (and the evidence showed no knowledge of certain

illegal acts, such as bribes to Heather Alfonso or Dr. Clough).  The government

may have presented 'a lot' of trial testimony about speaker programs, but little of it

was inculpatory and, where the evidence was inculpatory, it lacked credibility.  For

example, Burlikoff and Symanski's testimony connecting Lee to an October 2, 2012 dinner with Awerbuch at which bribery was discussed was so highly discredited that the Government did not argue it in closing or rebuttal.  In fact the evidence showed that Lee did not meet Awercuch until October 30, 2012.

Were the Court to credit all inculpatory speaker program testimony against Lee, it would still not suffice to warrant a three level "role in the offense" enhancement. Lee's at most limited awareness of the IRC activity cannot not form a basis for an enhancement by itself. Whatever role Lee played in her sales territory does not automatically translate into a supervisory or managerial role for the purpose of the insurance fraud scheme.

Additionally, because there were so many speaker programs that were perfectly legal any managerial role in encouraging sales representatives to book more programs, complete their paper work and secure more guests cannot be solely construed as illegal conduct.  The fact that certain high prescribing doctors were rewarded with more speaker programs was a decision that was not made by Lee, but above her head.  In this capacity she was no more than the IRC phone representative merely parroting the script to insurance companies.

Finally, other defendant's counsel have noted that, in the Insys bankruptcy case, a to-be-appointed liquidating trustee will likely attempt to claw back up to $150,000 in legal fees paid by Insys for some or all of the codefendants' criminal defense.  While there may be defenses to claw back, this underscores the unreasonableness of the current PSR position.

## C. THE PSR INCORRECTLY ASSESSES AN ADJUSTMENT FOR MULTIPLE VICTIMS IF THE COURT AGREES WITH THE LOSS CALCULATION SET FORTH IN THE PSR

At paragraph 136 of the PSR Lee is assessed with a 2 level enhancement for more than 10 victims.  This adjustment is not appropriate where the conduct described and losses calculated by probation must necessarily include multiple victims.  It is respectfully submitted that this type of loss calculation inherently assumes that there will be multiple victims.  As a result, Lee submits that it is impermissible double counting for the PSR to recommend both a loss calculation of in excess of $9,500,000 and +2 for multiple victims.  A multi-million dollar fraud is going to have multiple victims.

On the contrary, should the Court determine that there are no losses or minimal losses attributable to Lee, the +2 would be appropriate.

## D. LEE'S OFFENSE OF CONVICTION IS LESS SERIOUS THAN CONTEMPLATED BY THE SENTENCING GUIDELINES

The guidelines for this financial crime are thoughtless, draconian and irresponsible to victims.  There is simply no logical way to exchange the currencies of prison time for dollars stolen.  While pretending to serve the purpose of deterrence, the harsh sentences for financial crimes do not serve victims or the community from which the defendant has allegedly stolen.  Restitution is delayed.  Job placement is delayed.  Family assistance is delayed.  In this case, the PSR suggests that Lee be saddled with a multi-million dollar debt to repay to insurance companies.  She is 40 years old and will have limited employment options after this conviction.  As a result, she will have at best 30 years to repay her restitution on a minimal income.  The sooner she starts earning income, the more money the victims will recover.  It is that simple.  Incarceration does nothing for the victims of financial crimes. *Gall v. United States,* 552 U.S. 38, 59 (2007)( that in some cases, a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing).

22

Accordingly, this Court may consider this apparent discrepancy in deciding whether to depart or construct a variance pursuant to 3553 from the Guideline sentence. The sentencing guidelines are advisory, not mandatory. *United States v. Booker*, 543 U.S. 220 (2005). Federal Courts are now free to tailor individual sentences in light of the factors set forth in 18 U.S.C. 3553 (a), which includes the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the Defendant; (2) the need for the sentence imposed-(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the Defendant; and (D) to provide the Defendant with needed educational or vocational training, medical care, or other correctional treatment ...; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for ... the applicable category of offense committed by the applicable category of Defendant as set forth in the guidelines ...; (5) any pertinent policy statement ...; (6) the need to avoid unwarranted sentence disparities among Defendants with similar records ...; and (7) the need to provide restitution to any victims of the offense.

18 U. S. C. 3553 (a)(2)(A)(B)(C)(D). The Supreme Court's decisions in *United States v. Booker,* 543 U.S. 220 (2005), *Kimbrough v. United States,* 552 U.S. 85 (2007), and *Gall v. United States,* 552 U.S. 38 (2007), expand

the basis for non-guidelines sentences to include all offender and offense characteristics and to include policy problems in the applicable guidelines, and requires judges to impose a sentence that is sufficient but not greater than necessary to satisfy the purposes of sentencing.

In *Gall,* the court set forth a three step procedure:  First, begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  Second, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should consider all of the 3553(a) factors to determine whether they support the sentence requested by a party.   Third, the judge should explain.  *Gall*, 552 U.S. at 50.

In the instant case, the Court is urged to impose a sentence that is reflective of all the 3553 criteria, but emphasizes the defendant's lack of any criminal history, family characteristics, good deeds and the need for him to get back to work to pay for her restitution.

**E.    THE DEFENDANT'S MENTAL HEALTH, FAMILY CIRCUMSTANCES AND GOOD WORKS WARRANT A VARIANCE PURSUANT TO 18 U.S.C. SECTION 3553.**

As set forth in Part B of the PSR, Lee had an extraordinarily difficult childhood, has been dealing with extraordinary mental health issues and is the central unifying figure in her family.  The medical professionals describe the impact that Lee's childhood had on her and the choices she has made in her life.  Additional letters of support submitted to the Court describe the good deeds performed by the defendant towards family, friends and neighbors.  Accordingly, the defendant seeks a downward variance from the Sentencing Guidelines for her family circumstances and good works.

This Circuit has long recognized the critical importance that criminal defendants may have in the lives of their loved ones as a matter of day to day care and support.  This is a recognition of the fact that other family members are dependent on defendants to the point where a lengthy incarceration would act as a hardship to the family.  Not all of these adjustments rise to the level of a classic guideline departure, but may be a source of variance from the sentencing guidelines.

In *United States v. Thurston,* 544 F.3d 22, 25-26 (1ˢᵗ Cir. 2008), the First Circuit left intact a 24 month sentence imposed by the district court in a case where the defendant had pleaded guilty to a $5,000,000 Medicare fraud. This "dramatic" variance from the five year guideline sentence was supported by the district court's assessment of the Section 3553(a) factors and in particular the defendant's good works with others. *Id.*

The letters of support and medical records establish that the Defendant provides critical support for her family. Likewise, in *United States v. Roselli,* 366 F.3d 58, 69-70 (1ˢᵗ Cir. 2004), the First Circuit denied a Government appeal where the district court had granted a departure for extraordinary family circumstance in a case involving 2 children with serious medical conditions.

More recently, the First Circuit has affirmed that a departure or variance for exceptional family circumstances exist where the defendant's caretaking is "irreplaceable" to the family. *United States v. Herman,* 848 F3d 555 (2017).

As a result, a sentencing variance is warranted.

26

## F. ABERRANT BEHAVIOR

Lee's criminal conviction constitutes aberrant behavior entitling him to a departure from the applicable sentencing guidelines. *United States v. Pozzy*, 902 F.2d  133, 137-138 (1st  Cir. 1990); citing *United States v. Russell*, 870 F.2d 18 (1st Cir. 1989).   She has no prior record and has worked extremely hard for a length period of her life.

## G. COMBINATION OF FACTORS

A combination of the above factors may constitute a separate basis for departure. *Koon v. United States*, 518 U.S. 81, 113-14 (1996); *United States v. Sklar*, 920 F.2d 107, 117 (1st Cir. 1990).

## H. SENTENCING RECOMMENDATION

For the reasons set forth herein, there are many mathematical rabbit holes which do not result in a loss calculation that inspires any degree of confidence.  Likewise, a gain analysis does not do justice to Lee's daily, weekly and monthly activities at Insys.  If there were a method of docking her pay for time spent on Awerbuck and Madison, this would not be fair

27

either because there were patients who legally received Subsys and speaker programs that were perfectly legitimate.

In the end the Court must look to sentences that were imposed in other related cases.  It is submitted that Lee's role is not as serious as Alfonzo's who compromised her medical judgment on a daily basis to prescribe Subsys.  Alfonzo received a reduced sentence of 3 months probation for her cooperation in this case.  Assuming Alfonzo received a 50% reduction her original sentence would have been 6 months probation.

Another case sentenced in this district that is comparable is Natalie Levine (Babich) who received a sentence of 5 years probation following some limited cooperation with the Government.  Levine was a regional sales representative with a territory just like Lee.  Lee's title looks more impressive, but in the end it carried no greater responsibility than to support her sales representatives like Szymanski.  Levine was the equivalent of Szymanski in New England.

Given the sentences imposed in this case the Court need not sentence Lee to a period of incarceration.  Furthermore, any fine, restitution or

28

forfeiture would be grossly disproportionate to her role in this offense.

Lee's contribution to her CJA costs can also be attributed to offset any

modest fine.

## **<u>CONCLUSION</u>**

Based upon the foregoing arguments and authorities this Honorable

Court is respectfully urged to impose a sentence consistent with the

arguments set forth herein.

Respectfully submitted,

_____
Peter Charles Horstmann, Esquire
 BBO #556377
450 Lexington Street, Suite 101
Newton, Massachusetts 02466
 (617) 723-1980

## CERTIFICATE OF SERVICE

I, Peter Charles Horstmann, Esquire, hereby certify that on this 21st day of January, 2020, a copy of the foregoing SENTENCING MEMORANDUM was served electronically, upon AUSAs Nathaniel Yeager, Fred Wyshak and David Lazarus, 1 Courthouse Way, Boston,

MA 02110.

_____
Peter Charles Horstmann, Esquire