1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF MASSACHUSETTS

3              _____

4

5      UNITED STATES OF AMERICA,

6                          Plaintiff,          Criminal Action
                                               No. 16-CR-10343-ADB
7      v.
                                               January 22, 2020
8
       SUNRISE LEE,                            Pages 1 to 39
9

10                         Defendant.
       _____
11

12

13

14                       TRANSCRIPT OF SENTENCING
               BEFORE THE HONORABLE ALLISON D. BURROUGHS
15                  UNITED STATES DISTRICT COURT
                  JOHN J. MOAKLEY U.S. COURTHOUSE
16                       ONE COURTHOUSE WAY
                         BOSTON, MA 02210

17

18

19

20

21

22

23                    KATHLEEN I. SILVA, RPR, CRR
                         Official Court Reporter
                    John J. Moakley U.S. Courthouse
24                  One Courthouse Way, Room 7209
                         Boston, MA 02210
25                     kathysilva@verizon.net

1    APPEARANCES:

2

     FOR THE GOVERNMENT:
3
              K. NATHANIEL YEAGER
4             DAVID G. LAZARUS
              FRED WYSHAK
5             Assistant U.S. Attorneys
              United States Attorney's Office
6             John Joseph Moakley Federal Courthouse
              One Courthouse Way
7             Suite 9200
              Boston, Massachusetts 02210
8             617.748.3100
              nathaniel.yeager@usdoj.gov
9             david.lazarus2@usdoj.gov
              fred.wyshak@usdoj.gov
10

11

     FOR THE DEFENDANT SUNRISE LEE:
12
              PETER C. HORSTMANN, ESQ.
13            Law Offices of Peter Charles Horstmann
              450 Lexington Street, Suite 101
14            Newton, Massachusetts 02466
              617.723.1980
15            pete@horstmannlaw.com

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2              (The following proceedings were held in open

 3     court before the Honorable Allison D. Burroughs, United States

 4     District Judge, United States District Court, District of

 5     Massachusetts, at the John J. Moakley United States Courthouse,

 6     One Courthouse Way, Boston, Massachusetts, on

 7     January 22, 2020.)

 8              THE CLERK:  This is criminal matter 16-10343, United

 9     States v. Sunrise Lee.

10              Will counsel identify themselves for the record.

11              MR. YEAGER:  Good morning, Your Honor.  Nathaniel

12     Yeager for the United States.  With me is Assistant United

13     States Attorney David Lazarus and Assistant United States

14     Attorney Fred Wyshak.

15              MR. HORTSMANN:  Good morning, Your Honor.  Pete

16     Hortsmann on behalf of Sunrise Lee, who is present in court

17     awaiting sentencing.

18              THE COURT:  This is the longest Mr. Wyshak has gone in

19     my courtroom without speaking.

20              MR. YEAGER:  I didn't catch the last part, but I'm

21     sure he's fine, Your Honor.

22              THE COURT:  We're here for Ms. Lee's sentencing.

23              I have read and received the following: the

24     presentence report as revised on January 15, the defendant's

25     sentencing memorandum, which was filed on January 21 and
```

1   accompanied by 11 letters, which I've also read, and the

2   government's consolidated sentencing memorandum and a

3   sentencing memorandum individualized to Ms. Lee, both of which

4   were filed on December 18.  I've also read all the materials

5   concerning forfeiture and restitution that have been submitted

6   by all of the parties.

7           Anything else from probation, Ms. Golus?

8           PROBATION:  No.  And nothing has been withheld from

9   the presentence report.

10          THE COURT:  Thank you.  That was my next question.

11   Thank you for that.

12          MR. YEAGER:  And I would ask, and I've informed

13   counsel, that the transcripts of the patients that have

14   previously testified that I provided to him be part of the

15   record with regard to Ms. Lee's sentencing.

16          THE COURT:  Yes, that's fine.

17          Mr. Horstmann, anything I'm missing?

18          MR. HORTSMANN:  No, Your Honor.

19          THE COURT:  Okay.

20          Ms. Golus just confirmed that nothing's been withheld

21   from the report.

22          Mr. Hortsmann, have you had an opportunity to review

23   the presentence report?

24          MR. HORTSMANN:  At length, Your Honor.

25          THE COURT:  And have you gone over it with your

```
 1   client?
 2           MR. HORTSMANN:  Yes, Your Honor.
 3           THE COURT:  Ms. Lee, have you had ample opportunity to
 4   review the presentence report?
 5           THE DEFENDANT:  Yes.
 6           THE COURT:  And a chance to fully discuss it with your
 7   counsel?
 8           THE DEFENDANT:  Yes, Your Honor.
 9           THE COURT:  So I am -- the objections to this report
10   are not quite as voluminous as some of the others, but there
11   still are a lot of them.  It is my intention to resolve only
12   the ones that are relevant to the guideline sentencing
13   calculation, but if there are others that anyone would like me
14   to resolve, please let me know.  I have read them all and taken
15   note of all of the comments, but consistent with what I've done
16   in the other cases, I'm going to begin with a base offense
17   level of 6, which is taking into account probation's logic,
18   which I verified on my own by reviewing the appendix to the
19   Sentencing Guidelines.  The dollar loss is 20, plus two for
20   more than ten victims, plus two for reckless disregard of
21   safety, plus three for her role, which gets us to an adjusted
22   base offense level of 33.
23           She has zero criminal history points.  That puts her
24   in Criminal History Category I.
25           Anyone have any issues with that or want any of the
```

```
 1   other objections resolved?

 2         MR. HORTSMANN:  Your Honor, we object to all the

 3   enhancements above a base offense level of 6.  I objected to

 4   the entire factual background in the PSR.  I agree with you

 5   that it's not necessary to get into all of those objections

 6   today.  I think the most important objection is how loss is

 7   calculated above and beyond the level 6, and I'm happy to speak

 8   to that now, but we do object to the role that was assessed.

 9   We object to the danger.  We object to the enhancement for -- I

10   already said managerial role.

11         So beginning with loss.

12         THE COURT:  Well, the dollar loss -- I mean, if you

13   want to make an argument on the dollar loss, you can, but she

14   was convicted of being a participant in a RICO enterprise and

15   the business of the RICO enterprise was what it was, and the

16   loss figure is arrived at based on -- all the information has

17   been set forth in the presentence report in the government's

18   motion and in all the other motions that have concerned this.

19   So you know where the dollar loss figure comes from.

20         She was a regional sales director.  She supervised

21   other people.  That's where the role enhancement comes from.

22   And the fact that she was involved in the sale of Subsys,

23   although I threw out the drug offenses based on the fact that I

24   don't think anybody intended necessarily that doctors prescribe

25   it to patients that didn't need it, they were certainly
```

1    reckless in who that drug was going to and the way they

2    marketed it.  I'm happy to hear you on those things, but that's

3    my rationale.

4            MR. YEAGER:  If I could just make a record how this

5    plays out, just for the record.

6            THE COURT:  Yes.

7            MR. YEAGER:  We agree with the court's reasoning, and

8    we take no issue with it in terms of loss.

9            THE COURT:  That's fine.

10           MR. YEAGER:  But to be clear, the court explicitly

11   ordered all defendants to provide alternative loss

12   calculations.  I think the date was extended to January 6.  The

13   defendant did not respond to that.

14           Then with regard to objections to the PSR, the

15   defendant filed a series of objections before the government

16   ever filed a sentencing memorandum, in which he asserted that

17   there was zero loss.  He then withdrew those objections from

18   Ms. Broquist.  I pushed him on that in an email chain in which

19   I said, you know, are you going to file additional objections.

20   Once the PSR came down, he did not do that.

21           Then a week ago Monday Your Honor held a hearing to go

22   through all of the financial issues in this particular case,

23   and Your Honor explicitly on the record asked all the

24   defendants who was challenging loss, and the defendant did not

25   challenge that loss.

1          So the government comes to this hearing today on the

2   position that the defendant has waived any objection to loss at

3   this point.

4          THE COURT:  Well, I am not going to make a finding

5   today about whether he's waived it.  The facts are what the

6   facts are, but I am finding that the loss figures that we've

7   arrived at, the plus 20 points and 9.5 to whatever -- what's it

8   go up to, 17 million?

9          MR. YEAGER:  There's a range.

10          THE COURT:  It was 9.5 million to --

11          PROBATION:  It's 9.5 million to 25 million, Your

12   Honor.

13          THE COURT:  Right.  So -- I think by any calculation

14   the loss is squarely in that range.

15          MR. YEAGER:  Thank you, Your Honor.

16          THE COURT:  With regards to how loss is established in

17   a health care case, the government is allowed to rely on the

18   billing information, and then the burden shifts to the

19   defendant to try and erode or dispute that figure in any way,

20   and it hasn't been disputed in a way that I think that the

21   guidelines contemplate, but I'm not going to make a finding on

22   the waiver, but I am going to make a finding on the -- I think

23   I already did make the finding last week, but I'll make it

24   again, that the loss on the enterprise is between the 9.5 and

25   the 25 million.

1          MR. HORTSMANN:  Well, I still have the opportunity to

2     argue loss under 3553, but I do think this pushes the ball

3     closer to more of a guidelines attack than a 3553 attack

4     because of the manner in which the government calculated loss

5     here.  I certainly didn't intend to waive anything and there's

6     no waiver on the record, more importantly by Ms. Lee of her

7     right to challenge loss.  Your Honor did ask the question last

8     week, and my memory is that Mr. Kendall grumbled something, and

9     then Your Honor moved on and said something to the effect of

10    "We're not here for that."

11         So if that was --

12         THE COURT:  That is not what happened.  All right?  I

13    am not making a finding on waiver today.  But that is not what

14    happened.  Okay?  Go ahead.

15         MR. HORTSMANN:  My intent, having already filed

16    something that said that our loss calculation was zero, was

17    certainly not to waive it.

18         THE COURT:  Okay.

19         MR. HORTSMANN:  That's --

20         THE COURT:  I'm not finding waiver.  But what I am

21    finding is that the loss range where we are is appropriate to

22    the enterprise.  If you want to argue that that loss figure

23    overstates when you get to the 3553 factors, that is absolutely

24    fine.

25         MR. HORTSMANN:  I'm happy to do that now or I'm happy

 1  to wait.

 2          THE COURT:  We will get to that.

 3          So beyond sort of your objections to the enhancements,

 4  anything else on how we get to the guideline calculation that

 5  we get to?

 6          MR. HORTSMANN:  No, Your Honor.

 7          THE COURT:  Government?

 8          MR. YEAGER:  No, Your Honor.

 9          THE COURT:  All right.  That results in an adjusted

10  base offense level of 33, which gives us an advisory guideline

11  sentencing range of 135 to 168 months, one to three years of

12  supervised release, a fine range under the guidelines of 35,000

13  to 350,000, which is capped at 250,000 given previous findings

14  that we've made about the loss.  We will determine restitution

15  at an upcoming hearing.

16          Mr. Hortsmann, I am prepared to sort out forfeiture

17  now.  I don't have the figures from you that we've been using

18  to establish the forfeiture number, which has basically been

19  taking income, which is stock distributions and salary,

20  crediting taxes paid against them, but not crediting the cost

21  of the option exercise.  So I can -- the government has asked

22  me to defer on a forfeiture calculation for Mr. Babich this

23  afternoon, and I'm happy to defer on Ms. Lee's also.  I think

24  the methodology that I've been using on the forfeiture number

25  has been very consistent, and it is my intention to have it

1    continue to be consistent.  So would you like an opportunity to

2    sort that out with the government, or can the government give

3    the number now?  Do you know what the number is?

4            MR. LAZARUS:  No, Your Honor.  We have not sought to

5    calculate that number as we maintained, that that's not the

6    appropriate method of calculation, and that it's

7    Mr. Hortsmann's burden under the court's framework to provide

8    that information.  I have asked Mr. Hortsmann for that

9    information previously.  He told me on January 13 that he would

10   send me what he has.  I've received nothing.  So I don't have

11   the information necessary to comply with the method that you've

12   been using for the other defendants, and I maintain that the

13   $1,662,063.76, the gross figure pursuant to *Hurley* and the

14   other arguments I've raised is the only appropriate number.

15   But in short, no, I don't have the math, Your Honor.

16           THE COURT:  So I am guessing, Mr. Hortsmann, that the

17   appropriate forfeiture number, based on what I've been doing in

18   the past, is $1,662,063.76 minus whatever taxes she's paid on

19   that money.

20           MR. HORTSMANN:  Your Honor, I'm happy to defer this,

21   as Mr. Babich did.  My reason for not responding to Mr. Lazarus

22   was we got the presentence report on the 15th, two days later,

23   and it has her tax returns in there.  What it doesn't have is

24   2012 and 2013, which were given to probation but for whatever

25   reason didn't appear in the report.  So we can redo that and

1   argue about any differences later on, but I do think the one

2   unique feature of Ms. Lee's income is that she did have a

3   settlement with Insys in 2015, which tracks as income on her

4   W-2 and her tax returns, but it's -- it's not pure dollar-for-

5   dollar income, and we would submit that should be carved out of

6   any --

7           THE COURT:  I agree with that.  The settlement's not

8   income.

9           But let me -- I was going to get to this, but you've

10  all been very circumspect about the reasons for her termination

11  throughout the trial.  Is anyone prepared to shed any light on

12  that for me, either in open court or at sidebar?

13          MR. HORTSMANN:  Your Honor, it's -- may we approach

14  sidebar?

15          THE COURT:  Yes.

16          **(<u>SEALED</u> SIDEBAR CONFERENCE BOUND SEPARATELY.)**

17          THE COURT:  See we've now come to a philosophical

18  agreement on the forfeiture, at least a philosophical

19  understanding of what I'm going to do, and the government and

20  Mr. Hortsmann are going to get together with the intent of

21  coming up with a forfeiture number that represents her salary,

22  proceeds of her stock shares, minus whatever taxes she paid on

23  that money.

24          And the forfeiture will be part of the judgment

25  entered today with the specific amount to be determined, and,

1    Mr. Hortsmann, I understand that you're not going to ask that

2    your client come back for the specific entry of that forfeiture

3    number?  I don't know if she has a right to, but if she does --

4              (Defendant/counsel discussion.)

5              MR. HORTSMANN:  She'd like to keep her options open on

6    that, Your Honor.  I think it's something she may want to

7    return for.

8              THE COURT:  Okay.  I don't know if she has a right to

9    come.  If I'm ordering forfeiture equal to the forfeiture of

10   the proceeds without the specific number, I don't know that she

11   has a right to, but if you want -- why don't you all agree on a

12   number, and then you let me know where we stand on the rest of

13   it, and we'll make a legal determination from there.

14             MR. HORTSMANN:  Thank you.

15             THE COURT:  So where we are is an advisory guideline

16   sentencing range of 135 to 168 months, a supervised release

17   range of one to three years, a fine range of $35,000 to

18   $250,000, restitution to be determined, a special assessment of

19   $100, and forfeiture that I intend to have equal the amount of

20   her proceeds minus the taxes paid on it.

21             The government's recommendation, please.

22             MR. YEAGER:  If I might, Your Honor, are the

23   government's objections regarding the GSR preserved, Your

24   Honor?

25             THE COURT:  Yes.  You're interested in preserving --

1  you want the bankruptcy, the risk of insolvency, you're

2  objecting to that, and you're objecting to the three points

3  rather than the four?

4          MR. YEAGER:  Yes, Your Honor.

5          THE COURT:  Go ahead.  Those are preserved.

6          MR. YEAGER:  First of all, I want to thank probation.

7  We haven't had an opportunity to thank probation.  What

8  Ms. Golus has been forced to deal with here, through no fault

9  of her own, is a tremendous amount of work, and we're grateful

10  for the work she did on this PSR, as with all the others.

11          Yesterday counsel for defendant filed a sentencing

12  memorandum, and the uniqueness and creativity of his arguments

13  I believe were designed to distract the court and others from

14  what the defendant in this case did, from her crime.

15          It is true that the defendant came to Insys without

16  experience in the pharmaceutical industry, and our

17  recommendation is designed to reflect that fact.  The

18  defendant, however, is not a victim in this crime.  She made

19  1.6 million dollars by bribing doctors and by defrauding

20  insurers.  The defendant recruited and directed two of the

21  co-conspirator doctors in this case, physicians Paul Madison

22  and Gavin Awerbuch.

23          Ms. Lee started at Insys as a district manager, and

24  she was incredibly successful.  She was promoted to regional

25  sales director.  And at the time when she became a regional

1  sales director, along with two other regional sales directors,

2  she was responsible for one-third of the entire Insys sales

3  force.  Joe Rowan, who Your Honor sentenced yesterday, was one

4  of those sales directors.  The second was a woman named Beth

5  McKey, who testified before this court.  Ms. McKey joined the

6  company in 2013.  She immediately confronted Alec Burlakoff and

7  others regarding the criminal scheme that was going on, and she

8  was demoted within three months of joining the company, and her

9  responsibilities were taken away.  She left the company seven

10  months after joining it.

11        Ms. Lee was the third regional director.  She started

12  in the company as a district manager.  And unlike Ms. McKey,

13  embraced the scheme.  And she was promoted and went on to make

14  1.6 million dollars.  Ms. Lee knew exactly what she was doing.

15        Exhibit 2262, an email from HR to Ms. Lee, discusses a

16  performance evaluation that the defendant wrote on behalf of a

17  woman named Jodi Havens.  Ms. Havens was a sale rep who came to

18  work and responded to Dr. Paul Madison, and in the email Lee is

19  quoted as having to say that Havens should not be given credit

20  for Madison's prescriptions because those, quote, scripts are

21  guaranteed.  Guaranteed based off of the relationship that I

22  built with Madison.

23        Madison, as the court is aware, was a doctor from the

24  Chicago area who Lee had given -- the doctor who Lee had gained

25  a guarantee from ran a pill mill, and evidence in the case came

1     in on that under Exhibit 2, as well as the testimony of both

2     Jodi Havens, Richard Horrocks and Holly Brown.

3          Richard Horrocks testified before this court that

4     sales reps -- he had bribed sales reps in Texas or attempted --

5     as a sales rep, he attempted to bribe doctors in Texas.  As a

6     result he was promoted to take over the position that the

7     defendant held as a district manager in Michigan and throughout

8     the Midwest, when the defendant was made regional director.

9     And he described instructions provided by the defendant to him

10    when he took over as the district manager about both Awerbuch

11    and Madison.  With regard to Madison, the defendant told

12    Horrocks that she wanted at least anywhere -- quote, she wanted

13    at least anywhere from 8 to 10 scripts a day to keep

14    Dr. Madison up and going.

15         Gavin Awerbuch, who as Your Honor knows, testified

16    before the jury that he had been bribed by the defendant and

17    others, and that the bribes from Ms. Lee included fake dinners,

18    as well as a promise and arranging to pay the salary of one of

19    the employees in Dr. Awerbuch's office.  Awerbuch went on to

20    become the top prescriber of Subsys in the United States.

21         Your Honor has heard from patients who were victimized

22    by Dr. Awerbuch's activity.  And you heard from Dr. Awerbuch

23    directly.  He said these words, quote, "These were patients

24    that didn't need strong opioids like Subsys.  They did need

25    pain management.  But I certainly didn't need to write a

1  medicine like Subsys for them."

2          That, Your Honor, is why the defendant was indicted.

3  That, we believe, is why she was convicted.  And that is why

4  the court should sentence Ms. Lee to a substantial period of

5  incarceration and a $250,000 fine.  Thank you.

6          THE COURT:  When you say "substantial period of

7  incarceration," do you have something more specific in mind?

8          MR. YEAGER:  Seventy-two months in prison, Your Honor,

9  as we said before.  I apologize.

10         THE COURT:  So you're not going to modify your

11 recommendation in light of the sentences that have come before?

12         MR. YEAGER:  No, Your Honor.  And I think the court

13 should be aware, first of all, 72 months is the lowest

14 recommendation we made for any defendants in this case that did

15 not cooperate.  Ms. Lee, like every other defendant, had that

16 opportunity.  In fact, Ms. Lee was given the opportunity --

17         MR. HORTSMANN:  Objection.

18         MR. YEAGER:  -- of a reverse proffer and rejected --

19         MR. HORTSMANN:  It's not admissible in any proceeding,

20 Your Honor.

21         THE COURT:  It's fine.  I will consider it as

22 appropriate.

23         MR. YEAGER:  Thank you, Your Honor.

24         THE COURT:  Mr. Hortsmann.

25         MR. HORTSMANN:  Thank you, Your Honor.

1        I want to start by reminding the court that the only

2   reason Ms. Lee is in this case is to cast shade on Insys.

3   That's it.  If she were sitting here -- she would not be

4   sitting here if she had graduated Arizona State in the spring

5   of 2012 and had been hired by Insys right out of Arizona State.

6   There's no doubt she would not be sitting here.  The government

7   would have given her the same treatment that it gave all the

8   IRC women who answered the phone and lied about cancer.

9        She also wouldn't be sitting here, Your Honor, if

10  she was just Alec Burlakoff's girlfriend.  I mean, that is the

11  state of affairs.  What we have is a few salacious details that

12  have kept her in this case, and it's just as exploitive as the

13  pharma industry is in general.  And I think Your Honor can

14  consider that under 3553.  I would ask -- I had asked you to

15  consider it under the loss calculation as well.  It defies

16  logic that this woman is in this case for any reason other than

17  the fact that there are a few salacious details that the

18  government liked.  And the media is to blame too.  They like

19  those details.  They get hits.  I can't fully blame the

20  government for that.  They create these tabloid captions that

21  talk about Ms. Lee.  She gets more hits than any other

22  defendant in this case besides Mr. Kapoor, and it's solely

23  because of the salacious details.  We're not going to solve how

24  the pharmaceutical industry uses women with this case.  But

25  Your Honor can solve how Ms. Lee was treated in this case very,

1   very quickly.

2           I'm going to start -- I started already, but I'm going

3   to start at the end and say what I think are fair comparable

4   sentences that other individuals received that are related to

5   this case.  I identified two of them in my memo.  You heard

6   Ms. Alfonso received three months' probation.  Yes, she

7   cooperated with the government, but her role in this

8   conspiracy, in the RICO, was far more dangerous than any role

9   that Ms. Lee ever had.  She was writing prescriptions to

10  patients, and she was signing off on insurance claims, and

11  Ms. Lee didn't do any of that.  That was not her role.  So to

12  give Ms. Alfonso three months, understanding she cooperated and

13  testified for the government, and to give -- to ask for Sunrise

14  Lee to get 72 months is disproportionate, and it shows a clear

15  lack of perspective on the government's part.  They have lost

16  perspective in this case as a result of that.

17          Natalie Levine, Babich's wife, gets five years

18  probation.  That's a lot more serious than three months.  But

19  she was a regional sales manager, similar to Ms. Lee, who had

20  many doctors who she visited, and it came out at trial flirted

21  with.  She willingly exploited an infatuation that Dr. Clough

22  had with her, the doctor from New Hampshire, in order to get

23  him to write scripts.  And she got five months' probation.

24          The other individual that my client reminded me of

25  this morning, who I did not include in my memo, is Karen Hill.

1   Karen Hill is probably more dangerous in terms of what Insys

2   did here than any other female involved in the case.  She was

3   INSYS's trainer.  She went around the country training sales

4   reps, training managers.  She didn't testify at trial.  That's

5   who Karen Hill was.  She did assist the government.  So she got

6   a discount too.  But by the same token, I'm led to believe she

7   got five months, five months' probation.  I don't think she got

8   prison time either.

9          So those are the women in this case.  And, Your Honor,

10  I made a point of this in my memo as well.  The IRC women all

11  got free passes.  There's no forfeiture against them.  There's

12  no fines against them.  Some of them got immunity letters.

13  They lied every single day, many, many times a day, and they

14  were all women, and that's not what Ms. Lee did.  Ms. Lee was,

15  for lack of a better word, the entertainment committee.  That's

16  it.  She didn't manage anybody.  Some of the emails show a

17  managerial flare, but that's not what she did.

18         Let's get to Awerbuch and Madison, because I think

19  that's where the rubber hits the road here.  Awerbuch, the

20  government just won't let go of.  They won't.  It's in the PSR,

21  and a lot of the objections I had to the language in the PSR

22  had to do with how the Awerbuch relationship is phrased.  She

23  didn't start Awerbuch.  She didn't begin him.  That wasn't

24  developed by her.  The evidence at trial was that that was

25  Brett Szymanski.  "I did this for Brett" were Awerbuch's exact

1    words.  That was before Ms. Lee ever joined the company.  The

2    Awerbuch train left the station long before Ms. Lee was ever

3    employed by Insys.  He went to the July 2012 doctor conference

4    in Chicago.  He was one of the business cards that was on the

5    exhibit that was admitted at trial.

6         He met with Burlakoff.  He's one of the first people

7    that Burlakoff meets with after Burlakoff assumes his new title

8    because Burlakoff knew how valuable Awerbuch was.  And the

9    government tried -- not their fault.  They were misled by

10   witnesses -- tried to say during trial, and in their opening

11   statement, that Ms. Lee was present at a dinner October 2 of

12   2012, and that's simply not the case.  That's not the way the

13   evidence bore out.  The emails from Brett Szymanski after the

14   fact were thank you for dinner, for meeting with myself and

15   Alec, nothing about Sunrise, no cc to Sunrise.

16        The earliest that Ms. Lee met with Dr. Awerbuch was

17   late October, and her relationship developed over time where

18   they became friendly.  That's what she was supposed to do.

19   There's nothing in the Awerbuch record to show that she did

20   anything but make sure that Brett did his job, make sure that

21   Awerbuch was happy.  And this notion that she somehow

22   facilitated the hiring of Courtney Nagy, that was debunked at

23   trial too.  There's a series of emails in which she's the

24   intermediary.  She's the go-between between Mr. Szymanski and

25   Mr. Babich.  Grosshans is in there as well, Jenna Grosshans,

1    who I think was HR.  But Brett's asking what's going on with

2    Nagy.  Email goes to Jenna, who forwards it to Babich, and

3    Babich hires her.  So, you know, just for example, one of the

4    many problems with the PSR, paragraph 54 says Lee hired Nagy.

5    That's not what happened.  She may have facilitated it.  She

6    may have assisted it.  She may have wanted it, for all we know,

7    but to say she hired Nagy is a gross misstatement of the facts.

8    It makes it look like she was the only one who was deciding

9    that this was important.

10          Then we get to Madison, and Madison is a -- that's a

11   complicated loss calculation, because Your Honor literally has

12   nothing.  You have nothing other than the testimony of Holly

13   Brown to show that Ms. Lee even really had a rapport with

14   Madison.  You have Awerbuch too.  But she didn't develop

15   Madison.  The testimony at trial was that Napoletano flew out

16   right away to meet with Madison.  She met with -- she did meet

17   with him.  She did develop a friendship with him, and it was

18   useful to Insys, but to make her solely responsible for the

19   development of Madison is just not accurate.  And then where we

20   have very limited records from Madison, very little patients,

21   he didn't get charged with anything, so we don't have a loss

22   calculation that's attributable to him like we do with

23   Awerbuch.  That was sort of the reverse calculation that I was

24   trying to show you could be made here, Your Honor, was that

25   Awerbuch, we've got a loss figure of 3 million, and Madison --

1   you know, there's a settlement that Insys makes with the state

2   of Illinois for 4.4 million.  That's obviously Madison.  I

3   don't have any of the paperwork.  I don't have any of the civil

4   stuff.  I'm sure it's all confidential.

5       But the bottom line is Insys puts in its SEC filings

6   that there is this settlement with Illinois in the Cook County

7   Superior Court.  It's got to be Madison.  We didn't hear about

8   any other doctors that had anything to do with Chicago other

9   than Madison.  So that money's already been paid, settled by

10  Insys.  So how do you hit her with a loss for Madison without

11  even hearing from Madison himself, anybody who worked for

12  Madison, any patients of Madison that said anything of import?

13  There may be a few that the government can cull out of, you

14  know, tape recordings with the IRC where somebody grossly

15  misrepresented a patient's medical condition, but that's -- you

16  know, that's $1,800 a pop.  And, in fact, there may be a prior

17  medication that should be included in that calculation as well.

18  So, you know, we don't get to a 17-million-dollar figure with

19  Lee talking about Awerbuch and Madison.  We just don't.  And

20  that's the problem that I have with the calculation that the

21  government has made.

22      And then you know my critique of Fleischman's analysis

23  is not to say that it's inaccurate.  He's a doctor.  He did a

24  study.  He appears to have been well intentioned and he was

25  trying to inform the medical community about the value of TIRF

1    REMS.  It's not a study of Insys.  It's not a study of Subsys.

2    So that's the problem.  You can't take the 73 percent or 72

3    percent, as it really is, and apply it to Subsys prescriptions

4    when it relates to all other prescriptions for all TIRF REMS

5    drugs.  That's the problem I have.  This figure has been

6    applied by you three times already for co-defendants and now

7    you're going to apply it to Ms. Lee, and it's inapplicable.  It

8    doesn't mean Fleishman was wrong.  It's just not helpful in

9    determining the scheme of what the true loss is here.  I agree

10   it's complicated.  I don't think we should default to Fleishman

11   as a basis for establishing it.

12          And then, you know, we have other people who had more

13   significant roles, and I know you've heard about this from

14   other lawyers, so I'm not going to belabor it, but the most

15   significant individual, and, you know, I've had this debate

16   with Mr. Wyshak in other cases, the most significant individual

17   is Brett Szymanski.  He received millions of dollars from Insys

18   and he gets immunity.  So his immunity bars the government from

19   going after him for civil forfeiture, fines, contributing to

20   the overall loss figure.  I mean, when you take the three-to-

21   four-million dollars that Szymanski received out of the

22   pipeline of loss and dump it at Ms. Lee's feet, it's grossly

23   unfair.  I lost that battle in the First Circuit with

24   Mr. Wyshak.  The First Circuit says the government can do that,

25   but that doesn't mean it's fair, and it doesn't mean Your Honor

1   can't consider it under 3553 because you know, having heard the

2   evidence in this case, the significant role that Brett

3   Szymanski played in all of this.  He was the one sitting in

4   Awerbuch's office pumping out the claim forms and the prior

5   authorizations, and he's the one that developed the

6   relationship with Awerbuch to begin with.  "I did it for

7   Brett."

8           If I may just have a moment, Your Honor.

9           The one thing that Your Honor did not hear during the

10  trial, and that you've had some information on in the PSR is

11  the horrific nature of Ms. Lee's upbringing.  I haven't had a

12  client tell me that they were on the back of a milk carton

13  before.  That's the situation in which she was raised.  I don't

14  know what you do with that.  I think that she lacked any tools

15  in her tool box, in her tool shed, anywhere, she lacked any

16  tools to decipher that what was going on here was not normal.

17  It just -- those weren't part of her upbringing.  Those weren't

18  part of her training, and Alec Burlakoff preyed on that.  He

19  preyed on that.  You can send Alec Burlakoff to any gentlemen's

20  club on the North Shore today, and there's not a single woman

21  that wouldn't jump at this opportunity.  This was the

22  opportunity of a lifetime.  She never gave it a second thought.

23          You know, the government got a lot of traction at

24  trial, and I don't blame them, for the Horrocks email.  It says

25  what it says.  But there's a very innocent explanation for that

email as well.  Any sales representative who thought that their

commissions or credit were being given to somebody else would

have sent the exact same email, whether they're in the

equipment leasing industry or pharmaceutical sales, that email

can be read in context to simply just be a -- you know,

defending her turf and it doesn't have to mean that she knew

she had committed a crime.  I mean, that just -- I understand

the jury found her guilty, but there's an innocent explanation

for that email.

And with respect to the emails that Mr. Burlakoff was,

you know, circulating to the IRC and elsewhere, touting

Ms. Lee's credentials, there's another way to look at those as

well, Your Honor.  That's a boyfriend simply looking out for

his girlfriend in the managerial context.  I don't believe,

having looked at as much of the evidence in this case as I

have, I do not believe that Sunrise Lee originated and somehow

deserved credit for Awerbuch.  Brett Szymanski wouldn't agree

with that either.  To his credit, that was one of the few

things that Mr. Burlakoff agreed with me on on the witness

stand.  It wasn't a statement of truth from Burlakoff,

shocking.  It was simply, Hey, stop talking about my

girlfriend.  Stop talking about her and the IRC.  She does what

we ask her to do.  She does a good job.  Leave her alone.  It

was never intended to be what the government used it for.

So at the end of the day, Your Honor, you're left with

1　　what I think is a very difficult choice.  I think you've got

2　　other people in this case.  You've got other people in this

3　　district.  You've got other women in this district who have

4　　been sentenced to terms of probation, and the government walks

5　　in here with its knowledge of this case and the power of the

6　　United States government and says to you 72 months.  We're

7　　asking that you sentence Ms. Lee based upon her conduct in this

8　　case, and it doesn't amount to more than a probationary

9　　sentence.  We'd ask you to sentence her to six months'

10　　probation, and we'll be heard on forfeiture at a later time if

11　　we need to.

12　　　　　　THE COURT:  All right.  Ms. Lee, you have the --

13　　　　　　Sorry.  You want to --

14　　　　　　MR. YEAGER:  If I could briefly, Your Honor.

15　　　　　　The government takes great issue with the assertion

16　　that Ms. Lee was prosecuted because of her gender or because of

17　　any salacious activity.  The United States prosecuted Ms. Lee

18　　because she committed a crime.  The people that Mr. Hortsmann

19　　cites are people who cooperated with government investigations

20　　throughout the country, and IRC operators, who made $17 an

21　　hour, not 1.6 million dollars.

22　　　　　　In terms of salacious conduct, the defense in this

23　　case was that this was a legitimate speakers program.  The

24　　salacious conduct that counsel was talking about was offered in

25　　a limited way to demonstrate that it was not a legitimate

1   speaker program.  The salacious conduct was not mentioned to

2   jury in the opening.  It was not argued by me in closings, nor

3   was it argued by Mr. Wyshak in rebuttal.  The person who is

4   using that salacious conduct now with this court is

5   Mr. Hortsmann, and the government objects to that.

6           THE COURT:  Do you want to respond to that,

7   Mr. Hortsmann, or no?

8           MR. HORTSMANN:  Just to say that it was out there long

9   before the government indicted Ms. Lee.  The government

10  capitalized on it, and they should be held responsible for it.

11  It clearly was something they intended to use, and the

12  government -- the court doesn't need to look any further than

13  who was the first witness in the case?  Who was the very first

14  witness?  Boom, Holly Brown.  What are we talking about?  The

15  underground.  It says all you need --

16          MR. YEAGER:  The fact that Paul Madison was running a

17  pill mill.

18          THE COURT:  Gentlemen.  Okay.  I got it.  Two rounds

19  is all you get.

20          Ms. Lee, you have an opportunity to address the court

21  before I sentence you if you'd like.

22          THE DEFENDANT:  Okay.

23          THE COURT:  You can do it sitting or standing.  Just

24  make sure the microphone is close to your mouth.  Okay?

25          THE DEFENDANT:  Thank you, Your Honor.

 1          I've done a lot of thinking, reflecting on things that

 2     have happened, things that have led me to where I'm at right

 3     now.  When I was first arrested, I didn't understand, although

 4     during the settlement dispute I was dealing with the company, I

 5     was told that I was a subject of the investigation leaning

 6     towards being a target.  And I honestly felt that that was part

 7     of the threats that I was getting.  And after I had settled

 8     with the company, from what I was being told, and following up

 9     with my attorney, the government's interest in me dissipated,

10     which I believe that would have, because I just figured that

11     these are lies or rumors that possibly got to them, and they'll

12     check into the stuff.

13          Not making excuses about -- I don't want to make

14     excuses about what happened at that company.  I just want you

15     to understand where my mindset was.  At no point working at

16     that company did I think that what we were doing was somehow

17     wrong in the sense of things we would question, but our

18     understanding -- you've got to understand it from somebody

19     who's never worked in pharmaceuticals before.  When the

20     company's under investigation, and there are these national

21     sales meetings where they educate you on all this and they give

22     you these directions, and then you've got these conference

23     calls that are recorded, and they're giving these directions

24     that they're seeing, you know, like the eight to ten

25     prescriptions per day, those were directions given during these

1    conference calls, and I was following up with my team in terms

2    of what was distributed on the conference calls.

3          But when the company's under investigation and they're

4    getting advice from the government from a person who has never

5    been in this field, I couldn't comprehend that we were doing

6    something wrong, especially when these calls were recorded.  I

7    just -- and I honestly believe that after I lost my job and

8    was, you know, starting the process with the EEOC, that this

9    was part of the threat until -- and I didn't hear anything from

10   my attorney at all until I was arrested.  I didn't have a

11   warning.  I didn't have anything.  And I've been working on my

12   health, and it's been very difficult.

13         What I experienced at that company and what these guys

14   did to me and a lot of other girls, but they pushed me in that

15   direction, and I did -- nervous breakdown, whatever you call

16   it, but I reached a point where I couldn't recover, and I've

17   been trying to, and that's what I've been working on, is trying

18   to get healthy.

19         So as I was trying to work on getting healthy thinking

20   that this was behind me, I'm arrested.  And since then I have

21   been questioning why, how, how is it possible?  I read the

22   indictment.  It's still not making any sense because it's

23   incredibly fake.  The previous attorney I had, I came to learn

24   that there was a lot of conflict of interests.  And although he

25   claims that he did not --

1        To try to get you to understand my mindset as well,

2   I'm not making excuses.  I do understand that I failed to see

3   insurers as the victims.  I failed to see insurers as the

4   victims because I saw patients as the victims and learning

5   about their barriers and their experiences and the medications

6   they were being forced on, which was the generic brand of this.

7   When I spoke to doctors and reps, my focus was on switching and

8   getting them off of the generic because I found out diabetic

9   patients were on it.  It was the medication that was cheaper

10  and insurance would cover that.  So when this company offered a

11  new revolutionary drug that actually targeted their pain and

12  stayed in the system longer and they didn't have two grams of

13  sugar in it and, you know, you had patients that didn't have

14  teeth, I sympathized with that because I know what it's like to

15  not have insurance.  I know what it's like to have to struggle

16  and never -- not have the best service or treatment, and it's

17  just how life is, but I saw myself in a position where I really

18  had good intentions and tried to help, and that's my nature.

19        Everything that they said about me, although, yeah, I

20  traveled and did exotic dancing, but I took care of my kids.  I

21  put a roof over their heads and provided food on the table.

22  You know, my kids, my family always came first.

23        And that's how it is.  You can ask any of my friends

24  or my family, everybody knows me as a person who always wants

25  to help.  I've taken in families into my home.

1          So not making excuses, I'm just trying to get you to

2    understand me, where my mindset was, and I was easily taken

3    advantage of by Alec, and this opportunity of a lifetime that I

4    thought I had, which was fake, and I have to live with that.

5    But --

6          Thank you.

7          THE COURT:  Would either party object if I speak to

8    Ms. Golus for a moment?

9          MR. HORTSMANN:  No, Your Honor.

10         MR. YEAGER:  No, Your Honor.

11         (Discussion held off the record.)

12         THE COURT:  I want to thank the parties for their

13   advocacies.

14         I said it before with regards to these Insys

15   sentencings, but these are hard sentencings.

16         In coming to an appropriate sentence for Ms. Lee, I

17   have considered and am required to consider the advisory

18   guideline sentencing range, the nature and circumstances of the

19   offense of which she's been found guilty, her personal history

20   and characteristics, the need for the sentence to reflect the

21   seriousness of the offense, promote respect for the law, and

22   adequate deterrence, both general and specific.  And I also

23   have to consider all the factor under 18 U.S.C. 3553(a).

24         On the one hand, I view Ms. Lee as different from some

25   of the other defendants in this case.  I think she was, as

1    Mr. Hortsmann pointed out, in many way extremely ill-equipped

2    to deal with the situation at Insys and the pressures there.

3    Alec Burlakoff found her at a women's club or gentlemen's club,

4    and I think that the options in the oasis that he painted for

5    her were probably very difficult for her to resist.  And I

6    think not having the pharmaceutical background made her ill-

7    equipped to really sort out what was right and what was

8    wrong -- not right and wrong, but when and where the company

9    crossed the line with what they were doing.

10          On the other hand, Mr. Hortsmann, we -- us women, we

11   spend a lot of time trying to look for equal opportunities.

12   Right?  We don't want to be passed over because we're women,

13   but also being women, you can't look -- you can't look for

14   equality and then want lower standards and less exacting

15   conditions because you're a woman.  You sort of can't have it

16   both ways.

17          As far as I'm concerned, the government's -- their

18   prosecution of this case shows no gender bias as far as I can

19   tell.  They prosecuted regional sales reps across the board,

20   some of whom were women and some of whom weren't.  So that

21   allegation and the arguments that you made in your sentencing

22   report as a general matter get no traction with me, but the

23   specific circumstances of Ms. Lee's life and what she's been

24   able to achieve coming from a difficult background do.

25          As I say, and I think has been clear from these

 1   sentencings, I don't necessarily take issue with the

 2   government's charging decisions.  I think their sentencing

 3   recommendations are heavy-handed, to say the least.  The crimes

 4   here were no doubt serious and a lot of people were hurt.  And

 5   the government in most respects does the right thing by coming

 6   down swift and hard on a company that is hurting people the way

 7   Insys was.  That's the way they deter people.  But then when

 8   you look to the individual circumstances of sentencing a

 9   person, it's easier to see how the overall loss figures can

10   overstate the harm and overstate the culpability.  So I've

11   pushed the government to sort of look a little deeper in some

12   of those, particularly in light of the first sentencings, but

13   they've chosen not to modify their recommendations down.  I'm

14   assuming we'll hear the same this afternoon, that you'll stick

15   with your original recommendations with regards to all of the

16   defendants in this case.

17        But I have given a lot of thought to Ms. Lee, not

18   based on her gender but based on her personal circumstances and

19   what she's been able to overcome in her life so far, and what

20   effect prison will have on her.

21        Ms. Lee, I am going to sentence you to a period -- she

22   can -- you can sit.  I am going to sentence you to a period of

23   incarceration.  Given the charge that you've been convicted of,

24   it's very difficult for me to do anything else.  It's going to

25   be a significantly shorter term than what the government is

1   looking for.  And in some ways, you know, this will be a pause

2   in your life and you'll have a chance to sort of reflect on

3   what you want to do next.  You're obviously bright and you're

4   articulate and you've survived a lot of things, and you'll

5   survive this.  I can see from the letters that I've received

6   from your family and friends that you've raised two good kids,

7   and they'll survive this too.

8          So pursuant to the Sentencing Reform Act of 1984 and

9   having considered the sentencing factors enumerated at 18

10  U.S.C. 3553(a), it is the judgment of the court that the

11  defendant Sunrise Lee is hereby committed to the custody of the

12  Bureau of Prisons to be imprisoned for a term of one year and

13  one day.

14          Upon release from imprisonment, the defendant shall be

15  placed on a term of supervised release for a term of three

16  years.  That's not to monitor her behavior, which I'm sure will

17  be fine, but to assist in the recouping of any financial

18  penalties.

19          Within 72 hours of release from the custody of the

20  Bureau of Prisons, you shall report in person to the district

21  to which she's been released.

22          We'll do a restitution order later, but there will be

23  a restitution order included in the J&C.  I'm not going to

24  impose a fine, as the defendant does not have the financial

25  ability to pay a fine in addition to the restitution and

1   forfeiture obligations.  We've discussed forfeiture.  She will

2   be required to forfeit the proceeds of the offense minus the

3   tax money that she's paid.  That amount to be arrived at later

4   either in the presence of the defendant or not, depending on

5   how we agree.

6           Conditions of supervised release:  She cannot commit

7   another federal, state or local crime.  She cannot unlawfully

8   possess a controlled substance.  She cannot unlawfully use a

9   controlled substance.  I'm going to waive drug testing.  She'll

10  have to cooperate in the collection of DNA, and comply with any

11  other conditions that have been adopted by the court.

12          Special conditions: She'll have to pay the balance of

13  any restitution order according to a court ordered repayment

14  program.  She can't incur any new credit card charges or open

15  additional lines of credit without the approval of the

16  probation office while those financial obligations remain

17  outstanding, and she'll have to provide the probation office

18  with access to any requested financial information which they

19  can share with the financial litigation section.  $100 special

20  assessment.

21          Your rights of appeal are fully intact.  I'm going to

22  allow her to self-surrender at the institution designated by

23  the Bureau of Prisons.  We'll give a self-report date six weeks

24  from now.

25          Mr. Hortsmann, if no institution has been designated

1    and you want to ask for an extension of that time, let me know

2    and we'll extend it.

3           MR. HORTSMANN:  I do, Your Honor.  I'd also ask for

4    the court to recommend to the Bureau of Prisons that she serve

5    her time at the nearest female facility to Grand Rapids,

6    Michigan.

7           THE COURT:  Yes.  I'll make the recommendation that

8    she serve as close to her family in a female facility -- as

9    close to Grand Rapids, Michigan as possible.

10          MR. YEAGER:  May I ask that the stock be forfeited as

11    well?

12          THE COURT:  Any remaining stock shares will also be

13    forfeited.

14          MR. HORTSMANN:  There is no stock.

15          THE COURT:  To the extent she has any, they will also

16    be forfeited.

17          Anything else from probation?

18          PROBATION:  No, Your Honor, just we need a date for

19    self-report.

20          THE CLERK:  March 4.

21          THE COURT:  March 4.

22          From the government.

23          MR. WYSHAK:  Your Honor, just so you can prepare for

24    the next two sentencings, which are Mr. Babich and

25    Mr. Burlakoff, and to respond to your comments about modifying

1   our sentencing recommendations, obviously because we're

2   proceeding under the guideline 5K, made a motion for a downward

3   based upon the cooperation, we will be modifying our sentencing

4   recommendations in those two cases to seek proportionality with

5   some of the sentences that you've imposed already.  So we will

6   not be sticking with our original recommendations.

7            THE COURT:  You're going to seek proportionality for

8   your two cooperators, but you weren't willing to seek

9   proportionality for Ms. Lee or Mr. Rowan?  I think that you've

10  insisted in the last two sentencings that the recommendations

11  were appropriate and my misguided numbers weren't going to have

12  any impact on the government's view of what was right.

13           MR. WYSHAK:  Quite frankly, Your Honor, we disagree

14  with these significant variances that the court has imposed,

15  but it would be unfair to defendants who have come forward,

16  admitted their responsibility for the crimes, which I've heard

17  very little of from the defendants that you've sentenced, who

18  seem to have not accepted responsibility.  These individuals

19  have come before this court, accepted responsibility, pled

20  guilty, testified at this trial.  I believe that they will

21  assist other districts, and it would be unfair for the court --

22  for the government to recommend higher sentences for those

23  individuals when you have imposed the types of sentences that

24  you've imposed in the other defendants.  So all we are trying

25  to do is seek some proportionality.  The remaining defendant,

1   Mr. Kapoor, we believe is the most culpable party.  We believe

2   that our sentencing recommendation is appropriate.

3           MR. HORTSMANN:  Your Honor, may we be excused?

4           MR. WYSHAK:  Well, we don't need to debate this.

5           THE COURT:  Mr. Wyshak, I hear you.  I disagree with

6   you.  Welcome back.

7           Anything else, Mr. Hortsmann?

8           MR. HORTSMANN:  No, Your Honor.  Thank you.

9           THE COURT:  All right.  Ms. Lee, take care of

10  yourself.  I have every confidence that you will get through

11  this.  And I really do wish you the best.

12          The case is recessed.

13  (Proceedings adjourned at 11:06 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS      )

6

7

8            I certify that the foregoing is a correct transcript

9    from the record of proceedings taken January 22, 2020 in the

10   above-entitled matter to the best of my skill and ability.

11

12

13

14

15   /s/ Kathleen Mullen Silva                    1/27/2020

16

17   Kathleen Mullen Silva, RPR, CRR              Date
     Official Court Reporter
18

19

20

21

22

23

24

25