# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
**UNITED STATES OF AMERICA,**)
)
           **v.**    )
)        **Criminal No:  16-10343-ADB**
**SUNRISE LEE,**    )
        **Defendant.**  )
_____)   **REQUEST FOR HEARING**


### DEFENDANT LEE'S EMERGENCY MOTION FOR RELEASE PENDING APPEAL PURSUANT TO FED.R.APP.PRO., LOCAL RULE 9(b) AND 18 U.S.C § 3145(c)


NOW COMES the Defendant, Sunrise Lee, and hereby moves this Honorable Court for release pending appeal in this matter, pursuant to Fed.R.App.Pro, Local Rule 9(b) and Title 18 U.S.C. §§ 3142, 3143 and 3145(c).  In support thereof, counsel states the following:

### SUMMARY OF THE ARGUMENT

On January 22, 2020, Lee was sentence by the Court to twelve months plus one day in the custody of the U.S. Bureau of Prisons.  **THIS SENTENCE WILL LIKELY BE SERVED IN ITS ENTIERTY BEFORE HER APPEAL IS HEARD.**

On January 24, 2020, the Government filed its Notice of Appeal from this Court's Order partially granting Lee's Rule 29 motion and her sentence of twelve months plus one day.  (Doc. 1178).  Pursuant to Fed.R.App.R., Local Rule 9(b) and 18 U.S.C. §§ 3142, 3143 and 3145(c) this Court may Order the release of a defendant pending appeal.

1

Following a ten-week RICO trial, a jury found that Lee and other codefendants at trial conspired to commit the predicate acts of illicit distribution in violation of the Controlled Substances Act ("CSA"), honest services mail and wire fraud ("HSF"), and ordinary mail and wire fraud.  *See* Docket No. 841 at 2.

Thereafter, this Court partially granted Lee's Rule 29 motion agreed and vacated the jury's verdict the CSA and honest services predicate objects.  *See* Mem. Op. & Order, Dkt. No. 1028 at 81-82("Overturning the verdicts on the CSA and honest services fraud predicates .  is simply a reflection of the fact that the Government did not prove the requisite intent on the part of Defendants. . .").  This is the finding that the Government has appealed.

This Court declined, however, to "disturb the remainder of the verdict, which convicted all defendants of ordinary mail and wire fraud."  *Id.* at 82.  The Court also denied defendants' joint motion seeking a new trial under Rule 33.  As a result, on January 22, 2020, Lee was sentenced to twelve month and one day.  Lee will appeal her conviction to the First Circuit, including the Court's rulings denying defendants' joint motion for a new trial under Rule 33, denying in part defendants' joint motion for an acquittal under Rule 29, and denying her motion for a new trial based on the weight of the evidence.

## ARGUMENT

Under 18 U.S.C. § 1343(b), a defendant seeking release pending appeal generally must satisfy two requirements.  First, the defendant must show by clear and convincing evidence that she is not likely to flee or pose a danger to the community.  *Id.* § 1341(b)(1).  Second, the defendant must show that her appeal is not for the purpose of delay and raises

a substantial question of law or fact likely to result in reversal or an order for a new trial. *Id.* § 1341(b)(2).

The second requirement of this test has been interpreted as consisting of two prongs. The first prong focuses on whether "the appeal raise[s] a substantial question of law or fact." *United States v. Bayko*, 774 F.2d 516, 522 (1st Cir. 1985). A "substantial question" is "a 'close' question or one that very well could be decided the other way," and determining whether a defendant's appeal presents such a question is to be done on a case-by-case basis. *Id.* at 523. If a defendant's appeal presents a substantial question, the second prong then looks at whether resolving that question in favor of the defendant is "likely to result in reversal or an order for a new trial on all counts on which imprisonment has been imposed." *Id.* at 522. This standard is to be applied "flexibly," *United States v. Colon-Munoz*, 292 F.3d 18, 20 (1st Cir. 2002), and requires only that "the claimed error not be harmless or unprejudicial." *Bayko*, 774 F.2d at 523. Importantly, neither prong is "contingent on a finding by the district court that it is likely to be reversed." *Id.* *See United States v. Schwartz*, 86 F. Supp. 3d 25, 29–30 (D. Mass. 2015) (holding that the substantial question prong "does not require a showing that the defendant would 'probably' win").

## A. LEE IS NOT A FLIGHT RISK NOR DOES SHE POSE ANY DANGER TO THE COMMUNITY.

The question of whether Lee poses a flight risk is easily resolved. Lee was released pending trial with no surety to return to her home in Grand Rapids, Michigan. She returned to Boston for every required court hearing and stayed in Boston during the lengthy trial. There is no reason for the Court to deviate from these prior rulings in assessing Lee's risk of flight under § 1343(b).

3

Lee likewise poses no risk to the safety of other persons or the community.  She has no prior criminal history and, at 39 years old, is unlikely to be a recidivist.  *United States v. Bullion*, 466 F.3d 574, 577 (7th Cir. 2006) (observing that "the tendency to commit crimes, violent and otherwise, diminishes with age."); *United States v. Hernandez*, No. 03-cr-1257, 2005 WL 1242344, at *5 (S.D.N.Y. May 24, 2005) (noting a recent trend by some courts to impose lower sentences on older defendants because they "exhibit markedly lower rates of recidivism in comparison to younger defendants").  There is also no risk that Lee will engage in conduct like that alleged in this case; she is no longer involved in the pharmaceutical industry.  Finally, as described in the numerous letters of support accompanying her sentencing memorandum, Lee's life outside of this case, far from suggesting she poses any sort of safety risk, is notable only for its consistent generosity and commitment to helping others.

## B.  LEE IS NOT CROSS-APPEALING HER CONVICTION FOR THE PURPOSE OF DELAY.

The reason Lee plans to appeal her conviction is not to delay her sentence but to avoid an unwarranted period of incarceration.  Given that the median processing time for First Circuit appeals is more than 13 months,[1] it is likely that, if the Court denies her request to stay her sentence, Lee will have served her entire sentence by the time her appeal is decided.

---

[1]  *See*  First  Circuit  2018  Annual  Report  at  18,  *available  at* https://tinyurl.com/20181stCirRpt.

4

Lee also respectfully notes that the Court labored for seven months to resolve the Rule 29 motions which was no small task given the three months of testimony and thousands of exhibits.

### C. LEE'S CROSS-APPEAL WILL PRESENT ISSUES THAT SATISFY THE SUBSTANTIAL QUESTION REQUIREMENT BECAUSE THEY VERY WELL COULD BE DECIDED IN HER FAVOR.

As the court stated in *United States v. Hicks*, 611 F. Supp 497, 499 (S.D.Fla., 1985), in the context of whether to grant release pending appeal under 18 U.S.C. '3143(b)(1):

> In deciding whether a substantial question [on appeal] exists, the court must bear in mind that it is not being asked to reverse its position on issues decided at trial, nor is it being asked to grant a new trial. It must only decide that a significant issue existed that merits appellate review and that the issue is critical enough that a contrary ruling would warrant a reversal.

As Chief Justice Reinhardt of the Ninth Circuit wrote:

> Because the Defendants raise substantial issues on appeal, there is no rational purpose to [their detention]. If Koon and Powell lose, there will be plenty of time for them to serve their sentences after we dispose of the merits of their appeal. However, if they prevail we will have subjected them to unjustified incarceration without any reason at all.

*United States v. Koon*, 6 F.3d 561, 565 (9th Cir. 1993) (Reinhardt, C.J., dissenting).  The First Circuit in *United States v. Weiner*, No. 92-1708, 1992 WL 180697 (1st Cir., 1992)(unpublished) and the Second Circuit in *United States v. DiSomma*, 951 F.2d 494 (2nd Cir., 1991), would both agree.

As described earlier, a substantial question is presented within the meaning § 3143(b)(2) when the issue at hand is "a 'close' question or one that very well could be

decided the other way." *Bayko*, 774 F.2d at 523.  Lee's appeal will raise several issues that satisfy this standard.  First, her appeal will raise a substantial question because her case presents a compelling argument for spillover prejudice from the vacated CSA and HSF verdicts.  As explained below, this is not a run-of-the-mill spillover prejudice argument from a stray count that should not have gone to the jury, but rather, a reflection of the fact that the CSA and HSF charges were the crux of the government's presentation at trial, and were the allegations that labelled Lee—at the height of the national opioid epidemic—as a white collar drug dealer who was pushing opioids on patients who did not need them.  And it featured patient testimony about Subsys addiction and abuse that this Court expressly admitted based on its relevance to the now-rejected CSA allegations.  While the Court has described the remaining allegations in the case as "a pretty garden variety insurance fraud," the case the jury decided was anything but.  (1/13/20 Hr'g Tr. 41:2–7).  A substantial question exists whether the remnant insurance fraud verdict can stand given the nature and extent of the government's presentation at trial on the now-rejected CSA and HSF allegations.

Moreover, in seeking acquittal on the ordinary mail and wire fraud predicates, Lee's appeal will raise substantial questions because reasonable minds could differ on the Court's basis for finding deceit on the mail fraud predicate and because the law is unsettled on whether the intra-corporate conspiracy doctrine bars her conviction on the wire fraud predicate.

Lee will also raise a substantial question in appealing the government's rebuttal argument, which included an inappropriate reference to firing a gun into an audience (which

the government concedes should not have been made and the objection to which was preserved by all defendants), as well as other inappropriate comments that this Court resolved by means of waiver even though Lee and other defendants objected to them orally and in writing, and sought robust curative instructions which the Court declined to give in full.  Finally, a substantial question is presented by the Court's denial of Lee's weight-of-the-evidence motion because, at the very least, it is debatable whether sufficient evidence was presented against him on the ordinary mail and wire fraud predicates.

### D. LEE'S CROSS-APPEAL WILL RAISE A SUBSTANTIAL QUESTION BECAUSE PREJUDICIAL SPILLOVER FROM EVIDENCE PRESENTED ON THE VACATED CSA AND HSF SUBSTANTIALLY IMPACTED HER CONVICTION ON THE MAIL AND WIRE FRAUD PREDICATES.

In assessing a claim of spillover prejudice, courts look to three factors to determine "whether the totality of the circumstances requires reversal of some or all of the remaining counts." *United States v. Rooney*, 37 F.3d 847, 855 (2d Cir. 1994).  First, Courts assess whether the evidence on the vacated counts (or predicates, as relevant here) was so "inflammatory," *United States v. Friedman*, 854 F.2d 535, 582 (2d Cir. 1988), that it "would have tended to incite or arouse the jury into convicting the defendant on the remaining counts," *Rooney*, 37 F.3d at 855.  Second, courts look to the inter-relatedness of the evidence of the various counts (or predicates).  A defendant's claim of spillover prejudice will succeed where "evidence is introduced on the invalidated count that would otherwise be inadmissible on the remaining counts, and this evidence is presented in such a manner that tends to indicate that the jury probably utilized this evidence in reaching a verdict on the remaining counts."  *Id.* at 856.  Third, courts will make "a general assessment of the

strength of the government's case on the remaining counts." *United States v. Wapnick*, 60 F.3d 948, 954 (2d Cir. 1995) (citing *Rooney*, 37 F.3d at 856).

Each of these factors supports a finding of spillover prejudice in this case entitling defendants to a new trial on the mail and wire fraud predicates. First, the vast majority of the evidence adduced at trial against Lee related to the now-rejected CSA and HSF allegations. That evidence included the most explosive allegations in the case: that Lee (and the other defendants) intended and agreed that Subsys should be prescribed to be people who do not need, and in medically unnecessary does. And it included explosive patient testimony about Subsys addiction and abuse that the Court admitted on the express basis that it went to the CSA allegations and medical necessity, not insurance fraud. Second, while the Court's post-trial order treats the CSA and HSF allegations as inter-related with the insurance fraud scheme, the evidence on the two issues was largely segregated at trial, with the former the subject of testimony from sales executives, representatives, and medical practitioners, and the latter the subject of testimony from witnesses who worked in the IRC and insurance company personnel. Third, the evidence presented against Lee at trial overwhelmingly related to the CSA and HSF predicate objects, and not the insurance fraud allegations.

While the Court ruled declined to vacate the insurance fraud aspects of the jury's verdict in throwing out the CSA and HSF aspects, Lee submits that the correctness of that decision presents a substantial question. This is particularly so because the Court expressed grave doubts about the CSA and HSF predicates at the *pre-charging-conference* Rule 29 argument, when Lee argued that allowing the government to "equate Defendants with

street-level drug dealers" by arguing that they "conspired to push drugs onto people who did not need them" would "poison the jury against Defendants." (Doc.# 816, p.11). Despite those doubts, the Court elected to take the Rule 29 under advisement and declined to throw out the CSA and HSF allegations before the jury began to deliberate. (4/4/19 Trial Tr. 63:2–21)(informing parties at sidebar after instructing jury on CSA and HSF predicates but before closing arguments that Court was taking defendants' Rule 29 motion under advisement). Then, after the verdict, the Court granted defendants' challenges to the CSA and HSF that were materially indistinguishable from the ones they had raised before the charge conference and deliberations. As a result, neither the Court nor Lee can say with certainty how the jury would have decided the insurance fraud case had the Court granted the Rule 29 argument when it was first presented.

The totality of the circumstances supports a finding of spillover prejudice with respect to Lee's conviction on the mail and wire fraud predicates for two reasons. The government enhanced the prejudicial impact of the evidence it introduced in support of the CSA and HSF predicates by choosing to frame in a way that would rouse the jury's passions. For example, the government fought tooth and nail to convince the Court to allow it to introduce inflammatory testimony from nine separate patients discussing how practitioners allegedly bribed by defendants got them addicted to Subsys and the devastating impact that addiction had on their lives. Thus, it came as no surprise when the government chose to start on the theme of patient harm in its closing argument by emphasizing the potency and danger of Subsys:

> 70 to 100 times more potent than morphine. 20 to 25 times more powerful than heroin. The label in this case, the label for Subsys, repeatedly warns of

the dangers of the drug, the risks associated with the drug.  It can be an incredibly powerful reliever of pain for people who suffer from drastic pain, from cancer pain.  But it can also be dangerous.

(4/4/19 Trial Tr. 65:10-11).

Nor was it surprising when the government argued later that "every single one of the patients you saw was exploited," claiming their addiction to Subsys "happened because they were used, used as a way for [defendants] to get paid."  (4/4/19 Trial Tr. 116:6–8, 117:15–17).   Against this backdrop, the government urged the jury to convict defendants for placing "[p]rofits over patients," telling them it was "greed in its darkest and most destructive form that drove these defendants to commit this crime, a greed to transfer the profound risk of fentanyl to people who did nothing more than seek medical treatment." (4/4/19 Trial Tr. 66:9).  Evidence that seeks to portray defendants as "tak[ing] advantage of people who were less able to control their own destiny," is precisely the sort of evidence courts have found sufficient to establish prejudicial spillover.  *Rooney*, 37 F.3d at 856.

In addition, both the way the government presented its case and the jury's verdict suggest that the prejudicial evidence described above influenced the jury's consideration of the mail and wire fraud predicates.   On the mail fraud predicate, the verdict itself suggests that the jury conflated the mailing of payments to practitioners (which was premised upon the same medical bribery allegations the government attempted to use as support for the CSA and HSF predicates, *see* SSI ¶¶ 31, 34) with affirmative misrepresentations to insurance companies on telephone calls (which was the basis for the wire fraud predicate, *see id.* ¶ 61).  How else can one explain the jury's decision to hold all five trial defendants accountable for the mail fraud predicate, even though jurors told the press that they failed

to find that defendant Gurry was involved with medical practitioners and the bribery-based allegations?

The Court provided three reasons for rejecting defendants' argument that their convictions on the mail and wire fraud predicates were tainted by spillover prejudice. The first was that "the patient evidence [defendants] object to would likely have been admissible against [them] even if the trial were only on the ordinary mail and wire fraud predicates because the [government] could have used the testimony to show a patient's history of cancer or lack of dysphagia." (Doc. 1028, p.38). But this fails to address the crux of defendants' argument. Defendants do not dispute that evidence concerning a patient's history of cancer or lack of dysphagia would still be admissible at a hypothetical trial limited to the mail and wire fraud predicates. That does not mean, however, that the testimony these patients provided describing how they became addicted to Subsys and treatment they received from co-conspirator practitioners would also be admissible at the hypothetical trial. (Doc.#1028, p.2, Doc.# 676)(ruling that testimony "that a patient became addicted to Subsys" and "the medical consequences of that addiction" was admissible as evidence that "prescribing was not medically necessary or was in excess of what was medically necessary"). Because it is this latter testimony that defendants contend was unduly prejudicial, the admission of such testimony at a trial limited to the mail and wire fraud predicates presents a substantial question on appeal.

Indeed, Lee notes that, when the Court initially over-ruled defendants' objection to the admission of patient testimony, it did not rely on the insurance fraud allegations. In fact, at the final pretrial conference, the Court specifically rejected the idea that patients

were being allowed to testify about becoming addicted to Subsys because that testimony was relevant to the insurance fraud allegations. (1/16/19 H'rg Tr. 48:13–49:4)("It's not just defrauding the insurance company. If the intent of the conspiracy is to overprescribe and increase prescriptions, . . . they're allowed to put that evidence on to show they succeeded in their objective, which is evidence of the fact that it was their objective."). Rather, the Court allowed the government to "present testimony concerning the medical care that patients received from co-conspirator physicians, or the medical status of patients to show that prescribing was not medically necessary or was in excess of what was medically necessary." (Doc.# 676, p.2). This rationale no longer holds, given the Court's ruling throwing out the CSA predicate objects. And an appellate court could conclude that evidence admitted on such a basis would indeed result in spillover prejudice once the allegations that supported its admission were rejected following the jury's verdict.

The Court's assertion that it provided jury instructions that adequately guarded against spillover prejudice from one predicate to another also presents a substantial question on appeal. In particular, the instructions cited by the Court as addressing spillover prejudice from one predicate to another merely described the elements of each predicate. The First Circuit could conclude that this falls short of the instructions needed to adequately to guard against the risk of spillover prejudice. *See United States v. Casas*, 425 F.3d 23, 50 (1st Cir. 2005) (finding trial court adequately guarded against spillover prejudice where it instructed the jury to "consider each charged offense, and any evidence relating to it, separately as to each defendant"); *United States v. Natanel*, 938 F.2d 308, (1st Cir. 1991) (finding that trial court "minimized any possible prejudice by repeatedly instructing the jury to treat the

12

defendants as individuals and to consider each charge separately"). The Court's instructions here did not contain such language, nor could such clarifying instructions be easily given, given that all of the alleged predicates were presented by the government as part of a single RICO conspiracy.

The Court's final reason for rejecting defendants' spillover prejudice argument was "even if the Court accepted the premise that two conspiracies were charged, evidence of bribery was directly relevant to both." (Doc.# 1028, p.38). This rationale is problematic for two reasons. First, it is at odds with the Court's observation later in same the ruling that the government "could have easily proved bribery, but it elected not to charge bribes or kickbacks and now must live with that decision." *Id.* at 82. The government is not made to "live with [its] decision" when the Court allows the jury to consider evidence of bribery as proof of an entirely separate scheme involving insurance fraud. Another problem with this rationale is not all of the evidence supporting defendants' argument can be described as "evidence of bribery." In fact, the evidence that best supports defendants' argument is the patient testimony described earlier, which the Court determined was admissible as proof that "prescribing was not medically necessary," not as evidence of bribery. (Doc No. 676).

### E. LEE'S APPEAL WILL RAISE A SUBSTANTIAL QUESTION BECAUSE THE MAIL FRAUD PREDICATE IS NOT SUPPORTED BY SUFFICIENT PROOF THAT MAILINGS WERE USED TO FACILITATE THE INSURANCE FRAUD SCHEME.

Lee's Rule 29 motion argued for acquittal on the mail fraud predicate on the basis that the government failed to prove that the IRC deceived insurance companies about either Insys's financial relationships with certain practitioners or the medical necessity of the prescriptions it submitted for reimbursement. The Court rejected defendants' argument

13

based on two principal rationales.  First, the Court held that, contrary to defendants'
argument, the mail fraud predicate only required that the mailed bribes to prescribers have
"some tendency to facilitate execution of the fraud," which was satisfied by the
government's proof that the mailings "incentiviz[ed] prescriptions from high-volume
prescribers."  Mem. Op. & Order, Dkt. No. 1028 at 29.  Second, the Court concluded that
defendants' argument fails because the government "did not need to prove that the
prescriptions for which the IRC sought reimbursement were in fact medically illegitimate."
*Id.* at 30.  Both rationales present a substantial question on appeal.

On the first rationale, Lee maintains that the mail fraud predicate was not satisfied
simply because the mailed bribes "incentiviz[ed] prescriptions from high-volume
prescribers."  *Id.* at 29.  The jury's verdict appears to be inconsistent with the Court's
rationale, since the jury found the mail fraud predicate met even as to defendant Gurry,
whom the jury did not implicate in the CSA and HSF predicate objects, and for whom there
was an utter lack of evidence at trial of any involvement in the medical bribery scheme.
Simply put, if the medical bribery allegations were the lynchpin for the mailing element of
the mail fraud predicate, then the jury would have acquitted Mr. Gurry of those allegations
as it did with respect to the CSA and HSF allegations.  The fact that it did not strongly
suggests that the jury improperly equated the ordinary mail fraud allegations with the
ordinary wire fraud allegations.

The Court's second rationale misconstrues defendants' argument on deceit in their
reply brief.  Defendants were not, as the Court suggests, arguing that the alleged deception
had to involve a medically illegitimate prescription to satisfy the mail fraud predicate.

14

Rather, those arguments were part of a more basic point made in defendants' post-trial briefing: that the mail fraud predicate required proof of deception.  The government claimed heading into trial that the deception element would be satisfied by proof that the IRC made affirmative misrepresentations to insurers concerning Insys's financial relationship.  The government backed off this theory, however, in its opposition to defendants' post-trial motion, choosing instead to argue in the alternative that it satisfied the deception element by showing insurers would not authorize reimbursement for medically unnecessary prescriptions.  (Doc.# 936, pp. 23–24).  In doing so, it was the government that decided to tie the deception element to the issue medical necessity and the arguments in defendants' reply brief were simply responding to this new theory.

Perhaps the government could have satisfied the mail fraud predicate based on a theory that had nothing to do with medical necessity.  But that is not the theory that it has chosen here.  And because no affirmative misrepresentations have been identified that support the theory the government did choose—either by the government or the Court—a substantial question exists about whether the deception element was proven at trial on the mail fraud predicate.  For these reasons, Lee's appeal seeking an acquittal on this basis will raise a substantial question under § 3143(b)(2).

**F.  LEE'S CROSS-APPEAL WILL RAISE A SUBSTANTIAL QUESTION BECAUSE THE LAW IS UNSETTLED ON WHETHER THE INTERAGENCY CONSPIRACY DOCTRINE BARS HER CONVICTION ON THE WIRE FRAUD PREDICATE.**

Lee's Rule 29 motion sought acquittal on the wire fraud predicate because it was premised on an alleged conspiracy involving only Insys personnel and therefore was barred by the intracorporate conspiracy doctrine.  *See Ziglar v. Abassi*, 137 S. Ct. 1843, 1867

(2017) (holding that under the intracorporate conspiracy doctrine "an agreement between or among agents of the same legal entity, when the agents act in their official, is not an unlawful conspiracy").  Although acknowledging that there is a "recognized circuit split" on the issue of whether the intracorporate conspiracy doctrine applies to RICO conspiracies, the Court rejected defendants' argument after finding that the First Circuit was "unlikely to apply the doctrine to criminal RICO conspiracy cases."  (Doc.# 1028, pp. 26, 28).

Because the First Circuit has "yet to definitively extol on the applicability of the doctrine in the RICO context," however, the Court's ruling cannot be characterized as anything more than a prediction about what the First Circuit *might* do if confronted with this issue.  *Id.* at 26–27.  That the Court's only support for this predication consists of a single First Circuit case, *United States v. Peters*, 732 F.2d 1004, that didn't even involve the RICO conspiracy statute at issue here only underscores that the result it reached was far from inevitable.  *See id.* at 28 (acknowledging that *Peters* involved criminal conspiracies "prosecuted under 18 U.S.C. § 371," and not the RICO conspiracy statute, 18 U.S.C. § 1962(d)).  Add in the fact that at least two circuits have applied the intracorporate conspiracy doctrine in cases that did involve RICO claims, *see Fogie v. THORN Americas, Inc.*, 190 F.3d 889, 898–99 (8th Cir. 1999); *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 544 (4th Cir. 1997), this argument also satisfies the standard for a substantial question because it could "very well could be decided the other way."  *Bayko*, 774 F.2d at 522.

### G. LEE'S CROSS-APPEAL WILL RAISE A SUBSTANTIAL QUESTION BECAUSE OF THE GOVERNMENT'S IMPROPER REBUTTAL.

In their joint Rule 33 motion, defendants argued they were prejudiced by several improper remarks the government made during its rebuttal argument and were therefore

entitled to a new trial.  Principal among the challenged remarks was an attempt by the government to analogize Insys's use of speaker programs to market Subsys to shooting a loaded gun into a crowd of people. (4/5/19 Trial Tr. 169:23–170:4).  In its post-trial ruling, the Court did not dispute that the remark was improper nor did it conclude—as it did for the other challenged remarks—that defendants waived any objection to the curative instructions given by the Court in response.  (Doc.# 1028, p.43,n.93,4)5.  But the Court rejected defendants' argument that the prejudice that resulted necessitated a new trial, dismissing the remark as an "isolated incident" and finding that any resulting prejudice was adequately addressed by the Court's curative instructions.  Both rationales present a substantial question on appeal.

Also, the Court's curative instructions present a substantial question because they only address one aspect of the prejudice that resulted from the remark.  In its ruling, the Court points to the fact that its instructions sufficiently addressed any confusion the remarks caused on the standard for specific intent for the CSA and HSF predicates.  (Doc.# 1028, p. 46).  For one thing, that issue is now moot given that the same ruling overturned defendants' convictions on those two predicates.  More importantly, those instructions did nothing to address what the Court acknowledged was another part of defendants' challenge to the remark: that it "employed unfairly prejudicial imagery."  *Id.* at 44.  The Court could have addressed this by—as defendants proposed—instructing the jury that the government's remark was inappropriate and should be regarded; because it failed to do so, a substantial question exists about whether the government's use of the loaded gun metaphor entitles defendants to a new trial.

In addition, Lee submits that the Court's holding that she waived other objections to the government's rebuttal argument presents a substantial question on appeal. Defendants plainly objected to those other aspects, both during and after the rebuttal, both orally and in writing.   It is true that defendants, through counsel, proposed curative instructions.   But the Court failed to incorporate the most critical aspect of the "robust corrective instructions" requested by defendants: an admonishment that the government's rebuttal arguments were inappropriate and should be disregarded.   (Doc.# 819, pp.13–14)(requesting multiple instructions that stated "[t]he government should have never made this argument to you, and you must disregard it in your deliberations").   As defendants stressed in requesting the instructions, it was imperative that the Court not let jury begin deliberations "as if the government's rebuttal argument was a normal or permissible event." *Id.* at 12; *see, e.g., Berger v. United States*, 295 U.S. 78, 85 (1935) (holding that trial court's use of "mild judicial action" in response to prosecutor's misconduct made it "impossible to say that the evil influence upon the jury of these acts of misconduct was removed").

The Court's waiver analysis hinges on defendant's failure to respond when, after reading its curative instructions to the jury, the Court asked, "Sidebar or no?"  (Doc. 1028, p. 41).   In the Court's view, once the curative instructions were read to the jury, "the subject matter of the improper rebuttal and the Court's attempt to remedy it was unmistakably on the table, and Defendants' silence can be interpreted as approval of the Court's instruction." *Id.* (internal quotation marks and brackets omitted).   But the Court had already settled on the content of the instructions it read beforehand, which included striking the language admonishing the government for its improper rebuttal.   (4/8/19, 9:13–21, 12:25–

13:4)(responding to the government's objection to "any phrasing that indicates that the purpose of the instruction is in response to [its] rebuttal" by saying, "That's all out.  I took that all out.").  Although defendants could have restated their position yet again, requiring them to do so under threat of waiver prioritizes form over substance.  The fact remains that the Court declined to include defendants' requested language in the instructions, not because it was unaware that defendants wanted, but because the Court disagreed with defendants on whether that language was necessary.  The Court's ruling on waiver thus presents a substantial issue on appeal as to how many steps defendants need to take, beyond filing a misconduct motion against the government, to preserve their objections to a rebuttal closing argument.

### H.  LEE'S CROSS-APPEAL WILL RAISE A SUBSTANTIAL QUESTION BECAUSE THE EVIDENCE AGAINST HIM ON THE ORDINARY MAIL AND WIRE PREDICATES WAS VERY THIN.

The Court denied Lee's motion for a new trial based on the weight of the evidence after finding that the she worked with Liz Guererri on the pilot IRC program in 2012, helped hire Courtney Nagy and "supervising" ABMs and sales representatives handling Awerbuch and Madison's claims who were dealing with the IRC and insurance companies.  (Doc. #1028, pp. 58-61).  This conduct which on its face is inherently LEGAL, fails to include any specific allegations of criminal conduct on the part of Lee.  Indeed, Lee could have participated in all of the above conduct without knowing that there were any other individuals who were committing crimes.

Notably missing from the Court's findings is any reference to any fact, testimony or document in which Lee herself committed a crime or aided and abetted in the commission

of a crime.  In effect, the Court concluded that because Lee engaged in these activities she must be guilty without any evidence that she did anything illegal.  This is pure guilt by association and mere presence.  At worst the Court construed Lee's conduct to constitute "willful blindness" which was not a theory advanced by the Government.

In addition, the Court incorrectly concluded that Lee did not raise severance as a "trial management" function.  (Doc. #1028, p. 61, fn 99).  This is not accurate.  Lee specifically raised the Court's trial management discretion in her Motion for Relief from Prejudicial Joinder.  (Doc. #588, pp. 1-6).

Given that Lee's conviction now rests entirely on the a small amount of evidence connecting her to the alleged insurance fraud scheme, the question of whether she is entitled to a new trial based on the weight of evidence raises a substantial question under § 3143(b)(2).

## CONCLUSION

WHEREFORE, this Honorable Court is respectfully urged to release Lee on bail pending appeal.

## REQUEST FOR HEARING

Lee respectfully requests a hearing on the instant motion either before the trial

judge or the Magistrate Judge who initially released her pending trial.

Respectfully submitted,

_____
Peter Charles Horstmann, Esq.
BBO #556377
450 Lexington Street, Suite 450
Newton, Massachusetts 02466
(617) 723-1980

Attorney for Defendant Sunrise Lee

## CERTIFICATE OF SERVICE

I, Peter Charles Horstmann, Esquire herby certify that a copy of the instant motion was filed through the ECF system and served upon all counsel of record including the United States through its representatives AUSAs Nathaniel Yeager, Fred Wyshak and David Lazarus, 1 Courthouse Way, Boston, MA 02110 on February 7, 2020.

Peter Charles Horstmann, Esq.